## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>ZOHAR III, CORP., *et al.*,[1]<br><br>*Debtors.* | Chapter 11<br>Bankruptcy Case No. 18-10512 (KBO)<br>(Jointly Administered) |
| PATRIARCH PARTNERS<br>MANAGEMENT GROUP, LLC,<br><br>*Appellant*,<br><br>v.<br><br>ZOHAR III, CORP., *et al.*,<br><br>*Appellees.* | Civil Action No. 20-cv-1419 (MN) |

### OPENING BRIEF OF APPELLANT

Dated:  December 18, 2020

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
ddean@coleschotz.com
preilley@coleschotz.com

**GIBSON, DUNN & CRUTCHER LLP**
Monica K. Loseman (admitted *Pro Hac Vice*)
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

(Additional counsel on following page)

---

[1] The Debtor-Appellees, and, where applicable, the last four digits of their taxpayer identification number, are as follows:  Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar I," and together with Zohar II and Zohar III, the "Zohar Funds").  The Debtor-Appellees' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

Randy M. Mastro (admitted *Pro Hac Vice*)
Akiva Shapiro (admitted *Pro Hac Vice*)
Michael L. Nadler (admitted *Pro Hac Vice)*
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
rmastro@gibsondunn.com
ashapiro@gibsondunn.com
mnadler@gibsondunn.com

Michael G. Farag (admitted *Pro Hac Vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7559
Facsimile: (213) 229-6559
mfarag@gibsondunn.com

*Counsel to Appellant Patriarch Partners
Management Group, LLC*

## TABLE OF CONTENTS

Page

SUMMARY OF ARGUMENT ........................................................................... 1

BASIS OF APPELLATE JURISDICTION.......................................................... 2

ISSUES PRESENTED........................................................................................ 3

STANDARD OF APPELLATE REVIEW ........................................................... 4

STATEMENT OF THE CASE............................................................................. 5

    I.     The Chapter 11 Cases and the Monetization Process ............................ 5

    II.    The Credit Agreement and the Restructured Accrued Interest ............................ 6

    III.   The Oasis Management Services Agreement ...................................... 8

    IV.   The Proceedings Below ...................................................... 10

ARGUMENT ..................................................................................... 13

    I.     The Bankruptcy Court Erred in Failing to Give Full Meaning and Effect to the Plain Terms of the Entire Management Services Agreement. ............................ 13

          1.     PPMG Is Owed a Transaction Fee Because the Oasis Transaction Was a Liquidity Event Under the Management Services Agreement. ............... 13

          2.     The Bankruptcy Court's Interpretation of the Management Services Agreement Was Erroneous As a Matter of Law and Should Be Reversed. ................................................................................... 19

    II.    The Bankruptcy Court Erred in Finding that the Eighth Amendment Created Debt Rather Than Equity. ......................................................................... 22

CONCLUSION......................................................................................... 30

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Austin Vill., Inc. v. United States*,
432 F.2d 741 (6th Cir. 1970) ...................................................................4, 24, 28

*Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*,
520 B.R. 15 (Bankr. S.D.N.Y. 2014).................................................................20

*Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*,
269 F.3d 726 (6th Cir. 2001) .........................................................................23, 27

*In re Catholic Diocese of Wilmington, Inc.*,
484 B.R. 629 (D. Del. 2012)..................................................................................4

*Century Glove, Inc. v. First Am. Bank*,
860 F.2d 94 (3d Cir. 1988)....................................................................................3

*City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*,
429 U.S. 167 (1976)..............................................................................................25

*Cohen v. Formula Plus, Inc.*,
750 F. Supp. 2d 495 (D. Del. 2010)....................................................................18

*Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*,
432 F.3d 448 (3d Cir. 2006)...............................................23, 24, 25, 26, 28, 30

*In re Cold Harbor Assocs., L.P.*,
204 B.R. 904 (Bankr. E.D. Va. 1997).................................................................23

*In re Cont'l Airlines*,
203 F.3d 203 (3d Cir. 2000)..................................................................................4

*Dicola v. Am. Steamship Owners Mut. Prot. & Indem. Ass'n (In re Prudential
Lines, Inc.)*,
209 B.R. 621 (S.D.N.Y. 1997).............................................................................16

*Economy Premier Assurance Co. v. W. Nat'l Mut. Ins. Co.*,
839 N.W.2d 749 (Minn. 2013).............................................................................16

*Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*,
93 F.3d 1572 (Fed. Cir. 1996).......................................................................15, 16

*Fidelity Bond & Mortg. Co. v. Brand (In re Fidelity Bond & Mortg. Co.)*,
340 B.R. 266 (Bankr. E.D. Pa. 2006) .................................................................28

*Fin Hay Realty Co. v. United States*,
    398 F.2d 694 (3d Cir. 1968)..................................................................................24, 25, 26

*Friedman's Liquidating Tr. v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*,
    452 B.R. 512 (Bankr. D. Del. 2011) ......................................................................26, 27, 28

*Garza v. Marine Transp. Lines, Inc.*,
    861 F.2d 23 (2d Cir. 1988).................................................................................................20

*Geftman v. Comm'r*,
    154 F.3d 61 (3d Cir. 1998)................................................................23, 24, 25, 26, 28

*Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*,
    547 U.S. 651 (2006).............................................................................................................2

*Hudson-Port Ewen Assocs. v. Kuo*,
    78 N.Y.2d 944 (1991) .......................................................................................................18

*Isr. Disc. Bank Ltd. v. Gottesman (In re Ore Cargo, Inc.)*,
    544 F.2d 80 (2d Cir. 1976).................................................................................................15

*Italian Designer Import Outlet, Inc. v. N.Y. Cent. Mut. Fire Ins. Co.*,
    891 N.Y.S.2d 260 (Sup. Ct. 2009) ....................................................................................17

*Jamuna Fashion Wears Ltd. v. Micom Trading Corp.*,
    No. 09 Civ. 5339, 2012 WL 13140780 (S.D.N.Y. Dec. 28, 2012)....................................18

*Joseph Lupowitz Sons, Inc. v. Comm'r*,
    497 F.2d 862 (3d Cir. 1974).................................................................................................4

*In re Klaas*,
    858 F.3d 820 (3d Cir. 2017).................................................................................................3

*Koch Asphalt Co. v. Farmers Ins. Grp.*,
    867 F.2d 1164 (8th Cir. 1989) ...........................................................................................16

*Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings, Inc.)*,
    No. 13-12098, 2017 WL 1508606 (Bankr. D. Del. Apr. 27, 2017)....................................27

*Loblaw, Inc. v. Emps.' Liab. Assurance Corp.*,
    446 N.Y.S.2d 743 (App. Div. 1981) ..................................................................................16

*Lorsch v. Goldin Assocs., L.L.C. (In re Worldwide Direct, Inc.)*,
    No. 99-108, 2010 WL 3435380 (Bankr. D. Del. Aug. 27, 2010) .......................................18

*Machne Menachem, Inc. v. Spritzer*,
    456 F. App'x 163 (3d Cir. 2012) ..........................................................24

*Maynard v. City of San Jose*,
    37 F.3d 1396 (9th Cir. 1994) ..............................................................4

*Metz v. Poughkeepsie Sav. Bank, FSB (In re Metz)*,
    231 B.R. 474 (E.D.N.Y. 1999) ..........................................................13

*Minnesota Lawyers Mutual Insurance Co. v. Ahrens*,
    432 F. App'x 143 (3d Cir. 2011) ...................................................24, 28

*Muzak Corp. v. Hotel Taft Corp.*,
    1 N.Y.2d 42 (1956) ...................................................................20, 21

*In re Owens Corning*,
    419 F.3d 195 (3d Cir. 2005)..............................................................3

*Pepper v. Litton*,
    308 U.S. 295 (1939)........................................................................23

*Perella Weinberg Partners LLC v. Kramer*,
    58 N.Y.S.3d 384 (App. Div. 2017) .....................................................16

*Quadrant Structured Prods. Co. v. Vertin*,
    23 N.Y.3d 549 (2014) ....................................................................14

*Quintel Commc'ns, Inc. v. Fed. Transtel, Inc.*,
    142 F. Supp. 2d 476 (S.D.N.Y. 2001)................................................15

*Schering Corp. v. Home Ins. Co.*,
    712 F.2d 4 (2d Cir. 1983)................................................................16

*Scriptomatic, Inc. v. United States*,
    555 F.2d 364 (3d Cir. 1977)............................................................25

*Sensenig v. Commissioner of Internal Revenue*,
    720 F. App'x 139 (3d Cir. 2018) ......................................................25

*Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*,
    No. 15 Civ. 3538, 2019 WL 3858620 (S.D.N.Y. Aug. 16, 2019) ...........15

*State v. Home Indem. Co.*,
    486 N.E.2d 827 (N.Y. 1985)...........................................................16

*Sunbury Textile Mills, Inc. v. Comm'r*,
    585 F.2d 1190 (3d Cir. 1978)..........................................................17

*Trans-Atl. Co. v. Comm'r*,
 469 F.2d 1189 (3d Cir. 1972).................................................................27, 28

*Tyler v. Tomlinson*,
 414 F.2d 844 (5th Cir. 1969) ...............................................................24

*U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*,
 949 F.2d 569 (2d Cir. 1991)..................................................................16

*Walk-In Med. Ctrs., Inc. v. Breuer Cap. Corp.*,
 818 F.2d 260 (2d Cir. 1987)..................................................................17

*Wayne Land & Min. Grp. LLC v. Del. River Basin Comm'n*,
 894 F.3d 509 (3d Cir. 2018)....................................................................4

*Whitacre Constr. Specialties, Inc. v. Aetna Cas. & Sur. Co.*,
 448 N.Y.S.2d 287 (App. Div. 1982) ....................................................17

*In re White Beauty View, Inc.*,
 841 F.2d 524 (3d Cir. 1988)....................................................................3

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019)....................................................22

Matthew Nozemack, Note, *Making Sense Out of Bankruptcy Courts'*
 *Recharacterization of Claims*, 56 Wash & Lee L. Rev. 689 (1999)......................23

William G. Rothschild, *Mezzanine Loans: The Lesser of Two Evils?*, 31 No. 5
 Prac. Real Estate Law. 55 (2015)..........................................................27

## SUMMARY OF ARGUMENT

Patriarch Partners Management Group, LLC ("PPMG") appeals from the *Order Determining Dispute Between the Debtors and Patriarch Partners Management Services, LLC Related to Pending Oasis Transaction*, A-1 (the "Order"), A-1–2,[2] entered on October 15, 2020 by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), which is premised on fundamental misinterpretations of two separate contracts.  Though the Bankruptcy Court erred in interpreting both agreements in favor of the Debtors, neither document is ambiguous and both should be construed in PPMG's favor as a matter of law.  To the extent either is ambiguous, moreover, the Bankruptcy Court failed to take into account the uncontroverted evidence supporting PPMG's reading of both contracts.

*First*, a Management Services Agreement (or "MSA") between PPMG and non-party LVD Acquisition, LLC ("Oasis") makes clear that PPMG was entitled to a Transaction Fee upon the occurrence of a Liquidity Event, as those terms are defined in the Management Services Agreement.  The sale of Oasis was just such a Liquidity Event.  In ruling that Oasis's sale did not trigger a Transaction Fee, the Bankruptcy Court misinterpreted the governing contract by reading its use of two distinct terms—"Change of Control" and "Liquidity Event"—as synonymous.  That result stands in stark contrast to ordinary rules of contract interpretation and New York law, which governs this aspect of the parties' dispute.

All parties agree that the Management Services Agreement's use of an undefined phrase, "Change of Control," is a scrivener's error.  Indeed, no party has argued that the relevant section of the Management Services Agreement was properly drafted.  Accordingly, the question presented is whether the scrivener's error was (i) a two-letter typo in which the word "in" was

---

[2] Citations to the form "A-__" are to the Appendix filed herewith.

replaced with the word "of," such that the relevant provision of the Management Services Agreement should have referred to a "Change *in* Control," a term defined and used elsewhere in that same document; or, alternatively, (ii) replacing the defined term "Liquidity Event" with the entirely distinct  and undefined phrase "Change of Control," resulting in the use of two dissimilar phrases to refer to the same thing in the very same paragraph.  The Bankruptcy Court erred in rejecting the former interpretation in favor of the latter.

*Second*, even if the Bankruptcy Court correctly interpreted the Management Services Agreement (which it did not), that contract would still entitle PPMG to a Transaction Fee so long as the sale of Oasis permitted Oasis "to pay all of its . . . outstanding debt."  MSA § 3(c)(ii)(D).  Whether the sale allowed such payment depends, in turn, on whether $20 million in accrued interest that was restructured via an amendment to Oasis's credit agreement is properly characterized as debt or as equity.  Because that interest was restructured into an equity investment, Oasis owed approximately $60 million at the time of its sale, which was less than its sale price.  Accordingly, its sale permitted Oasis to repay its outstanding debt, thus requiring payment of a Transaction Fee to PPMG even under the Bankruptcy Court's erroneous interpretation of the Management Services Agreement.

For these reasons, and as set forth in more detail below, this Court should reverse the Bankruptcy Court's Order.

## BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction to hear appeals from all "final judgments, orders, and decrees" of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a)(1).  "Congress has long provided that orders in bankruptcy cases may be immediately appealable if they finally dispose of discrete disputes within the larger case."  *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651,

657 n.3 (2006) (quotation marks, emphasis and citation omitted).  The Third Circuit "take[s] a pragmatic approach" to finality in the bankruptcy context by "examin[ing] the practical effect of the court's ruling."  *In re Klaas*, 858 F.3d 820, 826 (3d Cir. 2017).  Bankruptcy orders concerning "issues central to the progress of the bankruptcy petition," and issues "likely to affect the distribution of the debtor's assets, or the relationship among the creditors," are routinely treated as final.  *In re Owens Corning*, 419 F.3d 195, 203 (3d Cir. 2005) (quoting *Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 98 (3d Cir. 1988)).  The purpose of this relaxed standard is to avoid "wast[ing] time and resources" by "delay[ing] resolution of discrete claims."  *Id.* (quoting *In re White Beauty View, Inc.*, 841 F.2d 524, 526 (3d Cir. 1988)).  Here, the Bankruptcy Court's Order decided a discrete legal dispute as to PPMG's entitlement to a Transaction Fee in connection with a specific transaction that has already taken place and it governs disposition of the estate's assets and relationships among the creditors and debtors.  It is thus final, giving this Court jurisdiction over the instant appeal.

## ISSUES PRESENTED

1.      Did the Bankruptcy Court err in interpreting the term "Change of Control" in the Management Services Agreement to be synonymous with "Liquidity Event," even though the latter is a separate defined term used in the same paragraph?

2.      Did the Bankruptcy Court err when it held that restructured accrued interest was debt rather than equity without weighing the restructured accrued interest's characteristics and substance, including, among other things, that it had a 0% interest rate, was not defined as a loan under the applicable credit agreement, was treated for tax purposes as "an equity contribution," and was not characterized as debt on the Debtors' reports?

## <u>STANDARD OF APPELLATE REVIEW</u>

This Court "review[s] the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercises of discretion for abuse thereof." *In re Cont'l Airlines*, 203 F.3d 203, 208 (3d Cir. 2000) (citation omitted); *see also In re Catholic Diocese of Wilmington, Inc.*, 484 B.R. 629, 631 (D. Del. 2012) ("In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions."). Here, the Order relates to (1) a legal determination as to the meaning of the Management Services Agreement based on the Bankruptcy Court's "review of the MSA" and its conclusions "from the four corners of" that contract, A-861:2–7; and (2) a legal determination "based on the unambiguous language of Amendment Number Eight" to Oasis's Credit Agreement, A-863:25–A-864:3. Accordingly, this matter presents purely issues of "contract construction . . . reviewed *de novo*." *Wayne Land & Min. Grp. LLC v. Del. River Basin Comm'n*, 894 F.3d 509, 528 (3d Cir. 2018). Moreover, although there was limited live testimony before the Bankruptcy Court at a hearing on September 14, 2020, it played no role in the Bankruptcy Court's decision. As the court below "did not make factual findings," this Court may "independently review the record" in evaluating the Bankruptcy Court's conclusions of law. *Maynard v. City of San Jose*, 37 F.3d 1396, 1406 (9th Cir. 1994); *see also*, *e.g.*, *Joseph Lupowitz Sons, Inc. v. Comm'r*, 497 F.2d 862, 865 (3d Cir. 1974) (the "ultimate finding of fact that the monies transferred . . . were loans . . . represents an inference drawn from the basic facts . . . reviewable as an issue of law [that] is not subject to the clearly erroneous rule"); *cf. Austin Vill., Inc. v. United States*, 432 F.2d 741, 744 (6th Cir. 1970) (suggesting, without deciding, that "the process of ascertaining facts should not be confused with the process of attaching a legal characterization and consequences to historical events found to have occurred. The determination

whether advances by the shareholders represent debt or equity involves the latter process, and, as such, the determination produces a conclusion of law.").

## STATEMENT OF THE CASE

### I.     The Chapter 11 Cases and the Monetization Process

Lynn Tilton created and founded the Zohar Funds, which were innovative distressed debt collateralized loan obligations.  A-5.  The Zohar Funds raised capital by issuing notes to noteholders who were, in exchange, entitled to interest payments over time, plus return of their principal at the maturity date.  A-5–6.  From the Zohar Funds' inception to present, Ms. Tilton has remained their sole owner, through entities she owns (directly or ultimately).  A-5.  The Zohar Funds' assets are primarily loans to companies that were in various stages of distress at the time the loans were initially made (the "Portfolio Companies").  A-6.  These loans were originated principally to undervalued, iconic American brands in need of capital and sound management strategy in order to rescue the businesses and restore value, creating and preserving jobs in America.  *Id.*

On March 11, 2018, in her capacity as sole director of each of the Zohar Funds, Ms. Tilton initiated the Debtors' voluntary Chapter 11 bankruptcy proceedings (the "Chapter 11 Cases").  *See* A-8.  Prior to the filing of the Chapter 11 Cases, the Debtors and various stakeholders were mired in protracted litigation across a variety of courts and jurisdictions that raised myriad complex legal issues.  The litigation cast a cloud of uncertainty over the Portfolio Companies, rendering them unable to obtain critical financing and stalling negotiations with potential buyers and lenders.  A-7–8.  As a result, the Debtors were unable to realize the value of their assets: loans to, and equity upside interests in, the Portfolio Companies.  *Id.*  Ms. Tilton, in her role as each Debtor's sole director, thus elected to file the Chapter 11 Cases in order to lift the intractable cloud of value-destroying litigation that had engulfed the Debtors and the Portfolio Companies.  A-8.

Immediately upon commencement of the Chapter 11 Cases, a series of motions were filed seeking to dismiss the Chapter 11 Cases and otherwise impose various stakeholders' wills on the proceedings. *See* A-50–51. The parties agreed to mediate, *see* A-51–52, the ultimate result of which was an ongoing process to monetize the Debtors' assets under the Bankruptcy Court's supervision, *see* A-84–85, A-107–121. As part of that process, the Debtors must (i) provide notice of certain Portfolio Company transactions to the Bankruptcy Court and other stakeholders in the Chapter 11 Cases, and (ii) obtain authorization from the Bankruptcy Court to complete such transaction on behalf of the Debtors' estates.

## II.     The Credit Agreement and the Restructured Accrued Interest

On or about June 1, 2009, Oasis—a Portfolio Company that provided water and various water-related products such as coolers and humidifiers, A-756:24–757:5—entered into a credit agreement with the Debtors (the "Credit Agreement"). A-663–747; A-770:22–771:3. The Credit Agreement governed certain "Loans," which accrued interest at a rate of LIBOR plus an "Applicable Margin." Credit Agreement § 2.8(a). Loans are a defined term within the Credit Agreement, referring specifically to "the Revolving Credit Loans and the Term Loans." *Id.* at 13. In turn, "Revolving Credit Loan" refers to "a Loan made by a Revolving Lender to any Borrower pursuant to" the Credit Agreement's revolving credit loan provisions, *id.* at 17, while "Term Loans" refer only to "the Term A Loans and the Term B Loans" made pursuant to other provisions of the Credit Agreement, *id.* at 20.

Oasis and the Debtors entered into Amendment No. 8 to the Credit Agreement (the "Eighth Amendment") in November 2015. A-315–322; A-773:1–9. The Eighth Amendment restructured approximately $20 million of Oasis's unpaid accrued interest and commitment fees into a new facility, which is a form of equity known as an equity kicker under the Debtors' indentures. *See* Eighth Amendment at 1; A-772:13–25; A-773:13–20; A-324–325. All available evidence

6

supports that these equity kickers are, as their name suggests, equity, rather than debt.  For example, the Eighth Amendment restructured the unpaid accrued interest into "Tranches TLD, TLE, and TLF," but it did not amend the Credit Agreement's definitions to indicate that these equity kicker tranches were to be included as "Loans" or "Term Loans" under the Credit Agreement.  *See* Eighth Amendment § 1.  In other words, the unpaid accrued interest was not restructured into "Loans" as that term is defined in the Credit Agreement (meaning Revolving Loans, Term A Loans, and Term B Loans), *see* Credit Agreement at 13, 17, 20, and thus Tranches TLD, TLE and TLF did not accrue interest at a rate of LIBOR plus an Applicable Margin, *see id.* § 2.8(a); *see also* A-773:13–774:12 (Ms. Tilton: "it wasn't a loan under the [Credit A]greement" and "it had no interest rate. . . . [I]t isn't a term loan under the definition of the term loan in the credit agreement").

Similarly, Schedule A to the Eighth Amendment provides that Tranches TLD, TLE and TLF have an "Applicable Margin" of "0%," as a result of which they did not accrue any interest whatsoever, and their "Interest Payment Date" was listed as "N/A," meaning "not applicable" in light of the fact that no interest accrued.  A-322; A-773:17–775:3; A-355:20–357:6; A-324–325.  For that very reason, the Debtors never attempted to collect interest from Oasis for these Tranches, nor could they.  *See* A-778:10–13.  The Eighth Amendment also provided that Tranches TLD, TLE and TLF have a Maturity Date of April 15, 2019 and a 7th "Prepayment Preference," Eighth Amendment Sched. A, placing them "last in line" for payment behind Oasis's debt, A-775:13–19.  These restructured tranches were treated as an equity contribution for tax purposes, A-778:14–21; A-359:15–18, and they were not characterized as debt on the Debtors' trustee reports, even though characterizing them as debt would have had various collateral consequences benefitting Ms. Tilton in her capacity as the Debtors' collateral manager.  A-770:25–771:3; A-773:7–9; A-775:23–

7

776:25.  Likewise, invoices submitted to Oasis by Patriarch Partners Agency Services, an affiliate of PPMG, reflect the unpaid accrued interest as being owed by Oasis prior to execution of the Eighth Amendment to the Credit Agreement while reflecting neither debt nor interest being owed by Oasis subsequent to that restructuring.  A-777:4–778:6; A-748; A-749.  In sum, all available evidence supports that, prior to the instant dispute, Tranches TLD, TLE and TLF were treated as equity rather than debt.

### III.        The Oasis Management Services Agreement

Oasis and PPMG entered into a Management Services Agreement on or about September 30, 2010.  A-298–313 § 1; A-758:3–9.  Although the Debtors are now litigating its interpretation, they are not a party to the Management Services Agreement, nor did they participate in its negotiation.    A-758:16–18.    Oasis  had  the  ability  to  negotiate  the  Management  Services Agreement's terms or to decline entering into the Management Services Agreement entirely.  A-759:9–25.  Pursuant to its voluntary agreement, Oasis received substantial, valuable services from PPMG "of a type customarily provided by sponsors of private equity firms . . . to companies in which they have a substantial investment," which included, without limitation:

> (a) general executive, professional, and management consulting
> services  (including  legal,  tax  and  accounting  services  . . . );
> (b) identification, support, negotiation and analysis of acquisitions
> and dispositions; (c) support, negotiation and analysis of financing
> alternatives . . . ; (d) finance functions . . . ; (e) marketing functions
> . . . ; and (f) human resource functions.

MSA § 1; *see also* A-756:4–18; A-760:1–761:18; A-350:4–353:9; A-354:3–12; A-370:2–11.

In exchange for its extensive work on behalf of Oasis, PPMG was entitled to compensation comprised chiefly of a small monthly fee and a larger fee that would be triggered upon the occurrence of certain enumerated transactions (the "Transaction Fee").  *See* MSA §§ 3(a), 3(c), 3(f); A-761:3–762:1; A-369:1–22; A-370:13–18.  Notably, PPMG's fee structure was below what

the private equity market typically provided for in similar scenarios and functioned to align the interests of PPMG and Oasis.  A-762:2–23.

In pertinent part, the Management Services Agreement provides that "PPMG will be entitled to receive a cash fee (the "Transaction Fee") equal to 5% of the Eligible Equity Value" upon consummation of a "Liquidity Event," MSA § 3(c)(i), wherein the Eligible Equity Value is roughly equivalent to "the total amount of cash paid, in connection with a Liquidity Event," MSA § 3(c)(ii)(A)-(B).  The Transaction Fee is not predicated on an increase in Oasis's equity value between the execution of the Management Services Agreement and the occurrence of a Liquidity Event triggering payment of such a fee.  Tying the amount of the Transaction Fee to Oasis's Eligible Equity Value nevertheless aligned the interests of Oasis and PPMG by providing PPMG with a strong incentive to improve Oasis's financial performance, which would lead to a higher eventual sale price and thus result in a higher Transaction Fee.  *See* A-784:16–23; A-785:23–786:21.  Although Oasis and PPMG could have included a provision requiring an increase in Oasis's equity value to trigger a Transaction Fee if they had desired to do so, they did not.

The term "Liquidity Event" generally refers to either a sale of 80% or more of Oasis's assets, MSA § 3(c)(ii)(D)(x);  a sale of 50% or more of Oasis's equity, MSA § 3(c)(ii)(D)(y); or a merger of Oasis and another company, MSA § 3(c)(ii)(D)(z).  The provision of the Management Services Agreement defining "Liquidity Event" concludes with a dangling clause that is the primary source of the instant dispute, which states that, "in each case, in order to constitute a qualifying *Change of Control*, the event must permit [Oasis] . . . to pay all of its . . . outstanding

debt." MSA § 3(c)(ii)(D) (emphasis added).[3]  The term "Change of Control" is not defined in the Management Services Agreement, nor is it used elsewhere in that document.

However, the nearly identical term "Change *in* Control" is defined and used in the Management Services Agreement's Annex A, which provides that a Change in Control refers to either the insolvency of Oasis or a subset of the Liquidity Events defined in § 3(c)(ii)(D) of the Management Services Agreement.  MSA, Annex A § 9 (emphasis added).  Annex A is expressly incorporated into the Management Services Agreements' broad indemnification provisions.  MSA § 7(b)(i).

## IV.  The Proceedings Below

In mid-2019, Oasis and Culligan International Company ("Culligan") commenced negotiating and drafting documents to effectuate the sale of all of Oasis's equity to Culligan (the

---

[3] In its entirety, § 3(c)(ii)(D) provides as follows: "'Liquidity Event' means

(x) a sale within any given 12 month period of 80% or more of the company's or any one or more of its subsidiaries' assets (without regard to liabilities) (other than a sale to persons who are shareholders of the Company or the respective subsidiary and hold 50% of [*sic*] more of the equity of the Company or the respective subsidiary on the applicable award date and their or its respective affiliates),

(y) the consummation of any transaction in which any person or group of persons (other than the persons who are shareholders of the Company or the respective subsidiary on the applicable award date and their or its respective affiliates) becomes the beneficial owner of stock of the Company or the applicable subsidiary constituting more than 50% of the total fair market value or total voting power of the Company or the applicable subsidiary, or

(z) the consolidation of the Company or one or more of its subsidiaries with, or merger of the Company or one or more of its subsidiaries with or into any other entity pursuant to a transaction in which any person or group of persons (other than the persons who are the shareholders of the Company or the applicable subsidiary on the applicable award ate and their or its respective affiliates) becomes the beneficial owner of the stock of the Company or one or more of its subsidiaries constituting more than 50% of the total fair market value or total voting power of the Company or the respective subsidiaries;

provided, however, that, in each case, in order to constitute a qualifying Change of Control, the event must permit the Company or the respective subsidiaries to pay all of its or their (as appropriate)outstanding [*sic*] debt."

"Oasis Transaction"). *See* A-123. These negotiations ultimately included the Debtors as well. Because the Oasis Transaction involved the sale of all of Oasis's equity, *see id.*, it qualified as a "Liquidity Event" under § 3(c)(ii)(D)(y) of the Management Services Agreement and entitled PPMG to a Transaction Fee. During the finalization of the Oasis Transaction's terms, however, the Debtors refused to allow payment of PPMG's Transaction Fee, arguing that, contrary to the plain words of the Management Services Agreement, PPMG was entitled to its Transaction Fee only if Oasis's sale price exceeded its outstanding debt, and that Oasis's outstanding debt exceeded the proposed sales price when Tranches TLD, TLE and TLF were (incorrectly) included as debt. *See* A-146 ¶ 1; A-579–580 ¶ 25.

On August 26, 2019, the Debtors notified the Bankruptcy Court that they intended to consummate the Oasis Transaction. A-122–142. On September 6, 2019, the Debtors filed a motion seeking a determination that PPMG was not entitled to the Transaction Fee, A-143–242, and PPMG concurrently filed its opening brief on the fee dispute, A-252–325 (subsequently amended version of filing). Oasis has not participated in this litigation and has taken no position on the proper interpretation of either the Management Services Agreement or the Eighth Amendment. The Oasis Transaction was approved by the Bankruptcy Court on September 9, 2019, prior to resolution of the parties' disagreement concerning PPMG's entitlement to a Transaction Fee. A-243–247. The Bankruptcy Court conducted a hearing on the Transaction Fee dispute on September 14, 2020, A-750–851, announced its ruling that PPMG was not entitled to a Transaction Fee on the record at a hearing on October 14, 2020, A-859:3–865:25, and entered the Order on October 15, 2020, A-1–2.

In rendering its oral ruling, the Bankruptcy Court explained that whether PPMG is entitled to the Transaction Fee depends upon how the undefined phrase "Change of Control" is interpreted

in § 3(c)(ii)(D) of the Management Services Agreement.  A-859:11–860:23.  The Bankruptcy Court found, based upon "the four corners of the MSA[,] that the defined term, change of control, means liquidity event, because any other reading of the contract terms would be unreasonable," concluding that the dangling clause referencing a Change of Control was intended "to create an exception for or condition in some way" within the broader definition of a Liquidity Event.  A-861:2–11.  Under that reading of the Management Services Agreement, a transaction must permit Oasis to pay off its outstanding debt in order to constitute a Liquidity Event triggering the payment of a Transaction Fee.

Three rationales were provided in support of this result.  First, the Bankruptcy Court stated without further explanation that it was supported by the Management Services Agreement's "use of the words 'in each case' and 'qualifying'" in connection with the term "Change of Control."  A-861:18–20.  Second, the Bankruptcy Court raised an argument *sua sponte*, noting that § 3(c)(ii) begins with the phrase "For purposes of this <u>Section 3(c)</u>" before providing definitions for various terms, including Liquidity Event.  This prefatory phrase was interpreted to mean that the Management Services Agreement "only intended the definition of liquidity event to apply for purposes of Section 3(c)[,] which discusses when a transaction fee becomes due," and thus precludes "defining a phrase in Section 3(c) for purposes outside that section."  A-861:21–862:7. Finally, the Bankruptcy Court reasoned that replacing the phrase "Change of Control" with "Change in Control" for purposes of § 3(c)(ii)(D) would be inconsistent with the definition provided for "Change in Control" in Annex A, as Annex A incorporates only two of the three types of Liquidity Events referenced in § 3(c)(ii)(D), while the dangling clause concluding § 3(c)(ii)(D) "specifically addresses and modifies all three of the events described" therein.  A-862:8–863:2.

After holding that the Management Services Agreement requires a transaction to permit payment of Oasis's outstanding debt in order to constitute a Liquidity Event, the Bankruptcy Court ruled that "the $20 million provided for in Amendment Number Eight" to Oasis's Credit Agreement was "debt and not equity . . . based on the unambiguous language of Amendment Number Eight." A-863:25–864:3.  In reaching that conclusion, the Bankruptcy Court focused on the "various terms [used] therein," such as the Eighth Amendment's "characteriz[ation] as a credit document," references to various parties "as borrower, lenders, and administrative agent," and descriptions of the $20 million at issue as "loans," which "are not words or terms associated with the creation of equity." A-864:4–23.  And because the Oasis Transaction did not provide sufficient funds to pay off that $20 million in addition to Oasis's other outstanding debt, it did not constitute a Liquidity Event under the Bankruptcy Court's interpretation of the Management Services Agreement.

PPMG subsequently filed in the Bankruptcy Court a motion to stay the Order pending resolution of the instant appeal on October 16, 2020, A-866–879, and noticed an appeal of the Order on October 22, 2020, ECF 1.  Following oral argument, the Bankruptcy Court denied PPMG's motion for a stay pending appeal on October 19, 2020.  A-893:2–894:2.

## ARGUMENT

I.     **The Bankruptcy Court Erred in Failing to Give Full Meaning and Effect to the Plain Terms of the Entire Management Services Agreement.**

1.     **PPMG Is Owed a Transaction Fee Because the Oasis Transaction Was a Liquidity Event Under the Management Services Agreement.**

The Management Services Agreement is governed by New York law, MSA § 10, which provides that a contract "should as a rule be enforced according to its terms" and "construed so as to give full meaning and effect to all of its provisions." *Metz v. Poughkeepsie Sav. Bank, FSB (In re Metz)*, 231 B.R. 474, 479 (E.D.N.Y. 1999) (internal quotation marks omitted).  Properly

construed, the Management Services Agreement entitled PPMG to a Transaction Fee upon the closing of the Oasis Transaction.  Specifically, PPMG's "Transaction Fee [became] payable in full by [Oasis] upon consummation of the relevant Liquidity Event," MSA § 3(c)(i), which took place when Culligan became "the beneficial owner of stock of [Oasis] constituting more than 50% of the total fair market value or total voting power of" Oasis, MSA § 3(c)(ii)(D)(y); *see also* A-763:7–764:4 (Ms. Tilton: a Liquidity Event "did not require [anyone] to be paid off" and occurred when "100 percent of the equity transferred to Culligan").  Culligan's purchase of Oasis was approved by the Bankruptcy Court in September 2019, more than one year ago.  *See* A-243–247.

The Bankruptcy Court nevertheless incorrectly held that the Oasis Transaction was not a Liquidity Event under the Management Services Agreement.  In reaching that conclusion, the Bankruptcy Court interpreted the Management Services Agreement to require payment of a Transaction Fee only if Oasis's sales price exceeded its outstanding debt by conflating § 3(c)(ii)(D)'s use of the undefined term "Change of Control" with the defined term "Liquidity Event."  *See* A-861:2–7.  But those terms are not interchangeable.  In ruling to the contrary—without citation to, or discussion of, any relevant legal authority—the Bankruptcy Court erroneously re-wrote the Management Services Agreement in a manner at odds with New York contract law.

Section 3(c)(ii)(D) of the Management Services Agreement defines the term "Liquidity Event," but the final clause of that paragraph states that, "in order to constitute a qualifying *Change of Control*, the event must permit [Oasis] to pay all of its . . . outstanding debt."  MSA § 3(c)(ii)(D) (emphasis added).  It does not provide that a "qualifying Liquidity Event" requires payment of Oasis's debt.  That omission must be honored, particularly in light of the Debtors' argument below that "similar agreements" "commonly define[]" the term Liquidity Event as used in the

Management Services Agreement to require payment of a company's outstanding debt.  A-150 n.12.  New York's highest court has explained that where "parties to a contract omit terms— particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission."  *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014) (citing *Isr. Disc. Bank Ltd. v. Gottesman (In re Ore Cargo, Inc.)*, 544 F.2d 80, 82 (2d Cir. 1976) ("Applying the maxim, *expression unius est exclusion alterius*, the failure of . . . a sophisticated commercial lender to include a similar specific reference . . . precludes our divining or implying such [a term] on the basis of the general language of the agreement.")).  The Bankruptcy Court provided no legal authority justifying its deviation from that bedrock principle of New York law.

The Management Services Agreement's "extensive use of defined terms demonstrates that its drafters were perfectly capable of using such terms when they wished to do so," such that their decision not to reference Liquidity Events in the final clause of § 3(c)(ii)(D) "should not be ignored."  *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, No. 15 Civ. 3538, 2019 WL 3858620, at *5 (S.D.N.Y. Aug. 16, 2019).  Rather, the use of two distinct terms in § 3(c)(ii)(D) reflects the parties' attempt to "set forth exactly what they meant in the body of the contract itself."  *Quintel Commc'ns, Inc. v. Fed. Transtel, Inc.*, 142 F. Supp. 2d 476, 482 (S.D.N.Y. 2001).  Plainly, what they meant when using two different phrases was to reference two different concepts.

The Federal Circuit's decision in *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572 (Fed. Cir. 1996), is instructive on this point.  In relevant part, *Ethicon* attempted to construe a patent that used two distinct terms within a single patent claim that referred to both a "pusher bar" and a "pusher assembly" in the very same sentence.  *Id.* at 1579.  While the patent did not define those terms, its use of the two different phrases "clearly impl[ied] . . . that whatever

15

'pusher assembly' means, it is not a synonym for 'pusher bar,'" such that "the plain meaning of the claim [would] not bear a reading that 'pusher assembly' and 'pusher bar' are synonyms." *Id.* Rather, the patent's failure to "consistently refer to this element as *either* a 'pusher bar' or a 'pusher assembly,' . . . especially . . . within the same clause," demonstrated as a matter of patent construction that each term must mean something different. *Id.*

*Ethicon*'s rationale applies with equal force here. The use of two entirely distinct and dissimilar terms—Liquidity Event and Change of Control—within a single provision of the Management Services Agreement cannot be cavalierly set aside. Rather, it conclusively demonstrates that PPMG and Oasis did not intend the final clause of § 3(c)(ii)(D) to limit the definition of when a Liquidity Event occurs.[4]

---

[4] The Debtors have previously argued that the Management Services Agreement should be interpreted as against its drafter, PPMG. A-576–579. In doing so, they rely on the doctrine of *contra proferentem*, which "may only be applied as a last resort," *Perella Weinberg Partners LLC v. Kramer*, 58 N.Y.S.3d 384, 389 (App. Div. 2017), and which "serves little purpose" in disputes between "sophisticated business entities," *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 574 (2d Cir. 1991). "While *contra proferentem* is an established principle of insurance law, it is typically applied where 'the language in [an] insurance contract is ambiguous and susceptible of two reasonable interpretations,' one proffered by the insurer and the other by the insured." *Dicola v. Am. Steamship Owners Mut. Prot. & Indem. Ass'n. (In re Prudential Lines, Inc.)*, 209 B.R. 621, 626 (S.D.N.Y. 1997) (quoting *State v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985)). Because that doctrine was promulgated for the benefit of "an individual who is inexperienced in matters of insurance coverage" when dealing with a sophisticated insurance company, *Loblaw, Inc. v. Emps.' Liab. Assurance Corp.*, 446 N.Y.S.2d 743, 745 (App. Div. 1981), its "underlying adhesion contract rationale . . . is inapposite" here, *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n.2 (2d Cir. 1983). Moreover, the Debtors are not parties to the Management Services Agreement, while Oasis, PPMG's contractual counterparty, is not a party to this dispute and has not challenged PPMG's proffered interpretation of § 3(c)(ii)(D). Accordingly, there is "no basis for construing [the Management Services Agreement] in favor of the Debtors, "who did not participate in the making of the contract." *Koch Asphalt Co. v. Farmers Ins. Grp.*, 867 F.2d 1164, 1166 (8th Cir. 1989); *see also In re Prudential Lines, Inc.*, 209 B.R. at 626-27 (declining to apply doctrine where litigant "was not a party to the[] contracts of insurance, and there [was] no evidence that any party to them suggested an interpretation" requested by the non-party litigant); *Economy Premier Assurance Co. v. W. Nat'l Mut. Ins. Co.*, 839 N.W.2d 749, 754 (Minn. 2013) (declining to apply *contra proferentem* to a "dispute between two insurers, one of which was not

The capitalization of the term "Liquidity Event" each time it is used throughout the contract, as well as the capitalization of the term "Change of Control" in the pertinent provision, both reflect that "the terms used were meant to have a consistent meaning throughout the document." *Whitacre Constr. Specialties, Inc. v. Aetna Cas. & Sur. Co.*, 448 N.Y.S.2d 287, 287 (App. Div.), *aff'd*, 443 N.E.2d 953 (N.Y. 1982). Because the term "Change of Control" is not defined in the Management Services Agreement, its meaning should be derived from an "objective[]" reading of the "entire integrated agreement" as it would be understood "by a reasonably intelligent person." *Italian Designer Import Outlet, Inc. v. N.Y. Cent. Mut. Fire Ins. Co.*, 891 N.Y.S.2d 260, 264 (Sup. Ct. 2009) (quoting *Walk-In Med. Ctrs., Inc. v. Breuer Cap. Corp.*, 818 F.2d 260, 263 (2d Cir. 1987)). It is therefore telling that Annex A to the Management Services Agreement defines and uses the nearly identical phrase "Change in Control" in setting forth how certain determinations relating to indemnification are to be made. *See* MSA, Annex A at §§ 2, 9. Moreover, Ms. Tilton—one of the signatories of the Management Services Agreement—testified that as used in § 3(c)(ii)(D) "change of control relates to Annex A which deals with the structure of the indemnification provisions." A-764:5–19; *see also* A-787:19–788:5. The Bankruptcy Court's oral ruling declined to address that "uncontroverted evidence disclosing the actual intent of the parties" to the Management Services Agreement. *Sunbury Textile Mills, Inc. v. Comm'r*, 585 F.2d 1190, 1198-99 (3d Cir. 1978) (lower court "committed reversible error" by disregarding "uncontradicted testimony" in dispute under Massachusetts law).

Annex A is expressly incorporated by reference in those sections of the Management Services Agreement addressing indemnification, *see* MSA § 7, such that the Management Services

---

a party to the disputed insurance contract" (collecting cases)). The Bankruptcy Court's oral ruling does not suggest that it relied on the *contra proferentem* doctrine.

Agreement itself cannot be properly interpreted without also accounting for its annexure.  Reading the Management Services Agreement as a whole, the purpose of the dangling clause at the end of § 3(c)(ii)(D) is not to further define when a Liquidity Event triggers a Transaction Fee.  Rather, notwithstanding a two-letter typographical error, the final clause of § 3(c)(ii)(D) was meant to limit when a Liquidity Event also constitutes a qualifying Change in Control for purposes of assessing indemnification under Annex A.  *See* A-787:19–788:5 (Ms. Tilton: "it's a typo and [Annex A § 9] relates back to liquidity event").

The Debtors' briefing below supports the conclusion that the term "Change of Control" in § 3(c)(ii)(D) was meant to read "Change in Control," the term defined and used in Annex A.  That is because the Debtors made the very same scrivener's error in their submissions to the Bankruptcy Court.  Specifically, Paragraph 27 of the Debtors' opening brief incorrectly quoted from a contract that is not presently at issue, a Phantom Equity Agreement between Oasis and certain of its management.[5]  But while the Phantom Equity Agreement upon which the Debtors relied defines and uses the phrase "Change *of* Control," the Debtors' brief instead repeatedly used the phrase

---

[5] The Bankruptcy Court properly disregarded the Debtors' reliance on several such documents when interpreting the Management Services Agreement because "there is no occasion to consider extrinsic evidence" where, as here, "consideration of a contract as a whole resolves the ambiguity created by one clause."  *Hudson-Port Ewen Assocs. v. Kuo*, 78 N.Y.2d 944, 945 (1991); *see also, e.g.*, *Cohen v. Formula Plus, Inc.*, 750 F. Supp. 2d 495, 503 (D. Del. 2010) ("In New York, . . . [e]vidence outside the four corners of the document as to what was really intended but unstated is generally inadmissible to add to or vary the writing." (quotation marks and alterations omitted)).  To the extent that the Management Services Agreement is ambiguous, however, courts may look to "relevant extrinsic evidence regarding the actual intent of the parties."  *Jamuna Fashion Wears Ltd. v. Micom Trading Corp.*, No. 09 Civ. 5339, 2012 WL 13140780, at *5 (S.D.N.Y. Dec. 28, 2012); *see also, e.g.*, *Lorsch v. Goldin Assocs., L.L.C. (In re Worldwide Direct, Inc.)*, No. 99-108, 2010 WL 3435380, at *4 (Bankr. D. Del. Aug. 27, 2010) ("If the plain language of a contract is held to be ambiguous in its terms, the court may consider testimony . . . .").  Here, there is uncontroverted  testimony from Ms. Tilton, a signatory of the Management Services Agreement.  Her "testimony was the only evidence regarding the parties' intent" and is thus dispositive in resolving any ambiguity.  *Jamuna*, 2012 WL 13140780, at *5.

"Change *in* Control."  *Compare* A-233 § 5(d), *with* A-155–156 ¶ 27.  In light of that minor yet revealing mistake, even the Debtors must acknowledge that that the prepositions "in" and "of" can be easily and inadvertently switched as occurred in the Management Services Agreement.  But even putting aside the scrivener's error, the term "Change in Control" must mean something different than "Liquidity Event."  Accordingly, whether or not Oasis's sales price exceeds its debt has nothing to do with PPMG's contractual right to receive a Transaction Fee upon the occurrence of a Liquidity Event.

>    **2.    The Bankruptcy Court's Interpretation of the Management Services Agreement Was Erroneous As a Matter of Law and Should Be Reversed.**

The Bankruptcy Court offered three justifications for its erroneous reading of the Management Services Agreement.  Each of those rationales is flawed as a matter of law.

First, the Bankruptcy Court reasoned that the Management Services Agreements' use of the phrases "in each case" and "qualifying" somehow militated in favor of replacing the phrase "Change of Control" in § 3(c)(ii)(D) with the term "Liquidity Event."  A-861:18–20.  Yet it provided no explanation whatsoever as to why those facially neutral words weighed in favor of either parties' proposed interpretation of that provision.  There is no grammatical or syntactical issue with reading the final clause of that paragraph as providing that, "in each case, in order to constitute a qualifying Change in Control, the event must permit [Oasis] to pay all of its . . . outstanding debt," which provides the very same import and meaning to the words "in each case" and "qualifying" as the Debtors' preferred reading of the Management Services Agreement.  Such a reading would plainly provide that for each type of Liquidity Event previously discussed in § 3(c)(ii)(D), that Liquidity Event would only qualify as a Change in Control for indemnification purposes if it allowed Oasis to pay its debts.  Stated simply, neither the phrase "in each case" nor

the word "qualifying" suggests one way or the other how "Change of Control," the term at issue, should be construed.

Next, the Bankruptcy Court noted that § 3(c)(ii) of the Management Services Agreement begins with the introductory clause, "For purposes of this Section 3(c)," which the Bankruptcy Court interpreted to mean that the definitions provided in § 3(c)(ii) should not be used to "defin[e] a phrase in Section 3(c) for purposes outside that section." A-861:21–862:7. But that introductory clause does not state that the definitions provided in § 3(c)(ii) were limited to be used "*only* for purposes of Section 3(c)." The restrictive word "only" and synonyms thereof are missing because the Bankruptcy Court was incorrect when stating that "the parties only intended the definition of liquidity event to apply for purposes of Section 3(c)." A-861:21–25.

The error is conclusively demonstrated by the plain fact that the term "Liquidity Event" appears in Annex A to the Management Services Agreement. The definition of "Change in Control" provided by Annex A incorporates by reference—and is thus expressly dependent on— "the definition of Liquidity Event" as provided in § 3(c)(ii)(D). *See* MSA, Annex A § 9 ("a 'Change in Control' means (a) the occurrence after the date hereof of any transaction described in clauses (y) or (z) of the definition of Liquidity Event . . . ."). Annex A's definition and use of the term "Change in Control" cannot be squared with the Bankruptcy Court's cribbed reading of § 3(c)(ii), which "would have the effect of rendering" portions of Annex A "meaningless." *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1988); *see also*, *e.g.*, *Muzak Corp. v. Hotel Taft Corp.*, 1 N.Y.2d 42, 46 (1956) ("The rules of construction of contracts require us to adopt an interpretation which gives meaning to every provision of a contract or, in the negative, no provision of a contract should be left without force and effect.").

Setting aside the Bankruptcy Court's failure to account for the Management Services Agreement's use elsewhere of terms defined in § 3(c)(ii), placing undue weight on the preface to those definitions also fails comport with New York contract law. "Indeed, a basic principle on contract interpretation under New York law is that specific terms in a contract will override the general." *Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c)),* 520 B.R. 15, 26 (Bankr. S.D.N.Y. 2014). Thus even assuming *arguendo* that the introductory clause did generally seek to limit the definitions provided in § 3(c)(ii) as applying "only . . . for purposes of Section 3(c)," A-861:21–25, the final clause of § 3(c)(ii)(D)'s use of the phrase "however, provided that" would nevertheless establish that the final clause was meant to be an exception to that general rule. *See, e.g.*, *Muzak Corp.*, 1 N.Y.2d at 46 ("[I]f there was an inconsistency between a specific provision and a general provision of a contract . . . , the specific provision controls.").

Finally, the Bankruptcy Court was wrong in concluding that replacing the phrase "Change of Control" with "Change in Control" for purposes of § 3(c)(ii)(D) would be inconsistent with the definition provided for "Change in Control" in Annex A. A-862:8–25. Rather, it would harmonize the two provisions and lead to a more rational result than the one adopted by making clear in both § 3(c)(ii)(D) and Annex A that only certain Liquidity Events are considered Changes in Control. Specifically, reading the final clause of § 3(c)(ii)(D) as referring to a "Change in Control" would limit those Liquidity Events that qualify as a Change in Control for indemnification purposes to instances in which the transaction permits payment of Oasis's outstanding debt. That is consistent with § 9(a) of Annex A, which provides that "transactions described in clauses (y) or (z) of the definition of Liquidity Event"—but not those described in clause (x) of that definition—qualify as a Change in Control for indemnification purposes, because § 3(c)(ii)(D)(x) provides for a type of Liquidity Event that is defined "without regard to [Oasis's] liabilities."

Moreover, it is entirely rational that indemnification would apply differently to Liquidity Events based upon a sale of Oasis's assets, as opposed to Liquidity Events based upon the acquisition or merger of Oasis.  An asset sale Liquidity Event pursuant to § 3(c)(ii)(D)(x) would allow Oasis to continue as a going concern with fewer assets—*i.e.*, "the entity is still existing"— whereas an acquisition of Oasis itself pursuant to § 3(c)(ii)(D)(y) or its merger with another company pursuant to § 3(c)(ii)(D)(z) would constitute a "change of control" accompanied by "the transfer of the equity risk."  A-789:5–790:5.  Those scenarios present fundamentally different circumstances.

In stark contrast, reading "Change of Control" to be synonymous with "Liquidity Event" renders § 3(c)(ii)(D) internally inconsistent.  That is because a sale of more than 80% of Oasis's assets constitutes a Liquidity Event "without regard to [its] liabilities" pursuant to § 3(c)(ii)(D)(x). That provision cannot be reconciled with the Debtors' proffered interpretation of the final clause of § 3(c)(ii)(D), under which a Liquidity Event would only occur if Oasis can "pay all of its . . . outstanding debt," *i.e.*, its liabilities.  *See, e.g.*, "Debt," *Black's Law Dictionary* (11th ed. 2019) (defining "debt" as, *inter alia*, "liability on a claim").  In other words, it cannot be the case that an asset sale must permit payment of Oasis's liabilities to qualify as a Liquidity Event, *and* that asset sales are Liquidity Events "without regard to [Oasis's] liabilities."  Because both of those statements cannot be true, and only the latter is expressly provided for, *see* MSA § 3(c)(ii)(D)(x), it is necessarily the case that a Liquidity Event does not require the ability to clear Oasis's debt.

## II.   The Bankruptcy Court Erred in Finding that the Eighth Amendment Created Debt Rather Than Equity.

Even if the Bankruptcy Court's interpretation of the Management Services Agreement was correct (which it is not), the Transaction Fee would nevertheless remain due to PPMG because the Oasis Transaction was sufficient to "permit [Oasis] to pay all of its . . . outstanding debt."  MSA

§ 3(c)(ii)(D).  Specifically, Oasis owed approximately $60 million at the time of its sale, which was less than its sale price.  In reaching a contrary result, the Bankruptcy Court misapplied federal common law to erroneously find that the Eighth Amendment (which restructured $20 million in accrued interest) created debt, rather than equity.

The MSA does not define the term "outstanding debt" for purposes of § 3(c)(ii)(D), and the Eighth Amendment does not expressly state whether Tranches TLD, TLE and TLF are "debt" or "equity."  Absent such express contractual classification, the doctrine of recharacterization guides the pertinent inquiry of "whether a debt actually exists" as a result of the Eighth Amendment.  *Bayer Corp. v. MascoTech, Inc.* (*In re AutoStyle Plastics, Inc.*), 269 F.3d 726, 748 (6th Cir. 2001) (quoting Matthew Nozemack, Note, *Making Sense Out of Bankruptcy Courts' Recharacterization of Claims*, 56 Wash & Lee L. Rev. 689, 716 (1999)).  Despite the name of this doctrine implying that it allows debt to be transformed into equity and suggesting the existence of a preexisting default status, the Third Circuit has been clear that "the label '*re* characterization' is misleading" because the question presented is actually "what is the proper characterization in the first instance of an investment" in light of courts' "equitable authority to ensure that 'substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'"  *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454 & n.7 (3d Cir. 2006) (quoting *Pepper v. Litton*, 308 U.S. 295, 305 (1939)); *see also*, *e.g.*, *In re Cold Harbor Assocs., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997) ("Rather than recharacterizing the exchange from debt to equity . . . , the question before the Court is whether the transaction created a debt or equity relationship from the outset.").

"No mechanistic scorecard suffices" in determining whether a financial instrument is debt or equity, which instead calls for an "overarching inquiry" based upon "facts that confer context

case-by-case." *In re SubMicron*, 432 F.3d at 456.  The focus is on the parties' "intent," which generally "may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances." *Id.*  Where the transaction is one "between related entities," however, the relevance of the nomenclature used by the parties to a transaction is at its nadir.  *Geftman v. Comm'r*, 154 F.3d 61, 68 (3d Cir. 1998). Because Oasis was one of the Debtors' Portfolio Companies at the time of the Eighth Amendment, "form does not necessarily correspond to the intrinsic economic nature of the transaction" and "[l]abels . . . thus lose their meaningfulness." *Fin Hay Realty Co. v. United States*, 398 F.2d 694, 697 (3d Cir. 1968).  Accordingly, the Eighth Amendment's terminology must be "subject to particular scrutiny" and "measured against an objective test of economic reality." *Geftman*, 154 F.3d at 68 (quotation marks omitted).

In finding that the Eighth Amendment created debt, the Bankruptcy Court nevertheless focused on the "various terms [used] therein," such as the Eighth Amendment's "use [of] the words loans" and the categories of information set forth on Schedule A to the Eighth Amendment, finding that the language used were not "words or terms associated with the creation of equity."  A-864:4–23.  That mode of analysis, which was legal error, improperly "ignore[s] the plain facts and . . . elevate[s] form over substance," as the law "requires more than a declaration of intention to create indebtedness and more than the existence of corporate paper encrusted with the appropriate nomenclatural captions." *Austin Vill.*, 432 F.2d at 746 (quoting *Tyler v. Tomlinson*, 414 F.2d 844, 850 (5th Cir. 1969)).

While "[f]orm is no doubt a factor," even in arms-length transactions "it is no more than an indicator of what the parties actually intended and acted on." *In re SubMicron*, 432 F.3d at 456. The Third Circuit has therefore repeatedly rejected the approach taken below.  In *Machne*

*Menachem, Inc. v. Spritzer*, for instance, it held that documents facially describing themselves as "loans" are not necessarily debt because "the label given to a transaction . . . does not outweigh what the parties actually intended or how they acted." 456 F. App'x 163, 165-66 (3d Cir. 2012). *Minnesota Lawyers Mutual Insurance Co. v. Ahrens* similarly explained that even where the parties "sometimes call[ed] the transactions 'loans' and call[ed] their expected returns 'interest,' [those] description do not end the inquiry." 432 F. App'x 143, 148 (3d Cir. 2011). And most recently, *Sensenig v. Commissioner of Internal Revenue* affirmed the Tax Court's determination "that, although [a litigant] identified a handful of the transactions as loans in his own [business's] journal entries, the transactions bore no other indicia of true loans and instead more closely resembled equity investments." 720 F. App'x 139, 141 (3d Cir. 2018). While the terminology used in the Eighth Amendment was treated as dispositive, such semantic analysis should have been accorded only minimal weight in light of "the ancient wisdom that calling a thing by a name does not make it so. *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 174 (1976). Focusing exclusively on the language used by the Eighth Amendment elides the fundamental issue: "whether the parties called an instrument one thing when in fact they intended it as something else." *In re SubMicron*, 432 F.3d at 456.

Here, the parties clearly intended the Eighth Amendment to create equity, not debt. To measure "the true nature of an asserted loan transaction . . . against the 'economic reality of the marketplace,'" the Court should "determine whether a third-party lender would extend credit under similar circumstances." *Geftman*, 154 F.3d at 76 (quoting *Scriptomatic, Inc. v. United States*, 555 F.2d 364, 367-68 (3d Cir. 1977)); *see also Fin Hay Realty*, 398 F.2d at 697 ("[I]t is useful to compare the form which a similar transaction would have taken had it been between the corporation and an outside lender, and if the shareholder's advance is far more speculative than

what an outsider would make, it is obviously a loan in name only.").  In conducting that analysis, the Third Circuit distinguishes between scenarios in which funds are only to be "repaid based on the borrower's fortunes," in which case "they are equity," as opposed to instances in which an investor "expects to be repaid with interest no matter the borrower's fortunes," in which case "the funds are debt."  *In re SubMicron*, 432 F.3d at 456.  The Eighth Amendment clearly places Tranches TLD, TLE and TLF within the former category because "no reasonable third-party lender would have extended [approximately $20 million] of credit with . . . no interest charges, no security, no repayment schedule, and no book entries recording a balance due." *Geftman* 154 F.3d at 76; *see also Fin Hay Realty*, 398 F.2d at 697-99 (similar).

Although the Bankruptcy Court did not address whether interest accrued on Tranches TLD, TLE and TLF, the uncontroverted evidence establishes that "interest was never billed" nor "paid" in connection with these funds.  A-774:6–17.  Under the Credit Agreement, Revolving Credit Loans, Term A Loans and Term B Loans "bear interest . . . at a rate per annum equal to LIBOR <u>plus</u> [an] Applicable Margin."  Credit Agreement § 2.8(a); *see also id.* at 13, 17, 20 (defining "Loans" for purposes of the Credit Agreement as referring specifically to Revolving Credit Loans, Term A Loans and Term B Loans).  The same does not hold true for the subsequently created Tranches TLD, TLE and TLF, however.  Those names reflect that these Tranches were meant to be "Term Loan D, E, [and] F," A-579–580 ¶ 25; *see also* A-654 at 50:21–24, none of which are "Loans" as that term is defined in the Credit Agreement, A-773:13–774:12.  Moreover, Schedule A to the Eighth Amendment clarifies that the Applicable Margin for Tranches TLD, TLE and TLF was "0%" and their Interest Payment Date was "N/A" because the very concept of an interest payment was not applicable to them absent the accrual of any interest.  *See, e.g.*, A-774:19–775:3. Read together, the clear import of these provisions is that Tranches TLD, TLE and TLF were not

debt because there was no expectation that they would be "repaid with interest." *In re SubMicron*, 432 F.3d at 456; *see also, e.g.*, *Friedman's Liquidating Tr. v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512, 520-21 (Bankr. D. Del. 2011) (the "absence of a fixed rate of interest and interest payments . . . is a strong indication the investment was a capital contribution, rather than a loan").

In addition, the lack of any meaningful security for Tranches TLD, TLE and TLF provides "a strong indication that the advances were capital contributions rather than loans." *In re Friedman's*, 452 B.R. at 522 (quoting *In re AutoStyle Plastics*, 269 F.3d at 752). Oasis's accrued unpaid interest and commitment fees were restructured so that they would be subordinate to all of Oasis's funded debt in light of their low prepayment preference. *See* Eighth Amendment Sched. A; A-775:13–19 (Tranches TLD, TLE and TLF "came out after all the debt"). Indeed, the express purposes of putting Tranches TLD, TLE and TLF "last in line" was "basically [to] protect [Oasis's] lenders in terms of repayment." A-772:13–25; A-775:13–19. That subordination "weighs in favor of characterizing the [Tranches] as equity." *In re Friedman's*, 452 B.R. at 522; *see also, e.g., Trans-Atl. Co. v. Comm'r*, 469 F.2d 1189, 1193 (3d Cir. 1972) ("It is . . . relevant . . . that payment of the[ ] principal amounts was subordinated to the loans from First Pennsylvania."); *Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings, Inc.)*, No. 13-12098, 2017 WL 1508606, at *14 (Bankr. D. Del. Apr. 27, 2017) ("Subordination of the Notes [at issue] to debt held by the Debtors' lenders" is among the factors "weighing in favor" of an equity characterization).

As weighed against those factors, that the Eighth Amendment provided maturity dates for Tranches TLD, TLE and TLF does not militate against finding them to be equity. While maturity dates are often associated with debt, certain types of preferred equity can have maturity dates as

well.  *See, e.g.*, A-775:4–9; William G. Rothschild, *Mezzanine Loans: The Lesser of Two Evils?*, 31 No. 5 Prac. Real Estate Law. 55, 56 n.3 (2015) ("'debt-like' preferred equity" may have a "stated maturity date").  Indeed, *In re Friedman's* dealt with investments that were "repayable over four years after entry" and where "no interim payment of principal" was required.  452 B.R. at 520.  That is the very same scenario presented here, in which the Eighth Amendment was executed in 2015 but provided for maturity dates in 2019, without any interim payments due in the meantime.  *See* Eighth Amendment at 1 & Sched. A; A-775:10–12.  Under identical circumstances, *In re Friedman's* held that such distant payments "weigh[ed] neither in favor of characterizing the [investment] as equity nor as debt."  452 B.R. at 520; *see also Fidelity Bond & Mortg. Co. v. Brand (In re Fidelity Bond & Mortg. Co.)*, 340 B.R. 266, 303 (Bankr. E.D. Pa. 2006) ("treat[ing] . . . as equity" funds that were to be repaid after five years).  That is because money that is not due to be reimbursed for several years ensures that "the funds infused are [to be] repaid based on the borrower's fortunes" alone.  *In re SubMicron*, 432 F.3d at 456; *see also Austin Vill.*, 432 F.2d at 745-46 ("a plan which made repayment contingent upon the success of the venture . . . is a classic example of an investment of risk capital").  Accordingly, where "expected returns depend[ ] upon [a company's] success, not an interest rate," a company's "promises that [investors] would be repaid by a fixed date" does "not convert their speculative investments into loans."  *Minn. Lawyers Mut. Ins. Co.*, 432 F. App'x at 148; *see also Geftman*, 154 F.3d at 71 ("even complete repayment . . . was not indicative of a bona fide debt since the repayment occurred after a long period without repayments").

Lastly, the parties' course of conduct demonstrates that they intended Tranches TLD, TLE and TLF to be equity, rather than debt.  *See, e.g.*, *In re SubMicron*, 432 F.3d at 456 (parties' intent "may be inferred . . . from what they do through their actions"); *Trans-Atl.*, 469 F.2d at 1193 ("The

subsequent history of the bonds, with only partial repayment, suggests they were treated like equity."). While invoices received prior to execution of the Eighth amendment show that millions of dollars were due from Oasis to the Debtors, *see, e.g.*, A-748 ($14 million owed to Zohar I as of October 2015 under a term loan ("854-01: TL") and revolving loan ("854-03: RL B"), those debts are not reflected on invoices for the very same facilities sent subsequent to the Eighth Amendment's restructuring, *see, e.g.*, A-749 (no money past due to Zohar I as of January 2016 under the same term loan and revolving loan), because they "had been converted into the equity kicker" Tranches TLD, TLE and TLF without any increase in the principal owed by Oasis to the Debtors, A-777:1–778:6. These Tranches were also treated as equity contributions for tax purposes, A-778:14–21; A-359:15–18, and for purposes of the Debtors' trustee reports even though doing so was contrary to the Ms. Tilton's interests, A-775:23–776:25. Conversely, there is simply no evidence suggesting that Tranches TLD, TLE and TLF were ever treated as debt rather than equity prior to the instant dispute. *See, e.g.*, A-778:10–13 ("prior to the close of the Oasis transaction . . . the debtors [n]ever attempt[ed] to collect interest from Oasis on the restructured facility"). The first time that anyone claimed that these facilities were debt occurred just last year, upon the Debtors' recognition that doing so might allow them to avoid paying PPMG its rightful compensation for its many years of work on behalf of Oasis. That timeline speaks volumes.

In sum, it is clear that Tranches TLD, TLE and TLF were intended to be, and should properly be considered, equity. The Bankruptcy Court failed to meaningfully point to any way in which Oasis and the Debtors' course of conduct or the economic realities undergirding the Eighth Amendment suggest that the Eighth Amendment was intended otherwise. And its dismissal of the evidence discussed above supporting the equity categorization was cursory and erroneous: the

Bankruptcy Court described the absence of periodic payment dates and the subordinated nature of Tranches TLD, TLE and TLF as "not per se characteristics of equity," without any further discussion of their relevance to the recharacterization analysis; it dismissed unspecified "terms . . . favorable to [Oasis]" as "not surprising," without any further elucidation of which terms it had in mind or what their import might be; it declined to even acknowledge that interest never accrued and was never collected in connection with Tranches TLD, TLE and TLF; and it summarily concluded that "the evidence presented . . . did not sufficiently convince [the Bankruptcy Court] that the amount should be treated as equity," without providing any basis whatsoever for failing to credit the uncontroverted testimony of Ms. Tilton concerning the characteristics of, and intent behind, the Eighth Amendment's restructuring.  A-865:4–17.

The parties' "actions" and "the economic reality" are clear.  *In re SubMicron*, 432 F.3d at 456.  The Debtors did not "expect[ ] to be repaid with interest no matter [Oasis's] fortunes," nor did they seek (or have a right to seek) repayment of the purported debt in the intervening years since the Eighth Amendment was executed in 2015.  *Id.*  Tranches TLD, TLE and TLF were subordinated to Oasis's preexisting debt and only after several years were they to be "repaid based on [Oasis's] fortunes," without interest.  *Id.*  "[H]ence they are equity."  *Id.*

## CONCLUSION

For the foregoing reasons, PPMG respectfully requests that this Court reverse the Order.

Dated:  December 18, 2020

COLE SCHOTZ P.C.

By: _/s/ Patrick J. Reilley_____
Norman L. Pernick (No. 2290)
G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
ddean@coleschotz.com
preilley@coleschotz.com

– and –

GIBSON, DUNN & CRUTCHER LLP
Monica K. Loseman (admitted *Pro Hac Vice*)
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

Randy M. Mastro (admitted *Pro Hac Vice*)
Akiva Shapiro (admitted *Pro Hac Vice*)
Michael L. Nadler (admitted *Pro Hac Vice*)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
rmastro@gibsondunn.com
ashapiro@gibsondunn.com
mnadler@gibsondunn.com

Michael G. Farag (admitted *Pro Hac Vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7559
Facsimile: (213) 229-6559
mfarag@gibsondunn.com

*Counsel to Appellant Patriarch Partners*
*Management Group, LLC*

**<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to Rule 8015(h) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy</u> <u>Rules</u>"), the undersigned hereby certifies that this brief complies with the type-volume limitation of Bankruptcy Rule 8015(a)(7)(B)(i).

1. Exclusive of the exempted portions of the brief specified in Bankruptcy Rule 8015(g), the brief contains 10,219 words.

2. The brief has been prepared using Microsoft Word. The undersigned has relied upon the word count feature of this word processing software in preparing this certificate.

Dated: December 18, 2020

*/s/ Patrick J. Reilley*