## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| ZOHAR III, CORP., *et al.*,[1] | Bankruptcy Case No. 18-10512 (KBO) |
| *Debtors.* | (Jointly Administered) |
| PATRIARCH PARTNERS MANAGEMENT GROUP, LLC, | |
| *Appellant*, | Civil Action No. 20-cv-1419 (MN) |
| v. | |
| ZOHAR III, CORP., *et al.*, | |
| *Appellees.* | |

### APPENDIX OF APPELLANT

Dated: December 18, 2020

**COLE SCHOTZ P.C.**
Norman L. Pernick (No. 2290)
G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
ddean@coleschotz.com
preilley@coleschotz.com

**GIBSON, DUNN & CRUTCHER LLP**
Monica K. Loseman (admitted *Pro Hac Vice*)
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

(Additional counsel on following page)

---

[1] The Debtor-Appellees, and, where applicable, the last four digits of their taxpayer identification number, are as follows:  Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar I," and together with Zohar II and Zohar III, the "Zohar Funds").  The Debtor-Appellees' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

Randy M. Mastro (admitted *Pro Hac Vice*)
Akiva Shapiro (admitted *Pro Hac Vice*)
Michael L. Nadler (admitted *Pro Hac Vice)*
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
rmastro@gibsondunn.com
ashapiro@gibsondunn.com
mnadler@gibsondunn.com

Michael G. Farag (admitted *Pro Hac Vice*)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7559
Facsimile: (213) 229-6559
mfarag@gibsondunn.com

*Counsel to Appellant Patriarch Partners
Management Group, LLC*

## TABLE OF CONTENTS[2]

October 15, 2020 Order Determining Dispute Between the Debtors and Patriarch
Partners Management Services, LLC Related to Pending Oasis Transaction
(D.I. 2019)......................................................................................................... A-1

Declaration of Lynn Tilton in Support of Chapter 11 Petitions (D.I. 5)..................................... A-3

Debtors' Motion, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy
Rule 9019, for an Order Approving and Authorizing the Settlement Agreement By
and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance
Corp., and the Zohar III Controlling Class (D.I. 223) ............................................... A-47

Order Approving and Authorizing the Settlement Agreement By and Between the
Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the
Zohar III Controlling Class (D.I. 266) ........................................................... A-84

Order in Aid of Implementation of the Global Settlement Agreement Approved in
These Cases Establishing Certain Procedures for the Independent Director's Approval
of Monetization Transactions and Related Relief (D.I. 545)................................... A-107

Notice of Binding Portfolio Company Transaction Pursuant to Portfolio Company
Transaction Procedures (D.I. 868) ........................................................... A-122

Debtors' Motion For an Order Determining Dispute Between the Debtors and
Patriarch Partners Management Services, LLC Related to Pending Oasis Transaction
(D.I. 911 (Sealed); D.I. 1130 (Redacted)) ........................................... A-143

Order Approving Consummation of Oasis Portfolio Company Transaction (D.I. 918)......... A-243

PPMG's Opening Brief Regarding PPMG's Right to Payment of Transaction Fees in
Connection With the Oasis Transaction (D.I. 1200 (Sealed); D.I. 1197 (Redacted)) ........... A-248

PPMG's Opposition to the Debtors' Motion For an Order Determining Dispute
Between the Debtors and PPMG Related to Pending Oasis Transaction
(D.I. 1915 (Sealed); D.I. 1971 (Redacted)) ........................................... A-326

Debtors' Response to PPMG's Opening Brief Regarding PPMG's Right to Payment
of Transaction Fee in Connection with Oasis Transaction (D.I. 1916 (Sealed);
D.I. 1970 (Redacted)) ........................................................... A-565

---

[2]  The Appendix contains certain pleadings filed under seal.  If a pleading was filed under seal, this index references the D.I. number of both the sealed pleading ("Sealed") and redacted pleading ("Redacted").  The Sealed version is contained in the Appendix filed under Seal and the Redacted version is contained in the publicly filed Appendix.

LVD Acquisition, LLC Credit Agreement (Zohar Exhibit 2) ................................................. A-663

LVD Loan Invoice – October 2015 (PPMG Exhibit 3) ......................................................... A-748

LVD Loan Invoice – January 2016 (PPMG Exhibit 7) ......................................................... A-749

Transcript of Bankruptcy Court Hearing on September 14, 2020 (D.I. 1943) ...................... A-750

Excerpt of Transcript of Bankruptcy Court's Oral Ruling on October 14, 2020
(D.I. 2026) ............................................................................................................................ A-852

PPMG's Motion for Stay Pending Appeal of the Transaction Fee Order and for the
Escrowing of Certain Transaction Fees (D.I. 2029) ............................................................. A-866

Excerpt of Transcript of Bankruptcy Court's Oral Ruling on October 19, 2020
(D.I. 2042) ............................................................................................................................ A-880

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Ref. Sealed Docket Nos. 911, 1200 1915, 1916** |
| | ) | |

**ORDER DETERMINING DISPUTE BETWEEN THE DEBTORS AND
PATRIARCH PARTNERS MANAGEMENT SERVICES, LLC
RELATED TO PENDING OASIS TRANSACTION**

Upon the *Motion of the Debtors for an Order Determining Dispute Between the Debtors
and Patriarch Partners Management Services, LLC Related to Pending Oasis Transaction*
(the "Motion") [Docket No. 1130],[2] of the above-captioned debtors and debtors-in-possession
(collectively, the "Debtors"); and the Court having jurisdiction to consider the Motion and the
relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order
of Reference from the United States District Court for the District of Delaware*, dated as of
February 29, 2012; and consideration of the Motion and the requested relief being a core
proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant
to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided,
and it appearing that no other or further notice need be provided; and the Court having held a
hearing to consider the Motion and all related filings on September 14, 2020 (the "Hearing"); and

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar
III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar
III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar III"). The
Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the
Motion.

the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, for the reasons set forth on the record at the hearing held on October 14, 2020, it is hereby ORDERED:

1.      The Motion is GRANTED.

2.      Within two (2) business days of entry of this order, PPMG shall refund to the Debtors the $3,798,240.92 million Transaction Fee paid in connection with the LVD Transaction.

3.      This Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

Dated:  October 15, 2020
       Wilmington, Delaware

THE HONORABLE KAREN B. OWENS
UNITED STATES BANKRUPTCY JUDGE

2

A-2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*, | Case No. 18-10512 (CSS) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF LYNN TILTON
## IN SUPPORT OF CHAPTER 11 PETITIONS

1

A-3

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................. 3

II.   MY ROLE AS OWNER AND DIRECTOR OF THE ZOHAR FUNDS........................ 7

III.  OVERVIEW OF THE ZOHAR FUNDS AND MY ENTERPRISE. ............................... 8

    A.   MY FIRST FUNDS – FORMATION OF THE ARKS................................................................8
    B.   STRUCTURE OF SUBSEQUENT FUNDS – CREATION OF THE ZOHAR FUNDS.....................10
    C.   THE ZOHAR FUNDS' NOTEHOLDERS.............................................................................14
    D.   OWNERSHIP OF THE ZOHAR FUNDS' PREFERENCE SHARES. .........................................16

IV.  THE PORTFOLIO COMPANIES ARE EXTREMELY SUCCESSFUL. .................... 19

    A.   REINVENTING AN AMERICAN ICON – MD HELICOPTERS..............................................20
    B.   A CALIFORNIA SUCCESS STORY – STILA COSMETICS ..................................................22
    C.   THE CROWN JEWELS OF MICHIGAN'S AUTO SUPPLIERS – DURA AND GAS .................23

V.   THE ZOHAR FUNDS' PREFERENCE SHARES ARE "IN THE MONEY." ............ 26

VI.  THE VALUE OF THE ZOHAR FUNDS IS LOCKED AND  CANNOT BE
MONETIZED EXCEPT THROUGH THE BANKRUPTCY PROCESS. ............................ 28

    D.   MBIA HAS PRESENTED OBSTACLES TO MY PRIOR ATTEMPTS TO RESTRUCTURE THE ZOHAR FUNDS. ........30
    E.   ZOHAR I BANKRUPTCY LITIGATION. ...........................................................................33
    F.   ZOHAR I COLLATERAL AUCTION. .................................................................................34
    G.   MBIA'S EXPOSURE RELATED TO ZOHAR I AND ZOHAR II............................................35

VII. MBIA APPOINTS AMZM AS THE NEW COLLATERAL MANAGER. ................... 36

    A.   PATRIARCH RESIGNS AS COLLATERAL MANAGER AND WORKS TO TRANSITION THE ZOHAR FUNDS. ...........36
    B.   MBIA AND AMZM'S LITIGATION CAMPAIGN HAS CAST A CLOUD OVER THE ZOHAR FUNDS AND THE
PORTFOLIO COMPANIES RENDERING THEM ENTIRELY UNABLE TO MONETIZE ASSETS AND MAXIMIZE VALUE FOR
ALL STAKEHOLDERS. ........................................................................................................37
    C.   MBIA AND AMZM HAVE MADE NO EFFORT TO MONETIZE THE ZOHAR FUNDS' ASSETS OR MAXIMIZE
THEIR VALUE IN THE INTEREST OF ALL THE ZOHAR FUNDS' STAKEHOLDERS .........................40

IX.  THE PURPOSE OF THIS BANKRUPTCY PROCEEDING IS TO ACCESS THE
SIGNIFICANT VALUE LOCKED IN THE ZOHAR FUNDS' ASSETS AND MONETIZE
THEM FOR THE BENEFIT OF ALL STAKEHOLDERS. ................................................... 42

X.  CONCLUSION.................................................................................................. 44

A-4

I, Lynn Tilton, hereby declare under penalty of perjury, pursuant to section 1746 of title

28 of the United States Code, as follows:

## I.      <u>Introduction</u>

1.      I am the sole director and owner of each of Zohar CDO 2003-1, Limited ("<u>Zohar</u>

<u>I</u>"), Zohar II 2005-1, Limited ("<u>Zohar II</u>"), Zohar III, Limited ("<u>Zohar III</u>," and together with

Zohar I and Zohar II, the "<u>Zohar Funds</u>"), each of which are Cayman Islands entities.  I own the

Zohar Funds through entities I own (directly or indirectly)—Octaluna, LLC ("<u>Octaluna I</u>"),

Octaluna II, LLC ("<u>Octaluna II</u>"), and Octaluna III, LLC ("<u>Octaluna III</u>," and collectively, the

"<u>Octaluna Entities</u>")—that hold all of the preference shares of the Zohar Funds.[1]  Through my

ownership of the Zohar Funds, I am also the indirect owner of Zohar CDO 2003-1, Corp.

("<u>Zohar I Corp.</u>"), Zohar II 2005-1, Corp. ("<u>Zohar II Corp.</u>") and Zohar III, Corp. ("<u>Zohar III</u>

<u>Corp.</u>"), and together with Zohar I Corp. and Zohar II Corp., the "<u>Zohar Corps</u>"), each of which

are Delaware corporations.  The Zohar Funds and the Zohar Corps (the "<u>Debtors</u>") are

collectively the debtors and debtors-in-possession in the above-captioned cases (the "<u>Chapter 11</u>

<u>Cases</u>").[2]  I am also the Zohar Funds' creator and founder, and I own, through my wholly owned

entities, the Class A-3 and B notes in Zohar I, and the Class B Notes in Zohar II and Zohar III,

respectively.

2.      The Zohar Funds are innovative distressed debt collateralized loan obligations

("<u>CLOs</u>").  The Zohar Funds raised capital by issuing notes to noteholders who were, in

---

[1]  Specifically, Octaluna I holds the preference shares of Zohar I, Octaluna II holds the preference shares of Zohar II, and Octaluna III holds the preference shares of Zohar III.

[2]  The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

exchange, entitled to interest payments over time, plus return of their principal at the maturity date.

3.     The Zohar Funds' assets are primarily loans to distressed companies (the "Portfolio Companies"). The Zohar Funds originated loans to the Portfolio Companies and also sometimes purchased distressed loans on the secondary market at a discount. These loans were originated primarily to undervalued, iconic American brands in need of capital and a sound management strategy, both of which were necessary to rescue the businesses and restore value, creating and preserving jobs in America. These brands are comprised primarily of domestic manufacturing companies that produce goods "made in the U.S.A.," including MD Helicopters, a defense contractor that manufactures and distributes helicopters and other military hardware to the U.S. and foreign militaries. I obtained control over the Portfolio Companies, implemented a long-term turnaround plan to create value and, in many cases, executed on such strategies, resulting in highly successful and exceedingly valuable companies from assets that would have otherwise been liquidated.

4.     In addition, the Zohar Funds hold "equity upside" interests in the Portfolio Companies. What this means is that, while I and my affiliates own all or almost all of the equity in the Portfolio Companies, I directed that upon a sale of the Portfolio Companies, certain percentages of the net proceeds would flow through the Zohar Funds' waterfall. Those proceeds flow through the waterfall to make outstanding principal and interest payments on the notes before any residual value flows to me, personally, as the Zohar Funds' owner, due to my ultimate ownership (through various entities I own and control) of the Zohar Funds' preference shares.

5.     I am actively involved in the management of the Portfolio Companies, often acting as CEO and as a board member or manager of the companies (in most cases, the sole

board member or manager). My active involvement empowers me to best use my experience and expertise in turning around distressed companies: to direct strategies and lead the rebuilding and revitalization of the Portfolio Companies. In fact, I am the Manager and/or Director of approximately 60 of these Portfolio Companies and CEO of several of the most successful. My platform is one of the largest woman-owned businesses in the United States and comprises Portfolio Companies headquartered across the United States and employing more than 50,000 people around the world. Despite these varied positions and the substantial time and effort expended in connection therewith, I earn no salary as CEO or Manager of any Portfolio Company, except at MD Helicopters where I am paid as the CEO.

6.     The Zohar Funds' assets, including the cash flows of principal and interest that flow from the loans, and the cash flow from the monetization of "equity upside" interests in the Portfolio Companies, have tremendous value. In fact, they are worth billions of dollars—far in excess of the amount owed to the Zohar Funds' noteholders (collectively, the "Noteholders"). Nevertheless, Zohar I and Zohar II have already defaulted, and Zohar III will likely default on loans maturing in March 2019, absent intervention from this Court. This substantial value is locked up in the Portfolio Companies and cannot be monetized for the benefit of all stakeholders as a consequence to the cloud of uncertainty and litigation tactics pursued by the Zohar Funds' new Collateral Manager, Alvarez & Marsal Zohar Management ("AMZM"), at the direction of Zohar I and Zohar II's controlling creditor, MBIA Insurance Corporation ("MBIA"), and Zohar III's controlling class. Indeed, these litigations have directly interfered with my recent efforts to sell at least one Portfolio Company and to obtain financing for several others. I understand from my negotiations with potential buyers and lenders that though they are more than willing to

engage in sale and refinancing transactions, they will only do so absent the ligation risk and with certainty that assets and equity will be delivered to them free and clear with no ongoing risk.

7.  Accordingly, in my capacity as the sole director of each of the Zohar Funds, and after having been advised on relevant matters, I determined it was in the best interest of the Zohar Funds and all the stakeholders to voluntarily file these Chapter 11 Cases to permit the bankruptcy court to oversee an orderly process of unlocking the value in the Zohar Funds through sales and refinancings of the Portfolio Companies.  Only through this process will Noteholders be made whole, and will the residual value in the Portfolio Companies inure to me as the Zohar Funds' preference shareholder.

8.  The Portfolio Companies themselves, however, will not be debtors in bankruptcy cases, as the selected companies to be monetized are no longer distressed but, rather, have seen their fortunes reversed, and both their value and buyer base would be significantly diminished if they were to be sold through a Chapter 11 process.

9.  The Zohar Funds were placed into bankruptcy in order that Noteholders and all other stakeholders can finally access the full value of the cash flows from Portfolio Companies sales or refinancings.  This value is locked as a result of protracted litigations.  I have hired a Chief Restructuring Officer, Marc Kirschner, to serve as an independent party to assist in further developing and executing on a plan to monetize the Zohar Funds' interests, as set forth in Mr. Kirschner's declaration.

10.  I submit this declaration (this "First Day Declaration"), pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to provide an overview of the Debtors' business and these Chapter 11 Cases.  Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors'

operations and finances, information learned from my review of relevant documents, information

supplied to me by other members of the Debtors' management, or my opinion based on my

experience, knowledge, and information concerning the Debtors' operations and financial

condition.  I have obtained this information in the course of my ownership and management of

the Debtors.  To the extent that any information provided herein is materially inaccurate, we will

act promptly to notify the Court and other parties; however, I believe all information herein to be

true to the best of my knowledge.  I am authorized to submit this First Day Declaration on behalf

of the Debtors and, if called upon to testify, I could and would testify competently to the facts set

forth herein.[3]

11.      To familiarize the Court with the Debtors, and the Chapter 11 Cases, this First

Day Declaration provides a summary overview of the Debtors and the Chapter 11 Cases.

## II.      My Role as Owner and Director of the Zohar Funds.

12.      I am the owner and director of each of the Debtors.

13.      In particular, as explained in greater detail below, I own the Zohar Funds through

my ownership, directly or indirectly, of the entities that own all of the Zohar Funds' preference

shares.  Those entities are the Octaluna Entities.

14.      I am the sole director of each of the Zohar Funds.  Specifically, on

January 25, 2017, pursuant to the Amended and Restated Articles of Association of the Zohar

---

[3]   The parties to these bankruptcy cases are currently involved in several litigations over the issue of who has
      proper ownership and control over the Portfolio Companies.  Certain facts set forth in this declaration that are
      relevant to those litigations may be in dispute.  However, as further described in Section IV of this Declaration,
      the results of these litigations are not relevant for purposes of executing a bankruptcy plan for the Zohar Funds
      because they do not impact the distribution of cash—through the Zohar Funds' payment waterfall--of any
      proceeds and residual value from the monetization of the Portfolio Companies.  The litigations also do not
      affect the parties' reserved rights, upon the monetization of the Portfolio Companies, to dispute the manner in
      which sale proceeds and residual value are distributed.

Funds, the Octaluna Entities removed the incumbent directors of Zohar I, Zohar II, and Zohar III, respectively, and appointed me as the sole director.

15.     I am also the founder and creator of each of the Zohar Funds.  In particular, as discussed in greater detail below, I created the Zohar Funds as CLO funds to invest in and originate loans to distressed companies.

16.     From the Zohar Funds' inception until March 2016, my wholly-owned entities— Patriarch VIII, LLC, Patriarch XIV, LLC, and Patriarch XV, LLC (collectively, "Patriarch")— served as the Zohar Funds' Collateral Managers.  Patriarch is a vertically-integrated investment enterprise owned and managed by me.  It focuses on the acquisition and invigoration of undervalued, iconic American brands where time, capital, and sound strategy can rescue a business and restore value, creating and preserving jobs in America and across the globe. Pursuant to an agreement with MBIA, as described below, Patriarch resigned as Collateral Manager of the Zohar Funds effective March 2016 to focus on managing and leading the Portfolio Companies, and effectuating turnaround strategies that will ultimately generate maximum value for all of their respective stakeholders.  Shortly thereafter, AMZM was appointed Collateral Manager of the Zohar Funds by Zohar I II's controlling creditor, MBIA.[4]

### III.     Overview of the Zohar Funds and My Enterprise.

A.     **My First Funds – Formation of the Arks.**

17.     After nineteen years of experience on Wall Street, I founded Patriarch Partners in 2000 to develop innovative solutions for financial institutions with large portfolios suffering

---

[4]   As of January 20, 2017, AMZM's role as Collateral Manager of Zohar I was terminated.  As discussed in greater detail below, the collateral of Zohar I was liquidated in its entirety at auction and the proceeds of that auction were distributed by U.S. Bank, the Trustee of the Zohar Funds on January 20, 2017.  In light of the liquidation of all of the Zohar I collateral and distribution of the proceeds therefrom, pursuant to Section 5.1 of Collateral Management Agreement among Zohar I and AMZM, dated March 3, 2016 (the "Zohar I CMA"), the Zohar I CMA has terminated.  Accordingly, subject to Sections 5.5 and 5.6 of the Zohar I CMA, all of AMZM's rights, duties, and obligations under the Zohar I CMA terminated on January 20, 2017.

under the burden of nonperforming and distressed loans that were causing them accounting and

regulatory issues.

18.     I created a ground-breaking model for investing in a portfolio of distressed loans,

through a CLO, that would use borrowed funds from investors to purchase a portfolio of

distressed loans at a discount and, through active management and restructuring, repay

noteholder investors their principal plus interest, with residual value flowing to me and my

partners.

19.     In November of 2003, I was granted a business method patent, Patent No. US

6,654,727 B2 (Method of Securitizing a Portfolio of at Least 30% Distressed Commercial Loans)

for the CLO investment model I created and is the basis for the Zohar Funds' model.  My

investment method—that I utilized with respect to the Zohar Funds—was described by an

administrative law judge of the Securities and Exchange Commission (the "<u>SEC</u>"):

> Having become interested in distressed assets, Tilton developed a
> method of evaluating distressed loans – analyzing the potential
> cash flows and other factors; and determining on that basis whether
> to purchase, and an appropriate price for, each loan to make up a
> portfolio of varied loans that would generate sufficient cash flows
> to pay expenses, including interest and principal to investors in a
> vehicle that would hold the portfolio.  A portion of the pool had to
> have a high likelihood of paying interest on a consistent basis, in
> order to pay investors; as Tilton explained, if all the loans were
> non-performing at the start, there would be no interest coming in to
> pay investors, while if all were higher quality, there would not be
> enough potential for profit because she would have to pay too
> much for them…Tilton obtained equity and became active in
> management of the Portfolio Companies.  Since some of the
> Portfolio Companies were bound to fail, it was necessary for some
> to succeed in order to mitigate the risk of loss.

20.     I initially created two CLO issuers in 2000 and 2001, respectively called Ark I

CLO 2000-1 Ltd ("<u>Ark I</u>") and Ark II CLO 2001-1 Ltd ("<u>Ark II</u>"), each of which is a Cayman

Islands company (collectively, the "<u>Arks</u>"), based on this innovative investment strategy.  The

Arks were widely recognized as successful transactions, and the Arks repaid their noteholders well ahead of their respective maturity dates.

21.     My fund strategy involved my active management and control of the Portfolio Companies, unlike many CLOs, which passively invest in debt.  As a result, at the closing table for Ark I, the rating agency (S&P) objected that, unlike most other CLO funds, my fund would be engaged in U.S. trade or business for U.S. tax purposes, which would subject it to unquantifiable tax liabilities such that the rating agency was not willing to rate the deal.

22.     In order to obtain an investment grade rating from S&P, which was necessary for the closing of the transaction, I formed a separate entity that actively managed Ark I's assets, allowing Ark I to remain a passive income vehicle that was not subject to U.S. trade or business taxes.

**B.      Structure of Subsequent Funds – Creation of the Zohar Funds.**

23.     The successes of the Arks, and Ark II in particular, which MBIA had insured, prompted MBIA to reach out to me to request priority on any similar transactions in the future. In 2002, facing a potential insurance liability shortfall of $200-300 million on a set of unrelated CDOs, MBIA sought my help.

24.     Patriarch became the replacement Collateral Manager for MBIA's seven failing CDOs ("MBIA Funds"), and I created a new CLO called Zohar I, modeled after the Ark investment strategy and structure, to help remediate MBIA's shortfall.

25.     The ratings agencies had the same concern for Zohar I with respect to tax and other liabilities as they did for the Arks.  As a result, Zohar I was structured, like the Arks, as a disregarded entity with a U.S. taxpayer (Octaluna I, the sole preference shareholder of Zohar I) serving as the owner of the Zohar Funds and the active manager of Octaluna I's assets.

26. This structure was the essential element of closing the deal, so that Zohar I would not be subject to U.S. tax liability.

27. After Zohar I closed, prices for distressed loans increased, and I felt that I would no longer be able to ramp up Zohar I by purchasing distressed loans from the secondary market alone.

28. Instead, I proposed a revised strategy to MBIA: Zohar I would continue to purchase distressed senior secured loans, but the primary strategy would be for Zohar I to originate loans to distressed Portfolio Companies, side-by-side with my personal investment vehicles investing in the Portfolio Companies, so that I could gain control over the distressed companies and implement a long-term turnaround strategy to create value.

29. MBIA chose to proceed with the revised investment strategy, and the governing documents were amended accordingly.

30. After Zohar I had deployed and invested the majority of its capital, I created two more entities to increase purchasing power and to extend additional loans to Portfolio Companies. Zohar II and Zohar III were formed in 2005 and 2007, respectively, to loan side-by-side with Zohar I and my personal investment vehicles, and to pursue the same investment strategy.

31. I have personally invested approximately $218.5 million into the Zohar Funds: $5.1 million in Zohar I, $50 million in Zohar II, and $60 million in Zohar III, respectively, to own the preference shares of each of the Zohar Funds, and $103.4 million to own the A-3 Notes in Zohar I. In addition, I have invested in and loaned more than $440 million to the various Portfolio Companies.

A-13

32.     As noted above, each of the Zohar Funds raised capital by selling notes and preference shares, which entitled Noteholders to interest payments and a return of principal at the maturity date.  Noteholders have no right to receive any payment beyond interest payments and a return of their principal at maturity.

33.     The fundamental investment strategy of the Zohar Funds differed markedly from traditional CLOs.  Most CLOs involve highly rated performing bank loans.  The Zohar Funds held primarily distressed loans purchased from the secondary market and loans originated at high interest rates by the Zohar Funds, themselves, to distressed companies.

34.     Given the nature of the Zohar Funds' investment—loans to distressed companies—the Noteholders and MBIA never expected that every Portfolio Company would repay its loans in full.  Instead, the strategy for interest payment and eventual note repayment was premised on the following expectations: (1) Portfolio Companies would pay high interest on loans the Zohar Funds originated; (2) distressed loans purchased on the secondary market would repay the Zohar Funds in excess of the price the Zohar Funds paid for the loan; and (3) the Zohar Funds would have an equity upside interest in the net proceeds from sales of the Portfolio Companies.

35.     Because of these unique features, the Zohar Funds' success was predicated both on me having the authority (as Collateral Manager) to control the terms of repayment on the loans as well as the power (as equity owner of the Portfolio Companies) to direct the rebuilding of the Portfolio Companies, serving as company director and often as an officer, working with management to create value for the Portfolio Companies for all stakeholders.

36.     That I took on multiple, active roles in the Zohar Funds enterprise was an essential factor for MBIA when it invested.

A-14

37.     I am the principal and owner of several affiliated Patriarch entities, including Patriarch VIII, Patriarch XIV, and Patriarch XV, that, as noted above, served as Collateral Managers of the Zohar Funds.  I, or entities owned by me, also served as administrative agent for the lenders, Zohar Funds' equity owner, and owner and manager of the Portfolio Companies. This allowed me, for example, to renegotiate loan terms to prevent a Portfolio Company default. These multiple roles—which were fully disclosed and any conflicts arising out of them waived— ultimately benefited the Noteholders (as well as the Portfolio Companies) by ensuring that the Portfolio Companies continued to pay their debts to the greatest extent possible, even when faced with short-term liquidity shortfalls.

38.     I had broad authority as Collateral Manager to control the repayment terms of the Portfolio Companies and typically acquired a controlling interest in Portfolio Company equity, allowing me to revive and rebuild the Companies.  My equity stake in both the Zohar Funds and the Portfolio Companies gave me a deep and broad personal interest in their success.

39.     Although I retained the voting rights attendant to that Portfolio Company equity and bore the tax and other liabilities inherent to that equity, I also granted the Zohar Funds a limited interest in a sale of that equity as well.  Specifically, as noted above, I decided that each Fund would receive the first dollars of net proceeds from any sale of the Portfolio Companies for its respective interest up to the amount needed to pay all outstanding interest and principal on its notes.  The equity upside interests were granted to the Zohar Funds to ensure that Noteholders would be fully repaid even if some distressed Portfolio Companies were unable to repay their loans (as expected).

40.     To memorialize this arrangement, I listed the Zohar Funds as the record holders of the Portfolio Company equity.  The Zohar Funds' governing documents established a waterfall

through which Portfolio Company sales proceeds (as well as interest and principal payments made to the Zohar Funds) flow: the proceeds run through the Zohar Funds waterfall, paying Noteholders principal and interest due and paying the Zohar Funds' expenses. Only after the Noteholders are paid in full do the residual proceeds inure to me as the sole Zohar Funds preference shareholder.

**C.    The Zohar Funds' Noteholders.**

41.    The Zohar Funds' Notes are secured and were issued primarily in two classes— Class A (with each Class A tranche having subclasses of notes) and Class B. The Class A subclasses have an interclass priority waterfall and have differing applicable principal amounts, interest rates, commitment fees, and other varying features. The Class B Notes are all held by the Octaluna Entities (and therefore indirectly by me) and, while also secured, are subordinate in right of payment to the Class A Notes. All of the Debtors' obligations under the Zohar Funds' Notes are non-recourse.

42.    A summary of the Zohar Funds' Note issuances and outstanding debt is as follows:

| Zohar I Notes Class | Principal Amount | Issued | Maturity | Approximate Outstanding |
|---|---|---|---|---|
| Class A-1 | $150 million | 2003 | 11/20/15 | $0.00 |
| Class A-2 | $32 million | 2003 | 11/20/15 | $0.00 |
| Class A-3a | $297.5 million | 2003 | 11/20/15 | $234 million |
| Class A-3b | $52.5 million | 2003 | 11/20/15 | $52.5 million |
| **Total Class A:** | **$532 million** | | | **Total: $286.5 million** |
| Class B | $150 million | 2003 | 11/20/15 | $150 million |

| Zohar II Notes Class | Principal Amount | Issued | Maturity | Approximate Outstanding |
|---|---|---|---|---|
| Class A-1 | $250 million | 2005 | 1/20/17 | $190 million |
| Class A-2 | $550 million | 2005 | 1/20/17 | $418 million |
| Class A-3 | $200 million | 2005 | 1/20/17 | $152 million |
| **Total Class A:** | **$1 billion** | | | **Total: $760 million** |
| Class B | $200 million | 2005 | 1/20/20 | $200 million |

| Zohar III Notes Class | Principal Amount | Issued | Maturity | Approximate Outstanding |
|---|---|---|---|---|
| Class A-1R | $200 million | 2007 | 4/15/19 | $136 million |
| Class A-1T | $150 million | 2007 | 4/15/19 | $102 million |
| Class A-1D | $350 million | 2007 | 4/15/19 | $237.5 million |
| Class A-2 | $200 million | 2007 | 4/15/19 | $200 million |
| Class A-3 | $116 million | 2007 | 4/15/19 | $116 million |
| **Total Class A:** | **$1.016 billion** | | | **Total: $791 million** |
| Class B | $196 million | | 4/15/19 | $196 million |

43.    The Zohar Funds' Notes are held by highly sophisticated, institutional investors. "The terms of the Zohar indentures and accompanying note forms and certificates show that the notes were primarily intended for Qualified Institutional Buyers and Qualified Purchasers and include strict restrictions on the transfer of the notes."[5]  I am advised that the Securities Act Rule 144A defines a "Qualified Institutional Buyer" as a list of specified entities that "acting for its own account or the accounts of other qualified institutional buyers, that in the aggregate owns and invests on a discretionary basis at least $100 million in securities of issuers that are not affiliated with the entity…"  I am also advised that a "Qualified Purchaser" is defined in Section 2(a)(51) of the Investment Company Act of 1940 to include "(i) any natural person…who owns not less than $5,000,000 in investments, (ii) any company that owns not less than $5,000,000 in investments and that is [family-]owned, (iii) [certain kinds of trusts]; or (iv) any person, acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis, not less than $25,000,000 in investments."

44.    Of the $532 million in original Zohar I Notes, $350 million was raised from Barclays Bank and the remaining $182 million was raised from Natixis Global Asset Management and MBIA.  The Zohar I Notes were also "wrapped" by MBIA, as credit enhancer. In its capacity as credit enhancer, MBIA insured Zohar I's obligations under the Zohar I Notes

---

[5]    *In re Lynn Tilton*, Initial Decision, SEC Exchange Act Release No. 1182, 2017 WL 4297256, at *9 (ALJ Sept. 27, 2017).

by providing a financial guarantee to certain classes of holders of Zohar I Notes to pay its interest and principal in full, if Zohar I could not meet its repayment obligations.  Under the applicable insurance contracts, upon the payment of claims following a default under the Zohar I Notes, MBIA is fully subrogated to the rights of the applicable Class A Zohar Funds Noteholders.

45.     On the Zohar I deal, Barclays notes—the Series A-3 notes—were separately insured by MBIA apart from the insurance provided to the other Zohar I Noteholders (though that insurance was later separately commuted).  As discussed more fully below, in 2015, Barclays Bank sold its position in Zohar I to my wholly-owned entity, Patriarch XV, LLC ("Patriarch XV") for approximately $103 million and received an undisclosed payment from MBIA on account of its wrap obligations.  Patriarch XV currently holds all of the Class A Zohar I Notes (although MBIA purported to extinguish those rights through an auction that is now the subject of ongoing litigation in the U.S. District Court for the Southern District of New York).

46.     MBIA has also wrapped the Zohar II Notes.  After Zohar II defaulted on the Zohar II Notes on January 20, 2017, MBIA was required to pay the then-holders of the Zohar II Notes approximately $770 million.  MBIA currently holds all of the Class A Zohar II Notes.

47.     To the best of my knowledge, the holders of the Zohar III Notes comprise a small group of approximately 15[6] Noteholders and, like the holders of the other Zohar Funds Notes, are highly sophisticated, institutional investors.

**D.      Ownership of the Zohar Funds' Preference Shares.**

---

[6] There are approximately 25 Class A Zohar III Noteholders, but a number of them are affiliated entities.

48.     I am the ultimate owner of the Zohar Funds because I own, directly or indirectly, the entities that own the preference shares of the Zohar Funds.  As preference shareholder, I receive the residual value in the Zohar Funds after the Zohar Funds notes are repaid.  Prior to repayment of the notes, I was entitled only to a capped amount of dividends which I received several years ago.

49.     As described above, when I formed Zohar I, I formed an entity called Octaluna, I to, among other things, serve as the U.S. taxpayer owner for Zohar I and owner of the Zohar I preference shares.  (I sometimes refer to the Octaluna Entities as "blocker affiliates.")  For the later funds we formed similar entities: for Zohar II, Octaluna II and for Zohar III, Octaluna III, respectively.

50.     The Octaluna Entities were created to own, hold, and control the assets of the Zohar Funds, and to bear the tax consequences, good or bad, from that ownership.  In each case, the Octaluna Entities are the beneficial owners of the assets held by the Zohar Funds, and I am the ultimate owner of the Octaluna Entities.

51.     In particular, each of the Octaluna Entities holds the preference shares of the relevant Zohar Funds.  These are the Zohar Funds' only outstanding shares.  The Octaluna Entities also own all of the Class B notes issued by the Zohar Funds.

52.     The Zohar Funds were, until 2016, classified as disregarded entities for U.S. federal tax purposes.  The Zohar Funds are passive income vehicles which receive only the cash flow from the Zohar Funds' assets.

53.     The preference shares (i.e., the equity) of each Zohar Fund are wholly owned by the corresponding Octaluna Entities, which are themselves owned by other entities ultimately owned by me.  Through my personal investment vehicles, I paid a total of $5.1 million in cash

and assets in exchange for the preference shares in Zohar I.  Similarly, through my personal investment vehicles, I paid a total of $50 million in cash and assets in exchange for the preference shares in Zohar II.  For Zohar III, I paid in total $60 million in cash in exchange for the preferences shares held by Octaluna III.

54.    By virtue of this ownership structure, I, or entities ultimately owned by me, have been allocated more than 99% of the income, gain, and loss of all of the entities which are held by the Octaluna Entities.

55.    Accordingly, entities I own have historically reported all income of the Zohar Funds, as well as income generated by the debt and equity investments in the Portfolio Companies.  Prior to 2016, all such income flowed up by way of a series of pass-through entities to my personal tax return.  Any resulting tax liability was borne by me personally.

56.    During that time, the IRS had always treated me as the tax owner of the entire enterprise structure—which includes the Portfolio Companies, Zohar Funds, Octaluna Entities, and other entities.  When my tax returns were prepared for the 2016 and prior tax years, my tax return preparer allocated Portfolio Company income and loss up to me, and ultimately reported all of the income and loss of the Portfolio Companies organized as limited liability companies (defined below) on my personal tax return.

57.    Since the inception of the Zohar Funds, I had reported taxable income in respect of interest income and capital gains.  Additionally, if a Portfolio Company were sold, I was ultimately responsible for reporting, and for any tax liability in connection with, any resulting capital gains or income.

58.    Beginning in 2016, however, the Zohar Funds elected to be taxed as corporations for U.S. federal tax purposes and therefore were no longer treated as pass-through entities.  Since

that time, entities wholly owned by me have been allocated Portfolio Company income and loss, and are subject to U.S. federal tax . Additionally, these entities are responsible for reporting, and for any tax liability in connection with, any resulting capital gains or income from the sale of a Portfolio Company.

## IV.    The Portfolio Companies are Extremely Successful.

59.    The Portfolio Companies today comprise twenty-five (25) operating business platforms across a broad spectrum of industries including automotive and aerospace, fashion, technology, manufacturing, industrial and home goods.  Many of the Portfolio Companies are storied American brands such as MD Helicopters, Stila Cosmetics, Rand McNally, Oasis Water, Dura Automotive, Universal Instruments and Dana Fragrances.  I have played a very active role in the management, strategic direction and rebuilding of each and every Portfolio Company from the day I negotiated their respective acquisitions.  For those Portfolio Companies in which I serve as CEO, I am deeply involved in their day-to-day management.

60.    In addition to the active management role played by me, Patriarch affiliates, Patriarch Partners Management Group ("PPMG") and Patriarch Partners Agency Services ("PPAS"), provide operational management consulting and agency services to the Portfolio Companies.

61.    In addition, entities I directly or indirectly own, separate from the Zohar Funds, have invested more than $440 million in the Portfolio Companies.

62.    Prior to the Zohar Funds' investment, the Portfolio Companies were often deeply distressed and typically had no positive cash-flow as they were often purchased out of bankruptcy and foreclosure sales, and sometimes were merely assets not operating.  These Portfolio Companies were generally unable to obtain funding from any source other than from the Zohar Funds or my personal investment vehicles.

A-21

63.     The Zohar Funds and my personal investment vehicles were often the sole lenders to the Portfolio Companies, which allowed me to control the terms of the loans without having to address the competing interests of other lenders.  I, and entities owned or controlled by me, often owned all or almost all of the equity in the Portfolio Companies.

64.     I was, and continue to be, actively involved in the management of the Portfolio Companies, often acting as CEO and as a board member or manager of the Companies (in most cases, the sole board member or manager).  This active involvement allows me to design and direct the strategies for revitalization of the Portfolio Companies, which was a key selling point for the Zohar Funds' investors.

65.     Under my active involvement, many of the Portfolio Companies have thrived and currently provide more than 50,000 jobs, primarily for American workers, in a number of industries.  A few examples of my success stories are described below, but the list of Portfolio Company successes detailed below is by no means exhaustive.

A.     **Reinventing an American Icon – MD Helicopters**

66.     MD Helicopters' U.S. roots date back more than 60 years to 1955, when the Hughes Tool Company, Aircraft Division (part of Hughes Aircraft, which was established by famed businessman and aviator, Howard Hughes) first developed "light helicopters."  In 1984, Hughes sold its successful helicopter business to McDonnell Douglas, which opened the Company's Mesa, Arizona facility at Falcon Field.  In 1997, McDonnell Douglas merged with Boeing to become the Boeing Company.  In 1999, Boeing sold some of McDonnell Douglas's commercial helicopter lines to MD Helicopter Holdings Inc., an indirect subsidiary of the Dutch company, RDM Holding Inc.

67.     Until I purchased MD Helicopters, the Company's ability to continue operations was in serious question.  In late 2001, the Company began experiencing production delays

related to two groups of highly specialized helicopters. These production delays created a situation where the Company was forced to borrow money to account for slower revenue generation. In fact, because of the production delays and the increased debt, by 2005, the Company had incurred substantial operating losses, was in default on a credit facility and other loans extended by Wachovia Finance Corporation, and indebted to Boeing Capital Corporation, Textron and others. Wachovia was under no further obligation to make loans, nor were they willing to extend any other financial accommodations to the Company. MD Helicopters was facing financial crisis and imminent liquidation of its assets.

68.      In July 2005, acting through my Octaluna Entities and Patriarch affiliates, I acquired MD Helicopters to restructure, recapitalize, and save this iconic American brand. Since then, I have invested more than $82 million of my personal funds into MD Helicopters.

69.      In order to effectuate the turnaround and revitalize the Company, I was appointed as MD Helicopters' sole director in 2005, and also assumed the role of Chief Executive Officer in late 2006. Under my leadership, MD Helicopters has flourished.

70.      In 2005, MD Helicopters employed around 150 people in Arizona. Today it employs nearly three times that number, more than 500, at its Mesa headquarters alone, and has plans to hire an additional 150 employees over the course of 2018.

71.      Over the past 12 years, MD revenue has grown ten-fold with more than 60% revenue growth projected for 2018. MD Helicopters has been reestablished as a premier U.S. defense contractor providing military aircraft, both training and armed helicopters to the U.S. military as well as to foreign military forces around the world. The Company has also been awarded and successfully managed numerous contractor logistics support ("CLS") contracts in support of U.S. and foreign military installations.

72.     Today, MD Helicopters has more than 2,500 aircraft in service around the world, with customers and fleet users including U.S. Special Operations, Afghan Air Force, Saudi Arabia National Guard, Jordanian Special Forces, Korean Armed Forces, Japanese Self Defense Forces, Houston Police, Columbus Police, Finnish Armed Forces, and many others.  MD Helicopters is known for producing safe, versatile, responsive, and reliable aircraft that are able to fly "hot and high."

73.     In recognition of its revitalization, MD Helicopters has received numerous aviation and law enforcement awards, and now boasts an "aircraft on ground" or AOG rate among the lowest in the industry and a flight readiness rate among the highest in the industry.

74.     This turnaround is due to my tireless work in executing growth strategies for MD Helicopters.  My strategies have proven extraordinarily successful.  MD Helicopters is now a thriving Company with a bright future: indeed, the United States Army recently awarded MD Helicopters a $1.4 billion contract for 150 armed aircraft, adding two named aircraft to its fleet.

**B.      A California Success Story – Stila Cosmetics**

75.     For over 20 years, Stila has created innovative, artistry-proven cosmetics and other personal care products.  Stila was created by celebrity makeup artist Jeanine Lobell in 1994. The cosmetics line was bought by Estee Lauder in 1999, only to be accounted for as a "discontinued operation" and then sold to Sun Capital Partners in 2006.  By 2009, however, Stila had defaulted on a loan and its creditors forced it into an involuntary bankruptcy, where Wachovia Corp. and CIT Group took the Company over from Sun Capital Partners through a foreclosure sale. Prior to my acquisition, Stila's predecessor company was just days away from going under for good—all employees had been placed on furlough; the company's website was taken down "for routine maintenance," with a note that previously placed orders might be canceled; and calls to the Company's Glendale, California headquarters were going unanswered.

76.     In 2009, I created Stila Styles, LLC, to acquire substantially all of the assets of Stila Corp., Stila International, Inc., and its affiliates, Stila UK Limited, and Stila Holding Corp. At the same time, the Company entered into a credit agreement with Zohar III, which issued a $7 million senior secured term loan and a $5 million revolving credit loan.  All of the loans to Zohar III have now been repaid.  In addition, a preferred equity interest which was provided to Zohar III for a zero purchase price in the amount of $3.5 million has also been paid in full.

77.     Under my stewardship, Stila has been completely transformed into a highly successful California business.  The Company is again recognized as an innovation leader, spearheading much of the color cosmetics industry in creating new product categories, elegant packaging design  and consistently evolving its products.  The Company redesigned its distribution, adding significant international revenues, strengthening the brand, and consolidated its sourcing partners to form strong relationships.  The Company also implemented a new inventory management system to ensure on-time launches and in-stock levels above 99%.  As a result, the Company is now operating at a significant profit, employs more than 75 workers in 3 locations, and enjoys double digit revenue growth.

78.     The Company's tremendous success is a direct result of my hands-on guidance and expertise in my role as the CEO.  This success is also due in no small measure to my personal investments in the Company, which currently includes financing totaling approximately $14 million.  Stila is now on firm footing, highly profitable and has a solid upward trajectory for future growth.

**C.     The Crown Jewels of Michigan's Auto Suppliers – Dura and GAS**

79.     I am the manager, CEO, and owner of Dura Buyer, LLC  ("Dura Buyer"), Dura Automotive Systems, LLC ("Dura Auto") (collectively, "Dura"), and Global Automotive Systems, LLC ("GAS").

A-25

80.     For more than a decade under my stewardship, these once-distressed companies have risen again as Tier 1 suppliers to Michigan's legacy automotive companies, as well as the international automotive base.  Like the industry they serve, these companies have had their struggles.  They were on the brink of collapse and liquidation when I stepped in as manager and owner, and since then I have done everything to save them.

81.     I spent years working tirelessly to bring these automotive companies back from the brink of extinction, including infusing them with more than $32 million of my own personal funds.

82.     In addition, I invested "sweat equity"—putting in time in Michigan, and across the globe, boots on the ground—to bring the companies back to life, seeing them through the 2008 financial crisis and the harsh years that followed, and transforming them into profitable, woman-owned businesses that are the jewels in the crown of Michigan's automotive industry.

83.     GAS was formed by me in 2005, as a platform to acquire and consolidate certain assets and operations, including poor performing metal bending, rollforming and stamping suppliers.  I began by acquiring out of bankruptcy the assets of a trio of Michigan companies— Jacobs Industries, Metalforming Technologies, and Trim Trends—and consolidating them into GAS.  The Zohar Funds and Ark Investment Partners II, L.P. (an entity I wholly own), initially committed to extend term and revolving loans of over $115 million to GAS and its related entities.

84.     The foundational documents for GAS direct that I will act as the sole Manager of GAS, and I further assumed the position of Chief Executive Officer in October 2012.

85.     Since its inception in 2005, and under my control and leadership, GAS has transformed into a high technology manufacturing platform.  I have structured GAS's operations

in a manner that has made the Company profitable and recognized as a top supplier in its market. GAS has also been able to leverage collaborative partnerships within my network of Portfolio Companies, which has not only reduced costs but allowed GAS to utilize real-time data collection to efficiently monitor and improve each step in its manufacturing process.

86.     Dura Automotive, together with its affiliated entities, is a leading independent designer and manufacturer of driver control systems, advanced driving systems, infotainment systems, lightweight metal structures, electrical vehicle battery trays, seating control systems, glass systems, engineered assemblies, structural door modules and exterior trim systems for the global automotive industry.  Dura Automotive, through predecessors, dates back more than 100 years.

87.     After years of borrowing to fund its acquisition strategy, Dura Automotive had a 12:1 debt to EBITDA ratio before it filed for Chapter 11 bankruptcy protection on October 30, 2006.  Although it emerged from bankruptcy protection in June 2008, the restructured entity could not withstand the economic and financial downturn that began in late 2008.  The Company, in fact, was just days away from liquidation, owing in excess of $30 million to its customers, as well as hundreds of millions to its creditors, when, in October of 2009, I stepped in.

88.     I formed Dura Buyer on or about November 10, 2009 to own a controlling interest in Dura Automotive.  Dura Automotive then entered into both U.S. and European credit agreements with Zohar II and Zohar III in January 2010, with commitments totaling across the agreements of $ 105.9 million.  Dura Buyer ultimately came to own and control a 73% interest in Dura Automotive, through the purchase of preferred securities in the amount of $20 million.

89.    Since I took control, GAS and Dura have been transformed.  They now operate in 36 locations in 15 different countries.  As of January 1, 2017, they had approximately 12,000 employees, and annual sales of approximately $1.5 billion, generating substantial positive EBIDTA.  This is a far cry from the companies' financial state of significant losses and broken customer relationships that were existing before I created GAS and Dura Buyer and took control.

90.     As a result of my transformation of the Portfolio Companies I have received a number of awards from industry publications and groups.  Just a few examples: in 2010, Automotive News named me one of the 100 Leading Women in the automotive industry.  In 2011, I was inducted into the Living Legends of Aviation Hall of Fame and named Entrepreneur of the Year; the first female in history to receive that distinction.  In 2012, in my capacity as the CEO of Dura Automotive, the Women's Business Enterprise Council – Great Lakes presented me with the Role Model & Mentor of the Year Award.  I was also subject of a Barbara Walters 20/20 interview discussing my mission of saving American jobs and a special Made in America segment with Diane Sawyer on ABC's World News Tonight.  CNBC and its viewers also named me one of the 100 Most Influential Names in Business over the last 25 years.

### V.    The Zohar Funds' Preference Shares Are "In The Money."

91.    There is significant value in the Portfolio Companies in excess of the liabilities of the Debtors.

92.    As I testified in late 2016, in a proceeding brought by the Securities & Exchange Commission (the charges were dismissed in full on the merits after trial), Patriarch has performed financial analyses to value the Portfolio Companies that demonstrates that even a select group of top-performing Portfolio Companies is worth billions of dollars.

93.    Other stakeholders recognize the same value.  For example, according to one MBIA valuation of a selection of 11 Portfolio Companies—comprising a small subset of the total

number of Portfolio Companies in the Zohar Funds, for Zohar I and II only—that subset of Portfolio Companies have a combined value, for the benefit of Zohar I and II only, ranging between $952 million and $1.484 billion, which is far in excess of the amount MBIA claims as the controlling creditor.

94.     Documents MBIA produced in discovery in an action initiated by AMZM in the Delaware Court of Chancery (the "Section 225 Action") regarding the ownership and control of three Portfolio Companies, demonstrated further that MBIA believes the Zohar Funds preference shares are "in the money"—namely, that upon the sale of these Portfolio Companies, there would be residual value to holders of the Zohar Funds preference shareholder after the Noteholders have been paid in full from proceeds of such Portfolio Company sales.  As the preference shareholder of the Zohar Funds, any residual value would then flow to me, by the terms of the payment waterfall.

95.     As noted above, when creating the Zohar Funds, I recorded Portfolio Company equity in the Zohar Funds' name for the purpose of granting the Zohar Funds an "equity upside" interest.  This interest provides that the net proceeds from any Portfolio Company sale run through the Zohar Funds' waterfall, thereby protecting Noteholders by paying them with such proceeds first until their note obligations are satisfied in full before paying any residual proceeds to me as the Zohar Funds' preference shareholder.

96.     Whether I, through the Octaluna Entities, or the Zohar Funds own the equity in the Portfolio Companies has no impact on the structural framework of this payment waterfall.  In other words, regardless of who owns the Portfolio Companies, the net proceeds from any Portfolio Company sale would first go towards payment in full to the Noteholders  through the payment waterfall, with any residual proceeds flowing to me.  Therefore, the outcome of the

ongoing litigations filed in other jurisdictions will not impact the distribution of funds upon the sales or refinancings of Portfolio Companies during this bankruptcy proceeding. Nonetheless, as further described below, the ongoing litigations have hindered the ability of the Zohar Funds to maximize the value of the Portfolio Companies.

## VI.  The Value of the Zohar Funds is Locked and Cannot be Monetized Except Through the Bankruptcy Process.

97.     The current Collateral Manager for the Zohar Funds, AMZM, at the direction of MBIA and the Zohar III controlling class of noteholders ("Zohar III Noteholders"), and on behalf of the Zohar Funds, and I (and various entities I own) are engaged in protracted litigations spanning a number of actions across federal and state jurisdictions. AMZM, MBIA and the Zohar III Noteholders alleged that the Zohar Funds are the beneficial owners of the Portfolio Company equity interests recorded in the Zohar Funds' names. But, as noted above, the Zohar Funds were never structured to own equity in the Portfolio Companies; the Octaluna Entities are and always have been the beneficial owners of the equity in the Portfolio Companies.

98.     As noted above, this dispute over who has beneficial ownership of the equity in the Portfolio Companies, however, is meaningless in the context of this proceeding. At such time as the Portfolio Companies are sold or refinanced, the net cash proceeds from that activity will flow through the waterfall to repay the Noteholders in full, first, before any funds inure to the benefit of the preference shares.

99.     Nonetheless, the consequence of the protracted litigations over ownership has cast a cloud of uncertainty over the Zohar Funds, making it unfeasible for the Portfolio Companies to refinance their existing debt facilities or for me, on behalf of the Portfolio Companies, to consummate any sale transaction. Indeed, I have been told that bankers will not market these transactions, and that buyers will not complete the due diligence to acquire them, if there is any

chance that a closing of the transaction will meet obstacles posed by the ongoing and various litigation matters. Further, the Portfolio Companies have consistently met roadblocks in efforts to refinance their loans due to risk committees that will not permit lending due to litigation risk. The ongoing litigations have effectively locked the value of the Portfolio Companies, rendering it virtually impossible to monetize the Zohar Funds' assets for the benefit of all stakeholders.

100.     It should also be noted that, in various pleadings, filings, and testimony throughout these actions, MBIA and AMZM have repeatedly accused me of wrongdoing and impugned my character. I have vehemently denied these false allegations. Despite the environment of baseless accusations they systematically create, neither MBIA, AMZM, nor anyone else, has ever presented any evidence at any trial or evidentiary hearing to support their allegations, and no court has ever credited any such allegations. Moreover, in relentlessly attacking me, MBIA and AMZM have ignored their own fiduciary duties as controlling creditor and Collateral Manager, respectively, in their unwavering quest to seize control of the Portfolio Companies, regardless of what damage it causes to them.

101.     Indeed, I was fully vindicated by an SEC Administrative Law Judge ("ALJ") following a three-week trial in an administrative proceeding instituted against me, Patriarch and the Patriarch Collateral Managers (collectively, the "Patriarch Respondents") (the "SEC Action"). In that proceeding, the SEC alleged that the Patriarch Respondents collected unearned management fees and other payments based on inflated values of the Portfolio Companies, defrauded Noteholders, and breached fiduciary duties to them and the Zohar Funds by failing to disclose certain alleged conflicts of interest and by issuing misleading financial statements pertaining to the impairment and value of certain of the Zohar Funds' assets. During the course of the SEC's seven (7) year investigation, MBIA witnesses cooperated with the SEC and were

prepared to testify at trial in the SEC's case in chief (though in the end no MBIA witnesses were called). Following a 14-day trial—which included eighteen witnesses (of which nine were experts) and three and one-half days of testimony from me—Administrative Law Judge Carol Fox Foelak concluded that the SEC had failed to prove any of its allegations and, therefore, dismissed all charges. But again, these allegations are irrelevant to this proceeding. I mention this only so that these continued allegations do not cloud the focal argument and need for appealing to this court of equity. I seek, in this Court, only a mechanism to maximize value for all of the Zohar Funds' stakeholders and to protect the Portfolio Company constituents and monetize their considerable value.

102.    My strategy for the Zohar Funds has always been to build value and monetize that value by selling the Portfolio Companies or refinancing their debt, and to execute in a manner that will maximize the value to the benefit of all Zohar Funds' stakeholders. Indeed, I already have monetized billions of dollars of assets across the Zohar Funds and have always planned to sell these remaining Portfolio Companies. I have expressed this strategy of monetization and intention to the Zohar Funds' stakeholders on many occasions over the years. But, as described in further detail below, the current litigious environment has made it very difficult to sell or refinance the Portfolio Companies, while maximizing their value.

**D.    MBIA Has Presented Obstacles to My Prior Attempts to Restructure the Zohar Funds.**

103.    I began exploring, in 2011 and 2012, restructuring options that would avert a default of Zohar I on its maturity date. By the terms of the Zohar I indenture, the consent of all Noteholders is required in order to change the maturity date or otherwise effectuate any amendment  that would affect the payment, timing or amount of principal and interest due on the Zohar I notes.

A-32

104.    I believed that an extension of the Zohar I maturity date would have been in the best interest of all the Noteholders because it would have prevented a situation where I would be forced to sell the Zohar I collateral under "fire sale" conditions in order to stave off Zohar I's default.  Such a sale would have resulted in proceeds far less than the Portfolio Companies' true value and would have significantly impaired the future cash flows and recoveries for Zohar II and Zohar III, both of which had overlapping collateral and were not yet facing a maturity.  The triggering of potential defaults and the impairment of future value in Zohar II and III, I believed could have been avoided by aligning the Zohar I and Zohar II maturities, while also providing more time for the parties to negotiate a global restructuring of all of the Zohar Funds, and to allow monetization of the assets in an orderly fashion to maximize value for all Zohar stakeholders.

105.    I believed so strongly in the need for such restructure, which would have provided me sufficient time to sell the Portfolio Companies in an orderly manner, that on March 26, 2015, merely 8 months before the maturity date of Zohar I,  I purchased the A-3 notes in Zohar I from a noteholder who refused to consent to any extension or restructure.  I "took them out" and paid for 35 cents on the dollar, paying a total of $103,919,863.34.  At the time, I believed MBIA's representations that my purchase of the notes would facilitate the proposed restructure, because it would remove the only other party, other than MBIA and my entities, whose consent would be necessary to effectuate an extension of the Zohar I maturity date.  I remain the current holder of the A-3 notes in Zohar I.

106.    As the Collateral Manager of the Zohar Funds, I was required by the terms of the Zohar I Indenture to begin selling the Zohar I collateral in May 2015, six months prior to the Zohar I maturity date.  The Indenture also provided that the proceeds of such a sale would be

31

A-33

distributed to the Class A-1, A-2 and A-3 Noteholders pari passu. Because the Class A-3 Notes had by far the larger balance, I would have received roughly twice the distribution of the notes insured by MBIA—approximately 66 percent of every dollar distributed to the Zohar I Noteholders following such a collateral sale. But if Zohar I matured, my interests would be subordinated to MBIA's, as the Class A-3 Notes are subordinated to the Class A-1 and Class A-2 Notes.

107.    Prior to May 2015, MBIA informed me that it did not want me to sell the Zohar I collateral, and asked if I would be would be willing to amend the Indenture to remove this requirement so that the parties would have more time to negotiate and complete a restructuring. My goal has always been to maximize the value of Zohar Funds' assets for all the stakeholders. I therefore agreed to amend the Indenture even though my Class A-3 interests entitled me at the time to a substantially higher payout than MBIA would receive, because an extension of the maturity date was in the best interest of all stakeholders of all three Zohar Funds. I also believed the statements that MBIA made to me and statements they made publicly on their earnings calls that they, too, believed that working with Patriarch towards a global restructure of the Zohar Funds was in the best interest of the stakeholders.

108.    As MBIA requested, I agreed to not sell the Zohar I collateral in May 2015. I kept my end of the bargain, but MBIA did not live true to its promises to me at the time: it never agreed to an extension of the Zohar I maturity date, and it never agreed to a global restructuring of the Zohar Funds. Thus, following Zohar I's default, MBIA gained a "preference" on all payments to Zohar I Noteholders resulting from the sale of the Zohar I collateral, thereby putting itself in a senior position to me as the holder of the A-3 Notes, a seniority position that it did not hold at the time that I had planned to sell the Zohar I collateral.

A-34

E.    **Zohar I Bankruptcy Litigation.**

109.    On November 22, 2015, I caused Patriarch XV to file involuntary Chapter 11 bankruptcy petitions (the "Involuntary Bankruptcies") against the Zohar I Entities (the "Involuntary Debtors") in the United States Bankruptcy Court for the Southern District of New York and immediately moved to terminate the Involuntary Debtors' exclusive period to propose and solicit a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code.  I filed the involuntary petitions because, after the failed restructuring negotiations with MBIA, I reluctantly concluded that the only way to protect Zohar I's asset value and maximize the value of the Portfolio Companies, in an orderly sales process, was to cause Patriarch XV to file involuntary petitions against the Zohar Funds.

110.    My clear and stated intention in filing the Involuntary Bankruptcies was to propose a Chapter 11 plan of reorganization for Zohar I, to sell certain of the Portfolio Companies in an investment banker led sales processes and to pay MBIA in full, interest and principal, over the course of two years.  And although Zohar I would enter into new CMAs with Patriarch VIII, all management fees would be deferred and all principal and interest due on the Class A-3 Notes, owned by my wholly owned entities, would have received no cash, neither principal nor interest, until the holders of Classes A-1 and A-2 of the Zohar I Notes were paid in full.  Zohar I (acting through its Cayman Island directors) and MBIA vehemently opposed the Involuntary Bankruptcies and sought—once again—to undermine my efforts at an orderly restructuring of Zohar I that would maximize value for the benefit of all stakeholders.

111.    By order dated March 28, 2016, Judge Robert Drain dismissed the Involuntary Cases.  The dismissal was based upon my notice of withdrawal and on an agreement—among the parties—to appoint an independent Collateral Manager for the Zohar Funds, upon my voluntary resignation.  As Judge Drain noted on the record, I agreed to do so on the "understanding" of the

A-35

parties that the new Collateral Manager would be "acceptable" and that "a proper process [was] laid out [that was] mutually acceptable to the parties for dealing with the underlying [Zohar I collateral] and the realization of appropriate value for those loans." Judge Drain also acknowledged that all parties, including MBIA, agreed that, should I resign as Collateral Manager, I would "remain in [my] positions with the underlying portfolio companies," which was "a good thing."

112.    Nevertheless, as discussed below, after I resigned as the Zohar Funds' Collateral Manager, MBIA (acting through AMZM and the Zohar Funds) failed to live up to its end of the agreement, and has sought to remove me from my position as Director of numerous Portfolio Companies.

**F.      Zohar I Collateral Auction.**

113.    As insurer of the Class A-1 and Class A-2 Notes, MBIA is designated as the "Credit Enhancer" under the Indenture. As Credit Enhancer, MBIA also qualifies as the "Controlling Party," unless and until the occurrence of a limited set of circumstances as set forth in the Indenture. After a default, the Controlling Party has the power to direct the Trustee to sell or foreclose upon the Zohar I collateral to the extent permitted by applicable law and/or not in conflict with any rule of law.

114.    Zohar I defaulted on November 20, 2015. In June 2016, MBIA directed U.S. Bank ("Trustee"), the Trustee for the Zohar Funds, to auction the Zohar I collateral. At MBIA's recommendation, the sales notice defined the "collateral" to be auctioned to purportedly include valuable equity in the Portfolio Companies that I beneficially own, many of which have strict transfer restrictions, and to include various other commercially unreasonable terms.

115.    Through entities I control, I brought an action for injunctive relief to block the auction. I was successful in obtaining a temporary restraining order to stop the auction, and

certain auction terms were amended as a result of the litigation to address some, but not all, of my objections. After originally granting a TRO enjoining the auction process, the Court eventually permitted the Zohar I auction to proceed, as substantially modified from what was originally proposed.

116. The Zohar I collateral was put to auction on December 21, 2016. MBIA prevailed with a winning no-cash credit bid of approximately $150 million, meaning that no money was paid into the fund or distributed through the "waterfall" for the benefit of the holder of the A-3 notes. Thus, following the auction, I received no payment on the A-3 notes.

117. The Portfolio Company equity upside interests are not collateral and have strict transfer restrictions. Therefore, it is anticipated that when the Portfolio Companies are sold, the cash from the sale of the equity interests will flow, as originally intended, through the Zohar I waterfall for the benefit first to the A-3 Noteholder and then for the benefit of the preference shareholder.[7]

**G.      MBIA's Exposure Related To Zohar I and Zohar II.**

118. By late 2016, MBIA's exposure on Zohar II totaled approximately $ 775.6 million. Upon Zohar II's default in January 2017, MBIA was obligated to pay this amount of outstanding principal payments and accrued interest to the Zohar II Noteholders.

119. In a November 2016 SEC filing, MBIA revealed its plans to pay its policy on its $775.6 million insurance exposure on Zohar II by selling its UK operation and raising $328.25 million from third parties by, among other things, pledging MBIA's purported "right, title and

---

[7]     There remains pending litigation in the U.S. District Court for the Southern District of New York where I am seeking damages over the auction results and declaratory relief defining the limited scope of the "collateral" at issue there.

35

A-37

interest in the Zohar I Collateral and the Zohar II Collateral."  That financing facility bears a 14 percent rate of interest.

<p style="text-align:center"><strong>VII.    MBIA Appoints AMZM as the New Collateral Manager.</strong></p>

**A.    Patriarch Resigns as Collateral Manager and Works to Transition the Zohar Funds.**

120.    After I and my Patriarch entities voluntarily resigned as the Collateral Manager to the Zohar Funds on February 5, 2016, AMZM was appointed as the successor  Collateral Manager at MBIA's direction.  AMZM is a subsidiary of Alvarez and Marsal ("A&M").  Neither entity had ever served as a Collateral Manager to a CDO or CLO before the Zohar Funds.

121.    Patriarch and I immediately began working with AMZM to ensure a smooth transition.  Patriarch's employees produced books and records for AMZM's review, and they trained AMZM's employees how to run the Zohar Funds.  Patriarch gave AMZM nearly 100,000 pages of documents, including the Portfolio Companies' latest financial information, the underlying security documents for all collateral debt obligations listed in the trustee's report, credit documents (along with associated schedules and amendments), Portfolio Company litigation documents, and reports issued by the trustee.  Patriarch also offered to provide AMZM with confidential, proprietary documents if AMZM entered into a standard confidentiality agreement.  AMZM refused to sign a confidentiality agreement.

122.    To ensure my availability during the transition process, I cancelled all business-related travel plans, contacted the Portfolio Companies to encourage them to work cooperatively with AMZM, and even offered to personally take AMZM on a tour of the Companies.

123.    AMZM was not satisfied with the documents we provided.  Their demands for documents began to escalate and they imposed unreasonable and arbitrary deadlines (not provided for in the CMA).

124. Even while pushing back against unreasonable demands and deadlines, Patriarch remained committed to ensuring that AMZM had the information necessary to manage the Zohar Funds.

125. On April 20, 2016, AMZM, on behalf of the Zohar Funds, ordered the Zohar Funds' trustee to withhold from Patriarch accrued collateral management fees that were owed for services Patriarch rendered to the Zohar Funds prior to Patriarch's resignation as Collateral Manager. Even though AMZM refused to authorize the Zohar Funds to pay Patriarch its accrued management fees, Patriarch never stopped gathering documents and continued to provide documents and information in response to AMZM's demands.

126. Two days after withholding Patriarch's fees, and just seven weeks after AMZM had been appointed Collateral Manager, the Zohar Funds (through AMZM) sued Patriarch, claiming that Patriarch had breached the parties' three CMAs by failing to turn over books and records in addition to the nearly 100,000 pages of documents already produced. After a short trial, the Delaware Court of Chancery decided that Patriarch had breached the CMAs. Patriarch has since produced more than 1,000,000 pages of documents, under the supervision of a court-appointed Special Master, and the little that remains at issue is largely ministerial in nature.

**B.      MBIA and AMZM's Litigation Campaign Has Cast a Cloud Over the Zohar Funds and the Portfolio Companies Rendering Them Entirely Unable to Monetize Assets and Maximize Value for All Stakeholders.**

127. AMZM and MBIA have engaged in a litigation campaign that has harmed the Zohar Funds and the Portfolio Companies. Since MBIA hired AMZM as Collateral Manager, AMZM has focused its energies on pursuing litigation in order to seize control and ownership of

the Portfolio Companies.  All in, MBIA and AMZM have instigated at least six (6) lawsuits against me and my entities since AMZM was appointed Collateral Manager in March 2016.[8]

128.    The litigation overhang has cast a cloud over the Portfolio Companies that has impeded my ability to monetize or maximize the value of the Companies through refinancing or sale—which will satisfy all outstanding obligations to Noteholders, with residual value flowing to me.

129.    For example, in November 2016, MBIA approved AMZM's execution of Written Consents to install AMZM and MBIA's own personnel as directors of three Portfolio Companies, Glenoit Universal LTD, FSAR Holdings, Inc. (PDP), and UI Acquisition Holding Co., claiming that the equity in those Companies is wholly and beneficially owned by the Zohar Funds.  MBIA then approved the filing of a "test case" lawsuit in November 2016 against me and these three Portfolio Companies in the Delaware Court of Chancery to gain control over these Companies.[9]  Contrary to findings of an SEC Administrative Law Judge that the design and

---

[8]    *U.S. Bank N.A. v. Patriarch Partners XIV*, LLC, No. 652173/2016 (N.Y. Sup. Ct.) (Trustee and AMZM brought an Interpleader action in New York State Court with respect to AMZM's decision to withhold collateral management fees from Patriarch); *Zohar CDO 2003-1, LLC v. Patriarch Partners, LLC*, No. 12247-VCS (Del. Ch. Ct.) (Zohar Funds filed suit against Patriarch in Delaware Chancery Court to compel Patriarch to turn over to AMZM collateral management books and records); *Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1*, Ltd., No. 16-cv-4488 (S.D.N.Y.) (PPAS filed suit against the Zohar Funds and Alvarez & Marsal Zohar Agency Services, LLC ("AMZAS") for breach of contract, resulting from the Zohar Funds' termination of PPAS as administrative agent. AMZM and the Zohar Funds brought counterclaims seeking a declaratory judgment that the Zohar Funds' removal of PPAS as administrative agent was lawful and that AMZAS (or one of the Zohar Funds, as the case may be) currently serve as administrative agent); *Zohar II 2005-1, Ltd. v. FSAR Holdings, Inc.*, No. 12946-VCS (Del. Ch. Ct.) (Zohar Funds brought a Section 225 proceeding in Delaware Chancery Court seeking to enforce written consents purportedly removing me as director of three Portfolio Companies, and replacing me with employees of AMZM and MBIA); *Zohar CDO 2003-1 Ltd. v. Patriarch Partners, LLC*, No. 17-cv-307 (S.D.N.Y.) (Zohar Funds brought RICO action against Patriarch and the Octaluna Entities alleging, among other claims, that the Zohar Funds are the equity owners of the Portfolio Companies, and that Patriarch breached its Collateral Management Agreements and fiduciary duties by allegedly failing to obtain for the Zohar Funds all equity interests to which they were entitled); *Zohar CDO 2003-1, Limited v. Croscill Home LLC et al.*, 1:17-cv-01797-JFB-SRF (D. Del.) (the Zohar Funds filed suit in Delaware Chancery Court against certain Portfolio Companies seeking to remove me as the manager of these companies).

[9]    After a six-day trial, the Chancery Court entered an opinion in favor of the Zohar Funds based on its interpretation of the series of contracts memorializing the creation of the Zohar Funds, contrary to the SEC

structure of the Zohar Funds showed that I owned the equity of the Portfolio Companies, the

Delaware Chancery Court ruled against me as to my ownership of three aforementioned

Portfolio Companies.  The court, however, stayed its order while it is on appeal to the Delaware

Supreme Court.

130.    MBIA also approved AMZM's filing of a now-dismissed RICO case against me

in the Southern District of New York, seeking a court ruling that the Zohar Funds own certain

equity in the Portfolio Companies.  The court granted my motion to dismiss the RICO and the

supplemental state law claims on December 29, 2017.  In that lawsuit, AMZM, acting at the

behest of MBIA, which admittedly reviewed and approved of the RICO suit before its filing,

unsuccessfully sought to tar me as a "racketeer" and fraudster, which was damaging not only to

me personally, but to the Portfolio Companies, given my roles as the Manager, Director, and/or

CEO of those Companies.

131.    The Funds also purported to terminate Patriarch Partners Agency Services

("PPAS"), the loan administration entity that administers the Zohar Funds' loans and collects and

disburses Portfolio Company loan payments.  This attempted termination resulted in litigation in

which the Funds are named parties.  In that litigation, AMZM twice attempted to seek

emergency relief against PPAS from the federal courts, and both attempts were immediately

rejected.[10]

---

ALJ's finding during the SEC Action that I am the equity owners of the Portfolio Companies. The court's
judgment is currently stayed pending an expedited appeal in the Delaware Supreme Court.  In agreeing to stay
its decision, the Delaware Chancery Court recognized that appeal was warranted because it was a close case and
that there were substantial "novel" issues at play in the action.

[10]    *Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1*, Ltd., No. 16-cv-4488 (S.D.N.Y.) (PPAS filed
suit against the Zohar Funds and Alvarez & Marsal Zohar Agency Services, LLC ("AMZAS") for breach of
contract, resulting from the Zohar Funds' termination of PPAS as administrative agent.  AMZM and the Zohar
Funds brought counterclaims seeking a declaratory judgment that the Zohar Funds' removal of PPAS as
administrative agent was lawful and that AMZAS (or one of the Zohar Funds, as the case may be) currently
serve as administrative agent).

132.     On November 13, 2017, I and several of my controlled entities initiated three state court actions seeking, on an expedited basis, declaratory judgments regarding the beneficial ownership of various Portfolio Companies where I am CEO.[11]  I filed these actions because the cloud created by AMZM and MBIA's litigation strategy had finally reached a point where it has seriously hindered the Portfolio Companies' ability to negotiate with lenders, including with regard to their Asset Backed Lending ("ABL") facilities.

133.     On November 16, 2017, and January 12, 2018, and admittedly in response to the declaratory judgments actions I filed, the Zohar Funds filed lawsuits in the Delaware Chancery Court regarding ownership of 13 Portfolio Companies[12] (collectively with the 11 Companies, the "11 Companies Defendants").

134.     The allegations in these and other lawsuits brought by AMZM at the behest of MBIA harm the value of every Portfolio Company, which value AMZM is supposed to preserve and maximize.  These litigations have created a cloud of uncertainty over the Portfolio Companies, has had a chilling effect on  potential buyers and made it difficult to monetize the companies.

**C.     MBIA and AMZM Have Made No Effort to Monetize the Zohar Funds' Assets or Maximize Their Value in the Interest of All the Zohar Funds' Stakeholders**

135.     At the same time, AMZM has failed to perform the duties of a Collateral Manager.  AMZM has prepared only intermittent reports to Noteholders containing insufficient information, despite its obligation to provide particular financial and other reports do so on a

---

[11]  *Tilton v. Zohar* CDO 2003-1, Ltd., No. CV-2017-013549 (Ariz. Sup. Ct.) (the "MD Action"), *Tilton v. Zohar III*, Ltd., No. BC683129 (Cal. Sup. Ct.) (the "Stila Action"), and *Tilton v. Zohar CDO 2003-1 Ltd*., No. 17-016240-CB (Mich. Cir. Ct.) (the "Dura/GAS Action").

[12]  The Portfolio Companies include Croscill Home LLC, f/k/a Croscill Acquisition, LLC, Denali Acquisition LLC, Dura Buyer, LLC, Global Automotive Systems, LLC, Gorham Paper And Tissue, LLC., Jewel of Jane LLC,  LVD Acquisition, LLC, d/b/a Oasis International, RM Acquisition, LLC,  Snelling Holdings, LLC, Stila Styles, LLC, IMG Holdings, Inc., MD Helicopters, Inc. and Vulcan Engineering, Inc.

monthly and quarterly basis under the Zohar Funds' Indentures. AMZM has not taken any action to request funding for the Portfolio Companies, including those that have defaulted on their watch. And AMZM has not independently valued the Zohar Funds' collateral, even though Patriarch produced over 1 million pages of documents to them in the "books and records" lawsuit, including Portfolio Company financial statements. In fact, it now appears that AMZM has made no effort to use the information it obtained from my extensive production of books and records to learn anything about the Portfolio Companies or to develop any strategy towards maximizing their value for the benefit of the Zohar Funds' stakeholders.

136. In April 2016, after 13 months as Collateral Manager, AMZM's Ms. LaPuma admitted that AMZM does not have a strategy to maximize the value of each Portfolio Company. Ms. LaPuma also admitted that the replacement boards of directors for the Portfolio Companies, whose members were selected by AMZM, and consisted largely of AMZM and MBIA personnel, had not prepared strategic plans for the Portfolio Companies. Indeed, AMZM's purported replacement directors and replacement managers include MBIA officers and employees who have no experience in the Portfolio Companies' respective industries and lack any knowledge or even a basic familiarity with the Portfolio Companies' businesses and operations.

137. Worse, it appears that AMZM is acting purely in the interest of MBIA and not in the interest of other Zohar Funds stakeholders. For example, when asked whether AMZM, as the Collateral Manager for the Zohar Funds, had a duty to take into account my interests as a preference shareholder, Ms. LaPuma testified: "It depends," meaning "sometimes yes, sometimes no." She explained that although AMZM had intended to "take into consideration all stakeholders' rights" when it first assumed its role as Collateral Manager, this was not the case

after Zohar II defaulted, at which time AMZM's "role and consideration . . . shifted some." Thus, while AMZM is now willing to "take [the preference shareholder's interest] into consideration," it ultimately "[has] obligations to make good on the debt due to the [Noteholders]." AMZM's belief that it has a duty to act in the best interest of the Noteholders alone is further supported by the language of its Collateral Management Agreements. Although those Agreements expressly provide that AMZM's duty is to the Noteholders, they make no mention of any duty owed to the Zohar Funds' preference shareholder.

138.    AMZM has been paid approximately $30 million in collateral management fees in its first year as the new Collateral Manager, even though they have not actually managed the loans held by the Zohar Funds.

### IX.    The Purpose of this Bankruptcy Proceeding Is To Access the Significant Value Locked in the Zohar Funds' Assets and Monetize Them for the Benefit of All Stakeholders.

139.    The Zohar Funds were placed into bankruptcy in order that its Noteholders and all other stakeholders can finally access the full value of the cash flows from Portfolio Companies sales or refinancings, which has been locked, for many years, as a result of the ongoing litigations with MBIA and AMZM.

140.    Several months prior to this filing, I began contemplating a plan and marketing process for monetizing the Portfolio Companies in a manner that would maximize their respective values for the benefit of all Zohar Funds' stakeholders.

141.    I have hired a Chief Restructuring Officer, Marc Kirschner, to serve as an independent party to assist me in further developing and executing on that plan for the monetization of the Portfolio Companies. I have consulted with Mr. Kirschner to formulate a plan to execute that monetization process, which is described in Mr. Kirschner's declaration.

142.    Portfolio Companies have already interviewed and, in some instances, have already chosen financial advisors in respect of these contemplated transactions.

143.    While confidentiality over this process is paramount in preserving the Portfolio Companies' value, I am committed to working with the CRO and have authorized and directed the CRO to develop a plan for periodic public and confidential reporting that will provide an appropriate measure of transparency into this process for the Court and all stakeholders without jeopardizing value.

144.    Many of the Portfolio Companies face near-term maturities on loans due to the Zohar Funds, certain of my personal investment funds, and third party lenders on or about March 2019.  In order to avert: (1) defaults on these loans; (2) the risks of bankruptcy or foreclosure and (3) the loss of major customer contracts, I, as the director or manager of each Portfolio Company, along with my management teams at the respective Portfolio Companies have commenced the interview and engagement process to hire investment bankers at the Portfolio Companies to pursue both refinancing and sale of company alternatives.  In doing so, we have learned that the litigation risk surrounding the Zohar Funds and the Portfolio Companies will foster a chilling effect on bank lenders and buyers.  It is, in large part, the reason the Debtors are here in this court of equity to ask for the time and protection to maximize value for all of the Zohar Funds' stakeholders and to best protect all stakeholders at the Portfolio Companies, including employees, customers and vendors.

145.    Seventeen business platforms have been targeted for near-term refinancing and or Portfolio Company sales efforts.  Of these seventeen, thirteen have lender commitments that come due in the March 2019 time frame. For each of these thirteen Portfolio Companies, multiple investment bankers have been interviewed.  In total, to date, 30 investment banking

A-45

firms and more than 100 bankers have made presentation to me, my Patriarch team and the management teams at the Portfolio Companies. Two separate investment banks have been chosen to lead the sales process on two Portfolio Companies. It is expected that at least 6 separate firms will be engaged by the end of March and the next 6 by the end of April. Although it would not have been my preference to market more than a dozen Portfolio Companies, simultaneously, so to avoid any connotation of a fire sale of these highly valuable companies, I am convinced that provided swords are down and litigation stayed, that the value of these Portfolio Companies can, nevertheless, be maximized if we move on all fronts with great speed, due to the (1) buoyancy of the stock market; (2) a low interest rate environment and (3) the dearth of companies for sale. However, in order to protect the Portfolio Companies from deterioration of value and to capitalize on a sellers' market, we must move with urgency for time is never a friend when there is a deal to be done.

## X. <u>Conclusion.</u>

In conclusion, for the reasons explained here and in each First Day Pleading, I respectfully request that each First Day Pleading be granted in its entirety, together with such other and further relief as the Court deems just and proper. Pursuant to 28 U.S.C. § 1746 I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 11, 2018

_____
Lynn Tilton

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (CSS) |
| Debtors. | Jointly Administered |
|  | **Hearing Date: May 18, 2018 at 4:00 p.m. (ET)** |
|  | **Obj. Deadline: May 11, 2018 at 4:00 p.m. (ET)** |
|  | **(Proposed)** |

## DEBTORS' MOTION, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, FOR AN ORDER APPROVING AND AUTHORIZING THE SETTLEMENT AGREEMENT BY AND BETWEEN THE DEBTORS, LYNN TILTON, THE PATRIARCH STAKEHOLDERS, MBIA INSURANCE CORP., AND THE ZOHAR III CONTROLLING CLASS

Zohar III, Corp. and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors") hereby submit this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), pursuant to section 105(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving the settlement agreement (the "Settlement Agreement")[2] by and between (i) the Debtors, (ii) Lynn Tilton, (iii) the Patriarch Stakeholders, (iv) MBIA Insurance Corp. ("MBIA"), and (v) Halcyon Capital Management LP[3], Coöperatieve Rabobank U.A., New York Branch, STS Master Fund, Ltd, SBF Opportunities Master Fund, Ltd, and Candlewood Structured Credit Harvest Master Fund, LTD (collectively, the "Zohar III  Controlling Class"

---

[1]  The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2]  Capitalized terms not herein defined shall have the meanings ascribed to them in the Settlement Agreement.

[3]  The members of the Zohar III Controlling Class affiliated with Halcyon Capital Management LP are disclosed in the Verified Statement Pursuant to Fed. R. Bankr. P. 2019(a) filed on March 27, 2018 [Docket No. 95].

and, together with the Debtors, Lynn Tilton, the Patriarch Stakeholders, and MBIA, the "Parties"). In support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors filed these Chapter 11 cases to obtain a breathing spell from the several contentious pending litigations and to create a process to monetize the Debtors' assets through sales or refinancings of the Debtors' interests in the Portfolio Companies, and unlock and maximize value for the benefit of all the Debtors' stakeholders. The settlement reached by the Parties provides the framework for the Debtors to do just that, despite the contentious start to these cases.

2.      Remarkably, and against all odds, with the herculean efforts of Judge Kevin Gross as judicially appointed mediator (the "Mediator") and following round-the-clock mediation sessions, the Parties have settled and resolved certain of their disputes, eliminated the need for a trial on the *Motion of MBIA Insurance Corporation and Zohar III Controlling Class to Dismiss the Chapter 11 Cases or, if Not Dismissed, to Appoint a Trustee* [Docket No. 56] (the "Dismissal/Trustee Motion") and the other Litigated Contested Matters (as defined below), and created a framework through which the Debtors (through a newly appointed independent director and CRO) and Ms. Tilton can embark on a path to monetize (through sales or refinancings) assets of the Portfolio Companies for the benefit of all stakeholders. During the period created through this framework, the resolution of preexisting disputes—which had carried over to these Chapter 11 cases—will be stayed. This framework is, in large part, memorialized in the Settlement Agreement and is described more fully below.

3.      The Parties represent nearly all of the economic stakeholders in the Chapter 11 Cases and the primary pre-bankruptcy litigants. As recognized by the Court at the status

conference held in these cases on April 23, 2018, the level of participation in the

mediation/settlement process by the Parties—after years of intense litigation—to the path set

forth in the Settlement Agreement speaks volumes. Specifically, the Court acknowledged:

> I believe from communications I received from Judge Gross, who served as the
> mediator, that the matter has settled. I congratulate the parties for their hard work
> in doing that.

*See* Transcript of 4-23-18 Status Conference at 3:14-17. The Debtors respectfully request that

the Court enter an order approving the Settlement Agreement.

## JURISDICTION

4.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334 and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware, dated as of February 29, 2012. This is a core proceeding pursuant to 28

U.S.C. § 157(b)(2), and pursuant to Local Rule 9013-1(f), the Debtors consent to entry of a final

order by the Court in connection with this Motion to the extent it is later determined that the

Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.

5.     Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

6.     The statutory and legal predicates for the relief sought herein are section 105(a) of

the Bankruptcy Code and Bankruptcy Rule 9019.

## BACKGROUND

### A. General Background

7.     On March 11, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for

relief under Chapter 11 of the Bankruptcy Code. The Debtors' Chapter 11 cases are being

jointly administered pursuant to Bankruptcy Rule 1015(b). No official committees have been

appointed pursuant to section 1102 of the Bankruptcy Code.

8.      The Debtors were placed into bankruptcy to obtain a breathing spell from the several contentious pending litigations and to create a process to monetize the Debtors' assets through sales or refinancings of the Debtors' interests in the Portfolio Companies, and maximize value for the benefit of all of the Debtors' stakeholders.  Those litigations, brought both by and against the Debtors, involve at least 12 separate cases, raise numerous complex legal issues, and involve virtually all Zohar Funds stakeholders.

9.      General information about the Debtors and the events leading up to the Petition Date, including descriptions of the relevant prepetition lawsuits, can be found in the *Declaration of Marc S. Kirschner in Support of Chapter 11 Petitions* [Docket No. 6] (the "Kirschner Declaration"), the *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* [Docket No. 5], each filed on March 12, 2018, and the Dismissal/Trustee Motion.

**B.   The Parties' Disputes**

10.     On March 12, 2018, the Debtors filed a motion to reject the collateral management agreements with Alvarez & Marsal Zohar Management, LLC ("AMZM") effective as of the Petition Date [Docket No. 8] (the "Rejection Motion").  On March 27, 2018, objections to the Rejection Motion were filed by AMZM [Docket No. 86], MBIA [Docket No. 89], the Zohar III Controlling Class [Docket No. 92], and U.S. Bank National Association, as indenture trustee ("U.S. Bank") [Docket No. 93].  On April 12, 2018, the Debtors filed their omnibus reply in support of the Rejection Motion [Docket No. 173].

11.     On March 14, 2018, AMZM filed a motion for relief from stay to pursue the 225 Action on appeal before the Delaware Supreme Court [Docket No. 21] (the "Lift Stay Motion").  AMZM's Lift Stay Motion was joined by the Zohar III Controlling Class [Docket No. 67] and MBIA [Docket No. 88].  On March 29, 2018, the Debtors filed their objection to the Lift Stay

A-50

Motion [Docket No. 111], and on April 12, 2018, AMZM filed its reply in support of the Lift Stay Motion [Docket No. 172].

12. On March 26, 2018, MBIA and the Zohar III Controlling Class filed the Dismissal/Trustee Motion. On April 3, 2018, the United States Trustee for Region 3 (the "U.S. Trustee") filed a motion for appointment of a Chapter 11 trustee or, alternatively, appointment of an examiner [Docket No. 132] (the "Trustee/Examiner Motion").

13. On April 10, 2018, the Debtors filed an omnibus objection to the Dismissal Trustee Motion and the Trustee/Examiner Motion [Docket No. 165]. Lynn Tilton and certain of her affiliated Patriarch entities filed an objection to the Dismissal/Trustee Motion on April 10, 2018 [Docket No. 163] and an objection to the Trustee/Examiner Motion on April 12, 2018 [Docket No. 176]. On April 15, 2018, MBIA and the Zohar III Controlling Class filed a reply in support of the Dismissal/Trustee Motion [Docket No. 182].[4]

14. On or about March 28 and April 4, 2018, the Court scheduled a two-day trial for April 17–18, 2018 (the "Trial"), to adjudicate the Litigated Contested Matters [Docket Nos. 108, 110, 138].

15. On April 5, 2018, the Court appointed Judge Kevin Gross to mediate the Parties' various disputes on April 16, 2018, the day before the Trial was scheduled to begin [Docket No. 143].

16. The Parties thereafter engaged in expedited discovery, including extensive document production and four separate day-long depositions, and devoted significant effort towards preparing for the Trial while simultaneously making preparations for a good-faith mediation effort before the Mediator.

---

[4] The filings described in paragraphs 7–10 above are referred to herein as the "Litigated Contested Matters."

17.     After the scheduled mediation session before the Mediator, which continued well into the night, the Parties agreed to adjourn the first day of the Trial to continue their in-person mediation efforts. *See* Docket No. 194. After a second day-long mediation session before the Mediator, which again continued well into the night, the Parties agreed to further adjourn the Trial to continue pursuing mediation. *See* Docket No. 196. Given that the Parties' mediation efforts were ongoing, but offered no assurances of success, the Court rescheduled the Trial for April 25 and 27, 2018. *See* Docket No. 204. After the initial Trial date was rescheduled, the Parties thereafter engaged in good-faith, in-person mediation sessions over the course of two additional full days, including a session that started on Wednesday, April 18, 2018 and continued into Thursday morning.

18.     All told, the Parties mediated their various disputes virtually around the clock for four straight days. The negotiations were complex, arms-length, and hard-fought, but ultimately successful. As the result of the arduous good-faith, in-person mediation efforts overseen by the Mediator, the Parties agreed to a comprehensive resolution of the Litigated Contested Matters, the terms of which are embodied in the Settlement Agreement attached to the Proposed Order as Exhibit 1.

### C. The Settlement Agreement

19.     The material terms of the binding Settlement Agreement are as follows:[5]

i.      The Mediator shall appoint a single Independent Director for each of the Zohar Funds (same director shall be appointed for all of the Zohar Funds). The Independent Director shall not have the power to convert or dismiss the Chapter 11 cases during the 15 Month Window. Tilton shall resign as a director of each and shall have no governance authority or responsibility for the Zohar Funds, other

---

[5] The following is a summary of the Settlement Agreement and is qualified in its entirety by reference to the Settlement Agreement, the terms of which control. The Parties acknowledge that the Settlement Agreement was drafted using best efforts during the Mediation and that disputes regarding the Settlement Agreement (and terms therein) will be addressed by the Mediator or, if necessary, by the Court.

than as Designated Tax Director.  On the Full Payment Date, the Independent Director shall be deemed to resign and Tilton shall be automatically reinstated as director of each of the Zohar Funds (with all powers attendant to such position also automatically reinstated).

ii.    Notwithstanding anything to the contrary herein except subject only to paragraph 3 and 14, Tilton shall remain the director of each of the Debtors (until such time as she is no longer the taxpayer for the Debtors,



iii.   Subject to the last sentence of this paragraph 3, if the Full Payment Date does not occur within the 15 Month Window, Tilton and the CRO shall negotiate in good faith on how to monetize the Group B Portfolio Companies.  In the event of any dispute in such negotiations, in the first instance such dispute shall be referred to the Mediator.  If the Mediator cannot resolve any or all disputes, the parties shall jointly seek an order of the Bankruptcy Court resolving such disputes.

iv.



v.

vi.    The Independent Director/CRO shall appoint a new independent administrative agent under the Zohar credit agreements (the "New Agent") who shall report only to the Independent Director/CRO and U.S. Bank ; provided, (a) that PPAS remains the administrative agent under the Zohar credit agreements for all purposes related to the Patriarch Stakeholders and any other third party; and (b) during the 15 Month Window or the 18 Month

Extended Window, as applicable, the New Agent shall have all rights and remedies available under the Credit Agreement with respect to the Zohar interests in the Group A Portfolio Companies; provided, however, that the New Agent shall not have the ability to take any action, declare any default or exercise any remedy with respect to any Group A Portfolio Company (other than for prospective non-payment of interest) or any Group B Portfolio Company and  subject to the tolling of claims and other terms hereof.  PPAS, the Independent Director/CRO, and the New Agent shall use reasonable efforts to transition existing Zohar-related PPAS matters to the new agent. Subject to the approval of the Independent Director/CRO.  PPAS shall use commercially reasonable efforts to take all reasonable actions to ensure the continued validity and perfection of any security interests and liens for loans transferred to the New Agent.  PPAS may be reimbursed for reasonable transition costs incurred in transition to the New Agent.  If there is any dispute with respect to any of the foregoing, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties shall jointly seek an order of the Bankruptcy Court resolving that dispute. Nothing in the foregoing paragraph shall prejudice  rights and remedies of the parties to Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd., No. 16-cv-4488 (S.D.N.Y.), in the event that litigation is resumes.

vii.   If the Independent Director resigns prior to the Full Payment Date, the Mediator shall appoint a replacement Independent Director.  In connection therewith, the Mediator shall consult with the controlling class of Zohar III noteholders, MBIA and Tilton about director candidates.  The Independent Director shall be fully charged with governance of the Zohar Funds under applicable Cayman or Delaware law.

viii.  The Independent Director will retain a CRO to participate in the process to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing (the "**_Monetization Process_**").



ix.    Tilton shall remain in her position as director, manager and officer, as applicable, of the Group A Portfolio Companies during the 15 Month Window, or, if qualified, for the 18 Month Extended

Window.  During the 15 Month Window or, if qualified, for the 18 Month Extended Window, all parties agree that no action shall be taken to remove Tilton from any such position.

x.    With full and joint authority, Independent Director/CRO, with full authority on behalf of the Debtors, and Tilton, with full authority on behalf of the Group A Portfolio Companies, will conduct a process to monetize the Group A Portfolio Companies and the Group B Portfolio Companies. It is acknowledged that the CRO will act in the best interests of the Zohar Funds, and Tilton in the best interests of the Group A  Portfolio Companies. ███████████

██████████████████████████████████

█████████ Each shall have full and complete information regarding the Monetization Process ████████████████████████████.

Tilton and the CRO shall use good faith, commercially-reasonable efforts to coordinate prospective meetings with bankers ████ ██████. But in no event shall the CRO interfere in any way with the operations of the Group A Portfolio Companies and the Group B Portfolio Companies.

xi.    Any dispute with respect to the Monetization Process between the Independent Director/CRO and Tilton, in the first instance, shall be referred to the Mediator.  If the dispute cannot be resolved by the Mediator, the parties retain all rights to seek an order of the Bankruptcy Court resolving such dispute.

xii.    Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies until such time as the (i) the parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or  (ii) the Full Payment Date.

xiii.    At the Full Payment Date, MBIA and the Zohar III Noteholders shall have no direct or indirect claim against, or interest or participation in the Zohar Funds or the Group A  Portfolio Companies ████████████████████████████ ██████████████████████████.

xiv.    The 225 Action remains subject to the stay subject to satisfaction of the 15 Month Window.  The Status Quo Orders entered in the 225 Action are held in abeyance and shall have no effect during the 15 Month Window or 18 Month Extended Window with respect to

the Monetization Process involving any Group A Portfolio Company.

xv.    MBIA and Zohar III shall form a Zohar Fund creditors committee (the "Committee") to oversee and monitor the Zohar bankruptcy. The CRO shall provide the Committee members with all information necessary to assess and represent the interests of the Other Stakeholders other than information whose distribution is reasonably limited at the request of investment bankers or potential buyers. ███████████████████████████████████

████████████████████████████████████████████

████████████████████████All other litigation, motions and contested matters between any of the parties other than the 225 Action as discussed above, shall be stayed, with appropriate protections so there is no prejudice to any parties.  Except as specifically set forth herein, no other litigation, motions, and/or contested matters may be re-initiated or brought (directly or indirectly) by (a) any Other Stakeholders, (b) the Debtors, (c) the New Agent, (d) the Group A Portfolio Companies, (e) the Group B Portfolio Companies, and (f) any Collateral Manager, seeking any relief against the Patriarch Stakeholders (and their respective officers, directors, employees, affiliates and agents), or any of the Group A or Group B Portfolio Companies.

For the avoidance of doubt, with respect to any of the entities identified in paragraph 15: (1) (a) any litigation, claim, motion, or contested matter that was or could have been brought prior to the date hereof, and (b) any litigation, claim, motion, or contested matter that could be brought after the date hereof arising from any facts, acts, or omissions that first arose prior to the date hereof, shall be stayed during the 15-Month Window, with appropriate protections so there is no prejudice to any party and;  (2) any other litigation, claim, motion, or contested matter not referenced in paragraph 15(1) shall only be brought subject to the provisions of paragraphs 17 and 23, and no other litigation, claim, motion, or contested matter that does not fall within paragraph 17 and 23 shall be brought by any such entity against any other such entity during the 15-Month Window.

xvi.    ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████████████████

MBIA and the Zohar III Noteholders shall designate a new Collateral Manager who has no claim against the Debtors, and the Collateral Management Agreement shall be amended in a manner to reflect the settlement herein and (b) all parties reserve their rights with respect to any AMZM fees and expenses incurred prior to the date hereof. ███████

███████████████████████████████████████████
███████████████████████████████████████████
█

xvii.    The Debtors shall promptly negotiate with the secured parties funding of the Debtors' Chapter 11 cases from the use of the secured parties' cash collateral. ████████████████████████

███████████████████████████████████████████
████████████████████████████████ In the event of any dispute among the parties with respect to use of cash collateral, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute.

xviii.   Any (A) claim asserted by the Patriarch Stakeholders ████████

███████████████████████████████████████████
███████████████████████████████████████████
████████████████████ and (B) equity interest asserted by the Patriarch Stakeholders █████████████████████████ shall be deemed due and payable through the closing of any monetization event ██████████

███████████████████████████████████████████ In connection with any such closing, the Patriarch Stakeholders will release any liens that secure any of the foregoing non-challenged claims on a pari passu basis with liens on the same collateral held by the Other Stakeholders. All parties' respective rights to challenge the

---

[3] ████████████████████████████████████████████

[4] ████████████████████████████████████████████
███████████████████████████████████████████

propriety of any of the foregoing claims or equity interests are tolled without prejudice until the expiration of the 18 Month Window . Nothing herein is intended to or shall elevate or modify the existing priority of any claims or liens.

xix.   All causes of action among the Debtors, Other Stakeholders and Patriarch Stakeholders (including any of their affiliates or agents) with respect to the Debtors, the Group A Portfolio Companies and the Group B Portfolio Companies shall be tolled during the 15 Month Window or, if qualified, for the 18 Month Extended Window, and all parties' respective rights shall be reserved with respect thereto, including with respect to venue and jurisdiction.

xx.   Tilton represents that the Group A Portfolio Companies and the Group B Portfolio Companies will be operated in the ordinary course of business during the 15 Month Window. During the 15 Month Window, the Group A Portfolio Companies and the Group B Portfolio Companies shall not declare dividends but shall be authorized to (b) (i) enter into financing transactions with affiliates on market terms, subject to first consulting with the CRO or (ii) issue new equity that will dilute the existing equity holdings on market terms, subject to first consulting with the CRO; provided, however, that if the CRO objects to the financing or equity described in the foregoing subparagraphs (b)(i) and (ii), the CRO may take that dispute to the Mediator for final resolution.

xxi. 

xxii. While any dispute is before the Mediator, no party to such dispute shall take any action in Bankruptcy Court.

xxiii. If any party materially breaches this Agreement, the dispute shall be in the first instance determined by the Mediator on a confidential basis. The Mediator shall have all remedies available to him. If the Mediator cannot resolve the dispute, the Mediator shall make a report and recommendation to the Bankruptcy Court and the parties shall jointly seek an order of the Bankruptcy Court resolving such dispute. In connection with the foregoing, the Mediator shall determine to what extent information should be filed under seal, subject to the order of the Bankruptcy Court approving such filing under seal. The parties agree that for purposes of any decision of the Bankruptcy Court dealing with any matter covered by this paragraph, the Agreement is non-severable under all circumstances.

xxiv. Any application by any party for assistance from the Mediator shall be brought within seven (7) days of identifying the dispute to the other party or parties involved in the dispute, and heard at the Mediator's earliest availability. Any application shall be in writing and served by email on the other parties.

xxv. 

A-59

xxvi.     The parties (other thn U.S. Bank) shall issue the joint press release as set forth in Exhibit F stating that the parties will work in a mutually cooperative process in support of the Monetization Process (and no other press release).  If the parties cannot jointly agree, then the Mediator shall resolve any disputes.  The parties shall also agree to standard non-disparagement terms.

xxvii.     The Bankruptcy Court shall retain jurisdiction to enforce the terms of this agreement and all parties agree to submit to the jurisdiction of the Bankruptcy Court for resolution of any matter in connection with this agreement or the enforcement thereof; provided, however, that no party shall be deemed to consent to venue or jurisdiction before the Bankruptcy Court for any matter not in connection with this agreement or the enforcement thereof.

xxviii.     The parties will work with the indenture trustee under the Zohar indentures to satisfy the requirements of the indentures with respect to the implementation of this Agreement.  Any such dispute related to satisfaction of such requirements shall be, in the first instance, referred to the Mediator.  If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute..

xxix.     For the avoidance of doubt, if each of MBIA and the Zohar III Claims receive 50% of the Paid in Full amount within the 15 Month Window, the 15 Month Window shall be herein shall be replaced with the term 18 Month Extended Window for all purposes.

xxx.     The foregoing terms shall be memorialized in a confidential stipulation filed under seal and entry of an order by Judge Sontchi, on terms and conditions satisfactory to the parties.  The order shall provide, among other provisions, that this Agreement and the order shall be binding on all parties and their successors and assigns.[6]

## RELIEF REQUESTED

20.     By this Motion, the Debtors request entry of an order, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, (i) approving the Settlement Agreement

---

[6] Although paragraph 30 of the Settlement Agreement states that the terms of the settlement will be further memorialized in a confidential stipulation, the Debtors submit that the Settlement Agreement, coupled with the Proposed Order annexed hereto as **Exhibit A**, sufficiently memorializes the Parties' agreement and no further documentation is required.

attached as <u>Exhibit 1</u> to the Proposed Order and (ii) authorizing the Debtors to take any and all actions necessary to effectuate the Settlement Agreement.

<div align="center">

**BASIS FOR RELIEF REQUESTED**

</div>

21.     Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The Third Circuit has enumerated four factors that should be considered in determining whether a settlement should be approved. The four enumerated factors are "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *accord Will v. Nw. Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 644 (3d Cir. 2006) (finding that the *Martin* factors are useful when analyzing a settlement of a claim against the debtor as well as a claim belonging to the debtor).

22.     The decision to approve a settlement "is within the sound discretion of the bankruptcy court." *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006); *see also In re Neshaminy Office Bldg. Assocs.*, 62 B.R. 798, 803 (E.D. Pa. 1986) (cited with approval in *Martin*). The bankruptcy court should not substitute its judgment for that of the debtor. *See Neshaminy Office Bldg. Assocs.*, 62 B.R. at 803. The bankruptcy court is not to decide the numerous questions of law or fact raised by litigation, but rather should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness. *See Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983); *see also World Health Alts.*, 344 B.R. at 296 ("[T]he court does not have to be convinced that the settlement is the best

<div align="center">

A-61

</div>

possible compromise. Rather, the court must conclude that the settlement is within the
reasonable range of litigation possibilities." (internal citations and quotations omitted)).

     23.     The resolutions embodied in the Settlement Agreement are reasonable and in the
best interests of the Debtors and all of their stakeholders. The Settlement Agreement provides
for a fair and practical resolution of the Litigated Contested Matters which, if litigated, could
consume a substantial portion of the Debtors' time and resources, continue to cost millions of
dollars, and would continue to cast a cloud over efforts to monetize the Debtors interests in the
Portfolio Companies through sales or refinancings. The Settlement Agreement was the product
of significant discussions and negotiations between the Parties, and the agreement embodied
therein falls well above the lowest point in the range of reasonableness. In addition, as discussed
below, the applicable *Martin* factors weigh in favor of approving the Settlement Agreement.

   **A. The Probability of Success in Litigation**

     24.     The result of the litigation of matters resolved by the Settlement
Agreement is uncertain. The litigation would be complicated and fact-intensive, and no
litigation result is assured. Absent the Settlement Agreement, disputes related to the matters
resolved by the Settlement Agreement would be litigated either before the Court or, if the
automatic stay was lifted, in numerous other proceedings and jurisdictions—and, potentially, on
appeal—with no guarantees of a more favorable outcome for the Debtors. And whichever party
ultimately prevailed on the Litigated Contested Matters, the result would likely be suboptimal.
Moreover, dismissal of these cases would send the Parties back to the litigation these cases were
filed to stop. Appointment of a trustee would delay and/or hinder progress already made in
connection with the refinancing of, or sale of, the Debtors' interests in the Portfolio Companies,
and undo the concessions Ms. Tilton and the Patriarch Stakeholders have made in that regard in

the Settlement Agreement.  And if the Debtors prevailed in the Litigated Contested Matters,

there would still be no assurances that all stakeholders would be able to reach agreement on a

consensual sales/refinancing monetization process, which is vital to the success of these Chapter

11 cases.  The Settlement Agreement not only resolves the Litigated Contested Matters, but it

also results in the avoidance of further litigation between the Parties and establishes a dispute

resolution mechanism overseen by the Mediator that provides an avenue to avoid burdensome,

costly, and time-consuming motion practice before the Court.

     25.    In contrast to the uncertainty and inherent risk in litigating these matters, and the

unavoidable expenditures related thereto, the Settlement Agreement eliminates the need for such

disputes and allows the value of the Portfolio Companies to be maximized for the benefit of all

stakeholders.  This outcome is <u>well above the lowest point in the range of reasonableness</u>.

Accordingly, the Settlement Agreement meets the first factor of the *Martin* test.

**B. The Likely Difficulties in Collection**

     26.    The Debtors do not believe that collection of any judgment that could be obtained

is a significant issue animating the Settlement Agreement.  This factor is thus neutral or not

applicable.

**C. The Complexity of Litigation Involved and the Expense, Inconvenience, and Delay Necessarily Attending It**

     27.    The Settlement Agreement satisfies the third factor in *Martin*'s four-factor test

because, in the absence of a consensual resolution of the Litigated Contested Matters, the

Chapter 11 cases would be burdened by additional inconvenience, expense, and potential

delays—effects that would be borne by the Debtors and all of their stakeholders.  The present

disputes between the Parties are fact-intensive and, absent a settlement, would require the Parties

and the Court to proceed with the multi-day evidentiary hearing previously scheduled and

     17

additional post-trial briefing.  Litigating these disputes to completion would be a complex, lengthy, expensive, and burdensome process—a process that the Settlement Agreement resolves in full.  Moreover, the Settlement Agreement provides for a mechanism to bring future disputes to the Mediator, and that mechanism should reduce (and could potentially eliminate) litigation before this Court, which would be burdensome, costly, and potentially value-destructive.  Accordingly, the third factor of *Martin*'s four-factor test is satisfied and weighs in favor of the Court approving the Settlement Agreement.

### D.  Paramount Interests of Creditors

28.     The Settlement Agreement serves the paramount interest of the Debtors' creditors as it provides a mechanism to monetize or refinance the Debtors' assets, and maximize value for the benefit of all stakeholders.  Indeed, representatives of the Debtors' most significant creditors participated in formulating and agreed to the terms of the Settlement Agreement.  Moreover, obviating litigation of the disputes covered by the Settlement Agreement will allow the Debtors and their professionals to focus on working collaboratively with the Debtors' creditors to maximize value for the benefit of all stakeholders.  Accordingly, the Debtors submit that the final factor is also met.

29.     Finally, the Settlement Agreement and the transactions contemplated therein are a sound exercise of the Debtors' business judgment.  The Settlement Agreement is the product of extensive arms'-length negotiations between the Parties and their respective representatives and represents a comprehensive resolution of the Parties' disputes.  In light of the above, the resolution of these disputes embodied in the Settlement Agreement (i) is fair and equitable; (ii) represents a compromise that rests well above the lowest point in the range of reasonableness; (iii) avoids the expense, delay, inconvenience, and uncertainty that would attend any litigation of

the Parties' issues; and (iv) advances the paramount interests of creditors.  Therefore, the

Settlement Agreement satisfies Bankruptcy Rule 9019 and should be approved by the Court.

<p style="text-align:center"><strong><u>NOTICE</u></strong></p>

30.	The Debtors will provide notice of this Motion to: (i) the U.S. Trustee; (ii) the

Office of the United States Attorney for the District of Delaware; (iii) the Internal Revenue

Service; (iv) counsel to the Patriarch Entities; (v) counsel to AMZM; (vi) counsel to U.S. Bank,

as indenture trustee; (vii) counsel to MBIA; (viii) counsel to the Zohar III Controlling Class; and

(ix) all parties that, as of the filing of this Motion, have requested notice in these Chapter 11

cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the

Debtors submit that no other or further notice is necessary.


<p style="text-align:center"><em>[Remainder of Page Intentionally Left Blank]</em></p>

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request entry of the Proposed Order, substantially in the form attached hereto, (i) authorizing the Debtors to enter into and perform in accordance with the Settlement Agreement and approving the terms thereof and (ii) granting such other and further relief as the Court deems just and proper.

Dated: April 30, 2018
       Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Michael R. Nestor*
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4421)
Ryan M. Bartley (No. 4985)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Proposed Counsel to the Debtors*
*and Debtors in Possession*

01:23154853.13

20

A-66

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| | ) Case No. 18-10512 (CSS) |
| Zohar III, Corp., *et al.*,[1] | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Requested Hearing Date**: |
| | ) **May 18, 2018 at 4:00 p.m. (ET)** |
| | ) **Requested Objection Deadline**: |
| | ) **May 11, 2018 at 4:00 p.m. (ET)** |

## <u>NOTICE OF MOTION</u>

TO:    (A) THE OFFICE OF THE UNITED STATES TRUSTEE FOR THE DISTRICT OF DELAWARE; (B) THE OFFICE OF THE UNITED STATES ATTORNEY FOR THE DISTRICT OF DELAWARE; (C) THE INTERNAL REVENUE SERVICE (D) COUNSEL TO THE PATRIARCH ENTITIES; (E) COUNSEL TO AMZM; (F) COUNSEL TO U.S. BANK, AS INDENTURE TRUSTEE; (G) COUNSEL TO MBIA INSURANCE COMPANY; (H) COUNSEL TO CERTAIN HOLDERS OF NOTES ISSUED BY ZOHAR III, LIMITED; AND (I) ANY PARTY THAT HAS REQUESTED NOTICE PURSUANT TO BANKRUPTCY RULE 2002

     **PLEASE TAKE NOTICE** that the debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "<u>Debtors</u>") have filed the *Debtors' Motion, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, for an Order Approving and Authorizing the Settlement Agreement By and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class* (the "<u>Motion</u>").

     **PLEASE TAKE FURTHER NOTICE** that, contemporaneously with the filing of the Motion, the Debtors have also filed a motion ("the <u>Motion to Shorten</u>") requesting that any objections to the Motion must be filed on or before **May 11, 2018 at 4:00 p.m. (ET)** (the "<u>Objection Deadline</u>") with the United States Bankruptcy Court for the District of Delaware, 3rd Floor, 824 Market Street, Wilmington, Delaware 19801. At the same time, you must serve a copy of any objection upon the undersigned counsel to the Debtors so as to be received on or before the Objection Deadline.

     **PLEASE TAKE FURTHER NOTICE** THAT, PURSUANT TO THE MOTION TO SHORTEN, THE DEBTORS HAVE REQUESTED A HEARING ON THE

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

01:23155688.2

MOTION WILL BE HELD ON **MAY 18, 2018 AT 4:00 P.M. (ET)** BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 5TH FLOOR, COURTROOM NO. 6, WILMINGTON, DELAWARE 19801.

      **PLEASE TAKE FURTHER NOTICE THAT IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR A HEARING.**


Dated: April 30, 2018        YOUNG CONAWAY STARGATT & TAYLOR, LLP
      Wilmington, Delaware

                                      */s/ Michael R. Nestor*
                                        James L. Patton, Jr. (No. 2202)
                                        Robert S. Brady (No. 2847)
                                        Michael R. Nestor (No. 3526)
                                        Joseph M. Barry (No. 4421)
                                        Ryan M. Bartley (No. 4985)
                                        Rodney Square
                                        1000 North King Street
                                        Wilmington, Delaware 19801
                                        Telephone: (302) 571-6600
                                        Facsimile: (302) 571-1253

                                        *Proposed Counsel to the Debtors*
                                        *and Debtors in Possession*

01:23155688.2

Case 18-10512-CSS Doc 223-2 Filed 04/30/18 Page 1 of 15

**EXHIBIT A**

**Proposed Order**

01:23154853.13

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[7] | Case No. 18-10512 (CSS) |
| Debtors. | Jointly Administered |
| | **Docket Ref. No. ___** |

## ORDER APPROVING AND AUTHORIZING THE SETTLEMENT AGREEMENT BY AND BETWEEN THE DEBTORS, LYNN TILTON, THE PATRIARCH STAKEHOLDERS, MBIA INSURANCE CORP., AND THE ZOHAR III CONTROLLING CLASS

Upon consideration of the motion (the "Motion")[8] of the Debtors for entry of an order, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the Settlement Agreement (attached hereto as **Exhibit 1**) entered into by and between (i) the Debtors, (ii) Lynn Tilton, (iii) the Patriarch Stakeholders, (iv) MBIA, and (v) Halcyon Capital Management LP[9], Coöperatieve Rabobank U.A., New York Branch, STS Master Fund, Ltd, SBF Opportunities Master Fund, Ltd, and Candlewood Structured Credit Harvest Master Fund, LTD (collectively, the "Zohar III Noteholders" and, together with the Debtors, Lynn Tilton, the Patriarch Stakeholders, and MBIA, the "Parties"), as more fully described in the Motion; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012; and it appearing that venue of these

---

[7] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[8] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Settlement Agreement, as applicable.

[9] The members of the Zohar III Controlling Class affiliated with Halcyon Capital Management LP are disclosed in the Verified Statement Pursuant to Fed. R. Bankr. P. 2019(a) filed on March 27, 2018 [Docket No. 95].

01:23154853.13

Chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and

the Court may enter a final order on the Motion consistent with Article III of the U.S.

Constitution; and this Court having determined that the relief requested in the Motion is in the

best interests of the Debtors, their estates, creditors, and other parties in interest; and this Court

having found that the relief requested in the Motion is justified by the facts and circumstances;

and it appearing that proper and adequate notice of the Motion has been given and that, except as

otherwise ordered herein, no other or further notice is necessary; and after due deliberation

thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.  The Motion is GRANTED.

2.  The Settlement Agreement, a copy of which is attached hereto as **Exhibit 1**, is

approved in its entirety pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule

9019, and is binding on all parties-in-interest in these Chapter 11 cases, including, but not limited

to, the Parties, any new Collateral Manager or New Agent appointed under the terms of the

Settlement Agreement, the Independent Director, the CRO, U.S. Bank, the Other Stakeholders,

the Patriarch Stakeholders, the Committee, and any subsequent holder of any secured notes

issued by any of the Debtors (including, with respect to any of the foregoing, any agents,

successors, or assigns); provided, however, with respect to the Zohar III Controlling Class only,

no Party shall be required to disclose the terms of the Settlement Agreement to any successor,

assign or transferee, nor shall it be liable for any successor's, assign's or transferee 's breach of

the Settlement Agreement;  provided, further however, that the first sentence of paragraph 30 of

01:23154853.13                                         2

A-71

the Settlement Agreement shall be null and void solely to the extent it contemplates a separate "confidential stipulation."

3.      A prospective purchaser or seller of debt issued or guaranteed by the Zohar III, Corp. or Zohar III, Limited may obtain a copy of the terms of the Settlement Agreement from the CRO, only after executing a standard NDA consistent with the practice in the District of Delaware for the sole and limited purpose of evaluating a potential purchase of such debt, provided however, that such terms shall not include Exhibits to the Settlement Agreement. Without limiting the binding effect of the Settlement Agreement provided for under Paragraph 2 of this Order, in the event a potential purchaser of debt becomes a holder of Zohar III Claims, such NDA shall bind the entity requesting access to the terms of the Settlement Agreement, any individual representing any such entity in such a request, and any individual who is granted access to the terms of the Settlement Agreement on behalf of any such entity.

4.      The Debtors are authorized and empowered to take any and all actions necessary to carry out, effectuate, or otherwise enforce the terms, conditions, and provisions of the Settlement Agreement.

5.      This Court shall retain jurisdiction to hear any and all disputes arising out of the interpretation or enforcement of this Order.

Dated: _____, 2018
        Wilmington, Delaware                    _____
                                                Christopher S. Sontchi
                                                United States Bankruptcy Judge

A-72

**Exhibit 1**

**Settlement Agreement**

01:23154853.13

**Mediation Term Sheet**
**(In re: Zohar III Corp., *et al.*, Case No. 18-10512 (CSS))**

*15 Month Window* – The period that expires 15 months from the date hereof.

*18 Month Extended Window* – If each of MBIA and the Zohar III Claims receive 50% of their respective Paid in Full amount within the 15 Month Window, the 15 Month Window shall be deemed to be extended by 3 months and shall be hereafter referred to herein as the 18 Month Extended Window.

*Bankruptcy Court* – The United States Bankruptcy Court for the District of Delaware, which is presiding over the Chapter 11 cases of the Debtors.

*Debtors* – The debtors in the Chapter 11 cases captioned: In re: Zohar III Corp., *et al.*, Case No. 18-10512 (CSS).

*Designated Tax Director* - the limited role Tilton shall have on behalf of the Debtors as described in paragraph 2 below.

*Full Payment Date* – The date on which the parties or the classes of noteholders on Exhibit A are Paid in Full.

*Independent Director* – the director appointed by the Mediator. The Independent Director (a) shall be unaffiliated with any party and (b) shall have played no role in connection with and held no claim against or interest in any of the Debtors.

*Indentures* – (1) The Indenture among Zohar CDO 2003-1, Limited, Zohar CDO 2003-1 Corporation, Zohar CDO 2003-1, LLC, and MBIA Insurance Corporation, CDC Financial Products, Inc., and U.S. Bank National Association, dated November 13, 2003; (2) The Indenture among Zohar II 2005-1, Limited, Zohar II 2005-1, Corp., Zohar II 2005-1, LLC, MBIA Insurance Corporation, IXIS Financial Products Inc., and LaSalle Bank National Association, dated January 12, 2005; and (3) The Indenture among Zohar III, Limited, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc., and LaSalle Bank National Association, dated April 6, 2007.

*MBIA* – MBIA Insurance Corp.

*Mediator* – The Honorable Kevin Gross, and if Judge Gross resigns as mediator Judge Sontchi will appoint a replacement mediator.

*Other Stakeholders* – (a) US Bank and MBIA, when not referring to Zohar III, (b) US Bank and the Controlling Class representative when solely referring to Zohar III, and (c) US Bank, MBIA and the Zohar III Controlling Class when referring to Zohar III and either or both of Zohar I and Zohar II.

1

A-74

*Paid in Full* – The amount owed to the parties and in the amounts listed and calculated on the schedule attached hereto as Exhibit A to be updated monthly to reflect accrued and unpaid interest and fees allowable under the Indentures.[1]

*Patriarch Stakeholder* – Entities included in Exhibit B.

*Group A Portfolio Companies* – Those companies listed on the schedule attached hereto as Exhibit C.

*Group B Portfolio Companies* – Those companies listed on the schedule attached hereto as Exhibit D.[2]

*Tilton* – Ms. Lynn Tilton.

<u>*U.S. Bank*</u> – U.S. Bank National Association, solely in its capacity as Trustee under the Indentures, and not in its individual capacity.

*Zohar III Noteholders* – those entities or the classes of noteholders listed on the schedule attached hereto as Exhibit E.

*Zohar III Claims* – Claims under the Zohar III Indenture $[X]

*Zohar Funds* – collectively, Zohar CDO 2003-1, Limited; Zohar CDO 2003-1 Corporation; nondebtor Zohar CDO 2003-1, LLC; Zohar II 2005-1, Limited; Zohar II 2005-1, Corp.; nondebtor Zohar II 2005-1, LLC; Zohar III, Limited; Zohar III, Corp.; and nondebtor Zohar III, LLC)

**<u>Terms</u>**

1. The Mediator shall appoint a single Independent Director for each of the Zohar Funds (same director shall be appointed for all of the Zohar Funds). The Independent Director shall not have the power to convert or dismiss the Chapter 11 cases during the 15 Month Window. Tilton shall resign as a director of each and shall have no governance authority or responsibility for the Zohar Funds, other than as Designated Tax Director. On the Full Payment Date, the Independent Director shall be deemed to resign and Tilton shall be



[1]

[2]   Group B Portfolio Companies will exclude the Group A Portfolio Companies.

2

A-75

automatically reinstated as director of each of the Zohar Funds (with all powers attendant to such position also automatically reinstated).

2. Notwithstanding anything to the contrary herein except subject only to paragraph 3 and 14, Tilton shall remain the director of each of the Debtors (until such time as she is no longer the taxpayer for the Debtors,



3. Subject to the last sentence of this paragraph 3, if the Full Payment Date does not occur within the 15 Month Window, Tilton and the CRO shall negotiate in good faith on how to monetize the Group B Portfolio Companies. In the event of any dispute in such negotiations, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve any or all disputes, the parties shall jointly seek an order of the Bankruptcy Court resolving such disputes.

4. 

5. 

6. The Independent Director/CRO shall appoint a new independent administrative agent under the Zohar credit agreements (the "New Agent") who shall report only to the Independent Director/CRO and U.S. Bank ; provided, (a) that PPAS remains the administrative agent under the Zohar credit agreements for all purposes related to the Patriarch Stakeholders and any other third party; and (b) during the 15 Month Window or the 18 Month Extended Window, as applicable, the New Agent shall have all rights and remedies available under the Credit Agreement with respect to the Zohar interests in the Group A Portfolio Companies; provided, however, that the New Agent shall not have the ability to take any action, declare any default or exercise any remedy with respect to any Group A Portfolio Company (other than for prospective non-payment of interest) or any Group B Portfolio Company and subject to the tolling of claims and other terms hereof. PPAS, the Independent Director/CRO, and the New Agent shall use reasonable efforts to transition existing Zohar-related PPAS matters to the new agent. Subject to the approval of the Independent Director/CRO. PPAS shall use commercially reasonable efforts to take all reasonable actions to ensure the continued validity and perfection of any security interests and liens for loans transferred to the New Agent. PPAS may be reimbursed for reasonable

3

A-76

transition costs incurred in transition to the New Agent. If there is any dispute with respect to any of the foregoing, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties shall jointly seek an order of the Bankruptcy Court resolving that dispute. Nothing in the foregoing paragraph shall prejudice rights and remedies of the parties to Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd., No. 16-cv-4488 (S.D.N.Y.), in the event that litigation is resumes.

7. If the Independent Director resigns prior to the Full Payment Date, the Mediator shall appoint a replacement Independent Director. In connection therewith, the Mediator shall consult with the controlling class of Zohar III noteholders, MBIA and Tilton about director candidates. The Independent Director shall be fully charged with governance of the Zohar Funds under applicable Cayman or Delaware law.

8. The Independent Director will retain a CRO to participate in the process to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing (the "*Monetization Process*").

9. Tilton shall remain in her position as director, manager and officer, as applicable, of the Group A Portfolio Companies during the 15 Month Window, or, if qualified, for the 18 Month Extended Window. During the 15 Month Window or, if qualified, for the 18 Month Extended Window, all parties agree that no action shall be taken to remove Tilton from any such position.

10. With full and joint authority, Independent Director/CRO, with full authority on behalf of the Debtors, and Tilton, with full authority on behalf of the Group A Portfolio Companies, will conduct a process to monetize the Group A Portfolio Companies and the Group B Portfolio Companies. It is acknowledged that the CRO will act in the best interests of the Zohar Funds, and Tilton in the best interests of the Group A Portfolio Companies. Each shall have full and complete information regarding the Monetization Process . Tilton and the CRO shall use good faith, commercially-reasonable efforts to coordinate prospective meetings with bankers . But in no event shall the CRO interfere in any way with the operations of the Group A Portfolio Companies and the Group B Portfolio Companies.

11. Any dispute with respect to the Monetization Process between the Independent Director/CRO and Tilton, in the first instance, shall be referred to the Mediator. If the

4

dispute cannot be resolved by the Mediator, the parties retain all rights to seek an order of the Bankruptcy Court resolving such dispute.

12. Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies until such time as the (i) the parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date.

13. At the Full Payment Date, MBIA and the Zohar III Noteholders shall have no direct or indirect claim against, or interest or participation in the Zohar Funds or the Group A Portfolio Companies ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████.

14. The 225 Action remains subject to the stay subject to satisfaction of the 15 Month Window. The Status Quo Orders entered in the 225 Action are held in abeyance and shall have no effect during the 15 Month Window or 18 Month Extended Window with respect to the Monetization Process involving any Group A Portfolio Company.

15. MBIA and Zohar III shall form a Zohar Fund creditors committee (the "Committee") to oversee and monitor the Zohar bankruptcy. The CRO shall provide the Committee members with all information necessary to assess and represent the interests of the Other Stakeholders other than information whose distribution is reasonably limited at the request of investment bankers or potential buyers. ████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████ All other litigation, motions and contested matters between any of the parties other than the 225 Action as discussed above, shall be stayed, with appropriate protections so there is no prejudice to any parties. Except as specifically set forth herein, no other litigation, motions, and/or contested matters may be re-initiated or brought (directly or indirectly) by (a) any Other Stakeholders, (b) the Debtors, (c) the New Agent, (d) the Group A Portfolio Companies, (e) the Group B Portfolio Companies, and (f) any Collateral Manager, seeking any relief against the Patriarch Stakeholders (and their respective officers, directors, employees, affiliates and agents), or any of the Group A or Group B Portfolio Companies.

For the avoidance of doubt, with respect to any of the entities identified in paragraph 15: (1) (a) any litigation, claim, motion, or contested matter that was or could have been brought prior to the date hereof, and (b) any litigation, claim, motion, or contested matter that could be brought after the date hereof arising from any facts, acts, or omissions that first arose prior to the date hereof, shall be stayed during the 15-Month Window, with appropriate protections so there is no prejudice to any party and; (2) any other litigation, claim, motion, or contested matter not referenced in paragraph 15(1) shall only be brought subject to the provisions of paragraphs 17 and 23, and no other litigation, claim, motion, or

5

contested matter that does not fall within paragraph 17 and 23 shall be brought by any such entity against any other such entity during the 15-Month Window.

16.   MBIA and the Zohar III Noteholders shall designate a new Collateral Manager who has no claim against the Debtors, and the Collateral Management Agreement shall be amended in a manner to reflect the settlement herein and (b) all parties reserve their rights with respect to any AMZM fees and expenses incurred prior to the date hereof.

17.  The Debtors shall promptly negotiate with the secured parties funding of the Debtors' Chapter 11 cases from the use of the secured parties' cash collateral.  In the event of any dispute among the parties with respect to use of cash collateral, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute.

18.  Any (A) claim asserted by the Patriarch Stakeholders  and (B) equity interest asserted by the Patriarch Stakeholders shall be deemed due and payable through the closing of any monetization event In connection with any such closing, the Patriarch Stakeholders will release any liens that secure any of the foregoing non-challenged claims on a pari passu basis with liens on the same collateral held by the Other Stakeholders. All parties' respective rights to challenge the propriety of any of the foregoing claims or equity interests are tolled without prejudice until the expiration of the 18 Month Window

---

3

4



. Nothing herein is intended to or shall elevate or modify the existing priority of any claims or liens.

19. All causes of action among the Debtors, Other Stakeholders and Patriarch Stakeholders (including any of their affiliates or agents) with respect to the Debtors, the Group A Portfolio Companies and the Group B Portfolio Companies shall be tolled during the 15 Month Window or, if qualified, for the 18 Month Extended Window, and all parties' respective rights shall be reserved with respect thereto, including with respect to venue and jurisdiction.

20. Tilton represents that the Group A Portfolio Companies and the Group B Portfolio Companies will be operated in the ordinary course of business during the 15 Month Window. During the 15 Month Window, the Group A Portfolio Companies and the Group B Portfolio Companies shall not declare dividends but shall be authorized to (b) (i) enter into financing transactions with affiliates on market terms, subject to first consulting with the CRO or (ii) issue new equity that will dilute the existing equity holdings on market terms, subject to first consulting with the CRO; provided, however, that if the CRO objects to the financing or equity described in the foregoing subparagraphs (b)(i) and (ii), the CRO may take that dispute to the Mediator for final resolution.



21.

22. While any dispute is before the Mediator, no party to such dispute shall take any action in Bankruptcy Court.

7

A-80

23. If any party materially breaches this Agreement, the dispute shall be in the first instance determined by the Mediator on a confidential basis. The Mediator shall have all remedies available to him. If the Mediator cannot resolve the dispute, the Mediator shall make a report and recommendation to the Bankruptcy Court and the parties shall jointly seek an order of the Bankruptcy Court resolving such dispute. In connection with the foregoing, the Mediator shall determine to what extent information should be filed under seal, subject to the order of the Bankruptcy Court approving such filing under seal. The parties agree that for purposes of any decision of the Bankruptcy Court dealing with any matter covered by this paragraph, the Agreement is non-severable under all circumstances.

24. Any application by any party for assistance from the Mediator shall be brought within seven (7) days of identifying the dispute to the other party or parties involved in the dispute, and heard at the Mediator's earliest availability. Any application shall be in writing and served by email on the other parties.

25. 

26. The parties (other thn U.S. Bank) shall issue the joint press release as set forth in Exhibit F stating that the parties will work in a mutually cooperative process in support of the Monetization Process (and no other press release). If the parties cannot jointly agree, then the Mediator shall resolve any disputes. The parties shall also agree to standard non-disparagement terms.

27. The Bankruptcy Court shall retain jurisdiction to enforce the terms of this agreement and all parties agree to submit to the jurisdiction of the Bankruptcy Court for resolution of any matter in connection with this agreement or the enforcement thereof; provided, however, that no party shall be deemed to consent to venue or jurisdiction before the Bankruptcy Court for any matter not in connection with this agreement or the enforcement thereof.

28. The parties will work with the indenture trustee under the Zohar indentures to satisfy the requirements of the indentures with respect to the implementation of this Agreement. Any such dispute related to satisfaction of such requirements shall be, in the first instance, referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute..

29. For the avoidance of doubt, if each of MBIA and the Zohar III Claims receive 50% of the Paid in Full amount within the 15 Month Window, the 15 Month Window shall be herein shall be replaced with the term 18 Month Extended Window for all purposes.

8

30. The foregoing terms shall be memorialized in a confidential stipulation filed under seal and entry of an order by Judge Sontchi, on terms and conditions satisfactory to the parties. The order shall provide, among other provisions, that this Agreement and the order shall be binding on all parties and their successors and assigns.

[INSERT SIGNATURE BLOCKS]

9

A-82

EXHIBITS A through F

[Redacted]

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| Zohar III, Corp., *et al.*,[1] | ) Case No. 18-10512 (CSS) |
| | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Docket Ref. Nos. 222 & 223** |

## ORDER APPROVING AND AUTHORIZING THE SETTLEMENT AGREEMENT BY AND BETWEEN THE DEBTORS, LYNN TILTON, THE PATRIARCH STAKEHOLDERS, MBIA INSURANCE CORP., AND THE ZOHAR III CONTROLLING CLASS

Upon consideration of the motion (the "Motion")[2] of the Debtors for entry of an order,

pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the

Settlement Agreement (attached hereto as **Exhibit 1**) entered into by and between (i) the

Debtors, (ii) Lynn Tilton, (iii) the Patriarch Stakeholders, (iv) MBIA, and (v)  Halcyon Capital

Management LP[3], Coöperatieve Rabobank U.A., New York Branch, STS Master Fund, Ltd, SBF

Opportunities Master Fund, Ltd, and Candlewood Structured Credit Harvest Master Fund, LTD

(collectively, the "Zohar III  Noteholders" and, together with the Debtors, Lynn Tilton, the

Patriarch Stakeholders, and MBIA,  the "Parties"), as more fully described in the Motion; and it

appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference* from the United States District Court

for the District of Delaware, dated as of February 29, 2012; and it appearing that venue of these

---

[1]  The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Settlement Agreement, as applicable.

[3]  The members of the Zohar III Controlling Class affiliated with Halcyon Capital Management LP are disclosed in the Verified Statement Pursuant to Fed. R. Bankr. P. 2019(a) filed on March 27, 2018 [Docket No. 95].

01:23222940.4

Chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and

the Court may enter a final order on the Motion consistent with Article III of the U.S.

Constitution; and this Court having determined that the relief requested in the Motion is in the

best interests of the Debtors, their estates, creditors, and other parties in interest; and this Court

having found that the relief requested in the Motion is justified by the facts and circumstances;

and it appearing that proper and adequate notice of the Motion has been given and that, except as

otherwise ordered herein, no other or further notice is necessary; and after due deliberation

thereon; and good and sufficient cause appearing therefor,

   IT IS HEREBY ORDERED THAT:

   1.     The Motion is GRANTED.

   2.     The Settlement Agreement, a copy of which is attached hereto as **Exhibit 1**, is

approved in its entirety pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule

9019, and is binding on all parties-in-interest in these Chapter 11 cases, including, but not limited

to, the Parties, any new Collateral Manager or New Agent appointed under the terms of the

Settlement Agreement, the Independent Director, the CRO, U.S. Bank, the Other Stakeholders,

the Patriarch Stakeholders, the Committee, and any subsequent holder of any secured notes

issued by any of the Debtors (including, with respect to any of the foregoing, any agents,

successors, or assigns); provided, however, with respect to the Zohar III Controlling Class only,

no Party shall be required to disclose the terms of the Settlement Agreement to any successor,

assign or transferee, nor shall it be liable for any successor's, assign's or transferee 's breach of

the Settlement Agreement;  provided, further however, that the first sentence of paragraph 30 of

the Settlement Agreement shall be null and void solely to the extent it contemplates a separate "confidential stipulation."

3.      A prospective purchaser or seller of debt issued or guaranteed by the Zohar III, Corp. or Zohar III, Limited may obtain a copy of the terms of the Settlement Agreement from the CRO, only after executing a standard NDA consistent with the practice in the District of Delaware for the sole and limited purpose of evaluating a potential purchase of such debt, provided however, that such terms shall not include Exhibits to the Settlement Agreement. Without limiting the binding effect of the Settlement Agreement provided for under Paragraph 2 of this Order, in the event a potential purchaser of debt becomes a holder of Zohar III Claims, such NDA shall bind the entity requesting access to the terms of the Settlement Agreement, any individual representing any such entity in such a request, and any individual who is granted access to the terms of the Settlement Agreement on behalf of any such entity.

4.      Notwithstanding anything in the Order to the contrary, nothing contained in this Order is or shall be deemed to be an act by the Trustee to consent to or vote for or accept or adopt on behalf of any Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding.  (All capitalized terms used in the prior sentence have the meaning ascribed to them in the applicable indenture between the Debtors and U.S. Bank.)

5.      Notwithstanding anything to the contrary in this Order or the Settlement Agreement, nothing set forth in the Settlement Agreement is binding on Blank Rome LLP.

6.      Notwithstanding anything to the contrary in this Order or the Settlement Agreement, nothing set forth in the Settlement Agreement is binding on Alvarez & Marsal Zohar

Management LLC ("AMZM"), provided, however, that paragraph 16 of the Settlement
Agreement provides that AMZM shall be terminated.

      7.     The Debtors are authorized and empowered to take any and all actions necessary
to carry out, effectuate, or otherwise enforce the terms, conditions, and provisions of the
Settlement Agreement.

      8.     This Court shall retain jurisdiction to hear any and all disputes arising out of the
interpretation or enforcement of this Order.

Dated:  May **21**, 2018
         Wilmington, Delaware

                                   Christopher S. Sontchi
                                   United States Bankruptcy Judge

**Exhibit 1**

**Settlement Agreement**

01:23222940.4

**Mediation Term Sheet**
**(In re: Zohar III Corp., *et al.*, Case No. 18-10512 (CSS))**

*15 Month Window* – The period that expires 15 months from the date hereof.

*18 Month Extended Window* – If each of MBIA and the Zohar III Claims receive 50% of their respective Paid in Full amount within the 15 Month Window, the 15 Month Window shall be deemed to be extended by 3 months and shall be hereafter referred to herein as the 18 Month Extended Window.

*Bankruptcy Court* – The United States Bankruptcy Court for the District of Delaware, which is presiding over the Chapter 11 cases of the Debtors.

*Debtors* – The debtors in the Chapter 11 cases captioned: In re: Zohar III Corp., *et al.*, Case No. 18-10512 (CSS).

*Designated Tax Director* - the limited role Tilton shall have on behalf of the Debtors as described in paragraph 2 below.

*Full Payment Date* – The date on which the parties or the classes of noteholders on Exhibit A are Paid in Full.

*Independent Director* – the director appointed by the Mediator. The Independent Director (a) shall be unaffiliated with any party and (b) shall have played no role in connection with and held no claim against or interest in any of the Debtors.

*Indentures* – (1) The Indenture among Zohar CDO 2003-1, Limited, Zohar CDO 2003-1 Corporation, Zohar CDO 2003-1, LLC, and MBIA Insurance Corporation, CDC Financial Products, Inc., and U.S. Bank National Association, dated November 13, 2003; (2) The Indenture among Zohar II 2005-1, Limited, Zohar II 2005-1, Corp., Zohar II 2005-1, LLC, MBIA Insurance Corporation, IXIS Financial Products Inc., and LaSalle Bank National Association, dated January 12, 2005; and (3) The Indenture among Zohar III, Limited, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc., and LaSalle Bank National Association, dated April 6, 2007.

*MBIA* – MBIA Insurance Corp.

*Mediator* – The Honorable Kevin Gross, and if Judge Gross resigns as mediator Judge Sontchi will appoint a replacement mediator.

*Other Stakeholders* – (a) US Bank and MBIA, when not referring to Zohar III, (b) US Bank and the Controlling Class representative when solely referring to Zohar III, and (c) US Bank, MBIA and the Zohar III Controlling Class when referring to Zohar III and either or both of Zohar I and Zohar II.

01:23191627.1

A-89

***Paid in Full*** – The amount owed to the parties and in the amounts listed and calculated on the schedule attached hereto as Exhibit A to be updated monthly to reflect accrued and unpaid interest and fees allowable under the Indentures.[1]

***Patriarch Stakeholder*** – Entities included in Exhibit B.

***Group A Portfolio Companies*** – Those companies listed on the schedule attached hereto as Exhibit C.

***Group B Portfolio Companies*** – Those companies listed on the schedule attached hereto as Exhibit D.[2]

***Tilton*** – Ms. Lynn Tilton.

***U.S. Bank*** – U.S. Bank National Association, solely in its capacity as Trustee under the Indentures, and not in its individual capacity.

***Zohar III Noteholders*** – those entities or the classes of noteholders listed on the schedule attached hereto as Exhibit E.

***Zohar III Claims*** – Claims under the Zohar III Indenture $[X]

***Zohar Funds*** – collectively, Zohar CDO 2003-1, Limited; Zohar CDO 2003-1 Corporation; nondebtor Zohar CDO 2003-1, LLC; Zohar II 2005-1, Limited; Zohar II 2005-1, Corp.; nondebtor Zohar II 2005-1, LLC; Zohar III, Limited; Zohar III, Corp.; and nondebtor Zohar III, LLC)

**Terms**

---

[1]   This footnote is intended to cover MBIA's claims. Other than the Policy Payment in the amount of $148,951,585 with respect to Zohar I and the Policy Payment of $770,109,326 with respect to Zohar II reflected on Exhibit A, the calculation of which amounts are not subject to challenge by Tilton; all other rights reserved. MBIA will consult in good faith with Tilton regarding the other amounts and calculations specified in Exhibit A. If the parties are unable to agree on those other amounts, the matter shall be referred to the Mediator. If the Mediator is unable to resolve the dispute, the matter shall be brought to the Bankruptcy Court for resolution. Any equity interest owed to MBIA or Zohar I, as applicable, will be escrowed until the expiration of the 15 Month Window; all parties' rights reserved. Any proceeds from the sale or repayment of Zohar I loans (but not the equity interest) shall be paid directly to MBIA.

[2]   Group B Portfolio Companies will exclude the Group A Portfolio Companies.

1.  The Mediator shall appoint a single Independent Director for each of the Zohar Funds (same director shall be appointed for all of the Zohar Funds). The Independent Director shall not have the power to convert or dismiss the Chapter 11 cases during the 15 Month Window. Tilton shall resign as a director of each and shall have no governance authority or responsibility for the Zohar Funds, other than as Designated Tax Director. On the Full Payment Date, the Independent Director shall be deemed to resign and Tilton shall be automatically reinstated as director of each of the Zohar Funds (with all powers attendant to such position also automatically reinstated).

2.  Notwithstanding anything to the contrary herein except subject only to paragraph 3 and 14, Tilton shall remain the director of each of the Debtors (until such time as she is no longer the taxpayer for the Debtors, the Group B Portfolio Companies, and Group A Portfolio Companies) solely for the purpose of exercising (and having no other rights or authority) to (a) manage the tax liability and reporting of the Debtors and the Group B Portfolio Companies, (b) manage the tax reporting of the Group A Portfolio Companies and (c) with respect to the Group B Portfolio Companies, manage any event causing cancellation of debt income (forgiveness of debt, liquidation, unwind, or foreclosure) including to manage the timing of sale of the Group B Portfolio Companies, forgiveness of debt and realizing gains and losses (the "Designated Tax Director"). In that capacity, Tilton shall continue to bear the tax liability associated with ownership of the Debtors, the Group B Portfolio Companies, and the Group A Portfolio Companies, including with respect to any Group A Portfolio Company transactions.

3.  Subject to the last sentence of this paragraph 3, if the Full Payment Date does not occur within the 15 Month Window, Tilton and the CRO shall negotiate in good faith on how to monetize the Group B Portfolio Companies. In the event of any dispute in such negotiations, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve any or all disputes, the parties shall jointly seek an order of the Bankruptcy Court resolving such disputes.

4.  [TBD: CRO and LT will develop reasonable process milestones related to hiring bankers, ....]

5.  The Group A Portfolio Companies will be sold without regard to Tilton's personal tax liability.

6.  The Independent Director/CRO shall appoint a new independent administrative agent under the Zohar credit agreements (the "New Agent") who shall report only to the Independent Director/CRO and U.S. Bank ; provided, (a) that PPAS remains the administrative agent under the Zohar credit agreements for all purposes related to the Patriarch Stakeholders and any other third party; and (b) during the 15 Month Window or the 18 Month Extended Window, as applicable, the New Agent shall

have all rights and remedies available under the Credit Agreement with respect to the Zohar interests in the Group A Portfolio Companies; provided, however, that the New Agent shall not have the ability to take any action, declare any default or exercise any remedy with respect to any Group A Portfolio Company (other than for prospective non-payment of interest) or any Group B Portfolio Company and subject to the tolling of claims and other terms hereof. PPAS, the Independent Director/CRO, and the New Agent shall use reasonable efforts to transition existing Zohar-related PPAS matters to the new agent. Subject to the approval of the Independent Director/CRO. PPAS shall use commercially reasonable efforts to take all reasonable actions to ensure the continued validity and perfection of any security interests and liens for loans transferred to the New Agent. PPAS may be reimbursed for reasonable transition costs incurred in transition to the New Agent. If there is any dispute with respect to any of the foregoing, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties shall jointly seek an order of the Bankruptcy Court resolving that dispute. Nothing in the foregoing paragraph shall prejudice rights and remedies of the parties to Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd., No. 16-cv-4488 (S.D.N.Y.), in the event that litigation is resumes.

7. If the Independent Director resigns prior to the Full Payment Date, the Mediator shall appoint a replacement Independent Director. In connection therewith, the Mediator shall consult with the controlling class of Zohar III noteholders, MBIA and Tilton about director candidates. The Independent Director shall be fully charged with governance of the Zohar Funds under applicable Cayman or Delaware law.

8. The Independent Director will retain a CRO to participate in the process to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing (the "*Monetization Process*"). The CRO shall (a) replace the current CRO, (b) be unaffiliated with any party, and (c) have played no role in connection with and held no claim against or interest in any of the Debtors; provided, however, that Rob Kost may be considered for any role in the monetization process, by the CRO. The Independent Director and CRO each will execute a standard NDA consistent with the practice in the District of Delaware.

9. Tilton shall remain in her position as director, manager and officer, as applicable, of the Group A Portfolio Companies during the 15 Month Window, or, if qualified, for the 18 Month Extended Window. During the 15 Month Window or, if qualified, for the 18 Month Extended Window, all parties agree that no action shall be taken to remove Tilton from any such position.

10. With full and joint authority, Independent Director/CRO, with full authority on behalf of the Debtors, and Tilton, with full authority on behalf of the Group A Portfolio Companies, will conduct a process to monetize the Group A Portfolio

Companies and the Group B Portfolio Companies. It is acknowledged that the CRO will act in the best interests of the Zohar Funds, and Tilton in the best interests of the Group A Portfolio Companies. Tilton and the CRO shall jointly select bankers and other professionals, prioritize sales, oversee the bid process and select transactions to complete. Tilton shall work with the CRO, who shall jointly with Tilton choose bankers to be retained for Group A Portfolio Company sales. Each shall have full and complete information regarding the Monetization Process and sources and uses of funds in any transaction consummated as part of the Monetization Process. Tilton and the CRO shall use good faith, commercially-reasonable efforts to coordinate prospective meetings with bankers and buyers. But in no event shall the CRO interfere in any way with the operations of the Group A Portfolio Companies and the Group B Portfolio Companies.

11. Any dispute with respect to the Monetization Process between the Independent Director/CRO and Tilton, in the first instance, shall be referred to the Mediator. If the dispute cannot be resolved by the Mediator, the parties retain all rights to seek an order of the Bankruptcy Court resolving such dispute.

12. Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies until such time as the (i) the parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date.

13. At the Full Payment Date, MBIA and the Zohar III Noteholders shall have no direct or indirect claim against, or interest or participation in the Zohar Funds or the Group A Portfolio Companies; provided, however, that the resolution of any dispute regarding the escrow referenced in footnote 1 shall not be barred as of the Full Payment Date by the provisions of this paragraph.

14. The 225 Action remains subject to the stay subject to satisfaction of the 15 Month Window. The Status Quo Orders entered in the 225 Action are held in abeyance and shall have no effect during the 15 Month Window or 18 Month Extended Window with respect to the Monetization Process involving any Group A Portfolio Company.

15. MBIA and Zohar III shall form a Zohar Fund creditors committee (the "Committee") to oversee and monitor the Zohar bankruptcy. The CRO shall provide the Committee members with all information necessary to assess and represent the interests of the Other Stakeholders other than information whose distribution is reasonably limited at the request of investment bankers or potential buyers. The committee shall be comprised of 3 representatives. The members and their respective advisors shall execute standard NDAs consistent with the practice in the District of Delaware. The reasonable fees and expenses of the Committee and its advisors shall be set forth in a budget to be approved by the CRO and shall

01:23191627.1

be paid by the estates. All other litigation, motions and contested matters between any of the parties other than the 225 Action as discussed above, shall be stayed, with appropriate protections so there is no prejudice to any parties. Except as specifically set forth herein, no other litigation, motions, and/or contested matters may be re-initiated or brought (directly or indirectly) by (a) any Other Stakeholders, (b) the Debtors, (c) the New Agent, (d) the Group A Portfolio Companies, (e) the Group B Portfolio Companies, and (f) any Collateral Manager, seeking any relief against the Patriarch Stakeholders (and their respective officers, directors, employees, affiliates and agents), or any of the Group A or Group B Portfolio Companies.

For the avoidance of doubt, with respect to any of the entities identified in paragraph 15: (1) (a) any litigation, claim, motion, or contested matter that was or could have been brought prior to the date hereof, and (b) any litigation, claim, motion, or contested matter that could be brought after the date hereof arising from any facts, acts, or omissions that first arose prior to the date hereof, shall be stayed during the 15-Month Window, with appropriate protections so there is no prejudice to any party and; (2) any other litigation, claim, motion, or contested matter not referenced in paragraph 15(1) shall only be brought subject to the provisions of paragraphs 17 and 23, and no other litigation, claim, motion, or contested matter that does not fall within paragraph 17 and 23 shall be brought by any such entity against any other such entity during the 15-Month Window.

16. AMZM and any of its affiliates (collectively, "AMZM") shall not be a member of or advisor to the Committee, and, except herein, AMZM shall not be paid or reimbursed by the estates or the Portfolio Companies for any fees or expenses with respect to the Monetization Process or any other purpose; provided, however, that (a) AMZM shall be terminated as Collateral Manager, and MBIA and the Zohar III Noteholders shall designate a new Collateral Manager who has no claim against the Debtors, and the Collateral Management Agreement shall be amended in a manner to reflect the settlement herein and (b) all parties reserve their rights with respect to any AMZM fees and expenses incurred prior to the date hereof. Subject to the approval of the CRO, AMZM may be reimbursed for reasonable transition costs solely incurred in the transmitting of information to the new collateral manager. [TBD: Side agreement b/w cro and CM ensuring reasonable fees which will be escrowed to escrow CM fees due under the indenture ]

17. The Debtors shall promptly negotiate with the secured parties funding of the Debtors' Chapter 11 cases from the use of the secured parties' cash collateral. In order to facilitate this negotiation, the Zohar Funds will provide customary bankruptcy case budgets, including anticipated sources and uses of cash (including payments from the Group A Portfolio Companies). It is understood and agreed the Zohar Funds shall not utilize any cash they are holding pending an agreed order. In the event of any dispute among the parties with respect to use of cash collateral, in

01:23191627.1

the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute.

18. Any (A) claim asserted by the Patriarch Stakeholders that is supported by written documentation showing the claim (a) was funded to a Group A Portfolio Company by a Patriarch Stakeholder (in the case of funded debt claim), or (b) represents a fee or other claim arising from a deferral of payment or any management and/or administrative fee owed to a Patriarch Stakeholder[3] and (B) equity interest asserted by the Patriarch Stakeholders is supported by written documentation, then such claim and equity interest, as applicable, shall be deemed due and payable through the closing of any monetization event on a pari passu basis with other similarly situated claims and equity unless the applicable credit agreement provides otherwise.[4] In connection with any such closing, the Patriarch Stakeholders will release any liens that secure any of the foregoing non-challenged claims on a pari passu basis with liens on the same collateral held by the Other Stakeholders. All parties' respective rights to challenge the propriety of any of the foregoing claims or equity interests are tolled without prejudice until the expiration of the 18 Month Window (provided the Full Payment Date does not occur on or before such date), but no such claim shall be brought during the 18 Month Window or used to block the closing of any pending transaction in the Monetization Process. The Patriarch Stakeholders will promptly provide any information reasonably requested by the CRO to verify the existence of the funding and documentation described above (provided that the CRO may share the foregoing information with Other Stakeholders (subject to the execution of an NDA approved by the Mediator) as required in the CRO's reasonable discretion. With respect to the claims in (A) above, the payments to the Patriarch Stakeholders that shall be made without further analysis or challenge shall be capped at $250 million, with any amounts in excess to be held in escrow until Full Payment Date. Tilton represents that none of the claims in (A) currently prime the secured claims of the Other Stakeholders in the Group A Portfolio Companies, other than ABLs in ███████████ ███. Nothing herein is intended to or shall elevate or modify the existing priority of any claims or liens.

19. All causes of action among the Debtors, Other Stakeholders and Patriarch Stakeholders (including any of their affiliates or agents) with respect to the Debtors, the Group A Portfolio Companies and the Group B Portfolio Companies

---

[3] Management and/or administrative fees as noted here are defined in a separate agreement entered between the parties concurrent with this agreement.

[4] Tilton to provide a good faith estimate on company by company basis for each of the Group A Portfolio Companies on an aggregate basis, in each case reflecting the aggregate amount she expects will be covered by this paragraph 17.

shall be tolled during the 15 Month Window or, if qualified, for the 18 Month Extended Window, and all parties' respective rights shall be reserved with respect thereto, including with respect to venue and jurisdiction.

20. Tilton represents that the Group A Portfolio Companies and the Group B Portfolio Companies will be operated in the ordinary course of business during the 15 Month Window. During the 15 Month Window, the Group A Portfolio Companies and the Group B Portfolio Companies shall not declare dividends but shall be authorized to (b) (i) enter into financing transactions with affiliates on market terms, subject to first consulting with the CRO or (ii) issue new equity that will dilute the existing equity holdings on market terms, subject to first consulting with the CRO; provided, however, that if the CRO objects to the financing or equity described in the foregoing subparagraphs (b)(i) and (ii), the CRO may take that dispute to the Mediator for final resolution. Notwithstanding the foregoing, the Group A Portfolio Companies and the Group B Portfolio Companies can distribute payments as designated by the Designated Tax Director for the payment of their state and federal income taxes.

21. The Group A Portfolio Companies shall share with employees of MBIA (who sign NDAs as described in Paragraph 15 herein) financial statements and backup reasonably requested in writing by MBIA. Any information provided to MBIA shall only be shared in the following way: someone employed by MBIA can view the documents in the New York offices of Gibson Dunn but may not take copies or pictures of any documents or share any information in those documents, except with the CRO. In the event of any dispute among the parties with respect to the reasonableness of that request, such dispute shall be finally decided by the Mediator.

22. While any dispute is before the Mediator, no party to such dispute shall take any action in Bankruptcy Court.

23. If any party materially breaches this Agreement, the dispute shall be in the first instance determined by the Mediator on a confidential basis. The Mediator shall have all remedies available to him. If the Mediator cannot resolve the dispute, the Mediator shall make a report and recommendation to the Bankruptcy Court and the parties shall jointly seek an order of the Bankruptcy Court resolving such dispute. In connection with the foregoing, the Mediator shall determine to what extent information should be filed under seal, subject to the order of the Bankruptcy Court approving such filing under seal. The parties agree that for purposes of any decision of the Bankruptcy Court dealing with any matter covered by this paragraph, the Agreement is non-severable under all circumstances.

24. Any application by any party for assistance from the Mediator shall be brought within seven (7) days of identifying the dispute to the other party or parties

01:23191627.1

involved in the dispute, and heard at the Mediator's earliest availability.   Any application shall be in writing and served by email on the other parties.

25. Upon the expiration of the 15 Month Window, the Independent Director/CRO may take all necessary and appropriate action in the best interests of the Zohar Funds without any restriction herein or otherwise, including, but not limited to, seeking relief from the Bankruptcy Court to lift the automatic stay, taking action to remove Tilton as a director or manager of the Group A Portfolio Companies or the Group B Portfolio Companies, or dismissing or converting the cases to chapter 7 cases. Upon the expiration of the 15 Month Window, all parties to the chapter 11 cases shall have and may exercise any and all rights available under applicable law.

26. The parties (other thn U.S. Bank) shall issue the joint press release as set forth in Exhibit F stating that the parties will work in a mutually cooperative process in support of the Monetization Process (and no other press release).  If the parties cannot jointly agree, then the Mediator shall resolve any disputes.  The parties shall also agree to standard non-disparagement terms.

27. The Bankruptcy Court shall retain jurisdiction to enforce the terms of this agreement and all parties agree to submit to the jurisdiction of the Bankruptcy Court for resolution of any matter in connection with this agreement or the enforcement thereof; provided, however, that no party shall be deemed to consent to venue or jurisdiction before the Bankruptcy Court for any matter not in connection with this agreement or the enforcement thereof.

28. The parties will work with the indenture trustee under the Zohar indentures to satisfy the requirements of the indentures with respect to the implementation of this Agreement. Any such dispute related to satisfaction of such requirements shall be, in the first instance, referred to the Mediator.  If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute..

29. For the avoidance of doubt, if each of MBIA and the Zohar III Claims receive 50% of the Paid in Full amount within the 15 Month Window, the 15 Month Window shall be herein shall be replaced with the term 18 Month Extended Window for all purposes.

30. The foregoing terms shall be memorialized in a confidential stipulation filed under seal and entry of an order by Judge Sontchi, on terms and conditions satisfactory to the parties.  The order shall provide, among other provisions, that this Agreement and the order shall be binding on all parties and their successors and assigns.


[INSERT SIGNATURE BLOCKS]

01:23191627.1

Case 18-10512-CSS    Doc 266-1    Filed 05/21/18    Page 11 of 19

EXHIBIT A

01:23191627.1

**ZOHAR I**

| | | |
|---|---:|---|
| Amounts paid on Nov. 20, 2015 under the Policy | 148,951,585 | Indenture § 11.1(a)(i)(G), 11.1(a)(ii)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Interest (Prime + 2%), as of April 18, 2018 | 8,249,532 | Insurance Agreement § 4.03 |
| SUBTOTAL | 157,201,117 | |
| Credit Enhancement Liabilities incurred in connection with MBIA's administration, enforcement, defense or preservation of rights under the Transaction Documents* | 7,718,876 | Indenture § 11.1(a)(i)(G), 11.1(a)(II)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Legal fees/expenses | 7,531,990 | |
| Financial, investment and non-legal advisors | 186,886 | |
| **TOTAL ZOHAR I CLAIM** | **164,919,993*** | |

**ZOHAR II**

| | | |
|---|---:|---|
| 1/20/2017 Policy Payment | 770,109,326 | Indenture § 11.1(a)(i)(G), 11.1(a)(ii)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Interest (Prime + 2%), as of April 18, 2018 | 27,080,207 | Insurance Agreement § 4.03 |
| SUBTOTAL | 797,189,533 | |
| Credit Enhancement Liabilities incurred in connection with MBIA's administration, enforcement, defense or preservation of rights under the Transaction Documents* | 14,851,685 | Indenture § 11.1(a)(i)(G), 11.1(a)(ii)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Legal fees/expenses | 10,641,048 | |
| Financial, investment and non-legal advisors | 4,210,637 | |
| **TOTAL ZOHAR II CLAIM** | **812,041,218*** | |

| | |
|---|---:|
| **ZOHAR PAID IN FULL AMOUNT** | **$976,961,211** |

*Assumptions:
All amounts are "as of" April 18, 2018 and will change pending Full Payment Date, including to reflect interest accrued and other Credit Enhancement Liabilities which MBIA has not yet paid
Portfolio Company Zohar I loan interest payments will continue to be paid directly to MBIA
Zohar II claim amount does not reflect Portfolio Company loan interest payments which MBIA is entitled to receive, but have not yet been distributed to MBIA.

MBIA is not seeking reimbursement for costs, expenses or interest payments made in connection with MZ Funding loan

# EXHIBIT A

## [ZOHAR III CLAIMS]

**Disclaimer**: The Zohar III Claims as forth in this <u>Exhibit A</u> have not been verified by the Collateral Manager since January 2016 as required by the Indentures and Management Agreement, and therefore, U.S. Bank makes no representation as to accuracy of the Zohar III Claims as set forth below, which claims and interest accruals may be modified or otherwise revised or verified when the new Collateral Manager is designated in accordance with the Mediation Term Sheet. Once the Collateral Manager is appointed, that person or entity, after consultation with U.S. Bank, will be responsible for updating the amounts herein to reflect unpaid principal, accrued and unpaid interest, and other fees, expenses, and other amounts allowable under the Indentures. Notwithstanding anything to the contrary in this <u>Exhibit A</u> or in the Mediation Term Sheet, nothing shall modify, alter, or otherwise change the Priority of Payments set forth in the Indentures, and U.S. Bank's rights, remedies, and objections to any such modification, alteration, or other change thereto are fully reserved. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Mediation Term Sheet to which this Exhibit A is attached or in the Indentures.

The following does not include interest accruing after 5/18/18. The following schedule excludes certain categories and amounts that must be paid prior to principal and interest owing to the Holders of the notes, including, without limitation, certain fees, expenses, reserves, and other amounts, which are set forth in the Priority of Payments of each Indenture (that have accrued or may accrue in the future):

| Issue Name | Issue Date | Maturity Date | Issue Amount | Original Par Amount | Current Balance | Prepetition Accrued Interest** | Addt'l Accrued Interest Thru 5/18/18*** | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| Class A-1R | 4/11/2007 | 4/15/2019 | $ 200,000,000.00 | $ 200,000,000.00 | $ 135,767,116.30 | $ 686,522.34 | $ 586,182.09 | $ 137,039,820.!3 |
| Class A-1T | 4/11/2007 | 4/15/2019 | $ 150,000,000.00 | $ 150,000,000.00 | $ 101,825,337.23 | $ 509,743.92 | $ 436,203.28 | $ 102,771,284.!3 |
| Class A-1D | 4/11/2007 | 4/15/2019 | $ 350,000,000.00 | $ 350,000,000.00 | $ 237,592,453.54 | $ 1,189,402.47 | $ 1,017,807.66 | $ 239,799,663.:7 |
| Class A-2 | 4/11/2007 | 4/15/2019 | $ 200,000,000.00 | $ 200,000,000.00 | $ 200,000,000.00 | $ 1,087,156.78 | $ 914,108.70 | $ 202,001,265.!8 |
| Class A-3 | 4/11/2007 | 4/15/2019 | $ 116,000,000.00 | $ 116,000,000.00 | $ 116,000,000.00 | $ 689,195.38 | $ 569,346.03 | $ 117,258,541.!1 |

**This is the accrued interest that wasn't paid because of the $4,637,241.39 deposit of interest outside the collection account before the petition date

***The "Addt'l Accrued Interest Thru 5/18/18" column capitalizes the "Prepetition Accrued Interest" into the Current Balance and then Accrues Interest Thereon through 5/18/18

EXHIBIT B

**Exhibit B: Patriarch Stakeholders**

• Ark Entities (including Ark Angels, LLC; Ark Angels II, LLC; Ark Angels III, LLC; Ark Angels VIII, LLC; Ark Investment Partners II, LP; Ark II CLO 2001-1, Ltd.)
• LD Investments, LLC
• Lynn Tilton
• Octaluna LLC Entities (including Octaluna LLC; Octaluna II, LLC; Octaluna III, LLC)
• Patriarch Partners Entities (including Patriarch Partners, LLC; Patriarch Partners VIII, LLC; Patriarch Partners, XIV, LLC; Patriarch Partners XV, LLC)
• Patriarch Partners Management Group, LLC (PPMG)
• Patriarch Partners Agency Services, LLC (PPAS)
• Zohar Holdings, LLC

01:23191627.1

EXHIBIT C

**Group A Portfolio Companies**

**[REDACTED]**

01:23191627.1

EXHIBIT D

**Group B Portfolio Companies**

**[REDACTED]**

01:23191627.1

A-103

EXHIBIT E

[To be provided]

01:23191627.1

EXHIBIT F

## The Zohar Funds, Lynn Tilton, MBIA, and the Zohar III Noteholders
## Announce Resolution to
## Stay Litigation, Refinance and Monetize Zohar Assets

NEW YORK – April [XX], 2018 –Zohar CDO 2003-1, Zohar CDO 2003-1 Corp., Zohar II
2005-1, Limited, Zohar II 2005-1 Corp., Zohar III, Limited, and Zohar III, Corp.
(collectively, the "Zohar Funds"), Lynn Tilton, MBIA Insurance Corporation, a wholly owned
subsidiary of MBIA Inc. (NYSE: MBI), and the Zohar III Controlling Class of Noteholders
jointly announce today that the parties have mutually resolved the motions pending in
federal Bankruptcy Court in the District of Delaware relating to the Zohar Funds, and have
agreed to a deal that will include a stay of all pending litigation between the parties. This
agreement is intended to facilitate the refinancing and monetization of assets of the Zohar
Funds to the benefit of all stakeholders, and the parties have agreed to work in a mutually
cooperative process in support of such refinancing and monetization.

As part of the agreement, an Independent Director will be appointed to govern the Zohar
Funds, along with a Chief Restructuring Officer, who together with Ms. Tilton as director
and manager of each Portfolio Company, will jointly implement the refinancing and
monetization process. During the process, Ms. Tilton will remain in her current roles at the
Portfolio Companies, all litigation between the parties will be stayed for a minimum of 15
months, and the bankruptcy cases will proceed without the appointment of a Trustee.

Ms. Tilton stated, "This agreement is a meaningful and important step towards allowing the
Zohar Funds to monetize and refinance their assets in order to pay off all creditor claims in
full. It is in the best interest of all stakeholders that we lay down our swords and stop the
years of damaging litigation in order to maximize value for all of the Funds' stakeholders."

Anthony McKiernan, Chairman of MBIA Insurance Corporation, stated that "MBIA is
pleased that the parties have been able to come to a consensual agreement that will put in
place a process to enable MBIA to recover on the significant amounts it has paid its
policyholders."

Marc Kirschner of Goldin Associates, Chief Restructuring Officer of the Zohar Funds, added,
"The resolution of the hotly contested litigation in the bankruptcy cases is in the best
interests of the Zohar Funds and their stakeholders as it will pave the way for the Zohar
Funds to maximize the value of their assets for the benefit of all. The mediated result was
the culmination of significant negotiations and the Zohar Funds are deeply appreciative of
the efforts of the mediator, Judge Kevin Gross, for facilitating a settlement of the pending
matters, which was no simple task."

Today's agreement will have no immediate effect on the operations of the Portfolio

01:23191627.1

A-105

Companies to whom the Zohar Funds have made senior secured loans. The Portfolio Companies will continue to operate their businesses in the ordinary course as they are not parties to these bankruptcy cases.

**MEDIA CONTACTS:**

FOR LYNN TILTON
**Brunswick Group**
Alex Yankus
212-333-3810
ayankus@brunswickgroup.com

**MBIA**
Greg Diamond, 914-765-3190
Investor and Media Relations
greg.diamond@mbia.com

01:23191627.1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | ) Case No. 18-10512 (CSS) |
| Debtors. | ) Jointly Administered |
| | ) **Docket Ref. No. 481** |

### ORDER IN AID OF IMPLEMENTATION OF THE GLOBAL SETTLEMENT AGREEMENT APPROVED IN THESE CASES ESTABLISHING CERTAIN PROCEDURES FOR THE INDEPENDENT DIRECTOR'S APPROVAL OF MONETIZATION TRANSACTIONS AND RELATED RELIEF

Upon the *Motion of the Debtors for Entry of an Order in Aid of Implementation of Global Settlement Agreement Establishing Certain Procedures for the Corporate Approval of Portfolio Company Transactions and for Related Relief* (the "Motion") [Docket No. 481],[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

102950217.19

A-107

Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1.      The Motion is GRANTED to the extent provided herein.

2.      Joseph J. Farnan, Jr., as Independent Director, has been fully charged with governance of the Debtors under applicable Cayman or Delaware law, as applicable, to authorize, approve and seek to consummate each Portfolio Company Transaction, including, but not limited to (i) authorizing the Debtors to vote or consent to any vote, as applicable, any and all Zohar Interests in favor of a Portfolio Company Transaction, (ii) exercising any rights with respect to the Zohar Interests to implement or consummate a Binding Portfolio Company Transaction, and (iii) authorizing and approving the Debtors' release of any of the Debtors' liens, claims or encumbrances in connection with a Portfolio Company Transaction.

3.      The Debtors are authorized to approve and seek to consummate Portfolio Company Transactions in accordance with the Procedures as follows:

a.      The Debtors shall file and serve a notice describing the Binding Portfolio Company Transaction, the form of which is attached hereto as Exhibit I (a "Transaction Notice"), and a proposed order, the form of which is attached to the Proposed Order as Exhibit II (a "Proposed Transaction Order" and, after entry, a "Transaction Order"), to the Court, and will provide notice of the Binding Portfolio Company Transaction to the Patriarch Stakeholders and Other Stakeholders, any known creditor of the affected Debtor, any official committee appointed in these cases, the U.S. Trustee and any party having filed a notice requesting service pursuant to FED. R. BANKR. P. 2002 in the Chapter 11 cases (each an "Interested Party" and, collectively, the "Interested Parties").

b.      The Debtors shall present any such Binding Portfolio Company Transaction to the Bankruptcy Court by filing the Transaction Notice (defined below). Such presentation will be for purposes of confirming the Independent Director's authority to exercise any and all of the Debtors' rights in connection with the authorization, approval and closing of such Binding Portfolio Company Transaction on behalf of the Debtors under the express terms of the Settlement Agreement. In the Proposed Transaction Order with respect to a Portfolio

102950217.19

2

A-108

Company Transaction, the Debtor will seek to provide that any and all Other Stakeholders' and Patriarch Stakeholders' liens, claims and encumbrances with respect to any Zohar Interests or Zohar Portfolio Company Debt, as applicable, are released pursuant thereto and will attach to the proceeds of any such Portfolio Company Transaction with the same validity and priority as those being released, in each case consistent with section 363(f) of the Bankruptcy Code.

        c.     No Binding Portfolio Company Transaction submitted with a Transaction Notice shall, under any circumstances, be subject to a higher and/or better bankruptcy auction process.

        d. Because the various private sale and/or refinancing processes underlying the Monetization Process are being conducted by the Portfolio Companies with the joint oversight of the Independent Director and CRO, on behalf of the Debtors, and Ms. Lynn Tilton, on behalf of the Portfolio Companies, the Debtors may elect to exclude from any public filing, including any Transaction Notice or Transaction Declaration (as defined below), any material term the Independent Director determines, in consultation with Ms. Tilton and the Portfolio Companies' investment bankers, would result in a negative impact on or financial consequence or impediment to (i) the closing of such Binding Portfolio Company Transaction, or (ii) the Debtors' ability to maximize the value for their estates with respect to future Portfolio Company Transactions and achieve the Paid in Full amounts under the Settlement Agreement. Any such excluded information ("<u>Excluded Transaction Information</u>") shall be subject to a separate motion (an "<u>Excluded Information Motion</u>") (to the extent such Excluded Transaction Information is not already the subject of an order of the Court regarding its confidentiality) requesting that such Excluded Transaction Information (x) not be publicly filed, (y) be delivered to the Mediator and to the chambers of the Hon. Christopher S. Sontchi, and (z) be provided on a confidential basis to the Other Stakeholders, the Patriarch Stakeholders and the U.S. Trustee, who shall not make such excluded material available to anyone else other than their professional advisors who agree in writing to maintain such information on a confidential basis, which Excluded Information Motion shall be filed contemporaneous with a Transaction Notice and considered on an expedited basis and no later than the Hearing (as defined below) for the applicable Binding Portfolio Company Transaction. The foregoing is without prejudice to the right of any party to seek a separate order sealing any other information regarding a Portfolio Company Transaction.

        e.     The Transaction Notice shall (subject to the immediately preceding paragraph) contain the following:

        (i) a summary of the material terms of the Binding Portfolio Company Transaction;

        (ii) a declaration from the CRO and/or the CMO attesting to: (1) the material terms of the sale process utilized for the Binding Portfolio Company Transaction (e.g., identification of investment banker, timeframe of process, number of CIMs sent out, number of third parties contacts, and number of bids or LOIs received); (2) why, in the Debtors' business judgment, such Binding Portfolio Company Transaction represents the highest and/or best

offer with respect to the Debtors' interests in such PC Assets; (3) whether the process resulting in the Binding Portfolio Company Transaction was, in his or their opinion, conducted in a commercially reasonable manner intended to achieve the highest and best offer; (4) any information bearing on the conduct of the sale process that would be relevant to the Court's consideration of the Binding Portfolio Company Transaction; and (5) support for any finding of fact or conclusion of law sought in a Transaction Order (a "Transaction Declaration"). The basis of a Transaction Declaration may be supported by a declaration from a banker or other financial professional hired at the Portfolio Company level;

(iii) The Debtors will also file with the Transaction Notice a Proposed Transaction Order: (w) authorizing the applicable Debtor to exercise any rights, including any rights of a Debtor as a lender or shareholder approval rights, with respect to such Binding Portfolio Company Transaction, as applicable; (x) holding that the Debtors' interests in the subject Portfolio Company are being delivered to the purchaser with good and marketable title; (y) approving the sale of the Debtors' assets free and clear of any liens, claims and encumbrances under section 363(f) of the Bankruptcy Code, provided that any such order must provide that any and all such liens, claims and encumbrances attach to the proceeds from such Portfolio Company Transaction with the same validity, extent, and priority as those being released, and (z) such other terms as the Debtors deem necessary, desirable or in the best interests of the estate to facilitate the consummation of the Binding Portfolio Company Transaction in a manner that maximizes value for the Debtors and their estates for achieving the Paid in Full amounts under the Settlement Agreement; and

(iv) The hearing to consider such Binding Portfolio Company Transaction (a "Hearing") may be held within fourteen (14) days from the date of filing of a Transaction Notice. Objections to any Transaction Notice shall be due at 4:00 p.m. (ET) on the date that is four (4) business days from the date of the Hearing, with any replies due at 4:00 p.m. (ET) on the date that is two (2) business days prior to the Hearing. The Debtors shall have the right, in their sole discretion but in consultation with Ms. Tilton and the Portfolio Companies' investment bankers, to extend any deadline set forth herein or to adjourn any Hearing to consider a Binding Portfolio Company Transaction. Nothing set forth herein shall preclude any party-in-interest from seeking to shorten the notice or deadlines set forth herein with respect to approval of a Binding Portfolio Company Transaction or to seek to extend such deadlines or adjourn any such Hearing, in each instance by separate motion for cause shown.

102950217.19

4

A-110

4. No standing to participate in these Chapter 11 Cases shall be conferred on any party solely based on their participation as a potential bidder or bidder in the Monetization Process.

5. The Transaction Notice and Proposed Transaction Order, substantially in the forms attached to the Motion as <u>Exhibits I</u> and <u>II</u>, respectively, are approved as to their form.

6. Nothing in this Order shall alter or impair the rights of the Debtors, the Other Stakeholders, and the Patriarch Stakeholders to receive payment of proceeds from a Portfolio Company Transaction pursuant to the Settlement Agreement.

7. The Debtors are authorized to execute and deliver all instruments and documents, and take such other action as may be necessary or appropriate to implement and effectuate the procedures contemplated by this Order.

8. This Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order

Dated: November 9, 2018
       Wilmington, Delaware

                                              THE HONORABLE CHRISTOPHER S. SONTCHI
                                              CHIEF UNITED STATES BANKRUPTCY JUDGE

102950217.19

A-111

**EXHIBIT I TO ORDER**

**Form of Transaction Notice**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (CSS) |
| Debtors. | Jointly Administered |

## NOTICE OF BINDING PORTFOLIO COMPANY TRANSACTION PURSUANT TO PORTFOLIO COMPANY TRANSACTION PROCEDURES

PLEASE TAKE NOTICE that the above-captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to the *Order in Aid of Implementation of the Global Settlement Agreement Approved in these Cases for Authority to Establish certain Procedures for the Corporate Approval of Portfolio Company Transactions and for Related Relief* [Docket No. __] (the "Procedures Order"),[2] intend to consummate the transaction (the "Portfolio Company Transaction") described herein. The Portfolio Company Transaction is not subject to a higher and/or better bankruptcy auction process. This Notice is being provided in accordance with and sets forth the information required under the Procedures Order.

Material Economic Terms and Conditions of the Proposed Portfolio Transaction. The Portfolio Company Transaction contains the following material terms: [INSERT TERMS]

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Procedures Order or the Debtors' motion granted by the Procedures Order [Docket No. ___], as applicable.

102950217.19

A-113

Transaction Declaration.  Attached hereto as Exhibit A is a declaration (the "Transaction Declaration") by [Mr. Michael Katzenstein, the Debtors' chief restructuring officer (the "CRO")/Mr. Robert S. Kost, the Debtors' chief monetization officer (the "CMO")].

Proposed Transaction Order.  Attached hereto as Exhibit B is a proposed order approving the Portfolio Company Transaction (the "Proposed Transaction Order").

Procedures for Objecting to the Proposed Portfolio Company Transaction.  Any objection to the proposed Portfolio Company Transaction (an "Objection") must:  (a) be in writing; (b) state with specificity the nature of the objection; and (c) be filed with the Bankruptcy Court and served on the (i) the Debtors, 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036 (Attn: Michael Katzenstein, mike.katzenstein@fticonsulting.com,); (ii) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 (Attn: Michael R. Nestor and Joseph M. Barry, mnestor@ycst.com, jbarry@ycst.com); (iii) counsel to the Patriarch Entities, Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, CA 90071 (Attn: Robert A. Klyman, rklyman@gibsondunn.com) and Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, DE 19801 (Attn: Norman L. Pernick, npernick@coleschotz.com); (iv) counsel to U.S. Bank, as indenture trustee, Alston & Bird LLP, 90 Park Avenue, New York, New York 10016 (Attn: John W. Weiss, john.weiss@alston.com); (v) counsel to MBIA Insurance Corp., Cadwalader, Wickersham & Taft, LLP, 200 Liberty Street, New York, New York 10281 (Attn: Gregory M. Petrick, gregory.petrick@cwt.com) and Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, Delaware 19899-8705 (Courier 19801) (Attn: Laura Davis Jones, ljones@pszjlaw.com); (vi) counsel to the Zohar III Controlling Class, Arnold & Porter Kaye Scholer LLP, 70 West Madison Street, Suite 4200, Chicago, IL 60602-

102950217.19

2

A-114

4321 (Attn: Brian J. Lohan, brian.lohan@arnoldporter.com) and Womble Bond Dickinson (US) LLP, 222 Delaware Avenue, Suite 1501, Wilmington, DE 19801 (Attn: Matthew P. Ward, matthew.ward@wbd-us.com); and (vii) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Brya Keilson, brya.keilson@usdoj.gov) (the "Notice Parties") on or before 4:00p.m. (ET) on the date that is four (4) days from the date of the Hearing (as defined below) (the "Objection Deadline").

Hearing to Consider the Proposed Portfolio Transaction. If any Objections are filed and served, as outlined above, a hearing to consider such transaction shall be held before the Court on _____ __, 20__ at __:__ _.m. (ET) (a "Hearing"). If no Objections are filed with the Court and served on the Notice Parties by the Objection Deadline in accordance with the terms of the Procedures Order, then the Court may enter the Proposed Transaction Order without further notice of a hearing.

Dated: _____, 2018
Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ _____
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4221)
Ryan M. Bartley (No. 4985)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel to the Debtors and Debtors in Possession*

102950217.19

3

A-115

# EXHIBIT II TO ORDER

**Form of Proposed Transaction Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>Zohar III, Corp., *et al.*,[1]<br><br>      Debtors. | ) Chapter 11<br>)<br>) Case No. 18-10512 (CSS)<br>)<br>) Jointly Administered<br>)<br>) **Docket Ref. No. ___** |

**ORDER APPROVING CONSUMMATION OF PORTFOLIO**
**COMPANY TRANSACTION**

  Upon the *Order in Aid of Implementation of the Global Settlement Agreement Approved in these Cases for Authority to Establish certain Procedures for the Corporate Approval of Portfolio Company Transactions and for Related Relief*, [Docket No. __] (the "Procedures Order"); and upon the notice filed with the Court on [  ] [ ], 2018 [Docket No. __] (the "Transaction Notice")[2] and the declarations attached thereto as Exhibits A and B; and the Court having jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Portfolio Company Transaction having been provided to the Interested Parties, and it appearing that no other or further notice need be provided; and the Court having found and determined that the consummation of the

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Procedures Order or the Transaction Notice, as applicable

102950217.19

Portfolio Company Transaction is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and any objections to the Portfolio Company Transaction having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

     1.     Joseph J. Farnan, Jr., as Independent Director, has been fully charged with governance of the Debtors under applicable Cayman or Delaware law, as applicable, to authorize, approve and consummate the Portfolio Company Transaction, including, but not limited to (i) authorizing the Debtors to vote or consent to any vote, as applicable, any and all Zohar Interests in favor of the Portfolio Company Transaction, (ii) exercising any rights with respect to the Zohar Interests to implement or consummate the Portfolio Company Transaction, and (iii) authorizing and approving the release of Debtors' liens, claims or encumbrances in connection with the Portfolio Company Transaction.

     2.     The consummation of the Portfolio Company Transaction on the terms set forth in the Transaction Notice is legal, valid and properly authorized.

     3.     Based upon, among other considerations, the Transaction Notice and the Transaction Declaration, the Independent Director's authorization, approval and consummation of the Portfolio Company Transaction is prudent, in good faith and in the best interest of the Debtors' estates and stakeholders and is fully consistent with the duties imposed upon him as a fiduciary.

     4.     The sale of the PC Assets and the consideration provided by the Purchaser are fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

102950217.19

A-118

5.      Effective as of the Closing, the sale of the PC Assets by the Debtors to the Purchaser shall constitute a legal, valid and effective transfer of the PC Assets notwithstanding any requirement for approval or consent by any person and shall vest Purchaser with all right, title and interest of the Debtors in and to the PC Assets, free and clear of all liens, claims, encumbrances and interests of any kind, pursuant to section 363(f) of the Bankruptcy Code with such liens, claims, encumbrances and interests attaching to the proceeds from such Portfolio Company Transaction with the same validity and priority as such released liens.

6.      The Purchaser is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code.

7.   [With the consent of the Patriarch Stakeholders and the Other Stakeholders, the sale of the Zohar Interests and/or Zohar Portfolio Company Debt, as applicable, is hereby approved free and clear of any liens, claims and encumbrances that could be asserted by any of the Patriarch Stakeholders and the Other Stakeholders, provided that any and all such liens, claims and encumbrances attach to the proceeds from such Portfolio Company Transaction with the same validity and priority as those being released hereby, and all such proceeds shall be delivered to the Debtors at closing.]

8.      The Debtors are authorized to execute and deliver all instruments and documents, and take such other action—including the exercise any shareholder or lender approval rights —as may be necessary or appropriate to consummate, implement and effectuate the Portfolio Company Transaction.

9.      [INSERT ADDITIONAL TERMS AS NECESSARY]

102950217.19

3

A-119

10.   This Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order

Dated: _____, 2018
            Wilmington, Delaware

_____
THE HONORABLE CHRISTOPHER S. SONTCHI
CHIEF UNITED STATES BANKRUPTCY JUDGE

## Exhibit B

The Debtors anticipate that the Portfolio Companies will implement one or more of the following possible transactions or possible combinations of transactions:

A.  a sale and delivery of those certain equity or LLC interests (an "Equity Sale") in a Portfolio Company of which the Debtors are record holders and all rights, benefits, and economic interests associated with such interests (the "Zohar Interests") requiring the Debtors' consent and approval through the Independent Director as contemplated by the Settlement Agreement;

B.  a sale and delivery of 100% of the equity or LLC interests in a Portfolio Company where such equity or LLC interests are entirely Zohar Interests (a "Company Sale") requiring the Debtors' consent and approval through the Independent Director as contemplated by the Settlement Agreement;

C.  a sale of all or substantially all of a Portfolio Company's assets (an "Asset Sale") requiring the Debtors' consent and approval through the Independent Director as contemplated by the Settlement Agreement, including, but not limited to, voting any Zohar Interests and/or releasing any liens securing any Zohar Portfolio Company Debt (as defined below);

D.  a sale, assignment or transfer of any outstanding loan obligations from a Portfolio Company to one of the Debtors ("Zohar Portfolio Company Debt") requiring the Debtors' consent and approval through the Independent Director as contemplated by the Settlement Agreement (a "Debt Sale");

E.  the refinancing of Zohar Portfolio Company Debt (a "Refinancing") requiring the Debtors' consent and approval through the Independent Director as contemplated by the Settlement Agreement;

F.  a merger, consolidation, amalgamation, business combination or exchange that results in a change of control of a Zohar Portfolio Company (or other disposition of substantially all assets) requiring the Debtors' consent and approval through the Independent Director as contemplated by the Settlement Agreement (a "Merger"); and/or

G.  any other transaction that, consistent with the Procedures and requiring the Debtors' consent and approval through the Independent Director as contemplated by the Settlement Agreement, will monetize the value of the Debtors' assets related to the Portfolio Companies (an "Other Transaction" and, together with an Equity Sale, a Company Sale, an Asset Sale, a Debt Sale, a Refinancing, and a Merger, the "Portfolio Company Transactions" with each being a "Portfolio Company Transaction")

102950217.19

A-121

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| ) | |
| ) | |
| In re: ) | Chapter 11 |
| ) | |
| Zohar III, Corp., *et al.*,[1] ) | Case No. 18-10512 (KBO) |
| ) | |
| Debtors. ) | Jointly Administered |
| ) | |
| ) | **Docket Ref. No. 545** |
| ) | **Hearing Date: September 11, 2019 at 2:00 p.m.** |
| ) | **(ET)** |
| ) | **Obj. Deadline: September 5, 2019 at 4:00 p.m.** |
| ) | **(ET)** |

**NOTICE OF BINDING PORTFOLIO COMPANY TRANSACTION PURSUANT TO
PORTFOLIO COMPANY TRANSACTION PROCEDURES**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "Debtors"), pursuant to the *Order in Aid of Implementation of the Global Settlement Agreement Approved in These Cases Establishing Certain Procedures for the Independent Director's Approval of Monetization Transactions and Related Relief* [Docket No. 545] (the "Procedures Order"), intend to consummate the transaction (the "Oasis Transaction") described herein. The Oasis Transaction is not subject to higher and/or better offers or a bankruptcy auction process. This Notice is being provided in accordance with, and sets forth the information required under, the Procedures Order.

1.    Material Economic Terms and Conditions of the Proposed Oasis Transaction. The Oasis Transaction contains the following material terms:[2]

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar I," and together with Zohar III and Zohar II, the "Sellers")). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] The Notice provides a summary of the material terms of the EPA only; in the event of a conflict between the terms of the EPA and the Notice, the terms of the EPA shall govern. A copy of the EPA will be submitted to the Court for *in camera* review.

A-122

- Culligan International Company ("Buyer") has entered into an Equity Purchase Agreement ("EPA") for the acquisition of 100% of the limited liability company membership interests in LVD Acquisition, LLC ("LVD" and such interest the "LVD Interests") from the Sellers.

- Through the Oasis Transaction, the Indebtedness (as defined in the EPA) of LVD and its Subsidiaries (as defined in the EPA) specified in the EPA, including under the Zohar Secured Debt Facility (as defined below), and all Seller Transaction Expenses will be paid from the purchase price as set forth in the EPA.

- Subject to certain working capital adjustments, closing cash reconciliation, post-closing expenses of the Seller Representative (as defined below), and ultimate distributions from an escrow set up under the EPA as a holdback related to certain indemnification provisions, the Debtors contemplate that the Sellers will receive approximately $63 million to $73 million from the Oasis Transaction.

- Buyer shall acquire the LVD Interests free and clear of all Encumbrances[3] and other interests of any kind, including, without any limitation, free and clear of all Encumbrances and other interests of any kind under that certain Credit Agreement, effective as of June 1, 2009, among LVD and the other borrower signatory thereto, the guarantors from time to time party thereto, the financial institutions and other investors from time to time party thereto as Lenders, and Patriarch Partners Agency Services, LLC, a Delaware limited liability company, as agent for such Lenders (the "Zohar Secured Debt Facility").

- With the consent of the Patriarch Stakeholders and the Other Stakeholders, pursuant to the Proposed Transaction Order (as defined below), the sale of the LVD Interests will be free and clear of any liens, claims and encumbrances that could be asserted by any of the Patriarch Stakeholders and the Other Stakeholders, provided that any and all such liens, claims and encumbrances attach to the proceeds from the Oasis Transaction with the same validity and priority as those being released, and all such proceeds shall be delivered to the Debtors at closing.

- The EPA contains the following release:

  Effective as of the Closing Date and upon Buyer's payment of the Agreed Upon Payoff Amounts and satisfaction of the Closing Conditions, Sellers and, in each case, each of their respective estates, representatives, partners, members, Affiliates, controlling persons, successors and assigns (the "Seller Releasing Parties"), hereby waive, release, and forever discharge, without any further consideration or additional documentation, any and all claims, liabilities, interests, and actions that any of the Seller Releasing Parties currently has or, in the future

---

[3] "Encumbrances" means "any mortgage, pledge, assessment, security interest, lien, adverse claim, levy, charge, option, right of first refusal, voting agreement, charge, debenture, indenture, deed of trust, easement, right-of-way, restriction, encroachment, license, servitude, concession, security agreement or other encumbrance of any kind or nature."

may have, against the Company and its Subsidiaries and Buyer based on, in relation to, or arising from, in whole or in part, (a) Indebtedness owed by the Company or any of its Subsidiaries to Sellers, (b) the Interests, (c) the ownership, management, or operation of the Company and its Subsidiaries, in each case, prior to or on the Closing Date, and/or (d) the assets and properties of the Company and its Subsidiaries; provided, however, that no release or discharge is granted by the Seller Releasing Parties arising out of the obligations of Buyer and rights of Sellers pursuant to this Agreement, including with respect to any matters entitled to indemnification under this Agreement.

- The Proposed Transaction Order (defined below) contains the following release:

Lynn Tilton, as Co-Seller Representative, shall have no liability to the Debtors or any other party for any claims or arising solely from any actions related to her role as Co-Seller Representative, including, without limitation, actions taken by any other Co-Seller Representative, except to the extent such liability arises from or is related to Lynn Tilton's own bad faith or willful misconduct.

- The Debtors shall take any and all actions necessary to secure the secure dismissal with prejudice of the action styled *Zohar CDO 20003-1, Limited v. Croscill Home LLC* as against the LVD before the United States District Court for the District of Delaware.

- Upon closing of the Oasis Transaction but subject to receipt of payment of the outstanding amounts owing under the Zohar Secured Debt Facility pursuant to the EPA, Ankura Trust Company, LLC and (to the extent necessary) Patriarch Partners Agency Services, LLC acting as, respectively, current and predecessor administrative and collateral agents for the Debtors, (a) shall be directed to take all actions necessary or appropriate to terminate, cancel and release all Encumbrances and other interests of any kind on the LVD Interests, if any, and on the Assets and Properties of LVD and its Subsidiaries, in each case arising under or related to the Zohar Secured Debt Facility, and (b) shall cancel and terminate the Zohar Secured Debt Facility and any mortgage, deed of trust, security interest, pledge, UCC filing, or other filing or document related to perfection of the Encumbrances under the Zohar Secured Debt Facility for LVD and its Subsidiaries upon closing of the transactions contemplated in the EPA.

2. <u>Transaction Declaration</u>. Attached hereto as <u>Exhibit A</u> is the declaration (the "<u>Transaction Declaration</u>") by Robert S. Kost, the Debtors' chief monetization officer (the "<u>CMO</u>").

3. <u>Proposed Transaction Order</u>. Attached hereto as <u>Exhibit B</u> is a proposed order approving the Oasis Transaction (the "<u>Proposed Transaction Order</u>").

4.        Procedures for Objecting to the Proposed Oasis Transaction.  Any objection to the proposed Oasis Transaction (an "Objection") must: (a) be in writing; (b) state with specificity the nature of the objection; and (c) be filed with the Bankruptcy Court and served on (i) the Debtors, 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036 (Attn: Michael Katzenstein, mike.katzenstein@fticonsulting.com); (ii) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, DE 19801 (Attn: Michael R. Nestor and Joseph M. Barry, mnestor@ycst.com, jbarry@ycst.com); (iii) counsel to the Patriarch Entities, Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, CA 90071 (Attn: Robert A. Klyman, rklyman@gibsondunn.com) and Cole Schotz P.C., 500 Delaware Avenue, Suite 1410, Wilmington, DE 19801 (Attn: Norman L. Pernick, npernick@coleschotz.com); (iv) counsel to U.S. Bank, as indenture trustee, Alston & Bird LLP, 90 Park Avenue, New York, NY 10016 (Attn: John W. Weiss, john.weiss@alston.com); (v) counsel to MBIA Insurance Corp., Cadwalader, Wickersham & Taft, LLP, 200 Liberty Street, New York, NY 10281 (Attn: Gregory M. Petrick, gregory.petrick@cwt.com) and Pachulski Stang Ziehl & Jones LLP, 919 N. Market Street, 17th Floor, P.O. Box 8705, Wilmington, DE 19899-8705 (Courier 19801) (Attn: Laura Davis Jones, ljones@pszjlaw.com); (vi) counsel to the Zohar III Controlling Class, Arnold & Porter Kaye Scholer LLP, 70 West Madison Street, Suite 4200, Chicago, IL 60602-4321 (Attn: Brian J. Lohan, brian.lohan@arnoldporter.com) and Womble Bond Dickinson (US) LLP, 222 Delaware Avenue, Suite 1501, Wilmington, DE 19801 (Attn: Matthew P. Ward, matthew.ward@wbd-us.com); (vii) the Office of the United States Trustee for the District of Delaware, 855 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Juliet M. Sarkessian, Juliet.m.sarkessian@usdoj.gov); (viii) Counsel for LVD Acquisition, Proskauer Rose LLP, Eleven Times Square, New York, NY 10036 (Attn: Daniel Ganitsky, DGanitsky@proskauer.com); and (ix) Counsel for the Buyer, Weil, Gotshal & Manges

LLP, 767 Fifth Avenue, New York, NY 10153 (Attn: Ramona Y. Nee and Debora A. Hoehne, ramona.nee@weil.com, debora.hoehne@weil.com) (collectively, the "Notice Parties") on or before 4:00 p.m. (ET) on September 5, 2019 (the "Objection Deadline").

5.      Hearing to Consider the Proposed Oasis Transaction.  If any Objections are filed and served, as outlined above, a hearing to consider such transaction shall be held before the Court on September 11, 2019, at 2:00 p.m. (ET) (a "Hearing").  If no Objections are filed with the Court and served on the Notice Parties by the Objection Deadline in accordance with the terms of the Procedures Order, then the Court may enter the Proposed Transaction Order without further notice or a hearing.

Dated: August 26, 2019
      Wilmington, Delaware

      YOUNG CONAWAY STARGATT & TAYLOR, LLP

      */s/ Joseph Barry*
      James L. Patton, Jr. (No. 2202)
      Robert S. Brady (No. 2847)
      Michael R. Nestor (No. 3526)
      Joseph M. Barry (No. 4221)
      Ryan M. Bartley (No. 4985)
      Shane M. Reil (No. 6195)
      Rodney Square
      1000 North King Street
      Wilmington, Delaware 19801
      Telephone: (302) 571-6600
      Facsimile: (302) 571-1253

      *Counsel to the Debtors and Debtors in Possession*

**EXHIBIT A**

**Transaction Declaration**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## DECLARATION OF ROBERT S. KOST IN SUPPORT OF ORDER
## AUTHORIZING THE OASIS TRANSACTION

I, ROBERT S. KOST, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.       I am the Chief Monetization Officer ("**CMO**") of each of the above-captioned debtors and debtors in possession (each a "**Debtor**"). I was appointed as CMO effective as of May 21, 2018. I support Michael J. Katzenstein in his capacity as Chief Restructuring Officer ("**CRO**") of the Debtors with respect to the monetization of the Debtors' assets.

2.       I have over thirty years of experience as an investment banker. I hold a Bachelor of Arts degree in Economics from the University of Michigan and a Master of Business Administration degree in Finance from Duke University. I have been employed as a Managing Director of Goldin Associates, LLC and Goldin Capital Advisors, LLC (together, "**Goldin**") since 2015. At Goldin, I head the firm's transaction advisory services group. I am a Registered Representative and hold Series 7, 24, and 63 licenses issued by the Financial Industry Regulatory Authority (FINRA). Prior to joining Goldin, I held Partner, Managing Director, or Director positions at several investment banks in groups that focused on restructuring advisory and

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

distressed mergers & acquisitions.  I have advised companies and their boards in connection with the sale of companies, debt financings, and have advised companies, lenders, and other creditors in complex restructuring transactions.  In my more than 30 years of experience, I have participated as an advisor in hundreds of transactions and have testified numerous times on matters related to investment banking and corporate finance, as both a fact and expert witness.

3.      I submit this declaration (the "**Declaration**") in support of the *Order Approving Consummation of Oasis Portfolio Company Transaction* (the "**Proposed Transaction Order**"), submitted by the Debtors pursuant to that certain *Notice of Binding Portfolio Company Transaction Pursuant to Portfolio Company Transaction Procedures* (the "**Transaction Notice**") to which this Declaration has been annexed.  I submit this Declaration with the understanding that it is being presented to the Court for purposes of confirming the Independent Director's authority to exercise any and all of the Debtors' rights in connection with the authorization, approval, and closing of the proposed Oasis Transaction (as defined in the Transaction Notice) on behalf of the Debtors, and that the proposed transaction is not under any circumstances subject to higher and/or better offers or a bankruptcy auction process.

4.      In my current capacity and involvement with the Debtors, I have become familiar with the Debtors' interest in LVD Acquisition, LLC and its subsidiaries (collectively, "**Oasis**") and generally familiar with Oasis's operations, business and financial affairs.  If called upon to testify, I could and would testify competently to the facts set forth herein.

5.      Except as otherwise stated, all facts contained within this Declaration are based upon my personal knowledge, my experience with and knowledge of the Debtors and Oasis, my discussions and interactions with Lynn Tilton and representatives of Raymond James &

01:24658036.9

2

A-129

Associates, Inc. ("**Raymond James**"), Oasis's investment bankers, and investment banking generally.

6.     Beginning in April, 2018, I met and spoke with Ms. Tilton on several occasions to discuss, among other topics, the process to market and sell Oasis.  Ms. Tilton is manager of LVD Acquisition, LLC and, at that time, was the sole director of the Debtors.  During this time, I also discussed with Ms. Tilton the investment banking firms she had interviewed to conduct the sale process for Oasis, and her decision to retain Raymond James to advise Oasis in connection with a potential sale.  Raymond James was retained pursuant to an engagement letter dated June 1, 2018.  I was familiar with Raymond James and one of the bankers on the team, and based on my discussions with Ms. Tilton regarding the selection process and underlying rationale, I was supportive of the selection of Raymond James and believed that the firm could competently lead the Oasis sale process.

7.     I began regular contact with members of the Raymond James team, both telephonically and by email, starting in mid-June as they began to prepare the marketing materials for the Oasis sale process.  Throughout the Oasis sale process, I was generally in regular contact with members of the Raymond James team, although the frequency of that contact increased or decreased depending on the relative activity of the Oasis sale process.  Throughout the Oasis sale process, I had open access to members of the Raymond James team, and they were responsive and forthcoming to my requests for information and input that I relayed to them on the Debtors' behalf.

8.     I also conferred with Ms. Tilton, both telephonically and in-person, on a periodic basis during the Oasis sale process.  In addition, we conducted an in-person meeting and held several calls with Raymond James and with Debtors' Independent Director (Joseph J. Farnan, Jr.) and Chief Restructuring Officer (Mike Katzenstein) to review the sale process.  The Debtors

were able to discuss and review with Ms. Tilton her perspectives on Oasis's business and sale process and were able to provide her with the Debtors' perspectives on the same.

9.     As CMO, I provided updates to Mr. Farnan, the CRO and the Debtors' advisors at weekly board meetings.  These discussions included an update on the status of the Oasis sale process.  In more recent weeks, these updates have been supplemented by counsel with respect to the discussions surrounding the status of legal diligence and definitive documentation of the Oasis Transaction.   In addition, I met weekly, and often daily, with the CRO, his team, and counsel to discuss the status of the monetization process, including the Oasis sale process.  Where circumstances warranted it, I would meet with the Independent Director, CRO, and counsel on an *ad hoc* basis when matters required attention on a more urgent timeframe than our regularly scheduled meetings allowed.  Through these discussions, the Independent Director, CRO, and counsel to the Debtors were kept updated on the Oasis sale process.

10.     Among other preparations for the launch of the Oasis sale process, the Raymond James team worked with Oasis's management and (i) prepared a confidential information memorandum (the "**CIM**") and financial operating model, (ii) prepared a virtual data room for potential buyers, (iii) provide access to a financial due diligence report ("**Quality of Earnings Report**"), (iv) held management meetings with the potential buyers, and (v) updated Ms. Tilton and the Debtors throughout the process.

11.     The Oasis sale process was launched on October 28, 2018.  During this stage, members of the Raymond James team contacted approximately 164 potentially interested parties and established a deadline for submitting indications of interest in December 2018.  Eighty-seven (87) potential buyers signed non-disclosure agreements and received the CIM, nine (9) of which submitted offers on or around the December bid deadline (and one thereafter).  Seven (7)

potential buyers were subsequently invited to attend management presentations and conduct due diligence. Throughout the process, I was in regular contact with the Raymond James team regarding the active participants in the sale process, received the Raymond James team's perspective of those participants, and offered observations the Debtors had regarding the sale process and participants.

12.    During December and January, Raymond James and management conducted management presentations and assisted the interested parties with their due diligence efforts. Raymond James notified the interested parties that second round offers were due on February 7, 2019. Following a review of the indications of interest received on or around this date, Oasis, in consultation with Raymond James and the Debtors, selected an offer from a private equity firm as the highest and best offer. On or about February 15, 2019, Oasis entered into a letter of intent with the private equity firm. During February and March, Raymond James and management assisted the private equity firm with their due diligence efforts and began to negotiate the terms and conditions of an offer.

13.    In early April, Culligan International Company ("**Buyer**") expressed an interest in reentering the sale process. Buyer had previously been contacted by Raymond James, but did not submit an offer during the first round. Following extensive discussions on an accelerated timeline, Buyer submitted a letter of intent for Oasis. After thoroughly evaluating the offer, Oasis, in consultation with Raymond James, Ms. Tilton and the Debtors, concluded that the letter of intent from Buyer was the highest and best offer to acquire Oasis, presenting both a superior purchase price and lower transaction risk than the other potential suitor. On or about April 18, 2019, Oasis executed a letter of intent with the Buyer that included a 45-day exclusivity period with a potential 15-day extension (this period was subsequently extended with the consent

01:24658036.9

5

A-132

of the Debtors).  Throughout May and June of 2019, Raymond James and Oasis's management team worked with Buyer as it conducted extensive due diligence, including attending presentations by Oasis's senior management team, reviewing numerous diligence documents hosted in a confidential data room, and accompanying Oasis's management on multiple site visits.  On or about June 21, 2019, Oasis executed a revised letter of intent with the buyer which revised certain terms and conditions, and extended the exclusivity period.  I remained in regular contact with Raymond James during the diligence process and kept the Independent Director, CRO, and the Debtors advisors apprised of the status and any notable developments.

14.     Upon information and belief, Buyer is a private company, headquartered in Rosemont, Illinois, which specializes in water softeners, water filtration systems, and bottled water for residential, commercial, and industrial consumers.  Buyer is a portfolio company of Advent International, a global private equity firm with reportedly $36 billion of assets under management, and Centerbridge Partners, L.P., a global investment firm with approximately $14 billion in assets under management in its private equity platform.  Buyer's offer was determined to be the best offer based on, among other things, the financial consideration offered, the significant due diligence Buyer conducted, the absence of a financing contingency, and an assessment of the overall certainty for Buyer to close a transaction.  With my input, the Debtors were supportive of selecting Buyer as the leading bidder.

15.     From and after the execution of the letter of intent, Zohar III, Limited, Zohar II 2005-1, Limited, and Zohar CDO 2003-1, Limited, as the sellers (collectively, the "**Sellers**") of the LVD Acquisition, LLC membership interests (the "**LVD Interests**") that are to be sold to Buyer as the "Acquired Assets" under the EPA (as defined below), with the advice of counsel (Young Conaway Stargatt & Taylor, LLP), and Oasis, with the advice of the Raymond James team

and the company's counsel (Proskauer Rose LLP), negotiated with Buyer the definitive terms of an agreement to acquire all of the LVD Interests from the Debtors (the "**EPA**") and, thereby and through entry of the Transaction Order, ownership and control of Oasis.  I believe that all parties to the Oasis Transaction have participated in the negotiation of this transaction in good-faith and at arm's length.

16.     In connection with my participation in the negotiation of this transaction, I have reviewed the Proposed Transaction Order and the EPA.  The Proposed Transaction Order and the EPA: (i) were negotiated and entered into in good faith by the parties; (ii) were entered into with the Debtors' approval and consent in the exercise of sound business judgment; and (iii) are in the best interest of the Debtors, their estates, and their stakeholders.

17.     The Sellers are the record owners of the LVD Interests and are owed no less than approximately $59.9 million in principal and interest, and no less than an additional $20.2 million, according to an amendment to the Secured Facility (as defined below), of accrued interest and commitment fees restructured into a subordinated tranche, each under a first lien credit agreement, as amended, between the Sellers, on the one hand, and Oasis and certain subsidiaries on the other hand (the "**Secured Facility**").[2] No other Debtors have an interest in Oasis, either by holding indebtedness owed by Oasis or an interest in equity issued by Oasis. A portion of the purchase price will be used to satisfy outstanding Indebtedness (as defined in the EPA), seller transaction expenses, target net working capital requirements, and escrow(s) to cover post-closing indemnity claims of Buyer.  Upon payment of the purchase price under the terms of the EPA toward the Secured Facility, Sellers will not retain any liens or claims against Oasis on account of the Indebtedness. The Oasis Transaction is the highest and best offer received for Oasis and the

---

[2]  I understand that Oasis and certain Patriarch Stakeholders (as defined in the "**Settlement Agreement**" [Docket No. 266, Ex. 1]) dispute that certain amounts owed under the Secured Facility constitute debt or indebtedness, but they nonetheless support the Oasis Transaction.

A-134

deal is supported by the Debtors' creditors. The Debtors currently estimate that the Oasis Transaction will result in the Debtors' receipt of approximately $63 million to $73 million. However, this range is subject to adjustments based on actual seller transaction expenses, closing cash adjustments, and any indemnity claims against the escrow(s).

18.    Based on my experience, my personal knowledge, and my participation in the Oasis sale process: (i) the sale process described above was conducted in a commercially reasonable manner intended to achieve the best offer; (ii) Raymond James conducted a fulsome sale process to thoroughly canvass the market; (iii) the Debtors were provided an appropriate opportunity to participate in the Oasis sale process leading up to the selection of Buyer, and the negotiations and documentation of the proposed transaction with Buyer after such selection; (iv) the proposed Oasis Transaction represents an arms'-length agreement and the documents have been negotiated and entered into in good faith by the parties; (v) the amounts payable to the Sellers for the LVD Interests, based on the proposed purchase price, represent a fair and reasonable price that has been market tested and was the best offer received; (vi) the Sellers' sale of the LVD Interests in the Oasis Transaction is an exercise of sound business judgment; (vi) the Oasis Transaction is in the best interest of the Debtors, their estates, and their stakeholders; and (vi) the ultimate decision to proceed with the Oasis Transaction reflects a joint determination by the Debtors and Ms. Tilton to proceed with the best transaction available.  Moreover, to the best of my knowledge, Buyer (a) is not affiliated with or related in any way to the Debtors or Ms. Tilton, (b) does not own an interest in the Debtors, and (c) is not an insider of the Debtors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  August 26, 2019

/s/ Robert S. Kost
Robert S. Kost
Chief Monetization Officer of the Debtors

## EXHIBIT B

**Proposed Transaction Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.,*[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
|  | **Docket Ref. Nos. 545 & ___** |

## ORDER APPROVING CONSUMMATION OF OASIS PORTFOLIO COMPANY TRANSACTION

Upon the *Order in Aid of Implementation of the Global Settlement Agreement Approved in These Cases Establishing Certain Procedures for the Independent Director's Approval of Monetization Transactions and Related Relief* [Docket No. 545] (the "Procedures Order"); and upon the notice filed with the Court on August 26, 2019 [Docket No. _____] (the "Transaction Notice")[2] and the declaration and exhibits attached thereto; and the Court having jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Oasis Transaction having been provided to the Interested Parties, and it appearing that no other or further notice need be provided; and the Court having found and determined that the consummation of the Oasis Transaction (as defined in the Transaction

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar I," and together with Zohar III and Zohar II, the "Sellers")). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Procedures Order [Docket No. 545], the Procedures Motion [Docket No. 481], or the Transaction Notice.

01:24657744

A-138

Notice, and hereinafter used) is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and any objections to the Oasis Transaction having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED**:

1.      Joseph J. Farnan, Jr., as Independent Director, has been fully charged with governance of the Debtors under applicable Cayman or Delaware law, as applicable, to authorize, approve and consummate the Oasis Transaction, including, but not limited to (i) authorizing the Debtors to vote or consent to any vote, as applicable, any and all Zohar Interests in favor of the Oasis Transaction, (ii) exercising any rights with respect to the Zohar Interests to implement or consummate the Oasis Transaction, and (iii) authorizing and approving the release of Debtors' liens, claims or encumbrances in connection with the Oasis Transaction.

2.      The consummation of the Oasis Transaction between Culligan International Company ("Buyer"), the Sellers, and all other parties executing the document, on the terms set forth in the Transaction Notice and EPA is legal, valid and properly authorized.

3.      The documents contemplated by or entered into in connection with the Oasis Transaction, are hereby authorized and approved, and shall be binding on and enforceable against all parties executing those documents.  Upon entry of this Order, all necessary consents, approvals, or authorizations of any kind, by any member of, holder of an interest in (whether record, beneficial, or otherwise) the Sellers, or other party, required to authorize the Oasis Transaction are hereby deemed to have been provided.

4.      Based upon, among other considerations, the Transaction Notice and the Transaction Declaration, the Independent Director's authorization, approval, and consummation of the Oasis Transaction is prudent, in good faith, in the best interest of

01:24657744

A-139

the Debtors' estates, their creditors and other parties in interest, and is fully consistent with the duties imposed upon him as a fiduciary.

5.      The sale of the LVD Interests, as more fully described in and pursuant to the EPA, and the consideration provided by Buyer are fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

6.      Effective as of the Closing of the EPA (which includes the sale of the LVD Interests by the Sellers to Buyer and the satisfaction or waiver of the Closing conditions in the EPA), the Oasis Transaction shall constitute a legal, valid and effective transfer of the LVD Interests to the Buyer notwithstanding any requirement for approval or consent by any person, and shall vest Buyer with all right, title and interest in and to the LVD Interests free and clear of all liens, claims, encumbrances and other interests of any kind, pursuant to section 363(f) of the Bankruptcy Code with such liens, claims, encumbrances and interests attaching to the proceeds from the Oasis Transaction with the same validity and priority as such released liens.

7.      The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code.

8.      The payment for and release of the Indebtedness under the Zohar Secured Debt Facility, as set forth in the EPA, is hereby approved free and clear of any and all Encumbrances and other interests of any kind that could be asserted by the Debtors, their estates, their Agents (as defined herein) or their creditors against the LVD Interests, LVD or its subsidiaries, or any assets or property of LVD or its subsidiaries.  The "Agents" constitute Ankura Trust Company, as agent, and Patriarch Partner Agency Services, LLC, as predecessor agent, under the Zohar Secured Debt Facility.

01:24657744

3

A-140

9.      With the consent of the Patriarch Stakeholders, the Other Stakeholders, and any Class B Members of the holders of preference shares of the Debtors, the sale of the LVD Interests is hereby approved free and clear of any liens, claims and encumbrances that could be asserted by any of the Patriarch Stakeholders and the Other Stakeholders, provided that any and all such liens, claims and encumbrances attach to the proceeds from the Oasis Transaction with the same validity and priority as those being released hereby, and all such proceeds shall be delivered to the Debtors at closing.

10.      Lynn Tilton, as Co-Seller Representative, shall have no liability to the Debtors or any other party for any claims or arising solely from any actions related to her role as Co-Seller Representative, including, without limitation, actions taken by any other Co-Seller Representative, except to the extent such liability arises from or is related to Lynn Tilton's own bad faith or willful misconduct.

11.      The Debtors and their Agents, to the extent applicable, are authorized and directed to execute and deliver all instruments and documents, and take such other action—including the exercise of any member, shareholder, or lender approval rights—as may be necessary or appropriate to consummate, implement and effectuate the Oasis Transaction pursuant to the EPA, including, but not limited to: (a) execution of any and all instruments necessary to terminate, cancel and release the Zohar Secured Debt Facility, and all Encumbrances and other interests of any kind arising under or related to the Zohar Secured Debt Facility, including any mortgage, deed of trust, security agreement, UCC financing statement, pledge, control agreement, Encumbrance, or other instrument related to the perfection of the Encumbrances and other interests of any kind against the LVD Interests and (b) dismissal with prejudice of the action styled *Zohar CDO 20003-1, Limited v. Croscill Home LLC* as against LVD before the United States District Court for the District of Delaware.

01:24657744

4

A-141

12.    The release by the Sellers as set forth in the EPA is authorized and approved.

13.    A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder of any state, county, or local authority to act to terminate and cancel any and all of the Encumbrances and other interests of any kind.

14.    Any stay applicable to this Order under Federal Rule of Bankruptcy Procedure 6004(h) is waived and this Order shall be effective and enforceable immediately upon its entry.

15.    This Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

01:24657744

A-142

*[THIS PAGE INTENTIONALLY LEFT BLANK]*

*[THIS PAGE INTENTIONALLY LEFT BLANK]*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |
|  | ) | **Hearing Date: September 24, 2019 at 10:00 a.m. (ET)** |
|  | ) | **Response Deadline: September 17, 2019 at 4:00 p.m. (ET)** |
|  | ) |  |

## DEBTORS' MOTION FOR AN ORDER DETERMINING DISPUTE BETWEEN THE DEBTORS AND PATRIARCH PARTNERS MANAGEMENT SERVICES, LLC RELATED TO PENDING OASIS TRANSACTION

Zohar III, Corp. and its affiliated debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors") hereby submit this motion (the "Motion"), pursuant to (i) section 105(a) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), (ii) this Court's *Order Approving and Authorizing the Settlement Agreement By and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class* (the "Settlement Order") [Docket No. 266], and (iii) the Settlement Agreement[2] (as defined in the Settlement Order) [Docket No. 266, Exh. 1],[3] for entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), determining that no "Transaction Fee" is owed to Patriarch Partners Management Group, LLC ("PPMG") pursuant to

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar III"). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Settlement Agreement or the *Debtors' Motion, Pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, for an Order Approving and Authorizing the Settlement Agreement* [Docket No. 222], as applicable.

[3] A copy of the Settlement Order and Settlement Agreement is annexed hereto as Exhibit B.

01:25035581.7

the applicable Management Services Agreement between PPMG and LVD Acquisition, LLC's ("LVD"). In support of the Motion, the Debtors respectfully state as follows:

### PRELIMINARY STATEMENT[4]

1.  ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████. The Zohar Funds are the only secured debt holders of LVD and are receiving several million dollars less than the fixed and liquidated obligations owed to them under the express terms of LVD's credit agreement (i.e., indebtedness of LVD). Accordingly, no transaction fee is due to PPMG under the PPMG MSA.

### JURISDICTION AND VENUE

2.  This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to entry of a final order by the Court in connection with this Motion to the extent it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.  The predicates for the relief sought herein are section 105(a) of the Bankruptcy Code, the Settlement Order, and, among others, paragraph 18 of the Settlement Agreement.

---

[4] Capitalized terms used but not defined in this Preliminary Statement shall have the meanings ascribed to them below.

01:25035581.7

2

## BACKGROUND

**A.    General Background**

4.    On March 11, 2018 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

5.    Shortly after the commencement of these cases, various parties-in-interest, including the Debtors, MBIA, U.S. Bank, the U.S. Trustee, the Zohar III Controlling Class, and the Patriarch Stakeholders, engaged in litigation including a contested collateral management agreement rejection motion, a motion for relief from the automatic stay, and two (2) motions to dismiss the cases or appoint a chapter 11 trustee (the "Litigated Contested Matters").

6.    On April 5, 2018, the Court appointed Judge Kevin Gross to mediate the parties' various disputes on April 16, 2018, the day before the trial on the Litigated Contested Matters was scheduled to begin [Docket No. 143]. As the result of the arduous good-faith, in-person mediation efforts overseen and facilitated by the Mediator, the parties agreed to a comprehensive resolution of the Litigated Contested Matters, the terms of which are embodied in the Settlement Agreement.

7.    On May 21, 2018, the Court entered the Settlement Order approving the Settlement Agreement.

8.    Also on May 21, 2018, the Court entered an order, consistent with the Settlement Order, appointing Joseph J. Farnan, Jr. as the Debtors' Independent Director. *See* Docket Nos. 266 & 267. Pursuant to the Settlement Agreement, Mr. Farnan is "fully charged with the governance of the Zohar Funds under applicable Cayman or Delaware law." Settlement Agreement, at ¶ 7. Also in accordance with the Settlement Agreement, Mr. Michael Katzenstein was appointed as the Debtors' Chief Restructuring Officer (the "CRO") and Mr. Robert S. Kost was appointed as the Debtors' Chief Monetization Officer (the "CMO"). *See* Docket Nos. 297 & 283.

01:25035581.7

3

9.     On November 9, 2018 date the Court entered the *Order in Aid of Implementation of the Global Settlement Agreement Approved in These Cases Establishing Certain Procedures for the Independent Director's Approval of Monetization Transactions and Related Relief* [Docket No. 545] (the "Monetization Procedures Order") establishing a joint process through which the Debtors and Ms. Tilton would monetize the various portfolio companies in which the Debtors hold interests.

**B.     LVD**

10.     Zohar I, Zohar II and Zohar III (collectively, the "Zohar Funds") are, collectively, the sole members of LVD, holding 18.9%, 58.3%, and 22.8% of its membership interests, respectively.  The Zohar Funds are also secured lenders to LVD pursuant to that certain Credit Agreement among LVD and its subsidiary, as borrowers, and the Zohar Funds, as lenders, dated June 1, 2009 (the "Credit Agreement").[5]  Schedule 2.1 to the Credit Agreement lists the various loan commitments thereunder, which initially consisted of (a) a $2 million revolving credit commitment from Zohar III, and (b) Term A Loans from Zohar I, Zohar II, and Zohar III of approximately $9.3 million, $30 million, and $11.6 million, respectively.  Further, Section 2.8 of the Credit Agreement initially provides that interest on unpaid principal would accrue at a per annum rate of LIBOR plus the "Applicable Margin," which was initially set at 8.0% for all Revolving Credit Loans, Term A Loans, and Term B Loans (each as defined in the Credit Agreement).  As of the date hereof, it is undisputed that approximately $59,957,540 plus interest is currently owed by LVD to the Zohar Funds under the Credit Agreement.[6]

---

[5] A copy of the relevant portions of the Credit Agreement is attached hereto as Exhibit C.

[6] In connection with the LVD Transaction (as defined below), the Debtors, Oasis, Patriarch Partners Agency Services, LLC and Ankura Trust Company, LLC agreed to the form of a payoff letter, a copy of which was filed on September 6, 2019 [Docket No. 909] and is attached hereto as Exhibit D (the "Payoff Letter").  By the Payoff Letter, LVD and the Debtors agree that $59,957,540.49 plus accrued interest is due under the Credit Agreement (other than under Amendment 8 (as defined below)).

01:25035581.7

4

11.     In November of 2015, LVD and the Zohar Funds entered into Amendment Number 8 to the Credit Agreement ("Amendment 8").[7] Amendment 8 provides that:

> The contents and columns set forth on Schedule A hereto are hereby inserted at the end of Schedule 2.1 to the Credit Agreement to reflect a restructuring of $20,291,872.92 of unpaid interest and commitment fees into Tranches TLD, TLE and TLF. In addition, Administrative Agent hereby waives its ability to call an Event of Default for the past failure to pay such unpaid interest.

Amendment 8, at § 1(a)(i).[8] On its face, the effect of Amendment 8 was to convert accrued and unpaid interest and fee obligations (i.e., indebtedness) into new Term Loans under the Credit Agreement (i.e., indebtedness), following the TLA, TLB, TLC, *et cetera* naming convention used for all of the term loan indebtedness owed under the Credit Agreement (collectively, the "Amendment 8 Tranches"). It is undisputed that the aggregate amount of the Amendment 8 Tranches is not less than $20,291,872.91.[9]

12.     Taking into account the drawn amounts under the two revolving commitments, and the outstanding term loans under the Credit Agreement, LVD has outstanding indebtedness to the Zohar Funds under the Credit Agreement of not less than $80,249,412 in principal amount, plus accrued and unpaid interest.

## C.     The PPMG MSA

13.     On September 30, 2010, LVD entered into to a Management Services Agreement (the "PPMG MSA") with PPMG – an entity owned and controlled by Ms. Tilton – pursuant to

---

[7] A copy of Amendment 8 is attached hereto as Exhibit E. Between execution of the Credit Agreement and entry into Amendment 8, LVD, the Zohar Funds, and the administrative agent under the Credit Agreement entered into a series of amendments that served to (i) add $2 million in revolving loan commitments extended by Zohar II, (ii) create a Term C Loan funded by Zohar III in the amount of $1.5 million, and (iii) create a delated draw Term D Loan, with commitments extended by Zohar II in the amount of $1.0 million.

[8] Amendment 8 further provides that, as it relates to Tranches TLD, TLE, and TLF the "Applicable Margin" is 0%. Thus, pursuant to Section 2.8 of the Credit Agreement, interest on the Amendment 8 Tranches accrues at the LIBOR rate.

[9] By the Payoff Letter, in connection with Amendment 8, LVD and the Debtors likewise agree that an additional "not less than $20,291,872.91" is due to the Debtors under the Credit Agreement. Payoff Letter, at Para 2(a).

which PPMG purports to provide LVD with certain management and consulting services.[10]



**D.    The LVD Transaction**

14.    LVD commenced its monetization process in or about June of 2018.  On or about April 18, 2019, LVD entered into a letter of intent with a prospective buyer (the "Buyer") to

---

[10] A copy of the PPMG MSA is attached hereto as Exhibit F.

A-150

acquire all of the limited liability membership interests in LVD.  Following extensive due diligence

and negotiations, on August 23, 2019, the Zohar Funds, LVD, and the Buyer executed an Equity

Purchase Agreement (the "EPA")[13] pursuant to which the Buyer will acquire 100% of the Zohar

Funds' equity interests in LVD (the "LVD Transaction").

      15.     Under the EPA, proceeds of the LVD Transaction will be applied first to fund

certain escrows and indemnification funds, second to "Seller Transaction Expenses," which would

include the Transaction Fee, if payable, and only then to "Indebtedness," including LVD's

obligations to the Zohar Funds, which, it is not disputed, will not be paid in full in connection with

the LVD Transaction.  The EPA – as approved and signed by Ms. Tilton – defines "Indebtedness"

as including:

> Credit Agreement, dated as of June 1, 2009, by and among the Company, B2
> Acquisition, Inc., the domestic subsidiaries of the borrowers from time to time
> guarantors thereunder, the lenders party thereto and Patriarch Partners Agency
> Services, LLC ("PPAS"), as amended by Amendment No. 1, dated as of April 12,
> 2010, Amendment No. 2, dated as of November 29, 2010, Amendment No. 3, dated
> as of June 2, 2011, Commitment Settlement Amendment, dated as of June 6, 2012,
> Amendment No. 4, dated as of September 22, 2013, Amendment No. 5, dated as of
> March 14, 2015, Amendment No. 6, dated as of September 1, 2015, Amendment
> No. 7, November 12, 2015, *Amendment No. 8, dated as of November 25, 2015*,
> and Amendment No. 9, dated as of November 19, 2015 (collectively and with other
> related loan documents, the "Zohar Credit Agreement").

EPA Disclosure Schedules, Schedule 2.02(c)(iii) (emphasis added).[14]  Further, Schedule 4.05(a)

of the Disclosure Schedules to the EPA – LVD's 2017 and 2018 consolidated financial statements

– lists ████████████████████████████████████, which would be inclusive of indebtedness

under the Amendment 8 Tranches.  The financial statements, referencing the Amendment 8

Tranches further provide, in relevant part, that: "████████████████████████████████████████

---

[13] A copy of the EPA was submitted for *in camera* review in connection with the Transaction Notice (as defined below).

[14] Relevant portions of the EPA Disclosure Schedules are attached hereto as Exhibit G.

████████████████████████████████████████████████." EPA, Disclosure Schedules, Schedule 4.05, p. 15.

16.    On August 26, 2019, the Debtors filed the *Notice of Binding Portfolio Company Transaction Pursuant to Portfolio Company Transaction Procedures* [Docket No. 868] (the "Transaction Notice") in accordance with the Monetization Procedures Order. The hearing to consider the Transaction Notice is currently scheduled for September 11, 2019. Assuming the Court approves the transaction contemplated therein (the "LVD Transaction"), the closing date shall be the date that is two business days following the date upon which all conditions set forth in Article II of the EPA have been satisfied or waived; *provided, however*, that the Buyer shall not be required to close prior to October 7, 2019.

17.    The parties do not dispute that the LVD Transaction will result in the Zohar Funds receiving substantially less than the $80.2 million due to them under their credit facility to LVD (with or without payment of the Transaction Fee).[15]

E.    **The Transaction Fee Dispute**

18.    Early in the negotiations of the EPA, Ms. Tilton made clear her view that PPMG would be owed a Transaction Fee in connection with the LVD Transaction despite the fact that the LVD Transaction would not result in full payment of LVD's existing debt obligations to the Zohar Funds. The Zohar Funds likewise made clear their position that the Transaction Fee was not triggered or payable under the PPMG MSA, the Settlement Agreement, or otherwise because the

---

[15] Specifically, as set forth in the *Declaration of Robert S. Kost in Support of Order Authorizing the Oasis Transaction*, which is attached to the Transaction Notice as Exhibit A, the Zohar Funds expect to receive between $63 and $73 million upon the closing of the LVD Sale, or approximately *$6 to $16 million less* than what is owed to them.

A-152

debt obligations to the Zohar Funds would not be paid in full in connection with the LVD Transaction.[16]

19.      In accordance with paragraph 11 of the Settlement Agreement, the parties participated in an in-person mediation session on July 31, 2019 with Judge Gross, but no resolution of this issue was reached.

20.      The Debtors and the Patriarch Stakeholders agreed to a schedule for the Court to adjudicate the disputed Transaction Fee.  So as not to delay the execution of the EPA and closing of the LVD Transaction, the Debtors also agreed that, in the event the Court has not ruled on the matter prior to the closing of the LVD Transaction, the disputed Transaction Fee shall be paid to PPMG; *provided, however*, that such payment shall be expressly subject to any remedy that the Court may direct in the event that the Court determines such payment was improper, including claw-back.[17]

### RELIEF REQUESTED

21.      By this Motion, the Debtors seek entry of an order, pursuant to section 105(a) of the Bankruptcy Code, the Settlement Order, and, among others, paragraph 18 of the Settlement Agreement, determining that no Transaction Fee is payable to PPMG in connection with the LVD Transaction.

---

[16] PPMG will likely attempt to argue that the Transaction Fee must be paid pursuant to paragraph 18 of the Settlement Agreement, which provides: "Any (A) claim asserted by the Patriarch Stakeholders *that is supported by written documentation* showing the claim…*represents a fee* or other claim arising from a deferral of payment or any management or administrative fee *owed to a Patriarch Stakeholder*…shall be deemed due and payable through the closing of any monetization event…."  Settlement Agreement, ¶ 18 (emphasis added).  There is no written documentation showing that the Transaction Fee is, in fact, owed to a Patriarch Stakeholder.  To the contrary, as set forth herein, the only written documentation – the PPMG MSA – plainly shows that the Transaction Fee *is not owed* under the circumstances.  Simply put, the condition precedent to the Transaction Fee being paid was not met so nothing is "due" nor "payable."

[17] In connection therewith, the parties have agreed to simultaneous initial filings on September 6, 2019 and simultaneous responding papers on September 17, 2019.

## BASIS FOR RELIEF REQUESTED

22.     Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code," and that "[n]o provision of [the Bankruptcy Code] providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules....".  11 U.S.C. § 105(a).  Further, bankruptcy courts retain "jurisdiction to interpret and enforce settlements and the accompanying orders approving settlements."  *See In re Baseline Sports, Inc.*, 393 B.R. 105, 118–19 (Bankr. E.D. Va. 2008); *accord In re Lazy Days' RV Center, Inc.*, 724 F.3d 418, 423 (3d Cir. 2013); *In re Patriot Coal Corp.*, 539 B.R. 812, 818–19 (Bankr. E.D. Mo. 2015).  Although "there are some significant limits to a bankruptcy court's ability to use section 105(a) of the Code . . . [it] plainly may be used 'to enforce and implement' earlier orders."  *In re River Ctr. Holdings, LLC*, 394 B.R. 704, 711 (Bankr. S.D.N.Y. 2008); *See Also In re Ames Dep't Stores, Inc.*, 317 B.R. 260, 273–74 (Bankr. S.D.N.Y. 2004).

23.     For the reasons set forth herein, the Debtors request that the Court enter the Proposed Order in furtherance of the Settlement Agreement and the Monetization Process, determining that the Transaction Fee is not payable in connection with the LVD Transaction.

### A.     The Transaction Fee is not Payable Under the Plain Terms of the PPMG MSA

24.     As set forth above ████████████████████████████████████████ ████████████████████████████████████████, no Transaction Fee is owed or payable to PPMG.

25.     That is clearly the case here.  As Ms. Tilton concedes in the EPA itself (see paragraph 15, *supra*), the liabilities under the Credit Agreement – including Amendment 8 – constitute "Indebtedness" of LVD.  In order to trigger the Transaction Fee, all "outstanding debt"

01:25035581.7

must be paid.  It cannot be disputed that the entirety of the amount owed by LVD to the Zohar

Funds (not less than $80.2 million) will not be fully repaid in connection with the LVD

Transaction.

26.     Accordingly, the Debtors respectfully submit that the PPMG MSA speaks for itself

and the facts clearly dictate denial of the PPMG Fee in connection with the LVD Transaction.

**B.     Tilton's Treatment** ████████████████████ **in Connection With the LVD
Transaction is Further Proof That no Transaction Fee is Owed**

27.     Additional context for the Debtors' position can found in connection with

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████
   █████

01:25035581.7

A-155

**C.**   **Tilton's Own Flow of Funds Model in Connection With a Prior Potential Portfolio Company Transaction is Still Further Proof That no Transaction Fee is Owed**

28.   In addition, in the context of a potential monetization process for a different Portfolio Company, Ms. Tilton previously conceded that under the PPMG MSAs, no transaction fee can be payable to PPMG unless and until the relevant transaction clears the respective Portfolio Company's debt.[19]

30.   For these reasons, the Debtors respectfully request that the Court enter the Proposed Order finding that no Transaction Fee is owed to PPMG in connection with the LVD Transaction.

---

[19]

## NOTICE

31.     The Debtors will provide notice of this Motion to: (i) the U.S. Trustee; (ii) counsel to the Patriarch Stakeholders; (iii) counsel to U.S. Bank, as indenture trustee; (iv) counsel to MBIA; (v) counsel to the Zohar III Controlling Class; and (vi) all parties that, as of the filing of this Motion, have requested notice in these Chapter 11 cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors request entry of the Proposed Order, granting the relief requested herein and such other and further relief as is just and proper.

Dated: September 6, 2019
    Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Joseph M. Barry
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4221)
Ryan M. Bartley (No. 4985)
Shane M. Reil (No. 6195)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel to the Debtors and Debtors in Possession*

01:25035581.7

A-157

*[THIS PAGE INTENTIONALLY LEFT BLANK]*

# EXHIBIT A

**Proposed Order**

01:25035581.7

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Ref. Docket Nos. 266, 545 & \_\_\_\_** |

### ORDER DETERMINING DISPUTE BETWEEN THE DEBTORS AND
### PATRIARCH PARTNERS MANAGEMENT SERVICES, LLC
### RELATED TO PENDING OASIS TRANSACTION

Upon the *Motion of the Debtors for an Order Determining Dispute Between the Debtors and Patriarch Partners Management Services, LLC Related to Pending Oasis Transaction* (the "Motion") [Docket No. \_\_\_],[2] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and that the legal and factual bases set forth in the Motion

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

01:25035581.7

establish just cause for the relief granted herein; and after due deliberation and sufficient cause
appearing therefor, it is hereby ORDERED:

  1.     The Motion is GRANTED.

  2.     For the reasons set forth in the Motion, no Transaction Fee shall be payable to
PPMG in connection with the LVD Transaction.

  3.     This Court shall retain jurisdiction over any and all matters arising from the
interpretation or implementation of this Order.

Dated:  September ___, 2019
        Wilmington, Delaware

                                    _____
                                    THE HONORABLE KAREN B. OWENS
                                    UNITED STATES BANKRUPTCY JUDGE

A-161

## EXHIBIT B

**Settlement Order and Settlement Agreement**

01:25035581.7

A-162

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (CSS) |
| Debtors. | Jointly Administered |
| | **Docket Ref. Nos. 222 & 223** |

### ORDER APPROVING AND AUTHORIZING THE SETTLEMENT AGREEMENT BY AND BETWEEN THE DEBTORS, LYNN TILTON, THE PATRIARCH STAKEHOLDERS, MBIA INSURANCE CORP., AND THE ZOHAR III CONTROLLING CLASS

Upon consideration of the motion (the "Motion")[2] of the Debtors for entry of an order, pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the Settlement Agreement (attached hereto as **Exhibit 1**) entered into by and between (i) the Debtors, (ii) Lynn Tilton, (iii) the Patriarch Stakeholders, (iv) MBIA, and (v) Halcyon Capital Management LP[3], Coöperatieve Rabobank U.A., New York Branch, STS Master Fund, Ltd, SBF Opportunities Master Fund, Ltd, and Candlewood Structured Credit Harvest Master Fund, LTD (collectively, the "Zohar III Noteholders" and, together with the Debtors, Lynn Tilton, the Patriarch Stakeholders, and MBIA, the "Parties"), as more fully described in the Motion; and it appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012; and it appearing that venue of these

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Settlement Agreement, as applicable.

[3] The members of the Zohar III Controlling Class affiliated with Halcyon Capital Management LP are disclosed in the Verified Statement Pursuant to Fed. R. Bankr. P. 2019(a) filed on March 27, 2018 [Docket No. 95].

01:23222940.4

A-163

Chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and

1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and

the Court may enter a final order on the Motion consistent with Article III of the U.S.

Constitution; and this Court having determined that the relief requested in the Motion is in the

best interests of the Debtors, their estates, creditors, and other parties in interest; and this Court

having found that the relief requested in the Motion is justified by the facts and circumstances;

and it appearing that proper and adequate notice of the Motion has been given and that, except as

otherwise ordered herein, no other or further notice is necessary; and after due deliberation

thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Settlement Agreement, a copy of which is attached hereto as **Exhibit 1**, is

approved in its entirety pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule

9019, and is binding on all parties-in-interest in these Chapter 11 cases, including, but not limited

to, the Parties, any new Collateral Manager or New Agent appointed under the terms of the

Settlement Agreement, the Independent Director, the CRO, U.S. Bank, the Other Stakeholders,

the Patriarch Stakeholders, the Committee, and any subsequent holder of any secured notes

issued by any of the Debtors (including, with respect to any of the foregoing, any agents,

successors, or assigns); provided, however, with respect to the Zohar III Controlling Class only,

no Party shall be required to disclose the terms of the Settlement Agreement to any successor,

assign or transferee, nor shall it be liable for any successor's, assign's or transferee 's breach of

the Settlement Agreement;  provided, further however, that the first sentence of paragraph 30 of

01:23222940.4

2

A-164

the Settlement Agreement shall be null and void solely to the extent it contemplates a separate "confidential stipulation."

3.      A prospective purchaser or seller of debt issued or guaranteed by the Zohar III, Corp. or Zohar III, Limited may obtain a copy of the terms of the Settlement Agreement from the CRO, only after executing a standard NDA consistent with the practice in the District of Delaware for the sole and limited purpose of evaluating a potential purchase of such debt, provided however, that such terms shall not include Exhibits to the Settlement Agreement. Without limiting the binding effect of the Settlement Agreement provided for under Paragraph 2 of this Order, in the event a potential purchaser of debt becomes a holder of Zohar III Claims, such NDA shall bind the entity requesting access to the terms of the Settlement Agreement, any individual representing any such entity in such a request, and any individual who is granted access to the terms of the Settlement Agreement on behalf of any such entity.

4.      Notwithstanding anything in the Order to the contrary, nothing contained in this Order is or shall be deemed to be an act by the Trustee to consent to or vote for or accept or adopt on behalf of any Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding. (All capitalized terms used in the prior sentence have the meaning ascribed to them in the applicable indenture between the Debtors and U.S. Bank.)

5.      Notwithstanding anything to the contrary in this Order or the Settlement Agreement, nothing set forth in the Settlement Agreement is binding on Blank Rome LLP.

6.      Notwithstanding anything to the contrary in this Order or the Settlement Agreement, nothing set forth in the Settlement Agreement is binding on Alvarez & Marsal Zohar

01:23222940.4                                   3

A-165

Case 1:20-cv-01418-MN Document 19 Filed 12/18/20 Page 170 of 898 PageID #: 1162
Case 18-10512-RBO Doc 1136-1 Filed 12/17/19 Page 8 of 91

Case 18-10512-CSS    Doc 266    Filed 05/21/18    Page 4 of 4

Management LLC ("AMZM"), provided, however, that paragraph 16 of the Settlement

Agreement provides that AMZM shall be terminated.

       7.    The Debtors are authorized and empowered to take any and all actions necessary

to carry out, effectuate, or otherwise enforce the terms, conditions, and provisions of the

Settlement Agreement.

       8.    This Court shall retain jurisdiction to hear any and all disputes arising out of the

interpretation or enforcement of this Order.

Dated:  May **21**, 2018
       Wilmington, Delaware

                         Christopher S. Sontchi
                         United States Bankruptcy Judge

**Exhibit 1**

**Settlement Agreement**

01:23222940.4

**Mediation Term Sheet**
**(In re: Zohar III Corp.,** *et al.***, Case No. 18-10512 (CSS))**

*15 Month Window* – The period that expires 15 months from the date hereof.

*18 Month Extended Window* – If each of MBIA and the Zohar III Claims receive 50% of their respective Paid in Full amount within the 15 Month Window, the 15 Month Window shall be deemed to be extended by 3 months and shall be hereafter referred to herein as the 18 Month Extended Window.

*Bankruptcy Court* – The United States Bankruptcy Court for the District of Delaware, which is presiding over the Chapter 11 cases of the Debtors.

*Debtors* – The debtors in the Chapter 11 cases captioned: In re: Zohar III Corp., *et al.*, Case No. 18-10512 (CSS).

*Designated Tax Director* - the limited role Tilton shall have on behalf of the Debtors as described in paragraph 2 below.

*Full Payment Date* – The date on which the parties or the classes of noteholders on Exhibit A are Paid in Full.

*Independent Director* – the director appointed by the Mediator. The Independent Director (a) shall be unaffiliated with any party and (b) shall have played no role in connection with and held no claim against or interest in any of the Debtors.

*Indentures* – (1) The Indenture among Zohar CDO 2003-1, Limited, Zohar CDO 2003-1 Corporation, Zohar CDO 2003-1, LLC, and MBIA Insurance Corporation, CDC Financial Products, Inc., and U.S. Bank National Association, dated November 13, 2003; (2) The Indenture among Zohar II 2005-1, Limited, Zohar II 2005-1, Corp., Zohar II 2005-1, LLC, MBIA Insurance Corporation, IXIS Financial Products Inc., and LaSalle Bank National Association, dated January 12, 2005; and (3) The Indenture among Zohar III, Limited, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc., and LaSalle Bank National Association, dated April 6, 2007.

*MBIA* – MBIA Insurance Corp.

*Mediator* – The Honorable Kevin Gross, and if Judge Gross resigns as mediator Judge Sontchi will appoint a replacement mediator.

*Other Stakeholders* – (a) US Bank and MBIA, when not referring to Zohar III, (b) US Bank and the Controlling Class representative when solely referring to Zohar III, and (c) US Bank, MBIA and the Zohar III Controlling Class when referring to Zohar III and either or both of Zohar I and Zohar II.

01:23191627.1

A-168

*Paid in Full* – The amount owed to the parties and in the amounts listed and calculated on the schedule attached hereto as Exhibit A to be updated monthly to reflect accrued and unpaid interest and fees allowable under the Indentures.[1]

*Patriarch Stakeholder* – Entities included in Exhibit B.

*Group A Portfolio Companies* – Those companies listed on the schedule attached hereto as Exhibit C.

*Group B Portfolio Companies* – Those companies listed on the schedule attached hereto as Exhibit D.[2]

*Tilton* – Ms. Lynn Tilton.

*U.S. Bank* – U.S. Bank National Association, solely in its capacity as Trustee under the Indentures, and not in its individual capacity.

*Zohar III Noteholders* – those entities or the classes of noteholders listed on the schedule attached hereto as Exhibit E.

*Zohar III Claims* – Claims under the Zohar III Indenture $[X]

*Zohar Funds* – collectively, Zohar CDO 2003-1, Limited; Zohar CDO 2003-1 Corporation; nondebtor Zohar CDO 2003-1, LLC; Zohar II 2005-1, Limited; Zohar II 2005-1, Corp.; nondebtor Zohar II 2005-1, LLC; Zohar III, Limited; Zohar III, Corp.; and nondebtor Zohar III, LLC)

**Terms**

---

[1]  This footnote is intended to cover MBIA's claims. Other than the Policy Payment in the amount of $148,951,585 with respect to Zohar I and the Policy Payment of $770,109,326 with respect to Zohar II reflected on Exhibit A, the calculation of which amounts are not subject to challenge by Tilton; all other rights reserved. MBIA will consult in good faith with Tilton regarding the other amounts and calculations specified in Exhibit A. If the parties are unable to agree on those other amounts, the matter shall be referred to the Mediator. If the Mediator is unable to resolve the dispute, the matter shall be brought to the Bankruptcy Court for resolution. Any equity interest owed to MBIA or Zohar I, as applicable, will be escrowed until the expiration of the 15 Month Window; all parties' rights reserved. Any proceeds from the sale or repayment of Zohar I loans (but not the equity interest) shall be paid directly to MBIA.

[2]  Group B Portfolio Companies will exclude the Group A Portfolio Companies.

01:23191627.1

1. The Mediator shall appoint a single Independent Director for each of the Zohar Funds (same director shall be appointed for all of the Zohar Funds). The Independent Director shall not have the power to convert or dismiss the Chapter 11 cases during the 15 Month Window. Tilton shall resign as a director of each and shall have no governance authority or responsibility for the Zohar Funds, other than as Designated Tax Director. On the Full Payment Date, the Independent Director shall be deemed to resign and Tilton shall be automatically reinstated as director of each of the Zohar Funds (with all powers attendant to such position also automatically reinstated).

2. Notwithstanding anything to the contrary herein except subject only to paragraph 3 and 14, Tilton shall remain the director of each of the Debtors (until such time as she is no longer the taxpayer for the Debtors, the Group B Portfolio Companies, and Group A Portfolio Companies) solely for the purpose of exercising (and having no other rights or authority) to (a) manage the tax liability and reporting of the Debtors and the Group B Portfolio Companies, (b) manage the tax reporting of the Group A Portfolio Companies and (c) with respect to the Group B Portfolio Companies, manage any event causing cancellation of debt income (forgiveness of debt, liquidation, unwind, or foreclosure) including to manage the timing of sale of the Group B Portfolio Companies, forgiveness of debt and realizing gains and losses (the "Designated Tax Director"). In that capacity, Tilton shall continue to bear the tax liability associated with ownership of the Debtors, the Group B Portfolio Companies, and the Group A Portfolio Companies, including with respect to any Group A Portfolio Company transactions.

3. Subject to the last sentence of this paragraph 3, if the Full Payment Date does not occur within the 15 Month Window, Tilton and the CRO shall negotiate in good faith on how to monetize the Group B Portfolio Companies. In the event of any dispute in such negotiations, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve any or all disputes, the parties shall jointly seek an order of the Bankruptcy Court resolving such disputes.

4. [TBD: CRO and LT will develop reasonable process milestones related to hiring bankers, ....]

5. The Group A Portfolio Companies will be sold without regard to Tilton's personal tax liability.

6. The Independent Director/CRO shall appoint a new independent administrative agent under the Zohar credit agreements (the "New Agent") who shall report only to the Independent Director/CRO and U.S. Bank ; provided, (a) that PPAS remains the administrative agent under the Zohar credit agreements for all purposes related to the Patriarch Stakeholders and any other third party; and (b) during the 15 Month Window or the 18 Month Extended Window, as applicable, the New Agent shall

01:23191627.1

A-170

have all rights and remedies available under the Credit Agreement with respect to the Zohar interests in the Group A Portfolio Companies; provided, however, that the New Agent shall not have the ability to take any action, declare any default or exercise any remedy with respect to any Group A Portfolio Company (other than for prospective non-payment of interest) or any Group B Portfolio Company and subject to the tolling of claims and other terms hereof. PPAS, the Independent Director/CRO, and the New Agent shall use reasonable efforts to transition existing Zohar-related PPAS matters to the new agent. Subject to the approval of the Independent Director/CRO. PPAS shall use commercially reasonable efforts to take all reasonable actions to ensure the continued validity and perfection of any security interests and liens for loans transferred to the New Agent. PPAS may be reimbursed for reasonable transition costs incurred in transition to the New Agent. If there is any dispute with respect to any of the foregoing, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties shall jointly seek an order of the Bankruptcy Court resolving that dispute. Nothing in the foregoing paragraph shall prejudice rights and remedies of the parties to Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd., No. 16-cv-4488 (S.D.N.Y.), in the event that litigation is resumes.

7. If the Independent Director resigns prior to the Full Payment Date, the Mediator shall appoint a replacement Independent Director. In connection therewith, the Mediator shall consult with the controlling class of Zohar III noteholders, MBIA and Tilton about director candidates. The Independent Director shall be fully charged with governance of the Zohar Funds under applicable Cayman or Delaware law.

8. The Independent Director will retain a CRO to participate in the process to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing (the "*Monetization Process*"). The CRO shall (a) replace the current CRO, (b) be unaffiliated with any party, and (c) have played no role in connection with and held no claim against or interest in any of the Debtors; provided, however, that Rob Kost may be considered for any role in the monetization process, by the CRO. The Independent Director and CRO each will execute a standard NDA consistent with the practice in the District of Delaware.

9. Tilton shall remain in her position as director, manager and officer, as applicable, of the Group A Portfolio Companies during the 15 Month Window, or, if qualified, for the 18 Month Extended Window. During the 15 Month Window or, if qualified, for the 18 Month Extended Window, all parties agree that no action shall be taken to remove Tilton from any such position.

10. With full and joint authority, Independent Director/CRO, with full authority on behalf of the Debtors, and Tilton, with full authority on behalf of the Group A Portfolio Companies, will conduct a process to monetize the Group A Portfolio

01:23191627.1

Case 1:20-cv-01413-MN Document 19 Filed 12/18/20 Page 176 of 898 PageID #: 1168
Case 18-10512-KBO Doc 1150 Filed 12/17/19 Page 24 of 31

Case 18-10512-CSS    Doc 266-1    Filed 05/21/18    Page 6 of 19

Companies and the Group B Portfolio Companies. It is acknowledged that the CRO will act in the best interests of the Zohar Funds, and Tilton in the best interests of the Group A Portfolio Companies. Tilton and the CRO shall jointly select bankers and other professionals, prioritize sales, oversee the bid process and select transactions to complete. Tilton shall work with the CRO, who shall jointly with Tilton choose bankers to be retained for Group A Portfolio Company sales. Each shall have full and complete information regarding the Monetization Process and sources and uses of funds in any transaction consummated as part of the Monetization Process. Tilton and the CRO shall use good faith, commercially-reasonable efforts to coordinate prospective meetings with bankers and buyers. But in no event shall the CRO interfere in any way with the operations of the Group A Portfolio Companies and the Group B Portfolio Companies.

11. Any dispute with respect to the Monetization Process between the Independent Director/CRO and Tilton, in the first instance, shall be referred to the Mediator. If the dispute cannot be resolved by the Mediator, the parties retain all rights to seek an order of the Bankruptcy Court resolving such dispute.

12. Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies until such time as the (i) the parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date.

13. At the Full Payment Date, MBIA and the Zohar III Noteholders shall have no direct or indirect claim against, or interest or participation in the Zohar Funds or the Group A Portfolio Companies; provided, however, that the resolution of any dispute regarding the escrow referenced in footnote 1 shall not be barred as of the Full Payment Date by the provisions of this paragraph.

14. The 225 Action remains subject to the stay subject to satisfaction of the 15 Month Window. The Status Quo Orders entered in the 225 Action are held in abeyance and shall have no effect during the 15 Month Window or 18 Month Extended Window with respect to the Monetization Process involving any Group A Portfolio Company.

15. MBIA and Zohar III shall form a Zohar Fund creditors committee (the "Committee") to oversee and monitor the Zohar bankruptcy. The CRO shall provide the Committee members with all information necessary to assess and represent the interests of the Other Stakeholders other than information whose distribution is reasonably limited at the request of investment bankers or potential buyers. The committee shall be comprised of 3 representatives. The members and their respective advisors shall execute standard NDAs consistent with the practice in the District of Delaware. The reasonable fees and expenses of the Committee and its advisors shall be set forth in a budget to be approved by the CRO and shall

01:23191627.1

be paid by the estates._ All other litigation, motions and contested matters between any of the parties other than the 225 Action as discussed above, shall be stayed, with appropriate protections so there is no prejudice to any parties. Except as specifically set forth herein, no other litigation, motions, and/or contested matters may be re-initiated or brought (directly or indirectly) by (a) any Other Stakeholders, (b) the Debtors, (c) the New Agent, (d) the Group A Portfolio Companies, (e) the Group B Portfolio Companies, and (f) any Collateral Manager, seeking any relief against the Patriarch Stakeholders (and their respective officers, directors, employees, affiliates and agents), or any of the Group A or Group B Portfolio Companies.

For the avoidance of doubt, with respect to any of the entities identified in paragraph 15: (1) (a) any litigation, claim, motion, or contested matter that was or could have been brought prior to the date hereof, and (b) any litigation, claim, motion, or contested matter that could be brought after the date hereof arising from any facts, acts, or omissions that first arose prior to the date hereof, shall be stayed during the 15-Month Window, with appropriate protections so there is no prejudice to any party and; (2) any other litigation, claim, motion, or contested matter not referenced in paragraph 15(1) shall only be brought subject to the provisions of paragraphs 17 and 23, and no other litigation, claim, motion, or contested matter that does not fall within paragraph 17 and 23 shall be brought by any such entity against any other such entity during the 15-Month Window.

16. AMZM and any of its affiliates (collectively, "AMZM") shall not be a member of or advisor to the Committee, and, except herein, AMZM shall not be paid or reimbursed by the estates or the Portfolio Companies for any fees or expenses with respect to the Monetization Process or any other purpose; provided, however, that (a) AMZM shall be terminated as Collateral Manager, and MBIA and the Zohar III Noteholders shall designate a new Collateral Manager who has no claim against the Debtors, and the Collateral Management Agreement shall be amended in a manner to reflect the settlement herein and (b) all parties reserve their rights with respect to any AMZM fees and expenses incurred prior to the date hereof. Subject to the approval of the CRO, AMZM may be reimbursed for reasonable transition costs solely incurred in the transmitting of information to the new collateral manager. [TBD: Side agreement b/w cro and CM ensuring reasonable fees which will be escrowed to escrow CM fees due under the indenture ]

17. The Debtors shall promptly negotiate with the secured parties funding of the Debtors' Chapter 11 cases from the use of the secured parties' cash collateral. In order to facilitate this negotiation, the Zohar Funds will provide customary bankruptcy case budgets, including anticipated sources and uses of cash (including payments from the Group A Portfolio Companies). It is understood and agreed the Zohar Funds shall not utilize any cash they are holding pending an agreed order. In the event of any dispute among the parties with respect to use of cash collateral, in

01:23191627.1

A-173

the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute.

18. Any (A) claim asserted by the Patriarch Stakeholders that is supported by written documentation showing the claim (a) was funded to a Group A Portfolio Company by a Patriarch Stakeholder (in the case of funded debt claim), or (b) represents a fee or other claim arising from a deferral of payment or any management and/or administrative fee owed to a Patriarch Stakeholder[3] and (B) equity interest asserted by the Patriarch Stakeholders is supported by written documentation, then such claim and equity interest, as applicable, shall be deemed due and payable through the closing of any monetization event on a pari passu basis with other similarly situated claims and equity unless the applicable credit agreement provides otherwise.[4] In connection with any such closing, the Patriarch Stakeholders will release any liens that secure any of the foregoing non-challenged claims on a pari passu basis with liens on the same collateral held by the Other Stakeholders. All parties' respective rights to challenge the propriety of any of the foregoing claims or equity interests are tolled without prejudice until the expiration of the 18 Month Window (provided the Full Payment Date does not occur on or before such date), but no such claim shall be brought during the 18 Month Window or used to block the closing of any pending transaction in the Monetization Process. The Patriarch Stakeholders will promptly provide any information reasonably requested by the CRO to verify the existence of the funding and documentation described above (provided that the CRO may share the foregoing information with Other Stakeholders (subject to the execution of an NDA approved by the Mediator) as required in the CRO's reasonable discretion. With respect to the claims in (A) above, the payments to the Patriarch Stakeholders that shall be made without further analysis or challenge shall be capped at $250 million, with any amounts in excess to be held in escrow until Full Payment Date. Tilton represents that none of the claims in (A) currently prime the secured claims of the Other Stakeholders in the Group A Portfolio Companies, other than ABLs in ███████████. Nothing herein is intended to or shall elevate or modify the existing priority of any claims or liens.

19. All causes of action among the Debtors, Other Stakeholders and Patriarch Stakeholders (including any of their affiliates or agents) with respect to the Debtors, the Group A Portfolio Companies and the Group B Portfolio Companies

---

[3]  Management and/or administrative fees as noted here are defined in a separate agreement entered between the parties concurrent with this agreement.

[4]  Tilton to provide a good faith estimate on company by company basis for each of the Group A Portfolio Companies on an aggregate basis, in each case reflecting the aggregate amount she expects will be covered by this paragraph 17.

01:23191627.1

A-174

shall be tolled during the 15 Month Window or, if qualified, for the 18 Month Extended Window, and all parties' respective rights shall be reserved with respect thereto, including with respect to venue and jurisdiction.

20. Tilton represents that the Group A Portfolio Companies and the Group B Portfolio Companies will be operated in the ordinary course of business during the 15 Month Window. During the 15 Month Window, the Group A Portfolio Companies and the Group B Portfolio Companies shall not declare dividends but shall be authorized to (b) (i) enter into financing transactions with affiliates on market terms, subject to first consulting with the CRO or (ii) issue new equity that will dilute the existing equity holdings on market terms, subject to first consulting with the CRO; provided, however, that if the CRO objects to the financing or equity described in the foregoing subparagraphs (b)(i) and (ii), the CRO may take that dispute to the Mediator for final resolution. Notwithstanding the foregoing, the Group A Portfolio Companies and the Group B Portfolio Companies can distribute payments as designated by the Designated Tax Director for the payment of their state and federal income taxes.

21. The Group A Portfolio Companies shall share with employees of MBIA (who sign NDAs as described in Paragraph 15 herein) financial statements and backup reasonably requested in writing by MBIA. Any information provided to MBIA shall only be shared in the following way: someone employed by MBIA can view the documents in the New York offices of Gibson Dunn but may not take copies or pictures of any documents or share any information in those documents, except with the CRO. In the event of any dispute among the parties with respect to the reasonableness of that request, such dispute shall be finally decided by the Mediator.

22. While any dispute is before the Mediator, no party to such dispute shall take any action in Bankruptcy Court.

23. If any party materially breaches this Agreement, the dispute shall be in the first instance determined by the Mediator on a confidential basis. The Mediator shall have all remedies available to him. If the Mediator cannot resolve the dispute, the Mediator shall make a report and recommendation to the Bankruptcy Court and the parties shall jointly seek an order of the Bankruptcy Court resolving such dispute. In connection with the foregoing, the Mediator shall determine to what extent information should be filed under seal, subject to the order of the Bankruptcy Court approving such filing under seal. The parties agree that for purposes of any decision of the Bankruptcy Court dealing with any matter covered by this paragraph, the Agreement is non-severable under all circumstances.

24. Any application by any party for assistance from the Mediator shall be brought within seven (7) days of identifying the dispute to the other party or parties

01:23191627.1

A-175

involved in the dispute, and heard at the Mediator's earliest availability. Any application shall be in writing and served by email on the other parties.

25. Upon the expiration of the 15 Month Window, the Independent Director/CRO may take all necessary and appropriate action in the best interests of the Zohar Funds without any restriction herein or otherwise, including, but not limited to, seeking relief from the Bankruptcy Court to lift the automatic stay, taking action to remove Tilton as a director or manager of the Group A Portfolio Companies or the Group B Portfolio Companies, or dismissing or converting the cases to chapter 7 cases. Upon the expiration of the 15 Month Window, all parties to the chapter 11 cases shall have and may exercise any and all rights available under applicable law.

26. The parties (other thn U.S. Bank) shall issue the joint press release as set forth in Exhibit F stating that the parties will work in a mutually cooperative process in support of the Monetization Process (and no other press release). If the parties cannot jointly agree, then the Mediator shall resolve any disputes. The parties shall also agree to standard non-disparagement terms.

27. The Bankruptcy Court shall retain jurisdiction to enforce the terms of this agreement and all parties agree to submit to the jurisdiction of the Bankruptcy Court for resolution of any matter in connection with this agreement or the enforcement thereof; provided, however, that no party shall be deemed to consent to venue or jurisdiction before the Bankruptcy Court for any matter not in connection with this agreement or the enforcement thereof.

28. The parties will work with the indenture trustee under the Zohar indentures to satisfy the requirements of the indentures with respect to the implementation of this Agreement. Any such dispute related to satisfaction of such requirements shall be, in the first instance, referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute..

29. For the avoidance of doubt, if each of MBIA and the Zohar III Claims receive 50% of the Paid in Full amount within the 15 Month Window, the 15 Month Window shall be herein shall be replaced with the term 18 Month Extended Window for all purposes.

30. The foregoing terms shall be memorialized in a confidential stipulation filed under seal and entry of an order by Judge Sontchi, on terms and conditions satisfactory to the parties. The order shall provide, among other provisions, that this Agreement and the order shall be binding on all parties and their successors and assigns.

[INSERT SIGNATURE BLOCKS]

01:23191627.1

EXHIBIT A

**ZOHAR I**

| | | |
|---|---|---|
| Amounts paid on Nov. 20, 2015 under the Policy | 148,951,585 | Indenture § 11.1(a)(i)(G), 11.1(a)(i)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Interest (Prime + 2%), as of April 18, 2018 | 8,249,532 | Insurance Agreement § 4.03 |
| SUBTOTAL | 157,201,117 | |
| Credit Enhancement Liabilities incurred in connection with MBIA's administration, enforcement, defense or preservation of rights under the Transaction Documents* | 7,718,876 | Indenture § 11.1(a)(i)(G), 11.1(a)(i)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Legal fees/expenses | 7,531,990 | |
| Financial, investment and non-legal advisors | 186,886 | |
| TOTAL ZOHAR I CLAIM | 164,919,993* | |

**ZOHAR II**

| | | |
|---|---|---|
| 1/20/2017 Policy Payment | 770,109,326 | Indenture § 11.1(a)(i)(G), 11.1(a)(i)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Interest (Prime + 2%), as of April 18, 2018 | 27,080,207 | Insurance Agreement § 4.03 |
| SUBTOTAL | 797,189,533 | |
| Credit Enhancement Liabilities incurred in connection with MBIA's administration, enforcement, defense or preservation of rights under the Transaction Documents* | 14,851,685 | Indenture § 11.1(a)(i)(G), 11.1(a)(i)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Legal fees/expenses | 10,641,048 | |
| Financial, investment and non-legal advisors | 4,210,637 | |
| TOTAL ZOHAR II CLAIM | 812,041,218* | |

| | |
|---|---|
| ZOHAR PAID IN FULL AMOUNT | $976,961,211 |

*Assumptions:
All amounts are "as of" April 18, 2018 and will change pending Full Payment Date, including to reflect interest accrued and other
Credit Enhancement Liabilities which MBIA has not yet paid
Portfolio Company Zohar I loan interest payments will continue to be paid directly to MBIA
Zohar II claim amount does not reflect Portfolio Company loan interest payments which MBIA is entitled to receive, but have not yet been distributed to MBIA.

MBIA is not seeking reimbursement for costs, expenses or interest payments made in connection with MZ Funding loan.

A-178

# EXHIBIT A

## [ZOHAR III CLAIMS]

**Disclaimer:** The Zohar III Claims as forth in this Exhibit A have not been verified by the Collateral Manager since January 2016 as required by the Indentures and Management Agreement, and therefore, U.S. Bank makes no representation as to accuracy of the Zohar III Claims as set forth below, which claims and interest accruals may be modified or otherwise revised or verified when the new Collateral Manager is designated in accordance with the Mediation Term Sheet. Once the Collateral Manager is appointed, that person or entity, after consultation with U.S. Bank, will be responsible for updating the amounts herein to reflect unpaid principal, accrued and unpaid interest, and other fees, expenses, and other amounts allowable under the Indentures. Notwithstanding anything to the contrary in this Exhibit A or in the Mediation Term Sheet, nothing shall modify, alter, or otherwise change the Priority of Payments set forth in the Indentures, and U.S. Bank's rights, remedies, and objections to any such modification, alteration, or other change thereto are fully reserved. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Mediation Term Sheet to which this Exhibit A is attached or in the Indentures.

The following does not include interest accruing after 5/18/18. The following schedule excludes certain categories and amounts that must be paid prior to principal and interest owing to the Holders of the notes, including, without limitation, certain fees, expenses, reserves, and other amounts, which are set forth in the Priority of Payments of each Indenture (that have accrued or may accrue in the future):

| Issue Name | Issue Date | Maturity Date | Issue Amount | Original Par Amount | Current Balance | Prepetition Accrued Interest** | Addt'l Accrued Interest Thru 5/18/18*** | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| Class A-1R | 4/11/2007 | 4/15/2019 | $ 200,000,000.00 | 200,000,000.00 | $ 135,767,116.30 | $ 686,522.34 | $ 586,182.09 | $ 137,039,820.13 |
| Class A-1T | 4/11/2007 | 4/15/2019 | $ 150,000,000.00 | 150,000,000.00 | $ 101,825,337.23 | $ 509,743.92 | $ 436,203.28 | $ 102,771,284.13 |
| Class A-1D | 4/11/2007 | 4/15/2019 | $ 350,000,000.00 | 350,000,000.00 | $ 237,592,453.54 | $ 1,189,402.47 | $ 1,017,807.66 | $ 239,799,663.17 |
| Class A-2 | 4/11/2007 | 4/15/2019 | $ 200,000,000.00 | 200,000,000.00 | $ 200,000,000.00 | $ 1,087,156.78 | $ 914,108.70 | $ 202,001,265.18 |
| Class A-3 | 4/11/2007 | 4/15/2019 | $ 116,000,000.00 | 116,000,000.00 | $ 116,000,000.00 | $ 689,195.38 | $ 569,346.03 | $ 117,258,541.11 |

**This is the accrued interest that wasn't paid because of the $4,637,241.39 deposit of interest outside the collection account before the petition date
***The "Addt'l Accrued Interest Thru 5/18/18" column capitalizes the "Prepetition Accrued Interest" into the Current Balance and then Accrues Interest Thereon through 5/18/18

EXHIBIT B

**Exhibit B: Patriarch Stakeholders**

• Ark Entities (including Ark Angels, LLC; Ark Angels II, LLC; Ark Angels III, LLC; Ark Angels VIII, LLC; Ark Investment Partners II, LP; Ark II CLO 2001-1, Ltd.)
• LD Investments, LLC
• Lynn Tilton
• Octaluna LLC Entities (including Octaluna LLC; Octaluna II, LLC; Octaluna III, LLC)
• Patriarch Partners Entities (including Patriarch Partners, LLC; Patriarch Partners VIII, LLC; Patriarch Partners, XIV, LLC; Patriarch Partners XV, LLC)
• Patriarch Partners Management Group, LLC (PPMG)
• Patriarch Partners Agency Services, LLC (PPAS)
• Zohar Holdings, LLC

EXHIBIT C

**Group A Portfolio Companies**

**[REDACTED]**

01:23191627.1

EXHIBIT D

**Group B Portfolio Companies**

**[REDACTED]**

01:23191627.1

EXHIBIT E

[To be provided]

01:23191627.1

EXHIBIT F

**The Zohar Funds, Lynn Tilton, MBIA, and the Zohar III Noteholders
Announce Resolution to
Stay Litigation, Refinance and Monetize Zohar Assets**

NEW YORK – April [XX], 2018 –Zohar CDO 2003-1, Zohar CDO 2003-1 Corp., Zohar II 2005-1, Limited, Zohar II 2005-1 Corp., Zohar III, Limited, and Zohar III, Corp. (collectively, the "Zohar Funds"), Lynn Tilton, MBIA Insurance Corporation, a wholly owned subsidiary of MBIA Inc. (NYSE: MBI), and the Zohar III Controlling Class of Noteholders jointly announce today that the parties have mutually resolved the motions pending in federal Bankruptcy Court in the District of Delaware relating to the Zohar Funds, and have agreed to a deal that will include a stay of all pending litigation between the parties. This agreement is intended to facilitate the refinancing and monetization of assets of the Zohar Funds to the benefit of all stakeholders, and the parties have agreed to work in a mutually cooperative process in support of such refinancing and monetization.

As part of the agreement, an Independent Director will be appointed to govern the Zohar Funds, along with a Chief Restructuring Officer, who together with Ms. Tilton as director and manager of each Portfolio Company, will jointly implement the refinancing and monetization process. During the process, Ms. Tilton will remain in her current roles at the Portfolio Companies, all litigation between the parties will be stayed for a minimum of 15 months, and the bankruptcy cases will proceed without the appointment of a Trustee.

Ms. Tilton stated, "This agreement is a meaningful and important step towards allowing the Zohar Funds to monetize and refinance their assets in order to pay off all creditor claims in full. It is in the best interest of all stakeholders that we lay down our swords and stop the years of damaging litigation in order to maximize value for all of the Funds' stakeholders."

Anthony McKiernan, Chairman of MBIA Insurance Corporation, stated that "MBIA is pleased that the parties have been able to come to a consensual agreement that will put in place a process to enable MBIA to recover on the significant amounts it has paid its policyholders."

Marc Kirschner of Goldin Associates, Chief Restructuring Officer of the Zohar Funds, added, "The resolution of the hotly contested litigation in the bankruptcy cases is in the best interests of the Zohar Funds and their stakeholders as it will pave the way for the Zohar Funds to maximize the value of their assets for the benefit of all. The mediated result was the culmination of significant negotiations and the Zohar Funds are deeply appreciative of the efforts of the mediator, Judge Kevin Gross, for facilitating a settlement of the pending matters, which was no simple task."

Today's agreement will have no immediate effect on the operations of the Portfolio

01:23191627.1

Case 1:20-cv-01419-MN Document 19-1 Filed 12/18/20 Page 189 of 898 PageID #: 1181
Case 18-10512-KBO Doc 1130-1 Filed 12/17/19 Page 27 of 31

Case 18-10512-CSS   Doc 266-1   Filed 05/21/18   Page 19 of 19

Companies to whom the Zohar Funds have made senior secured loans.  The Portfolio Companies will continue to operate their businesses in the ordinary course as they are not parties to these bankruptcy cases.

**MEDIA CONTACTS:**

FOR LYNN TILTON
**Brunswick Group**
Alex Yankus
212-333-3810
ayankus@brunswickgroup.com

**MBIA**
Greg Diamond, 914-765-3190
Investor and Media Relations
greg.diamond@mbia.com

01:23191627.1

**EXHIBIT C**

**Credit Agreement Provisions**

01:25035581.7

Section 2.8      Interest on Loans.

(a)      Applicable Rates.  Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) on the unpaid principal amount thereof at a rate per annum equal to LIBOR plus the Applicable Margin.

(b)      Calculation of Interest Rates.  Interest payable pursuant to this Section 2.8 shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan or the first day of an interest period applicable to such Loan shall be included, and the date of payment of such Loan or the expiration date of an interest period applicable to such Loan shall be excluded; provided, if such Loan is repaid on the same day on which it is made, one day's interest shall be paid on such Loan.  For the purposes of the Interest Act (Canada), (i) whenever any interest or fees under this Agreement or any other Credit Document is calculated using a rate based on a year of 360 days, the rate determined pursuant to such calculation, when expressed as an annual rate, is equivalent to (x) the applicable rate, (y) multiplied by the actual number of days in the calendar year in which the period for which such interest is payable (or compounded) ends, and (z) divided by 360, (ii) the principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement, and (iii) the rates of interest stipulated in this Agreement are intended to be nominal rates and not effective rates or yields.

(c)      Payment of Interest.  Interest on the Loans shall be payable in arrears on (i) the first day of each calendar month, (ii) the date of any prepayment of the Loans, whether voluntary or mandatory, to the extent accrued on the amount being prepaid, and (iii) the Maturity Date, including final maturity.

(d)      Default Interest.  Upon the occurrence and during the continuance of an Event of Default described in Section 8.1, the principal amount of all Loans and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder not paid when due, in each case whether at stated maturity, by notice of prepayment, by acceleration or otherwise, shall thereafter bear interest (including, without limitation, interest, as provided in this Agreement, accruing after the filing of a petition initiating any insolvency proceedings, whether or not such interest accrues or is recoverable against the Borrowers after the filing of such petition for purposes of the Bankruptcy Code or is an allowed claim in such proceeding) payable on demand at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to the Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.8 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Agent or any Lender.

Section 2.9      Changed Circumstances.  If the introduction of or any change in or in the interpretation of (in each case, after the date hereof) any law or regulation applicable to any Lender makes it unlawful, or any Governmental Body asserts, after the date hereof, that it is

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP                PP105226
ON BEHALF OF PATRIARCH PARTNERS LLC

A-187

**SCHEDULE 2.1**

**COMMITMENTS**

<u>Revolving Credit Commitments</u>

| Lender | Revolving Credit Commitment |
|---|---|
| ZOHAR III, LIMITED | $2,000,000.00 |
| **Total** | **$2,000,000.00** |

<u>Term A Loan Commitments</u>

| Lender | Term A Loan Commitment |
|---|---|
| ZOHAR CDO 2003-1, LIMITED | $9,303,993.33 |
| ZOHAR II 2005-1, LIMITED | $30,014,224.60 |
| ZOHAR III, LIMITED | $11,639,322.55 |
| **Total** | **$50,957,540.48** |

<u>Term B Loan Commitments</u>

| Lender | Term B Loan Commitment |
|---|---|
| N/A | $0.00 |
| **Total** | **$0.00** |

DL1-6247158v5

CONFIDENTIAL TREATMENT REQUESTED BY BRUNE & RICHARD LLP
ON BEHALF OF PATRIARCH PARTNERS LLC

**EXHIBIT D**

**Payoff Letter**

PAYOFF LETTER

[ ], 2019

LVD Acquisition, LLC
222 East Campus View Blvd.
Columbus, Ohio 43235
Attention: President and Chief Executive Officer
Email: MLeibold@oasiscoolers.com
    LBudzak@oasiscoolers.com

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement dated as of June 1, 2009 (as modified, amended and supplemented and in effect on the date hereof, the "Credit Agreement"; together with the various instruments, documents and other agreements executed in connection therewith, the "Credit Documents") among LVD Acquisition, LLC ("LVD") and B2 Acquisition, Inc., as borrowers (together, the "Borrowers"), the Domestic Subsidiaries that from time to time became guarantors thereunder, the financial institutions and other investors from time to time as lenders thereto (collectively, the "Lenders") and Ankura Trust Company, LLC, a Delaware limited liability company ("Ankura Trust Company"), as successor administrative agent for such Lenders (in such capacity, the "Administrative Agent"). Capitalized terms used herein and not otherwise defined shall have the meanings assigned to such terms in the Credit Agreement.

LVD and the Lenders have advised the Administrative Agent that LVD and the Lenders, on the one hand, and Culligan International Company ("Buyer"), on the other have entered into that certain Equity Purchase Agreement dated as of August __, 2019 (the "EPA"), pursuant to which the Buyer will purchase 100% of the Interests (as defined in the EPA) of LVD. Through the contemplated sale to the Buyer, LVD has advised the Administrative Agent that the Borrowers intend to repay an amount equal to 100% of the Agreed Upon Payoff Amounts (as defined in the EPA) received by LVD in connection with the transaction contemplated by the EPA, which amount shall be applied as set forth in Section 2.13(b) of the Credit Agreement on [October 6, 2019] (the "Payoff Date")[1] and shall be deemed a payment in full under the Credit Agreement.

Each of the undersigned Lenders (which Lenders constitute 100% of the Lenders under the Credit Agreement) hereby directs the Administrative Agent to accept its Pro Rata Share of the Lender Payoff Amount (as defined on Schedule 1) in full satisfaction of the Obligations. This direction is irrevocable and may not be amended, modified or waived except by written instrument signed by the Lenders and the Administrative Agent.

1.      This letter confirms that the aggregate amount (the "Payoff Amount") as of the Payoff Date necessary to be deemed to pay all amounts owing by the Borrowers to the Administrative Agent and the Lenders under the Credit Agreement and the other Credit Documents is specified on Schedule 1 hereto, subject to the same being paid by wire (together with notification to the Administrative Agent of the applicable federal funds wire reference number(s)) to, and confirmed received not later than 2:00 p.m. (New York City time) on the Payoff Date (the "Required Payment Time") by, the Administrative Agent in U.S. Dollars in immediately available funds to the account of the Administrative

---

[1] NTD: To align with the inside date in the Equity Purchase Agreement.

- 2 -

Agent as specified on Schedule 2 hereto (except for payment of fees and expenses of the Administrative Agent's legal counsel, which shall be remitted by wire by such time directly to such counsel as specified in such schedule). Please note that such amounts which comprise the Payoff Amount assume that no further extension of credit (or repayment of the Loans) will be made under the Credit Agreement after the date of this letter. The Borrowers agree that, from the date hereof through the Effective Time (as defined below), the Borrowers shall neither request nor receive any borrowing under the Credit Agreement, and the Borrowers and the Administrative Agent agree that the Administrative Agent and Lenders shall not fund any borrowing request received from the Borrowers from the date hereof through the Effective Date. If the Payoff Amount is not received before 2:00 p.m. (New York City Time) on [October 6, 2019], then this letter shall automatically terminate and be of no further force or effect.

2.    The Borrowers and each other Credit Party:

(a)    acknowledge that, (i) the aggregate outstanding principal amount of the Loans (other than Tranches TLD, TLE and TLF) as of the Payoff Date is equal to $59,957,540.49 and accrued and unpaid interest thereon (excluding default interest) is equal to $[710,008.33][2] and (ii) the aggregate outstanding amount of Tranches TLD, TLE and TLF as of the Payoff Date is not less than $20,291,872.91 (collectively, "Outstanding Obligations"). Interest is calculated at the non-default rate under the Credit Agreement and no interest is calculated with respect to Tranches TLD, TLE and TLF. Such calculations are not admissions or concessions by the Lenders or the Administrative Agent that interest at the default rate is not owed on the Loans or that interest (LIBOR or default rate) is not owed with respect to Tranches TLD, TLE and TLF. The foregoing amounts do not include fees, expenses and other amounts that are chargeable or otherwise reimbursable under the Credit Documents;

(b)    acknowledge that, as of the Payoff Date, the Payoff Amount is due and owing pursuant to the Credit Documents, which Payoff Amount the Lenders and Administrative Agent have agreed to receive in full satisfaction of the Credit Agreement. If, for any reason, any of the Payoff Amount or any other amounts previously received by the Administrative Agent or the Lenders to payment of the Obligations is voided or rescinded or must otherwise be returned by the Administrative Agent of the Lenders as a result of Borrowers' insolvency, bankruptcy, or otherwise required by applicable law, the Borrowers acknowledge and agree that their obligations and liabilities under the Credit Agreement (including the Outstanding Obligations) shall be reinstated with full force and effect, without need for any action by any Person, and shall be enforceable against the Borrowers and the other Credit Parties and their successors and assigns as if such payment had never been made;

(c)    agree that, as of the Effective Time, the Administrative Agent, the Lenders and their respective participants, if any, shall have no further obligation, duty, liability or responsibility under the Credit Agreement, any other Credit Document or any other document or agreement that is either or both executed and delivered in connection therewith (except as otherwise expressly provided herein); and

(d)    agree that, as of the Effective Time, the Borrowers and the other Credit Parties release and discharge the Administrative Agent, Patriarch Partners Agency Services, LLC ("PPAS"), the predecessor administrative agent under the Credit Agreement and the other Credit Documents, and each Lender, and their respective shareholders, partners, members, managers, directors, officers, employees, agents, attorneys and Affiliates from any and all claims, suits, demands, accounts or causes of action the Borrowers and the other Credit Parties may have

---

[2] Amount currently only includes interest through end of August. This number will be updated to calculate interest for October through the Payoff Date.

- 3 -

against the Administrative Agent, PPAS, or any Lender or their respective agents, officers and directors, arising out of the obligations under the Credit Agreement or any other Credit Document (the "Credit Agreement Claims").

3.    This letter confirms that effective as of the time of receipt by the Administrative Agent of the Payoff Amount in the manner described above (such time being referred to as the "Effective Time") the Administrative Agent and the Lenders agree and acknowledge that:

(a)    all indebtedness of the Borrowers and the other Credit Parties to the Administrative Agent and the Lenders under the Credit Agreement and the other Credit Documents shall be satisfied and discharged;

(b)    all unfunded commitments of the Lenders to make Loans or otherwise extend credit to the Borrowers under the Credit Agreement and the other Credit Documents shall be terminated;

(c)    all security interests, mortgages, deeds of trust and other liens on the assets and property of the Borrowers and the other Credit Parties granted to or held by, and all guarantees made by the Borrowers and the other Credit Parties in favor of, the Administrative Agent for the benefit of the Lenders and any other secured parties under the Credit Documents shall be forever satisfied, released and discharged without further action; and

(d)    all other obligations of the Borrowers and the other Credit Parties to the Administrative Agent and the Lenders under the Credit Agreement and each other Credit Document shall be released and discharged, except any such obligations that are otherwise expressly stated in the Credit Agreement or any other Credit Document as surviving that respective agreement's termination, which in any such case shall, as so specified, survive without prejudice and remain in full force and effect.

4.    The Administrative Agent hereby represents and warrants that as of the date hereof:

(a)    Ankura Trust Company is the successor administrative agent under the Credit Agreement and the other Credit Documents; and

(b)    PPAS is the predecessor administrative agent under the Credit Agreement and the other Credit Documents and remains an agent of the Lender under certain Credit Documents solely for collateral perfection purposes.

5.    From and after the Effective Time, the Administrative Agent hereby acknowledges and agrees that Borrowers or their designees may execute and deliver the terminations and releases attached hereto as Exhibit A, together with any other Uniform Commercial Code termination statements, mortgage release documents, intellectual property release documents and other instruments of release and discharge pertaining to the security interests, mortgages and other liens described above of the Administrative Agent in any of the property, real or personal, of the Credit Parties, and the Administrative Agent and PPAS hereby agree to promptly execute and deliver any additional documents as may be required and as the Borrowers may reasonably request to effectuate, or reflect of public record, the release and discharge of all such security interests, mortgages and liens. Each of the Administrative Agent and PPAS will, from and after the Effective Time, deliver promptly all collateral in its possession, along with the original Notes and Guaranties (or fully executed releases of all Guaranties) to Borrowers at the address designated by Borrowers using a nationally-recognized overnight courier service. All of the foregoing deliveries shall be at the expense of the Borrowers.

- 4 -

      6.      This letter and any right, remedy, obligation, claim, controversy, dispute or cause of action (whether in contract, tort or otherwise) based upon, arising out of or relating to this letter shall be governed by, and construed in accordance with, the law of the State of New York without regard to conflicts of law principles that would lead to the application of laws other than the law of the State of New York.

      7.      This letter may be executed in any number of counterparts and by the different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which when taken together shall constitute but one and the same letter.  Delivery of an executed signature page of this letter by electronic transmission shall be effective as delivery of a manually executed counterpart hereof.

Sincerely,

ANKURA TRUST COMPANY, LLC, in its capacity as
the Administrative Agent under the Credit Agreement

By:_____

Name:

Title:

PATRIARCH PARTNERS AGENCY SERVICES,
LLC, in its capacity as predecessor Administrative
Agent under the Credit Agreement and limited collateral
agent

By:_____

Name:

Title:

*[Signature Page to LVD Term Loan Payoff Letter]*

ZOHAR CDO 2003-1, LIMITED, as Lender

By:_____

Name:  Michael Katzenstein

Title:   Chief Restructuring Officer


ZOHAR II 2005-1, LIMITED, as Lender

By:_____

Name:  Michael Katzenstein

Title:   Chief Restructuring Officer


ZOHAR III, LIMITED, as Lender

By:_____

Name:  Michael Katzenstein

Title:

Chief Restructuring Officer

*[Signature Page to LVD Term Loan Payoff Letter]*

Acknowledged and Agreed
as of the date first written above:

LVD ACQUISITION, LLC,
as Borrower

By:_____

Name:

Title:


B2 ACQUISITION, INC.,
as Borrower

By:_____

Name:

Title:

**EXHIBIT E**

**Amendment 8**

01:25035581.7

**AMENDMENT NO. 8**
**TO CREDIT AGREEMENT OF**
**LVD ACQUISITION, LLC**


Amendment No. 8 (this "Amendment"), dated as of November __, 2015, to the Credit Agreement, effective as of June 1, 2010 (as modified to the date hereof, the "Credit Agreement"), among LVD ACQUISITION, LLC, a Delaware limited liability company, and the other borrower signatory hereto (each a "Borrower" and, collectively, the "Borrowers"), the guarantors from time to time party thereto, the financial institutions and other investors from time to time party thereto as Lenders and PATRIARCH PARTNERS AGENCY SERVICES, LLC, a Delaware limited liability company, as administrative agent for such Lenders (in such capacity, the "Administrative Agent"). Capitalized terms used herein but not defined herein are used as defined in the Credit Agreement.

W I T N E S S E T H :

WHEREAS, the Borrowers, the Guarantors, the Lenders and the Administrative Agent are party to the Credit Agreement; and

WHEREAS, the Lenders party to this Amendment, the Borrowers and the Administrative Agent have agreed, subject to certain limitations and conditions set forth below, to make certain amendments to the Credit Agreement, as more specifically set forth below;

NOW, THEREFORE, the parties hereto agree as follows:

Section 1.     Amendments to the Credit Agreement.     The Credit Agreement is, effective as of the date first written above and subject to the satisfaction (or due waiver) of the conditions set forth in Section 2 (Conditions Precedent to the Effectiveness of this Amendment) hereof, hereby amended as follows (with bold, underline, highlighting, indenting and other formatting modified to conform to the formatting of the Credit Agreement):

(a)     Amendments to Schedules.

(i)     The contents of the columns set forth on Schedule A hereto are hereby inserted at the end of Schedule 2.1 to the Credit Agreement to reflect a restructuring of $20,291,872.92 of unpaid interest and commitment fees into Tranches TLD, TLE, and TLF. In addition, Administrative Agent hereby waives its ability to call an Event of Default for the past failure to pay such unpaid interest.

Section 2.     Conditions Precedent to the Effectiveness of this Amendment.     This Amendment shall become effective as of the date first written above (the "Amendment Effective Date") when, and only when, each of the following conditions precedent shall have been satisfied or duly waived by the Administrative Agent (the date each such conditions precedent is satisfied or duly waived, the "Conditions Precedent Date"):

(a)     Certain Documents. The Administrative Agent shall have received this Amendment, duly executed by the Borrowers and the Lenders constituting all Lenders, together with such additional documentation as the Administrative Agent may reasonably require, dated

**Patriarch/PC Confidential**

A-198

the Amendment Effective Date (unless otherwise agreed by the Administrative Agent) and in form and substance satisfactory to it;

(b)    <u>Representations and Warranties</u>.    Each of the representations and warranties contained in this Amendment were true when made;

(c)    <u>No Default or Event of Default</u>.  After giving effect to this Amendment, no Default or Event of Default shall be continuing, either on the date hereof or on the Conditions Precedent Date;

(d)    <u>Corporate and Other Proceedings</u>.  All corporate and other proceedings, and all documents, instruments, consents and other legal matters ancillary to the transactions contemplated by this Amendment shall be completed in a form and manner satisfactory in all respects to the Administrative Agent; and

(e)    <u>Fees and Expenses Paid</u>.  The Borrower shall have paid all Obligations due, after giving effect to this Amendment, on or before the later of the date hereof and the Conditions Precedent Date, including, without limitation, all fees set forth in <u>Section 4</u> (<u>Fees and Expenses</u>) hereof and all other costs, expenses and fees due under any Credit Document and invoiced prior to the Conditions Precedent Date.

Section 3.    <u>Representations and Warranties</u>.  On and as of the date hereof and as of the Conditions Precedent Date, after giving effect to this Amendment, each Borrower hereby represents and warrants to the Administrative Agent and each Lender as follows:

(a)    <u>Binding Obligation</u>.    This Amendment has been duly authorized, executed and delivered by such Borrower and constitutes a legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms and the Credit Agreement as modified by this Amendment;

(b)    <u>Subsidiaries</u>.    (i) the representations and warranties set forth in <u>Section 4.1(m)</u> (<u>Subsidiaries</u>) of the Credit Agreement are true as of the date hereof (replacing "Closing Date" therein with the date of this Amendment and taking into account any updated information delivered by any Borrower to the Administrative Agent on or prior to the date hereof) and] all Subsidiaries of any Borrower existing on the Conditions Precedent Date have executed the Credit Documents required to be executed with respect to such Subsidiaries pursuant to the Credit Agreement, including, without limitation, <u>Section 5.1(m)</u> (<u>Further Assurances</u>) thereof and (ii) in any case, all certificates, statements, updated schedules, collateral and other updates and other documents required to be delivered by such Borrower to the Administrative Agent or any Lender pursuant to any Credit Document as modified hereby have been delivered thereunder and all filings required to be made by or on behalf of such Borrower pursuant to any such Credit Document have been made;

(c)    <u>Representations and Warranties in Credit Documents</u>.  Each of the other representations and warranties of such Borrower contained any Credit Document (as modified hereby) or in any certificate, document or financial or other statement furnished at any time under or in connection therewith is true in all material respects on and as of the date hereof and the Conditions Precedent Date, in each case as if made on and as of such date and except to the extent that such representations and warranties expressly relate to a specific date, in which case such representations and warranties shall be true in all material respects as of such specific date;

- 2 -

**Patriarch/PC Confidential**

provided, however, that, as used therein, (i) "Credit Agreement" shall refer to the Credit Agreement and after giving effect to this Amendment and (ii) "Credit Documents" shall include this Amendment;

(d)     No Litigation or Defense.  No litigation has been commenced or threatened against such Borrower or any of its Subsidiaries seeking to restraint or enjoin (whether temporarily, preliminarily or permanently) the performance of any action by any Borrower or any Subsidiary of any Borrower required or contemplated by the terms of this Amendment or any other Credit Document as modified hereby, and there exists no cause of action, offset, claim, counterclaim or defense, whether or not asserted, against the Administrative Agent or any Lender or any of their Related Parties (as defined below) with respect to the Obligations under any Credit Document; and

Section 4.     Fees and Expenses.

(a)     Borrowers jointly and severally agree to pay on demand in accordance with the terms of Section 11.3 (Expenses) of the Credit Agreement all costs and expenses of the Administrative Agent in connection with the preparation, reproduction, execution, delivery and enforcement of this Amendment and all other Credit Documents entered into in connection herewith (including, without limitation, the fees and expenses of attorneys, advisors and other professionals hired by the Administrative Agent with respect to the Credit Parties or the Credit Documents).

Section 5.     Release.  In further consideration for the execution by the Administrative Agent and the Lenders party hereto of this Amendment and without limiting any rights or remedies the Administrative Agent or any Lender may have, each Borrower hereby releases each of the Administrative Agent, each Lender and each of their Related Parties (each a "Releasee" and, collectively, the "Releasees") from any and all Claims that such Borrower has or may have against any Releasee, whether or not relating to any Credit Document, Obligation, Collateral, or legal relationship that exists or may exist between any Releasee and any Borrower.  As used in this Section 5, (i) "Claims" means all liabilities, rights, demands, covenants, duties, obligations (including, without limitation, indebtedness, receivables and other contractual obligations), claims, actions and causes of actions, suits, disputes, judgments, damages, losses, debts, responsibilities, fines, penalties, sanctions, commissions and interest, disbursements, taxes, charges, costs, fees and expenses (including, without limitation, fees, charges and disbursements of financial, legal and other advisors, consultants and professionals and, if applicable, any value-added and other taxes and charges thereon), in each case of any kind or nature, whether joint or several, whether now existing or hereafter arising and however acquired and whether or not known, asserted, direct, contingent, liquidated, due, consequential, actual, punitive or treble, (ii) "Related Party" means, with respect to any Person, any Affiliate of such Person or of another Related Party of such Person (excluding, in each case, (A) the Borrowers and their Controlled Affiliates and (B) any other Person and its Controlled Affiliates in which any Lender or any other Affiliated Investor has made any investment, whether through the purchase of debt or equity securities, loans or otherwise) and such Person's and such Affiliate's predecessors, successors, assigns, managers, members, partners, directors, officers, employees (regardless of whether seconded to a third party and including, without limitation, individuals with independent contractor or similar status), individual stockholders, agents, attorneys-in-fact, trustees, fiduciaries, representatives and advisors, (iii) "Affiliated Investor" means any Person that is a collateralized debt obligation, collateralized loan obligation or any other investment pooling vehicle or other entity that (A) is created primarily to invest in equity or debt securities, loans and

- 3 -

Patriarch/PC Confidential

other investments, (B) does not operate any trade or business and (C) is administered, advised or managed by, or directly or indirectly under common administration, advice or management with, the Administrative Agent or any Lender or any Affiliate of any Lender or the Administrative Agent and (iv) "Controlled Affiliate" means, with respect to any entity, any Person directly or indirectly "controlled" (as defined in the definition of "Affiliate" set forth in the Credit Agreement on the date hereof) by one or more of such entity and its other Controlled Affiliates.

Section 6.    Reaffirmation of Obligations.  Each Borrower hereby reaffirms (a) all of its obligations and liabilities, as expressly modified hereby, under the Credit Documents and agrees that such obligations and liabilities shall remain in full force and effect, (b) the Liens granted under the Credit Documents, and agrees that such Liens shall continue to secure the Obligations as expressly modified hereby, and (c) the validity and enforceability of the Credit Documents.

Section 7.    Effect on the Credit Documents.  This Amendment is a Credit Document and is limited as written.  As of the date each modification set forth herein shall become effective, each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference in the other Credit Documents to the Credit Agreement (including, without limitation, by means of words like "thereunder," "thereof" and words of like import), shall refer to the Credit Agreement as modified thereby, and this Amendment and the Credit Agreement shall be read together and construed as a single agreement.  The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, (a) waive or modify any right, power or remedy under, or any other provision of, any Credit Document or (b) commit or otherwise obligate the Administrative Agent or any Lender to enter into or consider entering into any other waiver or modification of any Credit Document.  This Amendment is intended to cure and waive prior Events of Defaults caused by any failure to comply with the provisions it specifically modifies (whether modified directly or through a change in a definition) that would not have occurred if this Amendment had been in effect at the time of such failure, together with any Event of Default that may exist by reason of any failure to deliver notice thereof pursuant to the Credit Agreement and by past misrepresentations under the Credit Agreement, if any, that no Default or Event of Default existed and were continuing.

Section 8.    Waiver of Jury Trial; Miscellaneous.  Headings are for convenience only and do not form part of this Amendment, except when used to reference an article or section, in which case such title reference shall govern absent manifest error in case of conflict.   All communications and notices hereunder shall be given as provided in the Credit Documents.  This Amendment (a) shall be governed by and construed in accordance with the law of the State of New York, (b) is for the exclusive benefit of the parties hereto and, together with the other Credit Documents, constitutes the entire agreement of such parties, superseding all prior agreements among them, with respect to the subject matter hereof, (c) may be modified, waived or assigned only in writing and only to the extent such modification, waiver or assignment would be permitted under the Credit Documents (and any attempt to assign this Amendment without such writing shall be null and void), (d) may be executed in counterparts, which may be effectively transmitted by fax or e-mail (in each case return receipt requested and obtained) and which, together, shall constitute one and the same instrument, (e) is a negotiated document, entered into freely among the parties upon advice of their own counsel, and it should not be construed against any of its drafters and (f) shall survive the satisfaction or discharge of the Obligations.  The fact that any term or provision of this Amendment is held invalid, illegal or unenforceable as to any person in any situation in any jurisdiction shall not affect the validity, enforceability or legality of

- 4 -

Patriarch/PC Confidential

the remaining terms or provisions hereof or the validity, enforceability or legality of such offending term or provision in any other situation or jurisdiction or as applied to any person. **Each party hereto hereby irrevocably and unconditionally waives any right to trial by jury with respect to this Amendment.**

[SIGNATURE PAGES FOLLOW]

- 5 -

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective officers and general partners thereunto duly authorized, as of the date first written above.

LVD ACQUISITION, LLC,
as Borrower

By: _____
    Name: SACHA POLVEROFF
    Title: CEO

B2 ACQUISITION, INC.,
as Borrower

By: _____
    Name: JOHN J JACOBS
    Title: CFO

SIGNATURE PAGE TO AMENDMENT NO. 8
TO THE CREDIT AGREEMENT OF LVD ACQUISITION, LLC

**Patriarch/PC Confidential**

A-203

PATRIARCH PARTNERS AGENCY SERVICES, LLC,
as Administrative Agent

By:
Name: Lynn Tilton
Title: Manager

ZOHAR CDO 2003-1, LIMITED,
as Lender
By: Patriarch Partners VIII, LLC,
its Collateral Manager

By:
Name: Lynn Tilton
Title: Manager

ZOHAR II 2005-1, LIMITED,
as Lender
By: Patriarch Partners XIV, LLC,
its Collateral Manager

By:
Name: Lynn Tilton
Title: Manager

ZOHAR III, LIMITED,
as Lender
By: Patriarch Partners XV, LLC,
its Collateral Manager

By:
Name: Lynn Tilton
Title: Manager

Patriarch/PC Confidential

Patriarch/PC Confidential

SCHEDULE A
AMENDMENT NO. 8
TO CREDIT AGREEMENT
LVD ACQUISITION, LLC

| Type of Loan | Tranche | Commitments[1] | Outstandings | Lender | Applicable Margin | Interest Payment Date | Maturity Date | Commitment Period (if applicable) | Prepayment Preference | OID Number |
|---|---|---|---|---|---|---|---|---|---|---|
| Term Loan | TLD | $1,261,796.67 | $1,261,796.67 | ZOHAR CDO 2003-1, LIMITED | 0% | N/A | April 15, 2019 | N/A | 7th | 1 |
| Term Loan | TLE | $14,526,968.44 | $14,526,968.44 | ZOHAR II 2005-1, LIMITED | 0% | N/A | April 15, 2019 | N/A | 7th | 1 |
| Term Loan | TLF | $4,503,107.80 | $4,503,107.80 | ZOHAR III, LIMITED | 0% | N/A | April 15, 2019 | N/A | 7th | 1 |

[1] For loans which, when repaid, may not be reborrowed, only outstanding undrawn commitments are shown.

**EXHIBIT F**

**PPMG MSA**

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT F**

**PPMG MSA**

# [FILED UNDER SEAL]

**EXHIBIT F**

**PPMG MSA**

# [FILED UNDER SEAL]

**EXHIBIT F**

PPMG MSA

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT F**

PPMG MSA

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT F**

PPMG MSA

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT F**

PPMG MSA

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT F**

**PPMG MSA**

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT F**

PPMG MSA

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT F**

PPMG MSA

# [FILED UNDER SEAL]

**EXHIBIT F**

**PPMG MSA**

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT F**

PPMG MSA

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT F**

PPMG MSA

# [FILED UNDER SEAL]

01:25035581.7

**<u>EXHIBIT F</u>**

**PPMG MSA**

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT F**

PPMG MSA

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT F**

PPMG MSA

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT F**

**PPMG MSA**

# [FILED UNDER SEAL]

01:25035581.7

## EXHIBIT G

**Portions of EPA Disclosure Schedules**

# [FILED UNDER SEAL]

01:25035581.7

## **EXHIBIT G**

**Portions of EPA Disclosure Schedules**

# **[FILED UNDER SEAL]**

01:25035581.7

**EXHIBIT G**

**Portions of EPA Disclosure Schedules**

# [FILED UNDER SEAL]

**EXHIBIT G**

**Portions of EPA Disclosure Schedules**

# [FILED UNDER SEAL]

**EXHIBIT G**

**Portions of EPA Disclosure Schedules**

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT G**

**Portions of EPA Disclosure Schedules**

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT G**

**Portions of EPA Disclosure Schedules**

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT H**

**Illustrative Phantom Equity Agreement**

# [FILED UNDER SEAL]

**EXHIBIT H**

**Illustrative Phantom Equity Agreement**

# [FILED UNDER SEAL]

**EXHIBIT H**

**Illustrative Phantom Equity Agreement**

# [FILED UNDER SEAL]

01:25035581.7

## EXHIBIT H

**Illustrative Phantom Equity Agreement**

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT H**

**Illustrative Phantom Equity Agreement**

# [FILED UNDER SEAL]

01:25035581.7

## EXHIBIT H

**Illustrative Phantom Equity Agreement**

# [FILED UNDER SEAL]

01:25035581.7

## EXHIBIT H

**Illustrative Phantom Equity Agreement**

# [FILED UNDER SEAL]

**EXHIBIT H**

**Illustrative Phantom Equity Agreement**

# [FILED UNDER SEAL]

**EXHIBIT I**

**FoF Model**

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT I**

**FoF Model**

# [FILED UNDER SEAL]

01:25035581.7

**EXHIBIT I**

**FoF Model**

# [FILED UNDER SEAL]

01:25035581.7

## EXHIBIT I

**FoF Model**

# [FILED UNDER SEAL]

01:25035581.7

Case 18-10512-KBO   Doc 1130-1   Filed 12/17/19   Page 51 of 51

**EXHIBIT I**

**FoF Model**

# [FILED UNDER SEAL]

01:25035581.7

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.,*[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
| | **Docket Ref. Nos. 545 & 868** |

## ORDER APPROVING CONSUMMATION OF OASIS PORTFOLIO COMPANY TRANSACTION

Upon the *Order in Aid of Implementation of the Global Settlement Agreement Approved in These Cases Establishing Certain Procedures for the Independent Director's Approval of Monetization Transactions and Related Relief* [Docket No. 545] (the "Procedures Order"); and upon the notice filed with the Court on August 26, 2019 [Docket No. 868] (the "Transaction Notice")[2] and the declaration and exhibits attached thereto; and the Court having jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Oasis Transaction having been provided to the Interested Parties, and it appearing that no other or further notice need be provided; and the Court having found and determined that the consummation of the Oasis Transaction (as defined in the Transaction

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar I," and together with Zohar III and Zohar II, the "Sellers")). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Procedures Order [Docket No. 545], the Procedures Motion [Docket No. 481], or the Transaction Notice.

01:24657744

A-243

Notice, and hereinafter used) is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and any objections to the Oasis Transaction having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is hereby **ORDERED**:

1.      Joseph J. Farnan, Jr., as Independent Director, has been fully charged with governance of the Debtors under applicable Cayman or Delaware law, as applicable, to authorize, approve and consummate the Oasis Transaction, including, but not limited to (i) authorizing the Debtors to vote or consent to any vote, as applicable, any and all Zohar Interests in favor of the Oasis Transaction, (ii) exercising any rights with respect to the Zohar Interests to implement or consummate the Oasis Transaction, and (iii) authorizing and approving the release of Debtors' liens, claims or encumbrances in connection with the Oasis Transaction.

2.      The consummation of the Oasis Transaction between Culligan International Company ("Buyer"), the Sellers, and all other parties executing the document, on the terms set forth in the Transaction Notice and EPA is legal, valid and properly authorized.

3.      The documents contemplated by or entered into in connection with the Oasis Transaction, are hereby authorized and approved, and shall be binding on and enforceable against all parties executing those documents.  Upon entry of this Order, all necessary consents, approvals, or authorizations of any kind, by any member of, holder of an interest in (whether record, beneficial, or otherwise) the Sellers, or other party, required to authorize the Oasis Transaction are hereby deemed to have been provided.

4.      Based upon, among other considerations, the Transaction Notice and the Transaction Declaration, the Independent Director's authorization, approval, and consummation of the Oasis Transaction is prudent, in good faith, in the best interest of

01:24657744

A-244

the Debtors' estates, their creditors and other parties in interest, and is fully consistent with the duties imposed upon him as a fiduciary.

5.      The sale of the LVD Interests, as more fully described in and pursuant to the EPA, and the consideration provided by Buyer are fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

6.      Effective as of the Closing of the EPA (which includes the sale of the LVD Interests by the Sellers to Buyer and the satisfaction or waiver of the Closing conditions in the EPA), the Oasis Transaction shall constitute a legal, valid and effective transfer of the LVD Interests to the Buyer notwithstanding any requirement for approval or consent by any person, and shall vest Buyer with all right, title and interest in and to the LVD Interests free and clear of all liens, claims, encumbrances and other interests of any kind, pursuant to section 363(f) of the Bankruptcy Code with such liens, claims, encumbrances and interests attaching to the proceeds from the Oasis Transaction with the same validity and priority as such released liens.

7.      The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code.

8.      The payment for and release of the Indebtedness under the Zohar Secured Debt Facility, as set forth in the EPA and subject to the terms of a payoff letter agreed to by the Agents (the "Payoff Letter"), is hereby approved free and clear of any and all Encumbrances and other interests of any kind that could be asserted by the Debtors, their estates, their Agents (as defined herein) or their creditors against the LVD Interests, LVD or its subsidiaries, or any assets or property of LVD or its subsidiaries. The "Agents" constitute Ankura Trust Company, as agent, and Patriarch Partner Agency Services, LLC, as predecessor agent, under the Zohar Secured Debt Facility.

01:24657744

3

A-245

9.    With the consent of the Patriarch Stakeholders, the Other Stakeholders, and any Class B Members of the holders of preference shares of the Debtors, the sale of the LVD Interests is hereby approved free and clear of any liens, claims and encumbrances that could be asserted by any of the Patriarch Stakeholders and the Other Stakeholders, provided that any and all such liens, claims and encumbrances attach to the proceeds from the Oasis Transaction with the same validity and priority as those being released hereby, and all such proceeds shall be delivered to the Debtors at closing.

10.    Lynn Tilton, as Co-Seller Representative, shall have no liability to the Debtors or any other party for any claims or arising solely from any actions related to her role as Co-Seller Representative, including, without limitation, actions taken by any other Co-Seller Representative, except to the extent such liability arises from or is related to Lynn Tilton's own bad faith or willful misconduct.

11.    The Debtors and their Agents, to the extent applicable, are authorized and directed to execute and deliver all instruments and documents, and take such other action—including the exercise of any member, shareholder, or lender approval rights—as may be necessary or appropriate to consummate, implement and effectuate the Oasis Transaction pursuant to the EPA and the Payoff Letter, including, but not limited to: (a) execution of any and all instruments necessary to terminate, cancel and release the Zohar Secured Debt Facility, and all Encumbrances and other interests of any kind arising under or related to the Zohar Secured Debt Facility, including any mortgage, deed of trust, security agreement, UCC financing statement, pledge, control agreement, Encumbrance, or other instrument related to the perfection of the Encumbrances and other interests of any kind against the LVD Interests and (b) dismissal with prejudice of the action styled *Zohar CDO 20003-1, Limited v. Croscill Home LLC* as against LVD before the United States District Court for the District of Delaware.

01:24657744

A-246

12.      The release by the Sellers as set forth in the EPA is authorized and approved.

13.      A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder of any state, county, or local authority to act to terminate and cancel any and all of the Encumbrances and other interests of any kind.

14.      Any stay applicable to this Order under Federal Rule of Bankruptcy Procedure 6004(h) is waived and this Order shall be effective and enforceable immediately upon its entry.

15.      This Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

**Dated: September 9th, 2019**
**Wilmington, Delaware**

**KAREN B. OWENS**
**UNITED STATES BANKRUPTCY JUDGE**

01:24657744

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
| | **Related to Docket No. 914, 1093** |

### NOTICE OF FILING OF REVISED "PPMG'S OPENING BRIEF REGARDING PPMG'S RIGHT TO PAYMENT OF TRANSACTION FEES IN CONNECTION WITH THE OASIS TRANSACTION" [D.I. 914, 1093]

PLEASE TAKE NOTICE that, on September 6, 2019, Patriarch Partners Management Group, LLC ("PPMG") filed *PPMG's Opening Brief Regarding PPMG's Right to Payment of Transaction Fees in Connection with the Oasis Transaction* [Docket No. 914] (the "Brief").[2]

PLEASE TAKE FURTHER NOTICE that on November 26, 2019, PPMG filed a redacted version of the Brief [Docket No. 1093] (the "Redacted Brief"), in consultation with the Debtors and the Office of the United States Trustee.

PLEASE TAKE FURTHER NOTICE that PPMG, in coordination with the Debtors, has determined that certain portions of the Brief and Redacted Brief will be withdrawn. By withdrawing the agreed portions of the Brief and Redacted Brief, neither PPMG nor the Debtors make any admission or waiver with respect to their respective rights or arguments on any matter.

PLEASE TAKE FURTHER NOTICE that PPMG hereby files an amended version of the Redacted Brief, attached hereto as **Exhibit A**, with certain portions withdrawn as set forth in the

---

[1] The Debtors, and, where applicable, the last four digits of each of their respective taxpayer identification numbers, are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] Capitalized terms not otherwise defined herein shall have the meanings afforded to them in the Brief.

57772/0001-18881541v1

A-248

attached.  An unredacted version of the Brief is being filed under seal consistent with the Local

Rules of this Court.

*[Signatures to follow]*

Dated: December 31, 2019        **COLE SCHOTZ P.C.**

By:    */s/* Patrick J. Reilley
      Norman L. Pernick (No. 2290)
      Patrick J. Reilley (No. 4451)
      G. David Dean (No. 6403)
      500 Delaware Avenue, Suite 1410
      Wilmington, DE 19801
      Telephone: (302) 652-3131
      Facsimile: (302) 652-3117
      npernick@coleschotz.com
      preilley@coleschotz.com
      ddean@coleschotz.com

      – and –

**GIBSON, DUNN & CRUTCHER LLP**
Randy M. Mastro (Admitted Pro Hac Vice)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
rmastro@gibsondunn.com

Robert Klyman (Admitted Pro Hac Vice)
Michael S. Neumeister (Admitted Pro Hac
Vice)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-70520
rklyman@gibsondunn.com
mneumeister@gibsondunn.com

Monica K. Loseman (Admitted Pro Hac Vice)
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

*Counsel to Patriarch Partners Management
Group, LLC*

57772/0001-18881541v1        **A-250**

**EXHIBIT A**

AMENDED REDACTED VERSION
RE: DI 914 AND 1093

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) | Case No. 18-10512 |
| Zohar III, Corp., *et al.*,[1] | ) | Jointly Administered |
| Debtors. | ) | |
|  | ) | **Ref. Docket No. 868** |
|  | ) | **Hearing Date: September 24, 2019** |
|  | ) | **Obj. Deadline: September 17, 2019** |

## PPMG'S OPENING BRIEF REGARDING PPMG'S RIGHT TO PAYMENT OF TRANSACTION FEES IN CONNECTION WITH THE OASIS TRANSACTION

Patriarch Partners Management Group, LLC ("PPMG") hereby submits this brief in connection with the proposed Oasis Transaction, as that term has been defined in the *Notice of Binding Portfolio Company Transaction Pursuant to Portfolio Company Transaction Procedures* submitted to the Court on August 26, 2019 [D.I. 868], and with respect to the relief requested by the Debtors in their *Motion For An Order Determining Dispute Between The Debtors And Patriarch Partners Management Services, LLC Related To Pending Oasis Transaction,* filed this same day. The parties have agreed to submit concurrent responsive briefs by 4:00 p.m. on September 17, 2019.[2] This brief is submitted pursuant to:

(i) this Court's *Order Approving and Authorizing the Settlement Agreement Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class* (the "Settlement Order"),[3] entered on May 21, 2018 [D.I. 266]; and

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar I", and together with Zohar II and Zohar III, the "Zohar Funds"). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Settlement Agreement, the Management Services Agreement (as defined herein at ¶ 3 n.4), or the *Notice of Binding Portfolio Company Transaction Pursuant to Portfolio Company Transaction Procedures* [D.I. 868], as applicable.

[3] A copy of the Settlement Order and Settlement Agreement are annexed hereto as Exhibit A.

(ii) the Settlement Agreement (as defined in the Settlement Order) [D.I. 266 Ex. 1]

PPMG respectfully states as follows:

## PRELIMINARY STATEMENT

1.      At the outset of these Chapter 11 cases, the Debtors and the primary creditor constituencies entered into a Settlement Agreement approved by this Court.  [*See* D.I. 266.] Pursuant to the Settlement Agreement and PPMG's underlying agreement with Oasis, PPMG is now entitled to receive a "Transaction Fee" equal to five percent of the sale proceeds upon closing of the pending Oasis Transaction.  **[\*Text Withdrawn from Docket Nos. 914 & 1093\*].** In fact, an integral component of the Settlement Agreement was that such disclosed fees would be paid uncontested and all litigation claims stayed during the monetization period, with all rights reserved, should litigation stays be subsequently lifted by operation of the Settlement Agreement's terms.  Rather than acknowledge that payment is owed, however, the Debtors contest PPMG's bargained-for payment anyway.

2.      The Oasis Transaction involves the proposed acquisition of Oasis by Culligan International Company ("Culligan").  For the avoidance of doubt, PPMG does not object to the Oasis Transaction; indeed, PPMG supports it.  PPMG only seeks the Court's intervention to ensure that PPMG is paid the fees it is owed relating to the Oasis Transaction upon its closing, which should be paid without objection.  In contesting that payment, the Debtors are in clear breach of the Settlement Agreement.

3.      PPMG has long provided valuable management and consulting services to Oasis. For nearly a decade, those extensive services have been governed by a contract entered into on or about September 30, 2010 that sets out various forms of compensation and expense

reimbursement for PPMG.[4] ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ The Oasis Transaction qualifies as such a Liquidity Event.

4.      Separately, the Settlement Agreement provides that PPMG's fee "shall be due and payable" at the "closing" of the sale of a portfolio company, with all rights reserved to dispute the fee's propriety at a later date. [Settlement Agreement at § 18.]  **[\*Text Withdrawn from Docket Nos. 914 & 1093\*].**  No party filed any objection to the payment of such fees prior to the Court's approval of the Settlement Agreement.  The Debtors' belated objection should not stand and the negotiated terms of the Settlement Agreement should be enforced via timely payment of the Transaction Fee.  PPMG should receive its fee now, with the Debtors subsequently entitled to seek recoupment of the fee if it is appropriate to do so.

5.      Setting process aside, the Debtors are also wrong on the merits of their objection to PPMG's fee.  ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ The Debtors' contrary position is premised on their mistaken view that $20 million in accrued unpaid interest and fees constitute a portion of Oasis's debt, despite the fact that such interest and fees were restructured into a new facility as an equity kicker—a form of equity—in 2015 by way of an amendment to

---

[4]   A copy of the management services agreement between PPMG and Oasis, dated as of September 30, 2010 (the "Management Services Agreement" or "MSA") is annexed hereto as Exhibit B.

Oasis's credit agreement.[5] [*See* 8th Amdt. at § 1(a)(i).]  Stated simply, the Debtors are incorrectly interpreting a provision of the Management Services Agreement and then applying their incorrect interpretation to their erroneous assumptions about Oasis's capital structure.  They are wrong at each step of their analysis.

6.    Because PPMG and the Debtors were unsuccessful in resolving this dispute through mediation before Judge Gross, PPMG now seeks an order from this Court resolving this dispute and the Debtors' breach of the Settlement Agreement, as authorized pursuant to Section 8 of the Settlement Order and Section 27 of the Settlement Agreement.

**BACKGROUND**

7.    Prior to the commencement of these Chapter 11 Cases, the Debtors were trapped in a vicious cycle of value-destroying litigation that cast an intractable cloud over the Debtors and their portfolio companies—including Oasis—precluding their full value from being unlocked for the sake of all stakeholders.  Moreover, due to the presence of ongoing litigation and the specter of still further litigation, the portfolio companies were unable to obtain critical financing and their negotiations with potential buyers and lenders had stalled.  Accordingly, the Debtors voluntarily filed for Chapter 11 bankruptcy.

8.    Shortly thereafter, various parties-in-interest filed a wide array of substantive motions in this action.  On April 5, 2018, the Court appointed Judge Kevin Gross to mediate the parties' various disputes.  [D.I. 143.] Judge Gross initially oversaw several days of tense, complex and comprehensive negotiations among the parties.  The ultimate result of those efforts was the Settlement Agreement, "entered into by and between" "the Debtors" and "the Patriarch

---

[5]    A copy of Amendment No. 8 to Credit Agreement of LVD Acquisition, LLC (the "8th Amendment" or "8th Amdt.") is annexed hereto as Exhibit C.

4

Stakeholders," among others.  [Settlement Order at 1.]  As made clear by the Settlement

Agreement, the Patriarch Stakeholders includes PPMG.  [Settlement Agreement at Ex. B.]

9.  ██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

10.  █████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████

████

57772/0001-18881488v1

11. 

12.     Oasis and Culligan commenced drafting the documents to complete the Oasis Transaction in the summer of 2019, through which Culligan would become the beneficial owner of all of Oasis's equity through "an Equity Purchase Agreement [ ] for the acquisition of 100% of the limited liability company membership interests" in Oasis. [D.I. 868 at ¶ 1.] These negotiations ultimately included the Debtors as well. During the finalization of the Oasis Transaction's terms, however, the Debtors refused to permit payment of PPMG's Transaction Fee at closing. The parties mediated this dispute before the Honorable Kevin Gross on July 31, 2019, with no success.

13.     In order to prevent the instant dispute from derailing the Oasis Transaction, PPMG agreed to have the Court resolve it on a schedule aimed to precede the closing of the Oasis Transaction. On August 26, 2019, the Debtors notified the Court that they intend to consummate the Oasis Transaction. According to the notice, "the Debtors contemplate that the

---

6

6

Sellers will receive approximately $63 Million to $73 million from the Oasis Transaction." [*Id.*]
In the event of any objections to the Oasis Transaction, a hearing is tentatively scheduled for
September 11, 2019. [*Id.* at ¶ 5.]

14.        Moreover, the Debtors' claim that
Oasis's outstanding debt exceeds its proposed sales price, premised on their view that $20
million of accrued unpaid interest and commitment fees constitutes "debt" when, in reality, it
was restructured in 2015 into a new facility, which under the Zohar Funds' indentures, is an
"equity kicker," a form of equity. [*See* 8th Amdt. at § 1(a)(i); Tilton Decl. at ¶ 2.[7]]

15.       Section 18 of the Settlement Agreement establishes the process for disputes
relating to such fees, regardless of their merit. In relevant part, it provides as follows: "Any [ ]
claim asserted by the Patriarch Stakeholders [including PPMG] that is supported by written
documentation showing the claim . . . represents a fee or other claim arising from . . . any
management and/or administrative fee owed to a Patriarch Stakeholder . . . shall be deemed due
and payable through the closing of any monetization event on a pari passu basis with other
similarly situated claims and equity unless the applicable credit agreement provides otherwise."
[Settlement Agreement at § 18(A)(b).] Payments made under that provision are "capped at $250

---

[7]   The Declaration of Lynn Tilton (the "Tilton Decl.") is annexed hereto as Exhibit D.

million, with any amounts in excess to be held in escrow until" certain noteholders are paid in full, but otherwise such payments "shall be made without further analysis or challenge." [*Id.* at § 18.] Instead of allowing for immediate litigation, the Settlement Agreement provides that "[a]ll parties' respective rights to challenge the propriety of any [such] claims . . . are tolled without prejudice until the expiration of the 18 Month Window."[8] [*Id.*]

16.     The requirement in Section 18 that PPMG's demand for a fee be "supported by written documentation" is satisfied here by the Management Services Agreement, which establishes the Transaction Fee as "a fee or other claim arising from" a "management and/or administrative fee owed to a Patriarch Stakeholder." [*Id.*] The Debtors have never suggested that any "applicable credit agreement provides otherwise." [*Id.*] Because the fees paid out under Section 18 to-date are far less than $250 million, the Transaction Fee is now payable under the Settlement Agreement "without further analysis or challenge" during the 18 Month Window. [*Id.*]

17.     In addition, a footnote to Section 18 of the Settlement Agreement required Ms. Tilton "to provide a good faith estimate on [a] company by company basis . . . reflecting the aggregate amount she expect[ed] will be covered" by that provision.[9] [*Id.* at § 18 n.4.] **[*Text Withdrawn from Docket Nos. 914 & 1093*].**

**18.     [*Text Withdrawn from Docket Nos. 914 & 1093*].**

19.     The Settlement Agreement thus built in a mechanism for disputing any payment to PPMG in connection with the Oasis Transaction, but it stays any such dispute until the expiration of the 18 Month Window. The 18 Month Window was to expire on November 21,

---

[8]   Unlike many other provisions in the Settlement Agreement, Section 18 is expressly tied to the 18 Month Window rather than the 15 Month Window.

[9]   **[*Text Withdrawn from Docket Nos. 914 & 1093*].**

57772/0001-18881488v1

2019, 18 months from May 21, 2018, the date on which the Settlement Order approved of the parties' Settlement Agreement.  [*See* Settlement Order; Settlement Agreement at 1.]  The Debtors' objection to the payment of the Transaction Fee to PPMG at the closing of the Oasis Transaction thus constitutes a breach of foregoing terms of the Settlement Agreement, and should be rejected as both premature and meritless.

## RELIEF REQUESTED

20.     PPMG seeks entry of an order affirming that, pursuant to both the Settlement Agreement and the Management Services Agreement, PPMG is entitled to receive the Transaction Fee upon closing of the Oasis Transaction (subject to whatever reservation of rights the Settlement Agreement accords the Debtors).

## JURISDICTION

21.     Bankruptcy courts retain "jurisdiction to interpret and enforce settlements and the accompanying orders approving settlements." *Suntrust Bank v. Roberson (In re Baseline Sports, Inc.)*, 393 B.R. 105, 118-19 (E.D. Va. 2008); *see also, e.g.*, *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 423 (3d Cir. 2013) (finding bankruptcy court had jurisdiction "to resolve a dispute regarding the Settlement Agreement it had previously confirmed").  The Settlement Agreement expressly contemplates that this Court "shall retain jurisdiction to enforce the terms of th[at] agreement" and that both the Debtors and PPMG have "agree[d] to submit to the jurisdiction of the Bankruptcy Court for resolution of any matter in connection with th[at] agreement or the enforcement thereof."  [Settlement Agreement at § 27.]  Furthermore, the Settlement Order provided that "[t]his Court shall retain jurisdiction to hear any and all disputes arising out of the interpretation or enforcement of th[at] Order." [Settlement Order at § 8.]  As such, the Court is empowered to interpret and enforce the Settlement Order and Agreement, which includes the power to grant the relief requested herein.  *See, e.g.*, *In re River Ctr. Holdings, LLC*, 394 B.R.

9

704, 711 (Bankr. S.D.N.Y. 2008) (finding jurisdiction under similar circumstances). Consistent with the Settlement Agreement and Settlement Order, the Debtors and PPMG have agreed that the instant dispute relating to the Oasis Transaction should be resolved by this Court.

## BASIS FOR RELIEF REQUESTED

**A.    The Settlement Agreement Blocks The Debtors From Challenging The Payment Of The Transaction Fee To PPMG Before November 21, 2019.**

22.    The Debtors' objection should be denied as premature because the parties bargained for the unobstructed payment of the Transaction Fee during the 18 Month Window. [*See* Settlement Agreement at § 18.] The meaning of Section 18 of the Settlement Agreement is obvious: PPMG is entitled to payment of claims arising from the monetization of any of the Portfolio Companies, including Oasis, without resort to any value-destroying disputes prior to that time. The 18 Month Window expires on November 21, 2019, well after the anticipated closing of the Oasis Transaction in late September or early October.

23.    PPMG is entitled to immediate payment of the Transaction Fee under the plain language of the Settlement Agreement. It provides that where PPMG cites "written documentation showing" that it is owed "any management and/or administrative fee," such fees "shall be deemed due and payable through the closing of any monetization event . . . unless the applicable credit agreement provides otherwise." [*Id.*] That provision applies here. The Management Services Agreement constitutes the requisite "written documentation showing" that PPMG is entitled to the Transaction Fee as an essential part of its compensation for the necessary and valuable services it has provided to Oasis over the last nine years. Nothing more is required, and the Settlement Agreement does not include any sort of diligence or challenge right to refute PPMG's right to payment of its Transaction Fee during the 18 Month Window. In the absence of any assertion by the Debtors that an "applicable credit agreement provides otherwise"—which

the Debtors have never suggested—the Transaction Fee will become "due and payable" under the Settlement Agreement upon "the closing" of the Oasis Transaction.

24. **[*Text Withdrawn from Docket Nos. 914 & 1093*]** ███████████

████████████████████████ *Cf. Skylon Corp. v. Guilford Mills, Inc.*, 901 F. Supp. 711, 713 (S.D.N.Y. 1995) ("a . . . contractual provision[ ] must be construed in accordance with the intent of the parties who executed it"). As explained in her First Day Declaration, Ms. Tilton was the Debtors' "sole director and owner" at the time of the Debtors' bankruptcy filing. [D.I. 5 at ¶ 1.] It was not until May 21, 2018, when the Settlement Order was entered by this Court, that Mr. Farnan was also appointed and confirmed as the Independent Director of the Debtors. [D.I. 267 at ¶ 1; Tilton Decl. ¶ 1.] Indeed, that appointment and Ms. Tilton's concurrent resignation as director were contemplated as future events that had yet to take place at the time of the Settlement Agreement. [*See* Settlement Agreement at § 1 ("The Mediator *shall* appoint a single Independent Director for each of the Zohar Funds" and "Tilton *shall* resign as a director of each" (emphasis added)).] **[*Text Withdrawn from Docket Nos. 914 & 1093*].**

25. The Settlement Agreement also set out a process to address any disputes as to whether PPMG was ultimately entitled to retain such fees. Specifically, it provides that "[a]ll parties' respective rights to challenge the propriety of any of the foregoing claims . . . are tolled without prejudice until the expiration of the 18 Month Window," allowing such disputes to be litigated after the monetization process concludes. [Settlement Agreement at § 18.] Indeed, the parties were barred from raising such disputes "during the 18 Month Window" or from invoking such disputes "to block the closing of any pending transaction in the Monetization Process." [*Id.*] This was intended to ensure that any disputes over such fees would not interfere with the monetization process during either of the 15 Month or 18 Month Window, allowing sales to

proceed without the overhang of litigation. In other words, the Settlement Agreement requires that the Transaction Fee be paid to PPMG upon closing of the Oasis Transaction, with all rights to challenge such payment reserved, and any such disputes delayed until after the close of the 18 Month Window. The Debtors' instant assertion that PPMG is not entitled to the Transaction Fee is therefore premature.

26. Read in its entirety, the Settlement Agreement established that PPMG is to be paid the Transaction Fee upon closing of the Oasis Transaction. "[C]onstruing the agreement as a whole," *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016), Section 18 must be read in conjunction with Section 2. That latter provision clarifies that PPMG's ultimate owner, Ms. Tilton, was appointed as the Debtors' Tax Director and, so long as she remains in that capacity, she "shall continue to bear the tax liability associated with ownership of the Debtors, the Group B Portfolio Companies, and the Group A Portfolio Companies, including with respect to any Group A Portfolio Company transactions," which, in turn, includes the proposed Oasis Transaction. [Settlement Agreement at § 2; *see also id.* at Ex. C (including Oasis as a Group A Portfolio Company).] **[\*Text Withdrawn from Docket Nos. 914 & 1093\*].**

27. By refusing to pay the Transaction Fee to PPMG now, the Debtors are attempting to unilaterally re-trade and negate a key provision of the Settlement Agreement in order to increase their recovery, all at PPMG's (and ultimately Ms. Tilton's) expense. Instead, they should be held to the terms of the Settlement Agreement. PPMG's Transaction Fee should be paid at closing, with any challenge to the propriety of such a fee preserved until after the expiration of the 18 Month Window.

**B.      PPMG Is Entitled To A Transaction Fee Under The Management Services Agreement.**

28.      Assuming *arguendo* that this dispute can properly be raised now (which it

cannot), the Debtors' position should be rejected on the merits ████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

the Management Services Agreement "should as a rule be enforced according to its terms" and

"construed so as to give full meaning and effect to all of its provisions," *Metz v. Poughkeepsie*

*Savings Bank, FSB (In re Metz)*, 231 B.R. 474, 479 (E.D.N.Y. 1999) (internal quotation marks

omitted).

29.      ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

30.      ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

57772/0001-18881488v1

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████████████████████

**1.**    **PPMG Is Entitled To The Transaction Fee** ████████

31.    ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

32.    ████████████████████████████████████

█████████████████████████████████████

████████████████████████████████████████

███████████████████████[10] ██████████████████████

██████████████████████████████████████

██████████████████████████████████████

---

[10] The Debtors' attempt to do so is particularly striking given that the Debtors are not parties to the Management Services Agreement and did not negotiate that contract. Rather, the Debtors are third-parties seeking to impose their interpretation upon the parties to a contract that simply does not involve them.

██████████████████████████████████████████████

██████████████████████████████████████████████

That choice must be honored.  *See, e.g.*, *Quadrant Structured Prods. Co. Ltd. v. Vertin*, 23

N.Y.3d 549, 560 (2014) ("[I]f parties to a contract omit terms—particularly, terms that are

readily found in other, similar contracts—the inescapable conclusion is that the parties intended

the omission."); *Israel Discount Bank Ltd. v. Gottesman (In re Ore Cargo, Inc.)*, 544 F.2d 80, 82

(2d Cir. 1976) (under New York law "the failure of . . . a sophisticated commercial lender[ ] to

include a . . . specific reference" in a contract "precludes our divining or implying" that it was

meant to be included).

       33.     The Management Services Agreement's "extensive use of defined terms

demonstrates that its drafters were perfectly capable of using such terms when they wished to do

so," such that ██████████████████████████████████ "should not be

ignored." *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, No. 15 Civ. 3538, 2019

WL 3858620, at *5 (S.D.N.Y. Aug. 16, 2019). ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████

      34.     ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

57772/0001-18881488v1

35.     Where "the key contractual terms, the ones that require interpretation, are *defined terms*—that is, the parties set forth exactly what they meant in the body of the contract itself," as is the case here, it "makes the job of construction particularly easy." *Quintel Commc'ns, Inc. v. Fed. Transtel, Inc.*, 142 F. Supp. 2d 476, 482 (S.D.N.Y. 2001) (emphasis in original); *see also, e.g.*, *Whitacre Constr. Specialties, Inc. v. Aetna Cas. & Surety Co.*, 448 N.Y.S.2d 287, 287 (App. Div. 1982) (capitalization suggests terms have "a specific meaning" and defined terms are "meant to have a consistent meaning throughout the document[ ]"), *aff'd*, 57 N.Y.2d 1018 (1982). ████████████████████████

**2.     PPMG is Entitled To The Transaction Fee Because The Proposed Sales Price Exceeds Oasis's Outstanding Debt.**

36.     Even if this dispute were timely and ████████████████ ████████████████ (neither of which is true), PPMG would still be entitled to its Transaction Fee because the $76 million Oasis purchase price is sufficient to satisfy Oasis's "outstanding debt." In fact, Oasis's outstanding funded debt is only $60 million. In order to claim that Oasis's debt exceeds the $76 million purchase price and thereby contest payment of PPMG's Transaction Fee, the Debtors are including in their calculation approximately $20 million of unpaid accrued interest and commitment fees, which

16

57772/0001-18881488v1

A-267

was expressly restructured in 2015. In substance, the restructured interest and fees are properly considered equity, not debt.

37.    ████████████████████████████████████████████

████████████████████████████ In the absence of any such contractual clarity, this Court may "ask what is the proper characterization in the first instance of [the $20 million] investment" in light of its "equitable authority to ensure that 'substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'" *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454 (3d Cir. 2006) (quoting *Pepper v. Litton*, 308 U.S. 295, 305 (1939)) (footnote omitted). This question "has nothing to do with inequitable conduct." *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.)*, 405 B.R. 527, 554 (Bankr. D. Del. 2009). Rather, it simply assesses whether a "transaction created a debt or equity relationship from the outset." *In re Cold Harbor Assoc., L.P.*, 204 B.R. 904, 915 (Bankr. E.D. Va. 1997). While other courts "have adopted a variety of multi-factor tests" to aid in this inquiry, the Third Circuit has eschewed that approach because "[n]o mechanistic scorecard suffices." *In re SubMicron*, 432 F.3d at 455-56. Instead, it has encouraged lower courts to make "a commonsense conclusion" based upon "facts that confer context case-by-case." *Id.*

38.    Here, the restructured interest and fees should be treated as equity, not debt, for purposes of determining PPMG's right to a Transaction Fee. A preeminent consideration in determining whether an investment is debt or equity is whether a lender "expects to be repaid with interest no matter the borrower's fortunes," in which case "the funds are debt." *In re SubMicron*, 432 F.3d at 456. That is simply not the case here. Rather, the restructured equity

provided for a 0% margin of interest, with no applicable recurring interest payment date.[11] [8th Amdt. at Sched. A.] That "absence of a fixed rate of interest and interest payments . . . is a strong indication the investment was a capital contribution, rather than a loan." *Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512, 520-21 (Bankr. D. Del. 2011); *accord Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 750 (6th Cir. 2001).

39.     In addition, the absence of any meaningful security for the November 2015 investment provides "'a strong indication that the advances were capital contributions rather than loans.'" *In re Friedman's*, 452 B.R. at 522 (quoting *In re AutoStyle Plastics*, 269 F.3d at 752). Here, Oasis's accrued unpaid interest and commitment fees were restructured so that they would be subordinate to all of Oasis's funded debt in light of their prepayment preference. [*See* 8th Amdt. at Sched. A.] That subordination "weighs in favor of characterizing the Notes as equity." *In re Friedman's*, 452 B.R. at 522; *see also, e.g., Lipscomb v. Clairvest Equity Partners Ltd. P'ship (In re LMI Legacy Holdings, Inc.)*, No. 13-12098, 2017 WL 1508606, at *14 (Bankr. D. Del. Apr. 27, 2017) (listing "[s]ubordination of the Notes [at issue] to debt held by the Debtors' lenders" as among the factors "typically weighing in favor" of finding notes to be equity).

40.     In response, the Debtors will make much of the fact that the accrued unpaid equity interest was referred to as a series of "Term Loans" upon their restructuring. [*See* 8th Amdt. at Sched. A.] But the nomenclature adopted by the 8th Amendment is entirely beside the

---

[11]   The Debtors may argue that the restructured equity accrues interest at LIBOR based upon their reading of the underlying credit agreement. That was not the intent of the restructuring effectuated by the 8th Amendment, as demonstrated by the listing of Oasis's Interest Payment Date as "N/A," meaning "not applicable." [*See* 8th Amdt. at Sched. A.] If any interest were meant to accrue, presumably it would have to be paid at some point. Nothing in the 8th Amendment provides for such payment. Moreover, Patriarch is unaware of any documentation in its records or in any trustee reports under the Zohar Funds' indentures that suggests or reflects that the restructured equity has accrued interest at LIBOR, nor has Oasis been billed for any such interest. Indeed, the trustee reports—which regularly list the Zohar Funds' debt—do not list the restructured equity as debt. [*See* Tilton Decl. ¶ 2.] That is because it is not.

18

point.  Treating that terminology as dispositive would "ignore the ancient wisdom that calling a thing by a name does not make it so."  *City of Madison Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 174 (1976).  Indeed, the "overarching inquiry" that is called for here is an "attempt to discern whether the parties called an instrument one thing when in fact they intended it as something else."  *In re SubMicron*, 432 F.3d at 456; *see also, e.g.*, *Machne Menachem, Inc. v. Spritzer (In re Machne Menachem, Inc.)*, 456 F. App'x 163, 165-66 (3d Cir. 2012) (affirming that deposit slips and checks "with 'loan' written on them" related to a capital contribution rather than debt financing because "the label given to a transaction . . . does not outweigh what the parties actually intended or how they acted").  The use of the phrase "term loan" should therefore be accorded minimal weight, if any, and certainly it does not override the substantive characteristics of the transaction demonstrating that it is properly treated as equity.

41.     Nor does the mere listing of a "Maturity Date" in 2019 weigh against finding that the 2015 restructuring involved equity.  That same argument was rejected by *In re Friedman's*, in which the notes at issue "became repayable over four years after entry into the Notes with no interim payment of principal."  452 B.R. at 520.  Where "there is a fixed maturity date" but the debtor is "not required to make any principal payments for over four years," *In re Friedman's* held that the existence of the far-flung maturity date "weighs neither in favor of characterizing the [investment] as equity nor as debt."  *Id.*  Moreover, other courts have determined that where "the parties do not provide for payment of any principal indebtedness . . . through the first five years," that suggests that "the parties' plans and the economic realities . . . treated th[e] amount as equity."  *Fidelity Bond & Mortg. Co. v. Brand (In re Fidelity Bond & Mortg. Co.)*, 340 B.R. 266, 303 (Bankr. E.D. Pa. 2006).  That latter ruling accords with *In re SubMicron* because where "an investor" must await a distant maturity date without any entitlement to interim payments of

19

principal, "the funds infused are repaid based on the borrower's fortunes; hence, they are equity." 432 F.3d at 456; *see also, e.g.*, *In re Autostyle Plastics*, 269 F.3d at 751 ("If the expectation of repayment depends solely on the success of the borrower's business, the transaction has the appearance of a capital contribution.").

42.    In sum, it is clear that the $20 million in unpaid accrued interest and commitment fees that were restructured in 2015 should properly be considered equity, not debt.  Oasis's marginal interest rate is 0%, it is not required to make regular payments of interest or principal, it was never billed for any such payments, there is no date by which any supposed interest must be paid off, the restructured equity is subordinated to all of Oasis's outstanding debt, and the Debtors were required to wait for years before they could expect any repayment whatsoever.  Each of these factors makes clear that the funds at issue constituted a capital contribution.

**NOTICE**

43.    PPMG will provide notice of this brief to the U.S. Trustee and counsel to the Debtors.  In light of the nature of the relief requested herein, PPMG submits that no other or further notice is necessary.

WHEREFORE, PPMG respectfully requests entry of an order granting the relief requested herein and any such other and further relief as is just and proper.

Dated:  September 6, 2019    **COLE SCHOTZ P.C.**

By:   /s/ Norman L. Pernick
Norman L. Pernick (No. 2290)
G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
ddean@coleschotz.com
preilley@coleschotz.com

57772/0001-18881488v1

A-271

– and –

**GIBSON, DUNN & CRUTCHER LLP**
Randy M. Mastro (Admitted Pro Hac Vice)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
rmastro@gibsondunn.com

Robert Klyman (Admitted Pro Hac Vice)
Michael S. Neumeister (Admitted Pro Hac Vice)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-70520
rklyman@gibsondunn.com
mneumeister@gibsondunn.com

Monica K. Loseman (Admitted Pro Hac Vice)
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

*Counsel to Patriarch Partners Management Group,*
*LLC*

57772/0001-18881488v1

# **Exhibit A**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | )    Chapter 11 |
| | ) |
| Zohar III, Corp., *et al.*,[1] | )    Case No. 18-10512 (CSS) |
| | ) |
| | )    Jointly Administered |
| Debtors. | ) |
| | )    **Docket Ref. Nos. 222 & 223** |

## ORDER APPROVING AND AUTHORIZING THE SETTLEMENT AGREEMENT BY AND BETWEEN THE DEBTORS, LYNN TILTON, THE PATRIARCH STAKEHOLDERS, MBIA INSURANCE CORP., AND THE ZOHAR III CONTROLLING CLASS

Upon consideration of the motion (the "Motion")[2] of the Debtors for entry of an order,

pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, approving the

Settlement Agreement (attached hereto as **Exhibit 1**) entered into by and between (i) the

Debtors, (ii) Lynn Tilton, (iii) the Patriarch Stakeholders, (iv) MBIA, and (v) Halcyon Capital

Management LP[3], Coöperatieve Rabobank U.A., New York Branch, STS Master Fund, Ltd, SBF

Opportunities Master Fund, Ltd, and Candlewood Structured Credit Harvest Master Fund, LTD

(collectively, the "Zohar III  Noteholders" and, together with the Debtors, Lynn Tilton, the

Patriarch Stakeholders, and MBIA,  the "Parties"), as more fully described in the Motion; and it

appearing that this Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157

and 1334 and the *Amended Standing Order of Reference* from the United States District Court

for the District of Delaware, dated as of February 29, 2012; and it appearing that venue of these

---

[1]  The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119).  The Debtors' address is 350 Fifth Avenue, c/o Goldin Associates, LLC, New York, NY 10118.

[2]  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Settlement Agreement, as applicable.

[3]  The members of the Zohar III Controlling Class affiliated with Halcyon Capital Management LP are disclosed in the Verified Statement Pursuant to Fed. R. Bankr. P. 2019(a) filed on March 27, 2018 [Docket No. 95].

01:23222940.4

Chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b) and the Court may enter a final order on the Motion consistent with Article III of the U.S. Constitution; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, creditors, and other parties in interest; and this Court having found that the relief requested in the Motion is justified by the facts and circumstances; and it appearing that proper and adequate notice of the Motion has been given and that, except as otherwise ordered herein, no other or further notice is necessary; and after due deliberation thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED.

2.      The Settlement Agreement, a copy of which is attached hereto as **Exhibit 1**, is approved in its entirety pursuant to sections 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, and is binding on all parties-in-interest in these Chapter 11 cases, including, but not limited to, the Parties, any new Collateral Manager or New Agent appointed under the terms of the Settlement Agreement, the Independent Director, the CRO, U.S. Bank, the Other Stakeholders, the Patriarch Stakeholders, the Committee, and any subsequent holder of any secured notes issued by any of the Debtors (including, with respect to any of the foregoing, any agents, successors, or assigns); provided, however, with respect to the Zohar III Controlling Class only, no Party shall be required to disclose the terms of the Settlement Agreement to any successor, assign or transferee, nor shall it be liable for any successor's, assign's or transferee 's breach of the Settlement Agreement;  provided, further however, that the first sentence of paragraph 30 of

the Settlement Agreement shall be null and void solely to the extent it contemplates a separate "confidential stipulation."

3.       A prospective purchaser or seller of debt issued or guaranteed by the Zohar III, Corp. or Zohar III, Limited may obtain a copy of the terms of the Settlement Agreement from the CRO, only after executing a standard NDA consistent with the practice in the District of Delaware for the sole and limited purpose of evaluating a potential purchase of such debt, provided however, that such terms shall not include Exhibits to the Settlement Agreement. Without limiting the binding effect of the Settlement Agreement provided for under Paragraph 2 of this Order, in the event a potential purchaser of debt becomes a holder of Zohar III Claims, such NDA shall bind the entity requesting access to the terms of the Settlement Agreement, any individual representing any such entity in such a request, and any individual who is granted access to the terms of the Settlement Agreement on behalf of any such entity.

4.       Notwithstanding anything in the Order to the contrary, nothing contained in this Order is or shall be deemed to be an act by the Trustee to consent to or vote for or accept or adopt on behalf of any Secured Party any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding.  (All capitalized terms used in the prior sentence have the meaning ascribed to them in the applicable indenture between the Debtors and U.S. Bank.)

5.       Notwithstanding anything to the contrary in this Order or the Settlement Agreement, nothing set forth in the Settlement Agreement is binding on Blank Rome LLP.

6.       Notwithstanding anything to the contrary in this Order or the Settlement Agreement, nothing set forth in the Settlement Agreement is binding on Alvarez & Marsal Zohar

Management LLC ("AMZM"), provided, however, that paragraph 16 of the Settlement

Agreement provides that AMZM shall be terminated.

7.      The Debtors are authorized and empowered to take any and all actions necessary

to carry out, effectuate, or otherwise enforce the terms, conditions, and provisions of the

Settlement Agreement.

8.      This Court shall retain jurisdiction to hear any and all disputes arising out of the

interpretation or enforcement of this Order.


Dated:  May **21**, 2018
        Wilmington, Delaware

Christopher S. Sontchi
United States Bankruptcy Judge

**Exhibit 1**

**Settlement Agreement**

**Mediation Term Sheet**
**(In re: Zohar III Corp., *et al.*, Case No. 18-10512 (CSS))**

**15 Month Window** – The period that expires 15 months from the date hereof.

**18 Month Extended Window** – If each of MBIA and the Zohar III Claims receive 50% of their respective Paid in Full amount within the 15 Month Window, the 15 Month Window shall be deemed to be extended by 3 months and shall be hereafter referred to herein as the 18 Month Extended Window.

**Bankruptcy Court** – The United States Bankruptcy Court for the District of Delaware, which is presiding over the Chapter 11 cases of the Debtors.

**Debtors** – The debtors in the Chapter 11 cases captioned: In re: Zohar III Corp., *et al.*, Case No. 18-10512 (CSS).

**Designated Tax Director** - the limited role Tilton shall have on behalf of the Debtors as described in paragraph 2 below.

**Full Payment Date** – The date on which the parties or the classes of noteholders on Exhibit A are Paid in Full.

**Independent Director** – the director appointed by the Mediator. The Independent Director (a) shall be unaffiliated with any party and (b) shall have played no role in connection with and held no claim against or interest in any of the Debtors.

**Indentures** – (1) The Indenture among Zohar CDO 2003-1, Limited, Zohar CDO 2003-1 Corporation, Zohar CDO 2003-1, LLC, and MBIA Insurance Corporation, CDC Financial Products, Inc., and U.S. Bank National Association, dated November 13, 2003; (2) The Indenture among Zohar II 2005-1, Limited, Zohar II 2005-1, Corp., Zohar II 2005-1, LLC, MBIA Insurance Corporation, IXIS Financial Products Inc., and LaSalle Bank National Association, dated January 12, 2005; and (3) The Indenture among Zohar III, Limited, Zohar III, Corp., Zohar III, LLC, Natixis Financial Products Inc., and LaSalle Bank National Association, dated April 6, 2007.

**MBIA** – MBIA Insurance Corp.

**Mediator** – The Honorable Kevin Gross, and if Judge Gross resigns as mediator Judge Sontchi will appoint a replacement mediator.

**Other Stakeholders** – (a) US Bank and MBIA, when not referring to Zohar III, (b) US Bank and the Controlling Class representative when solely referring to Zohar III, and (c) US Bank, MBIA and the Zohar III Controlling Class when referring to Zohar III and either or both of Zohar I and Zohar II.

01:23191627.1

***Paid in Full*** – The amount owed to the parties and in the amounts listed and calculated on the schedule attached hereto as Exhibit A to be updated monthly to reflect accrued and unpaid interest and fees allowable under the Indentures.[1]

***Patriarch Stakeholder*** – Entities included in Exhibit B.

***Group A Portfolio Companies*** – Those companies listed on the schedule attached hereto as Exhibit C.

***Group B Portfolio Companies*** – Those companies listed on the schedule attached hereto as Exhibit D.[2]

***Tilton*** – Ms. Lynn Tilton.

***U.S. Bank*** – U.S. Bank National Association, solely in its capacity as Trustee under the Indentures, and not in its individual capacity.

***Zohar III Noteholders*** – those entities or the classes of noteholders listed on the schedule attached hereto as Exhibit E.

***Zohar III Claims*** – Claims under the Zohar III Indenture $[X]

***Zohar Funds*** – collectively, Zohar CDO 2003-1, Limited; Zohar CDO 2003-1 Corporation; nondebtor Zohar CDO 2003-1, LLC; Zohar II 2005-1, Limited; Zohar II 2005-1, Corp.; nondebtor Zohar II 2005-1, LLC; Zohar III, Limited; Zohar III, Corp.; and nondebtor Zohar III, LLC)

**Terms**

---

[1] This footnote is intended to cover MBIA's claims. Other than the Policy Payment in the amount of $148,951,585 with respect to Zohar I and the Policy Payment of $770,109,326 with respect to Zohar II reflected on Exhibit A, the calculation of which amounts are not subject to challenge by Tilton; all other rights reserved. MBIA will consult in good faith with Tilton regarding the other amounts and calculations specified in Exhibit A. If the parties are unable to agree on those other amounts, the matter shall be referred to the Mediator. If the Mediator is unable to resolve the dispute, the matter shall be brought to the Bankruptcy Court for resolution. Any equity interest owed to MBIA or Zohar I, as applicable, will be escrowed until the expiration of the 15 Month Window; all parties' rights reserved. Any proceeds from the sale or repayment of Zohar I loans (but not the equity interest) shall be paid directly to MBIA.

[2] Group B Portfolio Companies will exclude the Group A Portfolio Companies.

01:23191627.1

A-280

1. The Mediator shall appoint a single Independent Director for each of the Zohar Funds (same director shall be appointed for all of the Zohar Funds). The Independent Director shall not have the power to convert or dismiss the Chapter 11 cases during the 15 Month Window. Tilton shall resign as a director of each and shall have no governance authority or responsibility for the Zohar Funds, other than as Designated Tax Director. On the Full Payment Date, the Independent Director shall be deemed to resign and Tilton shall be automatically reinstated as director of each of the Zohar Funds (with all powers attendant to such position also automatically reinstated).

2. Notwithstanding anything to the contrary herein except subject only to paragraph 3 and 14, Tilton shall remain the director of each of the Debtors (until such time as she is no longer the taxpayer for the Debtors, the Group B Portfolio Companies, and Group A Portfolio Companies) solely for the purpose of exercising (and having no other rights or authority) to (a) manage the tax liability and reporting of the Debtors and the Group B Portfolio Companies, (b) manage the tax reporting of the Group A Portfolio Companies and (c) with respect to the Group B Portfolio Companies, manage any event causing cancellation of debt income (forgiveness of debt, liquidation, unwind, or foreclosure) including to manage the timing of sale of the Group B Portfolio Companies, forgiveness of debt and realizing gains and losses (the "Designated Tax Director"). In that capacity, Tilton shall continue to bear the tax liability associated with ownership of the Debtors, the Group B Portfolio Companies, and the Group A Portfolio Companies, including with respect to any Group A Portfolio Company transactions.

3. Subject to the last sentence of this paragraph 3, if the Full Payment Date does not occur within the 15 Month Window, Tilton and the CRO shall negotiate in good faith on how to monetize the Group B Portfolio Companies. In the event of any dispute in such negotiations, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve any or all disputes, the parties shall jointly seek an order of the Bankruptcy Court resolving such disputes.

4. [TBD: CRO and LT will develop reasonable process milestones related to hiring bankers, ….]

5. The Group A Portfolio Companies will be sold without regard to Tilton's personal tax liability.

6. The Independent Director/CRO shall appoint a new independent administrative agent under the Zohar credit agreements (the "New Agent") who shall report only to the Independent Director/CRO and U.S. Bank ; provided, (a) that PPAS remains the administrative agent under the Zohar credit agreements for all purposes related to the Patriarch Stakeholders and any other third party; and (b) during the 15 Month Window or the 18 Month Extended Window, as applicable, the New Agent shall

01:23191627.1

A-281

have all rights and remedies available under the Credit Agreement with respect to the Zohar interests in the Group A Portfolio Companies; provided, however, that the New Agent shall not have the ability to take any action, declare any default or exercise any remedy with respect to any Group A Portfolio Company (other than for prospective non-payment of interest) or any Group B Portfolio Company and subject to the tolling of claims and other terms hereof. PPAS, the Independent Director/CRO, and the New Agent shall use reasonable efforts to transition existing Zohar-related PPAS matters to the new agent. Subject to the approval of the Independent Director/CRO. PPAS shall use commercially reasonable efforts to take all reasonable actions to ensure the continued validity and perfection of any security interests and liens for loans transferred to the New Agent. PPAS may be reimbursed for reasonable transition costs incurred in transition to the New Agent. If there is any dispute with respect to any of the foregoing, in the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties shall jointly seek an order of the Bankruptcy Court resolving that dispute. Nothing in the foregoing paragraph shall prejudice rights and remedies of the parties to Patriarch Partners Agency Services, LLC v. Zohar CDO 2003-1, Ltd., No. 16-cv-4488 (S.D.N.Y.), in the event that litigation is resumes.

7. If the Independent Director resigns prior to the Full Payment Date, the Mediator shall appoint a replacement Independent Director. In connection therewith, the Mediator shall consult with the controlling class of Zohar III noteholders, MBIA and Tilton about director candidates. The Independent Director shall be fully charged with governance of the Zohar Funds under applicable Cayman or Delaware law.

8. The Independent Director will retain a CRO to participate in the process to monetize the Debtors' interests in the Group A Portfolio Companies, whether through sale or refinancing (the "*Monetization Process*"). The CRO shall (a) replace the current CRO, (b) be unaffiliated with any party, and (c) have played no role in connection with and held no claim against or interest in any of the Debtors; provided, however, that Rob Kost may be considered for any role in the monetization process, by the CRO. The Independent Director and CRO each will execute a standard NDA consistent with the practice in the District of Delaware.

9. Tilton shall remain in her position as director, manager and officer, as applicable, of the Group A Portfolio Companies during the 15 Month Window, or, if qualified, for the 18 Month Extended Window. During the 15 Month Window, or, if qualified, for the 18 Month Extended Window, all parties agree that no action shall be taken to remove Tilton from any such position.

10. With full and joint authority, Independent Director/CRO, with full authority on behalf of the Debtors, and Tilton, with full authority on behalf of the Group A Portfolio Companies, will conduct a process to monetize the Group A Portfolio

01:23191627.1

Companies and the Group B Portfolio Companies. It is acknowledged that the CRO will act in the best interests of the Zohar Funds, and Tilton in the best interests of the Group A Portfolio Companies. Tilton and the CRO shall jointly select bankers and other professionals, prioritize sales, oversee the bid process and select transactions to complete. Tilton shall work with the CRO, who shall jointly with Tilton choose bankers to be retained for Group A Portfolio Company sales. Each shall have full and complete information regarding the Monetization Process and sources and uses of funds in any transaction consummated as part of the Monetization Process. Tilton and the CRO shall use good faith, commercially-reasonable efforts to coordinate prospective meetings with bankers and buyers. But in no event shall the CRO interfere in any way with the operations of the Group A Portfolio Companies and the Group B Portfolio Companies.

11. Any dispute with respect to the Monetization Process between the Independent Director/CRO and Tilton, in the first instance, shall be referred to the Mediator. If the dispute cannot be resolved by the Mediator, the parties retain all rights to seek an order of the Bankruptcy Court resolving such dispute.

12. Tilton and the CRO shall work jointly as outlined herein to monetize the Group A Portfolio Companies until such time as the (i) the parties each agree in writing to terminate this settlement agreement, such agreement to be granted or withheld in their sole respective discretion or (ii) the Full Payment Date.

13. At the Full Payment Date, MBIA and the Zohar III Noteholders shall have no direct or indirect claim against, or interest or participation in the Zohar Funds or the Group A Portfolio Companies; provided, however, that the resolution of any dispute regarding the escrow referenced in footnote 1 shall not be barred as of the Full Payment Date by the provisions of this paragraph.

14. The 225 Action remains subject to the stay subject to satisfaction of the 15 Month Window. The Status Quo Orders entered in the 225 Action are held in abeyance and shall have no effect during the 15 Month Window or 18 Month Extended Window with respect to the Monetization Process involving any Group A Portfolio Company.

15. MBIA and Zohar III shall form a Zohar Fund creditors committee (the "Committee") to oversee and monitor the Zohar bankruptcy. The CRO shall provide the Committee members with all information necessary to assess and represent the interests of the Other Stakeholders other than information whose distribution is reasonably limited at the request of investment bankers or potential buyers. The committee shall be comprised of 3 representatives. The members and their respective advisors shall execute standard NDAs consistent with the practice in the District of Delaware. The reasonable fees and expenses of the Committee and its advisors shall be set forth in a budget to be approved by the CRO and shall

01:23191627.1

A-283

be paid by the estates. All other litigation, motions and contested matters between any of the parties other than the 225 Action as discussed above, shall be stayed, with appropriate protections so there is no prejudice to any parties. Except as specifically set forth herein, no other litigation, motions, and/or contested matters may be re-initiated or brought (directly or indirectly) by (a) any Other Stakeholders, (b) the Debtors, (c) the New Agent, (d) the Group A Portfolio Companies, (e) the Group B Portfolio Companies, and (f) any Collateral Manager, seeking any relief against the Patriarch Stakeholders (and their respective officers, directors, employees, affiliates and agents), or any of the Group A or Group B Portfolio Companies.

For the avoidance of doubt, with respect to any of the entities identified in paragraph 15: (1) (a) any litigation, claim, motion, or contested matter that was or could have been brought prior to the date hereof, and (b) any litigation, claim, motion, or contested matter that could be brought after the date hereof arising from any facts, acts, or omissions that first arose prior to the date hereof, shall be stayed during the 15-Month Window, with appropriate protections so there is no prejudice to any party and; (2) any other litigation, claim, motion, or contested matter not referenced in paragraph 15(1) shall only be brought subject to the provisions of paragraphs 17 and 23, and no other litigation, claim, motion, or contested matter that does not fall within paragraph 17 and 23 shall be brought by any such entity against any other such entity during the 15-Month Window.

16. AMZM and any of its affiliates (collectively, "AMZM") shall not be a member of or advisor to the Committee, and, except herein, AMZM shall not be paid or reimbursed by the estates or the Portfolio Companies for any fees or expenses with respect to the Monetization Process or any other purpose; provided, however, that (a) AMZM shall be terminated as Collateral Manager, and MBIA and the Zohar III Noteholders shall designate a new Collateral Manager who has no claim against the Debtors, and the Collateral Management Agreement shall be amended in a manner to reflect the settlement herein and (b) all parties reserve their rights with respect to any AMZM fees and expenses incurred prior to the date hereof. Subject to the approval of the CRO, AMZM may be reimbursed for reasonable transition costs solely incurred in the transmitting of information to the new collateral manager. [TBD: Side agreement b/w cro and CM ensuring reasonable fees which will be escrowed to escrow CM fees due under the indenture ]

17. The Debtors shall promptly negotiate with the secured parties funding of the Debtors' Chapter 11 cases from the use of the secured parties' cash collateral. In order to facilitate this negotiation, the Zohar Funds will provide customary bankruptcy case budgets, including anticipated sources and uses of cash (including payments from the Group A Portfolio Companies). It is understood and agreed the Zohar Funds shall not utilize any cash they are holding pending an agreed order. In the event of any dispute among the parties with respect to use of cash collateral, in

01:23191627.1

A-284

the first instance such dispute shall be referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute.

18. Any (A) claim asserted by the Patriarch Stakeholders that is supported by written documentation showing the claim (a) was funded to a Group A Portfolio Company by a Patriarch Stakeholder (in the case of funded debt claim), or (b) represents a fee or other claim arising from a deferral of payment or any management and/or administrative fee owed to a Patriarch Stakeholder[3] and (B) equity interest asserted by the Patriarch Stakeholders is supported by written documentation, then such claim and equity interest, as applicable, shall be deemed due and payable through the closing of any monetization event on a pari passu basis with other similarly situated claims and equity unless the applicable credit agreement provides otherwise.[4] In connection with any such closing, the Patriarch Stakeholders will release any liens that secure any of the foregoing non-challenged claims on a pari passu basis with liens on the same collateral held by the Other Stakeholders. All parties' respective rights to challenge the propriety of any of the foregoing claims or equity interests are tolled without prejudice until the expiration of the 18 Month Window (provided the Full Payment Date does not occur on or before such date), but no such claim shall be brought during the 18 Month Window or used to block the closing of any pending transaction in the Monetization Process. The Patriarch Stakeholders will promptly provide any information reasonably requested by the CRO to verify the existence of the funding and documentation described above (provided that the CRO may share the foregoing information with Other Stakeholders (subject to the execution of an NDA approved by the Mediator) as required in the CRO's reasonable discretion. With respect to the claims in (A) above, the payments to the Patriarch Stakeholders that shall be made without further analysis or challenge shall be capped at $250 million, with any amounts in excess to be held in escrow until Full Payment Date. Tilton represents that none of the claims in (A) currently prime the secured claims of the Other Stakeholders in the Group A Portfolio Companies, other than ABLs in ████████████████ ██████. Nothing herein is intended to or shall elevate or modify the existing priority of any claims or liens.

19. All causes of action among the Debtors, Other Stakeholders and Patriarch Stakeholders (including any of their affiliates or agents) with respect to the Debtors, the Group A Portfolio Companies and the Group B Portfolio Companies

---

[3]    Management and/or administrative fees as noted here are defined in a separate agreement entered between the parties concurrent with this agreement.

[4]    Tilton to provide a good faith estimate on company by company basis for each of the Group A Portfolio Companies on an aggregate basis, in each case reflecting the aggregate amount she expects will be covered by this paragraph 17.

01:23191627.1

shall be tolled during the 15 Month Window or, if qualified, for the 18 Month Extended Window, and all parties' respective rights shall be reserved with respect thereto, including with respect to venue and jurisdiction.

20. Tilton represents that the Group A Portfolio Companies and the Group B Portfolio Companies will be operated in the ordinary course of business during the 15 Month Window. During the 15 Month Window, the Group A Portfolio Companies and the Group B Portfolio Companies shall not declare dividends but shall be authorized to (b) (i) enter into financing transactions with affiliates on market terms, subject to first consulting with the CRO or (ii) issue new equity that will dilute the existing equity holdings on market terms, subject to first consulting with the CRO; provided, however, that if the CRO objects to the financing or equity described in the foregoing subparagraphs (b)(i) and (ii), the CRO may take that dispute to the Mediator for final resolution. Notwithstanding the foregoing, the Group A Portfolio Companies and the Group B Portfolio Companies can distribute payments as designated by the Designated Tax Director for the payment of their state and federal income taxes.

21. The Group A Portfolio Companies shall share with employees of MBIA (who sign NDAs as described in Paragraph 15 herein) financial statements and backup reasonably requested in writing by MBIA. Any information provided to MBIA shall only be shared in the following way: someone employed by MBIA can view the documents in the New York offices of Gibson Dunn but may not take copies or pictures of any documents or share any information in those documents, except with the CRO. In the event of any dispute among the parties with respect to the reasonableness of that request, such dispute shall be finally decided by the Mediator.

22. While any dispute is before the Mediator, no party to such dispute shall take any action in Bankruptcy Court.

23. If any party materially breaches this Agreement, the dispute shall be in the first instance determined by the Mediator on a confidential basis. The Mediator shall have all remedies available to him. If the Mediator cannot resolve the dispute, the Mediator shall make a report and recommendation to the Bankruptcy Court and the parties shall jointly seek an order of the Bankruptcy Court resolving such dispute. In connection with the foregoing, the Mediator shall determine to what extent information should be filed under seal, subject to the order of the Bankruptcy Court approving such filing under seal. The parties agree that for purposes of any decision of the Bankruptcy Court dealing with any matter covered by this paragraph, the Agreement is non-severable under all circumstances.

24. Any application by any party for assistance from the Mediator shall be brought within seven (7) days of identifying the dispute to the other party or parties

01:23191627.1

A-286

involved in the dispute, and heard at the Mediator's earliest availability. Any application shall be in writing and served by email on the other parties.

25. Upon the expiration of the 15 Month Window, the Independent Director/CRO may take all necessary and appropriate action in the best interests of the Zohar Funds without any restriction herein or otherwise, including, but not limited to, seeking relief from the Bankruptcy Court to lift the automatic stay, taking action to remove Tilton as a director or manager of the Group A Portfolio Companies or the Group B Portfolio Companies, or dismissing or converting the cases to chapter 7 cases. Upon the expiration of the 15 Month Window, all parties to the chapter 11 cases shall have and may exercise any and all rights available under applicable law.

26. The parties (other thn U.S. Bank) shall issue the joint press release as set forth in Exhibit F stating that the parties will work in a mutually cooperative process in support of the Monetization Process (and no other press release). If the parties cannot jointly agree, then the Mediator shall resolve any disputes. The parties shall also agree to standard non-disparagement terms.

27. The Bankruptcy Court shall retain jurisdiction to enforce the terms of this agreement and all parties agree to submit to the jurisdiction of the Bankruptcy Court for resolution of any matter in connection with this agreement or the enforcement thereof; provided, however, that no party shall be deemed to consent to venue or jurisdiction before the Bankruptcy Court for any matter not in connection with this agreement or the enforcement thereof.

28. The parties will work with the indenture trustee under the Zohar indentures to satisfy the requirements of the indentures with respect to the implementation of this Agreement. Any such dispute related to satisfaction of such requirements shall be, in the first instance, referred to the Mediator. If the Mediator cannot resolve that dispute, the parties will jointly seek an order of the Bankruptcy Court resolving that dispute..

29. For the avoidance of doubt, if each of MBIA and the Zohar III Claims receive 50% of the Paid in Full amount within the 15 Month Window, the 15 Month Window shall be herein shall be replaced with the term 18 Month Extended Window for all purposes.

30. The foregoing terms shall be memorialized in a confidential stipulation filed under seal and entry of an order by Judge Sontchi, on terms and conditions satisfactory to the parties. The order shall provide, among other provisions, that this Agreement and the order shall be binding on all parties and their successors and assigns.

[INSERT SIGNATURE BLOCKS]

01:23191627.1

EXHIBIT A

01:23191627.1

**ZOHAR I**

| | | | |
|---|---|---|---|
| Amounts paid on Nov. 20, 2015 under the Policy | | 148,951,585 | Indenture § 11.1(a)(i)(G), 11.1(a)(ii)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Interest (Prime + 2%), as of April 18, 2018 | | 8,249,532 | Insurance Agreement § 4.03 |
| SUBTOTAL | | 157,201,117 | |
| Credit Enhancement Liabilities incurred in connection with MBIA's administration, enforcement, defense or preservation of rights under the Transaction Documents* | | 7,718,876 | Indenture § 11.1(a)(i)(G), 11.1(a)(II)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
|     Legal fees/expenses | 7,531,990 | | |
|     Financial, investment and non-legal advisors | 186,886 | | |
| **TOTAL ZOHAR I CLAIM** | | **164,919,993*** | |

**ZOHAR II**

| | | | |
|---|---|---|---|
| 1/20/2017 Policy Payment | | 770,109,326 | Indenture § 11.1(a)(i)(G), 11.1(a)(ii)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
| Interest (Prime + 2%), as of April 18, 2018 | | 27,080,207 | Insurance Agreement § 4.03 |
| SUBTOTAL | | 797,189,533 | |
| Credit Enhancement Liabilities incurred in connection with MBIA's administration, enforcement, defense or preservation of rights under the Transaction Documents* | | 14,851,685 | Indenture § 11.1(a)(i)(G), 11.1(a)(ii)(B); Insurance Agreement (definition of Accrued Insurance Liabilities) |
|     Legal fees/expenses | 10,641,048 | | |
|     Financial, investment and non-legal advisors | 4,210,637 | | |
| **TOTAL ZOHAR II CLAIM** | | **812,041,218*** | |

| | |
|---|---|
| **ZOHAR PAID IN FULL AMOUNT** | **$976,961,211** |

*Assumptions:
All amounts are "as of" April 18, 2018 and will change pending Full Payment Date, including to reflect interest accrued and other Credit Enhancement Liabilities which MBIA has not yet paid
Portfolio Company Zohar I loan interest payments will continue to be paid directly to MBIA
Zohar II claim amount does not reflect Portfolio Company loan interest payments which MBIA is entitled to receive, but have not yet been distributed to MBIA.

MBIA is not seeking reimbursement for costs, expenses or interest payments made in connection with MZ Funding loan

# EXHIBIT A

## [ZOHAR III CLAIMS]

**Disclaimer**: The Zohar III Claims as forth in this Exhibit A have not been verified by the Collateral Manager since January 2016 as required by the Indentures and Management Agreement, and therefore, U.S. Bank makes no representation as to accuracy of the Zohar III Claims as set forth below, which claims and interest accruals may be modified or otherwise revised or verified when the new Collateral Manager is designated in accordance with the Mediation Term Sheet. Once the Collateral Manager is appointed, that person or entity, after consultation with U.S. Bank, will be responsible for updating the amounts herein to reflect unpaid principal, accrued and unpaid interest, and other fees, expenses, and other amounts allowable under the Indentures. Notwithstanding anything to the contrary in this Exhibit A or in the Mediation Term Sheet, nothing shall modify, alter, or otherwise change the Priority of Payments set forth in the Indentures, and U.S. Bank's rights, remedies, and objections to any such modification, alteration, or other change thereto are fully reserved. Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Mediation Term Sheet to which this Exhibit A is attached or in the Indentures.

The following does not include interest accruing after 5/18/18. The following schedule excludes certain categories and amounts that must be paid prior to principal and interest owing to the Holders of the notes, including, without limitation, certain fees, expenses, reserves, and other amounts, which are set forth in the Priority of Payments of each Indenture (that have accrued or may accrue in the future):

| Issue Name | Issue Date | Maturity Date | Issue Amount | Original Par Amount | Current Balance | Prepetition Accrued Interest** | Addt'l Accrued Interest Thru 5/18/18*** | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| Class A-1R | 4/11/2007 | 4/15/2019 | $ 200,000,000.00 | $ 200,000,000.00 | $ 135,767,116.30 | $ 686,522.34 | $ 586,182.09 | $ 137,039,820.3 |
| Class A-1T | 4/11/2007 | 4/15/2019 | $ 150,000,000.00 | $ 150,000,000.00 | $ 101,825,337.23 | $ 509,743.92 | $ 436,203.28 | $ 102,771,284.3 |
| Class A-1D | 4/11/2007 | 4/15/2019 | $ 350,000,000.00 | $ 350,000,000.00 | $ 237,592,453.54 | $ 1,189,402.47 | $ 1,017,807.66 | $ 239,799,663.7 |
| Class A-2 | 4/11/2007 | 4/15/2019 | $ 200,000,000.00 | $ 200,000,000.00 | $ 200,000,000.00 | $ 1,087,156.78 | $ 914,108.70 | $ 202,001,265.8 |
| Class A-3 | 4/11/2007 | 4/15/2019 | $ 116,000,000.00 | $ 116,000,000.00 | $ 116,000,000.00 | $ 689,195.38 | $ 569,346.03 | $ 117,258,541.1 |

**This is the accrued interest that wasn't paid because of the $4,637,241.39 deposit of interest outside the collection account before the petition date

***The "Addt'l Accrued Interest Thru 5/18/18" column capitalizes the "Prepetition Accrued Interest" into the Current Balance and then Accrues Interest Thereon through 5/18/18

EXHIBIT B

**Exhibit B: Patriarch Stakeholders**

• Ark Entities (including Ark Angels, LLC; Ark Angels II, LLC; Ark Angels III, LLC; Ark
Angels VIII, LLC; Ark Investment Partners II, LP; Ark II CLO 2001-1, Ltd.)
• LD Investments, LLC
• Lynn Tilton
• Octaluna LLC Entities (including Octaluna LLC; Octaluna II, LLC; Octaluna III, LLC)
• Patriarch Partners Entities (including Patriarch Partners, LLC; Patriarch Partners VIII, LLC;
Patriarch Partners, XIV, LLC; Patriarch Partners XV, LLC)
• Patriarch Partners Management Group, LLC (PPMG)
• Patriarch Partners Agency Services, LLC (PPAS)
• Zohar Holdings, LLC

01:23191627.1

EXHIBIT C

**Group A Portfolio Companies**

**[REDACTED]**

01:23191627.1

EXHIBIT D

**Group B Portfolio Companies**

**[REDACTED]**

01:23191627.1

A-293

EXHIBIT E

[To be provided]

EXHIBIT F

## The Zohar Funds, Lynn Tilton, MBIA, and the Zohar III Noteholders
## Announce Resolution to
## Stay Litigation, Refinance and Monetize Zohar Assets

NEW YORK – April [XX], 2018 –Zohar CDO 2003-1, Zohar CDO 2003-1 Corp., Zohar II 2005-1, Limited, Zohar II 2005-1 Corp., Zohar III, Limited, and Zohar III, Corp. (collectively, the "Zohar Funds"), Lynn Tilton, MBIA Insurance Corporation, a wholly owned subsidiary of MBIA Inc. (NYSE: MBI), and the Zohar III Controlling Class of Noteholders jointly announce today that the parties have mutually resolved the motions pending in federal Bankruptcy Court in the District of Delaware relating to the Zohar Funds, and have agreed to a deal that will include a stay of all pending litigation between the parties. This agreement is intended to facilitate the refinancing and monetization of assets of the Zohar Funds to the benefit of all stakeholders, and the parties have agreed to work in a mutually cooperative process in support of such refinancing and monetization.

As part of the agreement, an Independent Director will be appointed to govern the Zohar Funds, along with a Chief Restructuring Officer, who together with Ms. Tilton as director and manager of each Portfolio Company, will jointly implement the refinancing and monetization process. During the process, Ms. Tilton will remain in her current roles at the Portfolio Companies, all litigation between the parties will be stayed for a minimum of 15 months, and the bankruptcy cases will proceed without the appointment of a Trustee.

Ms. Tilton stated, "This agreement is a meaningful and important step towards allowing the Zohar Funds to monetize and refinance their assets in order to pay off all creditor claims in full. It is in the best interest of all stakeholders that we lay down our swords and stop the years of damaging litigation in order to maximize value for all of the Funds' stakeholders."

Anthony McKiernan, Chairman of MBIA Insurance Corporation, stated that "MBIA is pleased that the parties have been able to come to a consensual agreement that will put in place a process to enable MBIA to recover on the significant amounts it has paid its policyholders."

Marc Kirschner of Goldin Associates, Chief Restructuring Officer of the Zohar Funds, added, "The resolution of the hotly contested litigation in the bankruptcy cases is in the best interests of the Zohar Funds and their stakeholders as it will pave the way for the Zohar Funds to maximize the value of their assets for the benefit of all. The mediated result was the culmination of significant negotiations and the Zohar Funds are deeply appreciative of the the efforts of the mediator, Judge Kevin Gross, for facilitating a settlement of the pending matters, which was no simple task."

Today's agreement will have no immediate effect on the operations of the Portfolio

01:23191627.1

Companies to whom the Zohar Funds have made senior secured loans.  The Portfolio Companies will continue to operate their businesses in the ordinary course as they are not parties to these bankruptcy cases.

**MEDIA CONTACTS:**

FOR LYNN TILTON
**Brunswick Group**
Alex Yankus
212-333-3810
ayankus@brunswickgroup.com

**MBIA**
Greg Diamond, 914-765-3190
Investor and Media Relations
greg.diamond@mbia.com

01:23191627.1

# **EXHIBIT B**

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# EXHIBIT B

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# **EXHIBIT B**

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# EXHIBIT B

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# EXHIBIT B

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# EXHIBIT B

Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# **EXHIBIT B**

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# EXHIBIT B

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# **EXHIBIT B**

## Management Services Agreement

[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# **EXHIBIT B**

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# EXHIBIT B

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# EXHIBIT B

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# **EXHIBIT B**

## Management Services Agreement

[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# EXHIBIT B

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# EXHIBIT B

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# **EXHIBIT B**

Management Services Agreement

[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# EXHIBIT B

## Management Services Agreement
[PPMG has requested that the entirety of this Exhibit be filed under seal.]

# **Exhibit C**

# AMENDMENT NO. 8
## TO CREDIT AGREEMENT OF
## LVD ACQUISITION, LLC

Amendment No. 8 (this "Amendment"), dated as of November __, 2015, to the Credit Agreement, effective as of June 1, 2010 (as modified to the date hereof, the "Credit Agreement"), among LVD ACQUISITION, LLC, a Delaware limited liability company, and the other borrower signatory hereto (each a "Borrower" and, collectively, the "Borrowers"), the guarantors from time to time party thereto, the financial institutions and other investors from time to time party thereto as Lenders and PATRIARCH PARTNERS AGENCY SERVICES, LLC, a Delaware limited liability company, as administrative agent for such Lenders (in such capacity, the "Administrative Agent"). Capitalized terms used herein but not defined herein are used as defined in the Credit Agreement.

W I T N E S S E T H :

WHEREAS, the Borrowers, the Guarantors, the Lenders and the Administrative Agent are party to the Credit Agreement; and

WHEREAS, the Lenders party to this Amendment, the Borrowers and the Administrative Agent have agreed, subject to certain limitations and conditions set forth below, to make certain amendments to the Credit Agreement, as more specifically set forth below;

NOW, THEREFORE, the parties hereto agree as follows:

Section 1.    Amendments to the Credit Agreement.    The Credit Agreement is, effective as of the date first written above and subject to the satisfaction (or due waiver) of the conditions set forth in Section 2 (Conditions Precedent to the Effectiveness of this Amendment) hereof, hereby amended as follows (with bold, underline, highlighting, indenting and other formatting modified to conform to the formatting of the Credit Agreement):

(a)    Amendments to Schedules.

(i)    The contents of the columns set forth on Schedule A hereto are hereby inserted at the end of Schedule 2.1 to the Credit Agreement to reflect a restructuring of $20,291,872.92 of unpaid interest and commitment fees into Tranches TLD, TLE, and TLF. In addition, Administrative Agent hereby waives its ability to call an Event of Default for the past failure to pay such unpaid interest.

Section 2.    Conditions Precedent to the Effectiveness of this Amendment.    This Amendment shall become effective as of the date first written above (the "Amendment Effective Date") when, and only when, each of the following conditions precedent shall have been satisfied or duly waived by the Administrative Agent (the date each such conditions precedent is satisfied or duly waived, the "Conditions Precedent Date"):

(a)    Certain Documents.    The Administrative Agent shall have received this Amendment, duly executed by the Borrowers and the Lenders constituting all Lenders, together with such additional documentation as the Administrative Agent may reasonably require, dated

A-315

Patriarch/PC Confidential

the Amendment Effective Date (unless otherwise agreed by the Administrative Agent) and in form and substance satisfactory to it;

        (b)    <u>Representations and Warranties</u>.  Each of the representations and warranties contained in this Amendment were true when made;

        (c)    <u>No Default or Event of Default</u>.  After giving effect to this Amendment, no Default or Event of Default shall be continuing, either on the date hereof or on the Conditions Precedent Date;

        (d)    <u>Corporate and Other Proceedings</u>.  All corporate and other proceedings, and all documents, instruments, consents and other legal matters ancillary to the transactions contemplated by this Amendment shall be completed in a form and manner satisfactory in all respects to the Administrative Agent; and

        (e)    <u>Fees and Expenses Paid</u>.  The Borrower shall have paid all Obligations due, after giving effect to this Amendment, on or before the later of the date hereof and the Conditions Precedent Date, including, without limitation, all fees set forth in <u>Section 4</u> (<u>Fees and Expenses</u>) hereof and all other costs, expenses and fees due under any Credit Document and invoiced prior to the Conditions Precedent Date.

    Section 3.    <u>Representations and Warranties</u>.  On and as of the date hereof and as of the Conditions Precedent Date, after giving effect to this Amendment, each Borrower hereby represents and warrants to the Administrative Agent and each Lender as follows:

        (a)    <u>Binding Obligation</u>.  This Amendment has been duly authorized, executed and delivered by such Borrower and constitutes a legal, valid and binding obligation of such Borrower, enforceable against such Borrower in accordance with its terms and the Credit Agreement as modified by this Amendment;

        (b)    <u>Subsidiaries</u>.  (i) the representations and warranties set forth in <u>Section 4.1(m)</u> (<u>Subsidiaries</u>) of the Credit Agreement are true as of the date hereof (replacing "Closing Date" therein with the date of this Amendment and taking into account any updated information delivered by any Borrower to the Administrative Agent on or prior to the date hereof) and] all Subsidiaries of any Borrower existing on the Conditions Precedent Date have executed the Credit Documents required to be executed with respect to such Subsidiaries pursuant to the Credit Agreement, including, without limitation, <u>Section 5.1(m)</u> (<u>Further Assurances</u>) thereof and (ii) in any case, all certificates, statements, updated schedules, collateral and other updates and other documents required to be delivered by such Borrower to the Administrative Agent or any Lender pursuant to any Credit Document as modified hereby have been delivered thereunder and all filings required to be made by or on behalf of such Borrower pursuant to any such Credit Document have been made;

        (c)    <u>Representations and Warranties in Credit Documents</u>.  Each of the other representations and warranties of such Borrower contained any Credit Document (as modified hereby) or in any certificate, document or financial or other statement furnished at any time under or in connection therewith is true in all material respects on and as of the date hereof and the Conditions Precedent Date, in each case as if made on and as of such date and except to the extent that such representations and warranties expressly relate to a specific date, in which case such representations and warranties shall be true in all material respects as of such specific date;

Patriarch/PC Confidential

provided, however, that, as used therein, (i) "Credit Agreement" shall refer to the Credit Agreement and after giving effect to this Amendment and (ii) "Credit Documents" shall include this Amendment;

(d)     No Litigation or Defense.     No litigation has been commenced or threatened against such Borrower or any of its Subsidiaries seeking to restrain or enjoin (whether temporarily, preliminarily or permanently) the performance of any action by any Borrower or any Subsidiary of any Borrower required or contemplated by the terms of this Amendment or any other Credit Document as modified hereby, and there exists no cause of action, offset, claim, counterclaim or defense, whether or not asserted, against the Administrative Agent or any Lender or any of their Related Parties (as defined below) with respect to the Obligations under any Credit Document; and

Section 4.     Fees and Expenses.

(a)     Borrowers jointly and severally agree to pay on demand in accordance with the terms of Section 11.3 (Expenses) of the Credit Agreement all costs and expenses of the Administrative Agent in connection with the preparation, reproduction, execution, delivery and enforcement of this Amendment and all other Credit Documents entered into in connection herewith (including, without limitation, the fees and expenses of attorneys, advisors and other professionals hired by the Administrative Agent with respect to the Credit Parties or the Credit Documents).

Section 5.     Release.  In further consideration for the execution by the Administrative Agent and the Lenders party hereto of this Amendment and without limiting any rights or remedies the Administrative Agent or any Lender may have, each Borrower hereby releases each of the Administrative Agent, each Lender and each of their Related Parties (each a "Releasee" and, collectively, the "Releasees") from any and all Claims that such Borrower has or may have against any Releasee, whether or not relating to any Credit Document, Obligation, Collateral, or legal relationship that exists or may exist between any Releasee and any Borrower.  As used in this Section 5, (i) "Claims" means all liabilities, rights, demands, covenants, duties, obligations (including, without limitation, indebtedness, receivables and other contractual obligations), claims, actions and causes of actions, suits, disputes, judgments, damages, losses, debts, responsibilities, fines, penalties, sanctions, commissions and interest, disbursements, taxes, charges, costs, fees and expenses (including, without limitation, fees, charges and disbursements of financial, legal and other advisors, consultants and professionals and, if applicable, any value-added and other taxes and charges thereon), in each case of any kind or nature, whether joint or several, whether now existing or hereafter arising and however acquired and whether or not known, asserted, direct, contingent, liquidated, due, consequential, actual, punitive or treble, (ii) "Related Party" means, with respect to any Person, any Affiliate of such Person or of another Related Party of such Person (excluding, in each case, (A) the Borrowers and their Controlled Affiliates and (B) any other Person and its Controlled Affiliates in which any Lender or any other Affiliated Investor has made any investment, whether through the purchase of debt or equity securities, loans or otherwise) and such Person's and such Affiliate's predecessors, successors, assigns, managers, members, partners, directors, officers, employees (regardless of whether seconded to a third party and including, without limitation, individuals with independent contractor or similar status), individual stockholders, agents, attorneys-in-fact, trustees, fiduciaries, representatives and advisors, (iii) "Affiliated Investor" means any Person that is a collateralized debt obligation, collateralized loan obligation or any other investment pooling vehicle or other entity that (A) is created primarily to invest in equity or debt securities, loans and

- 3 -

Patriarch/PC Confidential

other investments, (B) does not operate any trade or business and (C) is administered, advised or managed by, or directly or indirectly under common administration, advice or management with, the Administrative Agent or any Lender or any Affiliate of any Lender or the Administrative Agent and (iv) "Controlled Affiliate" means, with respect to any entity, any Person directly or indirectly "controlled" (as defined in the definition of "Affiliate" set forth in the Credit Agreement on the date hereof) by one or more of such entity and its other Controlled Affiliates.

Section 6. <u>Reaffirmation of Obligations</u>. Each Borrower hereby reaffirms (a) all of its obligations and liabilities, as expressly modified hereby, under the Credit Documents and agrees that such obligations and liabilities shall remain in full force and effect, (b) the Liens granted under the Credit Documents, and agrees that such Liens shall continue to secure the Obligations as expressly modified hereby, and (c) the validity and enforceability of the Credit Documents.

Section 7. <u>Effect on the Credit Documents</u>. This Amendment is a Credit Document and is limited as written. As of the date each modification set forth herein shall become effective, each reference in the Credit Agreement to "this Agreement," "hereunder," "hereof," "herein," or words of like import, and each reference in the other Credit Documents to the Credit Agreement (including, without limitation, by means of words like "thereunder," "thereof" and words of like import), shall refer to the Credit Agreement as modified thereby, and this Amendment and the Credit Agreement shall be read together and construed as a single agreement. The execution, delivery and effectiveness of this Amendment shall not, except as expressly provided herein, (a) waive or modify any right, power or remedy under, or any other provision of, any Credit Document or (b) commit or otherwise obligate the Administrative Agent or any Lender to enter into or consider entering into any other waiver or modification of any Credit Document. This Amendment is intended to cure and waive prior Events of Defaults caused by any failure to comply with the provisions it specifically modifies (whether modified directly or through a change in a definition) that would not have occurred if this Amendment had been in effect at the time of such failure, together with any Event of Default that may exist by reason of any failure to deliver notice thereof pursuant to the Credit Agreement and by past misrepresentations under the Credit Agreement, if any, that no Default or Event of Default existed and were continuing.

Section 8. <u>Waiver of Jury Trial; Miscellaneous</u>. Headings are for convenience only and do not form part of this Amendment, except when used to reference an article or section, in which case such title reference shall govern absent manifest error in case of conflict. All communications and notices hereunder shall be given as provided in the Credit Documents. This Amendment (a) shall be governed by and construed in accordance with the law of the State of New York, (b) is for the exclusive benefit of the parties hereto and, together with the other Credit Documents, constitutes the entire agreement of such parties, superseding all prior agreements among them, with respect to the subject matter hereof, (c) may be modified, waived or assigned only in writing and only to the extent such modification, waiver or assignment would be permitted under the Credit Documents (and any attempt to assign this Amendment without such writing shall be null and void), (d) may be executed in counterparts, which may be effectively transmitted by fax or e-mail (in each case return receipt requested and obtained) and which, together, shall constitute one and the same instrument, (e) is a negotiated document, entered into freely among the parties upon advice of their own counsel, and it should not be construed against any of its drafters and (f) shall survive the satisfaction or discharge of the Obligations. The fact that any term or provision of this Amendment is held invalid, illegal or unenforceable as to any person in any situation in any jurisdiction shall not affect the validity, enforceability or legality of

- 4 -

Patriarch/PC Confidential

AMENDMENT NO. 8
CREDIT AGREEMENT
LVD ACQUISITION, LLC

the remaining terms or provisions hereof or the validity, enforceability or legality of such offending term or provision in any other situation or jurisdiction or as applied to any person. **Each party hereto hereby irrevocably and unconditionally waives any right to trial by jury with respect to this Amendment.**

[SIGNATURE PAGES FOLLOW]

- 5 -

**Patriarch/PC Confidential**

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be executed by their respective officers and general partners thereunto duly authorized, as of the date first written above.

LVD ACQUISITION, LLC,
as Borrower

By: _____
    Name: SACHA POLVEROFF
    Title: CEO

B2 ACQUISITION, INC.,
as Borrower

By: _____
    Name: JOHN JACOB
    Title: CFO

SIGNATURE PAGE TO AMENDMENT NO. 8
TO THE CREDIT AGREEMENT OF LVD ACQUISITION, LLC

**Patriarch/PC Confidential**

PATRIARCH PARTNERS AGENCY SERVICES, LLC,
    as Administrative Agent

By: _____
    Name:  Lynn Tilton
    Title:   Manager

ZOHAR CDO 2003-1, LIMITED,
    as Lender
By: Patriarch Partners VIII, LLC,
    its Collateral Manager

By: _____
    Name:  Lynn Tilton
    Title:   Manager

ZOHAR II 2005-1, LIMITED,
    as Lender
By: Patriarch Partners XIV, LLC,
    its Collateral Manager

By: _____
    Name:  Lynn Tilton
    Title:   Manager

ZOHAR III, LIMITED,
    as Lender
By: Patriarch Partners XV, LLC,
    its Collateral Manager

By: _____
    Name:  Lynn Tilton
    Title:   Manager

SIGNATURE PAGE TO AMENDMENT NO. 8
TO THE CREDIT AGREEMENT OF LVD ACQUISITION, LLC

A-321

Patriarch/PC Confidential

SCHEDULE A
AMENDMENT NO. 8
TO CREDIT AGREEMENT
LVD ACQUISITION, LLC

| Type of Loan | Tranche | Commitments[1] | Outstandings | Lender | Applicable Margin | Interest Payment Date | Maturity Date | Commitment Period (if applicable) | Prepayment Preference | OID Number |
|---|---|---|---|---|---|---|---|---|---|---|
| Term Loan | TLD | $1,261,796.67 | $1,261,796.67 | ZOHAR CDO 2003-1, LIMITED | 0% | N/A | April 15, 2019 | N/A | 7th | 1 |
| Term Loan | TLE | $14,526,968.44 | $14,526,968.44 | ZOHAR II 2005-1, LIMITED | 0% | N/A | April 15, 2019 | N/A | 7th | 1 |
| Term Loan | TLF | $4,503,107.80 | $4,503,107.80 | ZOHAR III, LIMITED | 0% | N/A | April 15, 2019 | N/A | 7th | 1 |

Patriarch/PC Confidential

---

[1] For loans which, when repaid, may not be reborrowed, only outstanding undrawn commitments are shown.

A-322

Case 18-10512-KBO Doc 1197-1 Filed 12/31/19 Page 57 of 59

# Exhibit D

AMENDED UNREDACTED VERSION
OF EXHIBIT D RE: DI 914 AND 1093

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Zohar III, Corp., *et al.*,[1]<br><br>              Debtors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Chapter 11<br><br>Case No. 18-10512<br><br>Jointly Administered<br><br>**Ref. Docket No. 868** |

## DECLARATION OF LYNN TILTON IN SUPPORT OF PPMG'S RIGHT TO PAYMENT OF TRANSACTION FEES IN CONNECTION WITH THE OASIS TRANSACTION

I, Lynn Tilton, declare, pursuant to 28 U.S.C. § 1746, under the penalty of perjury that:

1.      I am the owner of each of the Zohar Funds.  I own the Zohar Funds through entities I own (directly or indirectly), which hold all of the preference shares of the Zohar Funds. Through my ownership of the Zohar Funds, I am also the indirect owner of Zohar CDO 2003-1, Corp.; Zohar II 2005-1, Corp.; and Zohar III, Corp.  Collectively, these entities are the Debtors in the above-captioned Chapter 11 cases.  I am the Debtors' creator and founder, and I own, through my wholly owned entities, notes from certain of the Debtors.  I was also the Debtors' director prior to May 21, 2018.

2.      In November 2015, by way of *Amendment No. 8 to Credit Agreement of LVD Acquisition, LLC* (the "8th Amendment"), approximately $20 million of LVD Acquisition, LLC's ("Oasis") unpaid accrued interest and commitment fees were restructured into a new facility, which under the Zohar Funds' indentures, is an "equity kicker," a form of equity.

---

[1]  The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar I", and together with Zohar II and Zohar III, the "Zohar Funds").  The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

Specifically, the 8th Amendment provides (a) that the equity has a 0% marginal interest rate; (b) no requirement for Oasis to make regular or periodic payments in connection with that equity, whether of interest or principal; (c) no date by which any interest associated with that equity must be paid off; (d) that equity to be subordinate to all of Oasis's outstanding debt; and (e) the Debtors to wait for several years before they could expect any repayment whatsoever in connection with that equity.  Each of these characteristics was intended to reflect that the restructuring created a form of equity, not debt.  Furthermore, I am not aware of any documentation in Patriarch's records or in any trustee reports under the Zohar Funds' indentures suggesting or reflecting that any interest has ever accrued on this equity, nor has Oasis been billed for any interest or principal in connection with this equity.  Indeed, the trustee reports— which regularly list the Zohar Funds' debt—do not list the restructured equity as debt.

3.     **[\*Text Withdrawn from Docket Nos. 914 & 1093\*]**

4.     **[\*Text Withdrawn from Docket Nos. 914 & 1093\*]**

5.     **[\*Text Withdrawn from Docket Nos. 914 & 1093\*]**

6.     **[\*Text Withdrawn from Docket Nos. 914 & 1093\*]**

Dated: September 6, 2019                    /s/ Lynn Tilton
                                            Lynn Tilton

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | : | Case No. 18-10512 (KBO) |
| Debtors. | : | Jointly Administered |
|  | : | **Related to Docket No. 1915** |

## NOTICE OF FILING OF PROPOSED REDACTED VERSION OF PPMG'S OPPOSITION TO THE DEBTORS' MOTION FOR AN ORDER DETERMINING DISPUTE BETWEEN THE DEBTORS AND PPMG RELATED TO PENDING OASIS TRANSACTION

**PLEASE TAKE NOTICE** that, on September 4, 2020, **PPMG'S Opposition to the Debtors' Motion for an Order Determining Dispute Between the Debtors and PPMG Related to Pending Oasis Transaction** (the "Brief") [Docket No. 1915] was filed under seal with the Court.

**PLEASE TAKE FURTHER NOTICE** that pursuant to Del. Bankr. L.R. 9018-1(d)(ii), attached hereto as Exhibit A is the proposed redacted public version of the Brief.

Dated: September 30, 2020      **COLE SCHOTZ P.C.**

By: */s/ Patrick J. Reilley*
     Norman L. Pernick (No. 2290)
     Patrick J. Reilley (No. 4451)
     G. David Dean (No. 6403)
     500 Delaware Avenue, Suite 1410
     Wilmington, DE 19801
     Telephone: (302) 652-3131
     Facsimile: (302) 652-3117
     npernick@coleschotz.com
     preilley@coleschotz.com
     ddean@coleschotz.com

     – and –

---

[1]      The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

A-326

**GIBSON, DUNN & CRUTCHER LLP**
Robert Klyman (Admitted Pro Hac Vice)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
rklyman@gibsondunn.com

Monica K. Loseman (Admitted Pro Hac Vice)
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

Randy M. Mastro (Admitted Pro Hac Vice)
Mary Beth Maloney (Admitted Pro Hac Vice)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
rmastro@gibsondunn.com
mmaloney@gibsondunn.com

*Counsel to Patriarch Partners Management*
*Group, LLC*

## EXHIBIT A

Redacted Public Version of Sealed Brief [DI 1915]

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>Zohar III, Corp., *et al.*,[1]<br><br>                      Debtors. | ) Chapter 11<br>)<br>) Case No. 18-10512 (KBO)<br>)<br>) Jointly Administered<br>)<br>) **Ref. Docket No. 868, 911, 914, 1200**<br>) **Hearing Date: Sept. 14, 2020 at 10:00 a.m.** |

## PPMG'S OPPOSITION TO THE DEBTORS' MOTION FOR AN ORDER DETERMINING DISPUTE BETWEEN THE DEBTORS AND PPMG RELATED TO PENDING OASIS TRANSACTION

PPMG hereby submits this brief in opposition to the *Debtors' Motion for an Order Determining Dispute Between The Debtors and Patriarch Partners Management Services, LLC Related to Pending Oasis Transaction* (the "Debtors' Motion" or "Mtn.") [D.I. 911] and in further support of *PPMG's Opening Brief Regarding PPMG's Right to Payment of Transaction Fees in Connection with the Oasis Transaction* (the "PPMG Brief") [D.I. 914, 1200].[2]  PPMG respectfully states as follows:

## PRELIMINARY STATEMENT

1.      In its opening briefing in this dispute, PPMG argued that the Debtors' premature objection to payment of PPMG's fees in connection with the sale of Oasis violated Paragraph 18 of the Settlement Agreement.  [*See* PPMG Brief ¶¶ 22-27.]  Notwithstanding the clear language of Paragraph 18, requiring the Debtors to pay first and litigate later, the Debtors initially chose to take a "fight first and pay never" approach to the Patriarch Stakeholders' Oasis claim.

---

[1]   The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar I", and together with Zohar II and Zohar III, the "Zohar Funds").  The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2]   Capitalized terms not otherwise defined herein shall have the meanings set forth in the PPMG Brief or the Debtors' Motion, as applicable.

2.      When the Oasis Transaction was in the final stages of negotiation, the Debtors held hostage the entire deal, refusing to pay PPMG's fee despite the fact that it was supported by written documentation, namely, the Management Services Agreement entered into by Oasis and PPMG (the "MSA").  Rather than pay the claim and reserve their rights, the Debtors instead chose to fight the claim prior to closing and engage in motion practice, including the initial briefing in this dispute.  Ultimately, however, the Debtors relented and paid PPMG's Transaction Fee at the closing.[3]  Accordingly, PPMG addresses here only the merits of the underlying dispute and will not further address the Debtors' breach of Paragraph 18.[4]

3.      The ultimate question now before this Court is whether PPMG was entitled to its Transaction Fee.  The answer is a resounding "yes."  The MSA between PPMG and Oasis is clear on two crucial points: (1) PPMG is owed a fee upon the occurrence of a Liquidity Event, and (2) the definition of a Liquidity Event is not dependent on satisfaction of Oasis's outstanding debt.  Because the Oasis Transaction involved the sale of all of Oasis's stock, it was a Liquidity Event under the MSA.  And because it was a Liquidity Event, PPMG was entitled to a Transaction Fee.

4.      In their initial briefing, the Debtors provide no basis for a contrary conclusion. The Debtors first argue that the MSA "clearly provides" that PPMG was owed a Transaction Fee only if Oasis's debt was "satisfied in full" by Oasis's sale to Culligan.  [Mtn. ¶ 24.]  But the

---

[3]  This Court recently answered the threshold question as to when a Patriarch Stakeholder claim was deemed due and payable, and it "agree[d] with Patriarch that Paragraph 18 was intended to be a pay first fight later agreement," rejecting the notion that the Debtors' were entitled to somehow "'validate' an asserted Patriarch claim . . . before paying," which is simply "not what . . . the agreement in Paragraph 18 says."  [Aug. 4, 2020 Hr'g Tr. at 86:11-12, 88:12-18.]

[4]  Ms. Tilton and the Patriarch Stakeholders, however, reserve all rights in connection with Debtors' continued breaches of the Settlement Agreement, as "it is within [this Court's] authority . . . to hold [the Debtors] in contempt" of the Order Approving and Authorizing the Settlement Agreement [Dkt. No. 266] and "to fashion an appropriate remedy."  [Aug. 4, 2020 Hr'g Tr. at 90:14-16.]

2

MSA expressly says otherwise. The Debtors' argument rests entirely on an interpretation of the MSA that ignores the contract's language, language the parties to the MSA used to define a liquidity event triggering the transaction fee. The Debtors—non-parties to the MSA—now seek nothing less than a re-writing of the contract in order to avoid payment to PPMG.

5.      Second, even assuming, *arguendo*, that the Debtors' parsed reading of the MSA was valid, PPMG is still owed its transaction fee because the transaction cleared the company's outstanding debt. The Debtors blithely contend that "[i]t cannot be disputed that the entirety of the amount owed" would not "be fully repaid" upon consummation of the Oasis transaction. [*Id.* at ¶ 25.] To the contrary, this point is vehemently disputed and the Debtors knew it. They were well aware that the Patriarch Stakeholders have long maintained that Oasis's outstanding debt was only $60 million—far less than Oasis's sales price—and that approximately $20 million that the Debtors categorize as debt was restructured into equity years earlier through the 8th Amendment to Oasis's Credit Agreement. Rather than meaningfully engage with that dispute, the Debtors simply assert without any further analysis that these funds were "Term Loans under the Credit Agreement (i.e. indebtedness)," resulting in total debt exceeding Oasis's sales price. [*Id.* at ¶¶ 11-12.] The Debtors' acontextual use of the phrase "Term Loan" followed by a parenthetical referring to this $20 million as "indebtedness" is the sum total of the Debtors' purported argument on this issue. Once again, they cite no legal authority whatsoever because the law is clear that this $20 million is equity, not debt.

6.      Lastly, the Debtors seek to interpret the MSA by relying heavily on inadmissible parol evidence, namely, (1) the August 2019 Equity Purchase Agreement (and certain schedules thereto) between Culligan as Buyer, the Debtors as Sellers, and Oasis as the acquisition target; (2) March 2018 "Phantom Equity Agreements" between Oasis and certain Oasis executives; and

(3) a February 2019 spreadsheet purportedly related to a hypothetical transaction for a Portfolio Company other than Oasis. [*Id.* at ¶¶ 25-29]. Crucially, these documents do not shine any light on the proper interpretation of the MSA as (1) they are not contracts to which PPMG is a party and (2) each post-dates the MSA by nearly a decade. Even so, the documents are entirely consistent with PPMG's position here. Despite the Debtors' best efforts to misquote and misconstrue these documents, none actually support the Debtors' propositions.

## **ARGUMENT**

**A.** **Because The Oasis Transaction Was A "Liquidity Event" Under The MSA, PPMG Is Owed A Transaction Fee.**

7. Oasis and PPMG entered into the MSA in September 2010. [*See* MSA at 1.] Pursuant to that contract, PPMG provided substantial, valuable services to Oasis. These services are "of a type customarily provided by sponsors of private equity firms . . . to companies in which they have a substantial investment," which included, but were not limited to:

> (a) general executive, professional, and management consulting services (including legal, tax and accounting services . . . ); (b) identification, support, negotiation and analysis of acquisitions and dispositions; (c) support, negotiation and analysis of financing alternatives . . . ; (d) finance functions . . . ; (e) marketing functions . . . ; and (f) human resource functions.

[MSA § 1; *see also* Tilton Dep.[5] 31:4-34:9, 35:3-12, 138:2-11.] The Debtors are not a party to the MSA and never have been.

8. In addition to payment of a "small monthly fee," a material aspect of PPMG's compensation for its extensive efforts in connection with Oasis was the Transaction Fee that PPMG would receive "upon consummation of [a] relevant Liquidity Event," which includes a sale of more than 50% of Oasis's stock. [MSA §§ 3(c)(i) & 3(c)(ii)(D)(y); Tilton Dep. 136:1-22,

---

[5] Excerpts from the transcript of Lynn Tilton's July 13, 2020 deposition relating to the instant dispute ("Tilton Dep.") are annexed hereto as Exhibit 1.

138:13-18.] That Transaction Fee is "not based on [an] increased equity value" for Oasis between the execution of the MSA and the occurrence of a Liquidity Event triggering payment, a provision that the parties could have included if they had so desired. [Tilton Dep. 139:8-12.] Rather, the Transaction Fee is based on a contractually defined "Eligible Equity Value" that is fundamentally tied to the company's sales price. [MSA §§ 3(c)(ii)(A)-(C).]

9.    Because the Oasis Transaction involved the sale of all of Oasis's stock, it was a Liquidity Event triggering the payment of a Transaction Fee to PPMG. The final clause of Section 3(c)(ii)(D) is not to the contrary. That clause discusses a "Change of Control," which, as PPMG has previously explained, relates to indemnification provisions contained in Annex A to the MSA. [*See* PPMG Brief ¶¶ 31-35.] Indeed, reading the "Change of Control" provision as part of the definition of "Liquidity Event" would create an irreconcilable conflict between that clause—which is contingent upon payment of Oasis's "outstanding debt"—and an earlier clause in the very same paragraph providing that "a sale . . . of 80% or more of the Company's . . . assets (*without regard to liabilities*)" is a "Liquidity Event." [MSA § 3(c)(ii)(D) (emphasis added).]

10.    Although the section of the Debtors' Motion addressing their basis for relief purports to lead with an argument regarding "the plain terms of the PPMG MSA" [Mtn. at 11], it does no such thing. Rather, the crux of their argument as to what they assert the MSA "clearly provides" [*id.* at ¶ 24] is buried in a footnote in their "Background" section inviting the Court to re-write the MSA by replacing one defined term with another in order to suit the Debtors' needs [*see id.* at ¶ 13 n.12]. Specifically, the Debtors express their "belie[f] that 'Change of Control'" as used in Section 3(c)(ii)(D) of the MSA "refers to the Liquidity Event triggering the Transaction Fee," and that the "use of the term 'Change of Control' rather than 'Liquidity Event'

can be nothing other than a scrivener's error." [*Id.*]  But "the plain meaning" of Section 3(c)(ii)(D) "will not bear a reading that" two distinct terms—Liquidity Event and Change of Control—"are synonyms."  *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996).  To the contrary, the MSA "clearly impl[ies] . . . that whatever" Change of Control "means, it is not a synonym for" Liquidity Event: if both terms "described a single element, one would expect the [MSA] to consistently refer to this element as *either*" a Liquidity Event or a Change of Control, "but not both, especially not within the same clause."  *Id.*; *see also, e.g.*, *Sonterra Capital Master Fund, Ltd. v. Barclays Banks PLC*, No. 15 Civ. 3538, 2019 WL 3858620, at *5 (S.D.N.Y. Aug. 16, 2019) ("The APA's extensive use of defined terms demonstrates that its drafters were perfectly capable of using such terms when they wished to do so" such that a decision not to use a particular defined term "should not be ignored").  The use of different capitalized terms in the very same provision makes clear that they are not interchangeable.

11.    The Debtors offer three justifications for their requested contract reformation. None of them suffice to overcome the "'heavy presumption that a deliberately prepared and executed written instrument manifests the true intention of the parties,'" which applies under New York law even where a party claims that there has been a "scrivener's error."  *U.S. Russia Inv. Fund v. Neal & Co.*, No. 97 Civ. 1788, 1998 WL 557606, at *4-5 (S.D.N.Y. Sept. 2, 1998) (quoting *George Backer Mgmt. Corp. v. Acme Quilting Co.*, 46 N.Y. 2d 211, 219 (1978)).

12.    Their first argument is that the term "Change of Control" is not defined nor used anywhere else in the MSA, which is inherently tied to their third argument (discussed below) that the dangling clause at the end of Section 3(c)(ii)(D) would be meaningless if "Change of Control" and "Liquidity Event" are not equivalent to one another.  [Mtn. ¶ 13 n.12.]  Both

arguments assume that "Change of Control" is ambiguous and that the only reasonable interpretation of that term is to read it as "Liquidity Event." In order to find the term ambiguous under New York law, however, it must be "viewed objectively" from the perspective of "a reasonably intelligent person who has examined the context of the entire integrated agreement," *Italian Designer Import Outlet, Inc. v. N.Y. Cent. Mut. Fire Ins. Co.*, 891 N.Y.S.2d 260, 264 (N.Y. Sup. Ct. 2009), which necessarily includes the agreement's annexures, *see Cnty. of Jefferson v. Onondaga Dev., LLC*, 59 N.Y.S.3d 203, 208 (N.Y. App. Div. 2017) (assessing ambiguity of contract including schedule thereto). That standard undermines both the Debtors' first and third arguments.

13. Annex A to the MSA repeatedly uses the term "Change in Control," which is nearly identical to Section 3(c)(ii)(D)'s "Change of Control." [PPMG Brief ¶¶ 34-35.] Objectively viewing the MSA as a whole, a reasonably intelligent reader would conclude that Annex A's "Change in Control" and Section 3(c)(ii)(D)'s "Change of Control" are intended to be read together and to mean and refer to the same thing. For purposes of the provisions of Annex A governing the determination as to whether there is a right to indemnification in certain circumstances [*see* MSA Annex A § 2], the term "Change in Control" refers to either "(a) the occurrence . . . of any transaction described in clauses (y) or (z) of the definition of Liquidity Event" [MSA Annex A § 9] that "permit[s] [Oasis] to pay all of its . . . outstanding debt" [MSA § 3(c)(ii)(D)], or, alternatively, "(b) the insolvency of any of [Oasis], the filing of a voluntary petition in bankruptcy by [Oasis], the filing of an involuntary petition to have [Oasis] declared bankrupt, the appointment of a receiver or trustee for [Oasis] or the execution by [Oasis] of an assignment for the benefit of creditors" [MSA Annex A § 9]. In other words, the reference to a "Change of Control" in Section 3(c)(ii)(D) of the MSA clarifies that only a certain subset of

Liquidity Events are also considered a "Change in Control" for purposes of determining certain indemnification rights.

14.     The choice before the Court is thus simple: either the MSA (a) replaced the preposition "in" with the preposition "of" when using the same defined term in two different places in the contract, as PPMG posits, or (b) interchangeably used the entirely distinct and dissimilar defined terms "Change of Control" and "Liquidity Event" in the very same paragraph, as the Debtors argue. The latter determination would also require the Court to conclude that the term "Change of Control" bears no relationship to the nearly identical term "Change in Control" used elsewhere in the same agreement, and to somehow reconcile the possibility that a Liquidity Event" can simultaneously require payment of Oasis's "outstanding debt" while also occurring "without regard to [Oasis's] liabilities." [MSA § 3(c)(ii)(D).] The former explanation is infinitely more plausible.

15.     Tellingly, the Debtors' Motion provides strong support for the conclusion that "Change of Control" as used in Section 3(c)(ii)(D) of the MSA is meant to read "Change in Control," in that the Debtors make this very same typo. Specifically, Paragraph 27 of the Debtors' Motion quotes from an entirely different agreement—a Phantom Equity Agreement between Oasis and certain of its management. But while the Phantom Equity Agreement upon which the Debtors rely defines and uses the phrase "Change *of* Control," the Debtors' brief instead repeatedly uses the phrase "Change *in* Control." [*Compare* Phantom Equity Agreement § 5(d), *with* Mtn. ¶ 27.] Debtors' own briefing demonstrates how these prepositions are interchangeable.

16.     In addition, the Debtors also argue that other unspecified agreements between parties other than PPMG and Oasis "commonly define[]" the term "Change of Control" as

"synonymous" with the MSA's definition of "Liquidity Event." [Mtn. ¶ 13 n.12.] The definition of terms in entirely different contracts between third-parties is not only wholly irrelevant, such parol evidence is also forbidden under New York law absent ambiguity. *See Hudson-Port Ewen Assocs., LLC v. Kuo*, 78 N.Y.2d 944, 945 (1991). Even so, these other supposed contracts strongly support PPMG's interpretation: "Even where there is ambiguity, if parties to a contract omit terms—*particularly, terms that are readily found in other, similar contracts*—the inescapable conclusion is that the parties intended the omission. The maxim *expressio unius est exclusio alterius*, as used in the interpretation of contracts, supports precisely this conclusion." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560 (2014) (first emphasis added). Thus, crediting the Debtors' representation that "similar agreements" use the term "Change of Control" where the MSA uses the term "Liquidity Event" [Mtn. ¶ 13 n.12], that is all the more reason to find those terms *not* to be one and the same.

**B.     The 8th Amendment To Oasis's Credit Agreement Did Not Create Debt.**

17.     Even if the Debtors were correct that the final clause of Section 3(c)(ii)(D) discussing a "Change of Control" limits the circumstances in which PPMG is owed a Transaction Fee, such that PPMG is owed the fee only if Oasis's sales price exceeded Oasis's debt (and they are not), PPMG would still be owed the Transaction Fee because Oasis's sales price was greater than its debt. [*See* PPMG Brief ¶¶ 14, 36-42.]

18.     In order to assert otherwise and avoid payment of the Transaction Fee, the Debtors incorrectly characterize a $20 million equity kicker as debt. [*See, e.g.*, Mtn. ¶¶ 11-12, 15.] In short, the Debtors fail to cite any probative evidence (nor any legal authority whatsoever) regarding whether "the parties . . . intended" the 8th Amendment to create debt or equity, which is the relevant legal question on this issue. *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006). As made clear from the available

9

evidence and "the economic reality of the surrounding circumstances"—which are laid out in detail in PPMG's opening brief—that $20 million was in fact a capital contribution resulting from a restructuring. *Id.*

### 1. The Oasis Equity Purchase Agreement Does Not "Concede" That The $20 Million Constitutes Debt.

19. The Debtors first argue that it has already been "concede[d]" in the Equity Purchase Agreement for the Oasis Transaction that liabilities under the 8th Amendment to Oasis's Credit Agreement "constitute 'Indebtedness'" of Oasis.[6] [Mtn. ¶ 25.] But the Debtors' entire argument is based on a flagrant misreading of the Oasis Equity Purchase Agreement. Although the Debtors represented to the Court that the Equity Purchase Agreement "defines 'Indebtedness' as including" the 8th Amendment [*id.* at ¶ 15], that simply is not so. "Indebtedness" is indeed a defined term under the Equity Purchase Agreement, but it does not have the meaning that the Debtors ascribe it. [*See* EPA Sched. II at 5-6.] When the Debtors purport to provide the Equity Purchase Agreement's definition of "Indebtedness," they are actually quoting from the Equity Purchase Agreement's definition of the "Zohar Credit Agreement." [*See* Mtn. ¶ 15 (quoting EPA Sched. 2.02(c)(iii)); *see also* EPA Sched. II at 13 ("Zohar Credit Agreement" has the meaning set forth on Schedule 2.02(c)(iii).").] That definition is entirely irrelevant to the instant dispute. PPMG does not contest that portions of the Credit Agreement reflect debt owed by Oasis, nor is there any question that the 8th Amendment amended the Credit Agreement. Those uncontested facts do not answer the question at issue: Whether the restructuring effectuated by the 8th Amendment created debt or equity.

20. Moreover, the Debtors ignore that the Equity Purchase Agreement expressly

---

[6] A copy of the Equity Purchase Agreement, or "EPA," is annexed hereto as Exhibit 2, and its disclosure schedules are annexed hereto as Exhibit 3.

reserved for this Court the question of whether the Transaction Fees are owed.  In setting forth the transaction expenses to be paid at closing, the Equity Purchase Agreement provided that the payment of a Transaction Fee would be "determined by the Bankruptcy Court prior to the closing," or if no such determination had been made prior to closing, it would be paid to PPMG "subject to any remedy" available if this Court subsequently "determine[d] that such payment was improper."  [EPA § 1.01(c)(iii).]  Similarly, the Equity Purchase Agreement's disclosure schedules provide that whether "fees and expenses payable to [PPMG] pursuant to the Management Services Agreement" should be included within the Seller's Transaction Expenses remained "subject to adjudication by the Bankruptcy Court."  [EPA Sched. 1.03 ¶ 3.]  Those extremely pertinent provisions are not among the excerpts of the Equity Purchase Agreement that the Debtors provided to the Court along with their Motion.  Each undermines the supposed concession that the Debtors assert was embodied in the Equity Purchase Agreement.

21.    Even assuming, *arguendo*, that the Equity Purchase Agreement did not expressly decline to resolve the instant dispute, however, any so-called concession therein would still have no bearing on the issue before this Court because PPMG is not a party to that contract.  The Debtors fail to explain how an August 2019 contract that does not include PPMG is relevant for purposes of interpreting the bargain struck by PPMG nearly one decade earlier, particularly in light of that earlier agreement's merger clause.  [*See* MSA § 11 ("Any amendment or modification of this Letter Agreement shall be in writing and executed by each of the parties hereto.").]  But even if (1) the Equity Purchase Agreement and the MSA were entered into contemporaneously, *and* (2) both agreements involved the same parties, *and* (3) the earlier agreement lacked a merger clause, *and* (4) the latter agreement did not expressly reserve for this Court the question of whether the Transaction Fee was owed to PPMG, the Equity Purchase

57772/0001-21206995v1

Agreement would still not help Debtors because the defined term "Indebtedness" in the Equity

Purchase Agreement is not the same as the undefined term "outstanding debt" in Section

3(c)(ii)(D) of the MSA. Indeed, the use of a defined term in one agreement and a facially similar

but undefined term in another agreement suggests that the two terms were intended to have

different meanings. *See Quadrant Structured Prods.*, 23 N.Y.3d at 560. The Debtors appear to

draw the opposite conclusion but provide no legal basis for doing so.

### 2. Oasis's Financial Statements Support Characterizing The Contested $20 Million As Equity.

22. The Debtors next point to Oasis's financial statements in arguing that the

contested $20 million is debt. [*See* Mtn. ¶ 15 (citing EPA Sched. 4.05 at 15).] While the

financial statements categorize the funds under the heading "Long-term debt, related party"

[EPA Sched. 4.05(a) at 15], they do so because the restructuring transaction at issue indisputably

involved parties "related" to Oasis (*i.e.*, the Debtors), *not* because it resulted in "long-term debt"

[*see* Tilton Dep. 87:3-17]. But even assuming, *arguendo*, that the financial statements did

provide that these funds were debt, those financial statements were prepared "in accordance with

accounting principles generally accepted ["GAAP"] in the United States." [EPA Sched. 4.05(a)

at 1.] It is well-settled that categorization in accordance with GAAP has no bearing on contract

interpretation because "GAAP does not define default legal rules," particularly where, as here,

"nowhere in the contract do the parties agree that the terms will be interpreted according to

GAAP." *Koch Bus. Holdings, LLC v. Amoco Pipeline Holding Co.*, 554 F.3d 1334, 1339 (11th

Cir. 2009) (finding irrelevant under Delaware law whether "an accrual . . . was recorded,

pursuant to GAAP," as an "expense on [company's] financial statements"); *see also Harbinger*

*Capital Partners Master Fund I, Ltd. v. Granite Broad. Corp.*, 906 A.2d 218, 225-27 (Del. Ch.

2006) (GAAP treatment of preferred shares does not determine whether they are debt or equity

57772/0001-21206995v1

because holding otherwise "would grant [the Financial Accounting Standards Board], which is neither lawmaker nor judge, the power to fundamentally alter the law's understanding").

23.     Rather than focus on labels, the "overarching inquiry" necessary to assess the status of the contested funds requires determining the parties' intent and the economic reality of the underlying transaction.  *In re SubMicron*, 432 F.3d at 456.  Viewed through that lens, the financial statements support characterizing the $20 million as equity by clarifying that it "does not bear interest."  [EPA Sched. 4.05(a) at 15.]  Indeed, Ms. Tilton—the only witness involved in amending Oasis's Credit Agreement whose testimony has been sought—repeatedly explained that there "was no interest . . . because it wasn't a loan." [Tilton Dep. 51:23-24.]  Stated otherwise, interest "was never billed" and "[i]t was never paid."  [*Id.* at 52:24-53:5; *see also*, *e.g.*, *id.* at 55:17-19, 56:7-14, 58:12-59:2, 63:18-64:20.]  For that very reason, Oasis's loan invoices reflect that more than $14 million was "past due" to the Debtors by Oasis under two facilities as of October 1, 2015 [Oasis_PPMG_PPAS_00000395, annexed hereto as Exhibit 4], prior to execution of the 8th Amendment to Oasis's Credit Agreement, while *no money was past due as of December 1, 2015* [Oasis_PPMG_PPAS_00000409, annexed hereto as Exhibit 5], *subsequent to the restructuring*.  As PPMG has previously explained, the absence of interest weighs heavily in favor of finding that the 8th Amendment involved a $20 million capital contribution.  [*See* PPMG Brief ¶ 38.]

24.     That this restructuring created an equity kicker, rather than debt, is further corroborated by Ms. Tilton and Patriarch's course of conduct.  For instance, Ms. Tilton's taxes accounted for these funds as "an equity contribution" rather than debt.  [Tilton Dep. at 56:15-18; *see also id.* at 86:22.]  And these funds are not reflected as debt on the Debtors' trustee reports because Patriarch never reported them to the Trustee as debt.  [*Id.* at 105:16-107:13.]  Those

13

decisions to treat these funds as an equity infusion, rather than as debt, were made years before the Debtors' current leadership first raised the instant dispute.

### 3. Oasis's Phantom Equity Agreements Are Irrelevant And, In Any Event, Support PPMG

25.     The Debtors' reliance on Oasis's Phantom Equity Agreements [Mtn. ¶ 27] suffers from the same fundamental flaw as their reliance on the Equity Purchase Agreement:  contracts entered into in 2018 by parties other than PPMG have no bearing on what Oasis and PPMG intended upon executing the MSA in 2010.

26.     Whether payment needs to be made under the Phantom Equity Agreement is also irrelevant because such payment is due "upon a Change of Control" [Phantom Equity Agreement § 1], the definition of which differs from a "Liquidity Event" under the MSA.  [*Compare id.* at § 5(d), *with* MSA § 3(c)(ii)(D).]  The Debtors' claim that the two provisions are "nearly identical" implicitly concedes that they are *not* identical, and is in any event simply incorrect. [Mtn. ¶ 27.]  Their differences include, but are not limited to:

- Section 5(d) of the Phantom Equity Agreement requires "outstanding Indebtedness" (a defined term) to have "been paid in full at the time of the Change of Control" (*i.e.* the debt must already have been extinguished), whereas Section 3(c)(ii)(D) of the MSA provides that an "event must permit" payment (*i.e.* in the future) of "outstanding debt" (an undefined term); and

- Section 5(d) of the Phantom Equity Agreement requires payment only of "Indebtedness owed to any Company-Related Entity or any fund managed by any such Person," whereas Section 3(c)(ii)(D) of the MSA refers to payment of "all of [Oasis's] outstanding debt" without any limitation based on who holds such debt.

Thus, whether a "Change of Control" occurred under the Phantom Equity Agreement has no bearing on whether a "Liquidity Event" occurred under the MSA.[7]  If anything, the fact that

---

[7]   Nor does "Indebtedness" mean the same thing in the Equity Purchase Agreement and the Phantom Equity Agreements.  [*Compare* EPA Sched. II at 5-6, *and* Phantom Equity Agreement § 5(j).]

Section 5(d) of the Phantom Equity Agreement defines and uses the term "Change of Control" throughout, whereas Section 3(c)(ii)(D) of the MSA uses the distinct defined term "Liquidity Event" while separately referencing "Change of Control," only further supports PPMG's position that these are distinct and non-interchangeable terms. Whether payment is owed under Section 5(d) of the Phantom Equity Agreement has no relevance to the separate question of whether payment is owed under Section 3(c)(ii)(D) of the MSA.

**4.    The Preliminary ▆▆ Flow Of Funds Analysis Is Irrelevant And, In Any Event, Supports PPMG**

27.    Finally, the Debtors rely on a "proposed flow of funds model" related to what they concede is a "potential monetization process for a *different* Portfolio Company" for which they provide no additional explanation. [Mtn. ¶ 28 (emphasis added).] That is because the context of that worksheet utterly refutes the Debtors' reliance on it.

28.    On February 14, 2019, the Debtors' chief monetization officer, Robert Kost, emailed Ms. Tilton to inform her, *inter alia*, that he had been asked "to start collecting information with respect to ▆▆▆▆"—Portfolio Companies not presently at issue—and requested that she provide "any information / documents regarding the refinancing of ▆▆▆ [Feb. 14, 2019, email from Mr. Kost to Ms. Tilton, annexed hereto as <u>Exhibit 6</u>.] Ms. Tilton wrote back five minutes later, stating that she was "working on the information" requested, and would circulate it "as soon as possible" but that her "team [was] slammed" and she was "leav[ing] for Europe" the following day for meetings related to the potential refinancing of ▆▆ [*Id.*; *see also* Tilton Dep. 146:3-5.] Ms. Tilton provided the Debtors with Exhibit I to their Motion shortly thereafter simply because it was an "internal worksheet" used to "keep[ ] track of things internally" that Ms. Tilton had "easily available" reflecting "all the debt listed out" for ▆▆▆▆. [*Id.* at 146:3-19, 148:6-150:4.] The document was not created in

15

response to Mr. Kost's email, nor did it relate to any potential sale of ███████ under consideration in February 2019; indeed, there was no ongoing sales process for ███████ at the time of their February 2019 refinancing efforts.  [*Id.*; *see also*, *e.g.*, 145:13-15, 151:8-152:4, 161:6-21.]  The Debtors offer no basis on which to find such internal work product—which was prepared in connection with the refinancing of Portfolio Companies other than Oasis and which reflects an entirely fictional proposal—binding on PPMG in connection with the Oasis Transaction.

29.     Moreover, as the Debtors concede, even that unfinished, hypothetical flow of funds includes a "line-item" reflecting a "PPMG Fee" for ███████ Eligible Equity Value."  [Mtn. ¶ 29.]  That is directly analogous to the Transaction Fee currently at issue. Accordingly, the Debtors' argument appears to be that (1) PPMG once considered waiving its fee in connection with a transaction that never actually occurred, and (2) that would have involved a different company in any event, (3) based solely upon a spreadsheet that actually reflects a ███ transaction fee being owed to PPMG in connection with that hypothetical transaction, (4) which somehow means that PPMG should now be forced to waive a fee that it has never considered waiving in connection with the Oasis Transaction that actually took place. Such argument makes the head spin and is far too slender a reed on which to rest their conclusion that it has already been conceded that PPMG was not owed a Transaction Fee in connection with the sale of *Oasis*.  If anything, it supports just the opposite conclusion: absent an express waiver of the transaction fee—which indisputably did not occur with respect to Oasis—PPMG is owed the Transaction Fee.

30.     Even more galling, the Debtors' disingenuous argument fails to mention that Ms. Tilton reviewed in detail with the Debtors' representatives flow-of-funds models for both ███

16

and ▮ (among other portfolio companies) in July 2019 that reflected transaction fees being paid to PPMG in the event of a sale of either company. [*See* Tilton Dep. 143:18-144:9, 147:7-10, 163:5-164:4; July 2019 flow-of-funds models, annexed hereto as <u>Exhibit 7</u>.] Specifically, the July 2019 flow-of-funds models reflected a contemplated sale of ▮ for ▮ with a "PPMG Fee ▮ of Eligible Equity Value)" of ▮ and a contemplated sale of ▮ for ▮ with a "PPMG Fee ▮ of Eligible Equity Value)" of ▮ respectively. Both of those flow-of-funds models make clear that the PPMG fee in question is "defined in the Management Services Agreement" for each of those companies. The ▮ flow-of-funds model is particularly instructive because it includes the ▮ PPMG fee as a closing expense despite ▮ total debt of ▮ *exceeding* the modelled ▮ purchase price. In other words, the actual flow-of-funds model regarding a potential sale of ▮ indisputably supports PPMG because it reflects payment of PPMG's fee in the event that ▮ sales price did not clear its outstanding debt—just as the Debtors mistakenly claim to be the case with Oasis.

\*      \*      \*      \*

31.      For all of the reasons set forth above and in its prior briefing, PPMG respectfully requests that the Court enter an order finding the Transaction Fee was properly paid to PPMG as it was owed as part of PPMG's bargained-for compensation in exchange for the extensive work done for Oasis over the course of nearly a decade.

Dated:  September 4, 2020

**COLE SCHOTZ P.C.**

By: */s/ G. David Dean*
Norman L. Pernick (No. 2290)
G. David Dean (No. 6403)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, DE  19801
Telephone: (302) 652-3131
Facsimile: (302) 652-3117
npernick@coleschotz.com
ddean@coleschotz.com
preilley@coleschotz.com

– and –

**GIBSON, DUNN & CRUTCHER LLP**
Randy M. Mastro (Admitted Pro Hac Vice)
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
rmastro@gibsondunn.com

Robert Klyman (Admitted Pro Hac Vice)
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: (213) 229-7000
Facsimile: (213) 229-70520
rklyman@gibsondunn.com

Monica K. Loseman (Admitted Pro Hac Vice)
1801 California Street, Suite 4200
Denver, CO 80202-2642
Telephone: (303) 298-5784
Facsimile: (303) 313-2828
mloseman@gibsondunn.com

*Counsel to Patriarch Partners Management Group,
LLC*

18

# **Exhibit 1**



Transcript of the Testimony of

**LYNN TILTON**

July 13, 2020

**IN RE: Zohar III, Corp., et al.**

Reliable Court Reporting

Phone – 215-563-3363

Fax – 215-563-8839

www.reliable-co.com

```
 1           IN THE UNITED STATES BANKRUPTCY COURT

 2               FOR THE DISTRICT OF DELAWARE

 3      --------------------------X.

 4      In Re:                    Chapter 11

 5      Zohar III, Corp., et al.,  Case No. 18-10512 (KBO)

 6              Debtor.

 7      --------------------------X.

 8

 9                      -   -   -

10                   July 13, 2020

11                      -   -   -

12

13

14

15           Remote deposition of LYNN TILTON was taken

16      pursuant to notice, beginning at 2:03 p.m. on the

17      above date before Gail L. Inghram Verbano,

18      Registered Diplomate Reporter, Certified Realtime

19      Reporter, Certified Shorthand Reporter-CA (No.

20      8635)and Notary Public, there being present via

21      videoconferencing:

22                      -   -   -

23

24
```

TILTON, LYNN

```
 1              at the time.
 2    BY MR. BARRY:
 3         Q.    Okay.  Let's go through those.
 4              So did PPMG provide, quote,
 5    general executive services to Oasis?
 6                 MS. LOSEMAN:  Object to form.
 7                 THE WITNESS:  Yes.
 8    BY MR. BARRY:
 9         Q.    What were those?
10                 MS. LOSEMAN:  Object to form.
11                 THE WITNESS:  I mean, we provided
12            legal services, review of contracts.
13            Oasis did not have a general counsel.
14              You know, we provided finance,
15            consulting, taxes.  We had -- we provided
16            all type of human resources, as well as
17            we did all the recruiting.  So the entire
18            executive team was hired by our talent
19            acquisition group.
20              We provided management people to
21            look over the company, platform leaders
22            and managers to help guide the executive
23            team.
24              We reviewed all their contracts.
```

IN RE: Zohar III, Corp., et al.

```
 1              And we did web services, marketing
 2              services, design services.  We had a full
 3              team advising on finance, human
 4              resources, talent, legal, as well as, in
 5              addition, marketing design.
 6    BY MR. BARRY:
 7         Q.    Who provided all those services?
 8         A.    The people in PPMG, as well as --
 9         Q.    Who, though?
10         A.    Who?
11         Q.    Yeah.
12         A.    John Harrington as the platform
13    leaders for many, many years, among others.
14    Kevin Dell provided legal services.  Cari in
15    litigation and going through the litigation.
16    Carlos Mercado on finance and tax.
17              Randy Jones and Richard White on
18    all the talent acquisition.
19              And at the time -- there were
20    probably 12 lawyers providing services.  We had a
21    whole loan finance group doing all the loan
22    agreements for them and not charging them for
23    that.  Valat de Cordova, Ariana -- you know, I
24    don't have everybody's name in front of me right
```

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 33

```
 1    now, but over 100 people through most of the
 2    years provided services to these operating
 3    companies.
 4            Q.    So on the legal side, I think you
 5    said that PPMG provided all the preparation of
 6    all the loan documentation?
 7            A.    Well, we reviewed it.  It depends.
 8    If it was -- the loans for the Zohars, we
 9    provided them.  We did most of the work.  Often
10    had outside attorneys just look over things, but
11    we provided all that work.
12                  We reviewed contracts, reviewed
13    vendor agreements, advised on all the litigation.
14    Oasis never had a general counsel.
15            Q.    What litigation was Oasis subject
16    to during the term of the Management Services
17    Agreement?  Do you recall?
18            A.    They had -- they had litigation on
19    and off.  I don't know.  Normal, ordinary-course
20    litigation.  I know they once had a leaky machine
21    that led to litigation.  Water coolers that had
22    leaked in people's offices.  I mean, I can't,
23    sitting here right now, remember every bit of
24    litigation.  But I can certainly go back and find
```



```
1     it.

2     ██████████████████████████████

      ████████████

      ████████████████████████████████████████

      ██████████████████████████████████████████████

      ██████████████████████████████████████████████

      ████████████████████████████████████████

      ██████████████████████████████████████████

      █████████████████████

      ████████████████████████████████████████████

      ████████████████

      ████████████████████████████████████████

      ████████████████████████████████████████████

      ████████████████████████████████████████████

      ██████████████████████████

16           Q.     Did Oasis have its own tax

17    advisers?

18           A.     They had -- they had to prepare

19    their own short form, and, yes, and they would

20    work closely with us as well as with their -- our

21    tax advisers.

22           Q.     Who was Oasis' outside tax

23    adviser?

24           A.     I don't know sitting here right
```

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 35

```
 1    now.   I'm sure you can find their signature on

 2    their short-form tax returns.

 3             Q.      And this -- what accounting

 4    services did PPMG provide to Oasis?

 5             A.      We worked with them on building

 6    pricing models as well as providing them the

 7    templates for their income statement, balance

 8    sheet and their cash flow statement.

 9                     And we provided all that finance

10    templates to help them structure and run their

11    business.   They worked very closely with

12    Carlos Mercado and his team.

13             Q.      And you mentioned before Oasis had

14    a management team during your tenure as the

15    manager for Oasis; correct?

16             A.      Through the entire time, yes, they

17    had their own separate management team.

18             Q.      Okay.   I don't think we were

19    provided with a copy of the authority matrix that

20    you referenced earlier.   We would like to get a

21    copy of that.

22                     But I'd like to ask you a few

23    questions about -- about what the management team

24    was authorized to undertake.   I didn't know
```

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 51

```
 1          Q.      That's what I thought.
 2                  The next column over is titled
 3      "Commitments," and there's a footnote there.
 4                  Do you see that footnote?
 5          A.      Yes.
 6          Q.      And it says, "For loans which,
 7      when repaid, may not be reborrowed.  Only
 8      outstanding undrawn commitments are shown."
 9                  Right?  That's what it says?
10          A.      Yes.
11          Q.      Okay.  And the next column over,
12      the column heading is "Outstandings."  What are
13      those columns reflecting?  If you know.
14          A.      It's the amount that is funded
15      under the commitment.
16          Q.      And the next column is titled
17      "Lender," and that lists each of Zohars I, II and
18      III, respectively; correct?
19          A.      That is correct.
20          Q.      And the next column over refers to
21      the applicable margin, and that is 0 percent;
22      correct?
23          A.      That was no interest on it because
24      it wasn't a loan in terms of borrowed money, but
```

```
 1    an equity kicker that would have been upside

 2    beyond borrowing -- it wasn't a term loan in

 3    terms of borrowed money; it was an equity kicker

 4    that had no interest rate and was -- it was paid

 5    as -- the taxes on this had already been paid as

 6    interest income, and it was just converted as

 7    part of a credit agreement --

 8                  (Simultaneous cross-talk.)

 9    BY MR. BARRY:

10           Q.      Okay.

11           A.      -- with no interested --

12                  MR. BARRY:  Gail, the term is

13           "equity kicker," K-I-C-K-E-R.

14                  THE COURT REPORTER:  I got it.  I

15           think you kind of tend to jump in on her,

16           and it messes with her audio a little

17           bit.

18                  MR. BARRY:  Well, I'm trying to

19           get the questions done and answered so we

20           can get out of here; I want to make sure

21           we're focused on the questions I'm

22           asking.

23    BY MR. BARRY:

24           Q.      So it your testimony, though, that
```

IN RE: Zohar III, Corp., et al.

```
1    there's no interest at all on this tranche or

2    that there's no marginal interest?

3         A.    There's no interest at all on this

4    tranche.  It was never billed.  It was never

5    paid.  The credit agreement always identify

6    equity kickers in the credit agreements.

7              So whenever there was something

8    extra that could be garnered -- and if you look

9    at the indenture, you'll see the definition of

10   "equity kicker."  We always put them in the

11   credit agreement so that they would be documented

12   and identified because these don't go into a

13   trustee report.

14              MR. BARRY:  Rebekah, can you put

15         up Zohar 4 for me, please.

16              MS. LOSEMAN:  Ms. Tilton, I just

17         want to be sure that you completed your

18         last answer.  Sometimes we continue to

19         see your mouth moving but don't hear

20         audio.

21              THE WITNESS:  Well, it's because I

22         keep getting cut off.

23   BY MR. BARRY:

24         Q.    I apologize.  I will try not to do
```

```
 1    says, "Except as otherwise set forth herein, each

 2    loan shall bear interest on the unpaid principal

 3    amount thereof from the date made through

 4    repayment (whether about acceleration or

 5    otherwise) on the unpaid principal amount thereof

 6    at a rate per annum equal to LIBOR plus the

 7    applicable margin."

 8                    So the Amendment 8 states that the

 9    applicable margin is 0 percent.  So isn't the

10    interest rate in connection with the tranche 8

11    debt LIBOR?

12          A.     No.

13                    MS. LOSEMAN:  Object to the form.

14                    THE WITNESS:  There was -- this is

15              going back to the other loans.  I mean,

16              the other loans are still part of this

17              loan agreement.  There was never a dollar

18              billed at LIBOR or anything on these

19              loans.

20                    We've put them in tranches as --

21              if you go back to the indenture, you'll

22              understand that anything over borrowed

23              money that goes to the lenders, which I

24              signed for the lenders -- just like I
```

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 56

```
 1    signed when it was for PPMG -- was

 2    provided to them as a kicker above the

 3    borrowed money amount.  And that can take

 4    the form of preferred, common, debt,

 5    payment -- special payments on sales,

 6    warrants.

 7            So this is an equity kicker.

 8    Oasis was never billed LIBOR or any

 9    interest on any of these loans.  This

10    relates back to the other loans.

11            This was a 0.  It had no interest

12    rate due.  It was never billed for

13    interest.  It never paid interest on

14    these.

15            Those were equity kickers, and I

16    paid the taxes on this money prior to

17    then putting it as an equity contribution

18    into these agreements.  It was paid on

19    the interest due at the time as interest

20    income.

21            This has no basis.  It can't be

22    used as borrowed money.  It is purely an

23    equity kicker.

24            I could have forgiven it.  I could
```

```
 1    testimony, and I think if you go back to what
 2    PPMG billed following this, you will find that it
 3    did not bill for any interest on these equity
 4    kicker interest tranche loans.  It was done to
 5    protect the lender if and when this could get
 6    paid.  It also could have been forgiven, as it
 7    was with many of the other companies.
 8              Q.    Okay.  Let's --
 9                    MR. BARRY:  Rebekah, can we please
10         go back to Zohar 5 and the last page.
11    BY MR. BARRY:
12              Q.    Okay, next column over,
13    Ms. Tilton.  "Interest payment date," do you see
14    that?  It's -- I don't know, a little bit more
15    than halfway over, "interest payment date" is the
16    heading.  Do you see that?
17              A.    Yeah, I do.
18              Q.    And it says, N/A.  Do you know
19    what N/A means?
20              A.    Yeah.  Not applicable because
21    there was no interest on this accrued in tranche.
22              Q.    So there was no interest payment
23    date for this tranche, is what you're saying?
24              A.    There was no interest payment
```

Case 1:20-cv-04119-KBO Doc 19 Filed 11/02/20 Page 365 of 898 PageID #: 1357
IN RE: Zohar III, Corp., et al.
TILTON, LYNN
Page 59

```
 1    date, because there was no interest due on this
 2    equity kicker.
 3         Q.     Okay.
 4              MR. BARRY:  Rebekah, let's go back
 5         to the -- the prior document, Zohar 4,
 6         please, on the same page you were on.
 7         Okay.  If you could scroll down, please,
 8         to 2.8(c).
 9    BY MR. BARRY:
10         Q.     Ms. Tilton, just directing your
11    attention to 2.8(c).  It says -- it's titled
12    "payment of interest."  It says, "Interest on the
13    loans shall be payable in arrears on, i, the
14    first day of each calendar month; ii, the date of
15    any prepayments of the loans, whether voluntarily
16    or mandatory, to the extent accrued on the amount
17    being prepaid; and iii, the maturity date,
18    including final maturity."
19              Do you see that?
20         A.     I do.  It's only applicable to the
21    true borrowed money term loans.  It's not
22    applicable to the equity kicker tranche that were
23    put in to the loan agreement as equity kickers to
24    be paid when and if the company was able, when it
```

IN RE: Zohar III, Corp., et al.

```
 1    and I'll shut up.  But I'm trying to explain to

 2    you, and, you know, you don't want to hear the

 3    truth.

 4            Q.    I think there's a lag and I

 5    apologize.  I'm actually not trying to do that,

 6    Lynn.  But I do apologize.  I want you to -- I

 7    want you to answer the questions the way you want

 8    to answer them.

 9                 MS. LOSEMAN:  Counsel, I'm sorry.

10                 Could you repose the question just so we

11                 know where we are.

12                 MR. BARRY:  I kind of lost where

13                 we were.  I think I asked the question:

14                 Can you show me in Amendment 8 where it

15                 says -- excuse me.  I think I asked the

16                 question:  Can you show me in Amendment 8

17                 where N/A is defined.

18                 THE WITNESS:  N/A has always had

19                 the meaning to me "not applicable."  I do

20                 not believe there's a definition of "not

21                 applicable" here.  But it will also be

22                 represented in the fact that Oasis was

23                 billed every month for interest, and it

24                 was never billed from the time of this
```

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 64

```
 1              agreement for interest on these tranches.

 2                   So it's evident that this "not

 3              applicable" and "no interest rate" was

 4              then also evidenced in the billing of

 5              Oasis each month for its monthly

 6              interest.  The fact they were not billed

 7              and they never paid.

 8                   So it is not applicable because

 9              this is equity and it is, therefore --

10              there's no basis in it for borrowed

11              money.  It's not a loan in the true

12              meaning that it was lent to.  It was put

13              in as an upside to the lenders if and

14              when, when the company was sold, it would

15              be able to pay this money.  But it -- N/A

16              stands for "not applicable."  It doesn't

17              have a periodic interest.  It doesn't

18              have an interest rate.  It was never

19              billed for it, nor was it ever paid nor

20              do it accrue interest on it.

21         BY MR. BARRY:

22              Q.    Okay.  The next column over is

23         maturity date.

24                   Do you see that, on the exhibit to
```

1    the same document.

2          A.      Same -- we're talking about the

3    document, not the schedule.

4          Q.      The financial statement, sorry.

5          A.      The financial statements?

6          Q.      Yeah, sorry.

7                  Okay.  At the top of the Page 15,

8    it has a note that's titled, as you were just

9    mentioning, "Long-Term Debt, Related Party

10   Continued."  And it says, starting with the

11   second sentence under that heading, "Prior to

12   2016, 20,291,8 -- 291,873 of accrued interest was

13   converted into three term loans which are

14   included with long-term debt, related party.

15   This converted loan does not bear interest."

16                  Do you see that?

17         A.      So we have now settled the fact

18   that there is no interest on this.  And any

19   accountant will tell you that anything that does

20   not have interest -- an interest rate and a

21   timely payment of interest is not truly debt but

22   it is equity for any kind of tax purposes.

23                  So, yes, it does not bear interest

24   and it was included in the credit agreement,

```
 1    which is where we have always included any kind
 2    of equity kicker so that it is documented
 3    properly.  And it does not bear interest and it
 4    was included, and it's part of that same thing,
 5    related party as well as long-term debt.
 6              Q.     Okay.  So is it your testimony
 7    that the items covered under this are two
 8    different things, they're long-term debt and
 9    separately related party liabilities?
10              A.     That is my testimony, and it's
11    also that this is not debt in terms of its
12    characteristics.  It's got no basis, it's not
13    borrowed money.  The taxes were paid on income
14    and it was contributed as an equity kicker.
15                     Otherwise, it would have been like
16    every other borrowed money loan and have an
17    interest rate attached to it.
18              Q.     And you believe the statement in
19    here -- this covered -- this converted loan
20    amount does not bear interest, you believe that
21    solves the question as to whether or not there
22    was interest on that or not?
23              A.     Well, I think that along with the
24    fact that it was never billed for interest, it
```

Page 105

```
1              collateral manager, we would have put in
2              a ticket to put it in as debt and count
3              it on the fund financial statements and
4              the trustee report as additional loan
5              assets.
6                   But it wasn't borrowed money, and
7              it was an equity kicker when and if
8              available.
9                   Now it's a loan agreement, and so
10             it is a term loan and so the -- the
11             account is listed as indebtedness but it
12             doesn't have the same characteristics as
13             the new borrowed money that was provided
14             by the Zohars.
15   BY MR. BARRY:
16        Q.   Okay.  So I want to make sure I
17   understand what you just said, because this --
18   the -- if this were to be debt, it would have
19   been on the trustee reports; correct?
20        A.   It if it was considered to be a
21   loan under the indenture and it had an interest
22   rate, a maturity and periodic interest payments,
23   it would have been listed on the trustee report
24   as a loan asset to the Zohars.  Because it was an
```

```
 1    equity kicker and didn't have an interest rate

 2    and wasn't borrowed money, it was not listed on

 3    the trustee report, it was not in the fund

 4    financial statements as loan assets, and it

 5    wasn't part of the over-collateralization ratio.

 6            Q.    You said the collateral -- if it

 7    was debt, the collateral manager would have put

 8    in a ticket?  Can you explain that?

 9            A.    Well, when we report a loan made,

10    we would have reported that loan what we would

11    have called the trade ticket that would have

12    shown the loan to the trustee so that they could

13    add it to the trustee report as a loan asset.

14            Q.    Who was the collateral -- sorry

15    who the collateral manager at the time

16    Amendment 8 was executed?

17            A.    Patriarch Partner 8, 14 and 15

18    respectively.

19            Q.    So Patriarch would have been the

20    collateral manager to have put in the ticket to

21    the trustee to advise it that a new tranche of

22    debt had been put in?

23                  MS. LOSEMAN:  Object to the form.

24                  THE WITNESS:  That is correct and
```

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 107

```
1              we would have if it had been debt because
2              it would have been very helpful to us.
3    BY MR. BARRY:
4         Q.    Okay.  So the fact that it's not
5    in the trustee report is because Patriarch didn't
6    put a ticket in?
7                   MS. LOSEMAN:  Object to form.
8                   THE WITNESS:  Patriarch didn't
9              consider it debt or a loan asset but
10             rather an equity kicker.  And equity
11             kickers are not listed in the trustee
12             reports but in the loan agreements to the
13             companies.
14   BY MR. BARRY:
15        Q.    In your declaration, you
16   testified, "Indeed, the trustee reports -- which
17   regularly list the Zohar Funds' debt -- do not
18   list the restructured equity as debt."
19             Do you recall that?
20        A.    Yes.
21        Q.    But they're not listed in the
22   trustee's report because Patriarch didn't report
23   them to the trustee, because you didn't believe
24   they were debt?
```

```
 1          Q.     PPMG prepared this document.  What
 2   is the transaction fee intended to compensate
 3   PPMG for?
 4          A.     For all the work that PPMG
 5   provided in terms of services to be able to turn
 6   around as companies left for dead to a point
 7   where it would have had value and be able to be
 8   sold, and to compensate for any other fees that
 9   had not been paid during the time that the
10   company was distressed.
11          Q.     PPMG received a monthly fee under
12   this agreement; correct?
13          A.     PPMG's owed ███████████ of monthly
14   fees under these agreements.  Very often PPMG did
15   not receive its fees because it was more
16   important that they pay interest or have the
17   capital to run their business to restructure.
18                 So PPMG was not paid these fees --
19   a lot of these fees for a lot of the period
20   during the time that this company was
21   restructured or went through a bankruptcy or was
22   unable to pay.
23          Q.     I'm -- I'm not doing it very
24   artfully, so forgive me.  I'm just trying to
```

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

```
 1    statements.

 2                   This was under the private equity

 3    arm of Patriarch Partners Management Group that

 4    provided operational services, financial

 5    services, tax services -- you know, talent

 6    acquisition services which would have cost them

 7    millions of dollars a year in terms of paying

 8    headhunters and turnaround.  Web services -- you

 9    know, and secondment where we paid

10    John Harrington to be part of that, all the

11    lawyers, everything.

12                   So the indenture was for

13    collateral management services.  That's passive

14    investing.  This is for literally operational

15    turnaround services.  And for that turnaround

16    there was the small monthly fee and this

17    transaction fee, at which time the company could

18    be sold.

19        Q.      Right.  So for the turnaround

20    services under the Management Services Agreement,

21    the 5 percent transaction fee was intended to

22    compensate PPMG for the increased value in the

23    company under its management; isn't that right?

24        A.      Well, not -- it was for the value
```

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 143

```
1              there, it says "without regard to

2              liability."  It only relates to the

3              management proceeds, you know, and if you

4              go to the phantom equity agreement which

5              is where the management proceeds --

6              everything is based on a change of

7              control, and equity value -- because it's

8              equity securities.

9                   The total equity value is the

10             transaction amount.  It's paid the same

11             way it's paid to a banker.  It's based on

12             the transaction value.

13                  But the change of control does not

14             relate to a liquidity event.  It's not

15             part of the definition of a liquidity

16             event.

17   BY MR. BARRY:

18             Q.    So to your understanding, a

19   transaction doesn't have to satisfy its

20   indebtedness in order to trigger the PPMG

21   5 percent fee?

22             A.    That is correct.

23             Q.    Have you ever expressed that view

24   to anybody?
```

```
 1              A.      Well, it's in -- it was in every

 2     waterfall, so, yes.  And it was -- you know, so

 3     every waterfall -- you know, would have shown

 4     that this fee is payable even if the debt was not

 5     covered.

 6              Q.      Okay.

 7              A.      And we reviewed that with, you

 8     know, FTI in July and before that, line item by

 9     line item.

10              MR. BARRY:  Okay.  Let's put up,

11          Rebekah, please, Zohar 12.

12              (Whereupon, Exhibit 12 was marked

13          for identification.)

14     BY MR. BARRY:

15              Q.      This is an email from you dated

16     February 14th, 2019, to Mike Katzenstein.

17              A.      Right.

18              Q.      Did you review this in preparation

19     for your testimony today?

20              A.      Yes.

21              Q.      Okay.  What is this?

22              A.      This was -- on February 14th,

23     Rob Kost wrote to me as I was leaving for Europe

24     for the refinancings to ask for a number of
```

```
 1    documents, including the term sheet for the

 2    refinancing and a list of the debt for both

 3    debt --  ███████  and  ███████  and so I threw this out

 4    here to give them the list of the loans that

 5    would be refinanced.  This was not a waterfall in

 6    terms of a sale price.  This was sent to them --

 7    because I was surprised when I was looking at

 8    this that even  ███████  which was expected to go for

 9    far more than the debt, did not have our fee

10    listed in there.

11                   And then I went back to look at

12    the email.  All they were asking for was the list

13    of debt that would have been refinanced.  In

14    February, there was no sale process going on.

15    There was a refinancing going on, and Rob asked

16    me for this and asked me for the term sheet from

17    the refinancing, as well as some information on

18    the  ███████████████████ ; and I was rushing to

19    the airport and I sent this along with other

20    documents.

21                   This was not sent as a waterfall

22    in a sale process; this was a list of the debt

23    that they wanted to understand what would get

24    refinanced.
```

1          Q.      What would get refinanced in what

2    process?  What do you mean?

3          A.      I was going on the road to do a

4    refinancing.  I was heading to Europe to do the

5    ██████ refinancing.  So all he was asking for was a

6    list of the debt in ██████ and ████.  And so I sent

7    this, because I had it with all the debt listed

8    out.

9                  You can go back to

10   February 14th.  There is an email from Rob Kost

11   asking for things, and one of them is the list of

12   debt that would be refinanced.

13                 February 14th starts with an

14   email from Rob Kost.  And I sent him the ██████ --

15   I sent three emails:  The ██████ term sheet from

16   the refinancing, the -- this ██████ and ████ debt

17   listed in this because that's where I had it

18   easily available and ████████████████████ risk

19   management information that they requested.

20         Q.      So these -- these don't model out

21   transactions involving ██████ and ████████████████

22   ███████?

23         A.      I mean, they were -- they were in

24   a form but that's not -- I mean, if you look at

1    ████ which would have covered all the debt and

2    paid the equity, you don't see the PPMG fee paid

3    up there at the top.  This was not a true

4    waterfall.  I was just sending -- we had samples

5    that we were putting together and keeping the

6    numbers up in, but we were -- this was not for a

7    sale transaction.  I can show you 20 others that

8    list out all the fees and the documents we went

9    through with FTI in July that have all the fees

10   listed.  This was just a worksheet that we were

11   keeping track of things.  But it wasn't a

12   waterfall payment.

13              And even if you look at ████ where

14   all the debt would have been paid in full by a

15   long shot, you don't see the PPMG fee up there.

16   BY MR. BARRY:

17        Q.    So when you go halfway -- about

18   halfway down the page there that's up on the

19   screen, you get to the PPMG fee at 5 percent,

20   ████████; right?

21        A.    I know but that would have been

22   paid out up here, if this was what it was sent to

23   do.  The PPMG fee would be paid out before the

24   debt, not after the debt.

1          Q.      And this is --

2          A.      I can show you -- the waterfalls

3    that we reviewed at the time of the transactions.

4    The PPMG fee is part of the closing expenses.

5                  This -- I mean, go back and take a

6    look at the emails.  Rob Kost sends me an email.

7    He wants -- he wants a list of the debt in ████

8    and ███.  And these I had handy.  I said to him,

9    "I'm running to the airport to go to Europe."  I

10   said, "I'm slammed, but I'll get you what I have.

11   The company is tied up."

12                  And so I sent that.

13                  But this is not a -- this was --

14   there was no transaction going on at this time.

15   This was February.  I was heading to Europe to do

16   all the management meetings for the refinancing

17   to refinance out the debt.

18                  This is what I'm sending, a list

19   of the debt.  This was -- this was part of the

20   worksheets we had, but there was no transaction

21   going on at this time other than a refinancing.

22         Q.      So you didn't -- you didn't

23   prepare this for the purpose Rob Kost requested

24   it?  It was something you had handy?

IN RE: Zohar III, Corp., et al.

```
 1              A.        No.   No.   It was --

 2                        MS. LOSEMAN:  Object to form.

 3                        THE WITNESS:  It was just a form.

 4    BY MR. BARRY:

 5              Q.        Was it created at -- in response

 6    to Rob Kost's email?

 7              A.        No.  I just grab things that would

 8    provide the information.  There's an email back

 9    to Rob Kost on February 14th that the company

10    is slammed and can't get him the information,

11    that I will send him what I have handy, as I'm

12    running to the airport.

13              Q.        And what you had handy had the

14    PPMG fee getting paid out after debt; right?

15                        MS. LOSEMAN:  Object to form.

16                        THE WITNESS:  Well, it's just a

17              worksheet, a calculation of things.  This

18              was a worksheet.  This is not how the

19              water -- where the waterfalls that we

20              ultimately sent you don't look like this.

21    BY MR. BARRY:

22              Q.        Why was this prepared this way?

23              A.        This was us keeping track of

24    things internally so that when we had to prepare
```

Page 150

1  waterfalls, we had the information handy.  We had

2  the list of the debt.  We had the calculation of

3  the investment banker from the thing.  This

4  was -- these were our internal worksheets.

5          Q.     Well, weren't you traveling to

6  Europe to discuss and potentially negotiate a

7  restructuring of the ██████ and ██████ debt?

8          A.     No.  It was a refinancing.  Would

9  have paid off the Zohars.  But it had nothing --

10  Patriarch wouldn't have gotten any fees.  It

11  wasn't a sale of the company.

12          Q.     Okay.

13          A.     It was just a refinancing.  So the

14  Zohar loans were going to get refinanced out.

15  There would have been no transaction.  There

16  would have been no banker fees, no legal.

17                 These were our internal worksheets

18  so that when we needed to put a waterfall

19  together for a sale of the company, we had the

20  information available.  If you look at other

21  waterfalls that were sent to you for the closing

22  of transactions, they look different.

23                 These are internal worksheets.

24                 MR. BARRY:  Okay.  Can we please

Page 151

```
 1            go to Page 3.
 2                    Next page.  Sorry.  Next page.
 3    BY MR. BARRY:
 4            Q.    Okay.  So this is the -- the
 5    ████ -- it says, ████████████████████████  at the
 6    top.
 7            A.    I see it.
 8            Q.    So, again, you're saying this
 9    isn't modeling out a sale of ████
10            A.    It's just a worksheet.  There was
11    no sale of ████.  ████ hadn't even been put up for
12    sale yet.  It was just an internal worksheet
13    where we -- we were constantly trying to update
14    numbers so that when we had to do something, we
15    would be ready to do it.
16            Q.    Okay.
17            A.    So it listed out different things.
18    But when you go back to the waterfalls for the
19    closing of companies, you will see that the
20    Patriarch fee is paid out as part of the closing
21    expenses.
22            Q.    Okay.  So at the top, it says --
23            A.    You never know what the Patriarch
24    fee is going to be until you have a true purchase
```

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 152

1    price and you have management equity that you

2    have to subtract.  So it's mostly to have the

3    formulas here and to have everything that could

4    easily be updated once there was a transaction.

5          Q.    Right.  So --

6          A.    But these are internal worksheets.

7    They were just -- they were sample waterfalls.

8    We didn't have tax advisor expenses.  You know,

9    we didn't have other professional fees.

10         These were standard -- you know,

11    worksheets that we were making sure that things

12    worked and that we had information recorded.  But

13    there was no transaction here.

14          Q.    Yeah, I think, you just said you

15    wanted to have the formulas in place in case we

16    did have a transaction.  Isn't that really a

17    model?  Isn't that a [indecipherable] model?

18          MS. LOSEMAN:  Object to form.

19          THE WITNESS:  No.  This was for us

20        to have internal worksheets on debt

21        amounts, on -- and have things flowing.

22        But these were just internal worksheets

23        that would ultimately be turned into a

24        full waterfall.

```
 1              hard-and-fast agreement on that.  So --
 2                    MS. LOSEMAN:  15 minutes is fine.
 3                    MR. BARRY:  Well, I'll take as
 4              much time as I need.
 5        BY MR. BARRY:
 6              Q.    So is it your testimony that
 7        Rob Kost asked you to specifically put this
 8        document together in this format?
 9              A.    No.  He asked for me the debt
10        numbers.  And I handed him what I had that had
11        the debt numbers handy.
12                    This was an internal worksheet
13        that listed the debt numbers.  I was running for
14        the airport.  He asked me for certain things.  I
15        tried to shoot out, as I was running for the
16        airport, the things.  The debt numbers were in
17        this.
18                    There was no transaction for ▇▇▇
19        It wasn't on the market at this period of time.
20        These were internal documents that listed the
21        debt numbers, and I sent them.
22              Q.    Okay.  Do you have internal --
23        internal spreadsheets that just show the debt
24        numbers at these two companies?
```

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 163

1              going on in February.  There was a

2              refinancing.  And if you read the email

3              traffic, you will see.

4    BY MR. BARRY:

5              Q.    How long before you provided these

6    to Mr. Katzenstein did Mr. Mercado prepare it?

7              A.    I have no idea, but I do not -- it

8    was not recent.

9                    Just so you know, these fees are

10   paid up with the closing expense.  So when you go

11   back to your waterfalls for the true transactions

12   or the 12 that I provided in July, you will see

13   that the PPMG fee is under the closing expenses.

14             Q.    I'm sorry.  The ones that you

15   provided when?

16             A.    Well, that we walked through

17   with -- with FTI and Katzenstein back in July,

18   line item by line item for the overall plan of

19   reorganization deals.  There were waterfalls

20   provided and walked through, and then you have

21   the Denali and Oasis.  You'll see that they're

22   both paid as part of the closing expenses at the

23   top.

24                    This is just an internal

IN RE: Zohar III, Corp., et al.

```
 1    worksheet.  This is not what the true waterfalls

 2    that you'd received look like.

 3              Q.     Okay.

 4              A.     These are hypotheticals.

 5                     MR. BARRY:  Let's look at -- can

 6              you put Zohar 9 back up.  And I only have

 7              a few more questions.

 8    BY MR. BARRY:

 9              Q.     Okay.  Back to this.

10                     Turn to Page 2 at the very top.

11    The last sentence of the -- the last sentence

12    that's in the -- the sort of floating bottom of

13    that paragraph at the top says, "The obligations

14    of the companies under Sections 7 and 8 will

15    survive termination of this letter agreement

16    indefinitely, and the obligations of the

17    companies under Section 3 will survive

18    termination of this letter agreement."

19                     Do you see that?

20              A.     Yes, I see that.

21              Q.     I'm sorry.  Are you waiting for

22    me?

23                     MS. LOSEMAN:  Yeah.  Is there a

24              question?
```

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

# (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

# (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

# (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

# (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

# (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

# (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

# (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

# (REDACTED)

# **Exhibit 2**

# (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

# (REDACTED)

# **Exhibit 2**

(REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

# (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

# (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 2**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

# (REDACTED)

# **Exhibit 3**

# (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **<u>Exhibit 3</u>**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

# (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# Exhibit 3

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

# (REDACTED)

# Exhibit 3

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

# (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

# (REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

# (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

## (REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 3**

(REDACTED)

# **Exhibit 4**

Payment Due Date: **10/1/2015**

# LVD Acquisition, LLC (Oasis)

PATRIARCH
PARTNERS, LLC

**PAYOR:**

LVD Acquisition, LLC (Oasis)
222 East Campus View Blvd.
Columbus, OH 43235
United States

**PAYEE:**

Patriarch Partners Agency Services
Attn: Loan Operations
1 Broadway, 5th Floor
New York, NY 10004

Please be advised that, effective 10/1/2015, the total amount due for principal, interest, and fees is $14,676,968.44

## Billing Summary for 10/1/2015

| Facility | Current Due | Past Due | Credit | Total Due |
|---|---|---|---|---|
| **854-01: TL** | $621,925.16 | $13,308,771.61 | $0.00 | $13,930,696.78 |
| **854-03: RL B** | $41,326.15 | $704,945.51 | $0.00 | $746,271.67 |
| Total Owed: | **$663,251.32** | **$14,013,717.13** | **$0.00** | **$14,676,968.44** |

A-555

Confidential

Oasis_PPMG_PPAS_00000395

# **Exhibit 5**

Payment Due Date: **12/1/2015**

# LVD Acquisition, LLC (Oasis)

PATRIARCH
PARTNERS, LLC

**PAYOR:**

LVD Acquisition, LLC (Oasis)
222 East Campus View Blvd.
Columbus, OH 43235
United States

**PAYEE:**

Patriarch Partners Agency Services
Attn: Loan Operations
1 Broadway, 5th Floor
New York, NY 10004

Please be advised that, effective 12/1/2015, the total amount due for principal, interest, and fees is $160,531.28

## Billing Summary for 12/1/2015

| Facility | Current Due | Past Due | Credit | Total Due |
|---|---|---|---|---|
| **854-01: TL** | $123,418.69 | $0.00 | $0.00 | $123,418.68 |
| **854-02: RL** | $21,207.19 | $0.00 | $0.00 | $21,207.19 |
| **854-06: Delayed Draw Term Loan C (FDNG)** | $15,905.40 | $0.00 | $0.00 | $15,905.40 |
| Total Owed: | **$160,531.28** | **$0.00** | **$0.01** | **$160,531.28** |

Confidential

Oasis_PPMG_PPAS_00000409

# **Exhibit 6**

From: Lynn Tilton <Lynn.Tilton@patriarchpartners.com>
Sent: Thursday, February 14, 2019 10:15 AM
To: Rob Kost <rkost@goldinassociates.com>
Cc: Katzenstein Michael <mike.katzenstein@fticonsulting.com>
Subject: RE: Zohar

I a working on the information for ████ and ████  The team is slammed with a risk presentation that must be prepared for ██████ CEO and information for the refinancing banks.  I will get it to the group as soon as possible.
On the calls, I leave for Europe tomorrow but could be available Wed afternoon when I return or over the weekend from Europe. Monday and Tuesday will be blocked out.
We can talk further on ████████ and ████████

-----Original Message-----
From: Rob Kost <rkost@goldinassociates.com>
Sent: Thursday, February 14, 2019 10:10 AM
To: Lynn Tilton <Lynn.Tilton@PatriarchPartners.Com>
Cc: Katzenstein Michael <mike.katzenstein@fticonsulting.com>
Subject: Zohar

Lynn -
A couple of updates and requests.
- I have confirmed that ████████ and ████████ are both traveling. Given the timeliness of the decisions that need to be made, it might make more sense to do a call with Joe, Mike and the ████████ team as soon as possible.
- The ██████ team will not be in NYC and is actually trying to schedule a MP that day, so may not be available for a call. - I will send the current schedule to Ashley and you today.
- I know you are speaking with Mike today, but he asked me to start collecting information with respect to ████ and ████ Should i work with you or should I reach out to ████████? In particular, we would like some additional information related to the sale versus refinancing. 1) materials / views related to selling ████ as a ████████ business. 2) economic impact to ████ over the life of the new ████████████ contracts. 3) any information / documents regarding the refinancing of ████ to assist us with review the options.
- Lastly, I have received some inbounds for bankers interested in pitching for ████████ and ████████ I will send them to you today. If you have a view as to timing with respect to these processes, that would be helpful to know.
Thank you
Rob
*********************************************************************************************************
********************************
This email contains confidential information intended solely for the addressee(s). Please notify the sender immediately if you have received this email in error and delete it from your system. Disclosure, copying or distribution of this email or any information contained herein without express authorization from Goldin Associates LLC ("Goldin") or taking any action in reliance on the contents of this email is strictly prohibited. Goldin does not accept liability for any errors or omissions in the contents of this message or issues relating to its transmission (e.g., corrupted, lost, destroyed, late, incomplete, or virus-infected data).

A-559

# **Exhibit 7**

## (REDACTED)

# **Exhibit 7**

# (REDACTED)

# **Exhibit 7**

(REDACTED)

# **Exhibit 7**

## (REDACTED)

# **Exhibit 7**

## (REDACTED)

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
| | **Ref. Docket No. 1916 & 1969** |
| | **Hearing Date: October 14, 2020 at 10:00 a.m. (ET)**<br>**Objection Deadline: October 7, 2020 at 4:00 p.m. (ET)** |

## NOTICE OF FILING OF PROPOSED REDACTED VERSION OF DEBTORS' RESPONSE TO PPMG'S OPENING BRIEF REGARDING PPMG'S RIGHT TO PAYMENT OF TRANSACTION FEE IN CONNECTION WITH OASIS TRANSACTION

TO:     (I) THE U.S. TRUSTEE; (II) COUNSEL TO THE PATRIARCH STAKEHOLDERS; (III) COUNSEL TO U.S. BANK, AS INDENTURE TRUSTEE; (IV) COUNSEL TO MBIA; (V) COUNSEL TO THE ZOHAR III CONTROLLING CLASS; AND (VI) ALL PARTIES THAT, AS OF THE FILING OF THIS MOTION, HAVE REQUESTED NOTICE IN THESE CHAPTER 11 CASES PURSUANT TO BANKRUPTCY RULE 2002

**PLEASE TAKE NOTICE** that on September 4, 2020, the debtors and debtors in possession in the above-captioned Chapter 11 cases (collectively, the "Debtors") filed the *Debtors' Response to PPMG's Opening Brief Regarding PPMG's Right to Payment of Transaction Fee in Connection Oasis Transaction* [Docket No. 1916] (the "Response").

**PLEASE TAKE FURTHER NOTICE** that on September 30, 2020, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Filing of Portions of the Debtors' Response to PPMG's Opening Brief Regarding PPMG's Right to Payment of Transaction Fee in Connection Oasis Transaction* [Docket No. 1969] (the "Motion to Seal").

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the proposed redacted version of the Response (the "Proposed Redacted Document"), attached hereto as **Exhibit A**.

---

[1]  The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

26680063.1

A-565

PLEASE TAKE FURTHER NOTICE THAT A TELEPHONIC HEARING (THE "HEARING") ON THE MOTION TO SEAL WILL BE HELD ON **OCTOBER 14, 2020 AT 10:00 A.M. (ET)** BEFORE THE HONORABLE KAREN B. OWENS, IN THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE, 824 NORTH MARKET STREET, 6TH FLOOR, COURTROOM NO. 3, WILMINGTON, DELAWARE 19801.

PLEASE TAKE FURTHER NOTICE that any objections to the Motion to Seal are due on **October 7, 2020 at 4:00 p.m. (ET)**.

PLEASE TAKE FURTHER NOTICE THAT IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION TO SEAL WITHOUT FURTHER NOTICE OR A HEARING.

| | |
|---|---|
| Dated: September 30, 2020<br>Wilmington, Delaware | YOUNG CONAWAY STARGATT & TAYLOR, LLP<br><br>*/s/ Shane M. Reil*<br>James L. Patton, Jr. (No. 2202)<br>Robert S. Brady (No. 2847)<br>Michael R. Nestor (No. 3526)<br>Joseph M. Barry (No. 4221)<br>Ryan M. Bartley (No. 4985)<br>Shane M. Reil (No. 6195)<br>Rodney Square<br>1000 North King Street<br>Wilmington, Delaware 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br>Email: jpatton@ycst.com<br>rbrady@ycst.com<br>mnestor@ycst.com<br>jbarry@ycst.com<br>rbartley@ycst.com<br>sreil@ycst.com<br><br>*Counsel to the Debtors and Debtors in Possession* |

**Exhibit A**

**Proposed Redacted Document**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Ref. Docket Nos. 1093 & 1130** |
| | ) | |
| | ) | **Hearing Date: September 14, 2020 at 10:00 a.m. (ET)** |

**DEBTORS' RESPONSE TO PPMG'S OPENING BRIEF REGARDING
PPMG'S RIGHT TO PAYMENT OF TRANSACTION FEE
IN CONNECTION WITH OASIS TRANSACTION**

Zohar III, Corp. and its affiliated debtors and debtors in possession in the above-captioned

Chapter 11 cases (collectively, the "Debtors" or the "Zohar Funds") hereby submit this response

(this "Response") to *PPMG's Opening Brief Regarding PPMG's Right to Payment of Transaction

Fees in Connection With the Oasis Transaction* [Docket No. 1093][2] (the "PPMG Brief") and in

further support of the *Debtors' Motion for an Order Determining Dispute Between the Debtors

and Patriarch Partners Management Services, LLC Related to Pending Oasis Transaction*

[Docket No. 1130] (the "Motion"),[3] and further respectfully state as follows:

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar III"). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] PPMG originally filed its brief and supporting declaration on September 6, 2019 (the "Original Brief and Declaration") [Docket No. 914]. Thereafter, the Debtors requested that portions thereof be withdrawn as they violated the mediation privilege. On December 31, 2019, PPMG withdrew the offending passages in the Original Brief and Declaration (the "December 31st Brief and Declaration")[Docket No. 1197]. This Response is addressed to the December 31st Brief and Declaration.

[3] Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Motion. Attached as Exhibit A hereto is a revised Proposed Order (the "Revised Proposed Order") with respect to the Motion and attached hereto as Exhibit B is a redline of the Revised Proposed Order against the Proposed Order.

25163455.7

A-568

<u>**PRELIMINARY STATEMENT**</u>

1. PPMG advances two arguments to support its receipt of an approximately $3.8 million Transaction Fee under the PPMG MSA, which amounts would have otherwise been received by the Zohar Funds. Both of PPMG's arguments are unsupported by the documents at issue and should be rejected. First, PPMG argues that it was entitled under the terms of the PPMG MSA to the 5% Transaction Fee regardless of whether the proceeds of the LVD Transaction sufficed to pay off LVD's secured debt. This reading finds no support in the PPMG MSA. Second, PPMG argues that even if payment of the Zohar Funds' secured indebtedness was a condition to PPMG earning a Transaction Fee, the LVD Transaction did, in fact, pay the Zohar Funds' secured debt in full because $20 million of that indebtedness – the Amendment 8 Tranches – was actually equity. PPMG's position wholly conflicts with the unambiguous terms of the documents evidencing the Amendment 8 Tranches and should be rejected as well.

<u>**RESPONSE**</u>

**A.** **Section 3(c)(ii)(D) of the PPMG MSA Precludes Payment of a Transaction Fee if the Applicable "Liquidity Event" Does Not Satisfy LVD's Debt**

> *i.* *No Transaction Fee was Owed Under the Only Reasonable* <u>*Reading of the PPMG MSA*</u>

2. The Zohar Funds and PPMG agree that section 3(c)(ii)(D) uses a defined term – "Change *of* Control" – that is not defined in the PPMG MSA, but they disagree on what should have been used in its place. The competing candidates – "Liquidity Event" and "Change in Control," as well as the misused "Change of Control" – are frequently used in commercial settings to express similar concepts: namely, fundamental changes in the ownership and control of enterprises. However, as explained in the Motion, the only reasonable reading of the PPMG MSA would be to substitute the term "Liquidity Event" in place of the term "Change *of* Control" in section 3(c)(ii)(D). As a result, no Transaction Fee was owed or payable to PPMG because the

Zohar Funds' indebtedness was not satisfied in full by the LVD Transaction.[4] PPMG's contrary interpretation, which suggests that the proviso in subsection (c)(ii)(D) of section 3 of the PPMG MSA (dealing with Transaction Fees) was intended to modify the defined term "Change *in* Control," which is itself a specialized term employed in procedures established by Annex A (titled "Determination of Rights to Indemnification") to implement the indemnification of PPMG and related parties provided by a separate section of the PPMG MSA (Section 7 titled "Indemnification"), is not reasonable.

3.    The Court need not and should not consider Ms. Tilton's testimony or any other extrinsic evidence on this point because there is only one reasonable interpretation of the PPMG MSA when read as whole that corrects the inadvertent usage of the term "Change *of* Control" in section 3(c)(ii)(D). *Scotto v. Georgoulis*, 89 A.D.3d 717, 718, 932 N.Y.S.2d 120, 121 (2011) ("A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties ... Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement and, therefore, extrinsic evidence may be considered only if the agreement is ambiguous") (citing *Brad H. v. City of New York,* 17 N.Y.3d 180, 185–186, 928 N.Y.S.2d 221, 951 N.E.2d 743).

4.    Putting the term "Liquidity Event" in place of "Change *of* Control" in section 3(c)(ii)(D) leads to a reasonable construction based on several grounds.

i.    *First*, the term "Change *of* Control" is used in a *proviso* to the definition of "Liquidity Event" itself. It is reasonable to conclude that provisos in definitions

---

[4] The Debtors' position on this issue is long-held and was communicated to Patriarch as soon as the Debtors were (finally, and rightfully) included in the negotiation of the EPA in or around June of 2019. Any claim or insinuation by Patriarch, that the Debtors asserted their position at the last minute or in an effort to hold up the consummation the EPA is false.

are intended to refer to the term being defined, and, therefore, that the inadvertent usage of "Change of Control" was intended to be "Liquidity Event."

ii. _Second_, the _proviso_ seeks to place a further limitation on which of the three "events" enumerated before the proviso will "qualify" as something. The usage of "in each case" in the _proviso_ suggest that the thing being qualified is the term "Liquidity Event" which is defined by reference to three events (sub-parts (x), (y), and (z)) in the first part of the sentence in section 3(c)(ii)(D). Indeed, the definition of "Liquidity Event" is used for only one purpose in the MSA: to define when PPMG is entitled to a Management Fee. The word "qualifying" is central to that purpose, as it plainly establishes what type of Liquidity Event "qualifies" for payment of the fee. Patriarch has not, and cannot, explain what other purpose the word "qualifying" might serve in the definition. Rather, Patriarch seeks to read the word "qualifying" out of the definition entirely, inappropriately rendering it superfluous.

iii. _Third_, section 3(c) defines when a Transaction Fee is payable. It would be logical to interpret the _proviso_ in subsection (ii)(D) as including a further limitation on when a Transaction Fee is payable rather than creating a qualification on another obligation, entitlement, or right addressed under separate and unrelated parts of the PPMG MSA.

iv. _Fourth_, under the Debtors' reading, the use of "Change in Control" in Annex A is undisturbed, which makes sense as it is specifically defined therein "for purposes of this Annex A." Moreover, under the Debtors' reading, there is no need to reconcile the use of "Change **in** Control" in Annex A against "Change **of** Control" in section 3(c)(ii)(D).

The only reasonable interpretation is that the parties meant to use the term "Liquidity Event" in section 3(c)(ii)(D) instead.[5]

5. PPMG, for its part, fails to offer any adequate explanation in the PPMG Brief for this drafting error, and instead asks the Court to ignore it. _See_ PPMG Brief at ¶ 32 (stating, without

---

[5] Alternatively, if the parties intended to use the term "Change of Control," that would still support the Debtors' reading of the PPMG MSA. There is no dispute that subparts (y) and (z) of the definition of "Liquidity Event"—a transfer of more than 50% of LVD's stock and a merger transferring more than 50% of LVD's value or voting power, respectively—constitute what is colloquially known as a "change of control." Either "Change of Control" is a defined term referring to subparts (y) and (z) that the parties failed to insert, or the term "change of control" should be lowercase. Either way, it is clear that the term refers to what comes before it and is a type of Liquidity Event. As explained above, a "qualifying" "Change of Control"—_i.e._, one that results in PPMG receiving a Transaction Fee— is one that pays off LVD's debt. Here, there was a change of control through the sale of more than 50% of LVD's equity (_i.e._, subpart (y) of the definition of "Liquidity Event"), but that change of control was not a qualifying change of control because LVD's debt was not paid off.

4

further substantive discussion, that: "'Liquidity Event' has a defined meaning for purposes of determining whether a Transaction Fee is owed to PPMG, while 'Change of Control' is a more limited term used specifically with respect to issues of indemnification."). First, as PPMG later concedes in the PPMG Brief, "Change *of* Control" is not, in fact, the defined term used in the PPMG MSA with respect to indemnification issues. *See* PPMG Brief at ¶ 34. Rather, Annex A to the PPMG MSA uses the term "Change *in* Control." *See* PPMG MSA, Annex A. "Change *of* Control" is not defined anywhere in the PPMG MSA or in Annex A. As such, Patriarch's argument that "[t]he Parties to the Management Services Agreement['s]" choice to "use the term 'Change of Control' at the end of Section 3(c)(ii)(D) … must be honored" leads to an absurd result – namely, that the parties intentionally used a defined term that the PPMG MSA never defines. *Id.*

6.      Additionally, there is no reasonable relationship between the use of "Change *of* Control" in section 3(c)(ii)(D) of the PPMG MSA and the indemnification procedures in Annex A that rely on the term "Change *in* Control." As drafted, a "Change *in* Control" is relevant only to who makes a "Standard of Conduct Determination"; it provides Covered Persons with control over whether Independent Counsel, rather than a board put in place following a change in control (in the undefined sense of the term) of LVD, will determine what standard of conduct the Covered Person should have followed in making indemnity determinations. PPMG does not, and cannot, explain what relevance the payment of all of LVD's outstanding debt has to whether a Covered Person should be divested of the right to have Independent Counsel make the Standard of Conduct Determination when a "Change *in* Control" occurs. The Debtors respectfully submit that there is none. To hold otherwise would lead to the absurd result that Covered Persons would be deprived of access to determination by an Independent Counsel based upon the level of proceeds generated through a sale of LVD.

7.    Conversely, it makes abundant sense that the payment of LVD's outstanding debt would be a condition to payment of a Transaction Fee, as it would require LVD's senior secured lenders to be paid in full before a contractual manager – ostensibly responsible, at least in part, for LVD's financial and operational performance – could receive a transaction bonus on account of a sale of LVD or its assets.[6]

8.    Moreover, several other textual arguments show why PPMG's reading is untenable. For reference, section 3(c)(ii)(D) provides:

> "Liquidity Event" means "**(x)** as sale within any given 12 month period of 80% or more of the Company's or any one or more of its subsidiaries' assets (without regard to liabilities) (other than a sale to persons who are shareholders of the Company or the respective subsidiary and hold 50% or more of the equity of the Company or the respective subsidiary on the applicable aware date and their or its respective affiliates), **(y)** the consummation of any transaction in which any person or group of persons (other than the persons who are shareholders of the Company or the respective subsidiary on the applicable award date and their or its respective affiliates) becomes the beneficial owner of stock of the Company or the applicable subsidiary constituting more than 50% of the total fair market value or total voting power of the Company of the applicable subsidiary, or **(z)** the consolidation of the Company or one or more if its subsidiaries with, or merger of the Company or one or more of its subsidiaries with or into any other entity pursuant to a transaction in which any person or group of persons (other than the persons who are the shareholders of the Company or the applicable subsidiary on the applicable award date and their or its respective affiliates) becomes the beneficial owner of the stock of the Company or one or more of its subsidiaries constituting more than 50% of the total fair market value or total voting power of the Company or the respective subsidiaries; **provided, however, that, in each case, in order to constitute a qualifying Change of Control, the event must permit the Company or the respective subsidiaries to pay all of its or their (as appropriate) outstanding debt.**"

---

[6] Ms. Tilton in fact claims that the Transaction Fee was intended to compensate PPMG for "turn[ing] around" the Portfolio Companies, but nonetheless contends that PPMG should be paid 5% of the value received from any "Liquidity Event," before LVD's senior secured creditors are paid, even if LVD was insolvent at the time of the transaction. *See* Deposition of Lynn Tilton, July 13, 2020 (the "Tilton Deposition," excerpts of which are attached hereto as Exhibit G), at 136:1-10. In fact, under Ms. Tilton's interpretation, PPMG would be entitled to a 5% Transaction Fee even if LVD had become ***more distressed*** under PPMG's management.

PPMG MSA, section 3(c)(ii)(D) (emphasis added).  And Annex A of the PPMG MSA, defining "Change in Control," provides, in relevant part:

> For purposes of this Annex A, a "Change in Control" means (a) the occurrence after the date hereof of any transaction described in clauses (y) or (z) of the definition of Liquidity Event or (b) . . ."

PPMG MSA, Annex A, ¶ 9.

9.      For one, the proviso at the end of section 3(c)(ii)(D) states that it applies "in each case," which is clearly a reference to the preceding sub-parts (x), (y), and (z).  However, the definition of "Change *in* Control" in Annex A expressly incorporates only sub-parts (y) and (z) of the definition of Liquidity Event.  Under PPMG's interpretation, this creates an internal inconsistency, because a transaction falling under sub-part (x) is not a "Change in Control" and, therefore, the proviso cannot apply to it – *i.e.*, it cannot apply "in each case" under PPMG's reading despite saying that it does.

10.      Relatedly, PPMG fails to explain why, if the proviso was intended to relate to indemnification, it appears in section 3(c)(ii)(D) – the definition of "Liquidity Event" - rather than in section 7 of the PPMG MSA titled "Indemnification" or in Annex A's definition of "Change in Control," where, under Patriarch's interpretation, it would have made more sense to place it. PPMG has also not explained the distinction between a "Change of Control" and a "*qualifying* Change of Control."  As set forth above, the use of "qualifying" in section 3(c)(ii)(D) is a limitation on what constitutes a "Liquidity Event;" one that PPMG effectively reads out of the agreement.

11.      For the foregoing reasons, the Debtors submit that the only reasonable interpretation of the PPMG MSA is that section 3(c)(ii)(D) requires that the Company's outstanding debt be paid in full before a Transaction Fee is payable to PPMG.  And, because LVD's outstanding debt to the Zohar Funds was not paid in full in connection with the LVD

Transaction, the Court should grant the Debtors' Motion, determining that no Transaction Fee was owed.

ii. *If the Court Determines the PPMG MSA is Ambiguous, it Should Nonetheless Determine that the Debtors' Reading is Correct*

12.     Under New York law, language in a contract is ambiguous if it is susceptible to more than one reasonable interpretation.  *See NRT New York, LLC v. Harding*, 131 A.D.3d 952, 954, 16 N.Y.S.3d 255, 258 (2015) (citing *Brad H. v. City of New York*, 17 N.Y.3d at 186, 928 N.Y.S.2d 221, 951 N.E.2d 743)). "Extrinsic and parol evidence of the parties' intent may not be admitted to create ambiguity in a contract that is unambiguous on its face, but such evidence may be considered where a contract is determined to be ambiguous." *Id.*

13.     In the event that the Court determines that the usage of the term "Change *in* Control" in section 3(c)(ii)(D) of the PPMG MSA is susceptible to more than one reasonable interpretation, the Debtors respectfully submit that their reading should still prevail.  As set forth in the Motion, the Debtors' reading of section 3(c)(ii)(D) is entirely consistent with the treatment of Phantom Equity Awards at LVD, which similarly limited the payment of bonuses in ownership/governance altering transactions to instances where the secured indebtedness was paid in full through the transaction.  Likewise, Ms. Tilton, the principal of PPMG, tendered to the Zohar Funds a flow of funds model for a hypothetical sale of Portfolio Company C (which has a management services agreement with an identical Section 3 as the PPMG MSA)[7] where the proceeds were expected to be insufficient to satisfy the company's secured debt.  The Zohar Funds' CRO requested this model to understand what would be the likely recovery for the Zohar Funds

---

[7] A copy of Portfolio Company C's management services agreement with PPMG is attached hereto as <u>Exhibit C</u>.

in that hypothetical sale.  That model did not reflect payment of the 5% transaction fee owing to PPMG where the proceeds were insufficient to cover the debt.

14.     On the other hand, PPMG has produced *no* contemporaneous evidence of any kind, nor documentary evidence of any kind, in support of its contention that "Change *of* Control" in section 3(c)(ii)(D) was intended to be "Change *in* Control" and therefore reflected an intent that the Covered Parties (PPMG and its affiliates) would be limited in obtaining Independent Counsel's determination of their standard of conduct in the event that a "Change *in* Control" occurred but the proceeds from that transaction were insufficient to pay in full the debt owed to the Zohar Funds.

15.     PPMG's only evidence in support of its interpretation is testimony Ms. Tilton offered approximately one year after this dispute arose.  That testimony is inadmissible hearsay and should be disregarded.  Moreover, at her deposition, Ms. Tilton did not provide any credible or coherent explanation of why the term "Change *of* Control" – as opposed to "Liquidity Event" - was intended to be used in the *proviso* in section 3(c)(ii)(D) of the PPMG MSA.

     iii.     *If the Court Finds That the Extrinsic Evidence Does not Resolve any Ambiguities in the PPMG MSA, Such Ambiguities Must be Construed Against PPMG Under the Doctrine of* Contra Proferentum

16.     *Contra proferentum* is a principle of construction in which ambiguities in a contract are construed against the drafter.  *See Westchester Resco Co., L.P. v. New England Reinsurance Corp.*, 818 F.2d 2, 3 (2d Cir. 1987) (*citing* Restatement (Second) of Contracts § 206 & comment a (1981)).  Under New York law, which governs the MSAs, "where an ambiguity exists in a standard-form contract supplied by one of the parties, the well-established *contra proferentem* principle **requires** that the ambiguity be construed against that party." *Westchester Resco*, 818 F.2d at 3 (emphasis added).  Further, the doctrine takes on a particular importance where the parties to the agreement have unequal bargaining power.  *See Goldman v. Metro. Life*

*Ins. Co.*, 13 A.D.3d 289, 291, 788 N.Y.S.2d 25, 28 (2004), *aff'd*, 5 N.Y.3d 561, 841 N.E.2d 742 (2005) ("As a consequence of the disparity in bargaining power between the insurer and the insured, defendant is subject to the doctrine of contra proferentum.").

17.     PPMG's internal team of 12 attorneys, in consultation with lawyers from Jones Day, prepared the MSA.  *See* Tilton Deposition, at 111:1-6 ("Q: So just to make sure I understand, PPMG prepared this document in consultation with its internal lawyers and lawyers at Jones Day…?  A:  Yes, I believe that is a correct statement.").  As the sole director or manager of the 41 Group A and Group B Portfolio Companies, Ms. Tilton required all of the Group A and Group B Portfolio Companies – including LVD – to execute virtually identical management services agreements with PPMG.  *See* Tilton Deposition, at 117:10 - 119-12; *see also* Email from Monica Loseman, Esquire to Joseph Barry, Esquire dated June 18, 2020 ("the MSA is a fairly standard agreement used across the PCs.").[8]

18.     Despite alleging in her deposition testimony that the Portfolio Companies were free to agree to the form of MSA provided by PPMG or not, Ms. Tilton conceded that no Portfolio Company actually declined to execute an MSA, and could only identify two of the 41 companies that negotiated ***any*** of the terms, and none that negotiated the Transaction Fee.  *Id*. at 117:10 - 119-12; 118:9-11.  Ms. Tilton was further unable to confirm that any of the Portfolio Companies – including LVD – was represented by its own legal counsel in connection with any "negotiation" of the MSA.  *Id*., at 115:24 – 116:5.  In any event, Ms. Tilton's personal approval was required for any of the Portfolio Companies – including LVD – to sign it under LVD's operating agreement and the authority matrices she purportedly put into place at the Company.  *Id*. at 28:3-13; 112:23-113:2.

---

[8] A copy of this correspondence is attached hereto as <u>Exhibit D</u>.

10

19.     Contemporaneous email exchanges among representatives of PPMG and LVD confirm that LVD did not negotiate the terms of the PPMG MSA and was not represented by counsel in connection therewith.  Those emails, copies of which are attached hereto as <u>Exhibit E</u>, show that LVD received PPMG's form of MSA on September 24, 2010 in an email asking that they simply ███████████████████████████████████████████  The emails reflect that LVD did so within a few days – with no negotiation and whole-sale acceptance of the standard form PPMG MSA.

20.     As set forth above, the only reasonable interpretation of the PPMG MSA is that it requires a "Liquidity Event" to clear LVD's secured debt before a Transaction Fee can be paid.  If, however, the Court determines that the PPMG MSA is ambiguous on that issue and, after considering all relevant extrinsic evidence, cannot determine the intent of the parties, any ambiguities must be construed against PPMG.  As the drafter of the PPMG MSA, which appears to have been imposed upon LVD without any negotiation, and with LVD having no independent legal representation, PPMG was in the best position to manifest what was intended by the terms in its standard-form.

21.     PPMG has failed to provide any credible explanation as to why the phrase "Change *of* Control", as used in section 3(c)(ii)(D), should be construed as anything other than a drafting error in place of the term "Liquidity Event," or what function that *proviso* would serve under PPMG's proffered reading.  Conversely, as explained above and in the Motion, the use of "Liquidity Event" in that section clearly and logically comports with the balance of the PPMG MSA and is entirely reasonable in light of the parties' relationship and the purported commercial purpose of the Transaction Fee as described by Ms. Tilton herself (*i.e.*, to reward PPMG for "turning around" LVD).  As one court has observed "[c]onvoluted or confusing terms are the

problem of" the drafter.  *Twin City Fire Insurance Company,* 840 A.2d at 630 (quoting *Penn Mutual Life Ins. Co. v. Oglesby*, 695 A.2d 1146, 1150 (Del.1997).

22.     Therefore, the Court should find that no Transaction Fee was payable because the LVD Transaction did not clear LVD's debt and the Court should order that PPMG immediately repay the amount of $3,798,240.92 to the Debtors.

**B.      LVD's Debt to the Zohar Funds was not Satisfied Through the LVD Transaction**

   *i.     The Credit Agreement and Amendment 8 Unambiguously
           <u>Describe the Amendment 8 Tranches as "Debt"</u>*

23.     "[W]hen the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations." *Del Vecchio v. Cohen*, 288 A.D.2d 426, 428, 733 N.Y.S.2d 479, 481 (2001) (citations omitted). Further, "extrinsic or parol evidence is not admissible to create an ambiguity in a written agreement which is otherwise clear and unambiguous." *Id*. (citations omitted).

24.     As set forth herein and in the Motion, under section 3(c)(ii)(D) of the PPMG MSA, for any Transaction Fee to be triggered, the transaction in question must satisfy in full LVD's indebtedness.  As of the closing of the LVD Transaction, LVD's secured indebtedness to the Debtors under the Credit Agreement (including Amendment 8) totaled no less than $80,947,404. *See* Payoff Letter dated September 30, 2019, a copy of which is attached hereto as <u>Exhibit F</u> (the "<u>Payoff Letter</u>"), at ¶ 2(a).   On account of this secured indebtedness, the Debtors received $65,459,783.66. *See id.* at Sch. 1.  LVD's debt was thus not paid in full.

25.     The Credit Agreement and Amendment 8 repeatedly and unambiguously refer to the Amendment 8 tranches as "debt" and never once refer to them as anything but "debt."  It is not merely the case that the Amendment 8 Tranches are referred to in Amendment 8 as "Term Loans"

as PPMG suggests – they are also referred to as "Tranches TLD, TLE, and TLF" (*i.e.*, Term Loan D, E, & F)[9] and charted on a schedule to Amendment 8 under the column heading "Type of Loan," which chart includes additional columns for "Commitments," "Lender," "Maturity Date," *et cetera*. Among further objective indicia that the Amendment 8 Tranches are debt: (i) Amendment 8 was executed by LVD as the "Borrower" and by the Zohar Funds (under Ms. Tilton's signature) as the "Lenders;" (ii) footnote 1 of Schedule A to Amendment 8 provides, as a note to the column titled "Commitments," that "'[f]or *loans which, when repaid, may not be reborrowed,* only outstanding undrawn commitments are shown;" and (iii) Section 7 of Amendment 8 provides, in no uncertain terms, that: "[t]his Amendment is a Credit Document . . .." *See* Amendment 8 (emphasis added).

26.      Nonetheless, PPMG claims that the Debtors' secured indebtedness was paid in full because, according to PPMG, the amounts financed under Amendment 8 – at least $20,291,872 – are not debt but equity. And because, according to PPMG, the Debtors received at least $60,655,532 ($80,947,404 minus the amounts under Amendment 8), the "debt" was paid in full and the Transaction Fee was triggered.

27.      PPMG's only evidence for this claim is Ms. Tilton's declaration testimony, which misstates the characteristics of Amendment 8 and concludes that "[e]ach of these characteristics was intended to reflect that [Amendment 8] created a form of equity, not debt." Tilton Decl., at ¶ 2. Ms. Tilton's testimony is self-serving hearsay and should be disregarded.

28.      Moreover, even if Ms. Tilton's declaration testimony were admissible evidence, PPMG has not pointed to any ambiguity in the Credit Agreement or Amendment 8 that would

---

[9] Ms. Tilton testified at her deposition that the designations "TD" in connection with the "TLD," "TLE," and "TLF" loans refers to "Term Loan." Tilton Deposition at 50:21-24.

support this Court's considering whether the Amendment 8 Tranches are or were intended to be equity. Accordingly, the Tilton Declaration and any testimony Ms. Tilton intends to provide at the hearing with respect to whether the Amendment 8 Tranches are debt - as well as any other extrinsic evidence on which Ms. Tilton may seek to rely - are irrelevant and should not be considered by the Court.

>     ii.    *The Court Need Not Undertake a Recharacterization Analysis, But if it Does, Such Analysis Clearly Favors the Debtors' Position*

29.    Having spent several paragraphs of its brief arguing that sophisticated parties "mean what they say" in written agreements, and that the Court must honor the parties' choice of words (*see* PPMG Brief ¶¶ 31-35), PPMG takes the opposite stance as it relates to the Amendment 8 Tranches, claiming that the parties' choice of words is irrelevant. *See* PPMG Brief at ¶ 40 ("[T]he Debtors will make much of the fact that the accrued unpaid equity interest was referred to as a series of 'Term Loans' upon their restructuring . . . But the nomenclature adopted by the 8th Amendment is entirely beside the point.").

30.    However, as the cases cited by PPMG recognize, the terminology used by the parties is certainly relevant; in fact, it is the first factor that courts consider in determining whether debt should be recharacterized as equity. *See, e.g., In re Friedman's Inc.*, 452 B.R. 512, 520 (Bankr. D. Del. 2011) ("The first factor . . . is the name given to the instruments . . . here the monies were provided for under the 'Contribution Agreement' and 'Subordinated Promissory Note Due December 9, 2010.' The Contribution Agreement states that '[t]he Funding Obligation and Expense Amount shall be made as *unsecured subordinated* loans to the Company.' This factor weighs in favor of characterizing the Funding Obligation as debt.") (emphasis in original); *In re SubMicron Sys. Corp.*, 291 B.R. 314, 323 (D. Del. 2003), aff'd, 432 F.3d 448 (3d Cir. 2006).

31.     As set forth above, Amendment 8 is unambiguous and should therefore be construed in accordance with its plain meaning.  Thus, the Court can and should find that the Amendment 8 Tranches are "debt," and not equity, without resort to a recharacterization analysis as PPMG invites.  Moreover, Patriarch's attempt to effectively recharacterize and subordinate the Debtors' debt in LVD is, at the very least, procedurally improper, as claims for recharacterization must be brought through an adversary proceeding on a much fuller evidentiary record than Patriarch has offered.  *See* Bankruptcy Rule 7001(7) & (9).  If, however, the Court does find that a recharacterization analysis is necessary, the relevant factors weigh in favor of a finding that the Amendment 8 Tranches are debt, not equity.

32.     In the Third Circuit, "[t]he overarching inquiry in a recharacterization case is the intent of the parties at the time of the transaction, determined not by applying any specific factor, but through a common sense evaluation of the facts and circumstances surrounding a transaction." *In re Friedman's Inc.*, 452 B.R. 512, 518 (Bankr. D. Del. 2011).  Nonetheless, courts have "adopted various multi-factor tests to define the recharacterization inquiry" and the Third Circuit has held that these tests all include "pertinent factors." *Id.* at 519.

33.     In *SubMicron*, 291 B.R. at 323, the Delaware District Court set out a number of factors to be considered in determining whether debt should be recharacterized as equity, including: (1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right to enforce payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation.

34.    As set forth above, Amendment 8 clearly identifies the Amendment 8 Tranches as "debt." Further, as discussed in the Motion, the Amendment 8 Tranches were titled "long-term debt" in LVD's financial statements and as "indebtedness" in the EPA Disclosure Schedules, each of which Ms. Tilton approved on LVD's behalf.  *See* Motion, at ¶ 15.  Thus, the first and second *Submicron* factors weigh heavily against recharacterization.  PPMG has not produced to the Debtors any documentary evidence that existed prior to this litigation under which LVD or the Zohar Funds referred to or treated the Term Loans created under Amendment 8 as equity.  Instead, PPMG relies **solely** on declaration testimony from Ms. Tilton elicited for purposes of the instant dispute.  That testimony is not only self-serving, but inadmissible hearsay.  It is of no evidentiary value.[10]

35.    The third and fourth *Submicron* factors likewise weigh against recharacterization, as the Amendment 8 Tranches have a fixed maturity date – April 15, 2019 – and each is expressly a "legal, valid and binding obligation of [LVD], enforceable against [LVD] in accordance with its terms and the Credit Agreement as modified by [Amendment 8]."  *See* Amendment 8, at § 3(b) & Schedule A.  Further, while Ms. Tilton claims that the Amendment 8 tranches bore and accrued no interest, the documents themselves defeat that contention.  Schedule A to Amendment 8 lists an "Applicable Margin" of "0%" and section 2.8(a) of the Credit Agreement, titled "Interest on Loans" provides that "each Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment. . . at a rate per annum equal to LIBOR <u>plus</u> the Applicable Margin."  Credit Agreement, at § 2.8(a) (emphasis in original).  And section 2.8(c) of the Credit Agreement provides that "Interest on the Loans shall be payable in arrears on (i) the first day of

---

[10] Moreover, in her deposition, Ms. Tilton could not credibly describe her position that the Amendment 8 tranches were "equity", instead repeatedly referring to the term "equity kicker," which appears nowhere in the credit documents among the Debtors and LVD.  *See e.g.*, Tilton Deposition at 58-61; 74:14-23.

25163455.7                                      16

A-583

each calendar month, (ii) the date of any prepayment of the Loans, whether voluntary or mandatory, to the extent accrued on the amount being prepaid, and (iii) the Maturity Date, including final maturity." *Id.* at § 2.8(c). Thus, interest accrued on the Amendment 8 tranches at LIBOR and was payable and enforceable under the express terms of the Credit Agreement.

36.     The fifth *Submicron* favor also weighs against recharacterization, as the Amendment 8 Tranches did not give rise to any voting or other control rights in favor of the Debtors.

37.     Lastly, the sixth and seventh *Submicron* factors also weigh against recharacterization.   The Amendment 8 Tranches were expressly incorporated into the Credit Agreement and made subject to its terms.   Accordingly, the Amendment 8 Tranches are senior secured debt, which was to be repaid ahead of LVD's other "corporate contributors" – namely, general unsecured creditors and equity holders - and provided the Debtors with the greatest possible level of certainty of repayment in the event of LVD's insolvency or liquidation.  Ms. Tilton herself testified that the Amendment 8 Tranches would be paid just after LVD's other senior secured debt tranches – what she calls "true secured debt" – and  before any equity in LVD.  *See* Tilton Deposition at 66:1 – 67:1.  And that is exactly what happened.  At least a portion of the Amendment 8 Tranches – approximately $4.8 million -- was, in fact, paid as a part of the LVD Transaction, and not on account of any equity interests held by the Debtors.

38.     Thus, each of the *Submicron* factors clearly weighs in favor of a finding that the Amendment 8 Tranches are "debt."[11]

---

[11] Ms. Tilton has repeatedly asserted that Amendment 8 Tranches were "Equity Kickers" under the Zohar Indentures and therefore "equity" for purposes of the PPMG MSA.  As set forth above, Amendment 8 is unambiguous and, as such, the Court cannot consider the Zohar Indentures (which are extrinsic evidence) in interpreting its terms.  In any event, whether or not the Amendment 8 Tranches were "Equity Kickers" under the Zohar Indentures is irrelevant. "Equity Kicker" is merely a defined term under the Zohar Indentures, to which LVD is not a party.  The definition of

WHEREFORE, the Debtors request that the Court grant their Motion and such other and

further relief as it may deem just and proper.

| | |
|---|---|
| Dated: September 4, 2020<br>Wilmington, Delaware | YOUNG CONAWAY STARGATT & TAYLOR, LLP |

/s/ Shane M. Reil
James L. Patton, Jr. (No. 2202)
Robert S. Brady (No. 2847)
Michael R. Nestor (No. 3526)
Joseph M. Barry (No. 4221)
Ryan M. Bartley (No. 4985)
Shane M. Reil (No. 6195)
Rodney Square,
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: jpatton@ycst.com
    rbrady@ycst.com
    mnestor@ycst.com
    jbarry@ycst.com
    rbartley@ycst.com
    sreil@ycst.com

*Counsel to the Debtors and Debtors in Possession*

---

"Equity Kicker" has no independent legal significance and no bearing on the interpretation of the PPMG MSA, which makes no reference to "Equity Kickers" or the Zohar Indentures.

And, even if that defined term was in any way relevant to this dispute, it does not have a dispositive effect in favor of PPMG. A careful review of the definition of "Equity Kicker" contained in the respective indenture for each Zohar Fund demonstrates that, despite its name, the term "Equity Kicker" is broader than equity securities and would encompass various types of indebtedness.

18

**EXHIBIT A**

**Revised Proposed Order**

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| | ) | **Ref. Docket Nos. 1093, 1130, ____ & _____** |
| | ) | |

### ORDER DETERMINING DISPUTE BETWEEN THE DEBTORS AND PATRIARCH PARTNERS MANAGEMENT SERVICES, LLC <u>RELATED TO PENDING OASIS TRANSACTION</u>

Upon the *Motion of the Debtors for an Order Determining Dispute Between the Debtors and Patriarch Partners Management Services, LLC Related to Pending Oasis Transaction* (the "<u>Motion</u>") [Docket No. 1130],[2] of the above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the Motion and all related filings on September 14, 2020 (the "<u>Hearing</u>"); and

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("<u>Zohar III</u>"), Zohar II 2005-1, Limited (8297) ("<u>Zohar II</u>"), and Zohar CDO 2003-1, Limited (5119) ("<u>Zohar III</u>").  The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, for the reasons set forth on the record at the Hearing it is hereby ORDERED:

1.      The Motion is GRANTED.

2.      Within two (2) business days of entry of this order, PPMG shall refund to the Debtors the $3,798,240.92 million Transaction Fee paid in connection with the LVD Transaction.

3.      This Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

Dated:  September ___, 2020
        Wilmington, Delaware

_____
THE HONORABLE KAREN B. OWENS
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**Redline**

25163455.7

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| In re: | ) | |
| | ) | Case No. 18-10512 (KBO) |
| Zohar III, Corp., *et al.*,[1] | ) | Case No. 18-10512 (KBO) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | Ref. Docket Nos. 2661093, 545 & 1130, & |
| | ) | |
| | ) | |

## ORDER DETERMINING DISPUTE BETWEEN THE DEBTORS AND PATRIARCH PARTNERS MANAGEMENT SERVICES, LLC RELATED TO PENDING OASIS TRANSACTION

Upon the *Motion of the Debtors for an Order Determining Dispute Between the Debtors and Patriarch Partners Management Services, LLC Related to Pending Oasis Transaction* (the "<u>Motion</u>") [Docket No. 1130],[2] of the above-captioned debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"); and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated as of February 29, 2012; and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion having been provided,

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar III"). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

25035581.7

A-590

and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the Motion and all related filings on September 14, 2020 (the "Hearing"); and the Court having found and determined that the relief sought in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, for the reasons set forth on the record at the Hearing it is hereby ORDERED:

1.     The Motion is GRANTED.

2.     For the reasons set forth in the Motion Within two (2) business days of entry of this order, no PPMG shall refund to the Debtors the $3,798,240.92 million Transaction Fee shall be payable to PPMG paid in connection with the LVD Transaction.

3.     This Court shall retain jurisdiction over any and all matters arising from the interpretation or implementation of this Order.

Dated:  September ___, 2019 2020
         Wilmington, Delaware

_____
THE HONORABLE KAREN B. OWENS
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT C

**Portfolio Company C Management Services Agreement**


**FILED UNDER SEAL**

## EXHIBIT C

**Portfolio Company C Management Services Agreement**


**FILED UNDER SEAL**

**EXHIBIT C**

**Portfolio Company C Management Services Agreement**


**FILED UNDER SEAL**

<u>**EXHIBIT C**</u>

**Portfolio Company C Management Services Agreement**


**FILED UNDER SEAL**

# EXHIBIT C

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

<u>**EXHIBIT C**</u>

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

## EXHIBIT C

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

# EXHIBIT C

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

Case 1:18-... KBO... Doc 197... 13/08/20... Page 23 of 45

# <u>EXHIBIT C</u>

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

## EXHIBIT C

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

## EXHIBIT C

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

Case 1:20-cv-01414-KBO Document 19-7 Filed 12/30/20 Page 288 of 456 PageID #: 1599

**EXHIBIT C**

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

# EXHIBIT C

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

## EXHIBIT C

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

# EXHIBIT C

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

Case 1:18-cv-04418-KBO Doc 19-7 Filed 11/30/20 Page 289 of 445 PageID #: 1603

# <u>EXHIBIT C</u>

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

# EXHIBIT C

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

**<u>EXHIBIT C</u>**

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

## EXHIBIT C

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

# EXHIBIT C

**Portfolio Company C Management Services Agreement**


**FILED UNDER SEAL**

**EXHIBIT C**

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

<u>**EXHIBIT C**</u>

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

# EXHIBIT C

**Portfolio Company C Management Services Agreement**


**FILED UNDER SEAL**

# EXHIBIT C

**Portfolio Company C Management Services Agreement**

**FILED UNDER SEAL**

# EXHIBIT D

**June 18, 2020 Correspondence**

25163455.7

| From: | Loseman, Monica K. <MLoseman@gibsondunn.com> |
| Sent: | Thursday, June 18, 2020 5:14 PM |
| To: | Barry, Joseph; Zimmerman, Timothy |
| Cc: | Edwards, Erin; 'Hershey, Sam'; Norman L. Pernick (npernick@coleschotz.com) |
| Subject: | RE: Zohar - PPMG Production |

I'm not into the "gotcha" game, and I hope you'd know that by now. We have extremely limited IT resources. I have no reason to believe that period is going to reveal anything particularly relevant to this dispute – the MSA is a fairly standard agreement used across the PCs. But like I said, we're evaluating and will revert. We just need a bit of time to consider and determine whether we can do this, particularly given the many, many other requests we've received.

On Lynn's deposition, can we discuss logistics? Have you selected a video call provider/reporter, how do you want to handle exhibits, etc.?

And on the hearing itself, just so you're not surprised, I do intend to express to Judge Owens next week that we have a strong preference that this hearing be conducted in person. We're willing to do that on July 14, but if it can't be accommodated in person then, we would prefer to see it moved to a date when we can all gather in person. I suspect you disagree, but just wanted you to know our position and that we intend to raise it.


**Monica K. Loseman**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1801 California Street, Denver, CO 80202-2642
Tel +1 303.298.5784 • Fax +1 303.313.2828
MLoseman@gibsondunn.com • www.gibsondunn.com

---

**From:** Barry, Joseph
**Sent:** Thursday, June 18, 2020 3:03 PM
**To:** Loseman, Monica K. ; Zimmerman, Timothy
**Cc:** Edwards, Erin ; 'Hershey, Sam'
**Subject:** RE: Zohar - PPMG Production

[External Email]
Monica – I think the request is reasonable here. You did disclose your search parameters and I think we've been exceedingly cooperative here. I would think that we can agree on a limited search. If it cannot be done prior to Lynn's deposition, can't it be done after? It doesn't really make a ton of sense that the time parameter for the search relating to the drafting and negotiation of the MSA would be any time period but 2010. If the idea is "gotcha, you didn't pick this up in our search criteria," then I don't think that's really appropriate. Let's just agree here and not have another fight here. Oasis didn't produce anything in response to this, so I trust the same or similar would be for Patriarch.

Joe



**Joe Barry**
Young Conaway Stargatt & Taylor, LLP
P: 302.571.6705 | M: 302.584.7021
jbarry@ycst.com

---

**From:** Loseman, Monica K. <MLoseman@gibsondunn.com>
**Sent:** Thursday, June 18, 2020 4:56 PM
**To:** Barry, Joseph <jbarry@ycst.com>; Zimmerman, Timothy <TZimmerman@gibsondunn.com>
**Cc:** Edwards, Erin <eedwards@ycst.com>; 'Hershey, Sam' <sam.hershey@whitecase.com>
**Subject:** RE: Zohar - PPMG Production

Joe – I suspect it won't, as we disclosed our search parameters long ago and just don't have the resources to execute this search, let alone review documents, the week before Lynn's deposition. We are evaluating and will revert.


**Monica K. Loseman**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1801 California Street, Denver, CO 80202-2642
Tel +1 303.298.5784 • Fax +1 303.313.2828
MLoseman@gibsondunn.com • www.gibsondunn.com

---

**From:** Barry, Joseph <jbarry@ycst.com>
**Sent:** Thursday, June 18, 2020 2:50 PM
**To:** Zimmerman, Timothy <TZimmerman@gibsondunn.com>; Loseman, Monica K. <MLoseman@gibsondunn.com>
**Cc:** Edwards, Erin <eedwards@ycst.com>; 'Hershey, Sam' <sam.hershey@whitecase.com>
**Subject:** RE: Zohar - PPMG Production

[External Email]
Tim and Monica – Let us know if this works. Thanks. Joe



**Joe Barry**
Young Conaway Stargatt & Taylor, LLP
P: 302.571.6705 | M: 302.584.7021
jbarry@ycst.com

---

**From:** Barry, Joseph
**Sent:** Thursday, June 18, 2020 9:16 AM
**To:** 'Zimmerman, Timothy' <TZimmerman@gibsondunn.com>; Loseman, Monica K. (MLoseman@gibsondunn.com) <MLoseman@gibsondunn.com>
**Cc:** Edwards, Erin <eedwards@ycst.com>; Hershey, Sam <sam.hershey@whitecase.com>
**Subject:** Zohar - PPMG Production

Tim and Monica -

When we had our first meet and confer to discuss search criteria, you mentioned the time parameters for the search around Amendment #8. We did not discuss the time parameters around the MSA production. I see that the follow up summary Tim sent refers to the same criteria for the Amendment even though the MSA was entered into on September 30, 2010. Can we ask that you please conduct a supplemental search for the time period 6 months prior and 6 months after September 30, 2010 for documents, emails, etc. pertaining to the MSA? I trust this is a very narrow universe.

Thank you.

Joe

 **Barry**, Co-Chair, Bankruptcy & Corporate Restructuring Group
Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 North King Street
Wilmington, DE 19801
P: 302.571.6705 | M: 302.584.7021
jbarry@ycst.com | www.youngconaway.com | vCard

This message may contain confidential attorney-client communications or other protected information. If you believe you are not an intended recipient (even if this message was sent to your e-mail address), you may not use, copy, or retransmit it. If you believe you received this message by mistake, please notify us by return e-mail, and then delete this message. Thank you for your cooperation.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

A-619

**EXHIBIT E**

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

**EXHIBIT E**

**LVD / PPMG Correspondence**


**FILED UNDER SEAL**

## EXHIBIT E

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

**EXHIBIT E**

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

# EXHIBIT E

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

**EXHIBIT E**

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

## EXHIBIT E

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

**EXHIBIT E**

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

**<u>EXHIBIT E</u>**

**LVD / PPMG Correspondence**


**FILED UNDER SEAL**

# EXHIBIT E

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

**EXHIBIT E**

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

**EXHIBIT E**

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

# EXHIBIT E

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

**<u>EXHIBIT E</u>**

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

# EXHIBIT E

## LVD / PPMG Correspondence

## FILED UNDER SEAL

## EXHIBIT E

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

# EXHIBIT E

## LVD / PPMG Correspondence

## FILED UNDER SEAL

**EXHIBIT E**

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

**EXHIBIT E**

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

**EXHIBIT E**

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

**EXHIBIT E**

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

**EXHIBIT E**

**LVD / PPMG Correspondence**

**FILED UNDER SEAL**

## EXHIBIT F

**Payoff Letter**

**FILED UNDER SEAL**

**EXHIBIT F**

**Payoff Letter**

**FILED UNDER SEAL**

**EXHIBIT F**

**Payoff Letter**


**FILED UNDER SEAL**

**EXHIBIT F**

**Payoff Letter**

**FILED UNDER SEAL**

**EXHIBIT F**

**Payoff Letter**

**FILED UNDER SEAL**

**EXHIBIT F**

**Payoff Letter**


**FILED UNDER SEAL**

# **EXHIBIT F**

**Payoff Letter**

**FILED UNDER SEAL**

## EXHIBIT F

**Payoff Letter**


**FILED UNDER SEAL**

**EXHIBIT F**

**Payoff Letter**


**FILED UNDER SEAL**

**EXHIBIT F**

**Payoff Letter**

**FILED UNDER SEAL**

**EXHIBIT G**

**Tilton Deposition Excerpts**

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 26

1  manager for Oasis?
2          A.    Well, it was approved by me.
3  Not -- not decided by me.
4          Q.    Right.
5          A.    Typically, management had to get
6  manager or board signature in the form of a
7  written consent for certain types of major or
8  long-term borrowing, funding or contractual
9  obligations that could cause long-term liability.
10         Q.    Okay.  So something that would
11  incur a liability for 10 years?
12         A.    Even five years.  I mean, any kind
13  of lease obligation so that the company wouldn't
14  be left with a long-term lease where there would
15  be liability associated if they didn't really
16  need that.  So --
17         Q.    What about other long-term
18  contracts?
19         A.    You'd have to give me an example.
20  You know, and I'd have to tell you if it fell
21  under it.  If it was normal, ordinary-course
22  contracts with vendors and customers, they did
23  not need to come to the -- to the manager.
24                I mean, it would be listed in

Page 27

1  their authority matrix, which I don't have in
2  front of me right now.  And depending on the size
3  of the company, the numbers would be different.
4                Sometimes it was a contract over a
5  certain amount, sometimes it was something
6  that -- you know, would have consequences
7  and -- you know, liquidated damages.
8                Really depends under their
9  authority matrix.  But that was the governing
10  document between the manager, director and the
11  operating management team, the C-level team, not
12  this agreement.
13         Q.    Okay.  So --
14         A.    But authority matrix.
15         MR. BARRY:  Rebekah, can you put
16  up Zohar 9.
17         MS. LOSEMAN:  And, Counsel, while
18  that's happening, could we just identify
19  for the record, it looks like someone
20  else joined the Zoom meeting.
21         MR. HERSHEY:  Yeah, hi.  For the
22  record, this is Sam Hershey from
23  White & Case on behalf of Joseph Farnan
24  as the independent director of the Zohar

Page 28

1  Funds.
2  BY MR. BARRY:
3          Q.    So, Ms. Tilton, you previously
4  identified this is the Management Services
5  Agreement between LVD Acquisition and Patriarch
6  Partners Management Group.  Is this the type of
7  long-term commitment or long-term contract that
8  would require your approval?
9          MS. LOSEMAN:  Object to form.
10         THE WITNESS:  I mean, this
11         would -- this would have been the type of
12         contract that would have needed my
13         approval, yes.
14  BY MR. BARRY:
15         Q.    So can you -- you're familiar with
16  this.  Can you just briefly describe what this
17  agreement is.
18         A.    This is an agreement between
19  Patriarch Partners Management Group provided
20  certain robust and myriad services to
21  LVD Acquisition or Oasis, and it was the contract
22  between the company and PPMG for those services
23  listing the services and the cost of such
24  services to the company.

Page 29

1          Q.    Okay.  Paragraph 1 of this, which
2  is up on the screen, it says that Oasis engaged
3  PPMG to "Provide the companies with the
4  management and consulting services regarding the
5  business of the companies and other services
6  relating to the companies, all of a type
7  customarily provided by sponsor of private equity
8  firms based in the United States to companies in
9  which they have a substantial investment."
10                Do you see that?
11         A.    Yes.
12         Q.    And then it lists several
13  illustrative categories of services; right?
14                So what is your understanding of
15  the, quote, management and consulting services,
16  end quote, quote, customarily provided to
17  sponsors of private equity firms based in the
18  United States to companies in which they have a
19  substantial investment?"
20         MS. LOSEMAN:  Object to form.
21         THE WITNESS:  I'm sorry.  I don't
22         quite understand what your question is.
23  BY MR. BARRY:
24         Q.    That's okay.  I'm asking you:

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 50

1      nomenclature for anything that was
2      accrued and unpaid by that company.
3              MR. BARRY:  Okay.  Can we take a
4      look at Exhibit 8 -- or Exhibit A -- or
5      Schedule A.  Excuse me.  Schedule A.
6              I think it's the last page,
7      Rebekah.
8              Thank you for orienting that.
9  BY MR. BARRY:
10      Q.     Ms. Tilton, let's just walk
11  through this quickly, again, in the spirit of
12  getting you out of here.
13              Column headings, starting from
14  left to right, first column says, "Type of Loan."
15  And each tranche, it says, "Term Loan."
16              Correct?
17      A.     Yes.
18      Q.     And then the next column over
19  says, "Tranche."  And then there's a "TLD, TLE
20  and TLF."
21              Do you know what the designation
22  "TLD" means?
23      A.     Would have been term loan tranche
24  D, term loan tranche E, term loan tranche F.

Page 51

1      Q.     That's what I thought.
2              The next column over is titled
3  "Commitments," and there's a footnote there.
4              Do you see that footnote?
5      A.     Yes.
6      Q.     And it says, "For loans which,
7  when repaid, may not be reborrowed.  Only
8  outstanding undrawn commitments are shown."
9              Right?  That's what it says?
10      A.     Yes.
11      Q.     Okay.  And the next column over,
12  the column heading is "Outstandings."  What are
13  those columns reflecting?  If you know.
14      A.     It's the amount that is funded
15  under the commitment.
16      Q.     And the next column is titled
17  "Lender," and that lists each of Zohars I, II and
18  III, respectively; correct?
19      A.     That is correct.
20      Q.     And the next column over refers to
21  the applicable margin, and that is 0 percent;
22  correct?
23      A.     That was no interest on it because
24  it wasn't a loan in terms of borrowed money, but

Page 52

1  an equity kicker that would have been upside
2  beyond borrowing -- it wasn't a term loan in
3  terms of borrowed money; it was an equity kicker
4  that had no interest rate and was -- it was paid
5  as -- the taxes on this had already been paid as
6  interest income, and it was just converted as
7  part of a credit agreement --
8              (Simultaneous cross-talk.)
9  BY MR. BARRY:
10      Q.     Okay.
11      A.     -- with no interested --
12              MR. BARRY:  Gail, the term is
13      "equity kicker," K-I-C-K-E-R.
14              THE COURT REPORTER:  I got it.  I
15      think you kind of tend to jump in on her,
16      and it messes with her audio a little
17      bit.
18              MR. BARRY:  Well, I'm trying to
19      get the questions done and answered so we
20      can get out of here; I want to make sure
21      we're focused on the questions I'm
22      asking.
23  BY MR. BARRY:
24      Q.     So it your testimony, though, that

Page 53

1  there's no interest at all on this tranche or
2  that there's no marginal interest?
3      A.     There's no interest at all on this
4  tranche.  It was never billed.  It was never
5  paid.  The credit agreement always identify
6  equity kickers in the credit agreements.
7              So whenever there was something
8  extra that could be garnered -- and if you look
9  at the indenture, you'll see the definition of
10  "equity kicker."  We always put them in the
11  credit agreement so that they would be documented
12  and identified because these don't go into a
13  trustee report.
14              MR. BARRY:  Rebekah, can you put
15      up Zohar 4 for me, please.
16              MS. LOSEMAN:  Ms. Tilton, I just
17      want to be sure that you completed your
18      last answer.  Sometimes we continue to
19      see your mouth moving but don't hear
20      audio.
21              THE WITNESS:  Well, it's because I
22      keep getting cut off.
23  BY MR. BARRY:
24      Q.     I apologize.  I will try not to do

Page 58

1   testimony, and I think if you go back to what
2   PPMG billed following this, you will find that it
3   did not bill for any interest on these equity
4   kicker interest tranche loans.  It was done to
5   protect the lender if and when this could get
6   paid.  It also could have been forgiven, as it
7   was with many of the other companies.
8          Q.     Okay.  Let's --
9                 MR. BARRY:  Rebekah, can we please
10         go back to Zohar 5 and the last page.
11  BY MR. BARRY:
12         Q.     Okay, next column over,
13  Ms. Tilton.  "Interest payment date," do you see
14  that?  It's -- I don't know, a little bit more
15  than halfway over, "interest payment date" is the
16  heading.  Do you see that?
17         A.     Yeah, I do.
18         Q.     And it says, N/A.  Do you know
19  what N/A means?
20         A.     Yeah.  Not applicable because
21  there was no interest on this accrued in tranche.
22         Q.     So there was no interest payment
23  date for this tranche, is what you're saying?
24         A.     There was no interest payment

Page 59

1   date, because there was no interest due on this
2   equity kicker.
3          Q.     Okay.
4                 MR. BARRY:  Rebekah, let's go back
5          to the -- the prior document, Zohar 4,
6          please, on the same page you were on.
7          Okay.  If you could scroll down, please,
8          to 2.8(c).
9   BY MR. BARRY:
10         Q.     Ms. Tilton, just directing your
11  attention to 2.8(c).  It says -- it's titled
12  "payment of interest."  It says, "Interest on the
13  loans shall be payable in arrears on, i, the
14  first day of each calendar month; ii, the date of
15  any prepayments of the loans, whether voluntarily
16  or mandatory, to the extent accrued on the amount
17  being prepaid; and iii, the maturity date,
18  including final maturity."
19                Do you see that?
20         A.     I do.  It's only applicable to the
21  true borrowed money term loans.  It's not
22  applicable to the equity kicker tranche that were
23  put in to the loan agreement as equity kickers to
24  be paid when and if the company was able, when it

Page 60

1   was sold.
2          Q.     Can you show me in Amendment 8
3   where it says that?
4          A.     Go to where it says "not
5   applicable."  There's no interest payment date,
6   not applicable on those.  The payment of interest
7   on the -- if you go back and look at -- let's
8   look at a credit agreement that has the other
9   loans in it, you will see that it actually has a
10  payment date.  It won't say N/A.  It says, N/A
11  here because there was no interest to be charged
12  on these loans, nor any payment date to be
13  charged.  This is applicable to the borrowed
14  money term loans, not to the equity kicker.
15  That's why it wasn't reported on the trustee
16  report as loans.
17                It wasn't in the funds financial
18  statements as loan assets.  And it wasn't put
19  into the numerator for the OC test, which would
20  have helped the funds' performance.  This was
21  equity, not loans.  It was never reported as a
22  loan asset to the funds in the trustee reports,
23  in the financial statements; nor was it used in
24  the over-collateralization ratio.

Page 61

1                 This -- these -- this 2.8 interest
2   on loans applies to the other loans, not the one
3   that says "0" and "not applicable."
4                 MS. LOSEMAN:  I want to note for
5          the record what while you pointed her to
6          Amendment 8, the document that remained
7          on the screen is Section 2.8 of the
8          credit agreement.
9                 MR. BARRY:  Okay, fair enough.
10         Let's flip back to 2.8 -- excuse me,
11         let's flip back to Zohar 5, Rebekah,
12         please.
13                THE WITNESS:  Let me get to
14         Amendment 8 so that I'm not being misled,
15         please.
16  BY MR. BARRY:
17         Q.     Sure.  Take your time.
18         A.     So the second you're showing me is
19  not in the amendment at all.  So it -- it's from
20  the credit agreement and it applies to those
21  loans that actually do have an interest payment
22  date and applicable margins.
23                It does not apply to these equity
24  kickers.

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 66

1    Q.    So this applies if there's payment
2  before the maturity date?
3        A.    Or at the time of the sale or at
4  any point in time when there would be a waterfall
5  of funds.  It would be seventh in prepayment.
6  So all the secured debt, the true borrowed money
7  would be paid first, and this was an equity
8  kicker that would get paid after all the borrowed
9  money would have been paid.
10        So I think you'd have to look at
11  the entire credit agreement, and you would see
12  sort of a waterfall of preference on how things
13  got paid.  And this would be last in line before
14  any kind of equity would -- common equity or
15  membership interest would have been paid.
16    Q.    Okay.  When you say last in line,
17  you mean last of all the other secured debt;
18  correct?
19        A.    After secured debt, after the
20  other tranches which were actually senior
21  secured, and this would have come out prior to
22  membership interest.  This was to protect the
23  lenders so that they would get this money as an
24  equity kicker before any kind of membership

Page 67

1  interest or management equity.
2        MR. BARRY:  Okay, Rebekah, can you
3     put up Zohar 6.
4        (Whereupon, Exhibit 6 was marked
5     for identification.)
6  BY MR. BARRY:
7    Q.    Ms. Tilton, do you recognize this
8  document?
9        A.    I see Amendment No. 7, but I have
10  not looked it.  But I see that it's No. 7 which
11  would have been before this amendment, and it's
12  dated June 1, 2009 -- the credit agreement was
13  June 1, this was November 2015.  Was this --
14  was this ever signed?  I don't see a date on it.
15        MR. BARRY:  Go -- Rebekah, if you
16     don't mind, go to the signature page, one
17     more down.
18  BY MR. BARRY:
19    Q.    Are those your signatures on
20  behalf of PPAS and the Zohars?
21        A.    Yes, it is.
22    Q.    Now, this was provided to us by
23  Oasis, if you --
24        MR. BARRY:  Rebekah, could you go

Page 68

1     one page up?
2  BY MR. BARRY:
3    Q.    We were not provided with a fully
4  executed copy of this document.  Do you know if
5  this was -- document was ever fully executed?
6        MS. LOSEMAN:  Counsel, can I ask
7     that the witness have an opportunity to
8     look at each of the pages of the
9     document.  I know doing this
10     electronically is difficult, but --
11        THE WITNESS:  I have to read it to
12     understand what it is, because it's the
13     same -- same month as Amendment No. 8.
14     So I'd like to see if this was a former
15     draft or something.
16        But if you got it from Oasis, I'm
17     surprised, if it was ever executed, that
18     they didn't have their own signature
19     pages.
20  BY MR. BARRY:
21    Q.    Yeah, I mean, we received -- we
22  did receive this --
23        (Simultaneous cross-talk.)
24        A.    -- I read the whole document; I'll

Page 69

1  let you know if I understand what it is.
2        MR. BARRY:  Okay.  Ms. Loseman,
3     it's been, I guess, an hour and 15
4     minutes.  Do you want to take a break and
5     perhaps, Ms. Tilton -- it's only a
6     six-page document.  Take a look at the
7     document, and we can come back in 10, 15
8     minutes?
9        THE WITNESS:  Do you want to send
10     it to me by email?
11        MS. LOSEMAN:  I was going to ask,
12     Counsel, can you email me a copy of it so
13     I could look at it as well?
14        MR. BARRY:  Yeah, absolutely.
15        MS. LOSEMAN:  That would be great.
16     Thank you.
17        MR. BARRY:  We'll do that right
18     now.  And you want to take a 10-minute
19     break?
20        MS. LOSEMAN:  Yeah, 10 minutes is
21     great.
22        THE WITNESS:  Thank you.
23        MR. BARRY:  Thank you.
24        (Off the record, 3:15 p.m.)

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 74

1    A.    I'm so sorry.  Go ahead.
2    Q.    Yeah.  I was going to say the --
3  this amendment took approximately $20 million of,
4  quote, unpaid interest and commitment fees and
5  turned it into three new tranches of debt, didn't
6  it?
7    A.    Not of debt.  Debt would have an
8  interest payment that was -- a periodic interest
9  payment that was due.  This was an equity kicker.
10  It was not turned into debt.  Debt would have to
11  have different requirements.  And it wasn't
12  borrowed money, and it didn't have basis for the
13  funds.
14         It was accrued interest that --
15  that I had already paid taxes upon.  And then
16  instead of forgiving it, which I was entitled to
17  do under the credit agreement -- under the
18  indenture, which we did on companies that we
19  didn't think could repay, in order to protect the
20  lenders and try to get them the maximum dollars
21  available upon a sale of the company or a
22  turnaround of the company, I turned it into an
23  equity kicker under the loan agreement.
24    Q.    Okay.  Again, I think -- I think

Page 75

1  you had said that that that differs from
2  Amendment 7 had Amendment 7 been executed,
3  correct?
4    A.    That's right.  Because that was
5  borrowed money.
6    Q.    Okay.
7    A.    That would have been borrowed from
8  the funds versus accrued and unpaid interest and
9  fees that could have been forgiven but was
10  instead waived and accrued so that it could later
11  be paid prior to the membership interests and
12  more closely attached to the borrowed money.
13    Q.    Okay.  Thank you.
14         I'd like to talk a little bit
15  about the equity purchase agreement now, if we
16  could.
17         MR. BARRY:  Rebekah, would you
18         mind, please, putting up Zohar 7.
19  BY MR. BARRY:
20    Q.    Ms. Tilton, I think this is one of
21  the documents you have there in the room with
22  you.
23    A.    I do.
24         MS. LOSEMAN:  Joe, just for the

Page 76

1  record, does this version of the document
2  include the disclosures schedules?
3         MR. BARRY:  It does.
4         MS. LOSEMAN:  Okay.  Thank you.
5  BY MR. BARRY:
6    Q.    Now, Ms. Tilton, you previously
7  testified you were the manager of Oasis at the
8  time this was executed.
9         Did you play a role in negotiating
10  this document on Oasis' behalf?
11    A.    I did.
12    Q.    And what role did you play?
13    A.    When we were negotiating major
14  business points, I would get involved between
15  the -- with the banker and the seller.  I didn't
16  draft the document, but I got involved in certain
17  negotiations of certain points.
18    Q.    I don't even draft documents like
19  this, so I can't imagine you would.
20    A.    I did not.
21    Q.    If it's above my pay grade, I
22  guess it's way above your paygrade.
23         Did you have -- you had
24  substantive input into the economic terms of

Page 77

1  this; correct?
2    A.    Yes, I did.
3    Q.    And you were -- were you the lead
4  negotiator for Oasis on this?
5    A.    I would say the lead negotiator
6  with their attorneys.  And certainly in terms of
7  seller reps and all the schedules and stuff, it
8  would have been the management team.
9         So I would say on the economics
10  and on major deal points that would affect the
11  lenders and -- you know, those who are left
12  behind with the documents, seller reps as well as
13  indemnifications, I would say that I was the lead
14  negotiator on the deal points.
15         But in terms of schedules or
16  company reps, that would have been the management
17  team.
18    Q.    Okay.  Can you -- can you flip to
19  Page 13 of the document.
20         Let me know when you're there.
21    A.    I'm there.
22    Q.    Okay.  So Section 4.05 is titled
23  "Financial Statements:  Undisclosed Liabilities."
24  I'm not going to read this whole thing but the

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 110

1      performance of the company.
2              But it would be similar in nature.
3  BY MR. BARRY:
4      Q.      Okay.  Were -- I mean, other than
5  the management fees, were the agreements
6  generally the same across all of the portfolio
7  companies?
8              MS. LOSEMAN:  Object to form.
9              THE WITNESS:  I didn't draft the
10             agreements, but I believe so.
11  BY MR. BARRY:
12     Q.      Okay.  Who did prepare the
13  agreement?
14             MS. LOSEMAN:  Object to the form.
15             THE WITNESS:  I believe the
16             agreements were prepared by internal
17             lawyers in conjunction and in
18             consultation with outside counsel.
19  BY MR. BARRY:
20     Q.      Do you know what outside
21  counsel -- what outside firm PPMG used to prepare
22  the document, the form document?
23     A.      I believe at this time it was
24  Jones Day.

Page 111

1      Q.      Okay.  So just to make sure I
2  understand, PPMG prepared this document in
3  consultation with its internal lawyers and
4  lawyers at Jones Day; is that right?
5      A.      Yes, I believe that is a correct
6  statement.
7      Q.      And this was a required
8  document -- this was a document that PPMG
9  required of the companies that it provided the
10  management services to?
11     A.      This was a contract between the
12  companies and PPMG to receive their services.
13     Q.      Okay.  And did the Oasis
14  management team approach Patriarch Partners
15  Management Group to provide these services?
16             MS. LOSEMAN:  Object to the form.
17             THE WITNESS:  At what point in
18             time?  Whom?  I mean, I'm just not quite
19             sure what you're asking.
20  BY MR. BARRY:
21     Q.      Sure.  The agreement is dated
22  September 30th, 2010.
23     A.      Yes.
24     Q.      At some point around this time,

Page 112

1      did -- did a human being that was in the
2  management team of Oasis approach you or someone
3  else from PPMG indicating an interest in having
4  the services provided to Oasis?
5      A.      These were services that we
6  provided to all the portfolio companies if, in
7  fact, they wanted those services provided.  We
8  provided the agreement.  They had the opportunity
9  to sign and not sign if they wanted such
10  services.
11     Q.      So let's talk about Oasis
12  specifically.
13             You're saying Oasis could have
14  declined to provide these services if it elected
15  to do so?
16     A.      Sure.
17     Q.      Aren't you the manager -- weren't
18  you the manager of Oasis at the time this was
19  signed?
20     A.      Yeah, but I didn't sign for the
21  company, and I wasn't the day-to-day manager of
22  the company.
23     Q.      But you testified earlier that
24  this is the kind of long-term contract that would

Page 113

1  have required your approval?
2      A.      To sign but not to not sign.
3      Q.      Okay.  So in the authority matrix
4  that you testified to earlier, the management
5  team could have declined to execute this, of
6  their own, without consulting with you?
7      A.      Yes.  I mean, I have to approve
8  their signature to long-term agreements.  I don't
9  force them to sign long-term agreements.
10     Q.      So who -- who at -- who at
11  Oasis -- was the Management Services Agreement in
12  this forum, was it negotiated between PPMG and
13  Oasis?
14     A.      I wasn't part of the negotiations
15  here, but I don't know how this went down.  I
16  don't know whether they came back on anything or
17  they just signed it.  There had been a Management
18  Services Agreement before this, and these were
19  new agreements.
20     Q.      Do you know if Oasis had its own
21  lawyers representing it in the context of signing
22  this?
23     A.      I do not know.  We had a very big
24  legal team at the time, probably 12 lawyers.  I

Page 110

1    performance of the company.
2            But it would be similar in nature.
3    BY MR. BARRY:
4        Q.    Okay.  Were -- I mean, other than
5    the management fees, were the agreements
6    generally the same across all of the portfolio
7    companies?
8            MS. LOSEMAN:  Object to form.
9            THE WITNESS:  I didn't draft the
10           agreements, but I believe so.
11   BY MR. BARRY:
12       Q.    Okay.  Who did prepare the
13   agreement?
14           MS. LOSEMAN:  Object to the form.
15           THE WITNESS:  I believe the
16           agreements were prepared by internal
17           lawyers in conjunction and in
18           consultation with outside counsel.
19   BY MR. BARRY:
20       Q.    Do you know what outside
21   counsel -- what outside firm PPMG used to prepare
22   the document, the form document?
23       A.    I believe at this time it was
24   Jones Day.

Page 111

1        Q.    Okay.  So just to make sure I
2    understand, PPMG prepared this document in
3    consultation with its internal lawyers and
4    lawyers at Jones Day; is that right?
5        A.    Yes, I believe that is a correct
6    statement.
7        Q.    And this was a required
8    document -- this was a document that PPMG
9    required of the companies that it provided the
10   management services to?
11       A.    This was a contract between the
12   companies and PPMG to receive their services.
13       Q.    Okay.  And did the Oasis
14   management team approach Patriarch Partners
15   Management Group to provide these services?
16           MS. LOSEMAN:  Object to the form.
17           THE WITNESS:  At what point in
18           time?  Whom?  I mean, I'm just not quite
19           sure what you're asking.
20   BY MR. BARRY:
21       Q.    Sure.  The agreement is dated
22   September 30th, 2010.
23       A.    Yes.
24       Q.    At some point around this time,

Page 112

1    did -- did a human being that was in the
2    management team of Oasis approach you or someone
3    else from PPMG indicating an interest in having
4    the services provided to Oasis?
5        A.    These were services that we
6    provided to all the portfolio companies if, in
7    fact, they wanted those services provided.  We
8    provided the agreement.  They had the opportunity
9    to sign and not sign if they wanted such
10   services.
11       Q.    So let's talk about Oasis
12   specifically.
13           You're saying Oasis could have
14   declined to provide these services if it elected
15   to do so?
16       A.    Sure.
17       Q.    Aren't you the manager -- weren't
18   you the manager of Oasis at the time this was
19   signed?
20       A.    Yeah, but I didn't sign for the
21   company, and I wasn't the day-to-day manager of
22   the company.
23       Q.    But you testified earlier that
24   this is the kind of long-term contract that would

Page 113

1    have required your approval?
2        A.    To sign but not to not sign.
3        Q.    Okay.  So in the authority matrix
4    that you testified to earlier, the management
5    team could have declined to execute this, of
6    their own, without consulting with you?
7        A.    Yes.  I mean, I have to approve
8    their signature to long-term agreements.  I don't
9    force them to sign long-term agreements.
10       Q.    So who -- who at -- who at
11   Oasis -- was the Management Services Agreement in
12   this forum, was it negotiated between PPMG and
13   Oasis?
14       A.    I wasn't part of the negotiations
15   here, but I don't know how this went down.  I
16   don't know whether they came back on anything or
17   they just signed it.  There had been a Management
18   Services Agreement before this, and these were
19   new agreements.
20       Q.    Do you know if Oasis had its own
21   lawyers representing it in the context of signing
22   this?
23       A.    I do not know.  We had a very big
24   legal team at the time, probably 12 lawyers.  I

was not involved in the negotiation or the signing of these agreements.

**Q. Who were those 12 lawyers working for?**

A. I'm sorry?

**Q. You said there was a big legal team of 12 lawyers.**

A. Patriarch and PPMG at that time.

**Q. But they weren't representing Oasis in connection with this agreement?**

A. Oasis would have had to represent themselves in this agreement.

**Q. And you testified earlier they had no in-house counsel; correct?**

A. No, but they had access to outside counsel.

**Q. Who was that?**

A. I don't know who it was at the time. I mean, I didn't run this company. You'll --

**Q. You testified earlier that they would have had to obtain your consent, permission to hire lawyers.**

A. At the time they hired a lawyer

for a specific purpose: to enter into an engagement letter. But they wouldn't have had to do that, to use lawyers they already had engaged at the time of the engagement.

So I don't know who they used for their issues during this period.

**Q. Okay.**

A. But they would have had outside attorneys that they used for different issues -- litigation, corporate. That was up to them.

But if they were entering into an engagement letter or choosing an attorney, they would need to go through me to make certain that I believe that person was appropriate. Once they had attorneys, they didn't need to come every time they were going to pay a legal fee.

**Q. Including hiring lawyers to negotiate or represent them in connection with the management service agreement?**

A. If they are hiring new lawyers, they would have needed approval. If they were using lawyers, they would not have needed approval.

**Q. And you don't -- do you know if**

**they had representation in connection with negotiating this MSA?**

A. I don't. I was not involved in the negotiation between the lawyers or the company and counsel of these documents.

**Q. Okay.**

MS. LOSEMAN: Counsel, I don't mean to interrupt. Do you have a rough sense of how much longer or whether it makes sense to take another short break now?

MR. BARRY: I don't have a sense as to how long it's going to be, hopefully less than an hour. But I'm happy to defer to you and Ms. Tilton on taking a break.

THE WITNESS: Yeah. I'd like to use the bathroom, if we could, if we could take -- I mean, it doesn't have to be this second. But if we're going to go another hour, I need a bathroom break.

MR. BARRY: Okay. Take 10 minutes or however long.

MS. LOSEMAN: Okay.

THE WITNESS: Do you want to say 10 minutes?

MR. BARRY: That works for me, yeah.

MS. LOSEMAN: Agree.

MR. BARRY: Thanks.

(Off the record, 4:32 p.m.)

(Back on the record, 4:40 p.m.)

BY MR. BARRY:

**Q. Okay. Ms. Tilton, I think that you testified earlier that the portfolio companies were free to agree to or not agree to the form of Management Services Agreement that PPMG offered; is that correct?**

A. Well, if they didn't agree to it, then they weren't going to get services from PPMG; but they were free to negotiate and decide what they wanted to do, and some did negotiate.

**Q. Okay. Did any of the portfolio companies ever decline the services altogether?**

A. No, they did not.

**Q. Do you know why that is?**

A. Because it was important services to support these very distressed companies. A

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 118

1  lot of bodies and a lot of services provided to
2  them that they needed.
3      Q.    Which -- which companies
4  negotiated the terms you just mentioned?
5      A.    I know Glenoit negotiated some of
6  the terms.  I believe, Denali negotiated some of
7  the terms.  In terms of their management fees,
8  not the services they provided.
9      Q.    Did anybody negotiate transaction
10  fee?
11      A.    No.
12      (Clarification by reporter.)
13      Q.    And was there a Management
14  Services Agreement at each of the portfolio
15  companies?
16      A.    To the best of my knowledge, yes.
17      Q.    So there's -- there is 14 Group A
18  companies and there's 31 Group B companies, and
19  to your recollection, all of them had Management
20  Services Agreements with PPMG?
21      A.    To the best of my knowledge, yes.
22  But I don't know --
23      Q.    And only two of those -- oh, I'm
24  sorry, I didn't mean to interrupt you.  Finish

Page 119

1  your sentence.  Sorry.
2      A.    Only two that I can recall at the
3  moment negotiated.  As I said to you, I wasn't
4  involved in the negotiations.
5      Q.    And -- and none of them negotiated
6  the transaction fee?
7      A.    Not to my knowledge.  I wasn't
8  involved in the negotiations.  I don't believe --
9  whether they negotiated it, whether they were
10  agreed to, I wasn't involved in the negotiations.
11  I don't know of any change to the transaction fee
12  by the companies.
13      MR. BARRY:  Can we put up,
14      Rebekah, please, Zohar 25.
15      (Whereupon, Exhibit 25 was marked
16      for identification.)
17      MR. BARRY:  Okay.  Scroll down to
18      document Bates 337 -- there you go.
19      Okay.
20  BY MR. BARRY:
21      Q.    So this is a document that PPMG
22  produced.  It's an email thread starting on
23  September 24th, Ms. Tilton.  And I'm going to
24  try to go through this pretty quickly.  The first

Page 120

1  email is from Marvin Hohertz to James Oh on which
2  two others are copied.  And it says, "James,
3  attached is the new MSA for Oasis for the
4  company's signature."
5      Do you see that?
6      A.    Yes.
7      Q.    Who is --
8      MS. LOSEMAN:  Counsel, I'm sorry.
9      I don't mean to interrupt or belabor any
10      of this.  I'm having a hard time seeing
11      the Bates numbers.  Can you identify that
12      for the record and/or just send me a copy
13      so I can follow along here.
14      MR. BARRY:  Yeah.  No problem.
15      These are the documents you produced.
16      This is Bates -- the Bates range that
17      we're going to be talking about here,
18      Monica, is 335 through 353.  And we are
19      currently on 337.
20      MS. LOSEMAN:  Okay.
21      MR. BARRY:  Do you want me to send
22      you an email of this?
23      MS. LOSEMAN:  If you have it
24      handy, that would be great.  That might

Page 121

1  be quicker.
2      MR. BARRY:  Yeah, Jared, would you
3  mind sending that to Monica.
4      MR. KOCHENASH:  We'll do.
5      MR. BARRY:  Do you want to wait
6  for the questioning or can I go ahead?
7      MS. LOSEMAN:  You can go ahead
8  unless Ms. Tilton needs an opportunity to
9  look at the whole document, again, not to
10  take up time here but just so she has
11  some context before she starts answering
12  questions about pages in it.  If you can
13  go up so I can see the rest of it before
14  you start asking your question.
15      MR. BARRY:  Rebekah, can you
16  scroll that up, please, so Ms. Tilton can
17  read the thread.  Just go up one page and
18  then Ms. Tilton can tell you when she's
19  done reading that page.
20      THE WITNESS:  Keep going, please,
21  Rebekah.
22      Okay.  Keep going up.  I need you
23  to go from bottom to top.  So I can --
24  because it --

A-661

IN RE: Zohar III, Corp., et al.

TILTON, LYNN

Page 134

1    Q.    Okay.  So this is an email dated
2  September 30th, 2011, from James Oh to
3  John Kucharik, the subject of which is
4  "MSA Agreements."
5             And it says, "Hi, John.  Thanks
6  for the quick turnaround on the MSA agreements.
7  Received them today and will send a hard copy
8  back to you when Lynn signs them.  Best, Jim."
9             So this email suggests that within
10 three days of Oasis receiving the MSA, they
11 signed it and sent it back to Patriarch?  Would
12 you agree with that?
13    A.    Was it 9/27 or 9/22?  Is that --
14 the other one was dated?
15    Q.    9/27.
16    A.    Okay.  Then I would say that that
17 is correct.
18    Q.    Okay.  Okay.  And you testified
19 you don't know anything about any negotiations
20 that were undertaken in connection with the MSA
21 that was proposed?
22    A.    I wouldn't know anything other
23 than these emails that you put before me.
24             MR. BARRY:  Got it.

Page 135

1             Okay.  We are actually getting, I
2         think, very close to the end here.
3             Rebekah, can you please put up
4         Zohar 9 again.  Specifically, let's look
5         at Page 3.
6  BY MR. BARRY:
7    Q.    Okay.  So this is Subsection -- I
8  believe it's 2(c), "The Management Services
9  Agreement."
10            Oh, excuse me.  3(c), "Transaction
11 Fee."
12            This is the -- this is the fee
13 that is currently under dispute and is the basis
14 for your testimony today; right?
15    A.    Yes.
16    Q.    And 3(c)(i) says, "In connection
17 with liquidity event, PPMG will be entitled to
18 receive a cash fee defined as the transaction fee
19 equal to 5 percent of the eligible equity value.
20            Do you see that?
21    A.    Yes.
22    Q.    What's the -- if you recall,
23 what's the purpose of the transaction fee?
24    A.    I don't understand your question.

Page 136

1    Q.    PPMG prepared this document.  What
2  is the transaction fee intended to compensate
3  PPMG for?
4    A.    For all the work that PPMG
5  provided in terms of services to be able to turn
6  around as companies left for dead to a point
7  where it would have had value and be able to be
8  sold, and to compensate for any other fees that
9  had not been paid during the time that the
10 company was distressed.
11    Q.    PPMG received a monthly fee under
12 this agreement; correct?
13    A.    PPMG's owed $70 million of monthly
14 fees under these agreements.  Very often PPMG did
15 not receive its fees because it was more
16 important that they pay interest or have the
17 capital to run their business to restructure.
18            So PPMG was not paid these fees --
19 a lot of these fees for a lot of the period
20 during the time that this company was
21 restructured or went through a bankruptcy or was
22 unable to pay.
23    Q.    I'm -- I'm not doing it very
24 artfully, so forgive me.  I'm just trying to

Page 137

1  understand this transaction fee.  I understood
2  the transaction fee as follows:
3             Zohar -- through you, the Zohar
4  Funds required these troubled portfolio
5  companies.  PPMG entered into the Management
6  Services Agreement with the portfolio company.
7  It provided the services it provided under the
8  Management Services Agreement to turn the
9  companies around and then sell them under the
10 Zohar indentures.  And in order to --
11    A.    Well, I'm going to -- the
12 collateral management is very different than the
13 PPMG.  Don't -- the indentures are for collateral
14 management services.  They have nothing to do
15 with providing turnaround and operational
16 services to the company.
17    Q.    I'm not saying that.
18    A.    Well, you just said "under the
19 indenture."  This is not under the indenture.
20            The indenture is for collateral
21 management services, which is choosing
22 investments, managing those investments in terms
23 of the passive interest and principal received,
24 providing trustee reports, providing financial

**CREDIT AGREEMENT**

among

**LVD ACQUISITION, LLC,**

and

**B2 ACQUISITION, INC.,**

as Borrowers,

**THE DOMESTIC SUBSIDIARIES OF THE BORROWERS
FROM TIME TO TIME GUARANTORS HEREUNDER,**

as Guarantors,

**THE LENDERS PARTY HERETO,**

and

**PATRIARCH PARTNERS AGENCY SERVICES, LLC,**

as Agent

**Effective as of June 1, 2009**

DLI-6247158v5

**Zohar Ex 2**

**Patriarch/PC Confidential**

**TABLE OF CONTENTS**

<div align="right">Page</div>

ARTICLE I      Defined Terms ....................................................................1

    Section 1.1     Definitions................................................................ 1

ARTICLE II     Loans.................................................................................20

    Section 2.1     Assumed Obligations; Term A Loans......................... 20
    Section 2.2     Term B Loans ........................................................... 21
    Section 2.3     Revolving Credit Loans ............................................ 21
    Section 2.4     Borrowing Mechanics .............................................. 22
    Section 2.5     Pro Rata Shares ....................................................... 22
    Section 2.6     Use of Proceeds........................................................ 22
    Section 2.7     Evidence of Debt; Register Notes.............................. 23
    Section 2.8     Interest on Loans...................................................... 24
    Section 2.9     Changed Circumstances ........................................... 24
    Section 2.10    Fees .......................................................................... 25
    Section 2.11    Repayment ............................................................... 25
    Section 2.12    Optional Prepayments .............................................. 25
    Section 2.13    Mandatory Prepayments; Mandatory Commitment Reductions.............. 26
    Section 2.14    Application of Prepayments...................................... 27
    Section 2.15    General Provisions Regarding Payments................... 27
    Section 2.16    Ratable Sharing ....................................................... 28
    Section 2.17    Termination or Reduction of Commitments .............. 29

ARTICLE III    Conditions Precedent; Conditions Subsequent .....................29

    Section 3.1     Conditions Precedent; Closing Date ......................... 29
    Section 3.2     Conditions to Each Borrowing................................. 31
    Section 3.3     Conditions Subsequent.............................................. 32

ARTICLE IV     Representations and Warranties.........................................33

    Section 4.1     Representations and Warranties................................ 33

ARTICLE V      Affirmative Covenants.......................................................41

    Section 5.1     Affirmative Covenants ............................................. 41

ARTICLE VI     Negative Covenants/Financial Covenants ...........................47

    Section 6.1     Negative Covenants .................................................. 47
    Section 6.2     Financial Covenants ................................................ 54

ARTICLE VII    Increased Costs; Taxes; Indemnifications, Set Off; Etc ........54

    Section 7.1     Increased Costs; Capital Adequacy .......................... 54
    Section 7.2     Taxes; Withholding, Etc .......................................... 55
    Section 7.3     Indemnification ........................................................ 56
    Section 7.4     Right of Set Off........................................................ 57
    Section 7.5     Funding Breakage ................................................... 57

ARTICLE VIII   Events of Default ..............................................................58

DLI-6247158v5

<div align="center">i</div>

**Patriarch/PC Confidential**

**TABLE OF CONTENTS**
(Continued)

<div align="right">Page</div>

| | | |
|---|---|---|
| Section 8.1 | Events of Default | 58 |
| Section 8.2 | Remedies | 61 |
| ARTICLE IX | The Agent | 62 |
| Section 9.1 | Appointment of Agent | 62 |
| Section 9.2 | Powers and Duties | 63 |
| Section 9.3 | Delegation of Duties | 63 |
| Section 9.4 | General Immunity | 63 |
| Section 9.5 | Agent Entitled to Act with the Borrowers | 64 |
| Section 9.6 | Lenders' Representations, Warranties and Acknowledgment | 64 |
| Section 9.7 | Right to Indemnity | 65 |
| Section 9.8 | Successor Agent | 65 |
| Section 9.9 | Collateral Documents | 66 |
| Section 9.10 | Notice of Default | 67 |
| Section 9.11 | Delivery of Documents, Notices , Etc | 67 |
| ARTICLE X | Subordination of Intercompany Obligations; Joint and Several Liability; Contribution | 67 |
| Section 10.1 | Subordination Generally | 67 |
| Section 10.2 | Specific Performance; Waiver of Defenses | 67 |
| Section 10.3 | Distributions | 68 |
| Section 10.4 | Credit Party Failure to Act | 68 |
| Section 10.5 | Concerning Joint and Several Liability of the Borrowers | 68 |
| Section 10.6 | Contribution Obligations | 69 |
| ARTICLE XI | Miscellaneous | 70 |
| Section 11.1 | Amendments and Waivers; Release of Collateral | 70 |
| Section 11.2 | Notices | 71 |
| Section 11.3 | Expenses | 72 |
| Section 11.4 | Enforceability; Successors and Assigns | 73 |
| Section 11.5 | Lenders' Obligations Several | 74 |
| Section 11.6 | Integration | 74 |
| Section 11.7 | No Waiver; Remedies | 74 |
| Section 11.8 | Submission to Jurisdiction | 75 |
| Section 11.9 | Execution in Counterparts | 75 |
| Section 11.10 | Governing Law | 75 |
| Section 11.11 | Waiver of Jury | 75 |
| Section 11.12 | Severability | 76 |
| Section 11.13 | Survival | 76 |
| Section 11.14 | Maximum Lawful Interest | 76 |
| Section 11.15 | Interpretation | 76 |
| Section 11.16 | Ambiguities | 77 |
| Section 11.17 | Judgment Currency | 77 |

<div align="center">ii</div>

Patriarch/PC Confidential

| | |
|---|---|
| Exhibit A | Form of Borrowing Certificate |
| Exhibit B | Form of Revolving Credit Note |
| Exhibit C | Form of Borrower Certificate |
| Exhibit D | Form of Closing Date Certificate |
| Exhibit E | Form of Joinder |
| Exhibit F | Form of Assignment Agreement |
| Exhibit G-1 | Form of Term A Loan Note |
| Exhibit G-2 | Form of Term B Loan Note |
| SCHEDULE 2.1 | Commitments |
| SCHEDULE 4.1(c) | Real Property |
| SCHEDULE 4.1(f) | Legal Proceedings |
| SCHEDULE 4.1(j) | Partnerships, Etc. |
| SCHEDULE 4.1(m) | Capitalization |
| SCHEDULE 4.1(q) | Labor Practices |
| SCHEDULE 4.1(r) | Employee Benefits |
| SCHEDULE 4.1(s) | Environmental Liabilities |
| SCHEDULE 4.1(t) | Insurance |
| SCHEDULE 4.1(u) | Intellectual Property |
| SCHEDULE 4.1(w) | Defaults |
| SCHEDULE 4.1(x) | Material Contracts |
| SCHEDULE 4.1(y) | Brokerage Fees |
| SCHEDULE 5.1(g) | Cash Management Accounts |
| SCHEDULE 6.1(a) | Indebtedness |
| SCHEDULE 6.1(b) | Liens |
| SCHEDULE 6.1(e) | Investments |

A-666

Patriarch/PC Confidential

THIS CREDIT AGREEMENT, effective as of June 1, 2009, among LVD ACQUISITION, LLC, a Delaware limited liability company ("LVD"), B2 ACQUISITION, INC., a Delaware corporation ("B2" and together with LVD, each individually a "Borrower" and collectively, the "Borrowers"), the Domestic Subsidiaries (such term and each other capitalized term used but not defined herein have the meanings given to them in Article I) that from time to time become guarantors hereunder (collectively, the "Guarantors"), the financial institutions and other investors from time to time lenders hereunder (collectively, the "Lenders"), and PATRIARCH PARTNERS AGENCY SERVICES, LLC, a Delaware limited liability company ("PPAS"), as agent for the Lenders (in such capacity, the "Agent").

## RECITALS

WHEREAS, the Borrowers and the Debtors have entered into the Purchase Agreement, pursuant to which, among other things, the Borrowers have agreed to purchase certain of the assets of the Debtors and assume all of the Debtors' Pre-Petition Liabilities and DIP Liabilities which are outstanding as of the Closing Date;

WHEREAS, in connection therewith, the Borrowers, Lenders and Agent desire to enter into this Agreement in order to evidence their agreement with respect to, among other things, the assumed Pre-Petition Liabilities and DIP Liabilities and certain ongoing finance accommodations to be provided by the Lenders to the Borrowers; and

WHEREAS, each Guarantor is willing to guaranty all of the obligations of the Borrowers under the Credit Documents on the terms and conditions set forth in the Guaranty to which it is a party, and is willing to secure its guaranty obligations by granting to the Agent, for the benefit of the Agent and the Lenders, security interests in and liens upon certain of its existing and after-acquired personal and real property, including, without limitation, its intellectual property.

NOW THEREFORE, in consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I
## Defined Terms

Section 1.1    Definitions.  As used in this Agreement, including, without limitation, the preamble, recitals, exhibits and schedules hereto, the following terms have the meanings stated:

"Accommodation Payment" has the meaning stated in Section 10.6(a).

"Account" has the meaning assigned to such term in the UCC as adopted and in effect in the State of New York.

"Acquisition" means the acquisition contemplated by the Purchase Agreement.

"Action" against a Person means an action, suit, litigation, arbitration, investigation, complaint, contest, hearing, inquiry, inquest, audit, examination or

DLI-6247158v5

A-667

Patriarch/PC Confidential

other proceeding threatened or pending against or affecting such Person or its property, whether civil, criminal, administrative, investigative or appellate, in law or equity before any arbitrator or Governmental Body.

"Administrative Borrower" means LVD.

"Affiliate" means, with respect to a specified Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes (i) any Person which beneficially owns or holds five (5%) percent or more of any class of Voting Stock of such Person or other equity interests in such Person, (ii) any Person of which such Person beneficially owns or holds five (5%) percent or more of any class of Voting Stock or in which such Person beneficially owns or holds five (5%) percent or more of the equity interests and (iii) any director or executive officer of such Person.  For the purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by agreement or otherwise.  Notwithstanding the foregoing, for purposes of this Agreement, none of the Agent, any Lender or any Affiliate of any Lender shall be an Affiliate of any Borrower or any of its Subsidiaries.

"Agent" means initially PPAS and thereafter any successor the Agent appointed pursuant to Section 9.8.

"Agent Account" has the meaning stated in Section 5.1(g).

"Agent Fee" has the meaning stated in Section 2.10(b).

"Aggregate Amounts Due" has the meaning stated in Section 2.16.

"Agreement" means this Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time.

"Applicable Margin" means, (i) with respect to Revolving Credit Loans, 8.0%, (ii) with respect to the Term A Loans, 8.0%, and (iii) with respect to Term B Loans, if any, 8.0%.

"Asset Sale" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person (other than the Borrowers or any wholly-owned Guarantor), in one transaction or a series of transactions, of all or any part of the businesses of any Borrower or any of its Subsidiaries, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including, without limitation, the

Patriarch/PC Confidential

Capital Stock of any Subsidiary of any Borrower, other than inventory (or other assets) sold or leased in the ordinary course of business.

"Assignee" has the meaning stated in Section 11.4(b).

"Assignment" has the meaning stated in Section 11.4(b).

"Assignment Agreement" has the meaning stated in Section 11.4(b).

"Assignment Fee" has the meaning stated in Section 11.4(b).

"Authorized Officer" means, as applied to any Person, any individual holding the position of chairman of the board (if an office), chief executive officer, president or one of its vice presidents (or the equivalent thereof), and such Person's chief financial officer or treasurer.

"B2" has the meaning stated in the Preamble of this Agreement.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the "prime rate" of interest in effect for such day as published in the Wall Street Journal, such rate to be adjusted by the Agent on the effective date of any change thereafter.

"Base Rate Loans" means Loans bearing interest at a rate determined by reference to the Base Rate.

"Borrower" and "Borrowers" have the respective meanings stated in the Preamble of this Agreement.

"Borrowing" means the making or deemed making of any Loan hereunder.

"Borrowing Certificate" means a Borrowing Certificate substantially in the form of Exhibit A.

"Borrowing Date" means the date of a Borrowing.

"Budget" has the meaning stated in Section 5.1(a)(vi).

"Business Day" means a day other than Saturday or Sunday or other day on which commercial banks in New York City, New York are authorized or required by law or other governmental action to close; and, with respect to any borrowings, disbursements and payments in respect of any calculations, interest rates and interest periods pertaining to LIBOR Loans, such day is also a day on which dealings are carried on for deposits in Dollars by and among banks in the London interbank market.

Patriarch/PC Confidential

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"Cash" means a credit balance in any Deposit Account, money or currency.

"Cash Management Account" has the meaning stated in Section 5.1(g).

"Change of Control" means any one or more of the following events:

(i)     the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of any Borrower or any Guarantor to any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), other than as permitted in Section 6.1(g) hereof;

(ii)     the liquidation or dissolution of any Borrower or any Guarantor or the adoption of a plan by the stockholders of any Borrower or any Guarantor relating to the dissolution or liquidation of such Borrower or such Guarantor, other than as permitted in Section 6.1(g) hereof;

(iii)     the acquisition by any Person or group (as such term is used in Section 13(d)(3) of the Exchange Act), except for one or more Permitted Holders, of beneficial ownership, directly or indirectly, of a majority of the voting power of the total outstanding Voting Stock of LVD without the Agent's prior written consent;

(iv)     the failure of the Permitted Holders to own directly or indirectly fifty-one (51%) percent of the voting power of the total outstanding Voting Stock of LVD without the Agent's prior written consent; or

(v)     the failure of LVD to own directly or indirectly one hundred (100%) percent of the voting power of the total outstanding Voting Stock of  B2 or any Guarantor.

"Closing Date" means the date on which all of the conditions set forth in Section 3.1 are satisfied or otherwise waived by the Lenders and the Agent.

"Closing Date Certificate" has the meaning stated in Section 3.1(g).

"Collateral" means any and all "Collateral" as defined in the Security Agreement or any other Collateral Document, as applicable.

A-670

Patriarch/PC Confidential

"<u>Collateral Documents</u>" means the Security Agreement, the Intellectual Property Security Agreement and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents (including, without limitation, all UCC financing statements and account control agreements) in order to grant to the Agent, for the benefit of the Lenders and the Agent, a Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"<u>Commitments</u>" means, collectively, the Revolving Credit Commitments and the Term Loan Commitments.

"<u>Consents</u>" means any approval, consent, authorization or order of, notice to or registration or filing with, or any other action by, any Governmental Body or other Person.

"<u>Contributing Credit Party</u>" has the meaning stated in Section 10.6(a).

"<u>Credit Document</u>" means any of this Agreement, the Notes (if any), the Collateral Documents, the Guaranty (if any), and all other documents, instruments or agreements executed and delivered by a Credit Party for the benefit of the Agent or any Lender in connection herewith.

"<u>Credit Party</u>" means each Person (other than the Agent or any Lender or any Affiliate or representative thereof) from time to time party to a Credit Document (including, without limitation, the Borrowers).

"<u>Currency Agreement</u>" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic cap or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with the operations of any Borrower or any of its Subsidiaries.

"<u>Debtors</u>" means Zohar Waterworks, LLC, a Delaware limited liability company, and B2 International Corporation, a Delaware corporation.

"<u>Default</u>" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"<u>Deposit Account</u>" means any deposit account (as such term is defined in the UCC as adopted and in effect in the State of New York), including, without limitation, a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"<u>DIP Credit Agreement</u>" means the Debtor-In-Possession Credit Agreement dated as of April 2, 2009, by and among the Debtors, Patriarch Partners Agency Services, LLC, as administrative agent, and the lenders party thereto, as amended, modified, supplemented and restated from time to time.

**Patriarch/PC Confidential**

"DIP Liabilities" mean the "Obligations" of the Debtors as defined in the DIP Credit Agreement which are outstanding as of the Closing Date.

"Dollars" and the sign "$" mean the lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary of any Borrower organized under the laws of the United States of America or any State thereof.

"Eligible Assignee" means (i) any Lender or any Affiliate of any Lender, (ii) any commercial bank, insurance company, investment or mutual fund or other entity that is an "accredited investor" (as defined in Regulation D under the Securities Act) and that extends credit or buys loans as one of its businesses, (iii) any Permitted Holder and/or (iv) any other Person approved by the Agent; provided, no Borrower nor any Affiliate of any Borrower (other than any Permitted Holder) shall be an Eligible Assignee.

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed to by, any Borrower, any Subsidiary of any Borrower or any of their respective ERISA Affiliates.

"Environmental Laws" means all federal, state, local and foreign laws (including without limitation common law), statutes, regulations and rules whether now or hereinafter in effect relating in any way to the environment, the preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or health and safety matters, including, without limitation, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Federal Clean Water Act, the Federal Clean Air Act, the Toxic Substances Control Act, in each case as amended, and all rules, regulations, judgments, decrees, orders and licenses arising under all such laws.

"Environmental Liability" means any actual, alleged or contingent liability or obligations of any Borrower, any of its Subsidiaries or any other Credit Party directly or indirectly resulting from or based on (i) violations or alleged violations of any Environmental Law, (ii) the generation, use, handling, transportation, management, storage, treatment or disposal of any Hazardous Material, (iii) exposure to any Hazardous Material, (iv) the release or threatened release of any Hazardous Material into the environment or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with any of the foregoing.

"Environmental Permits" means all permits, licenses, authorizations, registrations and other governmental consents required by applicable Environmental Laws for the use, storage, treatment, transportation, release, emission and disposal of raw materials, by-products, wastes and other substances used or produced by or

Patriarch/PC Confidential

otherwise relating to the operations of any Borrower, any of its Subsidiaries or any other Credit Party.

"Equipment" means, as to each Borrower and each Guarantor, all of the Borrowers' and such Guarantor's now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"ERISA Affiliate" means, as applied to any Person, (i) any corporation that is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member, (ii) any trade or business (whether or not incorporated) that is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member, and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii) above is a member.  Any former ERISA Affiliate of any Borrower, any Subsidiary of any Borrower or any other Credit Party shall continue to be considered an ERISA Affiliate of such Borrower, such Subsidiary or such Credit Party within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of such Borrower, such Subsidiary or such Credit Party and with respect to liabilities arising after such period for which such Borrower, such Subsidiary or such Credit Party could be liable under the Internal Revenue Code or ERISA.

"ERISA Event" means (i) a "reportable event" within the meaning of Section 4043 of ERISA and the regulations issued thereunder with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation), (ii) the failure to meet the minimum funding standard of Section 412 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(d) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 412(m) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan, (iii) the provision by the administrator of any Pension Plan pursuant to Section 4041(a)(2) of ERISA of a notice of intent to terminate such plan in a distress termination described in Section 4041(c) of ERISA, (iv) the withdrawal by any Borrower, any Subsidiary of any Borrower, any other Credit Party or any of their respective ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability pursuant to Section 4063 or 4064 of ERISA, (v) the institution by the PBGC of proceedings

Patriarch/PC Confidential

to terminate any Pension Plan, or the occurrence of any event or condition which might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (vi) the imposition of liability on any Borrower, any Subsidiary of any Borrower, any other Credit Party or any of their respective ERISA Affiliates pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA, (vii) the withdrawal of any Borrower, any Subsidiary of any Borrower, any other Credit Party or any of their respective ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential liability therefor, or the receipt by any Borrower, any Subsidiary of any Borrower, any other Credit Party or any of their respective ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA, (viii) the occurrence of an act or omission which could give rise to the imposition on any Borrower, any Subsidiary of any Borrower, any other Credit Party or any of their respective ERISA Affiliates of fines, penalties, taxes or related charges under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (1), or Section 4071 of ERISA in respect of any Employee Benefit Plan, (ix) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan other than a Multiemployer Plan or the assets thereof, or against any Borrower, any Subsidiary of any Borrower, any other Credit Party or any of their respective ERISA Affiliates in connection with any Employee Benefit Plan, (x) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code, or (xi) the imposition of a Lien pursuant to Section 401(a)(29) or 412(n) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"Event of Default" means each of the conditions or events set forth in Section 8.1.

"Exchange Act" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"Financial Officer Certification" means, with respect to the financial statements for which such certification is required, the certification of the chief financial officer of the Administrative Borrower that such financial statements fairly present, in all material respects, the financial condition of the Administrative Borrower and its Subsidiaries on a consolidated basis as at the dates indicated and the results of their operations and their cash flows for the periods indicated, subject to the absence of footnotes and changes resulting from audit and normal year-end adjustments.

Patriarch/PC Confidential

"<u>Financials</u>" means, with respect to any Person for any period, the balance sheet of such Person as at the end of such period, and the related statement of income and expense and statement of cash flow of such Person for such period, each setting forth in comparative form the figures for the previous comparable fiscal period, all in reasonable detail and prepared in accordance with GAAP.

"<u>Fiscal Quarter</u>" means a fiscal quarter of any Fiscal Year.

"<u>Fiscal Year</u>" means the fiscal year of the Administrative Borrower and its Subsidiaries ending on December 31 of each calendar year.

"<u>Foreign Lender</u>" has the meaning stated in Section 7.2(a).

"<u>Foreign Subsidiary</u>" means any Subsidiary of any Borrower that is not a Domestic Subsidiary.

"<u>GAAP</u>" means generally accepted accounting principles in the United States as in effect from time to time, consistently applied throughout the periods to which reference is made.

"<u>Governmental Body</u>" means any agency, bureau, commission, court, department, official, political subdivision, tribunal or other instrumentality of any administrative, judicial, legislative, executive, regulatory, police or taxing authority of any government, whether supranational, national, federal, state, regional, provincial, local, domestic or foreign.

"<u>Guarantors</u>" has the meaning stated in the Preamble to this Agreement.

"<u>Guaranty</u>" has the meaning stated in Section 5.1(n).

"<u>Hazardous Materials</u>" means any hazardous or toxic substance, waste, contaminant, pollutant, gas or material, including, without limitation, radioactive materials, oil, petroleum and petroleum products and constituents thereof, which are regulated under any Environmental Law, including, without limitation, any substance, waste or material which is (i) designated a "pollutant", "hazardous substance", "extremely hazardous substance" or "toxic chemical" under any Environmental Law, or (ii) regulated in any way under the Regulations of any state where any Borrower, or any Subsidiary of any Borrower or any other Credit Party conducts its business or owns any real property or has any leasehold or in which any Relevant Property is located.

"<u>Hedge Agreement</u>" means an Interest Rate Agreement or a Currency Agreement entered into in order to satisfy the requirements of this Agreement or otherwise in the ordinary course of the business of any Borrower or any of its Subsidiaries.

"<u>Inactive Subsidiaries</u>" means the Subsidiaries set forth as such on Schedule 4.1(m).

**Patriarch/PC Confidential**

"<u>Indebtedness</u>" means, with respect to any Person, without duplication, the following:  (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person for the deferred purchase price of property or services other than accounts payable and accrued liabilities that would be classified as current liabilities under GAAP which payables and liabilities are incurred in respect of property or services purchased in the ordinary course of business, (iii) all obligations of such Person evidenced by notes, bonds, debentures or similar borrowing or securities instruments, (iv) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (v) all obligations of such Person as lessee under Capital Leases, (vi) all obligations of such Person in respect of banker's acceptances and letters of credit, (vii) all obligations of such Person secured by Liens on the assets and property of such Person, (viii) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Stock or other ownership or profit interest in such Person or any other Person or any warrants, rights or options to acquire such Capital Stock, (ix) all obligations of such Person in respect of any guaranty by such Person of any obligation of another Person of the type described in clauses (i) through (viii) of this definition and (x) all obligations of another Person of the type described in clauses (i) through (ix) secured by a Lien on the property or assets of such Person (whether or not such Person is otherwise liable for such obligations of such other Person).

"<u>Indemnified Agent Person</u>" has the meaning stated in Section 9.7.

"<u>Indemnified Person</u>" has the meaning stated in Section 7.3(a).

"<u>Intellectual Property</u>" means, collectively, all copyrights, all patents and all trademarks, together with:  (i) all inventions, processes, production methods, proprietary information, know-how and trade secrets; (ii) all licenses or user or other agreements granted to any Borrower or any of its Subsidiaries with respect to any of the foregoing, in each case whether now or hereafter owned or used including the licenses or other agreements with respect to any Collateral; (iii) all customer lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs; (iv) all field repair data, sales data and other information relating to sales or service of products now or hereafter manufactured; (v) all accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data; and (vi) all causes of action, claims and warranties, in each case, now or hereafter owned or acquired by any Borrower or any of its Subsidiaries in respect of any of the items listed above.

Patriarch/PC Confidential

"Intellectual Property Security Agreement" means the Intellectual Property Security Agreement dated as of the date hereof, between LVD and the Agent (for itself and as the Agent for the Lenders).

"Intercompany Obligations" has the meaning stated in Section 10.1.

"Interest Period" means consecutive one-month periods, beginning on the date hereof and ending on the Maturity Date; provided that:

(i)     the initial Interest Period shall begin on the Closing Date and end on the last day of June 2009.  Thereafter, each subsequent Interest Period will begin on the day following the last day of the preceding Interest Period (with such last day of such preceding Interest Period determined with reference to clauses (ii) through (v) below;

(ii)    any Interest Period that would otherwise end on a day that is not a Business Day shall, subject to the provisions of clause (iv) below, be extended to the next succeeding Business Day unless such Business Day falls in the next calendar month, in which case such Interest Period shall end on the immediately preceding Business Day;

(iii)   any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (iv) below, end on the last Business Day of a calendar month;

(iv)    any Interest Period that would otherwise end after the Maturity Date shall end on the Maturity Date; and

(v)     except as otherwise provided under clause (i), (iii) or (iv) above, no Interest Period shall have a duration of less than one month and if any applicable Interest Period would be for a shorter period, such Interest Period shall not be available hereunder.

"Interest Rate Agreement" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement, each of which is for the purpose of hedging the interest rate exposure associated with the operation of any Borrower or any of its Subsidiaries.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"Investment" means (i) any direct or indirect purchase or other acquisition by any Borrower or any of its Subsidiaries of, or of a beneficial interest in, any of the Securities (including any Capital Stock) of any other Person, (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by any Borrower or any of its Subsidiaries from any Person, of any Capital Stock of such Person, and (iii) any direct or indirect loan, advance (other than advances to employees for moving, entertainment and travel expenses, drawing accounts and

Patriarch/PC Confidential

similar expenditures in the ordinary course of business) or capital contribution by any Borrower or any of its Subsidiaries to any other Person (other than the Borrowers or any of their Subsidiaries), including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales to that other Person and/or constitute ordinary trade credit extended in the ordinary course of business.  The amount of any Investment shall be the original cost of such Investment plus the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"Joint Venture" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; provided, in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"Knowledge " means, with respect to any Borrower or any other Credit Party as the context requires, the knowledge of such Borrower's or such Credit Party's Authorized Officers, after reasonable inquiry by such Authorized Officers.

"Leasehold Property" means any leasehold interest of any Borrower or any Guarantor as lessee under any lease of real property, other than any such leasehold interest designated from time to time by the Agent in its sole discretion as not being required to be included in the Collateral.

"Lenders" has the meaning stated in the Preamble to this Agreement.

"LIBOR" means, as to any Loan for any Interest Period, the rate quoted by Bloomberg Information Service (or by any successor or substitute for such Service, providing rate quotations comparable to those currently provided by such Service, as determined by the Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m., London time, two Business Days before the beginning of such Interest Period, as the rate for Dollar deposits with a maturity comparable to such Interest Period.  If such rate is not available at such time for any reason, LIBOR as to any LIBOR Loan for any Interest Period shall be the arithmetic mean (rounded upward, if necessary, to the next 1/16 of 1%) of the offered quotations of at least two Reference Banks to the prime banks in the London interbank market for dollar deposits with a maturity comparable to such Interest Period at approximately 11:00 a.m., London time, two Business Days before the beginning of such Interest Period.  For purposes of this definition, "Reference Banks" shall mean major banks in the London interbank market selected by the Agent.  For all purposes hereunder, LIBOR shall never below 2.0% per annum.

"LIBOR Loans" means Loans bearing interest at a rate determined by reference to LIBOR.

Patriarch/PC Confidential

"License Agreement" has the meaning stated in Section 4.1(t).

"Lien" means any encumbrance, mortgage, pledge, hypothecation, charge, lien, assignment, restriction or other security interest of any kind securing any obligation of any Person.

"Loans" means, collectively, the Revolving Credit Loans and the Term Loans.

"Losses" has the meaning stated in Section 7.3(a).

"Margin Stock" means "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"Material Adverse Effect" means any material adverse effect on or change in (i) the business, operations, properties, assets or condition (financial or otherwise) of the Borrowers and their Subsidiaries taken as a whole, (ii) the ability of any Borrower or any other Credit Party to perform its obligations hereunder or under of any of the other Credit Documents, (iii) the legality, validity or enforceability of any Credit Document, or (iv) the Collateral or the perfection or priority of any Lien granted to the Agent or any Lender under any of the Collateral Documents.

"Material Contracts" means, with respect to any Person, each contract listed on Schedule 4.1(x), each contract which is a replacement or a substitute for any contract listed on such Schedule and each other contract to which such Person is a party which is material to the business, financial condition, operations, performance, properties or reasonably foreseeable business prospects of such Person.

"Maturity Date" means the earlier of (i) June 1, 2014 and (ii) the date that the Loans shall become due and payable in full hereunder, whether by acceleration or otherwise.

"Multiemployer Plan" means any Employee Benefit Plan that is a "multi-employer plan" as defined in Section 3(37) of ERISA.

"Net Asset Sale Proceeds" means, for any Borrower or any of its Subsidiaries, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by such Borrower or any of its Subsidiaries from such Asset Sale, minus (ii) any bona fide direct costs incurred in connection with such Asset Sale, including (A) income or gains taxes actually payable by the seller as a result of any gain recognized in connection with such Asset Sale, (B) payment of the outstanding principal amount of and premium or penalty, if any, and interest on any Indebtedness (other than the Loans) that is secured by a Lien on the stock or assets in question and that is required to be repaid under the terms thereof as a result of such Asset Sale and (C) a reasonable reserve for any indemnification payments (fixed or contingent) attributable to seller's indemnities and

Patriarch/PC Confidential

representations and warranties to purchaser in respect of such Asset Sale undertaken by such Borrower or any of its Subsidiaries in connection with such Asset Sale.

"Net Insurance/Condemnation Proceeds" means, for any Borrower or any of its Subsidiaries, an amount equal to: (i) any Cash payments or proceeds received by such Borrower or such Subsidiaries (A) under any casualty insurance policy in respect of a covered loss thereunder or (B) as a result of the taking of any assets of such Borrower or such Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking minus (ii) (A) any actual and reasonable documented costs incurred by such Borrower or such Subsidiaries in connection with the adjustment or settlement of any claims of such Borrower or such Subsidiaries in respect thereof, and (B) any bona fide direct costs incurred in connection with any sale of such assets as referred to in clause (i)(B) of this definition, including income taxes actually payable as a result of any gain recognized in connection therewith.

"Notes" means, collectively, the Revolving Credit Notes and the Term Loan Notes.

"Notices" has the meaning stated in Section 11.2.

"Obligations" means all indebtedness, obligations and liabilities of each Credit Party from time to time owed to the Agent, the Lenders or any of them or their respective Affiliates direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, arising or incurred under this Agreement or any other Credit Document or in respect of any of the Loans, the Notes or any other instruments at any time evidencing any thereof.

"Original Currency" has the meaning stated in Section 11.17.

"Participant" has the meaning stated in Section 11.4(c).

"Participation" has the meaning stated in Section 11.4(c).

"Patriarch Term and Revolving Credit Agreement" means that certain Credit Agreement, dated as of August 26, 2005, among the Debtors, the lenders from time to time party thereto and PPAS, as administrative agent for such lenders, as amended from time to time.

"Patriarch Equipment Credit Agreement" means that certain Credit Agreement (Equipment Finance), dated as of April 25, 2007, among Zohar Waterworks, LLC, the lenders from time to time party thereto and PPAS, as administrative agent for such lenders, as amended from time to time.

"Paying Credit Party" has the meaning stated in Section 10.6(a).

Patriarch/PC Confidential

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, that is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"Permit" means any permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance or other authorization issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any federal, state, local or foreign Regulation.

"Permitted Holders" means each of (i) Patriarch Partners Agency Services, LLC, a Delaware limited liability company, (ii) Zohar CDO 2003-1, Limited, (iii) Zohar II 2005-1, Limited, (iv) Zohar III, Limited, (v) any Affiliates of the foregoing controlled by, or under common control with, Patriarch Partners LLC, and (vi) any other entity controlled by, or under common control with, Patriarch Partners, LLC.  For purposes of this definition, the term "control" (including with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by agreement or otherwise.

"Permitted Indebtedness" means the Indebtedness permitted pursuant to Section 6.1(a).

"Permitted Investment" has the meaning stated in Section 6.1(e).

"Permitted Liens" has the meaning stated in Section 6.1(b).

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, other legal entities and Governmental Bodies.

"PPAS" has the meaning stated in the Preamble to this Agreement.

"Pre-Petition Credit Agreements" means the Patriarch Term and Revolving Credit Agreement and the Patriarch Equipment Credit Agreement.

"Pre-Petition Liabilities" means, collectively, the "Obligations" as defined in each of the Pre-Petition Credit Agreements.

"Principal Office" means, for the Agent, its office located at 32 Avenue of the Americas, 17th Floor, New York, New York 10013, Attention: Loan

Patriarch/PC Confidential

Administration/LVD Acquisition, or such other office as the Agent may from time to time designate in writing to the Administrative Borrower and each Lender.

"Pro Rata Share" means (i) with respect to all payments, computations and other matters relating to the Term A Loans of any Term A Loan Lender, the percentage obtained by dividing (A) the aggregate principal amount of Term A Loans of such Term A Loan Lender by (B) the aggregate principal amount of Term A Loans of all Term A Loan Lenders; (ii) with respect to all payments, computations and other matters relating to the Term B Loans of any Term B Loan Lender, (A) prior to the Term B Loan Commitments being terminated or reduced to zero, the percentage obtained by dividing (1) the Term B Loan Commitments of such Term B Loan Lender by (2) the aggregate Term B Loan Commitments of all Term B Loan Lenders and (B) from and after the time that the Term B Loan Commitments have been terminated or reduced to zero, the percentage obtained by dividing (1) the aggregate principal amount of Term B Loans of such Term B Loan Lender by (2) the aggregate principal amount of Term B Loans of all Term B Loan Lenders; and (iii) with respect to all payments, computations and other matters relating to the Revolving Credit Commitment or Revolving Credit Loans of any Revolving Lender, (A) prior to the Revolving Credit Commitments being terminated or reduced to zero, the percentage obtained by dividing (1) the Revolving Credit Commitment of such Revolving Lender by (2) the aggregate Revolving Credit Commitments of all Revolving Lenders and (B) from and after the time that the Revolving Credit Commitments have been terminated or reduced to zero, the percentage obtained by dividing (1) the aggregate principal amount of Revolving Credit Loans of such Revolving Lender by (2) the aggregate principal amount of Revolving Credit Loans of all Revolving Lenders.  For all other purposes with respect to each Lender, "Pro Rata Share" means the percentage obtained by dividing (x) the aggregate principal amount of the Loans of such Lender by (y) the aggregate principal amount of the Loans of all Lenders.

"Purchase Agreement" means the Asset Purchase Agreement, dated as of April 2, 2009, among LVD, as buyer, and the Debtors, as sellers, as amended by Amendment No. 1 to Asset Purchase Agreement, dated as of June 1, 2008, and as partially assigned by LVD to B2 pursuant to the Assignment and Assumption Agreement dated as of June 1, 2009, as the same has been and may hereafter with the Agent's consent be amended, restated, supplemented or otherwise modified from time to time.

"Purchase Documents" means the Purchase Agreement and all other documents related thereto and executed in connection therewith, including, without limitation, the Assignment and Assumption Agreement, dated as of the date hereof, among the Debtors and LVD.

"Register" has the meaning stated in Section 2.7(b).

"Regulation" means each applicable law, rule, regulation, order, guidance or recommendation (or any change in its interpretation or administration) by any

16

Patriarch/PC Confidential

Governmental Body, central bank or comparable agency and any request or directive (whether or not having the force of law) of any of those Persons and each judgment, injunction, order, writ, decree or award of any Governmental Body, arbitrator or other Person.

"Relevant Property" means, for any Borrower, any Subsidiary of any Borrower and any other Credit Party, all sites, facilities, locations, real property and leaseholds (i) presently or formerly owned, leased, used or operated by such Borrower, Subsidiary or other Credit Party (whether or not such properties are currently owned, leased, used or operated by such Borrower, Subsidiary or other Credit Party), (ii) at which any Hazardous Material has been transported, disposed, treated, stored or released by such Borrower, Subsidiary or other Credit Party, or (iii) that are directly adjacent to any sites, facilities, locations, real property or leaseholds presently or formerly owned, leased, used or operated by such Borrower, Subsidiary or Credit Party.

"Required Lenders" means, at any time, one or more of the Lenders having Pro Rata Shares representing more than 50%.

"Restricted Junior Payment" means, for any Borrower and/or any of its Subsidiaries, (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of Capital Stock of such Borrower or such Subsidiary now or hereafter outstanding, except a dividend payable solely in shares of that class of Capital Stock to the holders of that class, (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any shares of any class of stock of such Borrower or such Subsidiary now or hereafter outstanding, and (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of Capital Stock of such Borrower or such Subsidiary now or hereafter outstanding.

"Revolving Credit Commitment" means (i) with respect to each Revolving Lender that is a lender on the Closing Date, the amount set forth opposite such Lender's name on Schedule 2.1 as such Lender's "Revolving Credit Commitment" and (ii) in the case of any lender that becomes a Revolving Lender after the Closing Date, the amount specified as such Lender's "Revolving Credit Commitment" in the Assignment and Acceptance pursuant to which such Lender assumed such Revolving Credit Commitment, in each case as the same may be reduced or increased from time to time pursuant to the terms hereof.

"Revolving Credit Commitment Period" means the period from the date of this Agreement to but excluding the Maturity Date.

"Revolving Credit Fee" has the meaning stated in Section 2.10(a).

"Revolving Credit Loan" means a Loan made by a Revolving Lender to any Borrower pursuant to Section 2.3.

Patriarch/PC Confidential

"Revolving Credit Note" has the meaning stated in Section 2.7(c).

"Revolving Lender" means a Lender that has a Revolving Credit Commitment.

"Second Currency" has the meaning stated in Section 11.17.

"Securities" means any stock, shares, limited liability company membership interests, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Security Agreement" means the Security Agreement, dated as of the date hereof, among the Credit Parties party thereto and the Agent (for itself and as the Agent for the Lenders).

"Solidary Claim" has the meaning stated in Section 9.1.

"Solvent" means, with respect to any Person, that as of the date of determination both (i)(A) the sum of such Person's debt (including contingent liabilities) does not exceed all of its property, at a fair valuation, (B) the present fair saleable value of the property of such Person is not less than the amount that will be required to pay the probable liabilities on such Person's then existing debts as they become absolute, and matured, (C) such Person's capital is not unreasonably small in relation to its business or any contemplated or undertaken transaction, and (D) such Person does not intend to incur, or believe (nor should it reasonably believe) that it will incur, debts beyond its ability to pay such debts as they become due, and (ii) such Person is "solvent" within the meaning given that term and similar terms under applicable laws relating to fraudulent transfers and conveyances.  For purposes of this definition, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Structuring Fee" has the meaning stated in Section 2.10(c).

"Sub-Agent" has the meaning stated in Section 9.3.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of

Patriarch/PC Confidential

which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, provided, in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.

"Tax" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed, provided, "Tax on the overall net income" of a Person shall be construed as a reference to a tax imposed by the jurisdiction in which that Person is organized or in which that Person's applicable principal office (and/or, in the case of a Lender, its lending office) is located or in which that Person (and/or, in the case of a Lender, its lending, office) is deemed to be doing business on all or part of the net income, profits or gains (whether worldwide, or only insofar as such income, profits or gains are considered to arise in or to relate to a particular jurisdiction, or otherwise) of that Person (and/or, in the case of a Lender, its applicable lending office).

"Term A Loan" means a Loan made by a Term A Loan Lender to any Borrower pursuant to Section 2.1.

"Term A Loan Commitment" means, (i) with respect to each Term A Loan Lender that is a Lender on the Closing Date, the amount set forth opposite such Term A Loan Lender's name on a Schedule 2.1 as such Lender's "Term A Loan Commitment" and (ii) in the case of any lender that becomes a Term A Loan Lender after the Closing Date, the amount specified as such Term A Loan Lender's "Term A Loan Commitment" in the Assignment Agreement pursuant to which such Lender assumed such Term A Loan Commitment, in each case as the same may be reduced or increased from time to time pursuant to the terms hereof.

"Term A Loan Lender" means a Lender that has a Term A Loan Commitment.

"Term A Loan Note" has the meaning stated in Section 2.7(c).

"Term B Loan" means a Loan made by a Term B Loan Lender to any Borrower pursuant to Section 2.2.

"Term B Loan Commitment" means, (i) with respect to each Term B Loan Lender that is a Lender on the Closing Date, the amount set forth opposite such Term B Loan Lender's name on a Schedule 2.1 as such Lender's "Term B Loan Commitment" and (ii) in the case of any lender that becomes a Term B Loan

Patriarch/PC Confidential

Lender after the Closing Date, the amount specified as such Term B Loan Lender's "Term B Loan Commitment" in the Assignment Agreement pursuant to which such Lender assumed such Term B Loan Commitment, in each case as the same may be reduced or increased from time to time pursuant to the terms hereof.

"Term B Loan Commitment Period" means the period commencing on the Closing Date up to (but not including) the Maturity Date.

"Term B Loan Lender" means a Lender that has a Term B Loan Commitment.

"Term B Loan Note" has the meaning stated in Section 2.7(c).

"Term Loans" means, collectively, the Term A Loans and the Term B Loans.

"Term Loan Commitments" means, collectively, the Term A Loan Commitments and the Term B Loan Commitments.

"Term Loan Lenders" means, collectively, the Term A Loan Lenders and the Term B Loan Lenders.

"Term Loan Notes" means, collectively, the Term A Loan Notes and the Term B Loan Notes.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"Voting Stock" means with respect to any Person, (i) one (1) or more classes of Capital Stock of such Person having general voting powers to elect at least a majority of the board of directors, managers or trustees of such Person, irrespective of whether at the time Capital Stock of any other class or classes have or might have voting power by reason of the happening of any contingency, and (ii) any Capital Stock of such Person convertible or exchangeable without restriction at the option of the holder thereof into Capital Stock of such Person described in clause (i) of this definition.

## ARTICLE II
### Loans

Section 2.1   Assumed Obligations; Term A Loans.

(a)   As set forth in the Purchase Agreement and the other Purchase Documents, on the date hereof, LVD has assumed all of the Debtors' Pre-Petition Liabilities and DIP Liabilities.  The aggregate amount of the Pre-Petition Liabilities as of the date hereof is $48,177,350.74.  The aggregate amount of the DIP Liabilities as of the date hereof if $2,780,189.74.

(b)   All of the Pre-Petition Liabilities and DIP Liabilities shall hereafter be deemed outstanding and governed by the terms of this Agreement with the aggregate

Patriarch/PC Confidential

amount of such liabilities constituting the principal balance of the Term A Loan hereunder.

(c)     Subject to the terms and conditions of this Agreement and relying on the representations and warranties set forth herein, on the Closing Date, each Term A Loan Lender shall be deemed to have made (severally, not jointly or jointly and severally) a Term A Loan to Borrowers in an amount equal to such Lender's Pro Rata Share of the Term A Loan Commitment by virtue of the assumption of the assumed Pre-Petition Liabilities and DIP Liabilities as set forth in Section 2.1(b) above.  Notwithstanding anything to the contrary contained herein, no Lender shall have any obligation to advance any further funds to the Borrowers under or with respect to the Term A Loan Commitment, all of which shall be deemed fully utilized as of the Closing Date.

(d)     Any amount borrowed under this Section 2.1 and subsequently repaid or prepaid may not be reborrowed.  Subject to Sections 2.12 and 2.13, all amounts owed under this Section 2.1 shall be paid in full no later than the Maturity Date.

(e)     Any amount borrowed under this Section 2.1 shall (i) bear interest as provided in Section 2.8(a) hereof and (ii) be entitled to the security interests, collateral and other rights and benefits provided pursuant to this Agreement and the other Credit Documents.

Section 2.2     Term B Loans.

(a)     During the Term B Loan Commitment Period and subject to the terms and conditions hereof and relying on the representations and warranties set forth herein, each Term B Loan Lender severally, and not jointly and severally, agrees to make a Term B Loan to the Borrowers in one or more advances in an aggregate amount up to but not exceeding such Lender's Term B Loan Commitment.  As of the Closing Date, the Term B Loan Commitment is zero.

(b)     Any amount borrowed under this Section 2.2 and subsequently repaid or prepaid may not be reborrowed.  Subject to Sections 2.12 and 2.13, all amounts owed under this Section 2.2 shall be paid in full no later than the Maturity Date.

(c)     Any amount borrowed under this Section 2.2 shall (i) bear interest as provided in Section 2.8(a) hereof and (ii) be entitled to the security interests, collateral and other rights and benefits provided pursuant to this Agreement and the other Credit Documents.

Section 2.3     Revolving Credit Loans.

(a)     During the Revolving Credit Commitment Period, subject to and upon the terms and conditions hereof, each Revolving Lender, severally, and not jointly and severally, agrees to make Revolving Credit Loans to the Borrowers in the aggregate amount up to but not exceeding such Lender's Revolving Credit Commitment.  Amounts borrowed pursuant to this Section 2.3 may be repaid and reborrowed during the Revolving Credit Commitment Period.

Patriarch/PC Confidential

(b)     Each Revolving Lender's Revolving Credit Commitment shall expire on the Maturity Date and all Revolving Credit Loans and all other amounts owed hereunder with respect to the Revolving Credit Loans and the Revolving Credit Commitments shall be paid in full no later than such date.

(c)     The Revolving Credit Loans shall (i) bear interest as provided in Section 2.8(a) hereof and (ii) be entitled to the security interests, collateral and other rights and benefits provided pursuant to the other Credit Documents.

Section 2.4     Borrowing Mechanics.

(a)     Loans shall be made in an aggregate minimum amount of $25,000 and integral multiples of $10,000 in excess of that amount (or such lesser amount as shall constitute the entire applicable Commitment then available).

(b)     Whenever the Borrowers desires that the Lenders make a Loan (other than the Term A Loan), the Administrative Borrower shall deliver to the Agent a fully executed Borrowing Certificate no later than 10:00 a.m. (New York City time) at least one Business Day in advance of the proposed Borrowing Date, which Borrowing Date shall be a Business Day.

(c)     Notice of receipt of each Borrowing Certificate in respect of the applicable Loans, together with the amount of each Lender's Pro Rata Share thereof, together with the applicable interest rate, shall be provided by the Agent to each applicable Lender by facsimile with reasonable promptness, but (provided, the Agent shall have received such notice by 10:00 a.m. (New York City time)) not later than 4:00 p.m. (New York City time) on the same day as the Agent's receipt of such Borrowing Certificate from the Administrative Borrower.

(d)     Each Lender shall make the amount of its Loans available to the Agent no later than 2:00 p.m. (New York City time) on the applicable Borrowing Date by wire transfer of same day funds in Dollars, at the Agent's Principal Office.  Except as provided herein, upon satisfaction or waiver of the conditions precedent specified herein, the Agent shall make the proceeds of such Loans available to the Borrowers on the applicable Borrowing Date by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by the Agent from the Lenders to be deposited by wire transfer to the account of the Borrowers designated in writing to the Agent by the Administrative Borrower.

Section 2.5     Pro Rata Shares.  All Loans shall be made by the Lenders simultaneously and proportionately to their respective Pro Rata Shares, it being understood that no Lender shall be responsible for any default by any other Lender in such other Lender's obligation to make the Loans hereunder.

Section 2.6     Use of Proceeds.  The proceeds of the Loans (other than the Term A Loans) shall be used by the Borrowers solely (i) for working capital and general corporate purposes of the Borrowers and their Subsidiaries (including providing cash collateral for the letters of credit permitted under Section 6.1(a)(vi), (ii) to pay the purchase price, costs and

Patriarch/PC Confidential

expenses related to the Acquisition, and (iii) to pay the costs and expenses related to the transactions contemplated by this Agreement.  No portion of the proceeds of any Borrowing shall be used by the Borrowers or any of their Subsidiaries in any manner that might cause such Borrowing or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof or to violate the Exchange Act, in each case as in effect on the date or dates of such Borrowing and such use of proceeds.

Section 2.7   Evidence of Debt; Register Notes.

(a)   Lenders' Evidence of Debt.  Each Lender shall maintain on its internal records an account or accounts evidencing the Indebtedness of the Borrowers to such Lender, including the amounts of the Loans owed to it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on the Borrowers, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments, Loans or any Borrower's Obligations in respect of any applicable Loans; and provided, further, in the event of any inconsistency between the Register and any Lender's records, the recordations in the Register shall govern.

(b)   Register.  The Agent shall maintain, as the Borrowers' agent, at the Agent's Principal Office a register for the recordation of the names and addresses of each Lender and such Lender's Commitments and the fees, interest and principal amount of Loans owed to each Lender (the "Register").  The Register shall be available for inspection by the Borrowers or any Lender at any reasonable time and from time to time upon reasonable prior notice.  The Agent shall record in the Register the Commitments, and the fees, interest and the outstanding balance of the Loans, and each repayment or prepayment in respect of the principal amount of and interest, fees and other amounts with respect to the Loans, and any such recordation shall be conclusive and binding on the Borrowers and each Lender, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect any Lender's Commitments or any Borrower's Obligations in respect of any Loan.  No transfer of the Commitments, the Loans and/or any interests therein shall be effective until such transfer is recorded in the Register.

(c)   Notes.  At closing, (i) the Borrowers (if requested by the Agent) shall execute and deliver to each Revolving Lender a promissory note, in the form of Exhibit B (each, a "Revolving Credit Note"), to evidence such Lender's Revolving Credit Loan, (ii) the Borrowers shall (if requested by the Agent) execute and deliver a promissory note, in the form of Exhibit G-1 (each, a "Term A Loan Note"), to evidence each Term A Loan Lender's Term A Loan, and (iii) the Borrowers shall (if requested by the Agent) execute and deliver a promissory note, in the form of Exhibit G-2 (each, a "Term B Loan Note"), to evidence each Term B Loan Lender's Term B Loan.

Patriarch/PC Confidential

Section 2.8     Interest on Loans.

(a)     Applicable Rates.  Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment (whether by acceleration or otherwise) on the unpaid principal amount thereof at a rate per annum equal to LIBOR plus the Applicable Margin.

(b)     Calculation of Interest Rates.  Interest payable pursuant to this Section 2.8 shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.  In computing interest on any Loan, the date of the making of such Loan or the first day of an interest period applicable to such Loan shall be included, and the date of payment of such Loan or the expiration date of an interest period applicable to such Loan shall be excluded; provided, if such Loan is repaid on the same day on which it is made, one day's interest shall be paid on such Loan.  For the purposes of the Interest Act (Canada), (i) whenever any interest or fees under this Agreement or any other Credit Document is calculated using a rate based on a year of 360 days, the rate determined pursuant to such calculation, when expressed as an annual rate, is equivalent to (x) the applicable rate, (y) multiplied by the actual number of days in the calendar year in which the period for which such interest is payable (or compounded) ends, and (z) divided by 360, (ii) the principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement, and (iii) the rates of interest stipulated in this Agreement are intended to be nominal rates and not effective rates or yields.

(c)     Payment of Interest.  Interest on the Loans shall be payable in arrears on (i) the first day of each calendar month, (ii) the date of any prepayment of the Loans, whether voluntary or mandatory, to the extent accrued on the amount being prepaid, and (iii) the Maturity Date, including final maturity.

(d)     Default Interest.  Upon the occurrence and during the continuance of an Event of Default described in Section 8.1, the principal amount of all Loans and, to the extent permitted by applicable law, any interest payments on the Loans or any fees or other amounts owed hereunder not paid when due, in each case whether at stated maturity, by notice of prepayment, by acceleration or otherwise, shall thereafter bear interest (including, without limitation, interest, as provided in this Agreement, accruing after the filing of a petition initiating any insolvency proceedings, whether or not such interest accrues or is recoverable against the Borrowers after the filing of such petition for purposes of the Bankruptcy Code or is an allowed claim in such proceeding) payable on demand at a rate that is 2.0% per annum in excess of the interest rate otherwise payable hereunder with respect to the Loans.  Payment or acceptance of the increased rates of interest provided for in this Section 2.8 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of the Agent or any Lender.

Section 2.9     Changed Circumstances.  If the introduction of or any change in or in the interpretation of (in each case, after the date hereof) any law or regulation applicable to any Lender makes it unlawful, or any Governmental Body asserts, after the date hereof, that it is

Patriarch/PC Confidential

unlawful, for any Lender to perform its obligations hereunder to maintain the Loans at LIBOR, such Lender shall notify the Agent of such event and the Agent shall notify the Administrative Borrower of such event, and the right of the Borrowers to apply LIBOR to any subsequent Interest Period shall be suspended until the Agent shall notify the Administrative Borrower that the circumstances causing such suspension no longer exist, and the Borrowers shall forthwith prepay in full the Loans then outstanding, and shall pay all interest accrued thereon through the date of such prepayment, unless a Borrower, within three (3) Business Days after such notice from the Agent, requests that the interest rate applicable to the Loans be converted from LIBOR plus the Applicable Margin to the Base Rate as in effect from time to time <u>plus</u> 4.5%; <u>provided</u>, that if the date of such repayment or proposed conversion is not the last day of an Interest Period applicable to the Loans, the Borrowers shall also pay any amount due pursuant to Section 7.5.

Section 2.10   <u>Fees</u>.

(a)     The Borrowers agree to pay to the Agent, for the ratable benefit of the Revolving Lenders, an unused commitment fee (the "<u>Revolving Credit Fee</u>") equal to (i) the average of the daily difference between (A) the Revolving Credit Commitments, and (B) the aggregate principal amount of outstanding Revolving Credit Loans <u>times</u> (ii) a rate equal to 1.50% per annum.  The Revolving Credit Fee shall be payable monthly in arrears on the first Business Day of each calendar month, commencing on the first such date to occur after the Closing Date, and on the Maturity Date.

(b)     The Borrowers agree to pay to the Agent, for its own account, a fee (the "<u>Agent Fee</u>") in an amount equal to $75,000 on the Closing Date and on each anniversary thereof on terms and conditions separately agreed upon by the Agent and the Borrowers.

(c)     On the Closing Date, the Borrowers agree to pay to the Agent, for the ratable benefit of the Lenders, a nonrefundable structuring fee (the "<u>Structuring Fee</u>") in an amount equal to (i) the sum of all Revolving Credit Commitments as of the Closing Date, <u>times</u> (ii) a rate equal to 2.0% per annum, which Structuring Fee shall be deemed fully earned and due and payable on the Closing Date and in addition to any other fee from time to time payable under the Credit Documents.

(d)     All fees referred to in this Section 2.10 shall be calculated on the basis of a 360-day year and the actual number of days elapsed and shall be paid to the Agent at its Principal Office.  Upon receipt of the fees referred to in Sections 2.10(a) and (c) above, the Agent shall promptly distribute to each Lender its Pro Rata Share thereof.

Section 2.11   <u>Repayment</u>.  Subject to Sections 2.12 and 2.13, the Loans shall be due and payable, and the Borrowers shall be required to repay all of the Obligations (including, without limitation, all accrued and unpaid principal and interest on the principal amounts of the Loans) on the Maturity Date.

Section 2.12   <u>Optional Prepayments</u>.

(a)     <u>Optional Prepayments</u>.  At any time and from time to time the Borrowers may (i) prepay, without premium or penalty, any Loans on any Business Day in whole or in part in an aggregate minimum amount of $250,000 and integral multiples of $50,000 in

**Patriarch/PC Confidential**

excess of that amount (or such lesser amount that shall constitute the entire amount of the Loans then outstanding) or (ii) reduce the Revolving Credit Commitment, without premium or penalty (provided that such Revolving Credit Commitment may not be reduced below the outstanding Revolving Credit Loans), on any Business Day in whole or in part in an aggregate minimum amount of $500,000 and integral multiples of $100,000 in excess of that amount, and the aggregate Revolving Credit Commitment shall be permanently reduced by such amount.  The Loans shall be prepaid according to each respective Lender's Pro Rata Share thereof.

(b)    Notice of Optional Prepayment.  All such prepayments and/or commitment reductions shall be made on a Business Day and upon not less than one Business Day's prior written or telephonic notice from the Administrative Borrower, in each case given to the Agent by 12:00 p.m. (New York City time) on the date required and, if given by telephone, promptly confirmed in writing to the Agent (and the Agent will promptly transmit such telephonic or original notice for the applicable Loans by facsimile or telephone to each Lender).  Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable and/or the Revolving Credit Commitment specified in such notice shall be permanently reduced on the date specified therein.  In the case of an optional prepayment of Revolving Credit Loans, the Administrative Borrower shall specify in such notice whether such prepayment shall be applied to permanently reduce the Revolving Credit Commitment or to reduce the outstanding amount of Revolving Credit Loans without reducing the amount of the Revolving Credit Commitment; provided in the event the Administrative Borrower fails to specify how the prepayment of Revolving Credit Loans shall be applied, such prepayment shall be applied to reduce the outstanding amount of Revolving Credit Loans without reducing the amount of the Revolving Credit Commitment.

Section 2.13    Mandatory Prepayments; Mandatory Commitment Reductions.

(a)    Excess Over Commitment.  If at any time the outstanding principal amount of the Revolving Credit Loans exceeds the Revolving Credit Commitment, the Borrowers shall immediately pay the amount of such excess to the Agent for application to the Revolving Credit Loans.  Failure to pay such amount shall be an immediate Event of Default under this Agreement.

(b)    Asset Sales.  No later than the first Business Day following the date of receipt by any Borrower or any of its Subsidiaries of any Net Asset Sale Proceeds, the Borrowers shall prepay the Loans and/or the Revolving Credit Commitments shall be permanently reduced as set forth in Section 2.14 in an aggregate amount equal to such Net Asset Sale Proceeds; provided (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Asset Sale Proceeds from the Closing Date through the applicable date of determination do not exceed $100,000, the Borrowers shall have the option, directly or through one or more of their wholly-owned Subsidiaries, to invest Net Asset Sale Proceeds within one hundred eighty (180) days of receipt thereof in long term productive assets of the general type used in the business of the Borrowers and their Subsidiaries; provided, further, pending any such investment all such Net Asset Sale Proceeds shall be applied to prepay

Patriarch/PC Confidential

outstanding Revolving Credit Loans (without a reduction in Revolving Credit Commitments).

(c)     Insurance/Condemnation Proceeds.  No later than the first Business Day following the date of receipt by any Borrower or any of its Subsidiaries, or the Agent as loss payee, of any Net Insurance/Condemnation Proceeds, the Borrowers shall prepay the Loans and/or the Revolving Credit Commitments shall be permanently reduced as set forth in Section 2.14 in an aggregate amount equal to such Net Insurance/Condemnation Proceeds; provided (i) so long as no Default or Event of Default shall have occurred and be continuing, and (ii) to the extent that aggregate Net Insurance/Condemnation Proceeds from the Closing Date through the applicable date of determination do not exceed $100,000, the Borrowers shall have the option, directly or through one or more of their wholly-owned Subsidiaries to invest such Net Insurance/Condemnation Proceeds within one hundred eighty (180) days of receipt thereof in long term productive assets of the general type used in the business of the Borrowers and their Subsidiaries, which investment may include the repair, restoration or replacement of the applicable assets thereof; provided, further, pending any such investment all such Net Insurance/Condemnation Proceeds, as the case may be, shall be applied to prepay outstanding Revolving Credit Loans (without a reduction in Revolving Credit Commitments).

(d)     Letters of Credit.  The Borrowers shall from time to time immediately prepay the Revolving Credit Loans to the extent that any letters of credit permitted to be incurred pursuant to Section 6.1(a)(vi) expire or terminate and the cash supporting such letter of credit is returned to the Borrowers.

(e)     Prepayment Certificate.  Concurrently with any prepayment of the Loans and/or reduction of the Revolving Credit Commitments pursuant to Section 2.13(b) through 2.12(d), the Administrative Borrower shall deliver to the Agent a certificate of an Authorized Officer demonstrating the calculation of the amount of the applicable net proceeds.  In the event that the Borrowers shall subsequently determine that the actual amount received exceeded the amount set forth in such certificate, the Borrowers shall promptly make an additional prepayment of the Loans and/or permanently reduce the Revolving Credit Commitment in accordance with Section 2.14 in an amount equal to such excess, and the Administrative Borrower shall concurrently therewith deliver to the Agent a certificate of an Authorized Officer demonstrating the derivation of such excess.

Section 2.14     Application of Prepayments.  Any amount required to be paid pursuant to Sections 2.13(b) and (c) shall be applied first, to prepay the Term B Loans, second, after payment in full of the Term B Loans, to prepay the Term A Loans, third, after payment in full of the Term A Loans, to prepay the Revolving Credit Loans to the full extent thereof; and fourth, to permanently reduce the Revolving Credit Commitments to the full extent thereof.

Section 2.15     General Provisions Regarding Payments.

(a)     Payments.  All payments by the Borrowers of principal, interest, fees and other Obligations shall be made to the Agent for the benefit of the Lenders in Dollars in

Patriarch/PC Confidential

same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the Agent not later than 2:00 p.m. (New York City time) on the date due at the Agent's Principal Office without presentment, demand, protest or notice or any kind, all of which are expressly waived by the Borrowers.

(b)    Non Conforming Payments.  The Agent shall deem any payment by or on behalf of any Borrower that is not made to the Agent in same day funds prior to 2:00 p.m. (New York City time) to be a non-conforming payment.  Any such payment shall not be deemed to have been received by the Agent until the later of (i) the time such funds become available funds and (ii) the applicable next Business Day.  The Agent shall give prompt telephonic notice to the Administrative Borrower and each applicable Lender (confirmed in writing) if any payment is non-conforming.  To the extent any non-conforming payment may be deemed to have been received on a date after the date such payment was due hereunder pursuant to the provisions of this Section 2.15(b), such failure of such payment to have been made when due will constitute or become a Default or Event of Default to the extent so provided under the terms of Section 8.1.  Interest shall continue to accrue on any principal as to which a non-conforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the rate determined pursuant to Section 2.8 from the date such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day).

(c)    Payments to Include Accrued Interest.  All payments in respect of the principal amount of any Loan (whether mandatory or optional) shall include payment of accrued interest on the principal amount being, repaid or prepaid, and all such payments (and, in any event, any payments in respect of any Loan on a date when interest is due and payable with respect to such Loan) shall be applied to the payment of interest before application to principal.

(d)    Distributions by the Agent.  The Agent shall promptly distribute to each Lender, such Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including, without limitation, all fees payable with respect thereto, to the extent received by the Agent.

(e)    Business Days.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day (subject to the definition of Interest Period) and such extension of time shall be included in the computation of the payment of interest hereunder.

Section 2.16   Ratable Sharing.  If at any time and from time to time there is more than one Lender, the Lenders hereby agree among themselves that, except as otherwise provided in the Collateral Documents with respect to amounts realized from the exercise of rights with respect to Liens on the Collateral, if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof),

**Patriarch/PC Confidential**

through the exercise of any right of set-off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such Lender hereunder or under the other Credit Documents (collectively, the "Aggregate Amounts Due" to such Lender) which is greater than the proportion received by any other Lender in respect of the Aggregate Amounts Due to such other Lender, then the Lender receiving such proportionately greater payment shall (a) notify the Agent and each other Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all the Lenders in proportion to the Aggregate Amounts Due to them; provided, if all or part of such proportionately greater payment received by such purchasing Lender is thereafter recovered from such Lender upon the bankruptcy or reorganization of any Borrower or otherwise, those purchases shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing Lender ratably to the extent of such recovery, but without interest. Each Borrower expressly consents to the foregoing arrangement and agrees that any holder of a participation so purchased may exercise any and all rights of banker's lien, set-off or counterclaim with respect to any and all monies owing by such Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

Section 2.17   Termination or Reduction of Commitments.  Unless previously terminated, each of the Commitments automatically shall terminate on the Maturity Date.  Upon the making of any Term Loan, each Term Loan Lender's Term Loan Commitment shall be permanently reduced by an amount equal to the principal amount of such Term Loan.  The Revolving Credit Commitments shall be permanently reduced in accordance with Section 2.12 and Section 2.13.

<div align="center">

ARTICLE III
Conditions Precedent; Conditions Subsequent
</div>

Section 3.1   Conditions Precedent; Closing Date.  The obligation of any Lender to make any Loan and the other financial accommodations described herein on the Closing Date is subject to the satisfaction, or waiver in accordance with Section 11.1, of the following conditions on or before the Closing Date:

(a)   Borrower Certificate.  The Lenders shall have received a certificate of the secretary or assistant secretary, the chief executive officer, the authorized signatory, the manager or the general partner, as the case may be, of each Credit Party, each substantially in the form of Exhibit C, with respect to (i) the articles of incorporation or certificate of formation, as the case may be, of such Credit Party, (ii) the regulations, bylaws, operating agreement or limited partnership agreement, as the case may be, of such Credit Party, (iii) the resolutions of the board of directors, manager or general partner, as the case may be, of such Credit Party approving each Credit Document to which such Credit Party is a party and the other documents to be delivered by such Credit

DLI-6247158v5                                29

**Patriarch/PC Confidential**

Party under the Credit Documents and the performance of the obligations of such Credit Party thereunder, and (iv) the names and true signatures of the officers of such Credit Party or such other persons authorized to sign each Credit Document to which such Credit Party is a party and the other documents to be delivered by it under the Credit Documents.

(b)      Organizational and Capital Structure.  On the Closing Date, the organizational structure and the capital structure of the Borrowers and their Subsidiaries, shall be as set forth in Section 4.1(m) and Schedule 4.1(m).

(c)      Good Standing Certificates.  The Lenders shall have received a good standing certificate from the applicable Governmental Body of each jurisdiction of incorporation, organization or formation of each Credit Party's and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated a recent date prior to the Closing Date.

(d)      [Reserved.]

(e)      [Reserved.]

(f)      [Reserved.]

(g)      Closing Date Certificate.  The Agent shall have received an originally executed Closing Date Certificate, in the form of Exhibit D (the "Closing Date Certificate"), from the Administrative Borrower, together with any attachments thereto.

(h)      UCC Financing Statements.  The Agent shall have received UCC financing statements duly authorized by each applicable Credit Party with respect to all personal, real and mixed property Collateral of such Credit Party, for filing in all jurisdictions as may be necessary or, in the opinion of the Lenders, desirable, to perfect the security interests created in such Collateral pursuant to the Collateral Documents.

(i)      Collateral Documents; Notes.  The Lenders shall have received duly executed original copies of the Security Agreement, the Intellectual Property Security Agreement and the Notes.  The financing statements and other Credit Documents related to perfection of the security interest and Liens of the Agent and the Lenders in the Collateral shall have been filed in all appropriate jurisdictions (or arrangements for such filings acceptable to the Agent shall have been made).

(j)      Security Collateral.  The Agent shall have received the Security Agreement, certificates, instruments and promissory notes (which certificates, instruments and promissory notes shall be accompanied by instruments of transfer or assignment duly endorsed in blank and otherwise in form and substance satisfactory to the Agent and the Lenders) representing or evidencing all negotiable documents, instruments, tangible chattel paper, certificated securities and certificates of title covering goods included in the Collateral and pledged pursuant to the Collateral Documents.

Patriarch/PC Confidential

(k)     <u>Other Actions to Perfect Security Interests</u>.  The Lenders shall have received evidence that each Credit Party shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument, and made or caused to be made any other filing and recording (other than as set forth herein) reasonably required by the Lenders.

(l)     <u>Other Information</u>.  The Agent and the Lenders shall have received any other financial or non-financial information regarding the Borrowers and their Subsidiaries as the Agent or any Lender may reasonably request.

(m)     <u>Proceedings</u>.  All proceedings taken or to be taken in connection with the transactions contemplated by this Agreement shall be satisfactory to the Agent and the Lenders and their counsel.

(n)     <u>Fees and Costs</u>.  The Borrowers shall have paid all fees and expenses (including attorneys' fees) and out of pocket expenses of the Lenders and the Agent incurred in connection with this Agreement and the other Credit Documents.

(o)     <u>Guaranty</u>.  The Lenders shall have received the Guaranty, if any, duly executed and delivered by each Guarantor (if any).

(p)     [Reserved.]

Section 3.2     <u>Conditions to Each Borrowing</u>.  The obligation of each Lender to make any Loan on any Borrowing Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 11.1, of the following conditions precedent:

(a)     <u>Borrowing Certificate</u>.  The Agent and the Lenders shall have received a fully executed and delivered Borrowing Certificate, in accordance with Section 2.4.  Each Borrowing Certificate shall be executed by an Authorized Officer of the Administrative Borrower in a writing delivered to the Agent and the Lenders on a Business Day.

(b)     <u>Representations, Warranties and Covenants</u>.  As of such Borrowing Date, the representations, warranties and covenants of the Credit Parties contained in the Credit Documents shall be true, correct and complied with on and as of that Borrowing Date, as if made on and as of that Borrowing Date.

(c)     <u>No Default or Event of Default</u>.  As of such Borrowing Date, no event shall have occurred and be continuing or would result from the consummation of the applicable Borrowing that would constitute an Event of Default or a Default.

(d)     <u>Consents</u>.  The Lenders shall have received such Consents and other information, approvals, opinions or documents reasonably requested by the Agent or the Lenders in connection with such Borrowing.

(e)     <u>Available Commitment</u>.  After making the Loans requested on such Borrowing Date, (i) the aggregate outstanding principal amount of Revolving Credit Loans shall not exceed the aggregate amount of Revolving Credit Commitments then in

Patriarch/PC Confidential

effect, (ii) the aggregate outstanding principal amount of Term A Loans shall not exceed the aggregate amount of Term A Loan Commitments then in effect, and (iii) the aggregate outstanding principal amount of Term B Loans shall not exceed the aggregate amount of Term B Loan Commitments then in effect.

(f)     Use of Proceeds.  The Borrowers shall have confirmed in writing that the proceeds of such Borrowing shall be used only in accordance with the provisions of Section 2.6.

(g)     No Material Adverse Effect.  No Material Adverse Effect shall have occurred after giving effect to the making of the Loans.

Section 3.3     Conditions Subsequent.  The Borrowers shall satisfy each of the following conditions in the time period provided below therefor:

(a)     Financial Covenants.  No later than 90 days after the Closing Date, the Borrowers and the Lenders shall mutually agree upon financial covenants under Section 6.2.

(b)     Cash Management.  No later than 20 Business Days after the Closing Date or such longer period as the Agent in its sole discretion may agree, the Borrowers shall open the Cash Management Account and implement the cash management systems described in Section 5.1(g) and deliver to the Agent fully-executed account control agreements with respect all Deposit Accounts of the Borrowers and their Subsidiaries, each to be executed by the financial institution at which such accounts are maintained and to be in form and substance acceptable to the Agent.

(c)     Foreign Qualification.  No later than 20 Business Days after the Closing Date or such longer period as the Agent in its sole discretion may agree, the Agent and the Lenders shall have received written evidence that the Borrowers are qualified to do business as a foreign entity in the States of Texas and Ohio and the Province of Quebec, Canada.

(d)     Evidence of Insurance.  No later than 20 Business Days after the Closing Date, the Lenders shall have received a certificate from the Borrowers' insurance broker or other evidence satisfactory to it that all insurance required to be maintained pursuant to Section 5.1(h) is in full force and effect and that the Agent, for the benefit of the Lenders and the Agent, has been named as additional insured and loss payee thereunder.

(e)     Actions to Perfect Security Interests in Collateral Located in Canada.  No later than 45 days after the Closing Date, the Lenders shall have received evidence that each Credit Party shall have taken or caused to be taken all actions, executed and delivered or caused to be executed and delivered all agreements, documents and instruments, and made or caused to be made all filings and recordings reasonably required by the Lenders to perfect the Agent's security interest in the Collateral located or registered in Canada.

Patriarch/PC Confidential

     (f)    <u>Pledge of Equity in Foreign Subsidiaries</u>.  No later than 45 days after the Closing Date, if requested by the Agent, the Borrower shall deliver to the Agent evidence, in form and substance reasonably acceptable to the Agent, that all actions required under the laws of the jurisdictions of organization of the Foreign Subsidiaries to perfect the Agent's lien in 65% of the equity owned by the Borrower or its Subsidiaries in such Foreign Subsidiaries shall have been completed.

     (g)    <u>Amendment to Schedules</u>.  No later than 45 days after the Closing Date, the Borrower shall deliver to the Agent an update Schedules 4.1(m) and 5.1(g) to Credit Agreement and Schedules I and VII to Security Agreement, with all blanks completed and in form and substance reasonably acceptable to the Agent.

<div align="center">

ARTICLE IV
<u>Representations and Warranties</u>

</div>

Section 4.1    <u>Representations and Warranties</u>.  In order to induce the Agent and the Lenders to enter into this Agreement and to make each Borrowing to be made thereby, each Credit Party hereby represents and warrants to the Agent and each Lender, on the Closing Date and on each Borrowing Date as follows:

     (a)    <u>Corporate Status; Corporate Authorization</u>.  Each Borrower, each of its Subsidiaries and each other Credit Party is duly organized, validly existing, and in good standing under the laws of its jurisdiction of organization and is duly qualified and in good standing in every other jurisdiction where it is doing business except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect on the Borrowers or any of their Subsidiaries, and the execution, delivery and performance by the Borrowers and their Subsidiaries and each other Credit Party of the Credit Documents (i) are within its respective authority, (ii) have been duly authorized, and (iii) do not conflict with or contravene their respective constitutive documents.  The execution, delivery, performance of their respective obligations, and exercise of their respective rights under the Credit Documents by the Borrowers, each of their Subsidiaries and each other Credit Party thereto, including, without limitation, the making of the Loans under this Agreement, (y) do not require any Consents that have not been obtained and (z) are not and will not be in conflict with or prohibited or prevented by (A) any Regulation or (B) any corporate governance document, corporate minute or resolution or (C) any instrument, agreement or provision thereof, in each case binding on any of them or affecting any of their property.

     (b)    <u>Execution and Binding Effect</u>.  Upon execution and delivery thereof, each Credit Document shall constitute the legal, valid and binding obligation of each Borrower, each of its Subsidiaries and each other Credit Party which is a party thereto, enforceable in accordance with its terms.

     (c)    <u>Properties</u>.

**Patriarch/PC Confidential**

(i)      Each Borrower and each of its Domestic Subsidiaries has good and marketable title to all real property owned or purported to be owned by it, in each case free of all Liens other than the Permitted Liens.

(ii)     Each Borrower and each of its Domestic Subsidiaries is, or when leases creating Leasehold Properties are executed will be, lawfully possessed of a valid and subsisting leasehold estate in and to its Leasehold Properties which it purports to lease free and clear of all Liens other than the Permitted Liens.

(iii)    Each Borrower and each of its Domestic Subsidiaries enjoys, and will enjoy, peaceful and undisturbed possession of, or a lease or license to use, all property (subject only to the Permitted Liens) that are necessary for their respective businesses.

(iv)     Set forth on Schedule 4.1(c) is a list, as of the date hereof, of all real property held by each Borrower and each of its Domestic Subsidiaries, indicating in each case whether the respective property is owned or leased, the identity of the owner or lessee, the location of the respective property.

(v)      Each Borrower and each of its Domestic Subsidiaries owns, or is licensed or otherwise has the right to use the Intellectual Property necessary to own and operate its properties and to carry on its business as presently conducted and presently planned to be conducted without conflict with the rights of others, except for such instances of non-compliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(d)      Real Property.  Except as set forth on Schedule 4.1(c), no Borrower nor any Domestic Subsidiary of any Borrower owns or has owned any real property.

(e)      [Reserved.]

(f)      Litigation.  Except as set forth on Schedule 4.1(f), there are no legal or other proceedings or investigations pending or threatened against any Borrower or any of its Subsidiary or any other Credit Party before any court, tribunal or regulatory authority which could, if adversely determined, alone or together, reasonably be expected to have a Material Adverse Effect.

(g)      Governmental Approvals and Filings.  No approval, order, consent, authorization, certificate, license, permit or validation of, or exemption or other action by, or filing, recording or registration with, or notice to, any Governmental Body is or will be necessary in connection with the execution and delivery of this Agreement or any other Credit Document, consummation by the Credit Parties of the transactions herein or therein contemplated, or performance of or compliance with the terms and conditions hereof or thereof, other than the filings and recordations contemplated by the Collateral Documents.  None of the Borrowers or any of their Subsidiaries is subject to regulation

Patriarch/PC Confidential

under the Public Utility Holding Company Act of 2005, the Federal Power Act, the Interstate Commerce Act or the Investment Company Act of 1940 or to any federal, state or provisional statute or regulation limiting the Borrowers' ability to incur Indebtedness for money borrowed. None of the Borrowers, any of their Subsidiaries or any other Credit Party is an "investment company" or a company "controlled" by an "investment company", with the meaning of the Investment Company Act of 1940, as amended.

(h)     Absence of Conflicts. The execution and delivery by each Credit Party of this Agreement and each other Credit Document to which it is a party and performance by it hereunder and thereunder will not violate any law (including, without limitation, Regulations T, U and X of the Federal Reserve Board) and will not conflict with or result in a breach of any order, writ, injunction, resolution, decree or other similar document or instrument of any court or Governmental Body or its certificate of incorporation or by-laws or similar constituent documents or create (with or without the giving of notice or lapse of time, or both) a default under or breach of any material agreement, bond, note or indenture, in each case to which it is a party (by successor in interest or otherwise), or by which it is bound or any material portion of its properties or assets is affected, or, except under the Collateral Documents, result in the imposition of any Lien (other than Permitted Liens) of any nature whatsoever upon any of the properties or assets owned by or used in connection with the business of the Borrowers and their Subsidiaries.

(i)     Collateral. From and after the execution and delivery of the Collateral Documents and the filing of the documents thereby required, the Agent, on behalf of the Lenders, shall have a first-priority perfected security interest and Liens in and to all of the Collateral, free and clear of any Liens other than the Permitted Liens, and entitled to priority under applicable law, with no financing statements, hypothecations, chattel mortgages, real estate mortgages or similar filings on record anywhere other than such filings in connection with this Agreement, the Collateral Documents or the Permitted Liens. Each of the representations and warranties made by each Credit Party in each Collateral Document to which it is a party is true and correct in all material respects as of each date made or deemed made.

(j)     Partnerships, Etc. Except as set forth on Schedule 4.1(j), none of the Borrowers or any of their Subsidiaries is a partner (general or limited) of any partnership, is a party to any Joint Venture or owns (beneficially or of record) any equity or similar interest in any similar Person (including, without limitation, any interest pursuant to which any Borrower or any of its Subsidiaries has or may in any circumstance have an obligation to make capital contributions to, or be generally liable for or on account of the liabilities, acts or omissions of such other Person) other than in each case, such arrangement solely between and/or among a Borrower and any of its Subsidiaries.

(k)     Fiscal Year. Each fiscal year of each Borrower and each of its Subsidiaries begins on January 1 of each calendar year and ends on December 31 of each calendar year.

(l)     Subsidiaries. Schedule 4.1(m) sets forth a true, correct and complete list, as of the Closing Date, of the Borrowers and each of their Subsidiaries, showing as to

Patriarch/PC Confidential

each entity (i) the jurisdiction of its organization, (ii) the number of shares of Capital Stock of each class (A) authorized and (B) issued and outstanding, (iii) the percentage of the outstanding shares of Capital Stock of each Borrower and each of its Subsidiaries owned directly or indirectly by each Borrower, (iv) the names of the record holders of each class of outstanding shares of Capital Stock of each Borrower and each of its Subsidiaries and the number of such shares held by each such holder, (v) the number of shares of Capital Stock of each Borrower and each of its Subsidiaries covered by all outstanding options, warrants, rights of conversion or purchase, and similar rights, (vi) the percentage of those options, warrants or rights owned directly or indirectly by each Borrower or such other Persons, and (vii) the names of the record holders of such options, warrants and rights and the number of such options, warrants and rights held by each such holder.

     (m)    <u>Capitalization</u>.

        (i)    Each Borrower, each Guarantor and each other Credit Party is the record and beneficial owner of all of the issued and outstanding shares of Capital Stock of each of the Subsidiaries listed on <u>Schedule 4.1(m)</u> as being owned by such Borrower, such Guarantor or such other Credit Party; there are no proxies, irrevocable or otherwise, with respect to such shares; no equity securities of any of the Subsidiaries are or may become required to be issued by reason of any options, warrants, rights to subscribe to, calls or commitments of any kind or nature; and there are no contracts, commitments, understandings or arrangements by which any Subsidiary is or may become bound to issue additional shares of its Capital Stock or securities convertible into or exchangeable for such shares.

        (ii)    As of the Closing Date, the issued and outstanding shares of Capital Stock of each Borrower and each Subsidiary are directly and beneficially owned and held by the persons indicated on <u>Schedule 4.1(m)</u>; in each case all of such shares have been duly authorized and are fully paid and non-assessable, free and clear of all claims, liens, pledges and encumbrances of any kind; no equity securities of any Borrower or any Subsidiary is or may become required to be issued by reason of any options, warrants, rights to subscribe to, calls or commitments of any kind or nature; and there are no contracts, commitments, understandings or arrangements by which any Borrower, or any Subsidiary is or may become bound to issue additional shares of its Capital Stock or securities convertible into or exchangeable for such shares.

     (n)    <u>Material Misstatements and Omissions</u>.  There are no facts pertaining to any Borrower or any of its Subsidiaries, their assets or properties or their businesses which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect and which have not been disclosed in this Agreement.  None of the representations or warranties of any Borrower, any of its Subsidiaries or any other Credit Party contained in the Credit Documents is untrue or incorrect in any material respect when made and on the Closing Date.  There is no information, as of the Closing Date,

**Patriarch/PC Confidential**

which would contradict or is inconsistent in any material respect with any representation or warranty of any Borrower, any of its Subsidiaries or any other Credit Party contained in the Credit Documents.

(o)     Solvency.  Each Borrower, each of its Subsidiaries and each other Credit Party is Solvent.

(p)     Fraudulent Transfer.

(i)     Each Credit Party will receive reasonably equivalent value for (i) each grant by such Credit Party of Liens to Agent in accordance with the terms of the Credit Documents, and (ii) such Credit Party's agreement to be jointly and severally liable for all of the Obligations as more fully set forth herein.

(ii)     No transfer of property is being made by any Credit Party and no obligation is being incurred by any Credit Party in connection with the transactions contemplated by this Agreement or the other Credit Documents with the intent to hinder, delay, or defraud either present or future creditors of such Credit Party.

(q)     Labor Practices.  Except as described in Schedule 4.1(q), no Borrower nor any Subsidiary of any Borrower is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is (i) no unfair labor practice complaint pending against any Borrower or any of its Subsidiaries or to their knowledge threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against any Borrower or any if its Subsidiaries or to their knowledge threatened against any of them, (ii) no strike or work stoppage in existence or to their knowledge threatened involving any Borrower or any of its Subsidiaries, and (iii) no union representation question existing with respect to the employees of any Borrower or any of its Subsidiaries, as the case may be, and no union organization activity that is taking place, except (with respect to any matter specified in clause (i), (ii) or (iii) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

(r)     Employee Benefits.  Except as set forth on Schedule 4.1(r), each Borrower, each of its Subsidiaries, each other Credit Party and each of their ERISA Affiliates are in substantial compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code and the regulations and published interpretations thereunder with respect to each Employee Benefit Plan, and have performed all their obligations under each Employee Benefit Plan, except where the failure to perform such obligations could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  Each Employee Benefit Plan which is intended to qualify under Section 401(a) of the Internal Revenue Code is so qualified.  Except as set forth on Schedule 4.1(r), no material liability to the PBGC (other than required premium payments), the Internal Revenue Service, any Employee Benefit Plan or any Trust

Patriarch/PC Confidential

established under Title IV of ERISA has been or is reasonably expected to be incurred by any Borrower or any of its Subsidiaries or any of their ERISA Affiliates, other than contributions required to be made to Employee Benefit Plans or Trusts.  Except as set forth on Schedule 4.1(r), no ERISA Event has occurred or is reasonably expected to occur which could reasonably be expected to have a Material Adverse Effect.  Except to the extent required under Section 4980B of the Internal Revenue Code or similar state laws, no Employee Benefit Plan provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Borrower, any of its Subsidiaries, any other Credit Party or any of their respective ERISA Affiliates.  Except as set forth on Schedule 4.1(r), each Borrower, each of its Subsidiaries, each other Credit Party and each of their ERISA Affiliates have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in material "default" (as defined in Section 4219(c)(5) of ERISA) with respect to payments to a Multiemployer Plan).

      (s)    <u>Environmental Matters</u>.

          (i)      Except as set forth on Schedule 4.1(s), no Borrower, any Subsidiary of any Borrower or any other Credit Party has any Environmental Liabilities at any Relevant Property, which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

          (ii)      Each Borrower, each of its Subsidiaries and each other Credit Party: (A) has operated its business in compliance with all applicable Environmental Laws; (B) has obtained all Environmental Permits required by applicable Environmental Laws for the ownership and operation of its properties, and all such Environmental Permits are in full force and effect or such Person has made all appropriate filings for issuance or renewal of such Environmental Permits; (C) is not aware of any acts, omissions, events or circumstances that may interfere with or prevent continued compliance with the Environmental Laws and Environmental Permits referred to in the preceding clauses (A) and (B); (D) has not received notice of any asserted or threatened claim, action, suit, proceeding, hearing, investigation or request for information relating to any environmental matter; and (E) has not received notice from any Governmental Body that it is a potentially responsible party under any Environmental Law at any disposal site containing Hazardous Materials, nor received any notice that any lien under any Environmental Law against any of its property exists, in each case, except for matters set forth on Schedule 4.1(r) and matters, which individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

      (t)    <u>Insurance</u>.  The policies, binders or self-insurance programs for fire, liability, product liability, workmen's compensation, vehicular and other insurance currently held by or on behalf of each Borrower and each of its Subsidiaries insure its material properties and business activities against such losses and risks as are adequate to protect its properties in accordance with customary industry practice when entered into or

**Patriarch/PC Confidential**

renewed.  As of the date hereof, all such policies, binders and self-insurance programs are in full force and effect.  As of the date hereof, except as set forth on Schedule 4.1(t), no Borrower nor any Subsidiary of any Borrower has received notice from any insurer or agent of such insurer that substantial capital improvements or other expenditures are required.  As of the date hereof, no Borrower nor any Subsidiary of any Borrower has received notice of cancellation of any material insurance policy or binder.

      (u)     Intellectual Property.  Except as set forth on Schedule 4.1(u), each Borrower and each of its Subsidiaries owns or licenses or otherwise has the right to use all Intellectual Property necessary for the operation of its business as presently conducted or proposed to be conducted.  As of the date hereof, the Borrowers and their Subsidiaries do not have any Intellectual Property registered, or subject to pending applications, in the United States Patent and Trademark Office or any similar office or agency in the United States, any State thereof, any political subdivision thereof or in any other country, other than those described in Schedule 4.1(u) and has not granted any licenses with respect thereto other than as set forth in Schedule 4.1(u).  No event has occurred which permits or would permit after notice or passage of time or both, the revocation, suspension or termination of such rights.  Except as set forth on Schedule 4.1(u), to the best of each Borrower's and its Subsidiaries' knowledge, no slogan or other advertising device, product, process, method, substance or other Intellectual Property or goods bearing or using any Intellectual Property presently contemplated to be sold by or employed by any Borrower or any of its Subsidiaries infringes any patent, trademark, servicemark, tradename, copyright, license or other Intellectual Property owned by any other Person presently and no claim or litigation is pending or threatened against or affecting any Borrower or any of its Subsidiaries contesting its right to sell or use any such Intellectual Property.  Schedule 4.1(u) sets forth all of the agreements or other arrangements of each Borrower and each of its Subsidiaries pursuant to which such Borrower or such Subsidiary has a license or other right to use any trademarks, logos, designs, representations or other Intellectual Property owned by another Person as in effect on the date hereof and the dates of the expiration of such agreements or other arrangements of such Borrower or such Subsidiary as in effect on the date hereof (collectively, together with such agreements or other arrangements as may be entered into by any Borrower or any of its Subsidiaries after the date hereof, collectively, the "License Agreements" and individually, a "License Agreement").  As of the date hereof, all material license and related rights are in full force and effect, no default or event of default exists with respect thereto in respect of the obligations of licensor or with respect to any royalty or other payment obligations of any Borrower or any of its Subsidiaries or any obligations of any Borrower or any of its Subsidiaries with respect to manufacturing standards, quality control or specifications and any Borrower or any of its Subsidiaries thereto is in compliance with the terms thereof in all material respects and no owner, licensor or other party thereto has sent any notice of termination or its intention to terminate such license or rights.

      (v)     Absence of Events of Default.  No event has occurred and is continuing and no condition exists which constitutes a Default or an Event of Default.

Patriarch/PC Confidential

(w)    <u>Absence of Other Defaults</u>.  Except as disclosed on Part I of <u>Schedule 4.1(w)</u>, no Borrower, any Subsidiary of any Borrower or any other Credit Party is in default under any agreement, ordinance, resolution, decree, bond, note, indenture, order or judgment to which it is a party (by successor in interest or otherwise) or by which it is bound, or any other agreement or other instrument by which any of the properties or assets owned by it or used in the conduct of its business is affected, which individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.  Each Borrower, each of its Subsidiaries and each other Credit Party has complied and is in compliance in all respect with all laws, except for such instances of non-compliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(x)    <u>Material Contracts</u>.  <u>Schedule 4.1(x)</u> sets forth a true, correct and complete list and description of all the Material Contracts, as of the Closing Date, to which any Borrower or any of its Subsidiaries is a party.  Except as set forth on Part II of <u>Schedule 4.1(x)</u>, no Borrower nor any Subsidiary of any Borrower is in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of the Material Contracts, and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.

(y)    <u>Brokerage Fees</u>.  Except as set forth on <u>Schedule 4.1(y)</u>, no broker's or finder's fee or commission will be payable with respect to the execution and delivery of this Agreement and the other Credit Documents, and no other similar fees or commissions will be payable by the Credit Parties for any other services rendered to the Credit Parties ancillary to the credit transactions contemplated herein.

(z)    <u>Margin Regulations</u>.  No part of the proceeds of the Loans issued hereunder will be used for the purpose of buying or carrying any Margin Stock or to extend credit to others for the purpose of buying or carrying any Margin Stock, in either case in a manner which would violate or conflict with Regulations T, U or X of the Board Governors of the Federal Reserve System.  No Credit Party is engaged in the business of extending credit to others for the purpose of buying or carrying Margin Stock.  Neither the making of the Loans nor any use of proceeds of any such Loans will violate or conflict with the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System, as amended from time to time.

(aa)    <u>Taxes</u>.  Each Borrower, each of its Subsidiaries and each other Credit Party has filed all federal and other material Tax returns required to be filed by it and has not failed to pay any material taxes, or interest and penalties relating thereto, on or before the due dates thereof except for Taxes not yet due and except for those the amount or validity of which is currently being contested in good faith by appropriate proceedings diligently pursued and available to it, and with respect to which adequate reserves have been set aside on its books.  Except as may be previously disclosed in writing to the Agent and except to the extent that reserves therefor are reflected in the Financials, (i) there are no material federal, state or local tax liabilities of any Borrower, any of its

Patriarch/PC Confidential

Subsidiaries or any other Credit Party due or to become due for any tax year ended on or prior to the date hereof relating to any Borrower, any of its Subsidiaries or any other Credit Party, which are not properly reflected in the Financials delivered pursuant to Section 5.1(a), and (ii) there are no material claims pending, proposed or to the Knowledge of any Borrower threatened against any Borrower, any of its Subsidiaries or any other Credit Party for past federal, state or local taxes, except those, if any, as to which proper reserves in accordance with GAAP are reflected in such Financials.

(bb)    USA Patriot Act; Etc.  Each Credit Party is in compliance in all material respects with the USA Patriot Act (Title III of Pub.L. 107-56 (signed into law October 26, 2001)).  No part of the proceeds of the extensions of credit hereunder will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the federal Foreign Corrupt Practices Act of 1977.

ARTICLE V
Affirmative Covenants

Section 5.1    Affirmative Covenants.  Each Credit Party covenants and agrees that until payment in full of all Obligations, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all the covenants in this Article V applicable to it:

(a)    Basic Reporting Requirements.  The Borrowers shall furnish to the Agent and the Lenders:

(i)    as soon as available but in any event within ninety (90) days after the close of each Fiscal Year, the audited consolidated Financials of the Borrowers and their Subsidiaries for such Fiscal Year, certified by the Borrowers' accountants;

(ii)    as soon as available but in any event within thirty (30) days after the end of each Fiscal Quarter, the unaudited consolidated Financials of the Borrowers and their Subsidiaries for such quarter, certified by the chief financial officer of each Borrower pursuant to a Financial Officer Certification;

(iii)    as soon as available but in any event within fifteen (15) Business Days after the end of each fiscal month the unaudited consolidated Financials of the Borrowers and their Subsidiaries for such month, certified by the chief financial officer of each Borrower pursuant to a Financial Officer Certification;

(iv)    together with the quarterly and annual audited consolidated Financials, a certificate of each Borrower setting forth computations demonstrating compliance with the financial covenants set forth in Section 6.2 (if any), and certifying that no Default or Event of Default has occurred,

Patriarch/PC Confidential

or if a Default or an Event of Default has occurred, the actions taken by the Borrowers with respect thereto;

(v)   not later than thirty (30) days prior to the end of each Fiscal Year an updated financial projection for the succeeding Fiscal Year;

(vi)   on the date hereof and on every Friday following the date hereof until the Maturity Date, the Borrowers agree to deliver to the Agent and the Lenders a cash-flow budget (such budget, as amended or modified from time to time by mutual agreement between the Borrowers and the Lenders, the "Budget") for the thirteen (13) week period following the date of delivery thereof, which Budget shall be reasonably satisfactory to the Lenders;

(vii)   at any time and from time to time any Borrower or any Guarantor obtains an ownership interest in any New IP Collateral (as such term is defined in the Security Agreement) it shall deliver to the Agent a written report, in reasonable detail, setting forth the New IP Collateral; and

(viii)   at any time and from time to time any Borrower or any Guarantor acquires an ownership interest in any real property or an interest in any Leasehold Property, it shall promptly deliver to the Agent a written notice of such acquisition and copies of the documentation evidencing such acquisition and such ownership interest or interest in Leasehold Property.

(b)   Visitation; Verification.  Each Borrower, each of its Subsidiaries and each of the other Credit Parties shall keep true and accurate books of account in accordance with GAAP and shall permit the Agent and, if an Event of Default has occurred and is continuing, any Lender, and or any of their designated representatives, upon reasonable notice and at the expense of the Borrowers, during normal business hours to visit and inspect the premises of any Borrower, any of its Subsidiaries and/or other Credit Party, to examine the books of account of any such Persons and their Affiliates (and to make copies and/or extracts therefrom) and to discuss the affairs, finances and accounts of such Persons and their Affiliates with, and to be advised as to the same by, the managers, executives and officers of such Persons and to be advised as to such or other business records upon the request of the Agent and/or Lender.

(c)   Existence; Maintenance of Properties; Compliance with Regulations.  Each Borrower, each of its Subsidiaries and each of the other Credit Parties shall maintain its corporate/legal existence and business, maintain its assets in good operating conditions and repair (subject to ordinary wear and tear and casualty damage and to all provisions of this Agreement permitting sales of certain of the Borrowers' assets), keep its business and assets adequately insured, maintain its chief executive office in the United States, continue to engage in the same or substantially similar lines of business, and comply in all respects with all Regulations, including without limitation, ERISA and Environmental Laws, except where a failure to do so could individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

Patriarch/PC Confidential

(d)     Notice of Material Events.  Each Borrower, each of its Subsidiaries and each of the other Credit Parties shall notify the Agent and the Lenders promptly in writing upon an Authorized Officer becoming aware of any of the following: (i) the occurrence of any Default or Event of Default, (ii) any noncompliance with ERISA or any Environmental Law or proceeding in respect thereof which could reasonably be expected to have a Material Adverse Effect, (iii) any change of address of any Borrower, any of its Subsidiaries or any other Credit Party, (iv) any threatened or pending litigation or similar proceeding affecting any Borrower, any of its Subsidiaries or any other Credit Party involving claims in excess of $100,000 in the aggregate or any material change in any such litigation or proceeding previously reported, (v) claims in excess of $100,000 in the aggregate against any assets or properties of any Borrower, any of its Subsidiaries or any other Credit Party encumbered in favor of the Agent and/or the Lenders and (vi) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(e)     Use of Proceeds.  Each Borrower, each of its Subsidiaries and each other Credit Party shall use the proceeds of the Loans only as permitted by Section 2.6 hereof (for the avoidance of doubt, the proceeds of the Loans shall not be used for the purpose of purchasing or carrying of "margin security" or "margin stock" within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System, 12 C.F.R. Parts 221 and 224).  No Borrower shall transfer any of the proceeds of the Loans to, nor use any such proceeds for the benefit of, any of its Subsidiaries that is not a Guarantor hereunder.

(f)     Further Assurances.

(i)     Each Borrower, each of its Subsidiaries and each of the other Credit Parties shall cooperate with the Agent, take such action, execute such documents, and provide such information as the Agent may from time to time reasonably request in order further to effect the transactions contemplated by and the purposes and intent of the Credit Documents.

(ii)     Each Borrower, each of its Subsidiaries and each other Credit Party shall promptly, upon request by the Agent or any Lender, correct, and cause each of the other parties to the Credit Documents to promptly correct, any defect or error that may be discovered in any Credit Document or in the execution, acknowledgment or recordation of the Credit Document. Promptly upon request by the Agent or the Required Lenders, each Borrower, each of its Subsidiaries and each other Credit Party shall execute, authorize, acknowledge, deliver, record, file and register, any and all such further acts, deeds, conveyances, documents, security agreements, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments as the Agent or the Required Lenders may require from time to time in order to carry out more effectively the purposes and intent of each Credit Document.  Without limiting the foregoing, each Borrower, each of its Subsidiaries and/or each other Credit Party shall (A)

Patriarch/PC Confidential

authorize the filing by the Agent of UCC-1 financing statements for all jurisdictions deemed necessary or desirable by the Agent, and (B) take such action from time to time (including, without limitation, authorizing, filing, executing and/or delivering such assignments, security agreements and other instruments) as shall be reasonably requested by the Agent to create, in favor of the Lenders, to the extent required under the respective Collateral Documents and to the maximum extent permitted under applicable law, a first-priority perfected Lien in all of the Collateral, subject only to Permitted Liens.

(g)   Account Control Agreements.

(i)   Each Borrower shall establish and maintain one or more accounts (each a "Cash Management Account") pursuant to a lockbox arrangement acceptable to the Agent with a bank or banks as may be selected by the Borrowers and approved by the Agent. The Cash Management Accounts shall provide that all proceeds received therein shall be swept on a daily basis to an account of the Agent (the "Agent Account").

(ii)   Except as and to the extent not more than $50,000 in the aggregate is deposited or maintained in such Deposit Account at any time, each Borrower and each of its Domestic Subsidiaries shall enter into an account control agreement in form and substance acceptable to the Agent as necessary to provide the Agent, to the extent not prohibited by applicable law, with "control" over, except as set forth below, each Deposit Account of such Credit Party (including, without limitation, each Cash Management Account) as provided for under Section 9-104 of Article 9 of the UCC for the purpose of perfecting the security interest which the Agent has in such Deposit Account pursuant to the Collateral Documents. No arrangement contemplated hereby or by any account control agreement in respect of any such Deposit Account of any Borrower or any of its Domestic Subsidiaries shall be modified by such Credit Party without the prior written consent of the Agent.

(iii)   Each Borrower shall deposit all Account payments into the Cash Management Accounts. Each Borrower shall bear all bank charges for the Cash Management Accounts.

(iv)   All funds deposited in the Cash Management Accounts, Agent Account or any such account shall immediately become the property of the Agent and any disbursements of proceeds in the Agent Account will only be made by the Agent. The Agent assumes no responsibility for the Cash Management Accounts and the Agent Account, including, without limitation, any claim of accord and satisfaction or release with respect to deposits which any banks accept thereunder. All remittances which any Borrower receives in payment of any Accounts, and the proceeds of any other Collateral, shall be (i) kept separate and apart from such Borrower's

Patriarch/PC Confidential

own funds so that they are capable of identification as the Agent's property; (ii) held by such Borrower as trustee of an express trust for the Agent's benefit; and (iii) immediately deposited in such accounts designated by the Agent.  All proceeds received or collected by the Agent with respect to Accounts, and reserves and other property of any Borrower in possession of the Agent at any time or times hereafter, may be held by the Agent without interest to such Borrower until all Obligations are paid in full or applied by the Agent on account of the Obligations.  The Agent may release to such Borrower such portions of such reserves and proceeds as the Agent may determine.  The Agent has no duty to protect, insure, collect or realize upon the Accounts to preserve rights in them.

(h)      Insurance.  Each Borrower shall maintain and/or shall cause each of its Subsidiaries to maintain, at its respective expense, and keep in effect with responsible insurance companies, such liability insurance for bodily injury and third-party property damage as is customary in the case of companies engaged in the same or similar business or having similar properties, similarly situated.  Each Borrower shall, and shall cause each of its Subsidiaries to, keep and maintain, at its expense, its material real and personal property insured against loss or damage by fire, theft, explosion, spoilage and all other risks ordinarily insured against by other owners or users of such properties in similar businesses in an amount equal to the full replacement or cash value thereof, subject to deductible amounts which the Borrowers, in their reasonable judgment, deems prudent.  At any time that a Default or an Event of Default has occurred and is continuing, the Agent shall make, settle, and adjust all claims under any Borrower's or any of its Subsidiary's policies of insurance and make all determinations and decisions with respect to such policies of insurance.

(i)      Information Regarding Collateral.  Each Borrower will furnish to the Agent prompt written notice of any change in (i) any Credit Party's corporate name or any trade name used to identify it in the conduct of its business or any Credit Party's chief executive office, its principal place of business or its jurisdiction of organization, (ii) any Credit Party's identity or corporate structure or (iii) any Credit Party's federal Taxpayer Identification Number.  Each Borrower will not effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC and all other actions have been taken that are required so that such change will not at any time adversely affect the validity, perfection or priority of any Lien established under any Credit Document on the Collateral.

(j)      Existence; Conduct of Business.  Each Borrower and each of its Subsidiaries will do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits (including, without limitation, Environmental Permits) privileges, franchises, patent, copyrights, trademarks and trade names material to the conduct of its business, except to the extent that failure to so act, which either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under Section 6.1(g).

Patriarch/PC Confidential

(k)    <u>Payment of Obligations</u>.  Each Borrower, each of their Subsidiaries and each other Credit Party will pay its Indebtedness and other obligations, including Tax liabilities, before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower, such Subsidiaries or such other Credit Party, as the case may be, (b) such Borrower, such Subsidiary or such Credit Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (c) such contest effectively suspends collection of the contested obligation and the enforcement of any Lien securing such obligation and (d) the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

(l)    <u>Compliance with Laws</u>.  Each Borrower, each of its Subsidiaries and each other Credit Party will comply with all laws (including, without limitation, all Environmental Laws), rules, licenses, permits, Regulations and orders of any Governmental Body applicable to it or its property, except where failures to do so, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(m)    <u>Subsidiaries</u>.  If any Subsidiary is formed or acquired by any Borrower or any other Guarantor after the Closing Date, such Borrower or such Guarantor will, prior to the date upon which such Subsidiary is formed or acquired, notify the Agent and the Lenders thereof and immediately following such formation or acquisition, cause any equity interest in, assets owned or leased by, or Indebtedness owned by or on behalf, of such Subsidiary to be added to the Collateral; <u>provided</u> that if such newly formed Subsidiary is a Foreign Subsidiary, such Borrower or such Guarantor shall cause only 65% of the equity interests thereof to be added to the Collateral.

(n)    <u>Guarantors</u>.  As of the Closing Date, the only Domestic Subsidiary of LVD is B2.  The Borrowers shall cause each Domestic Subsidiary (each, a "<u>Guarantor</u>") to become a Guarantor hereunder by (i) executing a joinder to this Agreement in the form of <u>Exhibit E</u> hereto (ii) executing a joinder to the Security Agreement in the form of Exhibit A thereto, and (iii) executing a guaranty in form and substance acceptable to the Agent and the Lenders in their sole discretion (each, a "<u>Guaranty</u>").  Upon delivery of any such joinder and such guaranty to the Agent, notice of which is hereby waived by the Credit Parties, each such Guarantor shall be as fully a party hereto as if such Guarantor were an original signatory hereof.  Each Guarantor expressly agrees that its obligations arising hereunder shall not be affected or diminished by the addition or release of any other Guarantor hereunder, nor by any election of the Agent not to cause any Subsidiary of any Borrower to become a Guarantor hereunder.

(o)    <u>Broker's Claims</u>.  Each Borrower hereby indemnifies and agrees to hold each Lender and the Agent harmless from and against any and all losses, liabilities, damages, costs and expenses which may be suffered or incurred by such Lender or the Agent, as the case may be, in respect of any claim, suit, action or cause of action now or hereafter asserted by a broker or any Person acting in a similar capacity arising from or in connection with the execution and delivery of this Agreement or any other Credit

DLI-6247158v5

Patriarch/PC Confidential

Document or Hedge Agreements or the consummation of the transactions contemplated herein or therein.  This Section 5.1(o) shall survive termination of this Agreement.

    (p)    <u>Landlord Consent</u>.  At the request of the Agent, to the extent that any Borrower or any of its Subsidiaries has or acquires any Leasehold Properties, such Borrower shall deliver to the Agent such landlord consents or waivers as may be reasonably requested by the Agent within 15 days of any request by the Agent for same.

    (q)    <u>Compliance with ERISA</u>.  Each Borrower, each Guarantor and each other Credit Party shall, and shall cause each of its ERISA Affiliates to: (i) maintain each Employee Benefit Plan in compliance in all material respects with the applicable provisions of ERISA, the Internal Revenue Code and other Federal and State law; (ii) cause each Employee Benefit Plan that is qualified under Section 401(a) of the Internal Revenue Code to maintain such qualification; (iii) not terminate any Pension Plan so as to incur any material liability to the Pension Benefit Guaranty Corporation; (iv) not allow or suffer to exist any prohibited transaction involving any Employee Benefit Plan or any trust created thereunder which would subject such Borrower, such Guarantor, such credit party or such ERISA Affiliate to a material tax or other material liability on prohibited transactions imposed under Section 4975 of the Internal Revenue Code or ERISA; (v) make all required contributions to any Employee Benefit Plan which it is obligated to pay under Section 302 of ERISA, Section 412 of the Code or the terms of such Employee Benefit Plan; or (vi) not allow or suffer to exist any occurrence of, with respect to any such Pension Plan, an ERISA Event which could reasonably be likely to have a Material Adverse Effect or any other event or condition which presents a material risk of termination by the Pension Benefit Guaranty Corporation of any Employee Benefit Plan that is a single employer plan, which termination could result in any material liability to the Pension Benefit Guaranty Corporation.

    (r)    <u>Mortgages</u>.  At the request of the Agent, to the extent that any Borrower or any of its Subsidiaries has or acquires any ownership interest in real property, such Borrower shall, or shall cause such Subsidiary to, execute and deliver to the Agent, for itself and for the benefit of the Lenders, mortgages, deeds of trust or similar instruments in form and substance satisfactory to the Agent as Agent shall deem necessary or appropriate to grant, evidence and perfect a first priority Lien in such property in favor of the Agent, for itself and for the benefit of the Lenders, together with such other assignments, conveyances, agreements, surveys, appraisals, title insurance policies, environmental assessments and other documents, in each case, as the Agent shall deem necessary or appropriate in connection with same.

<div align="center">

ARTICLE VI
<u>Negative Covenants/Financial Covenants</u>

</div>

Section 6.1    <u>Negative Covenants</u>.  Each such Credit Party covenants and agrees that until all of the Obligations have been paid in full, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6.1 applicable to it:

<div align="center">47</div>

<div align="right">**Patriarch/PC Confidential**</div>

(a) _Indebtedness._ Each Borrower shall not, and shall not permit any Subsidiary to, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), the Indebtedness, performance, obligations or dividends of any other Person, except:

(i)     the Obligations;

(ii)    purchase money Indebtedness (including Capital Leases) arising after the date hereof to the extent secured by purchase money security interests in Equipment (including Capital Leases) and purchase money mortgages on real property not to exceed $100,000 in the aggregate at any time outstanding so long as such security interests and mortgages do not apply to any property of such Borrower, Guarantor or Subsidiary other than the Equipment or real property so acquired, and the Indebtedness secured thereby does not exceed the cost of the Equipment or real property so acquired, as the case may be;

(iii)   guarantees by any Borrower or any Guarantor of the Obligations of other Borrowers or other Guarantors in favor of the Agent;

(iv)    the Indebtedness of any Borrower or any Guarantor to any other Borrower or any other Guarantor arising after the date hereof pursuant to loans by any Borrower or any other Guarantor permitted under Section 6.1(d) hereof;

(v)     unsecured Indebtedness of any Borrower or any Guarantor arising after the date hereof to any third person (but not to any Borrower or any other Guarantor); provided, that, each of the following conditions is satisfied as determined by the Agent:  (A) such Indebtedness shall be on terms and conditions acceptable to the Agent and shall be subject and subordinate in right of payment to the right of the Agent and the Lenders to receive the prior indefeasible payment and satisfaction in full payment of all of the Obligations pursuant to the terms of an intercreditor agreement between the Agent and such third party, in form and substance satisfactory to the Agent, (B) the Agent shall have received not less than ten (10) days prior written notice of the intention of such Borrower or such Guarantor to incur such Indebtedness, which notice shall set forth in reasonable detail satisfactory to the Agent the amount of such Indebtedness, the person or persons to whom such Indebtedness will be owed, the interest rate, the schedule of repayments and maturity date with respect thereto and such other information as the Agent may request with respect thereto, (C) the Agent shall have received true, correct and complete copies of all agreements, documents and instruments evidencing or otherwise related to such Indebtedness, (D) except as the Agent may otherwise agree in writing, all of the proceeds of the loans or other accommodations giving rise to such Indebtedness shall be paid to the Agent for application to the Obligations in

**Patriarch/PC Confidential**

such order and manner as the Agent may determine or at the Agent's option, to be held as cash collateral for the Obligations, (E) in no event shall the aggregate principal amount of such Indebtedness incurred during the term of this Agreement exceed $250,000, (F) as of the date of incurring such Indebtedness and after giving effect thereto, no Default or Event of Default shall exist or have occurred, (G) such Borrower and such Guarantor shall not, directly or indirectly, (1) amend, modify, alter or change the terms of such Indebtedness or any agreement, document or instrument related thereto, except, that, such Borrower or such Guarantor may, after prior written notice to the Agent, amend, modify, alter or change the terms thereof so as to extend the maturity thereof, or defer the timing of any payments in respect thereof, or to forgive or cancel any portion of such Indebtedness (other than pursuant to payments thereof), or to reduce the interest rate or any fees in connection therewith, or (2) redeem, retire, defease, purchase or otherwise acquire such Indebtedness (except pursuant to regularly scheduled payments permitted herein), or set aside or otherwise deposit or invest any sums for such purpose, and (H) the Borrowers and the Guarantors shall furnish to the Agent all notices or demands in connection with such Indebtedness either received by any Borrower or any Guarantor or on its behalf promptly after the receipt thereof, or sent by any Borrower or any Guarantor or on its behalf concurrently with the sending thereof, as the case may be;

(vi)     cash-backed letters of credit in an aggregate amount not to exceed $500,000;

(vii)     guarantee, indemnity, reimbursement and contribution agreements and similar agreements entered into in the ordinary cause in connection with performance bonds issued for the account of any Borrower; and

(viii)     the Indebtedness set forth on Schedule 6.1(a) to this Agreement; provided, that, (A) the Borrowers and the Guarantors may only make regularly scheduled payments of principal and interest in respect of such Indebtedness in accordance with the terms of the agreement or instrument evidencing or giving rise to such Indebtedness as in effect on the date hereof, (B) the Borrowers and the Guarantors shall not, directly or indirectly, (1) amend, modify, alter or change the terms of such Indebtedness or any agreement, document or instrument related thereto as in effect on the date hereof except, that, the Borrowers and the Guarantors may, after prior written notice to the Agent, amend, modify, alter or change the terms thereof so as to extend the maturity thereof, or defer the timing of any payments in respect thereof, or to forgive or cancel any portion of such Indebtedness (other than pursuant to payments thereof), or to reduce the interest rate or any fees in connection therewith, or (2) redeem, retire, defease, purchase or otherwise acquire such Indebtedness, or set aside or otherwise deposit or invest any sums for such purpose, and (C) the Borrowers and the Guarantors shall furnish to the Agent all notices or demands in connection with such

**Patriarch/PC Confidential**

Indebtedness either received by any Borrower or any Guarantor or on its behalf, promptly after the receipt thereof, or sent by any Borrower or any Guarantor or on its behalf, concurrently with the sending thereof, as the case may be.

(b)    <u>Liens</u>.  No Borrower shall create or incur, or cause any of its Subsidiaries to create or incur, any Liens on any of the property or assets of any Borrower or any Subsidiary of any Borrower, except (the Liens described in the following clauses (i) through (xv), the "<u>Permitted Liens</u>"):

(i)    the security interests and Liens of the Agent;

(ii)    Liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower, or such Subsidiary, as the case may be, and with respect to which adequate reserves have been set aside on its books;

(iii)    non-consensual statutory Liens (other than Liens securing the payment of taxes) arising in the ordinary course of such Borrower's or such Subsidiary's business to the extent:  (A) such Liens secure Indebtedness which is not overdue or (B) such Liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued and available to such Borrower or such Subsidiary, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which adequate reserves have been set aside on its books;

(iv)    zoning and land use restrictions, easements, encumbrances, licenses, covenants and other restrictions affecting the use of real property which do not interfere in any material respect with the use of such real property or ordinary conduct of the business of such Borrower or such Subsidiary as presently conducted thereon or materially impair the value of the real property which may be subject thereto;

(v)    purchase money security interests in Equipment (including Capital Leases) and purchase money mortgages on real property to secure Indebtedness permitted under Section 6.1(a)(ii) hereof;

(vi)    pledges and deposits of cash by any Borrower or any Subsidiary after the date hereof in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of such Borrower or such Subsidiary as of the date hereof;

A-716

**Patriarch/PC Confidential**

(vii)     pledges and deposits of cash by such Borrower or such Subsidiary after the date hereof to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of such Borrower or such Subsidiary as of the date hereof; provided, that, in connection with any performance bonds issued by a surety or other person, the issuer of such bond shall have waived in writing any rights in or to, or other interest in, any of the Collateral in an agreement, in form and substance satisfactory to the Agent;

(viii)     Liens arising from (A) operating leases and the precautionary UCC financing statement filings in respect thereof and (B) Equipment or other materials which are not owned by any Borrower or any Subsidiary located on the premises of such Borrower or such Subsidiary (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of such Borrower or such Subsidiary and the precautionary UCC financing statement filings in respect thereof;

(ix)     judgments and other similar Liens arising in connection with court proceedings that do not constitute an Event of Default; provided, that, (A) such Liens are being contested in good faith and by appropriate proceedings diligently pursued, (B) adequate reserves or other appropriate provision, if any, as are required by GAAP have been made therefor, and (C) a stay of enforcement of any such Liens is in effect;

(x)     Liens securing Indebtedness incurred pursuant to Section 6.1(a)(vi);

(xi)     the security interests and Liens set forth on Schedule 6.1(b);

(xii)     leases, subleases or licenses granted to others in the ordinary course of business;

(xiii)     any Liens which the underlying fee interest of the owners of real property leased by any Borrower or any Subsidiary is subject, including any Liens that apply to the leasehold interests of such Borrower or such Subsidiary by virtue of the underlying fee interest being subject to such Liens; and

(xiv)     landlord Liens for rent not yet due and payable.

(c)     Sales and Lease-Backs.  No Borrower shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Credit Party (i) has sold or transferred or is to sell or to transfer to any other Person (other than any Borrower or any

Patriarch/PC Confidential

of its Subsidiaries), or (ii) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Credit Party to any Person (other than a Borrower or its Subsidiaries) in connection with such lease.

        (d)     <u>Transactions with Shareholders and Affiliates</u>.  No Borrower shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder of 5% or more of any class of Capital Stock of any Borrower or any of its Subsidiaries or with any Affiliate of any Borrower, except those transactions that are on terms no less favorable to such Borrower or such Subsidiary, as the case may be, than those that generally might be obtained at the time from a Person who is not such a holder or an Affiliate.

        (e)     <u>Investments</u>.  Neither the Borrowers nor any of their Subsidiaries shall make any Investments other than Investments in:

        (i)     marketable obligations of the United States maturing within one (1) year;

        (ii)     certificates of deposit, bankers' acceptances and time and demand deposits of United States banks having total assets in excess of $1,000,000,000 or other similar cash equivalents;

        (iii)     ownership by any Borrower or any of its Subsidiaries of the Capital Stock of their existing or hereafter created or, with the prior written consent of the Agent, acquired Subsidiaries;

        (iv)     Indebtedness owing to any Borrower from any of its Subsidiaries;

        (v)     existing Investments set forth on <u>Schedule 6.1(e)</u> hereto;

        (vi)     Investments consisting of Accounts and promissory notes created, acquired or made and trade credit extended in the ordinary course of business and payable or dischargeable in accordance with customary trade terms in an aggregate amount not to exceed, together with Investments made pursuant to Section 6.1(e)(vii), $100,000 at any time outstanding; <u>provided,</u> that (A) the Borrowers shall provide the Agent with at least 2 Business Days prior written notice of such Investment and (B) upon receipt of such Investments, such Credit Party shall take all actions to ensure that such Investment is subject to the first priority Lien of the Agent;

        (vii)     Investments consisting of stock, obligations, securities or other property received in settlement of Accounts from financially troubled obligors in the ordinary course of business in an aggregate amount not to exceed, together with Investments made pursuant to Section 6.1(e)(vi), $100,000 at any time outstanding; <u>provided,</u> that (i) the Borrowers shall provide the Agent with at least 2 Business Days prior written notice of such

Patriarch/PC Confidential

Investment and (ii) upon receipt of such Investments, such Credit Party shall take all actions to ensure that such Investment is subject to the first priority Lien of the Agent;

(viii)    Investments consisting of non-cash consideration received in connection with a Disposition permitted under Section 6.1(g) hereof; and

(ix)    such other Investments as the Agent may from time to time approve in writing (each of (i) through (viii) above, a "Permitted Investment"). For the avoidance of doubt, the Borrowers and the Guarantors will be permitted to create new Domestic Subsidiaries so long as Sections 5.1(m) and (n) hereof are complied with.

(f)    Certain Agreements. If a Borrower or any of its Subsidiaries shall create or assume any Lien upon any of its properties or assets, whether now owned or hereafter acquired, other than Permitted Liens, it shall make or cause to be made effective provision whereby the Obligations will be secured by such Lien equally and ratably with any and all other Indebtedness secured thereby as long as any such Indebtedness shall be so secured; provided, notwithstanding the foregoing, this covenant shall not be construed as a consent by the Lenders to the creation or assumption of any such Lien not otherwise permitted hereby. Except with respect to (i) specific property encumbered to secure payment of particular Indebtedness or to be sold pursuant to an executed agreement with respect to a permitted Asset Sale and (ii) restrictions by reason of customary provisions restricting assignments, subletting or other transfers contained in leases, licenses and similar agreements entered into in the ordinary course of business (provided, that such restrictions are limited to the property or assets secured by such Liens or the property or assets subject to such leases, licenses or similar agreements, as the case may be), no Borrower nor any Subsidiary of any Borrower shall enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired.

(g)    Mergers; Asset Sales. No Borrower nor any of its Subsidiaries shall (i) become party to a merger, amalgamation or consolidation, (ii) effect any disposition of assets, (iii) purchase, sell, lease or otherwise dispose of assets other than in the ordinary course, (iv) make any changes in the corporate structure or identity of any Borrower or any of its Subsidiaries which could reasonably be expected to have a Material Adverse Effect or (v) enter into any agreement to do any of the foregoing; other than

(A)    Asset Sales in the ordinary course business and in an aggregate amount not to exceed $100,000 per Fiscal Year; provided that at the time of and after giving effect to such Asset Sales the Borrowers and their Subsidiaries are in pro forma compliance with the financial covenants set forth in Section 6.2;

(B)    disposals of obsolete, worn out or surplus property; and

Patriarch/PC Confidential

(C)    (i) any Borrower may merge with and into any other Borrower, and (ii) any Subsidiary of any Borrower may merge with and into any Borrower or any other Guarantor, in each case, upon not less than thirty (30) days' prior written notice (or such lesser time as the Agent may accept) to the Agent of such merger.

(h)    <u>Fiscal Year; Fiscal Quarter</u>.  No Borrower nor any Subsidiary of any Borrower shall change its or any of its Subsidiaries' fiscal year or fiscal quarter without the prior written consent of the Required Lenders, which consent shall not be unreasonably withheld.

(i)    <u>Restricted Payments</u>.  No Borrower nor any Subsidiary of any Borrower shall, directly or indirectly, declare, order, pay, make or set apart any sum for (i) any Restricted Junior Payment or (ii) Indebtedness owed to any Affiliate of such Credit Party; <u>provided</u> that so long as no Default or Event of Default has occurred, is continuing or would result therefrom, the Borrowers and their Subsidiaries may make dividends and distributions to their shareholders.

(j)    <u>Subsidiaries</u>.  No Borrower nor any Subsidiary of any Borrower shall form, or cause to be formed, any other Subsidiary, unless (i) all property and assets of such newly formed Subsidiary (if a Domestic Subsidiary) and (ii) all stock of any class of such newly formed Subsidiary (or, in the case of a Foreign Subsidiary, 65% of the stock of any class of such newly formed Subsidiary), in each case, are pledged to the Agent for the benefit of the Agent and the Lenders in accordance with the terms hereof and of the Collateral Documents.

(k)    <u>Conduct of Business</u>.  From and after the Closing Date, no Borrower nor any Subsidiary of any Borrower shall engage in any business other than (i) the business engaged in by such Credit Party on the Closing Date and similar or related businesses, and (ii) such other lines of business as may be consented to by the Lenders.

(l)    <u>Disposition of Collateral</u>.  Except as provided in Section 6.1(g) above, no Borrower nor any other Credit Party may, from and after the date that any Collateral Document is executed, sell, assign, lease, convey, transfer or otherwise dispose of any Collateral or enter into any agreement to do any of the foregoing without the prior written consent of the Required Lenders.

Section 6.2    <u>Financial Covenants</u>.  Within 90 days of the Closing Date, the Borrowers and the Lenders shall mutually agree upon financial covenants applicable to the Borrowers.

<div align="center">ARTICLE VII<br><u>Increased Costs; Taxes; Indemnifications, Set Off; Etc.</u></div>

Section 7.1    <u>Increased Costs; Capital Adequacy</u>.  In the event that any Lender shall have determined that the adoption, effectiveness, phase in or applicability after the Closing Date of any law, rule or regulation (or any provision thereof) regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Body, central bank or comparable agency charged with the interpretation or administration thereof, or

54

Patriarch/PC Confidential

compliance by any Lender (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Body, central bank or comparable agency, has or would have the effect of reducing the rate of return on the capital of such Lender or any corporation controlling such Lender as a consequence of, or with reference to, such Lender's Loans or Commitments or other obligations hereunder with respect to the Loans to a level below that which such Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase in, applicability, change or compliance (taking into consideration the policies of such Lender or such controlling corporation with regard to capital adequacy), then from time to time after the adoption, effectiveness or applicability of such Regulation, within five (5) Business Days after receipt by the Administrative Borrower from such Lender of the statement referred to in the next sentence, the Administrative Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such controlling, corporation on an after tax basis for such reduction.  Such Lender shall deliver to the Administrative Borrower (with a copy to the Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to Lender under this Section 7.1, which statement shall be conclusive and binding, upon all parties hereto absent manifest error.

Section 7.2    Taxes; Withholding, Etc.

(a)    Payments to Be Free and Clear.  All sums payable by any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than a Tax on the overall net income of any Lender) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of any Credit Party or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment; provided, however, that no Borrower shall be under any obligation to increase the sum payable to any Lender not organized under the laws of the United States or a state thereof (a "Foreign Lender") by an amount equal to the amount of the United States Tax required to be withheld under United States law from the sums paid to such Foreign Lender, if such withholding is caused by the failure of such Foreign Lender to be engaged in the active conduct of a trade or business in the United States, or all amounts of interest and fees to be paid to such Foreign Lender hereunder are not effectively connected with such trade or business within the meaning of U.S. Treasury Regulation 1.1441-1(a) or such Foreign Lender fails to comply with Section 7.2(c).

(b)    Withholding of Taxes.  If any Credit Party or any other Person is required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by any Credit Party to the Agent or any Lender in the ordinary or general conduct of business, which the Agent or Lender would have been subject to without regard to whether it had engaged in any transaction under any of the Credit Documents: (i) the Administrative Borrower shall notify the Agent of any such requirement or any change in any such requirement as soon as any Borrower becomes aware of it, (ii) the Borrowers shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on any Credit Party) for its own

Patriarch/PC Confidential

account or (if that liability is imposed on the Agent or such Lender, as the case may be) on behalf of and in the name of the Agent or such Lender, (iii) the sum payable by such Credit Party in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, the Agent or such Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction, withholding or payment been required or made, and (iv) within 30 days after paying any sum from which it is required by law to make any deduction or withholding, and within 30 days after the due date of payment of any Tax which it is required by clause (ii) above to pay, the Borrowers shall deliver to the Agent evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority.

(c)     Foreign Lenders.  Each Foreign Lender agrees that it will deliver to the Borrowers and the Agent (i) two (2) duly completed copies of United States Internal Revenue Service Form W-8BEN or W-8ECI or other applicable United States Internal Revenue Service forms, or successor applicable form(s), as the case may be, together with any other certificate or statement of exemption required under the Internal Revenue Code or regulations issued thereunder.  Each such Foreign Lender also agrees to deliver to the Borrowers and the Agent two (2) further copies of said Form W-8BEN or W-8ECI or other applicable United States Internal Revenue Service forms, or successor applicable form(s) or other manner of certification, as the case may be, on or before the date that any such form expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Borrowers and the Agent, and such extensions or renewals thereof as may reasonably be requested by any Borrower or the Agent, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required which renders all such forms inapplicable or which would prevent such Foreign Lender from duly completing and delivering any such form with respect to it and such Lender so advises the Borrowers and the Agent.  Such Foreign Lender shall certify in the case of a Form W-8BEN or W-8ECI or other applicable United States Internal Revenue Service forms that it is entitled to receive payments under this Agreement without deduction or withholding of any United States federal income taxes and that it is entitled to an exemption from United State backup withholding tax.

Section 7.3     Indemnification.

(a)     Indemnification by the Borrowers.  Each Borrower and its Subsidiaries will indemnify and defend the Agent, the Lenders and each of their respective shareholders, partners, members, managers, directors, officers, employees, agents, attorneys and Affiliates (collectively, the "Indemnified Persons") against and hold each Indemnified Person harmless from any and all liabilities, obligations, losses, damages, costs, expenses, claims, penalties, Actions, judgments, disbursements of any kind or nature whatsoever, interest, fines, cleanup costs, settlements, costs of preparation and investigation, costs incurred in enforcing this indemnity and reasonable attorneys' fees and expenses (collectively, "Losses"), that any of the Indemnified Persons may incur, suffer, sustain or become subject to arising out of, relating to, or due to (i) any inaccuracy

Patriarch/PC Confidential

or breach of any of the representations and warranties of any Credit Party contained in any Credit Document or in any certificate delivered thereunder, (ii) the nonfulfillment or breach of any covenant, undertaking, agreement or other obligation of any Credit Party contained in any Credit Document or in any certificate delivered thereunder, (iii) any Environmental Liability, and/or (iv) any use of proceeds of any Loans; provided that such indemnity shall not, as to any Indemnified Person, be available to the extent such Losses arise out of the gross negligence or willful misconduct of such Indemnified Person. Upon request of an Indemnified Person, the Borrowers shall retain counsel reasonably satisfactory to the Indemnified Person to represent the Indemnified Person in connection with any Losses or threatened Losses and shall pay the reasonable fees and disbursements of such counsel. The Indemnified Person shall have the right to employ its own counsel at the expense of the Borrowers if (i) the employment of counsel by the Indemnified Person at the Borrowers' expense has been authorized in writing by Administrative Borrower, (ii) the Borrowers have not in fact employed counsel to represent the Indemnified Person within a reasonable time after receiving notice of a request for the retention of counsel or (iii) both the Indemnified Person and a Borrower are implicated with respect to the Losses or the threatened Losses, and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them, in each of which cases the reasonable fees and expenses of counsel (including local counsel) will be at the expense of the Borrowers, and all such fees and expenses will be reimbursed promptly as they are incurred.

(b)     Contribution. If the indemnification provided for in this Section 7.3 is prohibited under applicable Regulations to an Indemnified Person, then the Borrowers, in lieu of indemnifying the Indemnified Person, will contribute to the amount paid or payable by the Indemnified Person as a result of the Losses in such proportion as is appropriate to reflect the relative fault of the Borrowers, on the one hand, and of the Indemnified Person, on the other, in connection with the events or circumstances which resulted in the Losses as well as any other relevant equitable considerations.

Section 7.4     Right of Set Off. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default each Lender and the Agent are hereby authorized by each Credit Party at any time or from time to time, without notice to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by such Lender or the Agent to or for the credit or the account of any Credit Party against and on account of the Obligations of any Credit Party to such Lender or the Agent hereunder, irrespective of whether or not (a) such Lender or the Agent shall have made any demand hereunder or (b) the principal of or the interest on the Loans or any other amounts due hereunder or the other Credit Documents shall have become due and payable and although such obligations and liabilities, or any of them, may be contingent or unmatured.

Section 7.5     Funding Breakage. In addition to the compensation required under Section 7.1, each Borrower shall pay all administrative fees charged by Lender and indemnify each Lender against any loss or expense (including loss of margin) which such Lender has

Patriarch/PC Confidential

incurred as a consequence of any payment or prepayment of any Loan on a day other than the last day of the corresponding Interest Period (whether or not such payment is mandatory or automatic and whether or not such payment or prepayment is then due). If any Lender sustains or incurs any such loss or expense or if any Lender has charged any Borrower for an administrative expense it shall from time to time promptly notify such Borrower and the Agent in writing setting forth in reasonable detail the amount determined in good faith by such Lender (such determination shall be conclusive absent manifest error) to be necessary to indemnify such Lender for such loss or expense and the amount of such administrative expense. Such amount shall be due and payable by such Borrower to the Agent for the account of such Lender, five Business Days after such notice is given.

<div align="center">

ARTICLE VIII
Events of Default

</div>

Section 8.1    Events of Default.  Any one or more of the following events which shall occur and be continuing shall constitute an "Event of Default":

(a)    Failure to Make Payments When Due.  Failure by any Credit Party to pay any of the Obligations, including failure by any Credit Party to pay when due any installment of principal of, or interest on, the Loans, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise, or any fee or any other amount due hereunder, and such failure, except in respect of principal and interest, is continuing for three (3) Business Days after the date due therefor;

(b)    Breach of Certain Covenants.  Failure of any Credit Party to perform or comply with any term or condition contained in Section 2.6, Article V or Article VI and, with respect only to Sections 5.1(f), 5.1(i) and 5.1(o), such failure is continuing ten (10) days after the date such term or condition should have been performed or complied with; provided, that, such ten (10) day period shall not apply in the case of:  (i) any failure to observe any such covenant which is not capable of being cured at all or within such ten (10) day period or which has been the subject of a prior failure within a six (6) month period or (ii) an intentional breach by any Borrower or any Credit Party of any such covenant;

(c)    Breach of Representations, Etc.  Any representation, warranty, certification or other statement made or deemed made by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries in writing, pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made;

(d)    Other Defaults Under Credit Documents.  Any Credit Party shall default in the performance of or compliance with any term contained in any of the Credit Documents, other than any such term referred to in any other section of this Section 8.1, and such default shall not have been remedied or waived within ten (10) days after the earlier of (i) the date upon which an Authorized Officer of any Borrower had Knowledge

Patriarch/PC Confidential

of such default and (ii) the date upon which written notice thereof is given to any Borrower by the Agent or any Lender;

(e)     Default in Other Agreements.  (i)  Failure of any Credit Party to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness in an individual principal amount of $50,000 or more or with an aggregate principal amount of $100,000 or more, in each case beyond the grace period, if any, provided therefor, or (ii) breach or default by any Credit Party with respect to any other material term of (A) one or more items of Indebtedness in the individual or aggregate principal amounts referred to in clause (i) above or (B) any loan agreement, mortgage, indenture or other agreement relating to such item of Indebtedness, in each case without cure or waiver within the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee on behalf of such holder or holders), to cause, such Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be;

(f)     Involuntary Bankruptcy, Appointment of Receiver, etc.  (i) A court of competent jurisdiction shall enter a decree or order for relief in respect of any Borrower, any of its Subsidiaries or any other Credit Party in an involuntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, which decree or order is not stayed, or any other similar relief shall be granted under any applicable federal or state law, or (ii) an involuntary case shall be commenced against any Borrower, any of its Subsidiaries or any other Credit Party under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, manager, liquidator, sequestrator, trustee, custodian or other officer having similar powers over any Borrower, any of its Subsidiaries or any other Credit Party, or over all or a substantial part of its property, shall have been entered; or there shall have occurred the involuntary appointment of an interim receiver, trustee or other custodian of any Borrower, any of its Subsidiaries or any other Credit Party for all or a substantial part of its property or a warrant of attachment, execution or similar process shall have been issued against any substantial part of the property of any Borrower, any of its Subsidiaries or any other Credit Party, and any such event described in this clause (ii) shall continue for 60 days without having been dismissed, bonded or discharged;

(g)     Voluntary Bankruptcy, Appointment of Receiver, Etc.  (i) Any Borrower, any of its Subsidiaries or any other Credit Party shall have an order for relief entered with respect to it or shall commence a voluntary case under the Bankruptcy Code or under any other applicable bankruptcy, insolvency or similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case, or to the conversion of an involuntary case to a voluntary case, under any such law, or shall consent to the appointment of or taking possession by a receiver, manager, trustee or other custodian for all or a substantial part of its property; or any Borrower, any of its Subsidiaries or any other Credit Party shall make any assignment for the benefit of creditors, or (ii) any Borrower, any of its Subsidiaries or any other Credit Party shall be unable, or shall fail

Patriarch/PC Confidential

generally, or shall admit in writing its inability, to pay its debts as such debts become due; or the board of directors (or similar governing body) of any Borrower, any of its Subsidiaries or any other Credit Party (or any committee thereof) shall adopt any resolution or otherwise authorize any action to approve any of the actions referred to herein or in Section 8.1(f);

(h)     Judgments and Attachments.  Any money judgment, writ or warrant of attachment or similar process involving (i) in any individual case an amount in excess of $50,000 or (ii) in the aggregate at any time an amount in excess of $100,000 (in either case to the extent not adequately covered by insurance as to which a solvent and unaffiliated insurance company has acknowledged coverage) shall be entered or filed against any Borrower, any of its Subsidiaries or any other Credit Party or any of their respective assets and shall remain undischarged, unvacated, unbonded or unstayed for a period of 30 days (or in any event later than five (5) days prior to the date of any proposed sale of assets under such judgment, writ or warrant of attachment or similar process);

(i)     Dissolution.  Any order, judgment or decree shall be entered against any Credit Party decreeing, the dissolution or split up of any Borrower, any of its Subsidiaries or any other Credit Party and such order shall remain undischarged or unstayed for a period in excess of ten (10) days;

(j)     Change of Control.  A Change of Control shall occur;

(k)     Collateral Documents and other Credit Documents.  At any time after the execution and delivery thereof, (i) this Agreement or any Credit Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, or the Agent shall not have or shall cease to have a valid and perfected first priority Lien, subject only to Permitted Liens, in any material portion of Collateral purported to be covered by the Collateral Documents (except (A) as expressly permitted by the Collateral Documents or (B) as a direct result of the actions or inactions of the Agent or any Lender) or (ii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability under any Credit Document to which it is a party;

(l)     Liens.  At any time after the execution and delivery thereof, the Liens created by the Collateral Documents shall not constitute a valid and perfected first priority Lien on the Collateral intended to be covered thereby (to the extent perfection by filing, registration, recordation or possession is required herein or therein) in favor of the Lenders, free and clear of all other Liens (other than Permitted Liens under the respective Collateral Documents), or, except for expiration in accordance with its terms, any of the Collateral Documents shall for whatever reason be terminated or cease to be in full force and effect, or the enforceability thereof shall be contested by any Credit Party;

(m)     Condemnation or Forfeiture of Collateral.  Any judicial process, condemnation or forfeiture proceedings is brought against any material item or portion of

Patriarch/PC Confidential

the Collateral or any rights therein shall be subject to such judicial process, condemnation or forfeiture proceedings; or

(n)     Defaults Under Material Contracts and License Agreements.  Any default by any Borrower or any of its Subsidiaries under any contract or License Agreement, which default continues for more than the applicable cure period, if any, with respect thereto and/or is not waived in writing by the other parties thereto, or any amendment, modification, waiver, termination or failure to renew and which default, amendment, modification, waiver, termination or failure to renew could reasonably be expected to have a Material Adverse Effect.

Section 8.2     Remedies.  Upon and after the occurrence of an Event of Default:

(a)     Non Bankruptcy Related Defaults.  In the case of any Event of Default specified in any Section other than Section 8.1(f) or 8.1(g), the Agent may, and at the request of the Required Lenders shall, by notice to the Administrative Borrower from time to time do any or all of the following:  (i) declare the unpaid principal amount of the Loans and interest accrued thereon and all other Obligations to be immediately due and payable, which shall become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower or (ii) declare the Commitments terminated, whereupon the Commitments will terminate and any fee hereunder shall be immediately due and payable without presentment, demand, protest or further notice of any kind, all of which are hereby waived, and an action therefor shall immediately accrue.

(b)     Bankruptcy Events of Default.  In the case of any of the Events of Default specified in either Section 8.1(f) or 8.1(g), automatically, without any notice to the Borrowers or any other act by the Agent or any Lender, automatically, (i) the Commitments shall thereupon terminate, and (ii) each of the following shall immediately become due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower, (A) the unpaid principal amount of and interest on the Loans and (B) all other Obligations.

(c)     Remedies in All Events of Default.  The Agent shall, at the request of or with the consent of the Required Lenders, (i) exercise all rights and remedies provided in the Credit Documents, (ii) exercise any right of counterclaim, setoff, banker's lien or otherwise which it may have with respect to money or property of any Borrower, (iii) bring any lawsuit, action or other proceeding permitted by law for the specific performance of, or injunction against any violation of, any Credit Document and may exercise any power granted under or to recover judgment under any Credit Document, (iv) enforce any and all Liens and security interests created pursuant to the Credit Documents, and (v) exercise any other right or remedy permitted by applicable Regulations or otherwise available to the Agent and/or the Lenders at law, in equity or otherwise.

(d)     Lenders' Remedies.  Unless otherwise directed by the Required Lenders, in case any one or more of the Events of Default shall have occurred and be continuing,

Patriarch/PC Confidential

and whether or not the Lenders shall have accelerated the maturity of the Loans pursuant to Section 8.2, the Required Lenders, if owed any amounts with respect to the Loans, may proceed to protect and enforce their rights by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Credit Agreement and the other Credit Documents or any instrument pursuant to which the Obligations to the Lenders are evidenced, including as permitted by applicable law the obtaining of the ex parte appointment of a receiver, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the such the Lenders, but subject to the provisions of Section 9.9(b).

      (e)    Remedies Cumulative.  No remedy herein conferred upon any Lender or the Agent or the holder of any Note is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

<div align="center">

ARTICLE IX
The Agent

</div>

Section 9.1    Appointment of Agent.  PPAS is hereby appointed the Agent hereunder, and each Lender hereby authorizes the Agent to act as its agent in accordance with the terms hereof and the other Credit Documents.  The Agent hereby agrees to act upon the express conditions contained herein and the other Credit Documents, as applicable.  The provisions of this Article IX are solely for the benefit of the Agent and the Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof.  In performing its functions and duties hereunder, the Agent shall act solely as an agent of the Lenders and does not assume and shall not be deemed to have assumed any obligation toward or relationship of agency or trust with or for any Borrower, any of its Subsidiaries or any other Credit Party.  The Agent without consent of or notice to any party hereto, may assign any and all of its rights or obligations hereunder to any of its Affiliates.  For the purposes of creating a *solidarité active* in accordance with Article 1541 of the Civil Code of Quebec between the Agent, on the one hand, and each Lender, taken individually on the other hand, each Credit Party and each such Lender acknowledge and agree with the Agent that such Lender and the Agent are hereby conferred the legal status of solidary creditors of each such Credit Party in respect of all Obligations owed by each such Obligor to the Agent and such Lender hereunder and under the other Credit Documents (collectively, the "Solidary Claim") and that, accordingly, but subject (for the avoidance of doubt) to Article 1542 of the Civil Code of Quebec, each such Credit Party is irrevocably bound towards the Agent and each Lender in respect of the entire Solidary Claim of the Agent and such Lender.  As a result of the foregoing, the parties hereto acknowledge that the Agent and each Lender shall at all times have a valid and effective right of action for the entire Solidary Claim of the Agent and such Lender and the right to give full acquittance for it.  Accordingly, and without limiting the generality of the foregoing, the Agent, as solidary creditor with each Lender, shall at all times have a valid and effective right of action in respect of the Solidary Claim and the right to give a full acquittance for same.  By its execution of the Credit Documents to which it is a party, each such Credit Party and Lender not a party hereto shall also be deemed to have accepted the stipulations hereinabove provided.  The parties further agree and

Patriarch/PC Confidential

acknowledge that such Liens (hypothecs) under the Security Documents and the other Credit Documents shall be granted to the Agent, for its own benefit and for the benefit of the Lenders, as solidary creditor as hereinabove set forth

Section 9.2   Powers and Duties.  Each Lender irrevocably authorizes the Agent to take such action on such Lender's behalf and to exercise such powers, rights and remedies hereunder and under the other Credit Documents as are specifically delegated or granted to the Agent by the terms hereof and thereof, together with such powers, rights and remedies as are reasonably incidental thereto.  The Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents.  The Agent may execute any of its duties under this Agreement and the other Credit Documents by or through agents or attorneys in fact, or may assign such duties to its wholly owned nominee without the consent of the Lenders, and shall be entitled to rely on advice of counsel concerning all matters pertaining to such duties.  The Agent shall not have, by reason hereof or any of the other Credit Documents, a fiduciary relationship in respect of any Lender and nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon the Agent any obligations in respect hereof or any of the other Credit Documents except as expressly set forth herein or therein.

Section 9.3   Delegation of Duties.  The Agent may execute any of its duties under this Agreement or any other Credit Document by or through third parties, agents, employees or attorneys in fact (any such entity, a "Sub-Agent") or may assign such duties to its wholly owned nominee without the consent of the Lenders, and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Agent shall not be responsible for the negligence or misconduct of any Sub-Agent that it selects as long as such selection was made with reasonable care.  Each Borrower and each Lender hereby agree that any Sub-Agent appointed hereunder shall be entitled to the benefit of the provisions of Sections 7.3, 9.2, 9.4, 9.5, 9.6, 9.7, 9.9, 9.10 and 9.11 of this Agreement as if such Sub-Agent is a party to this Agreement.

Section 9.4   General Immunity.

(a)   No Responsibility for Certain Matters.  The Agent shall not be responsible to any Lender for the execution, effectiveness, genuineness, validity, enforceability, collectibility or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by the Agent to any Lender or by or on behalf of any Credit Party to the Agent or any Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall the Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default.  Anything contained herein to the contrary notwithstanding, the Agent shall not have any liability arising from confirmations of the amount of outstanding Loans.

63

**Patriarch/PC Confidential**

(b)     Exculpatory Provisions.  None of the Agent or any of its officers, trustees, partners, members, directors, employees, attorneys or agents shall be liable to the Lenders for any action taken or omitted by the Agent under or in connection with any of the Credit Documents except to the extent caused by the Agent's gross negligence or willful misconduct.  The Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until the Agent shall have received instructions in respect thereof from the Required Lenders (or such other Lenders as may be required to give such instructions under Section 11.1) and, upon receipt of such instructions from the Required Lenders (or such other Lenders, as the case may be), the Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions.  Without prejudice to the generality of the foregoing, (i) the Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication, instrument or document believed by it to be genuine and correct and to have been signed or sent by the proper Person or Persons, and shall be entitled to rely and shall be protected in relying on opinions and judgments of attorneys (who may be attorneys for the Borrowers or their Subsidiaries), accountants, experts and other professional advisors selected by it, and (ii) no Lender shall have any right of action whatsoever against the Agent as a result of the Agent acting or refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of the Required Lenders (or such other Lenders as may be required to give such instructions under Section 11.1).  The Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document which involves discretionary decision making absent express written instructions from the Required Lenders with respect thereto.

Section 9.5     Agent Entitled to Act with the Borrowers.  The Agent and its Affiliates may accept deposits from, lend money to and generally engage in any kind of banking, trust, financial advisory or other business with any Borrower or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from any Borrower for services in connection herewith and otherwise without having to account for the same to the Lenders.

Section 9.6     Lenders' Representations, Warranties and Acknowledgment.

(a)     Each Lender represents and warrants that it has made its own independent investigation of the financial condition and affairs of the Borrowers and their Subsidiaries in connection with Borrowings hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of the Borrowers and their Subsidiaries.  The Agent shall not have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of the Lenders or to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, and the Agent shall not have any responsibility with respect to the accuracy of or the completeness of any information provided to the Lenders.

Patriarch/PC Confidential

(b)      Each Lender, by delivering its signature page to this Agreement and funding or holding any of its Loans and accepting its Commitments on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by the Agent or the Lenders, as applicable on the Closing Date.

Section 9.7    Right to Indemnity.  Each Lender, in proportion to its Pro Rata Share, severally (and not jointly) agrees to indemnify the Agent and its stockholders, directors, officers, employees, agents, attorneys and Affiliates (each an "Indemnified Agent Person"), to the extent that the Agent shall not have been reimbursed by any Credit Party, for and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including attorneys' fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnified Agent Person in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as the Agent in any way relating to or arising out hereof or in connection with the Credit Documents; provided, no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from the Agent's gross negligence or willful misconduct.  If any indemnity furnished to the Agent for any purpose shall, in the opinion of such the Agent, be insufficient or become impaired, the Agent may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; provided, further, in no event shall this sentence require any Lender to indemnify the Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such Lender's Pro Rata Share thereof, and provided, further, this sentence shall not be deemed to require any Lender to indemnify the Agent against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.

Section 9.8    Successor Agent.

(a)      The Agent may resign at any time by giving not less than ten (10) Business Days prior written notice thereof to the Lenders and the Administrative Borrower.  Upon any such resignation, the Required Lenders shall have the right to appoint a successor the Agent, which shall be (i) one of the Lenders or an Affiliate of one of the Lenders or (ii) a Person who would be an eligible successor agent if appointed by the resigning the Agent under Section 9.8(b).

(b)      If no successor the Agent shall have been so appointed by the Lenders within ten (10) Business Days after the resigning the Agent's giving of notice of resignation, then the resigning the Agent  may appoint, on behalf of the Borrowers and the Lenders, a successor the Agent, which shall be a commercial bank organized under the laws of the United States of America or of any state thereof and having a combined capital and surplus of at least $250,000,000.  In the event that the Agent is unable to appoint a replacement successor within ten (10) Business Days after it is entitled to do so after using reasonable efforts, the Agent may nonetheless resign by delivering a written resignation to the Lenders and the Administrative Borrower, provided that in such circumstances, and unless and until a successor the Agent is appointed, the Agent shall

Patriarch/PC Confidential

remain the Agent solely for the purpose of serving as secured party of record with respect to the Collateral, its sole duty in that capacity shall be to take such ministerial actions as it shall be directed to take by the Lenders (including, without limitation, the execution and delivery of documents or instruments relating to the Collateral), and the Agent shall be entitled to reimbursement from each Borrower for its out of pocket costs and expenses and reasonable compensation from each Borrower for its services.  If the Agent has resigned and no successor the Agent has been appointed, subject to the preceding sentence, the Lenders shall perform the duties of the Agent hereunder, and each Borrower shall make all payments in respect of the Obligations to the applicable Lender and shall deal directly with the Lenders.

(c)     No successor the Agent shall be deemed to be appointed hereunder until such successor the Agent has accepted the appointment in writing.  Upon the acceptance of any appointment as the Agent hereunder by a successor the Agent and upon the execution and filing of such financing statements, or amendments thereto, and such other instruments and notices, as may be necessary or desirable or as the Required Lenders may request, in order to continue the perfection of the Liens granted or purported to be granted under the Collateral Documents, such successor the Agent shall succeed to and become vested with all the rights, powers, discretion, privileges and duties of the resigning the Agent, and the resignation or termination of the Agent shall then be effective for all purposes.  Upon the effectiveness of the resignation or termination of the Agent, the resigning the Agent shall be discharged from its duties and obligations under the Credit Documents.  After the effectiveness of the resignation or termination of an the Agent, the provisions of Section 7.3, Section 11.3 and this Article IX shall inure to the former the Agent's benefit as to any actions taken or omitted to be taken by it while it was acting as the Agent under this Agreement.

Section 9.9     Collateral Documents.

(a)     Agent as the Agent under Collateral Documents.  Each Lender hereby further authorizes the Agent, on behalf of and for the benefit of the Lenders, to be the agent for and representative of the Lenders with respect to the Collateral and the Collateral Documents.  Subject to Section 11.1, without further written consent or authorization from the Lenders, the Agent may execute any documents or instruments necessary to release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which the Lenders have otherwise consented in the manner provided herein.

(b)     Agent's Right to Realize on Collateral.  Anything contained in any of the Credit Documents to the contrary notwithstanding, each Borrower, the Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by the Agent, on behalf of the Lenders in accordance with the terms hereof, and (ii) in the event of a foreclosure by the Agent on any of the Collateral pursuant to a public or private sale, the Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and the Agent, as agent for and representative of the Lenders (but not any Lender or the Lenders in its or their respective

Patriarch/PC Confidential

individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the Agent at such sale.

Section 9.10   Notice of Default.  The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Agent has received notice from a Lender or a Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Agent receives such a notice, the Agent shall promptly give notice thereof to the Lenders. The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Lenders; provided that unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

Section 9.11   Delivery of Documents, Notices , Etc.  In addition to, and in furtherance of any requirement placed upon the Agent herein to deliver, provide, distribute, notify or otherwise convey items received from any Borrower to the Lenders, the Agent shall promptly notify the Lenders of any notices, documents, requests, demands or other items the Agent received from any Borrower and promptly deliver or convey, to the extent they are in written form, such notices, documents, requests, demands or items to the Lenders.

ARTICLE X
Subordination of Intercompany Obligations; Joint and Several Liability; Contribution

Section 10.1   Subordination Generally.  Each Credit Party covenants and agrees that the payment of all indebtedness, principal, interest, fees, charges, expenses, attorneys' fees and any other sum, obligation or liability owing by any other Credit Party to such Credit Party, including any intercompany trade payables or royalty or licensing fees (collectively, the "Intercompany Obligations"), is subordinated, to the extent and in the manner provided in this Article X, to the prior payment in full in cash of all Obligations and that the subordination is for the benefit of the Agent and the Lenders, and the Agent, on behalf of the Lenders, may enforce such provisions directly.

Section 10.2   Specific Performance; Waiver of Defenses.  Each Credit Party executing this Agreement hereby (i) authorizes the Agent, on behalf of the Lenders, to demand specific performance of the terms of this Article X irrespective of whether any other Credit Party shall have complied with any of the provisions hereof applicable to it, at any time when such Credit Party shall have failed to comply with any provisions of this Article X that are applicable to it and (ii) to the extent not prohibited by applicable law irrevocably waives any defense based on the adequacy of a remedy at law, which might be asserted as a bar to such remedy of specific performance.

Patriarch/PC Confidential

Section 10.3   <u>Distributions</u>.  Except to the extent otherwise permitted herein, upon any distribution of assets of any Credit Party in any dissolution, winding-up, liquidation or reorganization:

(a)      the Lenders shall first be entitled to receive payment in full of the Obligations before any Credit Party is entitled to receive any payment on account of the Intercompany Obligations;

(b)      any payment or distribution of assets of any Credit Party of any kind or character, whether in cash, property or securities, to which any other Credit Party would be entitled, except for the provisions of this <u>Section 10.3</u>, shall be paid by the liquidating trustee or agent or other Person making such payment or distribution directly to the Agent, to the extent necessary to make payment in full of the Obligations, after giving effect to any concurrent payment or distribution or provision therefor to any Lender; and

(c)      if any payment or distribution of assets of any Credit Party of any kind or character, whether in cash, property or securities, shall be received by any other Credit Party on account of the Intercompany Obligations before payment in full of the Obligations, such payment or distribution shall be received and held for and shall be paid over to the Agent for application to the payment of the Obligations until payment in full of the Obligations, after giving effect to any concurrent payment or distribution or provision therefor to the any Lender.

Section 10.4   <u>Credit Party Failure to Act</u>.  No right of any Lender or any other present or future holders of any of the Obligations to enforce the subordination provisions herein shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of any Credit Party or by any act or failure to act, in good faith, by any such holder, or by any noncompliance by any Credit Party with the terms hereof, regardless of any knowledge thereof which any such holder may have or be otherwise charged with.

Section 10.5   <u>Concerning Joint and Several Liability of the Borrowers</u>.

(a)      Each of the Borrowers is accepting joint and several liability hereunder in consideration of all Loans and all other extensions of credit made to or for the account of any of the Borrowers under this Agreement, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of each of the Borrowers to accept joint and several liability for the obligations of each of them.

(b)      Each of the Borrowers jointly and severally hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers with respect to the payment and performance of all of the Obligations, it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them.

(c)      If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the

**Patriarch/PC Confidential**

Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation.

(d)     The obligations of each Borrower under the provisions of this Section 10.5 constitute full recourse obligations of such Borrower, enforceable against it to the full extent of its properties and assets (subject to applicable bankruptcy, insolvency, moratorium, fraudulent transfer and other laws affecting creditors' rights generally, and subject to general principles of equity, regardless of whether considered in a proceeding at law or in equity), irrespective of the validity, regularity or enforceability of this Financing Agreement or any other circumstances whatsoever.

(e)     The provisions of this Section 10.5 are made for the benefit of the Lenders and their respective successors and permitted assigns, and may be enforced by any such Person from time to time against any of the Borrowers as often as occasion therefor may arise and without requirement on the part of any Lender first to marshal any of its claims or to exercise any of its rights against any of the other Borrowers or to exhaust any remedies available to it against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations or to elect any other remedy. The provisions of this Section 10.5 shall remain in effect until payment in full of the Obligations.  If at any time, any payment, or any part thereof, made in respect of any of the Obligations, is rescinded or must otherwise be restored or returned by any Lender upon the insolvency, bankruptcy or reorganization of any of the Borrowers, or otherwise, the provisions of this Section 10.5 will forthwith be reinstated in effect, as though such payment had not been made.

Section 10.6    Contribution Obligations.

(a)     If, as of any date, the aggregate amount of payments made by a Credit Party on account of the Obligations and proceeds of such Credit Party's Collateral that are applied to the Obligations exceeds the aggregate amount of Loan proceeds actually used by such Credit Party in its business (such excess amount being referred to as an "Accommodation Payment"), then each of the other Credit Parties (each such Credit Party being referred to as a "Contributing Credit Party") shall be obligated to make contribution to such Credit Party (the "Paying Credit Party") in an amount equal to (i) the product derived by multiplying the sum of each Accommodation Payment of each Credit Party by the Allocable Percentage (as defined below) of the Credit Party from whom contribution is sought less (ii) the amount, if any, of the then outstanding Accommodation Payment of such Contributing Credit Party (such last mentioned amount which is to be subtracted from the aforesaid product to be increased by any amounts theretofore paid by such Contributing Credit Party by way of contribution hereunder, and to be decreased by any amounts theretofore received by such Contributing Credit Party by way of contribution hereunder); provided, however, that a Paying Credit Party's recovery of contribution hereunder from the other Credit Parties shall be limited to that amount paid by the Paying Credit Party in excess of its Allocable Percentage of all Accommodation Payments then outstanding of all Credit Parties.  As used herein, the term "Allocable Percentage" shall mean, on any date of determination thereof, a fraction the denominator of which shall be equal to the number of Credit Parties who are parties

Patriarch/PC Confidential

to this Agreement on such date and the numerator of which shall be one; <u>provided, however,</u> that such percentages shall be modified in the event that contribution from a Credit Party is not possible by reducing such Credit Party's Allocable Percentage equitably and by adjusting the Allocable Percentage of the other Credit Parties proportionately so that the Allocable Percentages of all Credit Parties at all times equals 100%.

(b)     Each Credit Party hereby subordinates any claims, including any right of payment, subrogation, contribution (including rights of contribution pursuant to <u>Section 10.6(a)</u>) and indemnity, that it may have from or against any other Credit Party, and any successor or assign of any other Credit Party, including any trustee, receiver or debtor-in-possession, howsoever arising, due or owing or whether heretofore, now or hereafter existing, to the prior payment in full of all of the Obligations; <u>provided,</u> unless an Event of Default shall then exist, the foregoing shall not prevent or prohibit the repayment of intercompany accounts and loans among the Credit Parties in the ordinary course of business.

(c)     Notwithstanding any provision to the contrary contained herein or in any other of the Credit Documents, to the extent the joint obligations of any Credit Party shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers) then the obligations of each Credit Party hereunder shall be limited to the maximum amount that is permissible under applicable law (whether federal or state), after taking into account, among other things, such Credit Party's right of contribution and indemnification from each other Credit Party under this Agreement or applicable law.

(d)     The provisions of this <u>Section 10.6</u> are made for the benefit of the Lenders and their respective successors and permitted assigns, and may be enforced by any such Person from time to time against any of the Credit Parties as often as occasion therefor may arise and without requirement on the part of any Lender first to marshal any of its claims or to exercise any of its rights against any of the other Credit Parties or to exhaust any remedies available to it against any of the other Credit Parties or to resort to any other source or means of obtaining payment of any of the Obligations or to elect any other remedy.  The provisions of this <u>Section 10.6</u> shall remain in effect until payment in full of all Obligations.

<div align="center">

ARTICLE XI
<u>Miscellaneous</u>

</div>

Section 11.1   <u>Amendments and Waivers; Release of Collateral</u>.

(a)     <u>General</u>.  Subject to Section 11.1(b) and Section 11.1(c) below, no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall be effective without the written consent of the Required Lenders.

**Patriarch/PC Confidential**

<div align="center">A-736</div>

(b)    <u>Other Consent</u>.  Notwithstanding the provisions of Section 11.1(a) above, no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall amend, modify, terminate or waive any provision of Article IX as the same applies to the Agent, or any other provision hereof as the same applies to the rights or obligations of the Agent, in each case without the consent of the Agent.

(c)    <u>Prior Unanimous Written Consent</u>.  Without the prior unanimous written consent of the affected the Lenders,

(i)    no amendment, consent or waiver shall (A) affect the amount or extend the time of the obligation of any Lender to make Loans or (B) extend the originally scheduled time or times of repayment of the principal of the Loans or (C) alter the time or times of payment of interest on any Loan or of any fees payable for the account of the Lenders or (D) alter the amount of the principal of the Loans or the rate of interest thereon or (E) alter the amount of any fee payable hereunder to the account of the Lenders or (F) permit any subordination of the principal of or interest on the Loans or (G) permit the subordination of the Lien created by the Collateral Documents in any of the Collateral,

(ii)    no Collateral, other than in connection with an Asset Sale made in accordance with the terms hereof or as otherwise specifically permitted in this Agreement or the Collateral Documents, shall be released from the Lien of the Collateral Documents; and

(iii)    none of the provisions of this Section 11.1(c) shall be amended.

(d)    <u>Effect of Notices, Waivers or Consents</u>.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice (except as otherwise specifically required hereunder or under any of the Credit Documents) or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 11.1 shall be binding upon each Lender at the time outstanding, each future Lender and, if signed by a Credit Party, on such Credit Party.

(e)    <u>Certain Collateral Releases</u>.  Each Borrower is entitled to receive, and the Agent is authorized to effect, the release of Collateral that is the subject of an Asset Sale or any other sale made in accordance with the terms thereof or as otherwise specifically permitted in this Agreement or the Collateral Documents from the Lien of the Collateral Documents.

Section 11.2    <u>Notices</u>.  All notices, requests, demands and other communications to any party or given under any Credit Document (collectively, the "<u>Notices</u>") will be in writing and delivered personally, by overnight courier or by registered mail to the parties at the following

Patriarch/PC Confidential

address or sent by facsimile, with confirmation received, to the facsimile number specified below (or at such other address or telecopy number as will be specified by a party by like notice given at least five calendar days prior thereto):

       (a)    If to the Administrative Borrower, at:

           LVD Acquisition, LLC
           222 East Campus View Blvd.
           Columbus, Ohio  43235
           Telephone:  (614) 861-1350
           Facsimile:  (614) 861-7174
           Attention:   President and Chief Executive Officer

       (b)    If to the Agent, at:

           Patriarch Partners Agency Services, LLC
           32 Avenue of the Americas, 17th Floor
           New York, NY 10013
           Telephone:  (212) 825 0550
           Facsimile:  (212) 825 2038
           Attention:   Loan Administration/LVD Acquisition

       (c)    If to the Lenders, to the address for such Lender set forth on the signature pages hereto or in the Assignment Agreement delivered by such Lender.

All Notices will be deemed delivered when actually received.  Each of the parties will hereafter notify the other in accordance with this Section of any change of address or telecopy number to which notice is required to be mailed.

       Section 11.3   <u>Expenses</u>.  Whether or not the transactions contemplated hereby shall be consummated or any Loans shall be made, each Borrower agrees to pay promptly:

       (a)    all the actual and reasonable costs and expenses of preparation of the Credit Documents and any consents, amendments, waivers or other modifications thereto; the reasonable fees, expenses and disbursements of counsel to the Agent in connection with the negotiation, preparation, execution and administration of the Credit Documents and any consents, amendments, supplements, waivers or other modifications thereto and any other documents or matters requested by any Borrower;

       (b)    all the actual costs and reasonable expenses of creating and perfecting Liens in favor of the Agent, for the benefit of the Lenders and the Agent, pursuant hereto, including, without limitation, filing and recording fees, expenses and taxes, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of counsel to the Agent and the Lenders;

       (c)    all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers;

Patriarch/PC Confidential

(d)    all the actual costs and reasonable expenses (including, without limitation, the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the Agent and its counsel) in connection with the inspection, verification, custody or preservation of any of the Collateral, to the extent required or permitted hereunder;

(e)    after the occurrence of a Default or an Event of Default, all costs and expenses, including, without limitation, reasonable attorneys' fees (including allocated costs of internal counsel) and costs of settlement, incurred by any the Agent or the Lenders in enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of any guaranty) or in connection with any negotiations, reviews, refinancing or restructuring of the credit arrangements provided hereunder, including without limitation in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings; and

(f)    the foregoing shall not be in addition to, and shall not be construed to limit, any other provisions of the Credit Documents regarding costs and expenses to be paid by any Borrower.

Section 11.4   Enforceability; Successors and Assigns.

(a)    Enforceability; Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of and is enforceable by the respective successors and permitted assigns of the parties hereto.  This Agreement may not be assigned by any Borrower hereto without the prior written consent of the Agent and each Lender.  Any assignment or attempted assignment in contravention of this Section will be void ab initio and will not relieve the assigning party of any obligation under this Agreement.

(b)    Assignments.  Each Lender may assign (each, an "Assignment") to one or more Eligible Assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of such Lender's Loans, Commitments and Notes, as the case may be).  Such Assignment may be made without the consent of the Borrowers but shall require the consent of the Agent.  In connection with any such Assignment, the assigning Lender and the Assignee shall execute and deliver to the Agent an Assignment Agreement, in the form of Exhibit F (each, an "Assignment Agreement"), and a $3,500.00 fee (the "Assignment Fee") payable to the Agent.  Upon its receipt of a duly executed and completed Assignment Agreement, the Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to the Administrative Borrower and shall maintain a copy of such Assignment Agreement in its Principal Office.  From and after the effective date of an Assignment, the Assignee shall be a party hereto and, to the extent of the interest assigned pursuant to the Assignment, have the rights and obligations of a lender under this Agreement, and the assigning Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement. Each Borrower hereby consents to the disclosure of any information obtained by Lender in connection

DLI-6247158v5

73

Patriarch/PC Confidential

with this Agreement to any Person to which Lender sells, or proposes to sell, its Loans, Commitments or Notes provided any such Person shall agree to keep any such information confidential.

        (c)    <u>Participations</u>.  Each Lender may sell participations (each, a "<u>Participation</u>") to one or more Persons (each, a "<u>Participant</u>") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of such Lender's Loans, Revolving Credit Commitment and Notes, as the case may be); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the Borrowers for the performance of such obligations, and (iii) the Borrowers shall continue to deal solely and directly with the Lender and the Agent in connection with the Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which the Lender sells such a participation shall provide that the Lender shall retain the sole right to enforce the Credit Documents and to approve any amendment, modification or waiver of any provision of the Credit Documents.  Each Borrower hereby consents to the disclosure of any information obtained by a Lender in connection with this Agreement and/or any other Credit Document to any Person to which such Lender participates, or proposes to participate, its Loans, Commitments or Notes.

        (d)    Notwithstanding anything else to the contrary contained herein, any Lender may any time pledge its Loans and such Lender's rights under this Agreement and the other Credit Documents to a Federal Reserve Bank and, in the case of any Lender that is a fund, to its trustee for the benefit of its investors; <u>provided</u>, that no such pledge to a Federal Reserve Bank (or in the case of any Lender that is a fund, to its trustee for the benefit of its investors) shall release such Lender from such Lender's obligations hereunder or under any other Credit  Document.

Section 11.5   <u>Lenders' Obligations Several</u>.  The obligation of each Lender hereunder is several and not joint and neither the Agent nor any Lender shall be responsible for the obligation of any other Lender hereunder.  Nothing contained in any Credit Document and no action taken by the Agent or any Lender pursuant hereto or thereto shall be deemed to constitute the Lenders to be a partnership, an association, a joint venture or any other kind of entity.  The amounts payable at any time hereunder to each Lender shall be a separate and independent debt; <u>provided</u> that if the Agent fails or refuses to exercise any independent debt or fails or refuses to exercise any remedies against the Borrowers after receiving the direction of the Lenders, each Lender shall be entitled to protect and enforce its rights arising out of this Agreement and it shall not be necessary for any other Lender to be joined as an additional party in any proceeding for such purpose.

Section 11.6   <u>Integration</u>.  This Agreement and the other Credit Documents contain and constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior negotiations, agreements and understandings, whether written or oral, of the parties hereto.

Section 11.7   <u>No Waiver; Remedies</u>.  No failure or delay by any party in exercising any right, power or privilege under this Agreement or any of the other Credit Documents will operate

**Patriarch/PC Confidential**

as a waiver of such right, power or privilege.  A single or partial exercise of any right, power or privilege will not preclude any other or further exercise of the right, power or privilege or the exercise of any other right, power or privilege.  The rights and remedies provided in the Credit Documents will be cumulative and not exclusive of any rights or remedies provided by law.

Section 11.8   Submission to Jurisdiction.  Each of the Borrowers, the other Credit Parties, the Agent and the Lenders hereby (a) agrees that any Action with respect to any Credit Document may be brought only in the New York State courts sitting in New York County or the federal courts of the United States of America for the Southern District of New York and sitting in New York County, (b) accepts for itself and in respect of its property, generally and unconditionally, the non-exclusive jurisdiction of such courts, (c) irrevocably waives any objection, including, without limitation, any objection to the laying of venue or based on the grounds of forum non conveniens, which it may now or hereafter have to the bringing of any Action in those jurisdictions, and (d) irrevocably consents to the service of process of any of the courts referred to above in any Action by the mailing of copies of the process to the parties hereto as provided in Section 11.2.  Service effected as provided in this manner will become effective ten (10) calendar days after the mailing of the process.

Section 11.9   Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.

Section 11.10   Governing Law.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE OTHER CREDIT DOCUMENTS, THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS, AND ALL CLAIMS, DISPUTES AND MATTERS ARISING HEREUNDER OR THEREUNDER OR RELATED HERETO OR THERETO, WILL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS EXECUTED IN AND TO BE PERFORMED ENTIRELY WITHIN THAT STATE, WITHOUT REFERENCE TO CONFLICTS OF LAWS PROVISIONS.

Section 11.11   Waiver of Jury.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTIES WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Patriarch/PC Confidential

Section 11.12  Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 11.13  Survival.  All representations, warranties, covenants, agreements, and conditions contained in or made pursuant to this Agreement or the other Credit Documents shall survive (a) the making of the Loans and the payment of the Obligations and (b) the performance, observance and compliance with the covenants, terms and conditions, express or implied, of all Credit Documents, until the due and punctual (i) indefeasible payment of the Obligations and (ii) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other Credit Documents; provided, however, that the provisions of Section 5.1(o), Article VII, Section 9.4, Section 9.6, Section 9.7 and Section 11.3 shall survive (x) indefeasible payment of the Obligations and (y) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other Credit Documents.

Section 11.14  Maximum Lawful Interest.  Notwithstanding anything to the contrary contained herein, in no event shall the amount of interest and other charges for the use of money payable under this Agreement or any other Credit Document exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  The Borrowers and the Lenders, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and other charges for the use of money and manner of payment stated within it; provided, however, that, anything contained herein to the contrary notwithstanding, if the amount of such interest and other charges for the use of money or manner of payment exceeds the maximum amount allowable under applicable law, then, ipso facto as of the Closing Date, each Borrower is and shall be liable only for the payment of such maximum as allowed by law, and payment received from any Borrower in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Loans to the extent of such excess.

Section 11.15  Interpretation.  As used in this Agreement, references to the singular will include the plural and vice versa and references to the masculine gender will include the feminine and neuter genders and vice versa, as appropriate.  Unless otherwise expressly provided in this Agreement (a) the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement and (b) article, section, subsection, schedule and exhibit references are references with respect to this Agreement unless otherwise specified.  Unless the context otherwise requires, the term "including" will mean "including, without limitation."  The headings in this Agreement and in the Schedules are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.  For purposes of any Collateral located in the Province of Quebec or charged by any deed of hypothec (or any

Patriarch/PC Confidential

other Credit Document) and for all other purposes pursuant to which the interpretation or construction of a Credit Document may be subject to the laws of the Province of Quebec or a court or tribunal exercising jurisdiction in the Province of Quebec, (i) "personal property" shall be deemed to include "movable property", (ii) "real property" shall be deemed to include "immovable property" and an "easement" shall be deemed to include a "servitude", (iii) "tangible property" shall be deemed to include "corporeal property", (iv) "intangible property" shall be deemed to include "incorporeal property", (v) "security interest" and "mortgage" shall be deemed to include a "hypothec", (vi) all references to filing, registering or recording under the UCC shall be deemed to include publication under the Civil Code of Quebec, and all references to releasing any Lien shall be deemed to include a release, discharge and mainlevee of a hypothec, (vii) all references to "perfection" of or "perfected" Liens shall be deemed to include a reference to the "opposability" of such Liens to third parties, (viii) any "right of offset", "right of setoff" or similar expression shall be deemed to include a "right of compensation", (ix) "goods" shall be deemed to include "corporeal movable property" other than chattel paper, documents of title, instruments, money and securities, and (x) an "agent" shall be deemed to include a "mandatary".

Section 11.16 <u>Ambiguities</u>. This Agreement and the other Credit Documents were negotiated between legal counsel for the parties and any ambiguity in this Agreement or the other Credit Documents shall not be construed against the party who drafted this Agreement or such other Credit Documents.

Section 11.17 <u>Judgment Currency</u>. If for the purpose of obtaining judgment in any court it is necessary to convert an amount due hereunder in the currency in which it is due (the "<u>Original Currency</u>") into another currency (the "<u>Second Currency</u>"), the rate of exchange applied shall be that at which, in accordance with normal banking procedures, the Agent could purchase in the New York foreign exchange market, the Original Currency with the Second Currency on the date two (2) Business Days preceding that on which judgment is given. Each Credit Party agrees that its obligation in respect of any Original Currency due from it hereunder shall, notwithstanding any judgment or payment in such other currency, be discharged only to the extent that, on the Business Day following the date the Agent receives payment of any sum so adjudged to be due hereunder in the Second Currency, the Agent may, in accordance with normal banking procedures, purchase, in the New York foreign exchange market, the Original Currency with the amount of the Second Currency so paid; and if the amount of the Original Currency so purchased or could have been so purchased is less than the amount originally due in the Original Currency, each Credit Party agrees as a separate obligation and notwithstanding any such payment or judgment to indemnify the Agent and the Lenders against such loss. The term "rate of exchange" in this Section 11.17 means the spot rate at which the Agent, in accordance with normal practices, is able on the relevant date to purchase the Original Currency with the Second Currency, and includes any premium and costs of exchange payable in connection with such purchase.

[Remainder of page intentionally left blank; signatures on following pages.]

Patriarch/PC Confidential

In witness whereof, the parties hereto have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

BORROWERS:

LVD ACQUISITION, LLC

By: _____
Name:   John Kucharik
Title:    President and Chief Executive Officer

B2 ACQUISITION, INC.

By: _____
Name:   John Kucharik
Title:    President and Chief Executive Officer

DLI-6247158            CREDIT AGREEMENT SIGNATURE PAGE

Patriarch/PC Confidential

A-744

AGENT:

PATRIARCH PARTNERS AGENCY
SERVICES, LLC, as the Agent

By: _____
Name:  Lynn Tilton
Title:  Manager

A-745

Patriarch/PC Confidential

LENDERS:

c/o Patriarch Partners VIII, LLC
32 Avenue of the Americas, 17th Floor
New York, New York 10013
Telephone:    (212) 825-0550
Facsimile:    (212) 825-2038
Attention:    Loan Administration/
              LVD Acquisition

ZOHAR CDO 2003-1, LIMITED

By:  Patriarch Partners VIII, LLC, its
     Collateral Manager

By: _____
     Name:  Lynn Tilton
     Title:  Manager

c/o Patriarch Partners XIV, LLC
32 Avenue of the Americas, 17th Floor
New York, New York 10013
Telephone:    (212) 825-0550
Facsimile:    (212) 825-2038
Attention:    Loan Administration/
              LVD Acquisition

ZOHAR II 2005-1, LIMITED

By:  Patriarch Partners IV, LLC, its
     Collateral Manager

By: _____
     Name:  Lynn Tilton
     Title:  Manager

c/o Patriarch Partners XV, LLC
32 Avenue of the Americas, 17th Floor
New York, New York 10013
Telephone:    (212) 825-0550
Facsimile:    (212) 825-2038
Attention:    Loan Administration/
              LVD Acquisition

ZOHAR III, LIMITED

By:  Patriarch Partners XV, LLC, its
     Collateral Manager

By: _____
     Name:  Lynn Tilton
     Title:  Manager



DLI-6247158

CREDIT AGREEMENT SIGNATURE PAGE

A-746

**Patriarch/PC Confidential**

**SCHEDULE 2.1**

**COMMITMENTS**

Revolving Credit Commitments

| Lender | Revolving Credit Commitment |
|---|---|
| ZOHAR III, LIMITED | $2,000,000.00 |
| **Total** | **$2,000,000.00** |

Term A Loan Commitments

| Lender | Term A Loan Commitment |
|---|---|
| ZOHAR CDO 2003-1, LIMITED | $9,303,993.33 |
| ZOHAR II 2005-1, LIMITED | $30,014,224.60 |
| ZOHAR III, LIMITED | $11,639,322.55 |
| **Total** | **$50,957,540.48** |

Term B Loan Commitments

| Lender | Term B Loan Commitment |
|---|---|
| N/A | $0.00 |
| **Total** | **$0.00** |

DLI-6247158v5

A-747

**Patriarch/PC Confidential**

Payment Due Date: **10/1/2015**

# LVD Acquisition, LLC (Oasis)



PATRIARCH
PARTNERS, LLC

**PAYOR:**

LVD Acquisition, LLC (Oasis)
222 East Campus View Blvd.
Columbus, OH 43235
United States

**PAYEE:**

Patriarch Partners Agency Services
Attn: Loan Operations
1 Broadway, 5th Floor
New York, NY 10004

Please be advised that, effective 10/1/2015, the total amount due for principal, interest, and fees is $14,676,968.44

## Billing Summary for 10/1/2015

| Facility | Current Due | Past Due | Credit | Total Due |
|---|---|---|---|---|
| **854-01: TL** | $621,925.16 | $13,308,771.61 | $0.00 | $13,930,696.78 |
| **854-03: RL B** | $41,326.15 | $704,945.51 | $0.00 | $746,271.67 |
| Total Owed: | **$663,251.32** | **$14,013,717.13** | **$0.00** | **$14,676,968.44** |

**PPMG Ex 3**

Confidential

Oasis_PPMG_PPAS_00000395

Payment Due Date: **1/4/2016**

## LVD Acquisition, LLC (Oasis)



**PAYOR:**

LVD Acquisition, LLC (Oasis)
222 East Campus View Blvd.
Columbus, OH 43235
United States

**PAYEE:**

Patriarch Partners Agency Services
Attn: Loan Operations
1 Broadway, 5th Floor
New York, NY 10004

Please be advised that, effective 1/4/2016, the total amount due for principal, interest, and fees is $344,404.52

## Billing Summary for 1/4/2016

| Facility | Current Due | Past Due | Credit | Total Due |
|---|---|---|---|---|
| **854-01: TL** | $322,927.42 | $0.00 | $0.00 | $322,927.42 |
| **854-03: RL B** | $21,477.10 | $0.00 | $0.00 | $21,477.10 |
| **Total Owed:** | **$344,404.52** | **$0.00** | **$0.01** | **$344,404.52** |

**PPMG Ex 7**

Oasis_PPMG_PPAS_00000419

```
1                    UNITED STATES BANKRUPTCY COURT
                          DISTRICT OF DELAWARE
2
                                      .   Chapter 11
3    IN RE:                           .
                                      .   Case No. 18-10512 (KBO)
4    ZOHAR III CORP., et al.,         .
                                      .   Courtroom No. 1
5                                     .   824 North Market Street
                                      .   Wilmington, Delaware 19801
6                                     .
7                  Debtors.           .   September  14,  2020
     . . . . . . . . . . . . . . . .  .   1:00 P.M.
8
                          TRANSCRIPT OF HEARING
9            BEFORE THE HONORABLE KAREN B. OWENS
                  UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12
     For the Debtors:          Joe Barry, Esquire
13                             YOUNG CONAWAY STARGATT & TAYLOR LLP
                               1000 North King Street
14                             Wilmington, Delaware 19801

15   For Patriarch:            Monica Loseman, Esquire
                               GIBSON DUNN
16                             333 South Grand Avenue
                               Los Angeles, California 90071
17
18   For U.S. Trustee:         Juliet Sarkessian, Esquire
                               OFFICE OF U.S. TRUSTEE
19                             844 King Street
                               Wilmington, Delaware 19801
20
     Audio Operator:           Al Lugano
21
     Transcription Company:    Reliable
22                             1007 N. Orange Street
                               Wilmington, Delaware 19801
23                             (302)654-8080
                               Email:  gmatthews@reliable-co.com
24
25   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
```

2

1                          <u>INDEX</u>

2

3      #4) Debtors' Motion for an Order Determining Dispute Between
       the Debtors and Patriarch Partners Management Services, LLC
       Related to Pending Oasis Transaction [(SEALED) D.I. 911;
4      9/6/19; (REDACTED) D.I. 1130; 9/6/19].

5      #7) Debtors' Motion for Entry of an Order Authorizing the
6      Filing of Portions of the Debtors' Reply in Support of the
       Debtors' Debtors' Motion to Compel Compliance with Prior
7      Orders Directing the Transition of Loan Agency Services,
       Including the Turn Over of Possessory Collateral and for an
8      Accounting Under Seal [D.I. 1917; 9/4/20].

9      **Ruling: Matter Taken Under Advisement**

10

11     PATRIARCH'S WITNESS(s)

12     **LYNN TILTON**

13          Direct Examination by Ms. Loseman        7

14          Cross Examination by Mr. Barry           30

15          Redirect Examination by Ms. Loseman      52

16          Recross Examination by Mr. Barry         53

17

18

19     <u>EXHIBITS</u>                         <u>I.D.</u>    <u>REC'D</u>

20     Joint Exhibits 1 thru 4                        4

21     Zohar Exhibits 1 through 7, 10, 12 thru 15    4

22     PPMG 2 thru 7                                  5

23

24

25

 1           (Proceedings commence at 10:03 a.m.)

 2           THE COURT:  Good morning, counsel.  This is Judge

 3  Owens.  We're gathered today in the Zohar omnibus cases.  I

 4  believe there's only one substantive matter going forward and

 5  then, perhaps, one non-substantive sealing motion going

 6  forward, but I'll turn the podium over to debtors' counsel

 7  and you can walk us through what we're doing today.

 8           MR. BARRY:  . . .the debtors.  You're correct,

 9  Your Honor, we have two items on the agenda for today.  One

10  is the more substantive PPMG Oasis (indiscernible) dispute.

11  The other is item number seven which is seal motion.

12           I understand from my colleague, Mr. Reil, that the

13  seal motion has been resolved.  And so, we'll be submitting a

14  proposed order, I think, under certification of counsel.  I

15  don't think the court needs to address that today.

16           THE COURT:  Okay. Great. So we can just go right

17  into the Oasis dispute.

18           MR. BARRY:  Yes, Your Honor.  And I think we have

19  some positive news on streamlining the hearing for today

20  which is we had a meet and confer last Wednesday and, as Your

21  Honor knows, we had a chambers conference on Thursday.  We

22  agreed to the submission of a joint hearing binder, again, in

23  the hopes of kind of streamlining things.  And then over the

24  weekend and today, we have actually agreed to the admission

25  of a number of documents in the binder so that we don't have

1    to sort of stop the evidentiary presentation.

2              So we would ask, Your Honor, that you take into

3    evidence the following exhibits.  And I'll pause for a

4    moment.  So that would be all four of the joint exhibits (one

5    through four).  Zohar Exhibits 1 through 7, 10, and 12

6    through 15.

7              THE COURT:  Okay.

8              MR. BARRY:  And then PPMG Exhibits 2 through 7.

9              THE COURT:  Okay.

10             MR. BARRY:  The parties have stipulated to the

11   admissibility of the documents and we would ask they be moved

12   into evidence.

13             And unless Your Honor has any thoughts to the

14   contrary, I conferred with Ms. Loseman this morning.  We

15   thought ideally it would be most convenient to launch right

16   into the evidentiary presentation with Ms. Tilton's testimony

17   followed by our (indiscernible) consistent with the chamber's

18   conference we had on Thursday.

19             THE COURT:  Okay.  Let me ask for the record is

20   there anyone who objects to the admission of the stipulated

21   exhibits?

22        (No verbal response)

23             THE COURT:  Okay.  They're admitted into evidence.

24        (Joint Exhibits 1 through 4, received into evidence)

25        (Zohar Exhibits 1 thru 7, 10, 12 thru 15, received into

1   evidence)

2          (PPMG Exhibits 2 thru 7, received into evidence)

3              THE COURT:  And I agree, let's just go forward

4   with how we discussed at the chamber's conference last week.

5   I see Ms. Tilton is ready and available. Thank you, Ms.

6   Tilton for taking the time out of your busy schedule to join

7   us again for testimony.

8              So, if we're ready, I guess it would be PPMG is

9   going to call Ms. Tilton to the stand.  And then Mr. Lugano

10  will come onto the screen and he will swear you in, Ms.

11  Tilton.

12             MS. TILTON:  Thank you.

13             THE COURT:  All right so, Ms. Loseman, are you

14  ready to go?

15             MS. LOSEMAN:  Yes.  Thank you, Your Honor.

16             And just one logistical matter before we call the

17  witness to the stand.

18             There are certain exhibits that I do not intend to

19  display publicly due to some of the confidential nature of

20  the information in some of those exhibits.  And so, what we

21  have done, we have provided the witness with a PDF that is a

22  complete collection of the exhibits that the parties

23  submitted to Your Honor on Friday.  And I will direct the

24  witness to the exhibit and the page number within that PDF,

25  if that is okay with Your Honor.

1              THE COURT:  That is perfectly fine.  And I would

2    just, I guess, remind us all of that item that you're

3    discussing is confidential, just so we know not to discuss

4    it.

5              MS. LOSEMAN:  Okay.

6              THE COURT:  Great.  Thank you.

7              Okay.  Well with that, why don't we swear in Ms.

8    Tilton, Mr. Lugano.

9              THE CLERK:  Yes, Your Honor.

10                  LYNN TILTON, WITNESS, AFFIRMED

11             THE WITNESS:  Yes, I do.

12             THE CLERK:  Please state your full name for the

13   record and spell your last?

14             THE WITNESS:  I'm so sorry.  I can't hear you

15   coming through?

16             THE CLERK:  Okay.  Please state your full name for

17   the record and spell your last?

18             THE WITNESS:  Okay.  My name is Lynn Tilton; T-I-

19   L-T-O-N.

20             THE CLERK:  Thank you, ma'am.

21             THE COURT:  Okay.  Thank you, Ms. Tilton.

22             Ms. Loseman, you can begin.

23             MS. LOSEMAN:  Thank you, Your Honor.

24                         DIRECT EXAMINATION

25   BY MS. LOSEMAN:

1  Q    Good morning, Ms. Tilton.  Let's start, if you could,

2  by providing the court an explanation of Patriarch Partners

3  Management Group.  What does PPMG do?

4  A    Patriarch Partners Management Group was the operational

5  arm of Patriarch Partners.  It was a group of people that

6  provided services to the portfolio companies to support their

7  value proposition and their turnaround strategy.

8      So anything from senior leadership to the platform

9  leaders, operational turnaround and restructuring, financing,

10  providing financial templates, pricing models, taxes,

11  especially (indiscernible) acquisition.  It was a large

12  department.  It did all the recruiting for the companies.

13  Human resources, legal for corporate, as well as litigation.

14  Design -- we had a full design team designing products for

15  the companies, as well as web design, among other things.

16      Supply chain.  People over in China finding product,

17  keeping prices down. Everything that outside consulting

18  services would normally provide at much higher rates.

19  Q    And, generally speaking, over the years, approximately

20  how many people did PPMG employ?

21  A    PPMG, along with Patriarch people who worked on the

22  operating companies would have been many hundreds, more than

23  400 people.

24  Q    Now, Ms. Tilton, what is LVD Acquisition Company?

25  A    LVD Acquisition was the LLC entity for Oasis which was,

1   you know, how it did business as Oasis which was over a

2   hundred-year-old company providing water, clean water to many

3   hardware products -- you know, bottle water coolers, over-the-

4   counter-water coolers, under-the-counter water coolers,

5   humidifiers in both the U.S. and in Europe.

6   Q     And if I refer to Oasis will you understand that I'm

7   referring to LVD Acquisition LLC?

8   A     Yes, I would.

9   Q     Was there a contracting placed between PPMG and Oasis?

10  A     Yes.

11  Q     Let's please display Joint Exhibit 3, the contract or

12  management services agreement between PPMG and Oasis?

13            THE COURT:  Ms. Loseman, who is sharing your

14  screen?

15            MS. LOSEMAN:  Hopefully, that would be either Mr.

16  Nadler or Mr. Farag from my team.

17            THE COURT:  Okay.  Mr. Lugano, can you give them

18  hosting privileges to do that?

19            THE CLERK:  Yes, Your Honor.

20            It's done, Your Honor.

21            THE COURT:  Great.  Thank you very much.

22            MS. LOSEMAN:  Thank you.

23  BY MS. LOSEMAN:

24  Q     Now, Ms. Tilton, you have in front of you or on the

25  screen the management services agreement between PPMG and

1   Oasis?

2   A     Yes, I do.

3   Q     And when was the management services agreement entered

4   into?

5   A     This one was entered in September 30th, 2010.

6   Q     And who are the parties to this agreement?

7   A     The parties to this agreement are LVD Acquisition,

8   otherwise, known as Oasis and Patriarch Partners Management

9   Group, LLC.

10  Q     And if we turn to page 12 of the document who signed

11  the management services agreement on behalf of PPMG?

12  A     I did as its manager.

13  Q     And who signed the agreement on behalf of Oasis?

14  A     John Kucharik who was at the time president and CEO of

15  those entities.

16  Q     Are any of the Zohar debtors' parties to the management

17  services agreement?

18  A     No.

19  Q     And who drafted this agreement?

20  A     At the time we were using Jones Day as outside counsel.

21  They drafted this agreement in conjunction with Jennifer Zahn

22  who was the inside attorney working on this at Patriarch at

23  the time.

24  Q     Who is the PPMG representative that discussed this

25  agreement with the Oasis CEO at the time, Mr. Kucharik?

1  A     It would have been John Harrington who would have been

2  the platform leader overlooking LVD along another, two other

3  companies at the time.

4  Q     Do you know whether Mr. Kucharik discussed or

5  negotiated any particular terms of this agreement with Mr.

6  Harrington?

7  A     I do not because I was not involved in the

8  negotiations.

9  Q     Now, Ms. Tilton, did you require that Oasis enter into

10 a management services agreement with PPMG?

11 A     No.  They wanted the services that they would provide

12 they would (indiscernible) to this agreement, but it was not,

13 you know, mandatory.

14        MS. LOSEMAN:  Mr. Farag, you can stop screen

15 sharing now.  Thank you.

16 BY MS. LOSEMAN:

17 Q     Ms. Tilton, was Oasis the only portfolio company that

18 entered into a management services agreement with PPMG?

19 A     No.  Many companies did.

20 Q     Did you require that any of the portfolio companies

21 enter into an agreement with PPMG?

22 A     None of them were required to do, no.

23 Q     And did any other portfolio companies negotiate the

24 terms of the management services agreement with PPMG?

25 A     Yes.

1   Q     After the MSA was entered into between PPMG and Oasis,

2   what services did PPMG provide the company?

3   A     There was always a platform leader providing senior

4   leadership and being on the ground with the companies and

5   advisor to the management team.  There was operational

6   people, supply chain. We had someone in China helping them

7   procure parts and manufacture over there.  We had tax

8   financial.  We provided templates for all their financial

9   reporting, as well as pricing models. And we had a full

10  design team that worked on many of their products and their

11  new products were designed by that design team.

12        We did all of the (indiscernible) for the entire

13  leadership team and sometimes below, so human resources.  And

14  they did not have a general counsel so all the contracts and

15  legal -- of course legal was done by PPMG, as well as

16  litigation -- it's advisory.

17  Q     And who were some of the senior PPMG staff that

18  provided the services you just described to the company?

19  A     There were always lawyers -- Jennifer Zahn, Kevin Dell

20  (ph), Connie Liu in China on supply chain, John Harrington,

21  Carlos Mercado on finance and tax.  I could go on and on.

22  Julian Nieves and John Bavaro did all the design work.  Erika

23  Barker helped with their web design, so there was always a

24  credit officer.  Michael Greenberg worked on it for a long

25  time.  Always a credit officer helping them with financial

1   and tax, so there were many.  And over the years, they

2   changed out as employees changed out.

3   Q     In terms of the services you described that PPMG

4   provided to the company, what was the benefit to Oasis?  What

5   was the benefit to the company of PPMG providing these

6   services as opposed to some other third-party consultant?

7   A     Well, first of all, it was far less expensive because

8   it was a monthly fee versus paying by the hour and getting

9   outside consultant services.  And also, when the companies

10  were unable to pay, those fees were accrued and deferred

11  which is why, you know, PPMG is owed over $70 million right

12  now.

13        So there was not the burden of payment if the company

14  did not have the liquidity at the time, you know, which,

15  otherwise, would have been required by outside law firms and

16  outside consulting firms. And it was just far less expensive.

17  I think for most of the years, they were charged between $15-

18  and $25,000 dollars a month.

19  Q     How was PPMG compensated for the services they

20  provided?

21  A     That small monthly fee and then upon the liquidity

22  event.  You know, sale of the company is when the company --

23  when PPMG would really be provided that upside to all those

24  services over the years.  And that was that transaction fee

25  which was 5 percent of the eligible equity value or the

1  purchase price.

2  Q     Were the monthly or transaction fees ever benchmarked

3  in terms of what fees were being charged in the -- two or

4  more fees were being charged for similar services in the

5  private equity phase?

6  A     Yeah, they were benchmarked and we used outside counsel

7  to help us understand and we ended up being far below market

8  and part of that was because these were companies, you know,

9  being turned around and we really wanted the value going into

10 and liquidity going into value creation because the

11 transaction fee was really where we were going to get paid

12 for all the years of service.

13 Q     Was the fee structure designed in a way to align the

14 interest of PPMG and the company?

15 A     Yes, of course, they were because in the end, we made

16 money if the company built that value and our interests were

17 always aligned which is why we were willing to, you know,

18 accrue fees instead of getting paid because that liquidity

19 would go towards it.  But only the bigger the fee was based

20 on the bigger the value that we were able to build together.

21       And so, the interest were always aligned versus just

22 providing services and then leaving.  We needed to make sure

23 that we were creating value.

24            MS. LOSEMAN:  Mr. Farag, if you could screen share

25 again and display Joint Exhibit 3, management services

1 agreement again.

2 BY MS. LOSEMAN:

3 Q     And if we turn page 3 of the document.  Ms. Tilton, do

4 you see in front of you the page that defines transaction

5 fee?

6 A     I do.

7 Q     Now when is a transaction fee owed to PPMG?

8 A     On a liquidity event.  When a liquidity event takes

9 place which would either be sale of 80 percent of the assets

10 without regard to liabilities or a transfer of more than 50

11 percent of the equity and control to another party.

12 Q     And did Oasis experience a liquidity event?

13 A     Yes because it transferred more than 50 percent of the

14 equity.  In this case, it was 100 percent of the equity

15 transferred to Culligan.

16 Q     And how was PPMG's transaction fee calculated in

17 connection with that liquidity event?

18 A     It was 5 percent of the total proceeds which was the

19 value paid plus the cash on the balance sheet.

20 Q     Now, Ms. Tilton, when you --

21 A     For the (indiscernible) of the value.

22 Q     Thank you.  Sorry, I did not mean to cut you off there.

23     Ms. Tilton, when you signed the management services

24 agreement, was it your understanding that the definition of a

25 liquidity event depended on whether the sales price exceed

1  Oasis' debt?

2  A    No.  It was based on the transaction value, the same

3  one we used investment banker would be paid.  It did not

4  require who gets to be paid off.

5  Q    Let me direct your attention if we turn to the next

6  page as the definition of liquidity event continues.

7       At the end of that paragraph, the top of the page, do

8  you see the clause that begins provided however?

9  A    Yes.

10 Q    And it references a change of control.  What is your

11 understanding of what that term means in the context of this

12 agreement?

13 A    The change of control relates to Annex A which deals

14 with the structure of the indemnification provisions, as well

15 as which parts of the liquidity event triggered that

16 indemnification provision and then it goes into standard of

17 conduct and who makes the decision on standard of conduct

18 under certain provisions.  So it relates to Annex A in terms

19 of indemnification.

20           MS. LOSEMAN:  And we can take that document down.

21 Thank you, Mr. Farag.

22 BY MS. LOSEMAN:

23 Q    Ms. Tilton, are you familiar with the term phantom

24 equity agreement?

25 A    Yes.

1    Q     And what does that refer to?

2    A     For each of the portfolio companies, we provided the

3    leadership team with up to 15 percent of the equity of the

4    companies in terms of what we call MIC or phantom equity at

5    which time on the change of control based on equity of

6    appreciation from the time they started to the time of change

7    of control, they would be paid a management incentive plan or

8    phantom equity.

9    Q     And, generally speaking, at a summary level, how is the

10   management standard of those agreements calculated?

11   A     It's complicated because there are a lot of things, but

12   it's basically the purchase price less indebtedness, less

13   initial equity value which is 4.5 times EBITDA at the time

14   they start plus any equity cap that was paid minus

15   transaction fees and any administration fees.  So it's, you

16   know, based on the equity value at the time they start

17   through the change of control, but it's equity appreciation.

18   Q     And if we -- let's take a look at Zohar Exhibit 6.

19         MS. LOSEMAN:  Mr. Farag, if you could screen

20   share.

21   BY MS. LOSEMAN:

22   Q     Ms. Tilton, do you recognize this document?

23   A     Yes.

24   Q     And what is it?

25   A     It's the phantom equity agreement that we provided to

1  leaders at the portfolio -- the executive leadership team at

2  the portfolio company.

3  Q     And let's turn to page 3 of this exhibit.  Do you see

4  in the middle of the page a definition of the term, change of

5  control, Ms. Tilton?

6  A     I do.

7  Q     Was it your understanding that the term liquidity event

8  in the management services agreement was meant to be the same

9  as this definition and work in the same way?

10  A     No, absolutely no.  And actually, here it's the change

11  of control is only if the indebtedness related to the funds

12  or company related parties like Patriarch or PPMG had been

13  paid in full.  It's a completely different definition and

14  these agreements were not done at the same time.

15          MS. LOSEMAN:  And Mr. Farag, we can take that

16  document down.  Thank you.

17  BY MS. LOSEMAN:

18  Q     Now, Ms. Tilton, did you prepare a flow of funds model

19  in connection with the Oasis transaction?

20  A     We did.

21  Q     And just generally speaking what is a flow of funds

22  model, what is that modeling?

23  A     It's as the funds would flow from the sale of a company

24  starting with the purchase price and adding back the cash and

25  subtracting out all the transaction expenses and then paying

 1  off the liabilities in its structural seniority to

 2  subordination going down through to the equity and how funds

 3  would flow from that sale.

 4  Q    And did the flow of the funds model for the Oasis

 5  transaction include a PPMG transaction fee?

 6  A    Yes, it did.

 7  Q    And why is that?

 8  A    Because there was a liquidity event.  It was the sale

 9  of more than 50 percent of the equity and it triggered a

10  transaction fee based on that event.

11  Q    Have you prepared both funds models for monetization

12  events of debtor portfolio companies?

13  A    Yes, I have.

14  Q    Let's look at PPMG Exhibit 5.

15        MS. LOSEMAN:  And, Mr. Farag, please do not share

16  this one.

17  BY MS. LOSEMAN:

18  Q    Ms. Tilton, if you could look to the PDF and turn to

19  page 465.

20  A    465?

21  Q    Yes.

22  A    Okay.

23  Q    And it should have a blue sticker on the bottom-right

24  hand corner that reads, PPMG Exhibit 5; do you have that in

25  front of you?

19

1    A      I do.

2    Q      And can you -- what is this email correspondence, Ms.

3    Tilton?

4    A      There was an email from (indiscernible) to me asking

5    for some information regarding two of the portfolio

6    companies.  I don't know if we should probably keep them

7    confidential at this point.  And asking me for some

8    information regarding those companies.

9    Q      And did you provide Mr. Koch (ph) and Mr. Katzenstein

10   the requested information?

11   A      I did.  Not all at one time, but I did provide that

12   information.

13   Q      And if we turn to Zohar Exhibit 13 which is at 399 of

14   your PDF.

15   A      Yes.

16   Q      And do you have Zohar Exhibit 13, the blue sticker

17   document in front of you, Ms. Tilton?

18   A      Yes, I do.

19   Q      And if we turn down to page 402 of the PDF, just a few

20   pages into this exhibit, do you see a flow of funds model for

21   what we've been referring to as Portfolio Company C?

22   A      I do.

23   Q      Is there a PPMG transaction fee in the closing expenses

24   section of this model?

25   A      No, there is not.

1    Q      Why not?

2    A      Because at the time we were only considering a

3    refinancing which was not a liquidity event and which was an

4    internal document just trying to track the different parts

5    that would go into a monetization or a, you know,

6    restructuring event, but there was no sale of the company

7    being considered at that time.

8    Q      Now, Ms. Tilton, did you later create a spreadsheet to

9    reflect a flow of funds for a liquidity event in connection

10   with Portfolio Company C?

11   A      Yes because it was part of the overall transaction that

12   was presented back in the summer of 2019 and then we had a

13   flow of funds based on the purchase price we were willing to

14   pay for that company.

15   Q      And if we turn to PPMG Exhibit 6 which is page 466 of

16   the PDF.

17   A      I'm there.

18   Q      And what is this document, Ms. Tilton?

19   A      This is the actual flow of funds based on the purchase

20   price we were offering for that company as part of the

21   overall transaction back in the summer of 2019.  And this is

22   based on the liquidity event.

23   Q      And if we turn to page 468 of the PDF, so just a couple

24   of pages into the exhibit.

25   A      Yes.

1   Q      Do you have the flow of funds modeling for Portfolio

2   Company C in front of you?

3   A      I do.

4   Q      And did this flow of funds modeling include a PPMG

5   transaction fee?

6   A      Yes, it does.

7   Q      And why is that?

8   A      Because it was based on a liquidity event or the sale

9   of the company and, therefore, it would trigger the

10  transaction fee.

11  Q      And in this flow of funds model, including the PPMG

12  transaction fee, did the transaction that's modeled here show

13  the purchase price exceeding the outstanding debt?

14  A      No, it does not exceed the outstanding debt.

15  Q      Now, let's switch gears just a bit here.

16         Did the Oasis transaction clear the company's debt, Ms.

17  Tilton?

18  A      Yes, it did.

19             MS. LOSEMAN:  Mr. Farag, if you could display

20  Zohar Exhibit 2.

21  BY MS. LOSEMAN:

22  Q      And this is the Oasis credit agreement.

23         Ms. Tilton when was this credit agreement entered into?

24  A      June 1, 2009.

25  Q      And who executed the credit agreement on behalf of

1    Zohar's I, II, and III?

2    A    I would have as the collateral manager of those funds

3    at the time.

4    Q    And who executed the agreement on behalf of Oasis?

5    A    John Kucharik was the president and CEO at the time.

6    Q    Turning to Section 2.8(a).  Can you explain how

7    interest rates were calculated under the credit agreement?

8    A    For the most part and here, it was a LIBOR rate plus an

9    applicable margin, so it would be LIBOR plus four, five, six,

10   seven or whatever the rate might have been based on company's

11   ability to pay and risk profile.

12   Q    And Section 2.8 uses a -- does it use a defined term to

13   the term loan in capital letters there, do you see that?

14   A    Yes.

15   Q    If we turn to page 13 of the agreement.

16        Can you read the definition of loans there, Ms. Tilton?

17   A    Yes.  Loans means collectively the revolving credit

18   loans and term loans.

19   Q    And if we turn to page 17, do you see the defined term

20   revolving credit loan, Ms. Tilton?

21   A    I do.

22   Q    And what does that define mean?

23   A    It means a loan made by a revolving lender to any

24   borrower, but revolving credit agreement usually means that

25   it can be borrowed, repaid and borrowed again.

1   Q      And if we turn to page 20.  Do you see a definition for

2   the term, term loan?

3   A      Yes.  Meaning collectively, the Term A loans and Term B

4   loans.

5   Q      And if we scroll up just a bit, page 19, are the terms

6   Term A loan and Term B loan also defined, Ms. Tilton?

7   A      They are.

8   Q      Now was the credit agreement the same as Zohar's and

9   Oasis ever amended?

10  A      Yes, it was.

11  Q      Let's take a look at Joint Exhibit 2?

12         And what is this amendment, Ms. Tilton?

13  A      This amendment which was the eighth amendment was where

14  we converted certain unpaid and accrued interest

15  (indiscernible) interest of $20,291,872.92 into term loans

16  that were equity pickers so that we could basically protect

17  the lenders in terms of repayment on a liquidity event such

18  that it was more closely aligned to the loan than the equity

19  which is not always equivalent to the amount of loans that

20  the companies -- that the funds have made since the equity is

21  given out at the beginning based on borrowed money and

22  certain additional loans are made during the course.  So this

23  was converted into an equity kicker and provided in the

24  credit agreement so that it would protect the lender upon a

25  sale of the company or liquidity event.

1  Q      When was this amendment to the credit agreement

2  executed?

3  A      In November of 2015.

4  Q      And who executed this amendment on behalf of Oasis?

5  A      John Jacob was the CFO at the time and Sasha Tasganof

6  (ph) who was the CEO for a short period at that time.

7  Q      And who executed this document on behalf of the

8  Zohar's?

9  A      I did as the collateral manager.

10 Q      Was this amount restructured as a loan as you

11 understand that term to be defined under the credit

12 agreement?

13 A      No, it was an equity kicker which is how we document

14 equity kickers in the loan agreement because that's the best

15 place to have them such that on the sale they're recognized

16 in the agreement, but it wasn't a loan under the agreement or

17 debt because it had no interest rate.  It was income that had

18 been taken by the taxpayer which was me as interest income,

19 and then basically an equity contribution back into the

20 company.

21 Q      Let's look at Schedule A to this amendment.

22        Do you see the first column on Schedule A that reads

23 type of loan, Ms. Tilton?

24 A      Yes.

25 Q      What was your understanding as to whether that column

1  or the labels used there were meant -- meant that these

2  facilities were considered loans under the credit agreement?

3          MR. BARRY:  Your Honor, I am going to object.  The

4  document speaks for itself.

5          THE COURT:  You can answer.  Please go ahead.

6          THE WITNESS:  There are equity kickers that are

7  put into the form of loan often where we were giving like a

8  second lien loan for zero.  It's still an equity kicker.

9  It's not borrowed money.  And so, you know, this was the best

10 for us to document and put into the credit agreement, but it

11 isn't a term loan under the definition of the term loan in

12 the credit agreement and it bears no interest.

13         You know, it bears no interest, interest was never

14 billed, it was never paid.  It's an equity kicker in that it

15 is upside to the lenders and not money that they leant to

16 them.  It was, basically, an equity contribution back into

17 the company after income had been taken.

18 BY MS. LOSEMAN:

19 Q    And the column titled "Applicable Margin" reflecting

20 zero percent for each of the facilities, what did that

21 indicate?

22 A    That there was no interest rate on this because it was

23 equity.

24 Q    And the column next to it titled "Interest Payment

25 Date" with entries reading NA for each restructured facility,

1  what did you understand that to mean?

2  A     Not applicable because there was no interest being

3  charged and there was no date by which it had to be paid.

4  Q     Now the next column over titled "Maturity Date" it

5  lists April 15th, 2019 for each of the restructured

6  facilities.  In your experience can equity have a maturity

7  date?

8  A     Sure.  Preferred equity has a maturity date all the

9  time.

10 Q     Were there any interim payments at all required prior

11 to that April 15th, 2019 maturity date?

12 A     No.

13 Q     And skipping over to the prepayment preference column,

14 do you see that?

15 A     Yes.

16 Q     What did that indicate?

17 A     That was the structural flow of funds and that

18 (indiscernible) came out after all the debt.  It was the last

19 in line in terms of preference payments.

20           MS. LOSEMAN:  We can take this document down.

21 Thank you, Mr. Farag.

22 BY MS. LOSEMAN:

23 Q     Ms. Tilton, after executing the eighth amendment did

24 the Patriarch collateral manager notify US Bank, the

25 indenture trustee, that the restructuring of Oasis's unpaid

1  fees and interests resulted in Oasis's debt increasing by $20

2  million dollars?

3  A    No, we did not.

4  Q    Why not?

5  A    We did not consider it debt and we did not increase the

6  debt with the (indiscernible) or loan asset.  Actually, it's

7  an asset to the trustee.  We did not increase the asset with

8  the trustee or on the financial statements for the funds.

9  Q    And why did the collateral manager not report it as

10  debt to the indenture trustee?

11  A    Because we considered it an equity kicker and if it

12  were reported as debt it would have increased the numerator

13  in the over collateralization ratio which would have been a

14  benefit.  It also would have increased the assets, but we did

15  not consider it a loan asset.  We considered it an equity

16  kicker and, therefore, it would not appear on the trustee

17  reports.

18  Q    When you say it would have increased the numerator in

19  the over collateralization ratio and that would have been a

20  benefit, what do you mean by that?  A benefit to whom?

21  A    Well, the OC ration determined how collateral

22  management fees got paid and whether the subordinated

23  management fee got paid.  It would have been a benefit -- it

24  would have been a boom for the collateral manager to call

25  that debt, but we did not because it was an equity kicker.

28

1        MS. LOSEMAN:   Let's look at PPMG Exhibit 3, Mr.

2   Farag, if you would.

3   BY MS. LOSEMAN:

4   Q    Ms. Tilton, what is this document?

5   A    This would have been the interest bill that would have

6   been sent out by Patriarch Partners Agency Services to LVD.

7   I believe this one would have been for Zohar II and this

8   would have been the bill for the current interest as well as

9   listing the past due interest that would have been owed.

10  Q    What is the date of this invoice?

11  A    The date of this invoice is October 1st, 2015.

12  Q    By the way, what is the difference in the amount, the

13  past due amount showing approximately 14 million and the

14  total of the restructured facility, the restructured a month

15  later, of approximately 20.29 million?

16  A    The difference is the Zohar I and Zohar III amounts

17  that were also included in that term loan dollar number.

18  Q    Now let's look at PPMG Exhibit 7.  Ms. Tilton, what is

19  this document?

20  A    This would be the next bill for Zohar II which would

21  have been three months later since it was quarterly, January

22  4th, 2016.  And this shows all the past due interest is no

23  longer on the bill because it had been converted into the

24  equity kicker and this is only the current interest due for

25  that period.

A-777

1   Q      Now comparing this invoice to the prior October 2015

2   invoice do they reflect an increase in the principal owed by

3   Oasis between those dates?

4   A      No.  Principal is not increased.  This is only interest

5   is being charged on the term loan as defined under the

6   agreement.

7            MS. LOSEMAN:  We can take that document down.

8   Thank you.

9   BY MR. LOSEMAN:

10  Q      Now prior to the close of the Oasis transaction, Ms.

11  Tilton, to your knowledge did the debtors ever attempt to

12  collect interest from Oasis on the restructured facility?

13  A      No, they did not.

14  Q      Historically or at the time of amendment number eight

15  to the credit agreement who had asserted beneficial ownership

16  over the equity in Oasis or what entity?

17  A      The Octaluna's.

18  Q      And how did the Octaluna's report the 2015

19  restructuring of Oasis's fees and interest through amendment

20  eight to the credit agreement?

21  A      It was a capital contribution.

22           MS. LOSEMAN:  Your Honor, if I may have a moment,

23  I believe I'm at the end. I just want to confirm.  I have no

24  further questions at this time.  Thank you.

25           THE COURT:  Thank you, Ms. Loseman.

```
 1              Cross examination?
 2              MR. BARRY:  Yes, Your Honor.  It would help if I'm
 3    off mute.  For the record Joe Barry of Young Conaway.
 4                        CROSS EXAMINATION
 5    BY MR. BARRY:
 6    Q     Good morning, Ms. Tilton.
 7    A     Good morning.
 8    Q     Ms. Tilton, at the time the MSA was entered into in
 9    September -- can you hear me okay?
10    A     I'm trying to, yeah.  So far I can hear you.
11    Q     Okay.  Let me know if you can't hear me and I'll work
12    it out.
13          At the time the MSA was entered into in September of
14    2010 you were the manager, the sole manager, of LVD
15    Acquisition, correct?
16    A     That is correct.
17    Q     And what was your role as the sole manager at LVD?
18    A     It would have been duties, you know, that would be
19    similar to that of the sole director of a board.  There was
20    an authority matrix of certain types of issues that needed to
21    be brought to me for my approval and I would act upon that
22    under the authority matrix.
23    Q     Okay.  And at the time the MSA was entered into there
24    was a management team at Oasis, correct?
25    A     Yes, there was.
```

1  Q     And that was the CEO of the company, I think you

2  testified, who was John Kucharik?

3  A     That is correct.

4        MR. BARRY:  So, Your Honor, could we have the co-

5  hosting capabilities transferred to Mr. Reil so we can put up

6  some documents?

7        THE COURT:  Absolutely.  Mr. Lugano, can you give

8  Mr. Reil co-hosting responsibilities?

9        MR. LUGANO:  It's done, Your Honor.

10       THE COURT:  Great.  Thank you.

11       MR. BARRY:  Thank you.

12       Mr. Reil, could we put up Zohar Exhibit 15.

13 BY MR. BARRY:

14 Q     Ms. Tilton, do you recognize this document?

15 A     I see it's a written consent of the sole manager.

16       MR. BARRY:  Mr. Reil could you scroll down to the

17 attachment to the written consent please.

18 BY MR. BARRY?

19 Q     Ms. Tilton, is the authority matrix that you just

20 testified to?

21 A     Yes, it is as of that time.

22 Q     And who prepared this?

23 A     Counsel.

24 Q     At your direction?

25 A     At my direction to have an authority matrix, yes.  I

1    wanted to have an authority matrix for each of the portfolio

2    companies where I served as director or sole manager.

3    Q     And this governed the decision making as between

4    management and the board, correct?

5    A     It discerns where they need to come to me to approve

6    their decisions versus the normal course day to day decisions

7    that they make on their own.  And there are two columns, one

8    is for the designated executive which was John Herrington at

9    the time and the other is for whether it needed board

10   approval.

11   Q     And directing your attention to Line 11 it says

12   "Related Party Transactions."  Do you see that?

13   A     Yes.

14   Q     And that says NA under designated executive which, Mr.

15   Reil, if you could scroll down to the notes.

16         It says,

17         "Certain action items are included in this list for

18   which the designated executive has no authority indicated by

19   NA under the designated column."

20         Do you see that?

21   A     Yes.

22   Q     And so next to that it says full board.  So does that

23   mean that any related party transactions would have to be

24   approved by you as the sole manager?

25   A     That is correct.

1  Q     And was entry into the management services agreement a

2  related party transaction?

3  A     Your question?

4  Q     Was entry into the management services agreement in

5  September of 2010 a related party transaction?

6  A     Yes.

7          MR. BARRY:  Mr. Reil, if we could, let's turn to

8  Joint Exhibit 3.

9  BY MR. BARRY:

10 Q     Ms. Tilton, this is the management services agreement

11 that you previously testified to.  I believe you testified

12 that Mr. Kucharik discussed this with Mr. Herrington.  Is

13 that your testimony?

14 A     I said I believed, based on what I know and what I've

15 seen in emails, that it was discussed with John Herrington.

16 It was not discussed with me.

17 Q     But you don't know for a fact that this was discussed

18 between Mr. Kucharik and Mr. Herrington, correct?

19 A     I've only seen an email between the two of them

20 concerning this.  Whether they got on the phone and discussed

21 it further I do not know.  I was not involved.

22 Q     Okay.  And you testified that none of the portfolio

23 companies were required to (indiscernible).  Is that correct?

24 A     Not unless they -- you know, if they wanted the

25 services that we provided that they would need to sign it,

1  but no one was forced to sign this agreement.

2  Q    But the ultimate decision to enter into this with you

3  was at Oasis, correct?

4  A    No.  My -- I needed to approve what they wanted to

5  enter into.  I don't decide what they enter into.  It takes

6  my approval if they choose to enter into a related party

7  transaction.  I don't tell them what to sign or what to do.

8  It needed my approval to be signed by them.

9  Q    And I think you testified on direct examination that

10 some of the portfolio companies negotiated the terms of the

11 management services agreement.  Is that correct?

12 A    Yes.

13 Q    How many?

14 A    Sitting here right now I can't tell you how many.  I

15 know a few who did so.

16 Q    Do you recall at your deposition that you testified

17 that you can only recall two of the portfolio companies

18 negotiated any of the terms?

19 A    If I said that at the time then I only thought of two

20 at the time.

21 Q    Do you recall at your deposition that you testified

22 that none of the portfolio companies negotiated the terms of

23 the transaction fee provision?

24 A    That is correct.

25 Q    And for clarity there is forty-five portfolio companies

A-783

1    that we're referencing, correct?

2    A     I'm not sure.  I don't know how many signed this

3    agreement.

4    Q     If I represent to you that there is fourteen portfolio

5    A companies and thirty-one portfolio B companies on the

6    settlement would that sound about right to you?

7    A     I will take what you say.

8    Q     And as to Oasis specifically are you aware that Oasis

9    management requested any changes to the form of management

10   services agreement that was proposed by PPMG?

11   A     I am not aware.  As I told you, I was not involved in

12   the negotiations.

13            MR. BARRY:  Mr. Reil, could we scroll down to

14   3(c), 2(b) of the management services agreement.

15   BY MR. BARRY:

16   Q     Ms. Tilton, you testified, I think, on direct

17   examination that one of the reasons for the transaction fee

18   was to you needed to ensure that you were creating value."

19   Is that correct?

20   A     The transaction fee was to be based on the value

21   creation.  So the more the companies sold for the more we

22   would get paid as the transaction (indiscernible).  So, it

23   was aligned with the interest of all parties.

24   Q     What if there was no creation of value?

25   A     If the company to be sold, and it was an ongoing

A-784

1  entity, especially since everything was brought --

2      (Inaudible audio)

3          THE COURT:  Ms. Tilton, could you --

4      (Inaudible audio)

5          THE COURT:  Excuse me, Ms. Barry and Ms. Tilton,

6  please stop for a moment.  I am getting a lot of feedback and

7  I actually cannot hear the witness.

8          Mr. Lugano, is there an issue on our end.  Do you

9  know?

10          MR. LUGANO:  None that I know of, Your Honor.

11          THE COURT:  Okay.  Were you hearing the feedback?

12          MR. LUGANO:  A little.

13          MR. BARRY:  I was as well, Your Honor.

14          THE COURT:  Okay.

15          THE WITNESS:  Is it possible to speak through Zoom

16  or no?

17          THE COURT:  No.  We can't speak through Zoom, but

18  there is a little bit of reverberation happening, I think.

19          So, if you remember, Ms. Tilton, what your

20  testimony was to Mr. Barry's last question could you please

21  repeat it or if you can't recall then I would ask Mr. Barry

22  to repeat his last question.  Then we will try it again.

23          THE WITNESS:  I believe that getting the company

24  to a point where it could be sold to another party based on

25  the fact these companies were purchased when they were left

1  for dead that that would be value creation.

2           THE COURT:  Okay.  Thank you.

3  BY MR. BARRY:

4  Q    Under PPMG's reading of the agreement, though, whether

5  there's the creation of value or not PPMG is entitled to earn

6  a fee, is it not?

7  A    It is a fee based on the sale price which gets larger

8  with the additional value creation, but, yes, it is based on

9  a sale of the company. It is entitled to a transaction fee.

10  Q    Okay.  If the fee, though, was to ensure the creation

11  of value and PPMG earns a fee if the company loses value then

12  can you explain that?

13  A    PPMG is entitled to a fee on the sale of the company

14  and creation of liquidity for the lenders.  I mean it is

15  based on transaction value.  The goal was to sell these

16  companies when we had created as much value as we believed we

17  were able to do.  That is when these things were being sold.

18  It doesn't -- it isn't based on value appreciation, but the

19  goal was to bill value and sell the companies to monetize.

20  That is when companies were sold, when the value was built

21  and we believed we could no longer create additional value.

22  Q    Okay.  You testified, Ms. Tilton, that the -- Mr. Reil,

23  could you do me a favor and scroll down to the proviso at the

24  end of (b).  Thanks.

25           Ms. Tilton, you testified that the phrase change of

1  control that's used in the proviso, that starts on the third

2  line from the bottom of this, has to do with the

3  indemnification provisions of annex A.  Is that correct?

4  A    Yes.

5  Q    Okay.  Can you explain that?

6  A    Can I explain how it -- well, if you move to annex A

7  you can see that --

8  Q    Let's do that.

9  A    -- annex A is where the change of control comes in and

10 you can see that the change of control carves out certain

11 liquidity events like a sale of the assets which does not

12 trigger the indemnification and then this speaks to standard

13 of care or conduct on who makes the decision under certain

14 circumstances, but this is where the change of control comes

15 in.

16              MR. BARRY:  Let's scroll down if we could, Mr.

17 Reil, to the defined term change of control.

18 BY MR. BARRY:

19 Q    So, this is Paragraph 9, Ms. Tilton. Do you see this

20 provision?

21 A    Yes.

22 Q    It's titled "Change in Control."

23 A    Mm-hmm.

24 Q    And you would agree that that's different from the term

25 change of control in the proviso in Paragraph 3 of the

1    agreement, correct?

2    A    Well, I can see its change in versus change of, but I

3    believe it's a typo and think it relates back to liquidity

4    event.  I believe that it was meant to refer to the change of

5    control in that paragraph at the end.

6    Q    Okay.  So, Paragraph 9 starts out "For purposes of this

7    annex A…" do you see that?

8    A    Yes.

9    Q    Do you have any understanding as to what that means?

10   A    For purposes of this annex A?

11   Q    Sure, yeah.

12   A    I think that's what it means.

13   Q    It means its limited to the annex A, correct?

14   A    Yes.

15   Q    Okay.  So, let's follow the defined term change in

16   control.  It says,

17       "Means, (A) the occurrence after the date hereof of any

18   transaction described in Clauses (y) or (d) of the definition

19   of liquidity event."

20       Do you see that?

21   A    Yes.

22          MR. BARRY:  Mr. Reil, if we could scroll up to

23   Paragraph 2.  I wanted to stay in annex A if you don't mind.

24   Okay.

25   BY MR. BARRY:

1  Q     So, are you familiar with Paragraph 2 of annex A?

2  A     I mean this is very legal.  I have read through it, but

3  I mean if you're asking me to argue the legal part of this

4  document I don't think that's appropriate.

5  Q     I'm just trying to understand your direct testimony

6  that change of control is the same of change in control and

7  relates to the annex.  I am just trying to understand how the

8  two relate to one another.

9  A     Well if you go back to the section where you were you

10  will see that it's carving out the asset sale from the

11  liquidity event because that's not a transfer of the equity

12  and adding in an insolvency. Those are the parts of liquidity

13  event that relate to this indemnification.  The asset sale

14  does not trigger the indemnification.  Part of that is the

15  equity risk is not transferring and it adds insolvency here

16  because those are conditions under which the indemnification

17  would need to kick in.

18        So, if we go back to the section where you were you

19  will see that it's now bringing liquidity event and those

20  sections under liquidity even not which trigger the

21  transaction fee, which is triggered by liquidity event, but

22  which the change of control, which defined in certain

23  liquidity events triggers indemnification and standard of

24  conduct decision making.

25  Q     So in order to trigger the indemnification provisions

1    of annex A, a change in control would have to clear the debt.

2    Is that your testimony?

3    A      No.  It's just that the change of control that triggers

4    indemnification is the transfer of the equity risk, not where

5    the entity is still existing.

6    Q      Okay.  Let's move on.

7           In your deposition you testified -- you described how a

8    proviso of 3(c)2(d) also had to do with management proceeds.

9    Could you explain that?

10   A      Well, the definition of eligible equity -- well if you

11   go back, I may not -- basically, the transaction fee is 5

12   percent of -- can you go up more?

13          So, the total equity value, eligible equity value its

14   total equity value minus management proceeds.  So, any

15   management proceeds that would have been paid based on equity

16   owned by management team would have been subtracted from

17   total equity value before the 5 percent of the fee is

18   calculated.

19   Q      And what does that have to do with the proviso at the

20   end of 3(c)2(d) satisfaction of the company's indebtedness?

21   A      Nothing.  That is not what it says, company's

22   indebtedness.

23          Can you show me what you are referring to?

24   Q      Sure.  It's the proviso that we have been discussing at

25   the end of Paragraph 3(c)2(d).

1  A     I know, but that doesn't say indebtedness.

2  Q     I'm sorry.  It says outstanding debt.

3  A     I know, but that's the thing.  You keep conflating debt

4  loan and indebtedness which are very different.  So, this has

5  nothing to do with the transaction fee.  It's based on equity

6  owned by management and that pay-out gets subtracted from our

7  fee.

8  Q     Okay.  And what does that have to do with the company's

9  satisfaction of its outstanding debt?

10  A     What does what have to do with the satisfaction of the

11  company's outstanding debt?

12  Q     Management proceeds.

13  A     Management proceeds, they're calculated under the

14  (indiscernible) agreement in a completely different way and

15  it's not even the outstanding debt.  That has to be a related

16  party to indebtedness.  So, that includes anything owed to

17  Patriarch, anything owed to the funds, that needs to be

18  satisfied in a management incentive agreement, but other debt

19  doesn't need to be paid off.

20        So, as I said you're mixing definitions and conflating

21  debt with indebtedness with loans.  I mean they're very

22  different.

23  Q     Okay.

24  A     This is a separate agreement that (indiscernible) based

25  on a liquidity event, which is either an asset sale without

43

1   regard to any liabilities or transfer of more than 50 percent

2   of the equity or control.  That is what triggers that.

3   Management proceeds are based on either the ownership of

4   outright equity, as it was in Denali or management incentive

5   plan which requires the payment of related party indebtedness

6   which includes even management fees owed to Patriarch, but

7   doesn't include bank debt or other things.  So, you are

8   mixing agreements and conflating definitions.

9           MR. BARRY:  Mr. Reil, can we put up the amendment,

10  the eighth amendment to the credit agreement which is, I

11  think, Joint Exhibit 2.

12  BY MR. BARRY:

13  Q     Ms. Tilton, while that document is coming I think you

14  testified that the Octaluna's recorded the eighth amendment

15  as a capital contribution.  Is that correct?

16  A     That is correct.

17  Q     Okay.  PPMG or Octaluna didn't submit any documentation

18  to support that contention, did they?

19  A     Submit information to whom and when? I don't understand

20  the question.

21  Q     There's no trial exhibit that was submitted that would

22  demonstrate what you just said?

23  A     I don't believe so, no.

24  Q     So, this is amendment number eight.  You talked about

25  an equity kicker.

1    A      That's correct.

2    Q      Can you show the court where equity kicker is discussed

3    in this document?

4    A      It's not discussed in this document.  Part of the

5    indenture and how things are treated if they are not loans

6    and borrowed money from the funds as upside (indiscernible).

7    The definition of equity kicker in the indenture.

8    Q      Okay.  So, equity kicker is not a concept that's in

9    this agreement.  Is it in the credit agreement with LVD and

10   Zohar?

11   A      The word equity kicker, no.

12   Q      Yes.  Okay.

13          What about you testified on direct about the OC ration.

14   Can you point us to where in this document the OC ratio is

15   discussed?

16   A      It's not.  It's part of the indenture for the Zohar

17   funds, but its --

18   Q      Is LVD a party to that indenture?

19   A      (Indiscernible) was not recorded as loans or debt.

20   Q      Is LVD a party to that indenture?

21   A      No, it's not.

22          MR. BARRY:  Mr. Reil, can we put up -- let me ask

23   one more question relative to the amendment eight.

24   BY MR. BARRY:

25   Q      Were the liabilities referenced in amendment eight

1  secured by collateral?

2  A    I don't really understand your question.

3  Q    I will ask it the same way.  Were the liabilities

4  referenced in amendment eight secured by collateral?

5  A    Are you asking me if the accrued interest tranches are

6  secured by collateral?  I am --

7  Q    I'm asking you --

8  A    I'm going to have to read amendment eight to go through

9  and understand what liabilities you are speaking to.  If you

10  want me to read the whole thing I will.  If you want to point

11  me to what you are asking me to then I can reply; otherwise,

12  I am going to have to read the entire agreement to understand

13  what liabilities it points to.

14  Q    Okay.  And, again, the liabilities that were

15  restructured in amendment eight what liabilities were those?

16  A    Those were accrued interest tranches.  It was accrued

17  interest that could have either been forgiven by the

18  collateral manager, continued owing or could have been

19  converted into these loans that were accrued interest

20  tranches and, basically, the equity kickers or upside when

21  and if the company had the money to pay when it was sold.

22  Q    And that interest was due from LVD to the Zohar's,

23  correct?

24  A    That is correct, but it was also something that could

25  have been forgiven by the collateral manager. And in

1    instances where we didn't believe the company would have the

2    wherewithal to pay.  It was forgiven.  And where we thought

3    that the company's increased value would maybe be able to

4    allow it to be paid, and because it closer aligned to the

5    loans then to the equity we added these as equity kickers.

6         Interest income has to be paid by the funds whether or

7    not this (indiscernible).  Therefore, when that interest

8    income is due and owing it has already been asked and when

9    it's put back into the company its put back in as an equity

10   contribution.

11              MR. BARRY:  Mr. Reil, can we put up Zohar 6.

12   Okay.  Can we go to Paragraph 5(d) please.

13   BY MR. BARRY:

14   Q    And, Ms. Tilton, you read this provision in your direct

15   examination, correct?  Do you recall that?

16   A    Out of the phantom equity agreement, I don't recall

17   reading this in my direct.

18   Q    Would you take a moment and read this.  Let me know

19   when you're finished?

20   A    Okay.  I've read it.

21   Q    Thank you.

22        Do you see, on the second line, there's a parenthetical

23   that says without regard to liabilities in the context of an

24   asset sale.  Do you see that?

25   A    Yes.

1    Q      Do you have an understanding as to what that means?

2    A      Well, it means that if 80 percent of the company assets

3    are sold without regard to whether the liabilities are picked

4    up or taken its considered a change of control.

5    Q      Okay.

6    A      And then, of course, it goes onto add a parenthetical

7    other than to sale of persons who already own 50 percent of

8    the limited liability company interest.

9          MR. BARRY:  Okay.  And, Mr. Reil, could we please

10   put up PPMG Exhibit 6.  Oh, take this down.  Take this down,

11   please.

12   BY MR. BARRY:

13   Q      My apologies.  Let's refer to --

14   A      I have the exhibits next to me if you want me to pull

15   something up.

16   Q      I wrote down, I think, your pint point sites, Ms.

17   Tilton.  I think it's 468 of the PDF's that you have.  Let me

18   know when you're there?

19   A      I'm there.

20   Q      Okay.  In the top, just so we're on the same page.

21   Literally, the top should say net proceeds and then portfolio

22   company see sale distributions.  Is that what you are looking

23   at?

24   A      Yes.

25   Q      Okay.  And when was this document prepared?

48

1  A      I believe it was prepared in accordance with the

2  overall plan of reorganization back in -- it would have been,

3  you know, June, July, August timeframe of 2019.

4  Q      Okay.  And who prepared it, if you recall?

5  A      It would have been Carlos Mercado -- wait a second,

6  this is a different one I think.  One second, let me just

7  check.  Yeah, I think this one was in the summer of 2019 at

8  the time of plan of reorganization.  This would have been

9  prepared by Carlos Mercado who works for me.

10 Q      And in PPMG's brief it says,

11        "Ms. Tilton reviewed in detail with the debtor's

12 representative flow of funds model for both portfolio company

13 B and C in July of 2019."

14        Is this that model?

15 A      Yes.

16 Q      And who did you review this in detail with?

17 A      It was in your offices.  And I sat with Mike

18 Katzenstein, Joe Farnan, Anthony McKiernan, John Greene,

19 Randy Jones was with me.  So, we went through each one of the

20 Class A companies, flow model and went through it line item

21 by line item.  It was put up on the screen in the conference

22 room when you first enter your offices.  We went through

23 every one of them line item by line item to explain how we

24 got to our plan of reorganization through the sale of this as

25 well as three other portfolio companies to Jefferies with me

1  rolling over all my interests.

2          MR. BARRY:  Your Honor, if I could just have one

3  moment.  Okay.  Just a couple more questions.

4          Mr. Reil, could we put up Zohar -- excuse me, PPAS

5  3.

6  BY MR. BARRY:

7  Q    Ms. Tilton, who is Patriarch Partners Agency Services

8  again?

9  A    It's the administrative agent for the or it was for the

10 Zohar funds that are owned by me.  Right now the agent for my

11 personal investment funds.

12 Q    And this purports to be an invoice from Patriarch

13 Partners Agency Services to Oasis that does not charge

14 interest on the amendment eight.  Is that correct?

15 A    No.  This was prior to amendment eight.  This is the 14

16 million past due interest that was converted into one of the

17 term loan equity kickers.  This is Zohar II's portion of 14

18 million.

19         MR. BARRY:  Mr. Reil, let's go to PPMG 4.

20 BY MR. BARRY:

21 Q    Okay.  Again, what is this purporting to demonstrate,

22 Ms. Tilton?

23 A    Well this one is for a different fund.  I believe this

24 is for Zohar I.  This would just be the current interest due

25 on the revolver and the term loans, you know, after the

1  amendment was done the past due is gone, but there is no
2  interest charged on the restructured facilities which I think
3  were D&F or I don't recall sitting here right now.
4      What you see is that the past due is gone and there is
5  no interest charged on those newly created term loan equity
6  kickers.
7  Q    And what is term loan C, what is that?
8  A    I am not sure sitting here right now.  That is
9  certainly not amendment eight, but it must have been an
10 additional loan provided.
11 Q    You don't know what it is?
12 A    No, not sitting here right now.
13 Q    And you find that Patriarch Partners Agency Services
14 records are typically correct and accurate?
15 A    Yes.
16         MR. BARRY:  Your Honor, I don't think I have any
17 other further questions on cross.
18         THE COURT:  Thank you.
19         Before we go back to -- let me ask for the record
20 is there any other party that wishes to cross-examine Ms.
21 Tilton?
22      (No verbal response)
23         THE COURT:  Okay.  Before I give Ms. Loseman the
24 opportunity to have redirect I have one point of
25 clarification, Ms. Tilton, and you can correct me if I'm

1  wrong.  I think your testimony was with respect to the MSA

2  that you did not negotiate the agreement or currently, as you

3  sit here today, know of any discussions that occurred between

4  the company and Patriarch regarding the management services

5  agreement.  Is that correct?

6          THE WITNESS:  I said that I've seen an email of

7  John Herrington who was the executive director and John

8  Kuckerik talking about the terms, but I don't know of any

9  negotiation between the two of them or nor was I involved in

10 any negotiation on the term.

11         THE COURT:  Okay.  So, then for my information how

12 did you come to form the basis of your understanding

13 regarding the MSA?

14         THE WITNESS:  Well, I was involved when the

15 lawyers put together the form of the MSA and it involved in

16 the fee schedule charge, both the transaction fee and the

17 monthly fee based on whether or not revenues were a certain

18 amount or whether they were positive EBITDA.

19         So, in the form I was involved with Jennifer

20 Gaines [phonetic] and Jones Day in putting the form together.

21 I just didn't negotiate any of the terms of this agreement

22 with Oasis, but I was very involved in the putting together

23 of the form document as well as understanding what other

24 private equity funds charged versus what we're charging for

25 the services we're providing and whether it was market or

1  below market.

2         So, in the form I was very involved.  In the

3  negotiations between the company that was done by other

4  Patriarch and PPMG people, whether it was the lawyers or the

5  executive directors, the platform leaders, I didn't negotiate

6  directly on their fee schedule, but I was very involved in

7  the form document and the initial charges, the fees and the

8  monthly fees that would be charged.

9         THE COURT:  Okay.  So just to close the loop, so

10  in the form document that you helped put together was the

11  provision that is the subject provisions, I guess, the

12  definition of liquidity event and the proviso paragraph that

13  we're focused on as well as annex A, was that all part of the

14  form?

15         THE WITNESS:  Yes, it was.

16         THE COURT:  Okay.  Thank you very much.

17         Ms. Loseman?

18         MS. LOSEMAN:  Yes.  Just briefly.  Thank you, Your

19  Honor.

20                  REDIRECT EXAMINATION

21  BY MS. LOSEMAN:

22  Q    Ms. Tilton, you were asked on cross examination several

23  questions about value creation and the relation of PPMG's

24  transaction fee to value creation.  Do you recall those

25  questions generally?

1   A      Yes.

2   Q      Now in those cases where a portfolio company became

3   (indiscernible), it wound down, or ceased to operate, or

4   filed for bankruptcy has PPMG received a transaction fee in

5   those cases?

6   A      No.  They have never taken a fee in those cases.

7   Q      And in those cases or those circumstances has PPMG

8   recouped any past due or accrued management fees?

9   A      No, we have not.

10         MS. LOSEMAN:  I have no further questions, Your

11  Honor.

12         THE COURT:  Okay.  Thank you.

13         Mr. Barry?

14         MR. BARRY:  I'm sorry, Your Honor.  I do have one

15  -- literally one question on redirect.

16         THE COURT:  That's fine.  Please go ahead.

17         MR. BARRY:  Thank you.

18                    RECROSS EXAMINATION

19  BY MR. BARRY:

20  Q      Ms. Tilton, isn't it the case that in the Dura

21  bankruptcy you filed a claim for your 5 percent transaction

22  fee?

23  A      I don't believe that's the case, no.

24  Q      You didn't file a proof of claim asking the court to

25  allow a transaction fee or, at least, reserving your right to

1  seek a transaction fee?

2  A    No.  Not that I am aware of, no.

3         MR. BARRY:  Nothing further, Your Honor.

4         THE COURT:  Okay.  Ms. Tilton, thank you so much

5  for your time and energy today.  I appreciate you taking the

6  time out of your schedule to testify today.  It was very

7  helpful.  You can consider yourself released from our virtual

8  witness box.

9         Thank you.

10        THE WITNESS:  Thank you very much.  I appreciate

11 you listening to me.  Bye-bye.

12        THE COURT:  Bye.

13    (Witness excused)

14        THE COURT:  Okay.  Before we go into oral argument

15 could we please take a ten minute break?  Is that okay with

16 the parties?

17        Okay.  So, we will be back at twenty of twelve.

18 Thank you.

19        COUNSEL:  Thank you, Your Honor.

20    (Recess taken at 11:31 a.m.)

21    (Proceedings resumed at 11:40 a.m.)

22        THE COURT:  Okay, everyone, this is Judge Owens.

23 If you're all available, we're back on the record and it

24 looks like everybody is on that needs to be on.

25        Okay.  So, why don't we go into closings.

1           Mr. Barry?  Or did you make a decision on who was
2    going first since it was cross-motions?
3           MR. BARRY:  Do you mind, Monica?
4           MS. LOSEMAN:  No, not at all.  Go ahead.
5           MR. BARRY:  Thank you.  I guess that's the one
6    thing we didn't talk about before now, but thank you,
7    Ms. Loseman.
8           Your Honor, we think that the Court's analysis
9    here involves three steps and, again, at the crux of this is
10   the Court's interpretation of 3(c)(2)(d) of the management
11   services agreement and I think there's three steps here for
12   the Court.
13          First, both parties argue that there's only one
14   reasonable reading of the agreement; of course, each side is
15   advocating that their reading is the only reasonable reading.
16   And if the Court determines that one of the party is correct
17   as to the reasonableness of their reading versus the
18   unreasonableness of the other's, the Court's inquiry ends
19   there.
20          If, however, the Court decides that the provision
21   is susceptible to more than one reading, then the Court can
22   consider parol evidence and, again, we submit that the
23   evidence that we've adduced, on balance, supports our
24   reading.
25          But I think importantly, Your Honor, if the Court

1   is still not convinced by the extraneous evidence that's

2   submitted, the Court has to resort to the doctrine of *contra*

3   *proferentem*.  Under that doctrine where one party drafts the

4   agreement, it would be construed against that party, and I

5   think here, there's no debate as to who drafted the

6   particular agreement in question, and that's PPMG.

7        So, Your Honor, we think those are the three steps

8   the Court must take to analyze this.  Again, reviewing the

9   plain language and determining if one party has a superior

10  reading of the language, determining whether or not the parol

11  evidence resolves any ambiguities, and if not, the Court

12  must, under New York law, construe the agreement against the

13  drafting party.

14        And I will note, Your Honor, that PPMG actually

15  cites to the Italian Designers case, which stands for the

16  proposition that we cite in our papers on *contra proferentem*.

17  It actually has a quote that says in instances where there's

18  an ambiguity, not that the Court may, but that it's a matter

19  of law and the Court must construe the agreement against the

20  drafting party.

21        So, here, Your Honor, the parties agree that the

22  term "change of control" as stated in the agreement is not

23  defined anywhere in the MSA or in the annex thereto, but

24  notwithstanding, we would submit that the agreement is

25  nonetheless clear on its face.

1          We think that it's fairly clear that change of
2   control, as used in the agreement must be read to mean
3   liquidity event and it must be a qualifying liquidity event
4   and the qualification being, that it must have paid off all
5   of Oasis' debt, which here, as all parties agree, the
6   Culligan deal did not, subject to Ms. Tilton's argument that
7   the Tranche 8 was equity.
8          And we think it's clear for a few reasons.  First,
9   the term change in control, change of control is used in the
10  definition of liquidity event, itself.  It's reasonable, Your
11  Honor, to conclude that provisions in the definition are
12  intended to refer to the term being defined, rather than as
13  PPMG urges, an unrelated provision in an annex, that's
14  actually not the same provision.
15         Second, the provision seeks to place a further
16  limitation on which of the three enumerated events under
17  liquidity event will "qualify as something."
18         So, the usage of the phrase in each case, Your
19  Honor, in 3(c)(2)(d), we think that that suggests that the
20  thing being qualified for here is the "liquidity event."
21  It's been defined by reference to the three events, X, Y, and
22  Z, in the first sentence of 3(c).
23         The definition of liquidity event, itself, is used
24  only for one purpose in the MSA and that's to define whether
25  PPMG is entitled to the management agreement.

1         And the term "qualifying," we think, Your Honor,

2    is key to that purpose.  It plainly establishes what type of

3    liquidity event qualified for the payment.  And I don't think

4    PPMG in its papers has addressed the word "qualifying" in

5    3(c)(2)(d).

6         Next, Your Honor, we think that 3(c) defines when

7    the transaction fee would be payable, so it would be logical

8    that 3(c)(2)(d) would put a further limitation on when it

9    becomes payable, rather than it has anything to do with Annex

10   A, which discuss when and how the standard of conduct is

11   applied and who gets indemnification and when.

12        Finally, Your Honor, we think that under our

13   reading, that the use of the term "change in control" under

14   Annex A is not disturbed.  You don't have to reconcile change

15   in control with change of control, and so, that, again,

16   supports the debtors' reading that the Court can and should,

17   on the face of it, conclude that change of control in

18   3(c)(2)(d) means liquidity event.

19        Your Honor, turning to PPMG's arguments, their

20   first argument is, and I think Ms. Tilton's testimony bore

21   this out a little bit, they argued that:

22        "The transaction fee is based on a transactionally

23   defined eligible equity value, that it's fundamentally tied

24   to the company's sale price."

25        So, they focused on the fact that the transaction

1  fee should be tied to its equity value.

2          Absent the transaction clearing the debt, there is

3  no equity value, so why use the term equity value if the

4  transaction fee is triggered whether there's equity value or

5  not?  I think Ms. Tilton's testimony today supports that.

6  She, I think, testified that the transaction fee was due, in

7  part, to reward PPMG for enhancing value.

8          Second, Your Honor, PPMG argues that the term

9  "change of control" at the end of 3(c)(2)(d) "must be

10 honored."  Your Honor, we don't understand that because the

11 parties have agreed that that's actually not a defined term,

12 so there's nothing really to honor there since it's not

13 really defined.

14         And I think PPMG goes on to posit that the use of

15 the phrase "without regard to liabilities" in an inapplicable

16 provision, the definition of liquidity event somehow negates

17 the debtors' argument there.

18         I think I understand the argument, Your Honor.  I

19 think it's how can it be a requirement that a transaction

20 fee -- how could it be a requirement to earn the transaction

21 fee to pay off Oasis' debt if a liquidity event is "without

22 regard to liabilities."  I think that's the argument they're

23 making and this argument, I think, actually supports the

24 debtors.

25         So, the "without regard to liability" language is

1    only in subsection X of the definition of liquidity event,

2    which is an asset sale -- that's one of the three liquidity

3    events, but it's only an asset sale.  So, if that language,

4    if we disregard liabilities for purposes of a liquidity

5    event, it's only a sale event, we only disregard it as to an

6    asset sale, because that's the only place that that language

7    appears.

8              So, the absence of that language in connection

9    with a stock sale, which the Culligan deal was, suggests that

10   we can and should consider liabilities.

11             I also think and, again, I think Ms. Tilton's

12   testimony relating to the phantom equity agreement, puts a

13   real fine point on this next point, Your Honor, which is the

14   "without regard to liabilities" phrase has nothing to do with

15   the *proviso* at the end of 3(c)(2)(d).  It's really clarifying

16   an asset sale.

17             When an asset sale constitutes a liquidity event,

18   it has to be 80 percent of the sale, without regard to

19   whether the buyer is assuming or leaving behind liabilities.

20   That's exactly how Ms. Tilton interpreted that provision in

21   the phantom equity agreement.

22             Candidly, that's exactly how I wrote it in my

23   notes in preparing for this hearing and I think that's what

24   it means.  It doesn't having anything to do with a

25   "qualifying liquidity event" for purposes of triggering the

1    fee.

2              And, finally, Your Honor, I think we asked

3    Ms. Tilton on cross how to reconcile the "without regard to

4    liabilities" phrase.  It's irreconcilable with the latter

5    portion of the phantom equity agreement which says you have

6    to clear the debt in order to have a qualifying change of

7    control.

8              It's virtually the same language that's in

9    3(c)(2)(d) of the MSA and the two can't really coexist.  So,

10   the argument that without regard to liabilities means you

11   disregard whether the company had liabilities for all

12   transactions just simply doesn't hold water.

13             Lastly, Your Honor, the PPMG hasn't, I don't think

14   they've explained how 3(c)(2)(d) relates to the

15   indemnification provisions.  Ms. Tilton was asked on cross-

16   examination to kind of connect the dots on that.  I think she

17   failed to do so.

18             Once more, Your Honor, why put that provision in

19   Section 3 relating to a liquidity event and a transaction fee

20   when there's an entire section entitled, "Indemnification,"

21   that that could have been put into.

22             And then Ms. Tilton, I think, testified that under

23   her view, change in control should be read as change of

24   control; the two are interchangeable with respect to the

25   annex.  But we think that that's not possibly the case and

1   here's why, first, again, they're not the same phrase.

2   Change of control says change of control.  Change in control

3   says change in control.  They're not the same.

4            Second, Annex A of paragraph 9 which defines

5   change in control expressly says it's only so defined "for

6   purposes of this annex."  Even Ms. Tilton testified her

7   understanding of that was that that only meant as to Annex A,

8   not to the MSA, itself.

9            So, lastly, what does Annex A do?  Annex A relates

10  to the determination of whether a covered person is entitled

11  to indemnification.  So, Section 2 says that there has to be

12  a determination by either the Board or independent counsel as

13  to whether the standard of conduct to receive indemnification

14  has been met and then it says three things.

15           It says, one, if there's not been a change in

16  control on the Board's side; two if there's been a change in

17  control, the independent counsel decides unless; three,

18  there's not been a change in control and the covered person

19  wants the Board to decide.  That has absolutely nothing to do

20  with whether and how the debtor is cleared, whether and how

21  there's a liquidity event, and whether and how PPMG gets paid

22  its fee.

23           So, Your Honor, for all those reasons, we think

24  the Court can and should read on the face of it that change

25  of control is actually meant to be a liquidity event in

A-811

1   3(c)(2)(d), and before I move on, Your Honor to, the next

2   argument, which relates to parol evidence, I wanted to pause

3   and see if Your Honor had any questions.

4              THE COURT:  I do not.  Thank you, though.

5              MR. BARRY:  Okay.  Thank you.

6              So, as I said, Your Honor, if the Court determines

7   that there's more than one -- that the agreement is

8   susceptible to more than one reading, the Court can consider

9   extraneous evidence to resolve that difference.  The evidence

10  that's been adduced thus far is as follows:  first, there's

11  the Company C flow-of-funds model.  This was an illustrative

12  portfolio company transaction where the Zohar Funds were not

13  getting paid in full, despite what PPMG says in its brief.

14  The flow-of-funds model clearly shows PPMG not getting paid

15  at closing.  It's listed below the proceeds deficit line,

16  which means it wasn't getting paid.  And I think as

17  Ms. Tilton testified, this was a model that PPMG just kind of

18  had laying around, and as such, it was the default model, so

19  we think that that militate in favor of the debtors' reading.

20             Ms. Tilton asked the Court to consider

21  Ms. Tilton's later July 2019 model as more demonstrative as

22  to how a transaction might work.  Your Honor, as Ms. Tilton

23  testified, that model was drafted and prepared in relation to

24  her attempt to acquire the company that's the subject of the

25  model in the summer of 2019.  So, it would behoove her to

1   increase the amount that she is owed as part of that model,

2   because it would be an offset or a deduct on her purchase

3   price.

4           So, if she's making a play for that company, it

5   would behoove her to go into the company and slant the model

6   and say, You owe me X millions of dollars and as a part of

7   the consideration, I'm going to give you, as a part of that

8   deal, I'm going to forgive or offset what you owe me.

9           So, we think, Your Honor, if we're doing the sort

10  of battle of the flow of funds, it would seem the flow-of-

11  funds model sitting around in February 2019, as Ms. Tilton

12  was sort of on her way to the airport and just thrown it

13  together, that seems to be, to me, to be more objective than

14  something that she put together in the context of making a

15  play to acquire the company.

16          There's the phantom equity agreements, Your Honor.

17  We think that Ms. Tilton's testimony, particularly as it

18  relates to the use of the phrase "without regard to

19  liabilities," she testified precisely as to the meaning of

20  that.  We think that that virtually eliminates their argument

21  as to the meaning of the term "without regard to liabilities"

22  and we don't think there was a fair reconciliation of that

23  argument that they make in their papers with the *proviso* at

24  the end of Paragraph 5(b) of the phantom equity agreements

25  which says the change of control has to clear the debt;

1    again, they're not identical, but they're virtually the same.

2              So, we think on balance, Your Honor, if that's the

3    parol evidence that the Court is considering, we think it

4    overwhelmingly weighs in favor of the debtors.

5              Lastly, Your Honor, is -- again, if Your Honor is

6    not convinced by the parol evidence, we get to the doctrine

7    of *contra proferentem*, which, again, both parties have cited

8    to jurisprudential law in New York on this concept.  If the

9    Court decides that both parties have a reading of the

10   agreement that, to which it's acceptable, the Court must

11   construe the agreement against PPMG.

12             And I think here, Your Honor, the evidence is

13   not -- it's uncontroverted.  PPMG and its lawyers at Jones

14   Day prepared the agreement.  Ms. Tilton was the stole

15   director -- excuse me -- sole manager of Oasis.  Counsel to

16   PPMG characterized the agreement as a "fairly standard

17   agreements used across all PCs."

18             We think, Your Honor, that alone is sufficient to

19   construe the document against PPMG and, in fact, the fact

20   that they drafted it alone is sufficient to construe it

21   against them.  In addition to that, we think the evidence

22   demonstrated that the management of Oasis could not have

23   negotiated this.

24             The authority matrix that Ms. Tilton testified to,

25   only she could have approved a transaction of this variety

1   and of this type, and as the manager, only she could approve

2   this agreement.  So, that, again, we think that the disparity

3   and the ability to negotiate that agreement should be weighed

4   against PPMG and we think, Your Honor, under the doctrine of

5   *contra proferentem*, the Court and should construe that

6   agreement against PPMG.

7            So, Your Honor, let me pause there.  I'm going to

8   get into the argument relating to whether the debt is equity

9   or the equity is debt, but I wanted to pause to see if Your

10  Honor had any questions.

11           THE COURT:  I do not.

12           MR. BARRY:  Okay.  So, Your Honor, the next

13  argument relates to the Tranche 8 debt.  The argument is that

14  even though the Zohars were owed some $81 million, over $20

15  million of that was what is being called an "equity kicker"

16  and because the Oasis deal with Culligan returned more than

17  $61 million, even if you agree with the Zohar's reading of

18  the MSA, the debt was cleared.

19           So, their arguments start with the following:

20           "The debtors failed to cite any probative

21  evidence, nor any legal authority whatsoever regarding

22  whether the parties intended the eighth amendment to create

23  debt or equity, which is the relevant legal question."

24           So, Your Honor, the reason that I think they start

25  with the "no probative evidence of intent" is because the

1  parties' intent is unambiguously manifested and the only two

2  documents the Court really needed to look at, which is the

3  credit agreement and Amendment 8 to the credit agreement,

4  both of which repeatedly and unambiguously characterized what

5  Amendment 8 was, was debt.

6          Even Ms. Tilton's own testimony, although she

7  called it an equity kicker, she conceded, Your Honor, what

8  that was, was accrued interest that was owed by Oasis to the

9  Zohars.  That's debt.  The fact that it was put into a new

10 amendment and recycled into that credit facility doesn't make

11 it anything but debt and Ms. Tilton couldn't testify as to

12 what an equity kicker was, where it could be found in the

13 documents, where the OCI (indiscernible); those are all

14 concepts that relate to the indenture, to which, again,

15 Ms. Tilton testified, Oasis is not a party.

16         So, Your Honor, setting aside what we think is a

17 pretty clear and unambiguous decision for the judge, I'll,

18 nonetheless, indulge in the SubMicron factors to, you know,

19 sort of cover that up.  And PPMG's argument relating to

20 SubMicron, the entirety of that is as follows:

21         "As made clear from the available evidence and the

22 economic reality of the surrounding circumstances, which are

23 laid out in detail in PPMG's opening brief, that $20 million

24 was, in fact, a capital contribution, resulting from a

25 restructuring."

1          That's the entirety of their argument on
2    SubMicron, and rather than address all of the SubMicron
3    factors, they take on two of them.  The Tranche 8 didn't
4    carry interest and they, "absence of meaningful security for
5    Tranche 8."
6          So, let me address those and then I'll move on to
7    the rest of the SubMicron factors.  First, they're wrong.
8    The Tranche 8 did carry interest.  Schedule A to the
9    Amendment 8 lists an applicable margin of zero percent.
10         In Section 2.8 of the credit agreement, titled
11   "Interest on Loans" provides that:
12         "Each loan that has bear interest on the unpaid
13   principal amount thereof from the date made through repayment
14   at a rate per annum, equal to LIBOR plus the applicable
15   margin."
16         That's what the credit agreement says and
17   Section 2.8(c) of the credit agreement says:
18         "Interest on loans shall be payable in arrears on
19   the first day of each calendar month of, one, the first day
20   of each calendar month; two, the date of any prepayment of
21   the loans, whether voluntary or mandatory, to the extent
22   accrued on the amount being repaid; and, three, the maturity
23   date."
24         So, Your Honor, we think that the document,
25   despite Ms. Tilton's testimony, the documents clearly and you

 1    equivocally demonstrate that Amendment 8 accrued interest at

 2    LIBOR and there were -- it was payable under the agreement.

 3              Now, she testified that they never paid it.  I

 4    don't -- I can't test that testimony, to be honest with you,

 5    but just because they didn't pay it doesn't mean it wasn't

 6    payable, and we think the documents are clear on their face

 7    that it was clearly payable.

 8              Second, Your Honor, with respect to this concept

 9    that there was an absence of meaningful security, I asked

10    Ms. Tilton in cross-examination if she believed the

11    liabilities under Tranche 8 were secured by collateral, used

12    for secured credit facilities, and she couldn't answer the

13    question.  I think her response was, I can't say so sitting

14    here today.

15              And under their -- their argument is a lack of

16    meaningful security is a "strong indication that the advances

17    were capital contributions."

18              Your Honor, there's been no argument thus far that

19    these were not secured obligations.  2.1(c) of the credit

20    agreement clearly says that these are secured obligations and

21    not only was Tranche 8 secure, Your Honor, it was actually

22    partially paid as secured indebtedness under the Oasis-

23    Culligan transaction that Ms. Tilton, herself, negotiated.

24    They were paid -- they were partially satisfied as secured

25    indebtedness.

1          So, we think, Your Honor, that the two SubMicron

2     point that they make in their papers, we think that the

3     overwhelming evidence demonstrates that those are not

4     (indiscernible), but just so there's no lack of clarity, I'll

5     run very quickly through the other SubMicron factors if I

6     can.

7          Number one, the name given to the instrument,

8     Amendment 8 clearly and repeatedly identifies as debt.

9     Various other documents identified as debt.  Oasis in its own

10    financial records identified as debt, which the SubMicron

11    Court found to be very persuasive as to how a borrower

12    carries a liability on its books as being very persuasive as

13    to whether it's debt or equity.

14         Other documents, Your Honor --

15         THE COURT:  Mr. Barry, let me interrupt you.

16         Where in the evidence is the evidence that Oasis

17    treated it as debt?  Is that part of the evidentiary record?

18         MR. BARRY:  It is, Your Honor.  It's the

19    disclosure schedules to the equity purchase agreement

20    contains the consolidated balance sheet and other financial

21    statements.  I can give you pinpoint cites to those

22    particular references.  They're also in our papers, but Oasis

23    carried approximately $81 million of long-term debt which

24    would have included, and did include the twenty-million-

25    dollar Tranche 8.

```
 1                THE COURT:  Okay.  Thank you.
 2                MR. BARRY:  You're welcome.
 3                And, again, the payoff letter that is also in
 4  evidence, Your Honor, and Ms. Tilton herself signed, includes
 5  the $20 million of debt as indebtedness being repaid.
 6                Two, Your Honor, under SubMicron, the intent of
 7  the parties, we think it's clearly manifested in the
 8  documents and the actions of the parties.  It's called debt.
 9  It's treated as debt.  And, again, it was paid as debt in the
10  Culligan transaction, at least in part, that Ms. Tilton
11  negotiated herself.
12                Third, Your Honor, the presence of a fixed
13  maturity, I don't think the parties disagree this had a fixed
14  maturity.  I think Ms. Loseman asked Ms. Tilton the question
15  on direct examination, Does equity have a fixed maturity?
16                And she said, Sure, preferred equity often has a
17  maturity date.
18                But she didn't testify that this was preferred
19  equity; she testified that this was something called an
20  equity kicker.  I don't -- frankly, I'm not going to try to
21  explain what I think an equity kicker is -- but Ms. Tilton
22  didn't testify that an equity kicker does or doesn't have a
23  maturity date.
24                Fourth, Your Honor, the right to enforce a payment
25  of principal and interest.  I won't go through it again, Your
```

1    Honor, but I just mentioned Section 2.8(a) and 2.8(c) of the

2    credit agreement, along with 2.1(c) of the credit agreement,

3    addressed interest in the apportionment of payment.

4             Five, presence or absence of voting rights.  I

5    don't think there's any dispute that there were none granted

6    in the eighth amendment.

7             Six, the status of contribution in relation to

8    regular corporate contributors.  Tranche 8 was a secured

9    obligation and it was paid as such.  As such, it was senior

10   to all the way through these other "corporate contributors."

11            And, finally, a certainty of repayment in the

12   event of an insolvency or liquidation.  Again, we were a

13   secured creditor, including as to Tranche 8, which doesn't

14   tie us to the fortunes of the equity of Oasis.

15            So, Your Honor, on balance -- not even on

16   balance -- in total, the SubMicron factors weigh heavily in

17   favor of a conclusion that this was debt and not equity.

18            And, Your Honor, with that, let me pause and see

19   if Your Honor has any questions.

20            THE COURT:  No, I don't have any questions.  Thank

21   you.

22            MR. BARRY:  Okay.  Thank you, Your Honor.

23            THE COURT:  Go ahead, Ms. Loseman.

24            MS. LOSEMAN:  Your Honor, can you hear me?

25            THE COURT:  I can.

1           MS. LOSEMAN:  Great.  Thank you.

2           For two reasons Your Honor should deny the

3    debtors' motion and grant PPMG's motion and rule that the

4    transaction fee was properly paid to PPMG.  First, the

5    management services agreement makes clear that PPMG is owed a

6    transaction fee based upon the occurrence of a liquidity

7    event and the definition of a liquidity event is not

8    dependent on satisfaction Oasis' outstanding debt.

9           I'll walk through and address the contract's

10   language and the debtors', frankly, attempt to rewrite the

11   contract here.  I will also address the parol evidence that

12   debtors rely on, in effect, to amend an agreement that they

13   are not even a party to.  Lastly, I address the hypothetical

14   scenario where debtors' interpretation of the agreement

15   prevails.  The transaction here, in any event, covered Oasis'

16   outstanding debt because the restructured facility under

17   Amendment 8, is not debt under the applicable case law.

18          So -- and, Your Honor, I am going to use

19   demonstrative slides just to aid in the argument.  If it

20   becomes distracting, just let me know.  The demonstratives

21   are merely cut-and-paste language from the MSA itself.

22          And, Mr. Faraj, if you'd share your screen, let's

23   go to Slide 2 of the demonstrative.  Thank you.

24          Now, Your Honor, this is the definition of

25   "transaction fee" from Section 3(c)(i) of the management

 1   services agreement and it sets forth the framework for
 2   determining PPMG's transaction fee and it involves two fairly
 3   straightforward steps.  First, do we have a liquidity event
 4   and, second, if we do, what is the amount of the transaction
 5   fee?
 6          Let's turn to the next slide.
 7          So, as to step one, under Section 3(c)(2)(d),
 8   liquidity event means one of three things:  a sale of Oasis'
 9   assets, a sale of the company's equity, or a merger of the
10   company with a subsidiary or another company.
11          The Oasis transaction here involved the sale of
12   all of the company's stock, qualifying as a liquidity event
13   under Paragraph Y of the definition of liquidity event.
14          So, then we go to step two, and let's move to the
15   next slide.  So, how is the transaction fee calculated?
16          The transaction fee is calculated as a percentage,
17   a defined term, eligible equity value.  Now, eligible equity
18   value is total equity value, another defined term, which is
19   defined essentially to include consideration for the
20   transaction.  So, cash plus the fair value of any other
21   consideration provided, and in the case of an asset sale,
22   also minus any debt assumed by the purchaser.
23          And then that total equity value, from that, we
24   deduct any management proceeds, which are proceeds that would
25   flow to management on account of any equity security interest

1    held by those members of management.

2           And the transaction fee for the Oasis' transaction

3    was calculated in accordance with this definition of the

4    amount paid, in connection with the closing of the

5    transaction.  This is the result of a plain reading of the

6    management services agreement.

7           And debtors essentially seek to amend or rewrite

8    the agreement, itself, as non-parties, and this is an

9    important point to keep in mind, Your Honor:  Debtors are not

10   a party to this agreement.  Only PPMG and Oasis, the company,

11   are parties to this agreement.  Debtors, as non-parties, seek

12   to change the contract terms by asking the Court to

13   substitute the terms in the contract.

14          And if we go back to Slide 3, the debtors'

15   argument is, essentially, that the last clause in this

16   paragraph defining liquidity event was meant to change the

17   entire structure and meaning of transaction fee under the

18   agreement.

19          Debtors suggest that that last dangling sort of

20   clause of the definition of liquidity event was meant to

21   exclude the (c) entirely where the event, the qualifying

22   event is not clear, all outstanding debt.

23          Now, in order to get there, debtor asked this

24   Court to essentially strike the term "change of control" and

25   essentially replace it with a very different term, the term

1   "liquidity event."  But the plain meaning of Section

2   3(c)(2)(d) will not bear a reading of two distinct terms:

3   liquidity event and change of control as synonyms,

4   particularly where those two distinct terms are used within

5   the very same clause.

6          Now, had that been the parties' intent, Oasis and

7   PPMG's intent, they could have simply accomplished it by

8   using the term liquidity event, where instead, they used the

9   term -- a very different term -- change of control.

10          The management services agreement's extensive use

11   of defined terms -- and I'm quoting here from Somterra

12   (phonetic), a Southern District of New York case from August

13   2019:

14          The extensive use of defined terms demonstrates

15   that its drafters were perfectly capable of using such terms

16   when they wished to do so.

17          Their decision here, PPMG and Oasis' decision not

18   to use the term liquidity event in that final clause cannot

19   be ignored.  Reading the clause, as the debtors urge, also

20   renders other portions of the contract, essentially, a

21   contradiction.

22          For example, in the case of an asset sale under

23   the definition of transaction fee within the MSA, the

24   transaction fee is a certain percentage of the eligible

25   equity value.  If the purchaser assumes any funded

 1  indebtedness or long-term liabilities as part of the

 2  transaction, the face amount of those liabilities are

 3  deducted from the consideration in calculating PPMG's

 4  transaction fee.

 5          If liquidity event, though, was designed to

 6  exclude any transaction where the price did not clear the

 7  debt, the carve-out for assumed debt in an asset sale, that

 8  carve-out in the definition of eligible equity value would be

 9  rendered superfluous.

10          The debtors' proposed reading also results in an

11  irreconcilable conflict within the definition.  If a

12  transaction -- if a liquidity event is defined to include

13  transactions, or in the case of asset sales, must clear

14  outstanding debts qualifies as a liquidity event, it would

15  render the earlier language about an asset sale completely

16  contradictory where it says that it qualifies as an asset

17  sale under Paragraph X there without regard to liabilities.

18          Now, as a rule of contract construction under New

19  York law, the MSA must be enforced according to its terms and

20  construed so as to give full meaning and effect to all of its

21  provisions, and that's a quote from the Mets (phonetic) case,

22  Eastern District of New York, 1999.

23          That -- debtors' interpretation here would render

24  the very definition of transaction fee internally

25  inconsistent and in conflict.

1            So, let me address the change of control language.

2    What is that change of control term about?

3            And let's move to demonstrative Slide 5.

4            The management services agreement includes various

5    broad indemnification provisions in Section 7 of the

6    agreement, including indemnification for PPMG, for other

7    Patriarch entities, and certain covered persons.

8            Now, Section 7 expressly incorporated MSA into the

9    management services agreement, itself, and it sets forth a

10   process where a covered person, as that term is defined in

11   that agreement in Section 7, to seek a determination

12   regarding the standard of conduct in particular

13   circumstances.  Now, whether that standard of conduct review

14   is conducted by the company's Board or is, instead, conducted

15   by independent counsel, largely depends on whether a

16   qualifying change of control has occurred.

17           And that term, "change of control," is defined in

18   Annex A to include a stock sale, consolidation, or

19   insolvency.

20           The effect of the term "change in control" -- I'm

21   sorry -- "change of control" is essentially given certain

22   conditions, a conduct or coverage determination to

23   independent counsel.  But where a change in control has not

24   occurred, the coverage determination stays with the company's

25   Board.

A-827

1          Now, while Section 3(c) -- that's the section on

2    the transaction fee -- uses the term "change of control" very

3    closely -- nearly the same as "change in control" -- a

4    reading of the use of that term to further define change of

5    control for purposes of Annex A or purposes of the

6    indemnification determination process, it leads to an

7    entirely more rational result than the contrary reading

8    proposed to the Court by debtors.

9          The use of the term there in Section 3 to further

10   distinguish a liquidity event from a change of or in control

11   event makes clear that only certain liquidity events are

12   considered change of control events.  If anything, the change

13   of control language in Section 3 can be more thoroughly read

14   to further limit those liquidity events that qualify as

15   change of control events to only those events where the

16   transaction clears all of the company's outstanding debts.

17         Under that internally consistent reading, the

18   decision regarding standard of conduct or coverage issues

19   related to the indemnification coverage will, in more cases,

20   rest with the Board than be committed to independent counsel.

21         Now, the choice of the parties to the management

22   services agreement to use the term change of control at the

23   end of Section 3(c)(2)(d), rather than the term liquidity

24   event, must be honored, and this much more straightforward

25   interpretation of the agreement does just that.

1           And we can take that document down now.  Thank

2   you, Mr. Faraj.

3           Let me turn next to the debtors' argument that the

4   management services agreement must be construed against PPMG

5   as the drafter of the document.  There's no --

6           THE COURT:  Before you move on to that topic, let

7   me -- let's revisit -- I think you had said that the debtors'

8   interpretation affects or creates an absurdity in the reading

9   with respect to items.  The first was the language without

10  regard -- this is the second one -- "without regard to

11  liabilities" as detailed in (c)(2)(d)(x).

12          What was the first one?  Something to do with the

13  total equity value calculation, I believe.

14          MS. LOSEMAN:  So, it's both, in terms of whether

15  an event qualifies as a liquidity event under the definition

16  of an asset sale under that section, so under Paragraph X.

17          If the change of control language was really meant

18  to read liquidity event at the end of Paragraph D, it would

19  render that "without regard to liabilities" parenthetical

20  meaningless.  It would have no meaning in terms of defining a

21  liquidity event.

22          But if it's also -- if change of control is also

23  really meant to be liquidity event at the end of Paragraph B,

24  it would also render meaningless the calculation of the

25  transaction fee in the case of an asset sale, where in the

1    case of an asset sale, where the purchaser assumes some

2    liability, the face amount of that liability or that debt is

3    to be deducted from the total equity value in calculating the

4    transaction fee.

5             So, those are the two instances in which, you

6    know, re-reading "change of control" to mean liquidity event,

7    renders the transaction fee, itself, internally inconsistent.

8             THE COURT:  Okay.  I'll have to take a look at

9    that definition again, then.  Thank you.

10            MS. LOSEMAN:  Sure.

11            THE COURT:  And then let me ask you one more

12   question before we move on to another topic, which is -- I

13   don't think this was addressed by the parties, but you can

14   address it and then Mr. Barry can address it -- but what do

15   we mean or what do we take from the provision that starts --

16   it's C(2) and it starts with, "For purposes of this

17   Section 3(c) ..."

18            So, isn't that section limited to just that part

19   of the management services agreement by its own terms?  It

20   says for purposes of this Section 3(c), so by definition,

21   would it mean that we wouldn't look to this section and apply

22   it to any other section, including Annex A?

23            MS. LOSEMAN:  Sure.  But that doesn't preclude a

24   reading, an internally consistent reading of the entire

25   document to read change of control to be consistent with how

1  it is defined in Annex A.

2          So, the mere fact that we're saying for purposes

3  of this Section 3(c), for purposes of calculating the

4  transaction fee, we're using terms that are defined elsewhere

5  in the agreement.  It doesn't mean that the parties meant to

6  redefine liquidity event by using the words change of control

7  there.

8          THE COURT:  But I believe, if I'm understanding

9  your argument correctly -- and I want to make sure that I

10  am -- aren't you arguing that the *proviso*, provided however,

11  does not apply to anything in this Section 3(c); it goes to

12  Annex A.

13          MS. LOSEMAN:  I'm sorry, the "provided however" at

14  the end of --

15          THE COURT:  Right.  So, the *proviso*, is it your

16  position that that *proviso* -- I guess I would ask you, how

17  does that *proviso* affect or how is it incorporated or how

18  does it address anything in 3(c)?

19          MS. LOSEMAN:  It doesn't, Your Honor.

20          THE COURT:  Okay.

21          MS. LOSEMAN:  I mean, your internally consistent

22  reading -- I think I understand your question, so thank you

23  for asking that --

24          THE COURT:  Okay.

25          MS. LOSEMAN:  Yeah.  It doesn't.  It doesn't

A-831

 1  define.  It doesn't rewrite the term liquidity event and it

 2  doesn't impact how the transaction fee is calculated.

 3          Now, how that can be reconciled with, you know,

 4  for purposes of this Section 3(c), I don't know, frankly,

 5  Your Honor, but I can tell you that re-reading change of

 6  control to mean liquidity event renders Section 3(c)

 7  internally inconsistent.

 8          So, that's the issue and that's why the preferred

 9  reading would be that change of control, as you

10  (indiscernible) there, is meant to further define or inform

11  the scope of coverage determinations under Annex A.

12          THE COURT:  Okay.  Thank you.

13          It sounds like there were -- I mean, listen, the

14  parties agree, and in Ms. Tilton's testimony, she agreed

15  there was a mistake.  There's a scrivener's error of some

16  sort in this document and it sounds to me that the

17  scrivener's error, from your perspective, there's a couple

18  scrivener's errors.

19          And because change in control -- your reading, I

20  just want to be clear that I understand your position, which

21  is change of control in the *proviso*, should mean change in

22  control, but I would also have to rewrite Annex A, because it

23  uses the phrase "change of control" consistently through

24  Annex A and that is not defined either.

25          So, it really is I have to correct the errors of

1  the use of the word "change of control" throughout the entire

2  document, is that your position --

3            MS. LOSEMAN:  Yeah, and --

4            THE COURT:  -- to "change in control."

5            MS. LOSEMAN:  That is correct.

6            And our position, Your Honor, is that that is

7  much, much less of a stretch than debtors' interpretation.

8  We're changing essentially one word and in changing that one

9  word, you're rendering the entire agreement internally

10 consistent.  The pieces, then, all work together.

11           THE COURT:  Okay.  Thank you.  I just want to

12 connect the dots.  Okay.  Thank you so much.  I didn't mean

13 to interrupt your presentation, but I think that's everything

14 on that point.

15           MS. LOSEMAN:  Okay.  Great.

16           So, I'll move on the next point, Your Honor, which

17 is debtors' contention that the agreement, the interpretation

18 of the agreement should be construed against PPMG as the

19 drafter here.  There is no cannon and the cited case law

20 certainly does not support that construction of a contract

21 against the drafter merely at the insistence of a non-party

22 to the contract.

23           Now, the three cases cited by debtors for the

24 proposition that the MSA should be construed against PPMG

25 here are actually all insurance-contract disputes.  And the

1   case that Mr. Barry referred to in his argument, the Italian

2   Designers case, is also an insurance-contract dispute.

3          Debtors cite no case law outside the insurance

4   context and those cases were also subject to the general

5   rule -- each of those cases, including the Italian Designers

6   case -- that ambiguities in an insurance policy are to be

7   construed strictly against the insurer drafter.

8          That really has no bearing here, and unlike here,

9   the parties in those disputes were, of course, also parties

10  to the insurance policy at issue.

11         Now, debtors' last citation in their brief is

12  actually to a dissenting opinion, which suggests that

13  insurance policies are interpreted against the drafter

14  because there is a disparity in the bargaining power between

15  the insurance company and the insured or covered person.

16         The debtors have presented no evidence as to the

17  history of negotiations here or even the parties' relative

18  bargaining power.  If anything, the only evidence on record,

19  Your Honor, is Ms. Tilton's testimony and it shows that the

20  portfolio companies and PPMG were on equal footing.  They

21  were capable of negotiating the terms where they determined

22  it was in their respective interests.

23         The debtors urged the Court to infer from

24  essentially a lack of evidence that there was no negotiation.

25  Oasis' did not have counsel, but it is telling here, that

1 debtors did endeavor to present any rebuttal witnesses.  I

2 think they mentioned at the last omnibus hearing that they

3 may call rebuttal witnesses and they presented no such

4 testimony here today, Your Honor.

5           The absence of evidence is not the absence of

6 negotiation or counsel's involvement by the company in

7 negotiating the MSA.  Even so, debtors have not pointed to

8 one case where a Court interpreted the contracts against the

9 drafter in such a way as to render essential defined terms

10 internally inconsistent and meaningless.

11          Before I move on to that point, Your Honor, let me

12 pause and see if you have any questions.

13          THE COURT:  No, not yet.  Thank you.

14          MS. LOSEMAN:  Thank you.

15          Let me next address, then, the parol evidence.

16 While it is our position that any ambiguity can be resolved

17 within the four corners of the agreement, itself, even the

18 parol evidence that debtors offer, supports PPMG's read of

19 the contract terms here.  So, let me address all of the parol

20 evidence.

21          First, we have, of course, Ms. Tilton's testimony.

22 The Court has heard from only one witness involved in the

23 management services agreement or its execution, and that

24 witness is Ms. Tilton.  Her unrebutted testimony makes clear

25 she understood when signing the management services agreement

1    that a liquidity event was an asset sale, a stock sale, or a

2    merger transaction, full stop; not contingent on satisfaction

3    of all the company's debt or any of the company's debt.

4            Let me turn now to the phantom equity agreement.

5    The debtors rely on this agreement, an agreement between the

6    company and its executives to suggest the definition of

7    change of control should essentially be supplanted into the

8    management services agreement despite the fact that, one,

9    it's an entirely different agreement to which the debtors,

10   again, are not a party; moreover, PPMG is not even a party to

11   the phantom equity agreement.

12           And even so, if it were appropriate to consider

13   the use of the term in a phantom equity agreement or any

14   other supposed contract using the term "change of" or "change

15   in control," those contracts only support PPMG's point, that

16   liquidity event means something entirely different.

17           And I want to note here Ms. Tilton's testimony on

18   that change of control definition in the phantom equity

19   agreement.  I think Mr. Barry raised this in his argument and

20   suggested that the change of control definition in the

21   phantom equity agreement was also written in a way to require

22   the transaction to clear all of the company's debt.

23           That's simply not the case.  The definition of

24   change in control in the phantom equity agreement is very

25   different.  It is written in a way to make clear the phantom

1  equity payment is triggered only where the purchase price

2  exceeds the Zohar debt or the Patriarch's debt -- not all of

3  the company's debt.  It's written in a very different way and

4  I believe Ms. Tilton explained that quite clearly on cross-

5  examination.

6          But even so, let me return to the case law, as the

7  New York Court of Appeals held in the Quadrant Structured

8  Products case.  If parties to a contract omit terms,

9  particularly terms that are readily found in other similar

10 contracts, the inescapable conclusion is that the parties

11 intended the omission.  And that was a quote from the

12 Quadrant case.

13         And that is the reasonable conclusion here, that

14 Oasis' and PPMG used liquidity event in Section 3 of the MSA

15 because they meant something different.  They meant something

16 other than change of control, as that term is defined

17 elsewhere in the MSA and in other documents, including the

18 phantom equity agreement.

19         Let me address the flow-of-funds document.  The

20 debtors next rely on a draft flow-of-funds model for the

21 proposition that that Excel model shows what the parties

22 really thought of the term liquidity event under the MSA.

23         Not so.

24         As you heard from Ms. Tilton, again, the only

25 witness here today, the draft flow of funds, at Debtors'

1    Exhibit 13, attached to the February 14th, 2019, email, was

2    not only an early rough cut at a flow of funds sent by

3    Ms. Tilton in the midst of catching a plane, it was a flow-

4    of-funds modeling cash flow, assuming a restructuring of a

5    portfolio company's debt, not the sale of that portfolio

6    company, not a sale of its assets, and not a merger.  So, in

7    other words, that flow of funds did not model a liquidity

8    event.  So, it's not surprising, perhaps, that it showed in

9    the transaction fee.

10               As Ms. Tilton explained in later flow-of-funds

11   models that she provided to the debtors, flow of funds that

12   actually modeled a qualifying liquidity event, the PPMG

13   transaction fee was included in the model, and, again, as

14   Ms. Tilton testified yearly today, the Oasis' flow-of-funds

15   model did include the PPMG transaction fee.

16               Your Honor, I'm going to move on to the equity

17   versus debt argument, unless you have any questions on the

18   contract interpretation?

19               THE COURT:  No, I think you answered all of my

20   questions.  Thank you.

21               MS. LOSEMAN:  Thank you.

22               All right.  So, let me, then turn Your Honor to

23   the second point.  Even were it an agreement as debtors urge

24   it to be read, PPMG is still entitled to the transaction fee

25   because the Oasis equity sale covered the debt in full.  And

1   that is so because the twenty-million-dollar restructured

2   facility is equity; it's not debt.

3           The MSA does not define the term "outstanding

4   debt" for purposes of calculating the PPMG transaction fee,

5   so this Court must, therefore, resolve the proper

6   characterization of the instrument itself.  And what's

7   important here, as the SubMicron factors, I think, show, is

8   how the parties treated the investment, the facility.

9   Labels, for example, are not so telling in terms of what the

10  instrument actually is.

11          So, I do want to address, briefly, a procedural

12  argument the debtors raised in their reply brief before I go

13  into the substance of the argument.  They raised for the from

14  time to time in their opposition that PPMG should have sought

15  equitable relief in the form of an adversary proceeding to

16  essentially recharacterize this debt.

17          Well, it was never debt to begin with.  It wasn't

18  raised today by Mr. Barry, so I'll leave it at this.  It's

19  simply, we believe Rule 7001 does not apply here.  We're not

20  seeking equitable relief; we're simply seeking enforcement of

21  a contract.

22          As to the merits, this Court must consider, of

23  course, the nature of the restructured facility and whether

24  its characteristics are more akin to equity, and, Your Honor,

25  here, they are.  A key consideration -- and I think Mr. Barry

1  agrees with this point -- in determining the nature of the

2  restructured facility is whether the holder expects to be

3  repaid with interest, no matter what happens to the borrower,

4  and that is simply not the case here.

5            The restructured equity provided -- also provided

6  for no interest and unsurprisingly, no applicable recurring

7  interest payment date as we saw earlier in Ms. Tilton

8  testimony, with reference to the schedule to Amendment 8

9  there.

10           Per the terms of the credit agreement, anything

11 that meets the defined term "loan" bears interest, but here,

12 the restructured facility never bore interest.  The express

13 purpose of the eighth amendment was to restructure unpaid

14 interest and commitment fees.

15           And the uncontroverted evidence before the Court

16 is that interest on these tranches was never paid and it was

17 never accrued and that's reflected by the disclosure

18 schedules to the sale agreement, itself.  The total

19 receivable for the restructured facility was still 20.29

20 million.  It's the same balance as when Amendment 8 was

21 executed.  So, no interest accrued on that facility.

22           Indeed, there's no evidence that debtors' own

23 financial advisors ever made any attempt to collect any

24 interest supposedly due on this restructured facility or

25 otherwise treat it as debt.

1          The absence of a fixed-rate of interest and

2   interest payments is a very strong indication that the

3   investment was a capital contribution, rather than a loan,

4   and that proposition can be found in the Friedman (phonetic)

5   case, a decision from 2011 from this Court, as well as from

6   the Sixth Circuit 2001 decision, cited in our papers, the

7   VeriCore (phonetic) decision.

8          And keep in mind, Your Honor, that's the same as

9   how it was reported by the historical beneficial owner of the

10  equity.  This restructured 20.2-million-dollar facility was

11  reported by the (indiscernible), as you heard Ms. Tilton

12  testify, as a capital contribution and not as debt.

13         Moreover, the invoices that we displayed during

14  Ms. Tilton's testimony made clear that interest was not

15  billed to Oasis, following the restructuring and execution of

16  Amendment 8.

17         And, of course, as Ms. Tilton testified, it's not

18  reported to the indenture trustee at debtor, either, and it

19  was reflected in the trustee reports as debt.  She didn't --

20  the collateral manager didn't report it in debt, in part,

21  because it would have been wrong; it would have been a

22  benefit to the collateral manager in determining the

23  overcollateralization ratio or "OC" ratio, which determines

24  what fees are paid to the collateral manager.  So, she didn't

25  report it as debt because she didn't consider it as debt in

1   her position as the collateral manager, either.

2          And Oasis' accrued, unpaid interest was

3   restructured so it would be subordinate to, and not mature

4   before any of the funded debt by the Zohars or other lenders.

5   The mere lifting of a maturity date does not change the fact

6   that interest was not paid and that there was risk, given the

7   repayment position of this particular facility coming at the

8   end, essentially, of the lender waterfall if there was a

9   transaction that occurred that did not reach down to that

10  seventh level of repayment or it goes all the way down to

11  this facility, there was risk that this $22 million would not

12  be repaid and that characterization, that fact is more

13  consistent with an equity interest instrument than a debt

14  instrument.

15         Let me address, just briefly, the labels that have

16  been affixed to this particular item.  Mr. Barry raised, for

17  example, in his argument that in the disclosure schedules to

18  the purchase and sale agreement, it was defined or included

19  as indebtedness, but, of course, there was also an express

20  reservation of rights and a reference to the dispute that is

21  now before Your Honor in terms of how it should be

22  characterized in interpreting the management services

23  agreement and the PPMG transaction fee.

24         So, we posit that the way in which it was

25  characterized is nullified by the reservation of rights in

1  the very same document, itself.

2          And, finally, let me just note for a moment,

3  although I didn't hear Mr. Barry at least focus on it

4  substantially during his argument, but it is addressed in the

5  papers, the fact that this restructured facility is included

6  in a category called "long-term debt, counter-related party"

7  on the company's financial statements.

8          First, I'd note that that includes related party

9  liabilities and does not necessarily purport to represent all

10  instruments that are included that has category as debt.  But

11  even if it did, you know, that (indiscernible) instrument is

12  reported in accordance with generally accepted accounting

13  principles, does not answer the legal question that this

14  Court must answer, and we cite cases to this, in fact, in our

15  briefing, that GAAP is not the definer of what is debt or

16  what is equity; that is a determination for this Court to

17  make.

18          And respectfully, we submit that all of the facts,

19  all of the evidence that Your Honor has heard today in

20  consideration of the SubMicron factors, all point to

21  characterizing this restructured facility as equity and not

22  debt.

23          I have nothing further unless you have questions,

24  Your Honor.

25          THE COURT:  I do not have any questions.  Thank

1    you.

2                 MS. LOSEMAN:  Thank you.

3                 THE COURT:  Mr. Barry, they were cross-motions, so

4    I don't know if I should give you the last word.  Did you

5    have anything that you wanted to say?

6                 MR. BARRY:  A couple of points, and, again, as we

7    all say, I'll be brief.

8                 But just to clarify, the don't believe that the

9    reservation that was referred to a moment ago is actually in

10   the consolidated financial agreements.  I think what

11   Ms. Loseman was referring to, Your Honor, is the provision in

12   the equity purchase agreement that says this will be dealt

13   with later.  I don't think that it was reflected in the

14   consolidated financial statements as something that's subject

15   to a pending dispute.  I think what she's referring to is the

16   actual equity purchase agreement.

17                A couple of points, Your Honor.  First, with

18   respect to the doctrine of *contra proferentem*, the PPMG's

19   papers cite to the Italian Designers case for general

20   contract principles.  They don't distinguish it as an

21   insurance or a non-insurance case.  They cite it for the

22   principle that in order to find, quote, in order to find the

23   term ambiguous under New York law, however, it must be viewed

24   objectively from the perspective of a reasonably intelligent

25   person, who's examined the context of the entire integrated

 1   agreement, which necessarily includes the agreement's

 2   (indiscernible).

 3          Now, I'm sure they weren't intending to call me an

 4   unintelligent person by quoting that, but, Your Honor, that

 5   very case goes on to say, quote, When the insurer fails to

 6   submit extrinsic evidence that resolved the ambiguity, the

 7   proper interpretation is an issue of law for the Court and

 8   the ambiguity must be resolved against the drafter of the

 9   contract.

10          So, I'm a little surprised to hear PPMG having

11   cited that for general contract principles to now sort of

12   walk back that it's somehow only applicable to insurance

13   contracts.

14          A second point, Your Honor, the repeated

15   characterization of Zohar as a non-party to the PPMG

16   agreement and that somehow bearing some weight on Your

17   Honor's determination of this seems a little hollow.  PPMG is

18   not a party to the credit agreement between Oasis and Zohar;

19   it's nonetheless arguing that that should be recharacterized

20   and arguing as to the intent of the parties entering into it.

21          So, I'm not sure -- they're not a party to that

22   agreement, so I'm not sure why that's any different.

23          Your Honor, with respect to the argument that you

24   just heard regarding the phrase "without regard to

25   liabilities," the entire argument you just heard was

1    completely belied by Ms. Tilton's testimony, who testified as

2    to what she understands the meaning of that parenthetical to

3    be, which is for purposes of an asset sale.  Without regard

4    to liability means you don't factor in whether the buyer is

5    picking up liabilities or not picking up liabilities.

6              Next, Your Honor, you won't be surprised to hear

7    that we read, for purposes of Section C, similar to the way

8    that you suggested and then, Your Honor, I would submit it no

9    different than the provision in Annex A that says for

10   purposes of this Annex A.  They're trying to self-contain the

11   provisions to the provisions and they can't be shared amongst

12   the provisions where they're limited as such.

13             Your Honor, with respect to our failure to call

14   rebuttal witnesses, I deposed Ms. Tilton three weeks ago and,

15   frankly, I think that she afforded the Court all of the

16   evidence the Court needs to rule on this and I don't think

17   that we needed to bring in extra witnesses to prove our case.

18             And, you know, finally, Your Honor, just to

19   complete the record on this, we checked, and, in fact,

20   Ms. Tilton did file a proof of claim in the Dura bankruptcy

21   case relative to a transaction fee in those bankruptcy cases.

22   I think the testimony was that she hadn't or she wasn't aware

23   that she had, but, in fact, she had.  It's proof of claim 706

24   in the Dura bankruptcy case.

25             So, unless Your Honor has any follow-up questions

1   for me, I'd like to rest.

2            THE COURT:  And, I'm sorry, what's the import of

3   the fact that that proof of claim was filed?

4            MR. BARRY:  Ms. Tilton testified that -- I think

5   on redirect, Ms. Tilton testified that she had never sought a

6   transaction fee in connection with any company that had gone

7   into liquidation or bankruptcy.  It's a fine point, Your

8   Honor, but that was the conclusion of her testimony, that she

9   had never sought such a claim and I think that that's belied

10  by the Dura proof of claim.

11           THE COURT:  Okay.  Thank you.

12           MS. LOSEMAN:  Your Honor, if I may just -- I'm

13  sorry, can you hear me, Your Honor?

14           THE COURT:  I can, yes.

15           MS. LOSEMAN:  If I may just have two minutes?

16  I'll be very brief.  Thank you.

17           First, on the Italian Designers case, and I

18  certainly meant to cast -- did not mean to cast any

19  aspersions on Mr. Barry, but I believe if you read that case

20  closely, the proposition for which we had cited it is a

21  general contract construction proposition.

22           But with respect to construing the agreement

23  against the drafter, that particular part of the decision

24  focuses in on insurance policies and insurance contracts and

25  how insurance policies, as the other cases the debtors cite

1    in their papers, should be construed against the insurer

2    drafter in those cases.

3            On Ms. Tilton's testimony, with respect to

4    interpreting the definition of liquidity event and the asset

5    sale and how it excludes or says without consideration of

6    liabilities, she did testify as to that, but I think the

7    point that Mr. Barry perhaps missed or I didn't articulate

8    well enough in my argument is simply that if liquidity event

9    is defined only as events where any of the transactions clear

10   the debt, the renders the calculation of the fee in the case

11   of an asset sale, how that fee is to be calculated, it

12   renders that definition internally inconsistent and

13   essentially superfluous.

14           Because in calculating the fee -- so, an asset

15   sale, without regard to any liabilities, qualifies as an

16   liquidity event.  But when we're calculating the fee, what

17   the 5 percent is multiplied by, we deduct in an asset sale,

18   the face amount of any assumed liabilities, any liabilities

19   assumed by the purchaser.

20           If the liquidity event is defined to exclude

21   events where transactions don't clear the debt, it's

22   internally inconsistent with that definition of how the fee

23   is calculated.  So, that was the point.

24           And then just lastly on the Dura point, Ms. Tilton

25   testified that she had never received a transaction fee in

100

1    connection with a company that had wound-down or had filed

2    for bankruptcy.  And the point that's important there, Your

3    Honor, is that it's consistent with the way in which

4    transaction fee is defined, not to apply only to those

5    transactions where the purchase price exceeds the debt, it is

6    a flat fee; it's akin to an investment banker fee, regardless

7    of what happens.

8            So, the point there is that PPMG also loses out

9    and takes risks on portfolio companies where they come in and

10   attempt to turnaround those portfolio companies and the

11   companies don't make it all the way through that turnaround.

12   In those cases, PPMG isn't compensated.

13           That's it, Your Honor.

14           THE COURT:  Okay.  Well, listen, thank you all

15   very much.

16           I'm not going to rule today.  I haven't had the

17   opportunity to give this as much thought as I would like to.

18   So, my goal is to have a ruling for you at our next omnibus

19   hearing, which is October 14th.  So, I will endeavor to do

20   that, and if I'm unable to devote enough time to be able to

21   come up with my conclusions, I will have my courtroom deputy

22   reach out to all of the parties so that you don't appear at

23   the hearing unnecessarily on that matter.  But for now, let's

24   plan on October 14th, okay, for that.

25           So, is there anything else, then, before we part

1  ways that we should discuss?

2        I see Ms. Sarkessian has been on the line.  I just

3  wanted to make sure that you weren't appearing today to

4  address anything specific before we sign off.

5        MS. SARKESSIAN:  Good afternoon, Your Honor.

6  Juliet Sarkessian for the U.S. Trustee.

7        No, I was just listening in and the one thing that

8  I think that was open, the seal motion, I have no issue with.

9  That's been taken care of, so thank you, Your Honor.

10        THE COURT:  Okay.  Perfect.  Thank you.

11        Okay.  Well, then, Mr. Barry and Ms. Loseman, is

12  there anything else that we should discuss before we part

13  ways?

14        MR. BARRY:  No, Your Honor.  I think we have taken

15  up enough of your time today.

16        MS. LOSEMAN:  Nope, all done.

17        THE COURT:  Okay.  Great.

18        Well, it was a pleasure seeing you all and, again,

19  I extend my thanks to Ms. Tilton for taking the time today to

20  testify and we will adjourn and I will see you all on

21  October 14th, okay.

22        Thank you all very much.

23        COUNSEL:  Thank you, Your Honor.

24      (Proceedings concluded at 12:48 p.m.)

25

1                          CERTIFICATE

2

3          We, MARY ZAJACZKOWSKI and WILLIAM GARLING, certify that

4     the foregoing is a correct transcript from the electronic

5     sound recording of the proceedings in the above-entitled

6     matter.

7
      /s/Mary Zajaczkowski              September 14, 2020
8     Mary Zajaczkowski, CET**D-531

9
      /s/William J. Garling             September 14, 2020
10    William J. Garling, CE/T 543

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE

2

                                    .   Chapter 11

3

IN RE:                              .
                                    .   Case No. 18-10512 (KBO)

4

ZOHAR III CORP., *et al.,*          .
                                    .   Courtroom No. 1

5

                                    .   824 North Market Street

6

                                    .   Wilmington, Delaware 19801
                                    .

7

                    Debtors.        .   October 14, 2020
. . . . . . . . . . . . . . . . . .     9:30 A.M.

8

                    TRANSCRIPT OF HEARING

9

              BEFORE THE HONORABLE KAREN B. OWENS
                  UNITED STATES BANKRUPTCY JUDGE

10

11

APPEARANCES:

12

For the Debtors:        James L. Patton, Esquire

13

                        Robert S. Brady, Esquire
                        Michael R. Nestor, Esquire

14

                        Joseph M. Barry, Esquire
                        Ryan M. Bartley, Esquire

15

                        Shane M. Reil, Esquire
                        Michael Neiburg, Esquire

16

                        YOUNG CONAWAY STARGATT & TAYLOR LLP
                        Rodney Square

17

                        1000 North King Street
                        Wilmington, Delaware 19801

18

19

Audio Operator:         Al Lugano

20

Transcription Company:  Reliable

21

                        1007 N. Orange Street
                        Wilmington, Delaware 19801

22

                        (302)654-8080
                        Email:  gmatthews@reliable-co.com

23

Proceedings recorded by electronic sound recording,

24

transcript produced by transcription service.

25

```
 1  TELEPHONIC APPEARANCES (Continued):

 2  For Patriarch:          Monica Loseman, Esquire
                            GIBSON DUNN
 3                          333 South Grand Avenue
                            Los Angeles, California 90071
 4
                            - and -
 5
 6                          David Dean, Esquire
                            COLE SCHOTZ P.C.
 7                          500 Delaware Avenue, Suite 1410
                            Wilmington, Delaware 19801
 8
     For the Portfolio      Robert Hotz, Esquire
 9   Companies:             LATHAM & WATKINS LLP
                            885 3rd Avenue
10                          New York, New York 10022

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  MATTERS GOING FORWARD:

2  #10.  Debtors' Motion for an Order Determining Dispute Between the
   Debtors and Patriarch Partners Management Services, LLC Related to
3  Pending Oasis Transaction [(SEALED) D.I. 911; 9/6/19; (REDACTED)
   D.I. 1130; 9/6/19]

4  **Ruling:  8**

5
   #14.  Emergency Motion of the Debtors for Hearing to Consider
6  Debtors' Request for Supplemental Order under Bankruptcy Rule 2004
   Directing Production of Form 906 Closing Agreement [D.I. 1991;
7  10/9/20]

8  **Ruling:  43**

9  #13.  Notice of Binding Portfolio Company (Rand) Transaction
   Pursuant to Portfolio Company Transaction Procedures [D.I. 1965;
10 9/25/20]

11

12 DEBTORS' WITNESS(s):

13 **JASON RUSSELL**

14       Direct Examination by Mr. Hotz              49

15       Cross Examination by Mr. Dean               94

16 **FREDERICK VESCIO**

17       Direct Examination by Mr. Neiburg           168

18       Cross Examination by Ms. Loseman            177

19       Redirect Examination by Mr. Neiburg         194

20

21 EXHIBITS                              I.D.    REC'D

22 Declaration of Jason Russell                    49

23 Joint Exhibit 10 - Email Communications         55

24 Debtors' Exhbiit 9 - Email from Intralinks      61

25 Debtors' Exhibit 12 - Report Prepared by PJS    61

1  Debtors' Exhibit 3 - Email Communications        69

2  Joint Exhibit 12 - Email Communications          76

3  Joint Exhibit 11 - Email Communications          78

4  Patriarch Exhibit 9 - PJ Solomon Report          83

5  Joint Exhibit 4 - Emails                         100

6  Joint Exhibit 5 - Project Optimus                118

7  Joint Exhibit 7 - Sealed Document                119

8  Patriarch Exhibit 10 - Emails                    119

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (Proceedings commence at 9:33 a.m.)

 2              THE COURT:  Good morning, parties.  This is Judge

 3   Owens. We're gathered today on the phone and via Zoom for the

 4   omnibus hearing in the Zohar cases.

 5              We have quite a few matters to deal with today and

 6   on the 19th and, perhaps, following the 19th, so why don't I

 7   turn the podium over to counsel for the debtors and you can

 8   walk us through the beginning of today's agenda.

 9              MR. NESTOR: Thank you, Your Honor.  Can you hear

10   me okay?  It's Mike Nestor, for the record.

11              THE COURT:  Yes, I can hear you.

12              MR. NESTOR:  Thank you, Your Honor.  I want to

13   thank Your Honor and Your Honor's chambers.  We tried over

14   the course of the last week to keep Your Honor and chambers

15   up to speed on the twist and turns of the agreements of the

16   parties and expectations and those sorts of things, so really

17   apologizing to Mr. Lopez.  But our goal was really to ensure

18   that Your Honor was in the loop on how we intended to proceed

19   today and so we wanted to make sure that you understood the

20   agreement and expectations of the parties.

21              Consistent with those communications, obviously

22   subject to Your Honor's consent, what we'd like to do is

23   proceed as follows, which is to the extent Your Honor is

24   prepared to do so, have you rule on the Oasis dispute from

25   September.

```
 1          Second, would be to address the emergency 2004
 2  motions that the debtors filed last Friday.  We would then
 3  turn to the Rand transaction.  And what we had proposed, what
 4  we had agreed upon between the parties and propose to Your
 5  Honor is that we would go right to evidence, no opening.  We
 6  would have two witnesses testify today -- Mr. Russel who is
 7  from PJ Solomon who is the investment banker for Rand, and
 8  Mr. Vescio who is from Houlihan Lokey who is the advisor for
 9  the debtors.
10          The goal would be not to duplicate their
11  declarations that they filed in support, but only put on
12  supplemental direct, have them be subject to cross, and then
13  redirect, if necessary.
14          Our plan then, again subject to Your Honor's
15  agreement, is to break for the day with respect to Rand.  We
16  did not want to risk the impairment of the party's ability to
17  communicate with their clients if either Ms. Tilton or Mr.
18  Katzenstein were not able to finish their testimony today.
19           And for different reasons, counsel believes we
20  need to be able to communicate with them, and we just didn't
21  want to impair or create the perception of any impropriety if
22  we spoke with them prior to resuming that testimony next
23  Friday.
24          What we then like to do is reconvene on Monday,
25  proceed then with the testimony of Ms. Tilton and Mr.
```

1   Katzenstein, again only with respect to incremental testimony

2   and then cross and redirect.  Then have closings and then if

3   Your Honor is prepared to do so obtain a ruling from the

4   court.

5             We had, as Your Honor noted, other matters that

6   were scheduled for a hearing.  And if we're able to finish

7   those on Monday, then that would be great. If we're not, then

8   we would, at that time, ask if Your Honor has available time

9   in the short term to hear those, at Your Honor's convenience.

10            And so, from the debtors' perspective, I think,

11  and the party's perspective, that is how we had proposed to

12  proceed today.  But, again, it's obviously subject to Your

13  Honor's input and consent.

14            THE COURT:  That sounds fine.  We'll just plow

15  through as you suggest and see where we finish up, where we

16  land on Monday.

17            MR. NESTOR:  Thank you very much, Your Honor.

18            I guess I would cede the podium to you, Your

19  Honor, if you're prepared on Oasis; otherwise, we

20  (indiscernible) to 2004.

21            THE COURT:  Okay.  That's fine.  I am prepared to

22  go forward.  I saw what you wanted to do and it pushed me to

23  do my homework.

24            Okay.  So let me just look to see what item on the

25  agenda it is, just for recordkeeping purposes.

1          MR. NESTOR:  I left my (indiscernible), same

2    thing.  I apologize.

3          THE COURT:  Okay.  It looks like it's matter

4    number 10, which as I promised the parties, I would deliver a

5    ruling on their cross motions with respect to the transaction

6    fee and the Oasis transaction.

7          So, the parties have cross moved for a

8    determination of PPMG's rights to a payment of a transaction

9    fee as a result of the previously approved LVD Acquisition,

10   LLC transaction.

11         Section 3(c) of the MSA, which is the relevant

12   governing document giving rising to the transaction fee,

13   provides that in connection with each liquidity event, PPMG

14   will be entitled to receive a cash fee, the "transaction fee"

15   equal to 5 percent of the eligible equitable value.

16         The dispute here centers on whether the LVD

17   transaction was a "liquidity event."  The answer to this

18   question will be determined by my interpretation of Section

19   3(c)(2)(d) of the MSA which defines liquidity event.

20         Section 3(c)(2)(d) delineates three events that

21   could give rise to a liquidity event.  One or (x) as its used

22   in the subsection of sale of assets; two or (y) the sale of

23   equity or; three or (z) a merger of a company.  And, again,

24   that's just a generalization of what that section provides.

25         Here, the debtors and PPMG agree that the LVD

1    transaction satisfies number two as it involved the sale of

2    all LVD's stock.  Therefore, one would simply think that the

3    matter is settled and a transaction fee is payable to PPMG

4    under Section 3(c) of the MSA.

5             However, after delineating the three just

6    described events, as the parties know, Section 3(c)(2)(d)

7    continues on to conclude with the following proviso.

8             "Provided, however, that in each case in order to

9    constitute a qualifying change of control, the event must

10   permit the company or the respected subsidiary to pay all of

11   its or their as appropriate outstanding debt."

12            The problem with this proviso and what gives rise

13   to the dispute before the court is that the parties made a

14   mistake when drafting it.  Change of control is undefined in

15   the document and only used once.

16            So the question before the court is whether the

17   parties meant change of control to mean liquidity event, as

18   the debtors urge, which would require the LVD transaction to

19   result in payment in full of LVD's indebtedness to constitute

20   a "liquidity event," and, thus, trigger payment of PPMG's

21   transaction fee or did the parties mean change in control as

22   PPMG argues, which would eliminate the need for satisfaction

23   of indebtedness for a liquidity event to occur.

24            Here, the answer to this question is critical

25   because, as I will discuss, the LVD transaction did not

1   result in the payment in full of LVD's indebtedness.

2         Following review of the MSA in consideration of

3   the party's agreements, it's clear to me from the four

4   corners of the MSA that the defined term, change of control,

5   means liquidity event, because any other reading of the

6   contract terms would be unreasonable for the reasons outlined

7   in the debtor's responsive brief.

8         More specifically, it is reasonable to conclude

9   that in this instance, the use of a proviso clause was meant

10  to create an exception for or condition in some way the topic

11  immediately preceding it.

12        In this instance, the top immediately preceding

13  the proviso is the party's agreement as to the three events

14  that would give rise to a "liquidity event."  And by

15  substituting the word liquidity event for change of control

16  in the proviso, the proviso then acts as it should to

17  condition the circumstances in which the three events give

18  rise to a liquidity event.  This was logical and it's

19  supported by the party's use of the words "in each case" and

20  "qualifying" in the proviso.

21        This interpretation is supported by the beginning

22  of Section 3(c)(2) which makes it clear that the parties only

23  intended the definition of liquidity event to apply for

24  purposes of Section 3(c) which discusses when a transaction

25  fee becomes due.

1          If we were to substitute the term change in

2    control for change of control in Subsection (c)(2)(d) then we

3    would be, in effect, defining a phrase in Section 3(c) for

4    purposes outside that section because change in control is

5    exclusively used and defined in Annex A and it discusses

6    rights to indemnification.  This is contradictory to the

7    plain language of Section 3(c).

8          Finally, inserting change in control for change of

9    control would not make sense for purposes of the definition

10   of change in control which is found at the end of Annex A.

11   That paragraph provides generally that "for purposes of this

12   Annex A, a change of control means the occurrence after the

13   date hereof of any transaction described in clauses (y) or

14   (z) of the definition of liquidity event or (b) the

15   insolvency of any of the companies, the filing of a voluntary

16   petition in bankruptcy by any of the companies, the filing of

17   an involuntary petition to have any of the companies declared

18   bankrupt, the appointment of a receiver trustee for any of

19   the company or the execution by any of the company's of an

20   assignment for the benefit of creditors."

21         The definition of change in control incorporates

22   only two of the three events described in Section

23   3(c)(2)(d)(y) and (z) but the proviso specifically addresses

24   and modifies all three of the events described in Section

25   3(c)(2)(d)(x)(z) and (z).  Accordingly, there would have been

1    no need for the parties to apply the proviso to each of the

2    three events under Patriarch's interpretation.

3           To the extent that Patriarch believes my

4    interpretation would contradict or render superfluous other

5    language in Section 3(c)(2)(d), I do not understand how and,

6    therefore, I cannot agree.

7           So having found that the proviso of Section

8    3(c)(2)(d) should read,

9           "Provided, however, that in each case in order to

10   constitute a qualifying liquidity event, the event must

11   permit the company or the respective subsidiaries to pay all

12   of its or their as appropriate outstanding debt."

13          I must now address the next point of contention

14   between the parties to determine whether the transaction fee

15   is due to PPMG as a result of the LVD transaction, namely dd

16   the transaction permit the company to pay off its outstanding

17   debt.

18          The answer to this question depends upon whether

19   approximately $20 million of unpaid accrued interest and

20   commitment fees owed by LVD under its existing credit

21   facility -- excuse me; under it's existing credit agreement

22   and restructured in a 2015 amendment called Amendment Number

23   Eight Qualified as Debt, as the debtors urge or equity as

24   PPMG urges.

25          I find that the $20 million provided for in

1   Amendment Number Eight is debt and not equity. This issue,

2   like the one before it, was not a close call, based on the

3   unambiguous language of Amendment Number Eight.

4          Sophisticated parties negotiated that amendment

5   and used various terms therein that restructured the amounts

6   at issue into debt and, more specifically, tranches the term

7   loan obligations.

8          For instance, in Amendment Number Eight, styled as

9   an amendment to the credit agreement and characterized as a

10   credit document, the parties referred to as borrower,

11   lenders, and administrative agent use the words loans and set

12   forth in Section A, among other things, the type of loans,

13   the specific tranches, the commitments, the outstanding

14   obligations, the particular lender, the applicable margin

15   used to calculate interest under the credit agreement, the

16   maturity debt and the prepayment preference.

17          Moreover, the parties specifically provided that

18   the amendment constituted legal obligations of the borrower

19   and enforceable, pursuant to the terms of the amendment and

20   the credit agreement.  These are not words or terms

21   associated with the creation of equity and I could find

22   nothing else in Amendment Number Eight to support PPMG's

23   position.

24          I, and courts, in general, for that matter, assume

25   that bargaining parties of the caliber of those who

1   negotiated and signed Amendment Number Eight know what they

2   intended in their dealings and that the draft documents

3   reflect that intention.

4          That the restructured debt has no periodic payment

5   date and is subordinated are not per se characteristics of

6   equity, and those terms which are undeniably favorable to LVD

7   are not surprising to me because it has been in the

8   Patriarch's stakeholder's consistent position, throughout

9   these proceedings, that they act and continue to act in the

10  best interest of the portfolio companies.

11         Moreover, to the extent that there is any

12  ambiguity arising from Amendment Number Eight, regarding the

13  nature of the disputed amounts, or that the necessary

14  analysis requires me to look outside the four corners of the

15  document, the evidence presented by the parties did not

16  sufficiently convince me that the amount should be treated as

17  equity, as opposed to debt.

18         So, accordingly, for the reasons that I just set

19  forth, I will approve the revised proposed order, attached to

20  the debtors' response brief, requiring PPMG to refund to the

21  debtors the transaction fee paid to it in connection with the

22  LVD transaction.

23         So that concludes my ruling on matter number 10.

24  And when the parties are ready, let's just go forward with

25  this 2004 motion.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Zohar III, Corp., *et al.*,[1] | Case No. 18-10512 (KBO) |
| Debtors. | Jointly Administered |
|  | **Hearing Date: To be Determined**<br>**Obj. Deadline: To be Determined** |

### PPMG'S MOTION FOR STAY PENDING APPEAL
### OF THE TRANSACTION FEE ORDER AND FOR THE ESCROWING OF CERTAIN
### TRANSACTION FEES

Patriarch Partners Management Group, LLC ("PPMG"),[2] by and through its counsel, hereby submits this motion (the "Motion"), pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order substantially in the form attached hereto as Exhibit A (the "Proposed Order"), granting a stay pending appeal of certain portions of the *Order Determining Dispute Between the Debtors and Patriarch Partners Management Services LLC Related to Pending Oasis Transaction* (the "Transaction Fee Order"), and ordering the escrow of certain transaction fees. In support of the Motion, PPMG respectfully represents as follows:

---

[1] The "Debtors," and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited ("Zohar III") (9261), Zohar II 2005-1, Limited ("Zohar II") (8297), and Zohar CDO 2003-1, Limited (together with Zohar II and Zohar III, the "Zohar Funds") (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] Capitalized terms not otherwise defined herein shall have the meanings set forth in the Transaction Fee Order, the Objection (as defined below), the *Order Approving and Authorizing the Settlement Agreement By and Between the Debtors, Lynn Tilton, the Patriarch Stakeholders, MBIA Insurance Corp., and the Zohar III Controlling Class* (the "Settlement Order") [D.I. 266], or the Settlement Agreement (as defined in the Settlement Order) [D.I. 266, Ex. C], as applicable.

## PRELIMINARY STATEMENT

1.    By this Motion, PPMG seeks to place the Transaction Fee into escrow pending a final resolution of its appeal.

2.    On October 15, 2020 the Court issued the Transaction Fee Order, requiring, among other things, that PPMG return the $3,798,240.92 Transaction Fee arising from the Oasis Transaction to Debtors within two business days.  PPMG plans to appeal the Transaction Fee Order, and is working diligently to expedite its appeal in order to have a final resolution as quickly as possible.  However, until such a final resolution is obtained, circumstances render a stay pending appeal by the placement of the Transaction Fee into escrow necessary.  Each of the relevant factors favors granting such a stay until PPMG's appeal is resolved.

3.    PPMG is likely to succeed on the merits of its appeal because the PPMG MSA is clear on its face: the Oasis Transaction constitutes a Liquidity Event triggering payment of the Transaction Fee; the Debtors' interpretation requiring payment of all debt for such a Transaction Fee to become due is contrary to the plain language of the MSA; and, even if the Debtors were correct, the Oasis Transaction resulted in the satisfaction of all Oasis debt.

4.    Moreover, there is no harm to the Debtors in temporarily staying return or temporarily placing into escrow the Transaction Fee pending final resolution of this dispute.  And, if the Transaction Fee is consumed by the payment of administrative expenses or distributed to other stakeholders, PPMG has no clear remedy.  Should the Transaction Fee be dissipated in this fashion, PPMG will be deprived of the entire rationale for its appeal.  PPMG will work with all diligence to expedite its appeal so that the final ownership of the Transaction Fee may be determined as soon as possible.  Accordingly, the balance of harms favors granting the stay.

5.    Further, granting a stay is in the public interest because the public has an interest in clarity on and correct application of the law and in the correct interpretation of contracts.

6.      Thus, PPMG submits that the Court should grant a stay of the return of the Transaction Fee under the Transaction Order.  To best protect the interests of all parties, PPMG requests that the Court order that the Transaction Fee be placed into an escrow account pending final resolution of this matter.

## JURISDICTION

7.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, PPMG consents to the entry of a final order by the Court in connection with this Motion[3] to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

9.      On March 11, 2018 (the "Petition Date"), Ms. Tilton, then as sole director for the Debtors, caused the Debtors to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  General information about the Debtors and the events leading up to the Petition Date can be found in the *Declaration of Marc S. Kirschner in Support of Chapter 11 Petitions* [D.I. 6] and the *Declaration of Lynn Tilton in Support of Chapter 11 Petitions* [D.I. 5].

10.     On May 21, 2018, the Court entered its Settlement Order, pursuant to which this Court approved the Settlement Agreement.  The Settlement Agreement establishes a procedure for

---

[3]  PPMG does not consent to the jurisdiction of this Court or to entry of a final order for any purpose other than the resolution of this Motion.

A-868

resolving certain PPMG claims, including the Transaction Fee. *See* Settlement Agreement ¶ 18. Pursuant to Paragraph 18 of the Settlement Agreement, any claim that is supported by "written documentation" is "deemed due and payable through the closing of any monetization event on a pari passu basis with other similarly situated claims and equity . . . ." Settlement Agreement ¶ 18. This Court has characterized this as a "pay first, fight later" process. Aug. 4, 2020 Hr'g Tr. at 86:11-12.

11.    Oasis and PPMG had long operated under the MSA, under which PPMG provided substantial, valuable services to Oasis. These services are "of a type customarily provided by sponsors of private equity firms . . . to companies in which they have a substantial investment." *See* MSA § 1.  In exchange for these services, PPMG received (i) a small monthly fee and (ii) became entitled to the Transaction Fee upon the close of any Liquidity Event.  MSA §§ 3(c)(i) & 3(c)(ii)(D)(y).

12.    Despite the "pay first, fight later" language of the Settlement Agreement, the Debtors began to contest the Transaction Fee in advance of the closing of the Oasis Transaction. This dispute was submitted to mediation before the Honorable Kevin Gross on July 31, 2019 to no success.  Ultimately, and in order to avoid derailing the Oasis Transaction, the Debtors agreed to pay the Transaction Fee upon closing.

13.    On September 6, 2019 the Debtors filed the *Debtors' Motion for an Order Determining Dispute Between the Debtors and Patriarch Partners Management Services LLC Related to Pending Oasis Transaction* [D.I. 911].  In response, PPMG filed *PPMG's Opening Brief  Regarding PPMG's Right to Payment of Transaction Fees in Connection With the Oasis Transaction* [D.I. 914], and *PPMG's Opposition to the Debtors' Motion for an Order Determining Dispute Between the Debtors and PPMG Related to the Pending Oasis Transaction* [D.I. 1915]

(the "<u>Objection</u>"). The Court conducted a hearing on the Motion on October 14, 2020 and entered the Transaction Fee Order on October 15, 2020.

<div align="center"><u>**RELIEF REQUESTED**</u></div>

14.     By this Motion, PPMG seeks a stay of enforcement of Section 2 of the Transaction Fee Order requiring return of the Transaction Fee to Debtors, and that the Court order the Transaction Fee be deposited into an escrow account mutually agreeable to PPMG and the Debtors, pending resolution of PPMG's appeal from the Transaction Fee Order.

<div align="center"><u>**BASIS FOR RELIEF**</u></div>

**A.     The Court Should Stay the Challenged Portions of the Transaction Fee Order Pending Appeal.**

15.     Bankruptcy Rule 8007 provides that "[o]rdinarily, a party must move first in the bankruptcy court for . . . a stay of a judgment, order, or decree of the bankruptcy court pending appeal . . . ." Bankruptcy Rule 8007(a)(1)(A). In determining whether to grant a stay pending appeal, courts consider four factors:

> (1) whether the stay applicant has made a strong showing that it is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (quotation marks omitted). The Third Circuit has endorsed a "'sliding-scale' approach" to determine "how strong a case a stay movant must show," under which "the necessary level or degree of possibility of success will vary according to the court's assessment of the other stay factors." *Id.* at 569 (quotation marks and alterations omitted). "[I]f a movant demonstrates irreparable harm that decidedly outweighs any

<div align="center">5</div>

<div align="center">A-870</div>

potential harm to the stay opponent if a stay is granted," it need only show "serious questions going to the merits." *Id.* at 570 (quotation marks and alterations omitted).[4]

16.     Here, each factor weighs in favor of a stay.

### 1.     PPMG Is Likely to Succeed on the Merits.

17.     PPMG need not demonstrate that success is a certainty, only that "it can win on the merits"—not that it will win—and that its chances are "significantly better than negligible but not greater than 50%." *Revel*, 802 F.3d at 571. "When considering the appeal's likelihood of success on the merits," a court should ask "whether the case presents a fair ground for litigation and more deliberative investigation." *Wynnefield Partners Small Cap Value L.P. v. Niagara Corp.*, 2006 WL 2521434, at *1 (Del. Ch. Aug. 9, 2006) (quotation marks omitted). As more fully set forth in the Objection, PPMG easily meets this standard.

18.     Under the MSA, the Oasis Transaction is a Liquidity Event triggering payment of the Transaction Fee. In asserting otherwise, the Debtors rely on a contrary reading that would render "Change of Control" and "Liquidity Event" synonyms in the MSA, in stark contrast to ordinary rules of contract interpretation. *See Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 93 F.3d 1572, 1579 (Fed. Cir. 1996); *Sonterra Capital Master Fund, Ltd. v. Barclays Banks PLC*, No. 15 Civ. 3538, 2019 WL 3858620, at *5 (S.D.N.Y. Aug. 16, 2019) ("The APA's extensive use of defined terms demonstrates that its drafters were perfectly capable of using such terms when they wished to do so" such that a decision not to use a particular defined term "should not be ignored"). Undoubtedly, the use of the phrase "Change of Control" in Section 3(c)(ii)(D) of the

---

[4]     Under this approach, "when the movant is more likely to succeed, the harm required to be shown is less; if success is less likely, then the harm needed must weigh more heavily in the movant's favor." *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 397 F. Supp. 2d 537, 548 (D. Del. 2005); *see also In re Cujas*, 376 B.R. 480, 485-86 (Bankr. E.D. Pa. 2007) (describing the Third Circuit's standard as the majority view that is "more consonant with the court's role in making decisions based on the equities and provides the court with the flexibility required to reach a fair result").

6

MSA is an unfortunate scrivener's error: the question for resolution will be whether that error was replacing the word "in" with the word "of" or whether it was replacing the defined term "Liquidity Event" with an entirely distinct phrase. PPMG respectfully submits that the latter is more likely.

19. Moreover, even if the Debtors' argument with regard to Section 3(c)(ii)(D) is accepted, the Transaction Fee remains due to PPMG because, properly construed, the Oasis Transaction resulted in the payment of all Oasis debt. As the Court noted, this issue turns entirely on whether a $20 million contribution set forth in Amendment No. 8 is best characterized as debt or as equity. If the $20 million contribution is debt, then the Oasis Transaction did not exceed Oasis's indebtedness and (assuming *arguendo* that the Debtors reading of the MSA is correct) PPMG maintains that, viewed in light of the "overarching enquiry" needed to assess the parties' intent, the $20 million contribution is best understood as an equity kicker, not as "indebtedness." *See Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.),* 432 F.3d 448, 456 (3d Cir. 2006). This reality is supported not only by Ms. Tilton's uncontroverted testimony but also by the parties' course of conduct and the relevant documentation.[5] Accordingly, the Oasis Transaction resulted in the repayment of all Oasis indebtedness, triggering the Transaction Fee even under the Debtors' (erroneous) interpretation of the MSA. Thus, PPMG is likely to succeed on the merits.

### 2. PPMG Will be Irreparably Injured Absent a Stay.

20. Without a stay pending appeal, PPMG will suffer irreparable harm that is far "more apt to occur than not." *Revel*, 802 F.3d at 569. These chapter 11 cases have been marked by consistent and ongoing litigation disputes—disputes which continue to drain Debtors' available liquidity. Without a stay pending appeal, PPMG fears that the Transaction Fee will be spent in

---

[5] Excerpts from the transcript of Lynn Tilton's July 13, 2020 deposition relating to the instant dispute ("Tilton Dep.") are annexed to the Objection as Exhibit 1.

such litigation, or otherwise dissipated by administrative expense claims, potentially compromising the Debtors' ability to make repayment post-distribution of proceeds of the Oasis Transaction to PPMG should PPMG be successful in its appeal. Thus, PPMG risks irreparable harm if the stay is not granted.

### 3. The Balance of Harms Favors Granting the Stay Pending Appeal.

21. The balance of harms also favors a stay. Without a stay, PPMG will suffer immediate, irreparable harm for the reasons explained above. Moreover, a stay would only last for the brief duration of the appeal, preventing the stay from burdening other parties. *See Fox Sports Net West 2, LLC v. Los Angeles Dodgers LLC (In re Los Angeles Dodgers LLC)*, 465 B.R. 18, 34 (D. Del. 2011) (brief stay would not unduly burden nonmoving parties); *In re Finova Grp., Inc.*, 2007 WL 3238764, at *2 (D. Del. Oct. 31, 2007) (90-day delay would not harm nonmoving parties); *St. John v. Affinia Grp., Inc.*, No. 09-2501 (WJM), 2009 U.S. Dist. LEXIS 47787, at *7 (D.N.J. June 8, 2009) (finding this factor weighed in favor of granting a motion for stay pending appeal where "the only harm to [the non-moving party] will be a short although not inconsequential delay"). Placement of the Transaction Fee into escrow will protect both PPMG and the Debtors from any potential dissipation of funds. Thus, the balance of harms favors granting the stay.

### 4. The Public Interest Favors Granting the Stay Pending Appeal.

22. Granting a stay is in the public interest because the public has an interest in clarity on and correct application of the law. *See Nw. Mo. Holdings, Inc. v. Townes Mo., Inc. (In re Nw. Mo. Holdings)*, No. 15-470-LPS, 2015 U.S. Dist. LEXIS 75407, at *7 (D. Del. June 11, 2015) ("the public has an interest in correct application of the law"). At the same time, there is no public interest in the immediate payment of the Transaction Fee.

23. Additionally, where the likelihood of success on the merits factor and the irreparable harm factor are met, courts almost always find that the public interest factor is also

met. *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 n.8 (3d Cir. 1994) ("As a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."). As detailed above, both such factors favor granting the stay. As such, granting a stay pending appeal is consistent with the public interest of preserving the ability of a party to effectively exercise its right to a meaningful review through a full and fair appeal process.

### B. The Court Should Order That the Transaction Fee Be Deposited Into Escrow Pending Resolution of PPMG's Appeal.

24.     PPMG respectfully submits that an escrow of the Transaction Fee is the appropriate means of protecting all parties until a final resolution of PPMG appeal may be obtained. Such escrow procedures are regularly used to protect funds pending final resolutions regarding ownership and it is well settled that the Court may order such an escrow. *See, e.g., In re Trico Marine Services, Inc.*, 450 B.R. 474, 478 (Bankr. D. Del. 2011); *In re Trico Steel Co., LLC*, 282 B.R. 318, 322 (Bankr. D. Del. 2002); *In re Am. Tissue, Inc.*, 2006 WL 3498065, at *5 (Bankr. D. Del. 2006).

25.     PPMG is willing to deposit the Transaction Fee into an escrow account, to be mutually agreed upon with the Debtors. The Transaction Fee, and any future transaction fees arising from Management Services Agreements between PPMG and the Portfolio Companies in the interim, would remain in escrow pending a final resolution of PPMG's appeal. In this way, all parties are protected from any potential diminution of funds and the transaction fees may be properly allocated upon a final resolution.

### C. No Supersedeas Bond Is Warranted to Accompany a Stay.

26.     The Court, in its discretion, may condition a stay on the posting of a bond. *See* Fed. R. Bankr. P. 8007. However, a bond is unnecessary where, as in the present case, a stay pending

appeal will not cause any harm. *See In re United Merchants & Manufacturers, Inc.*, 138 B.R. 426, 427 (D. Del. 1992) (a bond for a stay is discretionary and unnecessary when the stay does not cause any harm); *In re Los Angeles Dodgers LLC*, 465 B.R. at 38 (D. Del. 2011) (same).

27. Here, no bond is necessary because Debtors will sustain no monetary loss during the pendency of the stay should PPMG ultimately not prevail. As set forth above, no harm will result if the Court grants a stay of Section 2 of the Transaction Fee Order because the Transaction Fee will be placed into escrow, such a stay will be brief, and will last only during the pendency of the appeal. Accordingly, the Court should not require PPMG to post a bond in connection with any stay.

**NOTICE**

28. Notice of this Motion has been provided to: (i) the U.S. Trustee; (ii) counsel to the Debtors; (iii) counsel to U.S. Bank, as indenture trustee; (iv) counsel to MBIA; (v) counsel to the Zohar III Controlling Class; and (vi) all parties that have filed a notice of appearance in these chapter 11 cases pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, PPMG submits that no other or further notice is necessary.

<u>**CONCLUSION**</u>

WHEREFORE, PPMG respectfully requests that this Court (i) enter the proposed order attached hereto as <u>Exhibit A</u> staying certain portions of the Transaction Fee Order and (ii) grant such other relief as may be just and proper.

Dated: October 16, 2020
Wilmington, Delaware

        **COLE SCHOTZ P.C.**


        By: <u>*/s/ Patrick J. Reilley*</u>
        Norman L. Pernick (No. 2290)
        Patrick J. Reilley (No. 4451)
        500 Delaware Avenue, Suite 1410
        Wilmington, DE 19801
        Telephone: (302) 652-3131
        Facsimile: (302) 652-3117
        npernick@coleschotz.com
        preilley@coleschotz.com

          – and –

        **GIBSON, DUNN & CRUTCHER LLP**

        Monica K. Loseman (Admitted Pro Hac Vice)
        1801 California Street, Suite 4200
        Denver, CO 80202-2642
        Telephone: (303) 298-5784
        Facsimile: (303) 313-2828
        mloseman@gibsondunn.com

        Randy M. Mastro (Admitted Pro Hac Vice)
        Mary Beth Maloney (Admitted Pro Hac Vice)
        200 Park Avenue
        New York, NY 10166-0193
        Telephone: (212) 351-4000
        Facsimile: (212) 351-4035
        rmastro@gibsondunn.com
        mmaloney@gibsondunn.com

        *Counsel to Patriarch Partners Management Group,*
        *LLC*

11

A-876

**Exhibit A**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>Zohar III, Corp., *et al.*,[1]<br><br>            Debtors. | Chapter 11<br><br>Case No. 18-10512 (KBO)<br><br>Jointly Administered |

## ORDER GRANTING PPMG'S MOTION FOR STAY PENDING APPEAL OF THE TRANSACTION FEE ORDER OR ALTERNATIVELY FOR THE ESCROWING OF CERTAIN TRANSACTION FEES

Upon consideration of *PPMG's Motion for Stay Pending Appeal of the Transaction Fee Order And For the Escrowing of Certain Transaction Fees* [D.I. __] (the "Motion");[2] and the Court having found that it has jurisdiction to consider the Motion and the relief requested therein under 28 U.S.C. §§ 157 and 1334; and the Court having found that consideration of the Motion and the relief requested therein is a core proceeding under 28 U.S.C. § 157(b); and the Court having found that venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409; and the Court having found that due and proper notice of the Motion was provided and that such notice was adequate and appropriate under the particular circumstances; and the Court having determined that the legal and factual bases establish just cause for the relief granted herein; and any objections to the Motion having been withdrawn or overruled on the merits; and after due deliberation and sufficient cause appearing,

---

[1] The Debtors, and, where applicable, the last four digits of their taxpayer identification number are as follows: Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261), Zohar II 2005-1, Limited (8297), and Zohar CDO 2003-1, Limited (5119). The Debtors' address is 3 Times Square, c/o FTI Consulting, Inc., New York, NY 10036.

[2] Capitalized terms not otherwise defined herein shall have the meanings afforded to them in the Motion.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED.

2.      Section 2 of the Transaction Fee Order is hereby stayed pending resolution of PPMG's appeal therefrom.

3.      PPMG and the Debtors shall, as soon as reasonably practical, determine a mutually-agreeable escrow account (the "Transaction Fee Escrow Account").  PPMG shall deposit the Transaction Fee into the Transaction Fee Escrow Account and the Transaction Fee shall remain in escrow pending resolution of PPMG's appeal.  Should any further transaction fees become due and payable under a Management Service Agreement between PPMG and a Portfolio Company prior to resolution of PPMG's appeal, those transaction fees shall be deposited into the Transaction Fee Escrow Account, subject to the same terms.

4.      This Order shall be effective and enforceable immediately upon entry.

5.      The Court shall retain jurisdiction with respect to all matters arising from or related to the implementation and/or enforcement of this Order.

57772/0001-21495323v1

```
 1                  UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2
                                    .  Chapter 11
 3   IN RE:                         .
                                    .  Case No. 18-10512 (KBO)
 4   ZOHAR III CORP., et al.,       .
                                    .  Courtroom No. 1
 5                                  .  824 North Market Street
                                    .  Wilmington, Delaware 19801
 6                                  .
 7                   Debtors.       .  October 19, 2020
     . . . . . . . . . . . . . . . .   10:00 A.M.
 8
                         TRANSCRIPT OF HEARING
 9          BEFORE THE HONORABLE KAREN B. OWENS
               UNITED STATES BANKRUPTCY JUDGE
10

11   APPEARANCES:

12
     For the Debtors:        Michael Nestor, Esquire
13                           Joseph Barry, Esquire
                             Michael Neiburg, Esquire
14                           YOUNG CONAWAY STARGATT & TAYLOR LLP
                             1000 North King Street
15                           Wilmington, Delaware 19801

16   For Patriarch:          Monica Loseman, Esquire
                             GIBSON DUNN
17                           333 South Grand Avenue
                             Los Angeles, California 90071
18
19                           - and -

20                           Armando Gomez, Esquire
                             SKADDEN ARPS SLATE MEAGHER FLOM LLP
21                           1440 New York Avenue
                             Washington, DC 20005
22
                             - and -
23
                             David Dean, Esquire
24                           COLE SCHOTZ P.C.
                             500 Delaware Avenue
25                           Wilmington, Delaware 19801
```

2

```
 1   Audio Operator:          Al Lugano

 2   Transcription Company:   Reliable
                              1007 N. Orange Street
 3                            Wilmington, Delaware 19801
                              (302)654-8080
 4                            Email:  gmatthews@reliable-co.com

 5
     Proceedings recorded by electronic sound recording,
 6   transcript produced by transcription service.
```

```
 7
     APPEARANCES (Continued):
 8
     For the Portfolio Companies
 9   And RM Acquisition:      Christopher Clark, Esquire
                              LATHAM & WATKINS
10                            10 Northview Drive
                              New York, New York 12110
11
     For U.S. Trustee:        Juliet Sarkessian, Esquire
12                            UNITED STATES DEPARTMENT OF JUSTICE
                              OFFICE OF THE U.S. TRUSTEE
13                            844 King Street, Suite 2207
                              Lockbox 35
14                            Wilmington, Delaware 19801
15
     For Teleo Capital:       Evelyn Meltzer, Esquire
16                            TROUMAN PEPPER LLP
                              1313 N. Market Street
17                            Wilmington, Delaware 19801
18

19

20

21

22

23

24

25
```

A-881

1                               <u>INDEX</u>

2

3    #2) Patriarch's Motion for Entry of an Order (A) Enforcing and
     Implementing the Terms of the Settlement Agreement and (B)
4    Granting Related Relief [(SEALED) D.I. 1903; 8/31/20;
     (REDACTED) D.I. 1912; 9/3/20].

5
     #3) Motion of Certain Portfolio Companies of the Debtors' for
6    an Order Staying Litigation Against the Portfolio Companies
     Under 11 U.S.C. § 105 and 11 U.S.C. § 362 [(SEALED) D.I.
7    1928; 9/9/20; (REDACTED) D.I. 1939; 9/14/20].

8    #4) Notice of Binding Portfolio Company (Rand) Transaction
     Pursuant to Portfolio Company Transaction Procedures [D.I.
9    1965; 9/25/20].

10   #5) Motion of Certain Portfolio Companies of the Debtors to
     File Under Seal the Reply of Certain Portfolio Companies of
11   the Debtors in Support of their Motion for an Order Staying
     Litigation Against the Portfolio Companies Under 11 U.S.C. §
12   105 and 11 U.S.C. § 362 [D.I. 2009; 10/13/2.

13
     #6) PPMG's Motion for Stay Pending Appeal of the Transaction
14   Fee Order and for the Escrowing of Certain Transaction Fees
     [D.I. 2029; 10/16/20].

15   **Ruling:  13**

16

17   PORTFOLIO'S WITNESS:

18   **LYNN TILTON**

19        Direct Examination by Mr. Clark        19

20        Cross Examination by Mr. Dean          94

21        Redirect Examination by Mr. Clark      116

22

23

24

25

1 | DEBTORS' WITNESS:

2 | **MICHAEL KATZENSTEIN**

3 |      Direct Examination by Mr. Neiburg    123

4 |      Cross Examination by Mr. Dean    150

5 |      Redirect Examination by Mr. Neiburg    167

6 |

7 | <u>EXHIBITS</u>        <u>I.D.</u>   <u>REC'D</u>

8 | JX-1  Timeline Order        96

9 | JX-2  Amended Timeline Order    100

10 | JX-3  Email Exchange    102

11 | JX-8  Blackline Version of Bid    107

12 | JX-9  Email    100

13 | PX-1-A  Clean Version of Bid    107

14 | PX-2  Certification of Counsel    103

15 | PX-3  Certification of Counsel    103

16 | PX-4  Certification of Counsel    103

17 | PX-7  Email    102

18 | DX-6  Email

19 | DX-1  Email Chain

20 | DX-13  Text Messages    115

21 | DX-14  Restraining Notice    116

22 | DX-16  Phone Log    115

23 | DX-30  Operating Agreement    111

24 | Declaration of Michael Katzenstein    123

25 |

1  DX-5   Court Order                           129

2  JX-5   Document (Under Seal)               145

3  Declaration of Lynn Tilton              114

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Proceedings commence at 10:02 a.m.)

 2              THE COURT:  Good morning, parties.  This is Judge

 3  Owens.  We're gathered today in the Zohar hearings.

 4              We have a lot to accomplish today.  So, let me

 5  turn the podium over to debtors' counsel and we can get

 6  started.

 7              MR. BARRY:  Good morning, Your Honor.  For the

 8  record, Joe Barry of Young Conaway for the Zohar Funds.

 9  Happy Monday morning, Your Honor.

10              We have a quick, sort of, procedural or

11  housekeeping question for the court if we may.  On Friday

12  PPMG filed a motion for stay pending appeal of Your Honor's

13  ruling from the 14th and we filed a short response this

14  morning and sent it to Chambers.  The question for Your Honor

15  is would you prefer to roll right into the evidence or did

16  you want to hear that first?  I ask because the order that

17  was entered, I think, this morning said that that matter was

18  going forward at ten o'clock.

19              So, we just wanted to understand the court's

20  preference on that.  Happy to defer to Your Honor however you

21  prefer to proceed.

22              THE COURT:  Let's have that heard and get it out

23  of the way, then we go right into Rand.

24              MR. BARRY:  I'm sorry, Your Honor.  I couldn't

25  hear the first few words.
```

1          THE COURT:  I apologize.  I'm fine with having

2     that heard right now, and then we will get that out of the

3     way, and then we can get started with Rand.

4          MR. BARRY:  Very well, Your Honor.  With that I

5     will cede the virtual podium to the movant.

6          THE COURT:  Okay.  Ms. Loseman, good morning.

7          MS. LOSEMAN:  Yes.  Good morning, Your Honor.

8     Monica Loseman on behalf of PPMG and Ms. Tilton.

9          I will be brief.  As Your Honor mentioned, we do

10    have a very full plate today.

11         Your Honor, let me start by responding to the

12    opposition that debtors filed this morning.  I want to be

13    clear about the standard that applies to the motion that we

14    filed, Your Honor.  In this circuit the factors considered on

15    a request for stay pending appeal are evaluated on a sliding

16    scale.  That is the Revel AC, Inc. case, Third Circuit 2015.

17         So, this court should consider all of the factors,

18    weigh them accordingly.  Even if the chances of success do

19    not meet the standards that the debtors set forth in their

20    objection, and that's the wrong standard which I will get to

21    in a moment, the court should balance the likelihood of

22    success against the harm that will befall PPMG absent a stay.

23         Now on the likelihood of success prong the

24    standard is not what debtors suggest. In fact, they cite no

25    controlling precedent, no Third Circuit case law in the

8

 1   opposition that they filed this morning.  <u>Revel</u> is the

 2   controlling case here.  And it says the standard for

 3   likelihood of success on the merits is a sufficient degree of

 4   success for a strong showing exists if there is a reasonable

 5   chance, a reasonable chance or probability of winning.

 6          The issue here, respectfully, Your Honor, involves

 7   matters of contract interpretation and application of facts

 8   to a particular standard in terms of determining what is debt

 9   and what is equity.  We believe reasonable minds, at least,

10   can differ on these points, Your Honor, respectfully.  And we

11   think that this was a close call.  And the fact that it was a

12   close call was evidenced by the remarks that you shared with

13   the parties at the close of argument in the evidentiary

14   presentation.

15          So, we believe the standard here, the appropriate

16   Third Circuit standard here is satisfied and should next be

17   weighed against the harms that will befall PPMG absent a stay

18   of the order.

19          The debtors, by the way, Your Honor, essentially,

20   concede that the debtors' estate will suffer no harm from an

21   escrow of these proceeds, but PPMG will suffer harm.  There

22   seems to be, frankly, Your Honor, an unspoken assumption that

23   when Ms. Tilton or a Patriarch stakeholder receives a fee it

24   somehow just goes into her pocket.

25          Little attention is paid to the fact that the

1   Patriarch stakeholders, including PPMG have expenses

2   associated with the running of these companies the running of

3   the Patriarch stakeholders' operations, participating in the

4   monetization process, providing services to these companies

5   for years and years, and paying the taxes associated with

6   ownership of the companies through March 30th of this year;

7   not to mention the legal expenses, of course.  Those fees and

8   expenses are substantial, Your Honor, and all the while she

9   was continuing to accrue and pay for the expenses associated

10  with running the Patriarch stakeholders and providing these

11  services to the companies.  Ms. Tilton always put herself

12  last.

13          So, the PPMG fees, the PPAS fees, the interest

14  payments that were due even the Ark entities Ms. Tilton

15  allowed the companies, when the cash-flow necessitated, to

16  accrue those fees rather than pay-out to the Patriarch

17  stakeholder as appropriate.  That is why Ms. Tilton insisted

18  on the "pay first, fight later" structure that the parties

19  agreed to in the settlement.  Ms. Tilton needed that cash,

20  the cash that she was long due, to pay expenses associated

21  with running these Patriarch stakeholder operations.

22          Allowing the debtors to receive the cash and her

23  expenses become -- her fees become lower and administrative

24  priority is the problem here.  There was already a history of

25  the debtors not paying Ms. Tilton fees that are even

1  contractually owed, owed under the terms of the settlement

2  agreement. And while that matter is for another day, and I

3  believe the November omnibus hearing, that is the concern

4  that fees, monies that are owed to Patriarch stakeholders and

5  Ms. Tilton by the debtors' estate continue to degrade in

6  terms of administrative priority and there is risk that Ms.

7  Tilton will, in fact, not receive the fees that she is owed

8  and, essentially, render her appeal or attempt to appeal moot

9  at the get go.

10       With that, Your Honor, I am happy to answer any

11 questions you may have.

12       THE COURT:  I don't have any questions pertaining

13 to this; however, I do think it reveals a problem with the

14 arrangement that the parties have agreed to here.  And I

15 think the parties need to think about the escrow arrangement

16 that both parties seem to want right now.  Okay.

17       So, why don't I hear on the substance -- hear from

18 the debtors on the substance of the stay pending appeal.

19       MR. BARRY:  Thank you, Your Honor.  Again, for the

20 record, Joe Barry of Young Conaway for the debtors.

21       Your Honor, I would just note that much of what

22 Ms. Loseman recited to the court is not actually before the

23 court and not in evidence.  With respect to her argument that

24 this was a close call -- excuse me, that this was, in fact, a

25 close call based on some comments from Your Honor at the last

1  hearing I would just note that Your Honor actually said in
2  ruling on this particular issue that it was not, in fact, a
3  close call.  So, I would rely on Your Honor's actual comment
4  saying it wasn't a close call in evaluating whether it was or
5  was not.

6          Your Honor, you're right, we had approached the
7  Patriarch stakeholders, as set forth in our papers, on two
8  occasions to consensually agree to the concept of an escrow
9  pending the adjudication of the claims at issue including the
10 success fee at Rand, the transaction that Your Honor is going
11 to consider today. And it was only after a year's long
12 litigation and the court's ruling that they are now asking
13 for the concept of an escrow having not prevailed in its
14 argument relating to the management services agreement.

15         So, Your Honor, we think that Your Honor should
16 factor that into consideration of the motion for stay pending
17 appeal, but getting to the merits of with respect to the four
18 factors, Your Honor, a likelihood of success on merits.  Your
19 Honor, I think the case law is legion that a party can't
20 simply rehash the arguments that the Trial Court rejected in
21 its request for a motion for stay pending appeal.  It
22 actually has to make an argument as to how or why it may
23 prevail on appeal.  I think that Your Honor's ruling was
24 pretty clear, but, again, this one wasn't really a close
25 call.

1          With respect to the harm, Your Honor, this refers

2    to "harm that can't be prevented or fully rectified by a

3    successful appeal," which is what the <u>Revel</u> court says.  That

4    is the case that Ms. Loseman cited and this comes down to

5    money.  Money can be repaid, money can be used to satisfy the

6    claim if it's reversed on appeal.  So, this isn't something

7    that can't be rectified.  It's just simply, in essence, a

8    money judgment.

9          Conversely, Your Honor, this infusion of $3.8

10   million will assist the debtors in its ongoing monetization

11   process which, as the court knows, is the reason for these

12   cases to exist.  We have sales in the near and midterm in the

13   offing that we think will bring additional funds into the

14   case.  As such we don't think that Ms. Tilton, if she were to

15   succeed on appeal, we don't think that there is much, if any,

16   risk that the cash won't be there to be repaid.

17         Finally, Your Honor, with respect to public

18   interest we think that there is, as we set forth in our

19   papers, a strong public interest in having sophisticated

20   parties, as Your Honor said, live up to the benefit of their

21   bargain, as Your Honor has ruled, and with the expeditious

22   resolution of bankruptcy cases as was cited by the <u>Revel</u>

23   case.

24         So, with that, Your Honor, unless you have any

25   questions we will rest on that.

1           THE COURT:  No questions.

2           Ms. Sarkessian, I see that you are on our video

3   stream.  Did you want to address the court regarding the

4   matter that is before it?

5           MS. SARKESSIAN:  No, Your Honor.  I do not have

6   any comments regarding that motion.

7           THE COURT:  Okay.  Thank you.

8           All right.  Ms. Loseman, did you want a brief

9   reply?

10          MS. LOSEMAN:  Yes.  If I may, just briefly I would

11  like to address the escrow requests that were made.  The most

12  recent, I suppose, pitch by debtors' counsel was to escrow

13  all proceeds due to Patriarch stakeholders which, of course,

14  would, essentially, be evading Paragraph 18 of the settlement

15  agreement.  That was our objection to it.  I think debtors

16  had found a way to object to nearly every claim Ms. Tilton

17  and the Patriarch Stakeholders have set forth.  So, that was

18  our concern about the escrow proposal most recently forwarded

19  by debtors.

20          THE COURT:  I'm going to deny the (indiscernible)

21  stay pending appeal. I don't think that PPMG has satisfied

22  the burden.  I won't take up too much time here, but I agree

23  with the debtors that there is just simply a rehash -- sorry,

24  I'm getting some feedback here on the line.  Give it one

25  second please.

1           (Pause in record)

2           THE COURT:  Okay.  As I was saying, I agree with

3    the debtors that I just think that PPMG has rehashed its

4    arguments.  I don't think it's sufficient enough under the

5    standard.  I also think that there is no evidence of concrete

6    harm -- excuse me, no concrete evidence of harm to befall

7    PPMG with respect to the repayment of the funds.

8           I am not going to say anything more about the

9    request for the escrow.  At this point I think that is

10   something the parties are going to have to come to an

11   agreement on.  Do I think it makes abundant sense in some

12   circumstances to put money into an escrow, yes.  I see -- I

13   think the parties now understand why it probably makes

14   abundant sense to put some of the money into an escrow.

15          My hands are tied on a limited basis when it comes

16   to the "pay first, fight later" contractual provision that

17   they agreed to in the settlement agreement.  Perhaps the

18   parties need to put their heads together and determine

19   whether it makes sense that in certain tranches of disputed

20   claims here that they agree to an escrow, but I will leave it

21   to the parties to hash that out or if it gets presented again

22   that there be some sort of basis in law or the settlement

23   agreement as to why that I could issue -- why I could issue

24   those funds going into an escrow.

25          Right now under the stay pending appeal motion I

1  don't think that PPMG has met its burden and I am going to

2  deny that request.

3          MR. BARRY:  Thank you, Your Honor.  Again for the

4  record, Joe Barry of Young Conaway.

5          I think at this point we're prepared to continue

6  into the evidentiary record on the Rand transaction.  So with

7  that I will cede the virtual podium to either Mr. Clark or

8  Mr. Nestor.  I'm not quite sure who at this point.

9          THE COURT:  Okay.  Before we go forward on that we

10 have, I think, at least two other items that need to be

11 addressed by the court today.  We have a stopping time, and

12 I'm not sure if it was relayed to the parties, but no later

13 than 4:30.

14         So, what is the estimate timeframe for what is

15 left on the Rand transaction today?  What do we think for Mr.

16 Katzenstein, I think that is the next witness?  So, what is

17 the estimate for Mr. Katzenstein and what is the estimate for

18 Ms. Tilton?

19         MR. CLARK:  Your Honor, it's the Rand party's

20 intention to call Ms. Tilton next and we would expect that

21 her testimony would go around an hour on direct/cross and no

22 more than an hour and a half.

23         THE COURT:  Okay. And then what about Mr.

24 Katzenstein?

25         Ms. Loseman, do you have an estimate for your