IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ZOHAR III, CORP., et al. | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | Case No. 18-10512 (KBO) |
| | ) | |
| | ) | |
| PATRIARCH PARTNERS MANAGEMENT GROUP, LLC, | ) ) ) | |
| Appellants | ) ) | C.A. No. 20-1419 (MN) |
| v. | ) ) | |
| ZOHAR III, CORP., et al., | ) ) | |
| Appellees. | ) | |

**MEMORANDUM OPINION**

Norman L. Pernick, G. David Dean, Patrick J. Reilley, COLE SCHOTZ P.C., Wilmington, DE; Monica K. Loseman, GIBSON, DUNN & CRUTCHER LLP, Denver, CO; Randy M. Mastro, Akiva Shapiro, Michael L. Nadler, GIBSON, DUNN & CRUTCHER LLP, New York, NY; Michael G. Farag, GIBSON, DUNN & CRUTCHER LLP, Los Angeles, CA – Attorneys for Appellant Patriarch Partners Management Group, LLC.

James L. Patton, Jr. Robert S. Brady, Michael R. Nestor, Joseph M. Barry, Ryan M. Bartley, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE – Attorneys for Debtors-Appellees.

August 26, 2021
Wilmington, Delaware


**NOREIKA, U.S. DISTRICT JUDGE**

Pending before the Court is an appeal filed by Patriarch Partners Management Group, LLC ("PPMG") of the Bankruptcy Court's *Order Determining Dispute Between the Debtors and Patriarch Partners Management Services, LLC Related to Pending Oasis Transaction* (D.I. 1-1) ("the Order"), entered on October 15, 2020 based on the reasons set forth on the record on October 14, 2020 (A-859–865)[1] ("the Bench Ruling").  For the reasons set forth below, the Order is affirmed.

**I.    BACKGROUND**

    **A.    The Chapter 11 Cases**

The Zohar Funds[2] are special purpose investment vehicles, commonly referred to as collateralized loan obligation funds.  (*See* A-5).  Each Zohar Fund raised capital by issuing secured notes to investors under an indenture.  (*See id*.)  The Zohar Funds used the capital raised from issuing notes to their investors – approximately $2.5 billion in the aggregate – to make debt or equity investments that serve as the collateral for repayment of the secured notes.  (*See* A5–A6; A16–A17).  The Zohar Funds primarily invested in distressed, privately-held companies (each a "Portfolio Company," and collectively, "Portfolio Companies").  (*See* A-6).  The Zohar Funds received cash flow from two sources: (i) the Portfolio Companies' debt obligations to the Zohar Funds, which returned interest over time and the principal upon maturity, and (ii) any proceeds

---

[1]    The docket of the Chapter 11 cases, captioned *In re Zohar III, Corp., et al*., No. 18-10512 (KBO), is cited herein as "B.D.I. __."  The appendix (D.I. 19) filed in support of PPMG's opening brief (D.I. 17) is cited herein as "A-__."

[2]    The Debtor-Appellees, and, where applicable, the last four digits of their taxpayer identification number, are as follows:  Zohar III, Corp. (9612), Zohar II 2005-1, Corp. (4059), Zohar CDO 2003-1, Corp. (3724), Zohar III, Limited (9261) ("Zohar III"), Zohar II 2005-1, Limited (8297) ("Zohar II"), and Zohar CDO 2003-1, Limited (5119) ("Zohar I," and together with Zohar II and Zohar III, the "Zohar Funds").

received on account of the equity and limited liability membership interests they own in the Portfolio Companies.  (*See* A-7).

On March 11, 2018, the Zohar Funds filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code ("the Chapter 11 Cases").  (*See* A-147).  Thereafter, various parties in interest in the Chapter 11 Cases engaged in litigation over numerous issues, including motions to dismiss the chapter 11 cases or appoint a chapter 11 trustee.  (*See* A-50–51).  On April 5, 2018, the Bankruptcy Court appointed a mediator to mediate the bankruptcy litigation.  (*See* A-51 ¶ 15). Following four days of mediation, the parties achieved a settlement ("the Settlement Agreement"), which was approved by the Bankruptcy Court on May 21, 2018.  (*See* A-84–106).  The Settlement Agreement outlined an agreed-upon process for monetizing the Portfolio Companies for the benefit of the Zohar Funds' stakeholders.  (*See* A-92–93 ("Settlement Agreement") ¶¶ 8, 10–12). Pursuant to paragraph 18 of the Settlement Agreement, the Zohar Funds retained the right to challenge any payments made to PPMG in connection with the monetization of the Portfolio Companies.  (A-95 ¶ 18).  On November 9, 2018, the Bankruptcy Court entered an order establishing specific procedures by which monetization transactions would be approved by the Bankruptcy Court ("the Monetization Procedures Order").  (*See* A-107–112).

**B.     The LVD Credit Agreement**

LVD Acquisition, LLC ("LVD" or "Oasis") was a Portfolio Company.  (*See* A-148; A-757:6–10).  Zohar I, Zohar II, and Zohar III were collectively the sole members of LVD, holding 18.9%, 58.3%, and 22.8% of LVD's limited liability membership interests, respectively. (*See* A-482, Schedule 3.04).  The Zohar Funds entered into a credit agreement with LVD and its subsidiary, as borrowers, and the Zohar Funds, as lenders, on June 1, 2009 ("the LVD Credit Agreement").  (*See* A-663 (Preamble); A-770:22-771:3 (9/14/20 Hr'g Tr.)).  The Zohar Funds lent money to LVD on a secured basis, with initial loan commitments of (a) a $2 million revolving

credit commitment from Zohar III, and (b) Term A Loans from Zohar I, Zohar II, and Zohar III of approximately $9.3 million, $30 million, and $11.6 million, respectively, as reflected in Schedule 2.1 of the LVD Credit Agreement. (*See* A-187–188). The LVD Credit Agreement further provides that interest on unpaid principal would accrue at a per annum rate of LIBOR ***plus*** the "Applicable Margin" rate. (*See* A-690 § 2.8(a) (emphasis added)). The Applicable Margin was set at 8.0% for all Revolving Credit Loans, Term A Loans, and Term B Loans (each as defined in the LVD Credit Agreement). (*See* A-668). Pursuant to the LVD Credit Agreement, LVD was required to pay interest on (i) the first day of each month, (ii) upon prepayment of the "Loans," and (iii) the "Maturity Date." (*See* A-690 § 2.8).

From 2010–2015, LVD and the Zohar Funds entered into eight amendments to the LVD Credit Agreement. (*See* A-224). In November 2015, the Zohar Funds and LVD entered into Amendment 7 to the LVD Credit Agreement. The parties do not dispute that, pursuant to Amendment 7 (§ 1(a)(i)), Schedule 2.1 (Commitments)) to the LVD Credit Agreement is "replaced in their entirety."

In November of 2015, LVD and the Zohar Funds entered into Amendment 8 to the LVD Credit Agreement. The purpose of Amendment 8 was the "restructuring of $20,291,872.92 of unpaid interest and commitment fees into tranches TLD, TLE, and TLF" (collectively, "the Amendment 8 Traches"). (A-198 § 1(a)(i)). The Amendment 8 Tranches were inserted at the end of Schedule 2.1 to the LVD Credit Agreement (*see id.*) as additional "Commitments" under the LVD Credit Agreement (*see* A-747). These new Amendment 8 "Commitments" under the LVD Credit Agreement followed the TLA, TLB, TLC, et cetera naming convention used for all term loans under the LVD Credit Agreement.[3] (*See* A-205).

---

[3] PPMG's witness testified at trial that TLD, TLE, and TLF meant "Term Loan Tranche D, Term Loan Tranche E, and Term Loan Tranche F." (A-654).

3

Accordingly, under the LVD Credit Agreement, LVD had outstanding obligations to the Zohar Funds of not less than $80,249,413.40 comprised of the following: $59,957,540.49 in original principal amount, plus $20,291,872.91 in tranches TLD, TLE, and TLF created by Amendment 8. (*See* A-149–150; A-191).

### C. The Management Services Agreement

On September 30, 2010, LVD entered into a management services agreement ("the MSA") with PPMG, an entity owned and controlled by Lynn Tilton, who was then LVD's sole manager. (*See* A-207–222). Pursuant to the terms of the MSA, PPMG was required to provide management and consulting services in exchange for management fees and a "Transaction Fee," if applicable, upon the occurrence of a qualifying "Liquidity Event." (*See* A-207–210). Specifically, the MSA states that "[i]n connection with each Liquidity Event, PPMG will be entitled to receive a cash fee (the 'Transaction Fee') equal to 5% of the Eligible Equity Value." (*See* A-209 § 3(c)(i) (emphasis in original).

The term "Liquidity Event" generally refers to either a sale of 80% or more of LVD's assets (MSA § 3(c)(ii)(D)(x)); a sale of 50% or more of LVD's equity (*id.* § 3(c)(ii)(D)(y)); or a merger of LVD and another company (*id.* § 3(c)(ii)(D)(z)). The provision of the MSA defining "Liquidity Event" concludes with a clause that is the primary source of the instant dispute, which states that, "in each case, in order to constitute a qualifying Change of Control, the event must permit [LVD] . . . to pay all of its . . . outstanding debt." (MSA § 3(c)(ii)(D)). The term "Change of Control" is not defined in the MSA, nor is it used elsewhere in that document.

### D. The LVD Transaction and Transaction Fee Dispute

On August 23, 2019, the Zohar Funds, LVD, and the Culligan International Company ("the Buyer") entered into an equity purchase agreement ("the EPA"), pursuant to which the Buyer acquired 100% of the Zohar Funds' membership interests in LVD ("the LVD Transaction") and

the Zohar Funds received cash at closing of approximately $65.5 million.  (*See* A123; A390; A452–A453).  In connection with the LVD Transaction, the Zohar Funds and LVD agreed that $59,957,540.49 plus interest was currently owed by LVD to the Zohar Funds under the LVD Credit Agreement, not including Amendment 8 ("the Payoff Letter").  (*See* A190).  The parties to the Payoff Letter further agreed that an additional amount of "not less than $20,291,872.91" was due to the Zohar Funds under Amendment 8 of the LVD Credit Agreement and the Amendment 8 Tranches.  (*Id.*)

During the EPA negotiations, the Zohar Funds took the position that no Transaction Fee was payable, as LVD's indebtedness would not be paid in full in connection with the LVD Transaction, while PPMG took the position that it was entitled to a Transaction Fee pursuant to the MSA.  (*See* A153).  So as not to delay the LVD Transaction, the parties agreed that the disputed Transaction Fee would be paid to PPMG; provided, however, that such payment be expressly subject to any remedy the Bankruptcy Court may direct in the event it determined the payment was improper, including disgorgement of these funds from PPMG.  (A-153–154).

On August 26, 2019, the Zohar Funds filed the Notice of Binding Portfolio Company Transaction Pursuant to the Monetization Procedures Order thus commencing the Bankruptcy Court process to approve the LVD Transaction.  (A-122–126).  In connection with the Transaction Fee dispute, the parties agreed to brief and argue the dispute at a subsequent hearing.  (A-154 at n.17).  On September 6, 2019, the Zohar Funds filed a motion for an order determining the Transaction Fee dispute ("the Transaction Fee Motion").  (A-143–243).  The same day, PPMG filed an opening brief in connection with the Transaction Fee dispute.  (A-248–325).  On September 4, 2020, the Zohar Funds filed a response to PPMG's opening brief.  (A-565–662).  Likewise, PPMG filed a response to the Zohar Funds' Transaction Fee Motion on September 4, 2020.  (A-326–A-564).

5

On September 14, 2020, the Bankruptcy Court held an evidentiary hearing on the Transaction Fee Motion. (A-854). On October 14, 2020, the Bankruptcy Court ruled from the bench on both issues raised on this appeal. The Bankruptcy Court explained that whether PPMG is entitled to the Transaction Fee depends upon how the undefined phrase "Change of Control" is interpreted in § 3(c)(ii)(D) of the MSA. (A-859:11–860:23). The Bankruptcy Court found, based upon "the four corners of the MSA[,] that the defined term, change of control, means liquidity event, because any other reading of the contract terms would be unreasonable for the reasons outlined in the debtor's response brief . . . And by substituting the word liquidity event for change of control in the proviso, the proviso then acts as it should to condition the circumstances in which the three events give rise to a liquidity event." (A-861:3–18). The Bankruptcy Court further found "that the $20 million provided for in Amendment Number Eight is debt not equity. This issue, like the one before it, was not a close call, based on the unambiguous language of Amendment Number Eight." (*Id*. at A-863:25–864:3). According to the Bankruptcy Court, PPMG's reading of the MSA contradicts the plain language of Section 3(c) thereof. (A862:1–7). The Bankruptcy Court found nothing in Amendment 8 supported PPMG's position that the Amendment 8 Tranches were equity. (A864:17–23). The Bankruptcy Court subsequently entered the Order confirming the Zohar Funds' interpretation of the MSA, the LVD Credit Agreement, and Amendment 8. That Order is the subject of this appeal.

Briefing on the merits of the appeal is complete. (D.I. 17, 21, 23). The Court did not hear oral argument because the facts and legal arguments are adequately presented in the briefs and record, and the decisional process would not be significantly aided by oral argument.

## II.  JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction to hear an appeal from a final judgment of the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1). The Third Circuit "take[s] a pragmatic approach" to finality in

the bankruptcy context by "examin[ing] the practical effect of the court's ruling." *In re Klaas*, 858 F.3d 820, 826 (3d Cir. 2017). Bankruptcy orders concerning "issues central to the progress of the bankruptcy petition," and issues "likely to affect the distribution of the debtor's assets, or the relationship among creditors," are routinely treated as final. *In re Owens Corning*, 419 F.3d 195, 203 (3d Cir. 2005) (quoting *Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 98 (3d Cir. 1988)). The relaxed standard avoids "wast[ing] time and resources" by "delay[ing] resolution of discrete claims." *Id*. (quoting *In re White Beauty View, Inc*., 841 F.2d 524, 526 (3d Cir. 1988)). The Order on appeal decides a discrete legal issue as to the parties' obligations under the MSA, which clearly affects the disposition of the estate's assets and relationships among the creditors and debtors. Accordingly, the Order is final, and this Court has jurisdiction over the appeal.

This Court "review[s] the Bankruptcy Court's legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof." *Manus Corp. v. NRG Energy, Inc. (In re O'Brien Envt'l Energy, Inc.)*, 188 F.3d 116, 122 (3d Cir. 1999). When interpreting the legal effect of a contract, this Court reviews the lower court's legal determinations *de novo*. *See Viera v. Life Ins. Co. of North America*, 642 F.3d 407, 413 (3d Cir. 2011) ("We also review the legal interpretation of contractual language *de novo*."); *Heasley v. Belden & Blake Corp*., 2 F.3d 1249, 1254 (3d Cir. 1993). As the contract at issue is unambiguous, *de novo* is the appropriate standard of review by this Court. *See, e.g., Sköld v. Galderma Labs. L.P.*, 917 F.3d 186, 191 n.9 (3d Cir. 2019) ("[W]e review the interpretation of an unambiguous contract de novo.").

## III. DISCUSSION

### A. The Bankruptcy Court Properly Interpreted the MSA Under New York Law

The parties agree that the MSA is governed by New York law. (A-264; A-575). Under the MSA, PPMG is entitled to receive a Transaction Free upon the occurrence of a "Liquidity Event." Section 3(c)(ii)(D) of the MSA defines "Liquidity Event" as the following:

> **(x)** a sale within any given 12 month period of 80% or more of the Company's or any one or more of its subsidiaries' assets (without regard to liabilities) (other than a sale to persons who are shareholders of the Company or the respective subsidiary and hold 50% of more of the equity of the Company or the respective subsidiary on the applicable award and date and their or its respective affiliates), **(y)** the consummation of any transaction in which any person of group of persons (other than the persons who are shareholders of the Company or the respective subsidiary on the applicable award date and their or its respective affiliates) becomes the beneficial owner of stock of the Company or the applicable subsidiary constituting more than 50% of the total market value or total voting power of the Company or the applicable subsidiary, **or (z)** the consolidation of the Company or one or more of its subsidiaries with, or merger of the Company or one or more of its subsidiaries with or into any other entity pursuant to a transaction in which any person or group of persons (other than the persons who are the shareholders of the Company or the applicable subsidiary on the applicable award date and their or its respective affiliates) becomes the beneficial owner of the stock of the Company or one or more of its subsidiaries constituting more than 50% of the total fair market value or total voting power of the Company or the respective subsidiaries; ***provided, however, that, in each case, in order to constitute a qualifying Change of Control, the event must permit the Company or the respective subsidiaries to pay all of its or their (as appropriate) outstanding debt.***

(*See* A-209–210 § 3(c)(d)(ii)(D), at 3–4 (emphasis added)). Section 3(c)(ii)(D) of the MSA uses a defined term—"Change of Control"—that is not defined elsewhere in the document. (A-569). Although the parties agree that use of this term is a scrivener's error (*see* D.I. 17 at 18; D.I. 22 at 1, 3), they disagree as to what term should have been used in its place. The competing candidates are "Liquidity Event," which is the precise subject of the entire rest of the paragraph, and "Change

8

in Control" which is employed in an Annex to the document. *Id*. Indeed, PPMG's main argument is that although "Change *of* Control" is not defined anywhere in the document, the similar term "Change *in* Control" is defined and used in Annex A to the MSA, which sets forth indemnification provisions. As defined in Annex A, a "Change *in* Control" refers to either the insolvency of Oasis or to a subset of the Liquidity Events defined in § 3(c)(ii)(D) of the MSA. (A-220, MSA, Annex A § 9). The Bankruptcy Court rejected this interpretation, determining that the only reasonable interpretation of the MSA is that the parties intended the term "Change of Control" in Section (c)(ii)(D) to be "Liquidity Event." The Court agrees.

New York contract law requires courts to apply the plain meaning of the language chosen by the contracting parties when a written agreement is clear, complete, and subject to only one reasonable interpretation. *See Scotto v. Georgoulis*, 932 N.Y.S.2d 120, 121 (2011) (citing *Brad H. v. City of New York*, 951 N.E.2d 743, 745–46 (N.Y. 2011)). Courts must resolve any ambiguity, in the first instance, within the four corners of the document; extrinsic evidence cannot be considered to explain why the parties intended a meaning different from that expressed in the agreement. *Id*. "[W]hen interpreting a contract, the court should arrive at a construction which will give fair meaning to all of the language employed by the parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized." *G-3 Purves St., LLC v. Thomson Purves, LLC*, 953 N.Y.S.2d 109, 112 (2012). Only if a contract remains ambiguous after attempting to resolve ambiguity within the four corners of the document, may a court consider extrinsic evidence to interpret the intent of the parties. *See Scotto*, 932 N.Y.S.2d at 121.

In determining that the only reasonable interpretation of the MSA is that the parties intended the term "Change of Control" in Section (c)(ii)(D) to be "Liquidity Event," the Bankruptcy Court noted "specifically, it is reasonable to conclude that in this instance, the use of

9

a proviso clause was meant to create an exception for or condition in some way the topic immediately preceding it." (A-861:8-11). The Court agrees that the Bankruptcy Court's interpretation makes sense within Section 3(c)(ii)(D) of the MSA – which defines the term "Liquidity Event" – because definitional provisos like the one at issue here are typically used to further explain, or qualify, the meaning of the term being defined. As the Zohar Funds correctly point out, Section 3(c)(ii)(D) of the MSA is a single-sentence definitional subsection of Section 3(c), defining the term "Liquidity Event." (*See* A-209–210, § 3(c)(ii)(D)). The use of the phrase "Change of Control" makes no sense in the proviso, particularly when "Change of Control" is not used elsewhere in the document.

PPMG's interpretation would require the MSA to substitute "Change *of* Control" with "Change *in* Control," as it is defined in Annex A to the MSA, but such a substitution does not resolve the ambiguity or lead to a reasonable interpretation of the MSA. First, Annex A to the MSA governs indemnification. (*See* A-220–222). And Section 9 of Annex A of the MSA defines the term "Change *in* Control" only "[f]or the purposes of Annex A." (A-222). As the Zohar Funds correctly point out, substituting "Change *of* Control" with "Change *in* Control" would create inconsistencies within Section 3(c)(ii)(D). "Change *in* Control" is a defined term that references two of the three enumerated events listed in Section 3(c)(ii)(D) of the MSA—(y) and (z)—while the "*in each case*" language of Section 3(c)(ii)(D) of the MSA specifically refers to all three enumerated events. (*See* A-222). Accordingly, because "Change *in* Control" only refers to two of the three enumerated events, and the language "*in each case*" of Section 3(c)(ii)(D) of the MSA specifically refers to all three of the enumerated events, substituting "Change *of* Control" with "Change *in* Control" would render the MSA inconsistent. The Bankruptcy Court correctly applied the same reasoning in reaching its conclusion. (*See* A-862:21–863:2).

PPMG takes issue with the Bankruptcy Court's explanation that its decision was supported by the MSA's "use of the words 'in each case' and 'qualifying'" (A-861:18–20) in connection with the term "Change of Control." (*See* D.I. 17 at 12). The Bankruptcy Court properly considered this language in resolving the ambiguity on the four corners of the document. Substituting "Change *in* Control" in Section 3(c)(ii)(D) instead of "Liquidity Event" would render the qualifying language contained in the proviso superfluous. The definition of "Liquidity Event" is used only for one purpose in the MSA: to define the instances in which PPMG is entitled to a 5% Transaction Fee. (*See* A-209 § 3(c)(i)). A "Liquidity Event" occurs when one of the three events – (x), (y), and (z) – occurs; "provided, however, that, in each case, in order to constitute a qualifying Change of Control [sic], the event must permit the Company or the respective subsidiaries to pay all of its or their (as appropriate) outstanding debt." *See id*. The language "in each case" and "qualifying" indicate that the parties meant to place a further limitation on when one of the three enumerated "events" – (x), (y), and (z) – will constitute a "Liquidity Event." *See id*. The language "in each case" and "qualifying" are central to the purpose of Section 3(c) of the MSA, qualifying the instances which PPMG is entitled to a Transaction Fee. (*See id*.) Therefore, using "Change of Control" instead of "Liquidity Event" would render the language "in each case" and "qualifying" superfluous within Section 3(c)(ii)(D) of the MSA.

PPMG argues that reading "Change of Control" to be synonymous with "Liquidity Event" renders Section 3(c)(ii)(D) internally inconsistent. PPMG points to the language in subsection (x) which provides that a Liquidity Event includes (x) "a sale . . . of 80% or more of the Company's . . . assets (without regard to liabilities)." (D.I. 17 at 22 (citing MSA § 3(c)(ii)(D)(x))). According to PPMG, that provision cannot be reconciled with the Debtors' proffered interpretation of the final clause of § 3(c)(ii)(D), under which a Liquidity Event would only occur if Oasis can "pay all of its . . . outstanding debt," *i.e.*, its liabilities. (*Id*.) According to PPMG, the Zohar Funds offer

11

no explanation as to how to reconcile the possibility of a Liquidity Event occurring "without regard to [LVD's] liabilities" if a Liquidity Event requires payment of those very same liabilities. (D.I. 22 at 5). This argument is unavailing. The "without regard to liability" language appears only in subsection (x) of the definition of Liquidity Event and modifies only one of the three possible Liquidity Events – an asset sale. Thus, if liabilities are disregarded for purposes of a Liquidity Event, they are disregarded only with respect to an asset sale. The absence of that language in connection with a sale of equity, such as the one at issue here, suggests that the Court can and should consider liabilities. And as the Zohar Funds argued below, a more logical reading is that use of the phrase "without regard to liabilities" has nothing to do with the proviso at the end of Section 3(c)(ii)(D). Rather, the phrase "without regard to liabilities" is more naturally read to clarify in subsection (x), the only subsection in which it appears, that an asset sale constitutes a Liquidity Event when 80% of the assets are sold ***without regard to whether the buyer is assuming or leaving behind liabilities***. The Bankruptcy Court's interpretation results in no internal inconsistency. Even if the Bankruptcy Court had considered extrinsic evidence, PPMG's argument was clearly contradicted by its own witness. (B.D.I. 1943, 9/14/20 Hr'g Tr. at 46:22-47:4).

As to extrinsic evidence, PPMG cites testimony and other documents proffered in support of its urged interpretation. PPMG argues that, by refusing to credit its witness's uncontradicted testimony in support of its urged interpretation, the Bankruptcy Court committed "reversible error." (D.I. 22 at 4). Here, however, the Bankruptcy Court was able to resolve the ambiguity of a scrivener's error – a sole mention of a single undefined term – within the four corners of the document, and no ambiguity remained. (*See* A861:3-5) ("it's clear to me from the four corners of the MSA that the defined term, change of control, means liquidity event. . ."). The Bankruptcy Court arrived at a construction which gave "fair meaning to all of the language employed by the

parties to reach a practical interpretation of the expressions of the parties so that their reasonable expectations will be realized," *G-3 Purves*, 953 N.Y.S.2d at 112, and it did so without reference to extrinsic or parol evidence. The Court need not consider such evidence here.

> B. **The Bankruptcy Court Properly Determined That the Amendment 8 Tranches Were Debt and Not Equity**

PPMG argues that, even if the Bankruptcy Court's interpretation of the MSA was correct, the Transaction Fee would nevertheless remain due to PPMG because the LVD Transaction was sufficient to "permit [Oasis] to pay all of its . . . outstanding debt." (MSA § 3(c)(ii)(D)). PPMG argues that Oasis owed approximately $60 million at the time of its sale, which was less than its sale price, and the Bankruptcy Court erred in finding that Amendment 8 (which restructured $20 million in accrued interest) created debt, rather than equity.

As noted, the LVD Credit Agreement contains a choice of law provision, stating that New York law will govern. (*See* A741 § 11.10). New York contract law will therefore also govern the interpretation of the LVD Agreement and Amendment 8 thereto. Under New York law, when the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract, giving a practical interpretation to the language employed and the parties' reasonable expectations. *Del Vechio v. Cohen*, 733 N.Y.S.2d 479, 481 (2001). The reviewing court must not look towards extrinsic or parol evidence to create an ambiguity in a written agreement that is otherwise clear and unambiguous. *Id*.

Here, the Bankruptcy Court held "that the $20 million provided for in Amendment Number Eight is debt not equity. This issue, like the one before it, was not a close call, based on the unambiguous language of Amendment Number Eight." (A-863:25-3). The Bankruptcy Court further found nothing in Amendment 8 supported PPMG's position that the Amendment 8 Tranches were equity. (A-864:17–23). According to the Zohar Funds, the Court must not weigh

13

extrinsic or parol evidence presented by PPMG in the Bankruptcy Court or this Appeal to determine whether the Amendment 8 Traches are debt or equity, but must first look to the unambiguous language of Amendment 8 and the LVD Credit Agreement. PPMG disagrees. According to PPMG, the MSA does not define the term "outstanding debt" for purposes of § 3(c)(ii)(D), and Amendment 8 does not expressly state whether Tranches TLD, TLE and TLF are "debt" or "equity." Absent such express contractual classification, PPMG argues, the doctrine of recharacterization should have guided the Bankruptcy Court's inquiry as to "whether a debt actually exists" as a result of Amendment. *Bayer Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.)*, 269 F.3d 726, 748 (6th Cir. 2001). In finding that the Amendment 8 created debt, PPMG asserts that the Bankruptcy Court failed to conduct such an analysis, and erroneously relied on the "various terms [used] therein," elevating form over substance. (*See* D.I. 17 at 24). The Court disagrees. The Bankruptcy Court's determination was based on a common sense evaluation of facts and circumstances surrounding the transaction.

Recharacterization is a question of fact. *See Friedman's Liquidating Tr. v. Goldman Sachs Credit Partners, L.P (In re Friedman's Inc.)*, 452 B.R. 512, 519 (Bankr. D. Del. 2011). Despite the name of this doctrine implying that it allows debt to be transformed into equity and suggesting the existence of a preexisting default status, the Third Circuit has been clear that "the label 'recharacterization' is misleading" because the question presented is actually "what is the proper characterization in the first instance of an investment" in light of courts' "equitable authority to ensure that 'substance will not give way to form, that technical considerations will not prevent substantial justice from being done.'" *Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 454 & n.7 (3d Cir. 2006) (quoting *Pepper v. Litton*, 308 U.S. 295, 305 (1939)). "No mechanistic scorecard suffices" in determining whether a financial instrument is debt or equity, which instead calls for an "overarching inquiry" based upon "facts that confer

14

context case-by-case." *Id.* at 456. The overarching inquiry in a recharacterization analysis is the parties' "intent" at the time of the transaction, which generally "may be inferred from what the parties say in their contracts, from what they do through their actions, and from the economic reality of the surrounding circumstances." *Id*. Thus, intent is determined not by applying any specific factor, but through a common sense evaluation of the facts and circumstances surrounding a transaction.

This Court utilizes a seven-factor test to determine whether debt should be recharacterized as equity. *See Cohen v. KB Mezzanine Fund II, L.P. (In re Submicron Sys. Corp.),* 291 B.R. 314, 323 (Bankr. D. Del. 2003). The reviewing court may weigh, among other facts, the following: (1) the name given to the instrument; (2) the intent of the parties; (3) the presence or absence of a fixed maturity date; (4) the right of payment of principal and interest; (5) the presence or absence of voting rights; (6) the status of the contribution in relation to regular corporate contributors; and (7) certainty of payment in the event of the corporation's insolvency or liquidation. *Id*. As the Bankruptcy Court correctly found, PPMG's contention that the Amendment 8 Tranches were equity is contradicted by the record on appeal. Moreover, all seven *Submicron* factors tip in favor of the Zohar Funds.

First, with respect to the name given to the instrument, the Bankruptcy Court noted that Amendment 8 was "styled as an amendment to the credit agreement and characterized as a credit document, the parties referred to as borrower, lenders, and administrative agent use the words loans and set forth in Section A, among other things, the type of loans, the specific tranches, the commitments, the outstanding obligations, the particular lender, the applicable margin used to calculate interest under the credit agreement, the maturity [date] and the prepayment preference." (A-864:8-16). Indeed, the "LVD Credit Agreement" states that Schedule 2.1 are "Loans" and the indebtedness reflected in Amendment 8 was added to Schedule 2.1. (*See* A-685–686; A-198).

15

Schedule A to Amendment 8 to the LVD Credit Agreement expressly labels tranches TLD, TLE, and TLF as "Term Loans" under the heading "Type of Loan," refers to "Lenders," and states a "Maturity Date" of April 15, 2019 for each tranche. (*See* A-205). Moreover, footnote 1 of Schedule A to Amendment 8 to the LVD Credit Agreement describes the TLD, TLE, TLF "Commitments" as "loans which, when repaid, may not be reborrowed." (*Id*.)  Likewise, Amendment 8 to the LVD Credit Agreement refers to LVD as a "Borrower" and the Zohar Funds as "Lenders" in several instances. (*See* A198; A198–A205 (Preamble, §§ 2(a), 3(a))). As the Bankruptcy Court observed, these "sophisticated parties negotiated [the] amendment" and "specifically provided that the amendment constituted legal obligations of the borrower and enforceable, pursuant to the terms of the amendment and the credit agreement. These are not words or terms associated with the creation of equity . . . ". (A-864:4-7; A-864:17-21).

Moreover, Section 7 of Amendment 8 to the LVD Credit Agreement explicitly states that the Amendment 8 is a "Credit Document" which shall be "read together" with the LVD Credit Agreement "and construed as a single agreement." (*See* A-201 § 7). The plain language of LVD Credit Agreement refers to the amounts listed in "Schedule 2.1," to which the Amendment 8 Tranches were added, as "Loans." (*See* A-198; A-685–686). Because the "Credit Document" must be "read together" with the LVD Credit Agreement, construing the Amendment 8 tranches TLD, TLE, and TLF as equity would contradict the plain language of the Amendment 8 and the plain language of the LVD Credit Agreement. (*Id*.)

Second, with respect to the intent of the parties, on its face, Amendment 8 was intended to convert accrued and unpaid interest and fee obligations (*i.e*., indebtedness) into new Term Loans under the Credit Agreement (i.e., indebtedness), following the TLA, TLB, TLC, et cetera naming convention used for all of the term loan indebtedness owed under the Credit Agreement. It is undisputed that the aggregate amount of the Amendment 8 Tranches is not less than

16

$20,291,872.91.  (A-190).  The Amendment 8 Tranches were listed as "**long term debt**" and as "**indebtedness**" within LVD's EPA disclosure schedules, each of which Lynn Tilton approved on LVD's behalf without objection.  (A-224; A-229) (emphasis added).  This factor tips in favor of the Zohar Funds.[4]

Third, if an instrument lists a maturity date, then the instrument is more akin to debt than equity.  *See Submicron*, 291 B.R. at 324–25.  With respect to a maturity date, all of the Amendment 8 Tranches, TLD, TLE, and TLF have a fixed maturity date of April 15, 2019.  (*See* A-205).  This factor weighs in favor of Zohar Funds.

Fourth, if an instrument evinces a right to payment of principal plus interest, then the instrument is more akin to debt than equity.  Here, the plain language of the LVD Credit Agreement and Amendment 8 demonstrate that the Amendment 8 Tranches bore interest.  (*See* A-665).  The LVD Credit Agreement provides that "each Loan shall bear interest on the unpaid principal amount thereof from the date made through repayment . . . at a rate per annum equal to LIBOR plus the Applicable Margin."  (A-690, § 2.8(a)).  The "Applicable Margin" on the Amendment 8 Tranches was 0%.  (A-205).  Therefore, the Amendment 8 Tranches bore interest at the LIBOR rate.  (*Id*.; A-205).  Pursuant to the LVD Credit Agreement, LVD was required to pay interest on (i) the first day of each month, (ii) the date of any prepayment of the loans, and (iii) the maturity date.  (A-817; A-690).

---

[4]  PPMG contends that "no reasonable third-party lender would have extended [approximately $20 million] of credit" on the terms set forth in Amendment 8. (D.I. 17 at 26).  As the Debtors correctly point out, however, PPMG failed to raise this argument in the proceeding below and offered no evidence to support such a contention.  Therefore, PPMG waived its right to make such argumentation in this appeal.  *See In re La Paloma Generating Co. LLC*, 609 B.R. 80, 96 (D. Del. 2019) (citing *In re Grand Union Co.*, 200 B.R. 101, 106 (D. Del 1996) for the proposition that arguments not properly made in an underlying bankruptcy proceeding are waived).

17

PPMG argues that despite these plain terms, no interest was expected from the restructured notes in Tranches TLD, TLE, and TLF and LIBOR was not applicable. (D.I. 17 at 7). PPMG argues that Amendment 8 restructured the $20 million unpaid accrued interest and commitment fees into "a form of equity known as an equity kicker" (although that term does not appear anywhere in the documents). In support of this argument, PPMG argues that because "Loans" are defined as meaning "Revolving Loans, Term A Loans, and Term B Loans", and Amendment 8 did not amend the Credit Agreement's definition to indicate the new tranches were to be included as "Loans" or "Term Loans" under the Credit Agreement, they were not subject to the Credit Agreement's provision that each "Loan" bears interest "at a rate per annum equal to LIBOR plus the Applicable Margin." (*See* D.I. 17 at 6-7). Setting aside that Schedule A to Amendment 8 to the LVD Credit Agreement expressly labels tranches TLD, TLE, and TLF as "Term Loans" under the heading "Type of Loan," this factor focuses on whether the party has a ***right*** to payment of principal plus interest under the agreement, not whether the party expected payment. Moreover, the Payoff Letter clearly evidences the expectation of repayment with interest based on the "not less than" language in reference to the Amendment 8 Tranches. (*Compare* D.I. 17 at 27 with A-190–196). This factor weighs in favor of the Zohar Funds.

Fifth, if the instrument does not give its holder voting rights, then the instrument is more akin to debt than equity. *See Submicron*, 291 B.R. at 324–25. Here, the Amendment 8 Tranches did not give rise to any voting rights in favor of the Zohar Funds. Therefore, the fifth *Submicron* factor also weighs in favor of the Zohar Funds.

The sixth and seventh factors require the Court to evaluate the status of the contribution in relation to regular "corporate contributors" and the certainty of payment in the event of corporation's insolvency or liquidation. *See Submicron*, 291 B.R. at 323. Here, the sixth and seventh *Submicron* factors also tip in favor of the Zohar Funds because the Amendment 8 Tranches

were to be repaid ahead of other "corporate contributors." *Id*. The Amendment 8 Tranches were expressly incorporated into the LVD Credit Agreement and made subject to its terms. (*See* A-683; A-687–88). Accordingly, the Amendment 8 Tranches are senior secured debt, which was to be repaid ahead of LVD's other "corporate contributors" – namely, general unsecured creditors and equity holders – and provided the Zohar Funds with the greatest possible level of certainty of repayment in the event of LVD's insolvency or liquidation.

In sum, a common sense evaluation of the facts and circumstances supports the Bankruptcy Court's determination that the $20 million provided for in Amendment 8 is debt and not equity. The Court finds no clear error in the Bankruptcy Court's determination. *Friedman's,* 452 B.R. at 519.

## IV.     CONCLUSION

The Bankruptcy Court properly interpreted the plain and unambiguous language of the MSA, LVD Credit Agreement, and Amendment 8. A separate Order shall be entered.